1                                VOLUME 1

2                                PAGES 1 - 202

3              UNITED STATES DISTRICT COURT

4             NORTHERN DISTRICT OF CALIFORNIA

5        BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

6   UNITED STATES OF AMERICA,    )
                                 )
7            PLAINTIFF,          )
                                 )
8     VS.                        )   NO. CR 06-0803 SI
                                 )
9   TAMMY A. THOMAS,             )
                                 )   SAN FRANCISCO, CALIFORNIA
10           DEFENDANT.          )   MONDAY, MARCH 24, 2008
    _____)

11

12              **TRANSCRIPT OF TRIAL PROCEEDINGS**

13   **APPEARANCES:**

14   FOR THE GOVERNMENT:      JOSEPH P. RUSSONIELLO
                              UNITED STATES ATTORNEY
15                            150 ALMADEN ROAD, SUITE 900
                              SAN JOSE, CALIFORNIA  95113
16                      BY:  **JEFFREY DAVID NEDROW, ESQUIRE**
                            **MATTHEW A. PARRELLA, ESQUIRE**
17

18   FOR DEFENDANT:          COLEMAN & BALOGH, LLP
                             255 KANSAS STREET, SUITE 340
19                           SAN FRANCISCO, CALIFORNIA  94103
                        BY:  **ETHAN A. BALOGH, ESQUIRE**
20

21

22   **REPORTED BY:   JOAN MARIE COLUMBINI, CSR 5435, RPR**
             OFFICIAL COURT REPORTER, U.S. DISTRICT COURT
23

24

25

1          <u>PROCEEDINGS; MARCH 24, 2008</u>

2

3          **THE CLERK:**  CALLING CRIMINAL 06-803, UNITED STATES

4   VERSUS TAMMY THOMAS.  PLEASE STATE YOUR APPEARANCE FOR THE

5   RECORD.

6          **MR. NEDROW:**  GOOD MORNING, YOUR HONOR.  JEFF NEDROW

7   FOR THE UNITED STATES.

8          **MR. PARRELLA:**  AND MATT PARRELLA.  GOOD MORNING,

9   YOUR HONOR.

10          **THE COURT:**  GOOD MORNING.

11          **MR. BALOGH:**  GOOD MORNING, YOUR HONOR.  ETHAN BALOGH

12   ON BEHALF OF MS. THOMAS.  SHE'S PRESENT.

13          **THE COURT:**  GOOD MORNING.

14          I HAVE ONE QUESTION TO ASK WHILE I'M THINKING OF IT,

15   AND THEN IF THERE'S ANY OTHER HOUSEKEEPING, WE CAN DO IT.

16          I RECEIVED THE GOVERNMENT'S FINAL WITNESS LIST, AND

17   I WANTED TO KNOW IF THERE ARE ANY OTHER NAMES -- WHAT I WILL DO

18   WHEN THE PANEL IS HERE IS READ THE NAMES TO MAKE SURE THEY

19   DON'T KNOW ANY OF THESE FOLKS OR HAVE ISSUES WITH FOLKS.  SO,

20   ARE THERE ANY OTHER NAMES I SHOULD ADD TO THAT WITNESS LIST?

21          **MR. BALOGH:**  I THINK SO.  I WOULD ADD KEVIN RYAN.  I

22   WAS OBVIOUSLY GOING TO ASK ABOUT MR. NEDROW.  I WOULD ADD SUSAN

23   KRIEDER.  I WOULD ADD -- I THINK YOU ARE GOING TO HEAR ABOUT

24   RANDY MONTESANO DURING THIS TRIAL.

25          **THE COURT:**  NO KIDDING?  I'LL PUT THESE NAMES ON,

PROCEEDINGS

```
 1   WITHOUT PREJUDICE TO CONSIDERING WHETHER ANY OF THESE ACTUALLY

 2   GETS CALLED AS A WITNESS, BUT I'LL PUT THE NAMES ON --

 3             MR. BALOGH:  WHETHER THEY ARE CALLED AS A WITNESS

 4   WON'T NECESSARILY AFFECT THE NAMES, RATHER, WHETHER A JUROR

 5   KNOWING THESE PEOPLE MIGHT AFFECT THEIR JUDGMENT OF THE CASE.

 6             THE COURT:  YOU SAID KEVIN RYAN.  WHO ELSE?

 7             MR. BALOGH:  KRIEDER, K AS IN KANGAROO, R-E-I-D-E-R,

 8   AND RANDY MONTESANO.

 9             THE COURT:  ANYBODY ELSE?

10             MR. BALOGH:  NO, I DON'T THINK SO.

11             THE COURT:  ALL RIGHT.  THAT WAS MY QUESTION.  ARE

12   THERE OTHER ISSUES?

13             MR. PARRELLA:  WELL, WE HAVE ONE MATTER, YOUR HONOR.

14   18 USC 3161, SUBDIVISION, I BELIEVE, (C)(2), IT'S REQUIRED THAT

15   THE DEFENDANT CONSENT IN WRITING IF THE TRIAL COMMENCES LESS

16   THAN 30 DAYS FROM THE DATE ON WHICH SHE APPEARED ON THE

17   SUPERSEDING INDICTMENT, AND WE HAD REQUESTED THIS WRITTEN

18   WAIVER FROM DEFENSE, AND I THINK BEFORE WE START THIS IS A GOOD

19   TIME FOR THAT.  I DON'T KNOW IF IT'S PREPARED OR --

20             MR. BALOGH:  I DON'T HAVE A WRITTEN WAIVER.  WHAT I

21   RESPOND TO GOVERNMENT WHEN THEY ASKED ME IS WE'LL PUT THE

22   WAIVER ON THE RECORD.  I DON'T KNOW IF IT'S WRITTEN, BUT

23   HOWEVER WE NEED TO DO IT, WE'LL PUT THE WAIVER ON THE RECORD.

24             OBVIOUSLY, THEY HAVE THE CODE BOOK IN FRONT OF THEM.

25   SO WE CAN DO THAT LATER; WE CAN DO THAT NOW --
```

```
1          THE COURT:  DO YOU HAVE ANY OBJECTION TO IT?

2          MR. BALOGH:  OH, GOD, NO.

3          THE COURT:  HAVE YOU PREPARED ONE --

4          MR. PARRELLA:  NO, WE REQUESTED IT FROM THE DEFENSE.

5          THE COURT:  HOW ABOUT YOU WRITE ONE UP, IF THAT

6  SATISFIES THE WAY YOU SHOULD THINK IT SHOULD READ, AND REQUEST

7  THE DEFENDANT SIGN IT.  I SUGGEST THAT BE DONE BEFORE

8  10:00 O'CLOCK THIS MORNING.  HOW'S THAT?  CAN WE GET GOING?

9          MR. PARRELLA:  YES.

10         MR. NEDROW:  YES.

11         MR. BALOGH:  THAT'S FINE.

12         THE COURT:  YOU AGREE ON YOUR CLIENT'S BEHALF TO

13 WAIVE THE REQUIREMENT THAT SHE BE ALLOWED AT LEAST 30 DAYS

14 AFTER THE SUPERSEDING INDICTMENT.

15         MR. BALOGH:  YES, WE ARE PREPARED TO GO FORWARD.

16         THE COURT:  MS. THOMAS, IS THAT OKAY WITH YOU?

17         THE DEFENDANT:  YES, YOUR HONOR.

18         THE COURT:  WE'LL DO THAT.  IF YOU PREPARE THE

19 WRITTEN WAIVER, SHE'LL SIGN IT.

20         MR. NEDROW:  THANK YOU VERY MUCH, YOUR HONOR.

21         THE COURT:  CAN I -- YOU KNOW, I ALWAYS MESS THIS

22 UP.  IS IT "BALOGH"?

23         MR. BALOGH:  BALOGH, RHYMES WITH SHALLOW.  YOU WON'T

24 FORGET IT AGAIN.

25         I HAD A COUPLE OF ISSUES.  ONE, WE WOULD LIKE TO
```

PROCEEDINGS

1  MAKE A MOTION TO EXCLUDE WITNESSES FROM HEARING THE TRIAL.  ANY

2  WITNESSES THAT ARE GOING TO TESTIFY TO BE EXCLUDED DURING THE

3  PRESENTATION, EITHER OPENING, UNTIL THEY HAVE BEEN DONE AND ARE

4  NOT SUBJECT TO RECALL.

5          **THE COURT:**  THAT WILL BE GRANTED WITH THE EXCEPTION

6  OF EXPERTS.

7          **MR. PARRELLA:**  WITH THE EXCEPTION OF WHAT?

8          **THE COURT:**  EXPERTS.

9          **MR. PARRELLA:**  YOUR HONOR, WE WOULD ASK THE AGENT BE

10 PERMITTED TO STAY.  HE WILL BE TESTIFYING.  WE ASK HE BE ABLE

11 TO STAY.

12         **THE COURT:**  YOU GENERALLY GET ONE REPRESENTATIVE.

13 WILL HE BE IT?

14         **MR. PARRELLA:**  YES.

15         **MR. BALOGH:**  OKAY.  WE WOULD ALSO LIKE AN ORDER THAT

16 THE GOVERNMENT IS BARRED -- ACTUALLY, BOTH SIDES ARE TALKING TO

17 A WITNESS WHILE THE WITNESS IS STILL SUBJECT TO EXAMINATION

18 ABOUT THE SUBJECT OF EXAMINATION.  THE CASE IS *PETE VERSUS*

19 *WILLIAMS*.  I CAN GIVE A CITE IF THE COURT WOULD LIKE IT.

20         **THE COURT:**  IS THERE ANY OBJECTION?

21         **MR. PARRELLA:**  WELL, I DON'T THINK WE SHOULD BE

22 BARRED FROM TALKING TO OUR OWN WITNESSES IF SOMETHING ARISES.

23 I THINK WE COULD TAKE IT ON A WITNESS-BY-WITNESS BASIS.

24         **MR. BALOGH:**  UNDER NINTH CIRCUIT PRECEDENCE, IT'S

25 WITHIN THE DISCRETION OF THE COURT WHEN A WITNESS IS ON

PROCEEDINGS

1   CROSS-EXAMINATION TO BAR EITHER SIDE, EVEN OVERNIGHT, FROM

2   TALKING TO THEIR WITNESS ABOUT THE SUBJECT OF IT.

3          **THE COURT:**  WHEN THE WITNESS IS ON CROSS, IS THAT

4   OKAY FROM YOU?

5          **MR. PARRELLA:**  WHEN THE WITNESS IS ON CROSS?

6          **MR. BALOGH:**  WE DO HAVE A CONCERN, AND I WANT TO

7   MAKE SURE IT'S CLEAR.  I UNDERSTAND THE COURT'S PRETRIAL ORDER

8   TO BE THAT THE USADA EXAMINATION, THE USADA PROCEEDINGS, THAT

9   INFORMATION IS NOT COMING INTO THIS CASE EXCEPT AS IT'S

10  REFLECTED IN THE ACTUAL GRAND JURY TRANSCRIPT OF MS. THOMAS.

11         **THE COURT:**  ON CASE IN CHIEF.

12         **MR. PARRELLA:**  RIGHT.

13         **MR. BALOGH:**  OBVIOUSLY, THE REBUTTAL CASE WILL BE

14  DETERMINED BY THE PRESENTATION WE MAKE.

15         **THE COURT:**  OR CROSS-EXAMINATION.

16         **MR. BALOGH:**  EXACTLY.  MY CONCERN IS THERE'S A --

17  WAS AN ISSUE THAT'S BEEN RAISED BY LAST FRIDAY'S -- SINCE WE

18  WERE HERE, WE HAVE A REVISED EXPERT STATEMENT FROM DR. CATLIN.

19  DR. CATLIN IS PREPARED TO TESTIFY ABOUT WHETHER A CONTRACEPTIVE

20  COULD HAVE CAUSED THE POSITIVE TEST FOR NORBOLETHONE, AND THIS

21  WAS PART OF THE DEFENSE THAT WAS PRESENTED TO THE USADA

22  HEARING.  THAT IS NOT REPRESENTED IN THE GRAND JURY TRANSCRIPT.

23  UNLESS AND UNTIL THAT DOOR IS OPENED, THE SO-CALLED, QUOTE,

24  COVER STORY, UNQUOTE, SHOULD BE EXCLUDED FROM EVIDENCE AS WELL.

25  I THINK IT FITS WITHIN THE PARAMETERS OF THE COURT'S PRETRIAL

PROCEEDINGS

1   ORDER.

2          **THE COURT:**  YOU ARE SAYING THE MORNING-AFTER PILLS

3   WERE NOT IN THE GRAND JURY TRANSCRIPT?

4          **MR. BALOGH:**  A PART OF HOW THEY WERE REQUESTED IN

5   THERE, THERE'S -- WHAT SHE SAYS IN THE GRAND JURY TRANSCRIPT IS

6   THAT WAS PART OF MY USADA DEFENSE.  SHE DOESN'T PRESENT THAT

7   DEFENSE TO THIS GRAND JURY.  THAT DIRECT QUESTION DID NOT COME

8   UP.  SHE WASN'T INQUIRED ABOUT THAT.  SO I DON'T THINK

9   DR. CATLIN SHOULD BE ABLE TO BRING THAT INTO THE DIRECT AND

10  CHIEF TESTIMONY UNLESS AND UNTIL WE BRING IT UP.

11         **MR. PARRELLA:**  WELL, THERE'S A NUMBER OF GROUNDS TO

12  RESPOND ON THAT.  FIRST OF ALL, THAT PARTICULAR ISSUE WAS GONE

13  INTO IN DETAIL IN DR. CATLIN'S USADA HEARING TESTIMONY WHICH

14  WAS DISCLOSED TO THE DEFENSE LONG AGO.  SO, IT HAS NO IMPACT ON

15  ANY EXPERT NOTICE.

16         SECONDLY, AS I STAND HERE, I BELIEVE THAT THE

17  DEFENDANT IN HER OWN GRAND JURY TRANSCRIPT REFERENCES THE BIRTH

18  CONTROL MORNING-AFTER CONTRACEPTIVE PILL, AND IT'S ON PAGE 39.

19  I WON'T READ IT, BUT SHE DOES REFERENCE IT IN SOME DETAIL IN

20  RESPONSE TO A -- IN RESPONSE TO A GRAND JUROR QUESTION.  SO --

21  ADDITIONALLY, THE FACT THAT A --

22         **THE COURT:**  WHAT PAGE DID YOU SAY?  THIRTY-NINE?

23         **MR. PARRELLA:**  THAT IS ON THE THOMAS GRAND JURY

24  TRANSCRIPT AT PAGE 39 OF THE ACTUAL TRANSCRIPT, LINE 19, AND TO

25  THE END OF THE PAGE CARRYING OVER.

PROCEEDINGS

1          **THE COURT:**  I SEE IT IN HERE.

2          MR. BALOGH?

3          **MR. BALOGH:**  YES, IT'S IN THERE.  MY POINT IS WHAT

4  IT'S IN THERE AS IS SAYING, THIS WAS MY DEFENSE BEFORE THE

5  USADA HEARING.

6          **THE COURT:**  THAT'S WHAT THEY SAID FIRST.  THEN SHE

7  WENT ON AND SAID MORE ON PAGE 39.

8          **MR. BALOGH:**  SHE SAID SHE WAS TAKING CONTRACEPTIVE.

9  BUT SHE DIDN'T SAY THAT WAS --

10         **THE COURT:**  AND THAT CHEMICAL STRUCTURE OF THE

11  EMERGENCY CONTRACEPTIVE WAS ALMOST IDENTICAL TO THE CHEMICAL

12  STRUCTURE I HAVE BEEN ACCUSED OF TAKING, AND I HAVE AN EXPERT

13  OPINION ABOUT WHAT HAPPENED.  IT SEEMS TO ME SHE PUT IT IN

14  THERE.

15         **MR. BALOGH:**  MY OBJECTION IS MADE.  I THINK THE

16  CONTEXT WILL SHOW WHAT SHE JUST SAID IS ABSOLUTELY TRUE ON ITS

17  FACE.  IT IS ACTUALLY DUE TO CHEMICAL STRUCTURE, AND IT WAS

18  REPRESENTED IN THE USADA HEARING.  MY POINT IS SHE DIDN'T

19  PRESENT THAT, THE STATEMENT YOU JUST READ, TO THIS GRAND JURY

20  AS A BASIS WHY NORBOLETHONE ENDED UP IN HER URINE.

21         **THE COURT:**  YOUR POINT IS MADE.

22         **MR. BALOGH:**  LAST WEEK WE WERE BLESSED WITH ABOUT

23  50,000 PAGES OR 40,000 PAGES OF DISCOVERY, AND, BASED ON THAT

24  BLESSING, WE DID NOT HAVE THE OPPORTUNITY TO MEET AND CONFER

25  ABOUT HOW TO DEAL WITH THE GRAND JURY TRANSCRIPT, WHICH IS ONE

```
 1   OF THE THINGS YOUR HONOR ORDERED US TO DO.  I APOLOGIZE FOR

 2   THAT.

 3           WE WERE, I THINK BOTH SIDES, DILIGENT ABOUT GETTING

 4   THE DISCOVERY AND THE DEFENSE TRYING TO SYNTHESIZE IT IN THAT

 5   EIGHT-DAY TIMEFRAME SO WHAT I WOULD ASK THE COURT TO DO IS NOW,

 6   AS AN UNRESOLVED ISSUE BEFORE TRIAL BEGINS, IS AT THIS POINT WE

 7   WOULD ASK FOR THE COURT TO ENTER AN ORDER THAT THE GRAND JURY

 8   TRANSCRIPT WILL ONLY BE READ TO THEM.  AND IF IT IS GOING TO

 9   BECOME A TRAIL EXHIBIT, THAT IS SOMETHING WE COULD DEAL WITH AT

10   THE END OF TRIAL.

11           THE COURT:  I'M CONTENT TO ORDER THAT NOW.

12           MR. PARRELLA:  NO PROBLEM.

13           MR. BALOGH:  I ALSO UNDERSTAND FROM THE GOVERNMENT'S

14   PRESENTATION TO ME THAT MY CLIENT HAS NO PRIOR CRIMINAL

15   CONDUCT, AND AS FAR AS OUR 404 ORDER, I WANT TO BE CLEAR THAT

16   THERE'S GOING TO BE NO EVIDENCE OF ANY OTHER MISCONDUCT BUT THE

17   CHARGES SHE'S ON TRIAL FOR HERE.

18           MR. PARRELLA:  THAT'S CORRECT.

19           MR. BALOGH:  WE'VE RECEIVED FROM THE GOVERNMENT A

20   DECLARATION BY WHICH THEY INTEND TO OFFER THE CHECKS THAT WERE

21   WRITTEN TO PATRICK ARNOLD.  I WOULD ASSUME THAT MR. ARNOLD

22   WOULD HAVE BEEN THE WITNESS TO AUTHENTICATE HIM.  TO THE EXTENT

23   THE GOVERNMENT IS GOING TO RELY ON -- THEY PROVIDED A

24   DECLARATION ON FRIDAY PURSUANT TO RULE 902.  WE THINK THE

25   DECLARATION IS INSUFFICIENT.  SO AT THE TIME, IF THEY DO TENDER
```

1   THIS DECLARATION AS THE BASIS FOR THOSE CHECKS' AUTHENTICATION,

2   WE WILL HAVE AN OBJECTION, AND THE COURT SHOULD ADDRESS IT AT

3   WHATEVER APPROPRIATE TIME IT BELIEVES.

4           I ALSO HAVE TENDED TO THE GOVERNMENT A FORM OF

5   VERDICT WHICH WE ARE WAITING FOR THE SUPERSEDING INDICTMENT

6   BEFORE WE HANDED ONE UP.  I HAVE A COPY OF ORIGINAL FOR THE

7   COURT AND CLERK.

8           AND MY LAST ISSUE FOR MORNING HOUSEKEEPING IS, TO

9   THE EXTENT EITHER PARTY IS INTENDING TO USE DEMONSTRATIVE

10  EXHIBITS IN THE OPENING STATEMENT PART OF THE CASE, THE OTHER

11  SIDE SHOULD BE ALLOWED TO SEE THEM.

12          **MR. PARRELLA:**  YES.

13          **THE COURT:**  YES, THAT IS THE ORDER.

14          YOU ARE GOING TO GIVE AN OPENING?

15          **MR. BALOGH:**  I BELIEVE SO.

16          AND THE ONLY OTHER THING WE HADN'T ADDRESSED, THE

17  COURT DESCRIBED AT THE PRETRIAL CONFERENCE THAT IT WOULD SHARE

18  WITH US THE PRELIMINARY INSTRUCTIONS OR HOW THE COURT WAS GOING

19  TO DESCRIBE THE CASE, GIVEN SOME OF THE SENSITIVITIES OF THE

20  PRETRIAL RULINGS AND THE NARROWNESS AND BROADNESS OF THIS CASE.

21  IF WE COULD HAVE THAT OPPORTUNITY THIS MORNING, I'D APPRECIATE

22  IT.

23          **THE COURT:**  I TELL YOU WHAT NOW WHAT I'M PLANNING TO

24  TELL THEM IN TERMS OF THE INSTRUCTION, THE PRELIMINARY

25  INSTRUCTIONS, WHICH IS JUST TO TELL THEM -- AND THIS IS THE

PROCEEDINGS

```
 1  STANDARD NINTH CIRCUIT INSTRUCTION 1.2, THE PRELIMINARY

 2  INSTRUCTION, WHICH STARTS OFF BY SAYING, THIS IS A CRIMINAL

 3  CASE BROUGHT BY THE UNITED STATES GOVERNMENT; THE INDICTMENT

 4  CHARGES SIX COUNTS AGAINST THE DEFENDANT; THE INDICTMENT IS

 5  SIMPLY A DESCRIPTION OF THE CHARGES MADE BY THE GOVERNMENT

 6  AGAINST THE DEFENDANT; IT IS NOT EVIDENCE OF ANYTHING; THE

 7  INDICTMENT CHARGES FIVE COUNTS OF 18 USC SECTION 1623(A), WHICH

 8  IS FALSE DECLARATIONS BEFORE A GRAND JURY AND ONE COUNT OF 18

 9  USC SECTION 1503, WHICH IS OBSTRUCTION OF JUSTICE; THE

10  DEFENDANT HAS PLEADED NOT GUILTY, AND SHE'S PRESUMED INNOCENT.

11          SO THAT'S -- I AM NOT GOING TO BE MUCH MORE COMPLETE

12  THAN THAT.

13          I HAVE PLANNED DURING THE VOIR DIRE PROCESS TO TELL

14  THEM ALSO THAT IT'S A CRIMINAL MATTER AND IT'S FALSE

15  STATEMENTS, FALSE DECLARATIONS BEFORE A GRAND JURY, AND

16  OBSTRUCTION, AND I'M GOING TO SAY IT INVOLVES THAT -- THE

17  QUESTIONS INVOLVE THE USE OF STEROIDS IN ATHLETICS, BUT THEY

18  WILL NOT BE CALLED UPON TO -- IT WILL NOT -- THEY WILL NOT BE

19  ASKED TO EXPRESS A VIEW ON WHETHER STEROIDS ARE A GOOD OR BAD

20  THING OR WHETHER ATHLETICS SHOULD OR SHOULD NOT HAVE STEROIDS;

21  THIS IS MERELY A QUESTION OF FALSE STATEMENTS BEFORE A GRAND

22  JURY.  SO I DID PLAN TO INJECT THAT.

23          I DON'T THINK WE NEED TO WORRY ABOUT WHETHER THERE

24  ARE OPINIONS ON HOW ATHLETICS OUGHT TO BE RUN, BUT, RATHER, LET

25  THEM KNOW IT'S ONLY JUST A MATTER OF THE FALSE STATEMENTS.
```

PROCEEDINGS

1           **MR. BALOGH:**  AND THE SUBJECT MATTER -- THAT SUBJECT

2  MATTER IS FAIR GAME FOR VOIR DIRE.  WE ARE ENTITLED TO INQUIRE

3  ABOUT THAT TO ENSURE THAT WE HAVE JURORS WHO DON'T HAVE

4  PARTICULARLY STRONG OPINIONS ONE WAY OR THE OTHER.

5           **THE COURT:**  AS I TOLD YOU, YOU ONLY HAVE 30 MINUTES.

6  IT'S NOT A WHOLE LOT OF TIME.  BUT, YES, YOU MAY INQUIRE ABOUT

7  THAT.

8               **MR. PARRELLA:**  THANK YOU.

9           **THE COURT:**  IS THERE ANYTHING ELSE BY WAY OF

10 HOUSEKEEPING?

11              **MR. PARRELLA:**  NO, YOUR HONOR.

12          **THE COURT:**  THE JURY COMMISSIONER HAS BEEN EXTREMELY

13 HELPFUL.  WE ARE GOING TO HAVE 71, I THINK, TO START WITH,

14 WHICH IS A LARGER NUMBER THAN WE MIGHT ORDINARILY HAVE.  THIS

15 WAY, IF THERE ARE HARDSHIPS, WE CAN BE RELATIVELY COOPERATIVE

16 WITH PEOPLE, AND WE WILL GO AS QUICKLY AS I CAN.

17              AS I NOTED FROM OUR LAST CONVERSATION AT THE

18 PRETRIAL CONFERENCE, YOU ESTIMATED IT WILL BE EIGHT DAYS OR

19 LESS TO TRY THIS CASE, WHICH IS GOOD, BECAUSE THAT'S HOW MUCH

20 TIME THE COURT HAS.  SO I WANT TO MAKE SURE WE PROCEED AS

21 EFFICIENTLY AS WE CAN.

22          **MR. BALOGH:**  YES, YOUR HONOR.

23          **MR. NEDROW:**  THANK YOU VERY MUCH.

24          (THE POTENTIAL JURORS ENTERED THE COURTROOM.)

25          **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN, AND

1   WELCOME.  MY NAME IS SUSAN ILLSTON, AND I'M THE JUDGE WHO WILL

2   BE PRESIDING OVER THE CASE WHICH WILL TAKE PLACE IN THIS ROOM

3   FOR THE NEXT COUPLE OF WEEKS.

4           FIRST, LET ME TELL YOU, THANK YOU.  WE ARE VERY

5   GRATEFUL THAT YOU ARE HERE.  I KNOW YOU DID NOT VOLUNTEER TO

6   COME HERE, BUT WE ARE APPRECIATIVE THAT YOU ARE.  YOU ARE ABOUT

7   TO PARTICIPATE, THOSE OF YOU WHO ARE SELECTED, IN ONE OF THE

8   MOST IMPORTANT THINGS A CITIZEN CAN DO IN THIS COUNTRY, WHICH

9   IS SIT ON A JURY AND ASSIST US IN THE ADMINISTRATION OF JUSTICE

10  IN THIS BUILDING.  SO WE ARE VERY GRATEFUL THAT YOU ARE HERE.

11          FIRST LET ME TELL YOU THIS:  WE ARE HERE TO SELECT

12  14 JURORS.  SO YOU CAN SEE THAT MANY OF YOU WILL NOT BE CHOSEN.

13  I JUST WANTED TO GET THAT ON THE TABLE RIGHT OFF THE BAT.

14          NOW, LET ME TELL YOU WHAT WE WILL DO FOR THE NEXT

15  FEW MINUTES.  FIRST I WILL TELL YOU A LITTLE BIT ABOUT THE

16  CASE, AND I WILL TELL YOU HOW LONG WE EXPECT IT TO BE, AND I

17  WILL ASK ABOUT HARDSHIPS.  THEREAFTER, WE WILL ASK MORE -- I

18  WILL ASK MORE GENERAL QUESTIONS TO ALL OF YOU TO FIND OUT IF

19  THERE ARE ANY REASONS WHY IT WOULD BE INAPPROPRIATE FOR YOU TO

20  SIT AS JURORS.

21          AFTER I'VE FINISHED WITH THAT PROCESS, THE LAWYERS

22  WILL HAVE THE OPPORTUNITY TO ASK YOU A FEW QUESTIONS.  I HAVE

23  LIMITED THE AMOUNT OF TIME THEY HAVE TO SPEND WITH YOU.  THEY

24  WOULD LOVE TO SPEND THE NEXT COUPLE OF WEEKS ASKING YOU

25  QUESTIONS, BUT THEY WON'T HAVE THAT OPPORTUNITY.  IT WILL BE

1  MORE LIMITED THAN THAT.  THEREAFTER, WE'LL HAVE SOME PAPERWORK

2  TO DO, AND WE WILL SELECT THE JURY.  AS I SAY, WE WILL BE

3  SELECTING A JURY OF 14 PEOPLE.

4          FIRST LET ME TELL YOU, WE ARE EXPECTING THIS TRIAL

5  WILL TAKE THIS WEEK AND NEXT WEEK.  IT IS POSSIBLE THAT IT

6  WOULD SLIP OVER TO THE WEEK AFTER THAT, MAYBE FOR A DAY, BUT

7  WE'RE EXPECTING, REALLY, THAT IT WILL BE COMPLETED --

8  THE EVIDENCE PART WILL BE COMPLETED THIS WEEK AND NEXT WEEK.

9          WE SIT MONDAY THROUGH THURSDAY.  WE DON'T HAVE JURY

10  TRIALS ON FRIDAY, ALTHOUGH, IF A JURY IS OUT DELIBERATING, IT'S

11  FREE TO CONTINUE DELIBERATING FRIDAYS, BUT I HAVE OTHER CASES

12  THAT I HEAR IN THE COURT ON FRIDAYS.  SO WE DON'T HAVE JURY

13  TRIALS ON FRIDAYS.  SO IT WOULD BE MONDAY THROUGH THURSDAY NEXT

14  WEEK AND THE NEXT WEEK.

15          WE GO 8:30 IN THE MORNING UNTIL 3:30 IN THE

16  AFTERNOON.  WE HAVE A BRIEF BREAK IN THE MORNING AND AFTERNOON,

17  AND WE HAVE ABOUT 30 MINUTES FOR LUNCH EVERY DAY.  THIRTY

18  MINUTES FOR LUNCH EVERY DAY IS ENOUGH FOR YOU TO GET SUSTENANCE

19  AND KEEP BODY AND SOUL TOGETHER.  IT'S NOT ENOUGH TO GO OUT FOR

20  A NICE LUNCH.  THE TRADEOFF IS YOU GET TO LEAVE AT 3:30.  THAT

21  WILL BE THE SCHEDULE.

22          MY FIRST QUESTION TO ALL OF YOU IS:  ARE THERE ANY

23  OF YOU FOR WHOM SITTING FOR THAT PERIOD OF TIME AND ON THAT

24  SCHEDULE WOULD AMOUNT TO A SUBSTANTIAL HARDSHIP?  I DON'T MEAN

25  AN INCONVENIENCE, BECAUSE IT WILL INCONVENIENCE ALL OF YOU.  WE

1   RECOGNIZE THAT.  BUT IF IT'S THE KIND OF HARDSHIP THAT WOULD

2   MAKE IT DIFFICULT FOR YOU TO EVEN CONCENTRATE ON THIS CASE,

3   THAT'S WHAT I WANT TO KNOW ABOUT.  THOSE OF YOU WHO FEEL THAT

4   WAY, RAISE YOUR HAND.  I WILL TRY TO KEEP YOUR ANSWERS IN ORDER

5   AS BEST WE CAN SO WE CAN KEEP TRACK OF YOU.  WE WILL GET TO

6   EVERYONE.

7            RAISE YOUR HAND RIGHT NOW, AND TELL ME IF THAT'S THE

8   KIND OF HARDSHIP FOR YOU.  NOW IS THE TIME TO TELL ME.

9   TOMORROW WOULD BE A BAD TIME TO TELL ME.  RAISE YOUR HAND IF

10  YOU FEEL IT IS THAT KIND OF HARDSHIP.

11           FIRST, TELL ME YOUR NAME.  EVERYBODY NEEDS TO SPEAK

12  REALLY LOUD.  THIS ROOM ECHOES.  TELL ME WHAT THE PROBLEM IS.

13           **PROSPECTIVE JUROR ZHAO:**  MY NAME IS ANNA ZHAO.  I'M

14  SORRY.  I GOT COLD.  MY NAME IS ANNA ZHAO.  AND DURING THE

15  SCHEDULE I HAVE, LIKE, THE WEEKDAYS, I DO HAVE SOME SHOP TO

16  RUNNING, HAVE TO WORK EVERY DAY.

17           **THE COURT:**  YOU WORK?

18           **PROSPECTIVE JUROR ZHAO:**  YES.

19           **THE COURT:**  WHERE DO YOU WORK?

20           **PROSPECTIVE JUROR ZHAO:**  I WORK CITY OF RICHMOND.

21           **THE COURT:**  IN RICHMOND?

22           **PROSPECTIVE JUROR ZHAO:**  YES, THE EAST BAY,

23  RICHMOND.

24           **THE COURT:**  WHAT DO YOU DO?

25           **PROSPECTIVE JUROR ZHAO:**  I DO, LIKE, RETAIL CANDY

1  SHOP.

2          **THE COURT:**  ALL RIGHT.  YOU ARE AN EMPLOYEE THERE?

3          **PROSPECTIVE JUROR ZHAO:**  YEAH.

4          **THE COURT:**  WILL THEY PAY YOU IF YOU ARE DOING -- IF

5  YOU ARE ON JURY DUTY, WILL YOU STILL GET PAID?

6          **PROSPECTIVE JUROR ZHAO:**  I AM THE OWNER.

7          **THE COURT:**  YOU OWN THE SHOP?

8          **PROSPECTIVE JUROR ZHAO:**  YES.

9          **THE COURT:**  DO YOU HAVE ANYBODY WHO WORKS WITH YOU

10  IN THE SHOP?

11          **PROSPECTIVE JUROR ZHAO:**  NO, JUST BY MYSELF.

12          **THE COURT:**  SO, IF YOU ARE NOT THERE, DO YOU HAVE TO

13  CLOSE THE SHOP?

14          **PROSPECTIVE JUROR ZHAO:**  YEAH.

15          **THE COURT:**  I SEE.  ALL RIGHT.  THANK YOU.

16          NEXT PROBLEM IN THE BACK.

17          **PROSPECTIVE JUROR JAMES:**  NORALAINE JAMES.

18          **THE COURT:**  YES.

19          **PROSPECTIVE JUROR JAMES:**  I'M OKAY WITH TWO WEEKS,

20  BUT IF IT GOES BEYOND TWO WEEKS, MY EMPLOYER WON'T PAY ME.  SO

21  I'M OKAY WITH TWO WEEKS AS LONG AS IT DOESN'T GO BEYOND.

22          **THE COURT:**  SO YOU ONLY GET PAID FOR TWO WEEKS; IS

23  THAT WHAT YOU'RE SAYING?

24          **PROSPECTIVE JUROR JAMES:**  YES.

25          **THE COURT:**  ALL RIGHT.  ALL RIGHT.  NEXT HAND.  YES,

1   MA'AM.

2           **PROSPECTIVE JUROR TEAL:**  IT'S JUST THE POSSIBILITY

3   OF THE THIRD WEEK, BY -- LET'S SEE.  I HAVE PLANS TO FLY DOWN

4   TO PALM SPRINGS AND TAKE CARE OF A GRANDCHILD FOR A WEEK, AND I

5   WAS GOING TO LEAVE ON THE 12TH, BUT IT COULD BE THE 13TH, AND

6   SO THAT'S LIKE THURSDAY, FRIDAY OF THAT THIRD WEEK.  IT'S

7   JUST --

8           **THE COURT:**  THAT SHOULD BE NO PROBLEM.

9           **PROSPECTIVE JUROR TEAL:**  OKAY.

10          **THE COURT:**  AS I SAY, THE JURIES ARE FREE TO

11  DELIBERATE ON FRIDAYS, SO WE WOULD HAVE THAT FRIDAY OF NEXT

12  WEEK AVAILABLE.

13          NEXT HAND.  YES, MA'AM.  TELL ME YOUR NAME.

14          **PROSPECTIVE JUROR GOMES:**  NATALYA GOMES.

15          **THE COURT:**  AND THE PROBLEM?

16          **PROSPECTIVE JUROR GOMES:**  I HAVE TWO SMALL CHILDREN.

17  THEY ARE ON SPRING BREAK RIGHT NOW.  I WAS GOING TO WATCH THEM.

18  AND, ALSO, I DRIVE THEM TO SCHOOL EVERY MORNING, AND I'M THE

19  ONLY PERSON WHO CAN DO IT.

20          **THE COURT:**  WHAT ABOUT DURING SPRING BREAK, DO YOU

21  HAVE ANY CHILDCARE?

22          **PROSPECTIVE JUROR GOMES:**  I WAS PLANNING TO WATCH

23  THEM.

24          **THE COURT:**  HOW OLD ARE THEY?

25          **PROSPECTIVE JUROR GOMES:**  EIGHT AND FIVE.

```
 1              THE COURT:  ALL RIGHT.  THANK YOU.

 2              NEXT HAND.  YES.

 3              PROSPECTIVE JUROR STREET:  JOSEPH STREET, AND I AM A

 4    FULL-TIME GRADUATE STUDENT.  AS IT TURNS OUT, I'M ON BREAK THIS

 5    WEEK.  NEXT WEEK, IF I SERVE ON THE JURY, I WILL BE MISSING MY

 6    CLASSES.

 7              THE COURT:  WHERE ARE YOU IN SCHOOL?

 8              PROSPECTIVE JUROR STREET:  STANFORD.

 9              THE COURT:  WHAT DAYS A WEEK DO YOU HAVE COURSES?

10              PROSPECTIVE JUROR STREET:  IT WOULD BE MONDAY,

11    WEDNESDAY, FRIDAY.

12              THE COURT:  I COULDN'T HEAR YOU.

13              PROSPECTIVE JUROR STREET:  SORRY.  MONDAY,

14    WEDNESDAY, FRIDAY.

15              THE COURT:  ALL RIGHT.  THANK YOU.

16              NEXT HAND.

17              PROSPECTIVE JUROR HOYT:  MY NAME IS CECILIA HOYT.  I

18    WORK FOR WASHINGTON MUTUAL.  IN THE GROUP I'M IN, WE'VE HAD

19    SIGNIFICANT LAYOFFS OVER THE LAST COUPLE OF WEEKS.  I'M KIND OF

20    THE LAST MAN STANDING.  I COULD DO IT.  I COULD DO THE TWO

21    WEEKS, BUT IT WOULD BE A HARDSHIP FOR MY GROUP AND MY

22    MANAGEMENT.

23              THE COURT:  THANK YOU.

24              NEXT.  YES, MA'AM.

25              PROSPECTIVE JUROR MAC LEOD:  MY NAME IS SUSAN
```

1  MAC LEOD.  I WORK FOR A SMALL E-LEARNING COMPANY IN LARKSPUR,

2  AND THEY WILL PUT ME ON UNPAID LEAVE IF I'M ON TRIAL.

3          **THE COURT:**  THEY WON'T PAY YOU FOR JURY DUTY?

4          **PROSPECTIVE JUROR MAC LEOD:**  NO.

5          **THE COURT:**  WHAT IS THE NAME OF THE COMPANY?

6          **PROSPECTIVE JUROR MAC LEOD:**  CUBE LEARNING.

7          **THE COURT:**  ALL RIGHT.  THANK YOU.

8          YES, MA'AM.

9          **PROSPECTIVE JUROR CHICKERING ALLEN:**  MELANI

10 CHICKERING ALLEN, AND I JUST HAVE THIS BUG THAT'S BEEN GOING

11 AROUND, AND I JUST FEEL REALLY BAD.

12         **THE COURT:**  ALL RIGHT.  I'LL EXCUSE YOU RIGHT NOW.

13 YOU CAN JUST TAKE OFF.

14         **PROSPECTIVE JUROR CHICKERING ALLEN:**  I THINK

15 EVERYBODY WOULD BE PRETTY UNCOMFORTABLE WITH ME.

16         **THE COURT:**  THANK YOU VERY MUCH.  YOU NEED TO GO

17 BACK TO THE JURY ROOM AND TELL THEM I LET YOU GO.  I DON'T WANT

18 TO GET ANY OTHER SICKNESSES FROM HERE ON OUT.

19         YES, SIR.

20         **PROSPECTIVE JUROR MOORE:**  MY NAME IS MATTHEW MOORE,

21 AND I OWN A SMALL CONSTRUCTION COMPANY.  AND IF I'M NOT THERE,

22 WORK DOESN'T HAPPEN.  I DON'T SHUT THE DOORS, BUT ...

23         **THE COURT:**  WHERE IS IT LOCATED?

24         **PROSPECTIVE JUROR MOORE:**  HEALDSBURG, CALIFORNIA.

25         **THE COURT:**  THANK YOU, SIR.

```
 1              IN THE WHITE TOP, SIR.

 2              PROSPECTIVE JUROR MARCHESE:  MY NAME IS JARED

 3    MARCHESE.  I'M A FULL-TIME STUDENT AT THE COLLEGE OF MARIN.  I

 4    GO TO SCHOOL MONDAY THROUGH THURSDAY.

 5              THE COURT:  ARE YOU ON SPRING BREAK THIS WEEK?

 6              PROSPECTIVE JUROR MARCHESE:  I'M NOT.

 7              THE COURT:  WHAT ARE YOU STUDYING?

 8              PROSPECTIVE JUROR MARCHESE:  I'M TAKING GENERAL

 9    EDUCATION.

10              THE COURT:  THANK YOU, SIR.

11              NEXT HAND, I GUESS.

12              PROSPECTIVE JUROR WINTON-HENRY:  MY NAME IS STEPHEN

13    WINTON-HENRY.  I'M A HOSPICE CHAPLIN FOR SUTTER HOSPICE.  MY

14    COMPANY WILL PAY ME BUT I'M CONCERNED ABOUT THE PATIENTS AND

15    FAMILIES THAT I SERVE.

16              THE COURT:  ALL RIGHT.  THANK YOU, SIR.

17              YES, SIR.  NEXT HAND.

18              PROSPECTIVE JUROR PONTES:  MY NAME IS JOE PONTES.  I

19    HAVE A MEDICAL CONDITION.  I'M ON A LOT OF MEDICATION.  IT

20    DOESN'T ALLOW ME TO GO FOR VERY LONG PERIODS OF TIME.

21              THE COURT:  ALL RIGHT.  I'LL MENTION THIS RIGHT NOW

22    FOR YOUR BENEFIT, BUT ALSO FOR THE BENEFIT OF ANYBODY ELSE WHO

23    IS CONCERNED.  WE HAVE A BREAK ABOUT EVERY HOUR AND A HALF

24    ROUGHLY.  IF PEOPLE NEED A BREAK MORE OFTEN THAN THAT, WE WILL

25    ALWAYS BE WILLING TO TAKE A RECESS IN ADDITION.
```

1          SOMETIMES PEOPLE HAVE BACK ISSUES AND IT'S DIFFICULT

2     FOR THEM TO SIT FOR LONG PERIODS OF TIME.  IF SO, THERE'S NO

3     PROBLEM.  WE CAN PUT YOU IN THE BACK ROW, AND YOU CAN STAND

4     WHEN YOU NEED TO STAND.  SO I JUST WANTED TO GET THAT OUT ON

5     THE TABLE.

6          HAVING SAID THAT, SIR, DO YOU THINK YOU COULD SIT IF

7     WE HAD BREAKS THAT OFTEN?

8          **PROSPECTIVE JUROR PONTES:**  I HAVE TO GO TO THE

9     BATHROOM.

10          **THE COURT:**  MORE THAN, SAY, ONCE AN HOUR?

11          **PROSPECTIVE JUROR PONTES:**  YEAH.

12          **THE COURT:**  OKAY.  THANK YOU, SIR.

13          NEXT HAND.  YES, MA'AM.

14          **PROSPECTIVE JUROR OAKLEY:**  MY NAME IS CAROL OAKLEY,

15     AND I WORK FOR A -- AS AN EYE DOCTOR, AND I WILL NOT -- I DON'T

16     GET PAID FOR BEING HERE.  PLUS, I'M HIS ASSISTANT, AND TO BE

17     GONE FOR TWO WEEKS WOULD BE A HARDSHIP.

18          **THE COURT:**  SO YOU DON'T GET PAID IF YOU ARE ON JURY

19     DUTY?

20          **PROSPECTIVE JUROR OAKLEY:**  NO.

21          **THE COURT:**  ALL RIGHT.  THANK YOU.

22          I GUESS THE NEXT PERSON.  YES, SIR.

23          **PROSPECTIVE JUROR WAY:**  MY NAME IS HUNG WAY.  I AM

24     INDIVIDUAL CONTRACTOR.

25          **THE COURT:**  I COULDN'T HEAR YOU, SIR.  WE HAVE A

```
1    MICROPHONE THAT WORKS SOMEWHAT.

2              PROSPECTIVE JUROR WAY:  MY NAME IS HUNG WAY, AND I'M

3    THE INDIVIDUAL SUBCONTRACTOR.  IF I WON'T WORK, I WON'T GET

4    PAID AT ALL.

5              THE COURT:  THANK YOU.

6              PROSPECTIVE JUROR PEREZ:  MY NAME IS ROBERTO PEREZ.

7    I HAVE TWO JOBS, AND ONE I GET PAID, AND THE OTHER ONE I WON'T

8    GET PAID.  ALSO, I TRY TO DO MY BEST, BUT MY ENGLISH IS NOT

9    REALLY HIGH.

10             THE COURT:  ALL RIGHT.  THANK YOU, SIR.

11             ALL RIGHT.  YES, MA'AM.

12             PROSPECTIVE JUROR DICKINSON:  I'M KAY DICKINSON.

13   I'M A SELF-EMPLOYED REAL ESTATE BROKER.  IF I DON'T WORK,

14   OBVIOUSLY, I DON'T GET PAID EITHER.

15             THE COURT:  ALL RIGHT.  THANK YOU.

16             NEXT HAND.  YES, SIR.

17             PROSPECTIVE JUROR LEVY:  MY NAME IS PHILIPPE LEVY.

18   MY WIFE IS ALREADY ON JURY DUTY IN THE COURT -- I DON'T KNOW --

19   REDWOOD CITY ON A MURDER TRIAL.  AND IF THERE IS AN EMERGENCY,

20   THERE'S NOBODY TO GO GET THE KIDS.

21             THE COURT:  HOW LONG IS HER TRIAL EXPECTED TO TAKE?

22             PROSPECTIVE JUROR LEVY:  SHE IS SUPPOSED TO BE DONE

23   ON MARCH 28TH.

24             THE COURT:  HOW MANY CHILDREN DO YOU HAVE?

25             PROSPECTIVE JUROR LEVY:  TWO CHILDREN.  NINE AND
```

1    SIX.

2              THE COURT:  ALL RIGHT.  THANK YOU.

3              NEXT.

4              PROSPECTIVE JUROR JEW-GOMES:  MIMI JEW-GOMES.  MY

5    FATHER JUST PASSED AWAY, AND HIS FUNERAL IS THIS FRIDAY.

6              THE COURT:  WE WOULD NOT BE SITTING ON FRIDAY.  WE

7    WOULD NOT HAVE COURT ON FRIDAY.  WOULD THAT TAKE CARE OF THAT

8    PROBLEM?

9              PROSPECTIVE JUROR JEW-GOMES:  YES.

10             THE COURT:  OKAY.  THANK YOU.

11             YES, SIR.

12             PROSPECTIVE JUROR JOHNSON:  MY NAME IS KERMIT

13   JOHNSON.  I'M A PSYCHIATRIST.  I WORK IN A SMALL CLINIC IN

14   FREMONT.  I WOULDN'T GET PAID.  BUT, ALSO, THE PATIENTS,

15   THERE'S NO COVERAGE, REALLY.  IT'S SMALL MEDI-CAL CLINIC.  WE

16   SEE PROBABLY 15 PATIENTS A DAY, AND I WORK THREE DAYS A WEEK.

17   FOR THOSE TWO WEEKS THOSE PATIENTS WOULD HAVE TO BE -- THEY

18   WOULD HAVE TO BE RESCHEDULED OR SOMETHING LIKE THAT.

19             THE COURT:  WHAT DAYS A WEEK DO YOU WORK?

20             PROSPECTIVE JUROR JOHNSON:  MONDAY, WEDNESDAY,

21   THURSDAY.

22             THE COURT:  ALL RIGHT.  THANK YOU, SIR.

23             PROSPECTIVE JUROR SCHIMMELS:  MY NAME IS DEBBIE

24   SCHIMMELS.  I HAVE A BAD LEG, SO IT MAKES ME -- I CAN'T SIT FOR

25   A LONG PERIOD OF TIME.  I'M FIDGETY.  I GOT TO SIT AND TURN

```
1    THIS WAY AND THAT WAY.  I'M REAL UNCOMFORTABLE SITTING HERE

2    RIGHT NOW.

3              THE COURT:  THANK YOU.

4              PROSPECTIVE JUROR SCHIMMELS:  UH-HUH.

5              PROSPECTIVE JUROR DELLAFOSSE:  MARIA DELLAFOSSE.  I

6    HAVE THE SAME PROBLEM.  I HAVE A KNEE REPLACEMENT.  IF I SIT

7    FOR TOO LONG, IT STARTS HURTING.

8              THE COURT:  DOES IT HELP YOU IF YOU STAND UP?

9              PROSPECTIVE JUROR DELLAFOSSE:  I'M SORRY?

10             THE COURT:  DOES IT HELP IF YOU STAND UP?

11             PROSPECTIVE JUROR DELLAFOSSE:  IT HELPS, BUT IT

12   STILL HURTS.  IT'S PAINFUL.  ALSO, HAVE BACK PROBLEMS.  I HAVE

13   RHEUMATISM, ARTHRITIS.

14             PROSPECTIVE JUROR HODIL-MUNDY:  I'M CAROL

15   HODIL-MUNDY.  I HAVE A SMALL PAINTING COLOR CONSULTING

16   BUSINESS.  IF I DON'T WORK, THERE'S NO PAY.

17             THE COURT:  WHAT KIND OF PAINTING CONSULTING?

18             PROSPECTIVE JUROR HODIL-MUNDY:  INTERIORS.

19             THE COURT:  DO YOU HAVE AN OFFICE?

20             PROSPECTIVE JUROR HODIL-MUNDY:  IN MY HOME.

21             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

22             PROSPECTIVE JUROR CLEMENTINO:  TINA CLEMENTINO.  I

23   DON'T GET PAID FROM MY EMPLOYER, AND I DO HAVE A TRIP TO NEW

24   YORK ON THE 8TH.  SO TWO WEEKS MIGHT COVER IT, MIGHT NOT.

25             PROSPECTIVE JUROR REGEN:  I THINK MY VOICE CAN
```

1  CARRY.  THIS IS GOING TO BE A QUALIFIED HARDSHIP.

2          **THE COURT:**  I NEED YOUR NAME, THOUGH.

3          **PROSPECTIVE JUROR REGEN:**  SAM REGEN.  I AM IN THE

4  MIDDLE OF CLOSING ON A HOUSE, AND I HAVE TWIN 18-MONTH-OLD

5  DAUGHTERS AND A THREE-YEAR OLD.  I WOULD CLOSE AS EARLY AS THE

6  12TH.  IF THE TRIAL WOULDN'T GO PAST THE 12TH, I WOULD NOT BE

7  CLAIMING A HARDSHIP.  OKAY.

8          **THE COURT:**  OKAY.  THANK YOU.

9          **PROSPECTIVE JUROR WONG:**  MY NAME IS WEE LEE WONG.

10  I'M JUST HOLDING ON TO BE SURE MY EMPLOYER DOESN'T GIVE ME THE

11  PAY FOR THIS ONE.

12          **THE COURT:**  I DIDN'T UNDERSTAND YOU.

13          **PROSPECTIVE JUROR WONG:**  I CAME FROM -- MY ENGLISH

14  IS A LITTLE POOR.  SO MY EMPLOYER DOESN'T GIVE ME FOR --

15          **THE COURT:**  YOU DON'T GET PAID.  NO PAY FOR JURY

16  DUTY.

17          **PROSPECTIVE JUROR WONG:**  YEAH.

18          **THE COURT:**  THANK YOU, SIR.

19          **PROSPECTIVE JUROR TULLY:**  HOW LONG IS THE TRIAL

20  SUPPOSED TO LAST?

21          **THE COURT:**  TWO WEEKS.

22          **PROSPECTIVE JUROR TULLY:**  WHAT ARE THE DATES?

23          **THE COURT:**  FROM TODAY UNTIL THURSDAY, NEXT MONDAY

24  UNTIL THURSDAY.

25          **PROSPECTIVE JUROR TULLY:**  IT WOULD BE ENDED BY THE

1   END OF THE -- BY END OF THE MONTH.

2          **THE COURT:**  YES.  WE ARE EXPECTING IT WILL END BY

3   THE END OF NEXT WEEK, WHICH IS APRIL 4.

4          **PROSPECTIVE JUROR TULLY:**  APRIL WHAT?

5          **THE COURT:**  FOUR.

6          **PROSPECTIVE JUROR LAGUIO:**  MY NAME IS MIYOKO LAGUIO.

7   MY GRANDMOTHER JUST PASSED AWAY ON SATURDAY.  HER VIEWING IS ON

8   WEDNESDAY, AND HER FUNERAL IS ACTUALLY ON THURSDAY.

9          **THE COURT:**  THANK YOU.

10          **PROSPECTIVE JUROR TAYLOR:**  MY NAME IS CECILIA LEIGH

11   TAYLOR.  IT WOULD BE A FINANCIAL HARDSHIP FOR ME.  I JUST

12   BOUGHT A CONDO, AND I NEED MY FULL SALARY.  I DON'T THINK MY

13   EMPLOYER PAYS THE FULL SALARY.  I THINK THEY PAY ME SOME, BUT

14   NOT FOR TWO WEEKS.

15          **THE COURT:**  WHAT'S THE NAME OF YOUR EMPLOYER?

16          **PROSPECTIVE JUROR TAYLOR:**  MCKENNA CAPITAL.

17          **THE COURT:**  CAN YOU FIND OUT?  ON A BREAK, IF YOU

18   WOULD FIND THAT OUT, PLEASE?

19          **PROSPECTIVE JUROR PORTER:**  MY NAME IS PHILLIP

20   PORTER, AND I HAVE A CHRONIC BACK PAIN PROBLEM.  IT'S FAIRLY

21   MINOR, BUT I DO HAVE AN INJECTION PLANNED FOR MONDAY THE 31ST.

22   SO I WOULD HAVE TO MISS THAT AND RESCHEDULE IT.  IT WOULD BE

23   VERY INCONVENIENT FOR ME.

24          **THE COURT:**  WHAT TIME ON THE 31ST?

25          **PROSPECTIVE JUROR PORTER:**  8:30 IN THE MORNING IN

1   WALNUT CREEK.

2           **THE COURT:**  IS THAT IT?  ALL RIGHT.

3               AT THIS POINT, LADIES AND GENTLEMEN, WE ARE GOING TO

4   DO SOMETHING WE WOULD DO FROM TIME TO TIME DURING THE TRIAL FOR

5   THOSE OF YOU WHO ARE CHOSEN FOR THIS TRIAL, AND THAT IS HAVE A

6   SIDEBAR CONFERENCE.  WE TRY TO KEEP THESE CONFERENCES LIMITED

7   BECAUSE WE ARE TALKING OUT OF YOUR PRESENCE.  WE'RE NOT SHARING

8   WITH YOU WHAT'S GOING ON BECAUSE WE DON'T WANT TO WASTE YOUR

9   TIME.

10              THE REASON WE DO IT THIS WAY, OTHERWISE, WE WOULD

11  HAVE TO ASK YOU TO GET UP AND GO BACK TO JURY ROOM, AND IT

12  WINDS UP TAKING MORE TIME.  FROM TIME TO TIME WE DO THIS.

13              THE TRADEOFF IS WHILE WE ARE HAVING A SIDEBAR

14  CONFERENCE, THE JURY IS FREE NOT TO PAY ANY ATTENTION AT ALL.

15  STAND UP, STRETCH, CHAT WITH YOUR NEIGHBORS, AND NOT PAY

16  ATTENTION.

17          **UNIDENTIFIED PROPSECTIVE JUROR:**  ARE WE ALLOWED TO

18  GO TO THE RESTROOM?

19          **THE COURT:**  YOU MAY RIGHT NOW IF YOU JUST GO AND

20  COME RIGHT BACK.  AND THEN SIT IN THE SAME PLACE.

21          **THE CLERK:**  THE SKETCH ARTIST?  YOU NEED TO SIT IN

22  THE FAR BACK AND NOT GET MIXED UP WITH THE JURORS.  THANK YOU.

23              (SIDEBAR DISCUSSION HELD OUT OF THE HEARING OF THE

24              PROSPECTIVE JURY.)

25          **THE COURT:**  THE GENTLEMAN -- TRACY, IS THE GENTLEMAN

```
 1   WHO ASKED ABOUT THE --

 2              THE CLERK:  I COULDN'T --

 3              THE COURT:  WHICH ONE WAS THAT?

 4           MR. BALOGH:  ARTHUR BRENNAN TULLY, NUMBER 44.

 5              THE COURT:  I THINK WE SHOULD EXCUSE HIM.

 6           MR. NEDROW:  YES.

 7              MR. PARRELLA:  WHAT NUMBER IS THAT?

 8              THE CLERK:  FORTY-FOUR.

 9              THE COURT:  FORTY-FOUR.

10           ANNA ZHAO, SHE SOUNDS LIKE SHE OWNS HER OWN SHOP,

11   AND IF SHE'S NOT THERE TO KEEP HER GOING, IT'S CLOSED.  SO I

12   THINK WE SHOULD EXCUSE HER.

13              MR. PARRELLA:  NO OBJECTION.

14              THE COURT:  NORALAINE JAMES, SHE'S ONLY --

15              MR. PARRELLA:  NUMBER SIX.

16              THE COURT:  SHE'S ONLY PAID FOR TWO WEEKS.  I THINK

17   WE SHOULD LEAVE HER ON.

18              MR. BALOGH:  SHE'S FINE.

19              THE COURT:  SUZANNE TEAL, LEAVING ON THE 12TH OR

20   13TH.  I THINK SHE'S FINE, TOO.

21              MR. BALOGH:  FINE.

22              MR. PARRELLA:  WE HAD NUMBER 12, NATALYA GOMES.

23              THE COURT:  UNFORTUNATELY, I HAVE TO GO IN THE ORDER

24   THEY SPOKE, OTHERWISE I'LL GET CONFUSED.

25              GOMES, TWO KIDS, HAS TO DRIVE THEM TO SCHOOL.
```

1   THEY'RE OFF DURING SPRING BREAK, AND SHE DOESN'T HAVE CHILD

2   CARE.  I THINK WE SHOULD EXCUSE HER.

3           **MR. PARRELLA:**  OKAY.

4           **THE COURT:**  STREET, NUMBER 15.  FULL-TIME GRAD

5   STUDENT.  HE'S OFF THIS WEEK AND HAS CLASSES MONDAY, WEDNESDAY,

6   FRIDAY THE FOLLOWING WEEK.

7           **MR. BALOGH:**  WE ALL WENT TO GRAD SCHOOL, AND MISSING

8   A WEEK OF GRAD SCHOOL DOESN'T SEEM LIKE A SUBSTANTIAL HARDSHIP,

9   AND DOING JURY SERVICE IS PRETTY IMPORTANT.  I THINK HE SHOULD

10  STAY THROUGH THE VOIR DIRE PROCESS.

11          **THE COURT:**  WHAT DO YOU THINK?

12          **MR. PARRELLA:**  I THINK IT'S, ON THE HARDSHIP SCALE,

13  VERY LIGHT.

14          **THE COURT:**  LET'S LEAVE HIM ON.

15          THE NEXT ONE IS HOYT, NUMBER 25, CECILIA HOYT.  SHE

16  IS AT WASHINGTON MUTUAL, SHE GETS PAID BUT IT WOULD BE A

17  HARDSHIP FOR HER COMPANY.  I THINK WE SHOULD LEAVE HER ON.

18          **MR. BALOGH:**  I AGREE.

19          **THE COURT:**  MAC LEOD, NUMBER 26, SMALL E-LEARNING

20  COMPANY, NO PAY FOR JURY DUTY.  I THINK WE SHOULD LET HER OFF.

21          **THE CLERK:**  WE ALREADY EXCUSED MS. CHICKERING.

22          **THE COURT:**  CHICKERING?

23          **THE CLERK:**  SHE'S THE SICK ONE.

24          **THE COURT:**  TWENTY-SEVEN, WE EXCUSED HER FOR

25  ILLNESS.

1          THE NEXT ONE --

2          **MR. PARRELLA:**  FRANK MOORE.

3          **THE COURT:**  TWENTY-NINE.  FROM HEALDSBURG, HAD SMALL

4   CONSTRUCTION COMPANY, HARD TO KEEP IT GOING.

5          **MR. PARRELLA:**  I THINK IT'S WHEN THE CAT IS A WAY

6   PROBLEM.

7          **THE COURT:**  RIGHT, AND HEALDSBURG IS ACTUALLY QUITE

8   A DRIVE TO GET HERE BY 8:30.

9          **MR. BALOGH:**  I'M HAPPY TO LET HIM GO.

10         **THE COURT:**  IS THERE ANY OBJECTION?

11         **MR. PARRELLA:**  WE HAVE NO OBJECTION.

12         **THE COURT:**  JARED SOMETHING?

13         **MR. BALOGH:**  MARCHESE.

14         **THE COURT:**  FULL-TIME COLLEGE OF MARIN, GENERAL

15  EDUCATION, STUDENT, MONDAY THROUGH THURSDAY CLASSES.  WHAT DO

16  YOU THINK?

17         **MR. BALOGH:**  I HAD JURY DUTY WHEN I WAS A STUDENT.

18  I THINK IT'S THE TIME OF YOUR LIFE TO ACTUALLY LEARN TO BE A

19  CITIZEN.  I DON'T THINK IT'S A VERY -- HARDSHIP.  IT'S NOT THE

20  FINANCIAL OBLIGATIONS TO A FAMILY, I GUESS.  ALL OF US MISSED

21  LOTS OF CLASSES AND MANAGED TO MAKE IT THROUGH.  MR. MARCHESE

22  CAN PROBABLY MANAGE IT FOR TWO WEEKS.

23         **MR. PARRELLA:**  THIS INDIVIDUAL IS HIGHER ON THE

24  HARDSHIP SCALE THAN THE PRIOR STUDENT.  HE HAS CLASSES EVERY

25  DAY, AND HE'S NOT ON SPRING BREAK.  I THINK HE DOES MEET THE

1    STANDARD.

2              **THE COURT:**  I'M A LITTLE TORN ABOUT HIM.  I AGREE

3    WITH MR. PARRELLA.  THIS IS MORE SO THAN THE GRAD STUDENT WAS.

4    TWO FULL WEEKS OF MISSING CLASSES IS PRETTY SIGNIFICANT.  I

5    THINK WE SHOULD EXCUSE HIM.  DO YOU HAVE A SERIOUS OBJECTION?

6              **MR. BALOGH:**  OH, NO.

7              **THE COURT:**  STEVE --

8              **THE CLERK:**  WE PROBABLY --

9              STEPHEN WINTON-HENRY.

10             **THE COURT:**  THIS IS THE HOSPICE CHAPLIN.  I

11   APPRECIATE HIS SENSITIVITIES, BUT I DON'T THINK WE SHOULD

12   EXCUSE HIM.

13             **MR. PARRELLA:**  THAT'S FINE.

14             **MR. BALOGH:**  THAT'S FINE.

15             **THE COURT:**  OKAY.

16             JOE.

17             **THE CLERK:**  PONTES.

18             **THE COURT:**  WHAT NUMBER IS HE?

19             **THE CLERK:**  NUMBER 38.

20             **MR. PARRELLA:**  HE HAD A MEDICAL CONDITION.  HE

21   SEEMED TO BE PRETTY UNCOMFORTABLE.

22             **THE COURT:**  I THINK WE SHOULD LET HIM GO.

23             CAROL OAKLEY, 43.  SHE WORKS FOR AN EYE DOCTOR, NO

24   PAY FOR JURY DUTY.  SHE'S THE ONLY EMPLOYEE.  I THINK WE HAVE

25   TO LET HER GO.

```
 1            MR. PARRELLA:  I THINK WE DO, TOO.  SHE'S ALSO
 2   COMING FROM SANTA ROSA.
 3            THE COURT:  ON HUNG WAY, NUMBER 45, IS THAT HIM?  HE
 4   DOESN'T GET PAID IF HE DOESN'T WORK.  I THINK WE SHOULD LET HIM
 5   GO.
 6            ROBERTO PERES.
 7            THE CLERK:  THAT'S THE ONE THAT GOES BACK, BACK TO
 8   35.
 9            THE COURT:  TWO JOBS, ONE PAYS, ONE DOES NOT;
10   ENGLISH NOT GREAT.  I THINK WE SHOULD LET HIM GO.
11            MR. BALOGH:  I AGREE.
12            THE CLERK:  KAY DICKINSON, SHE'S NUMBER --
13            MR. BALOGH:  FORTY-SIX.
14            THE CLERK:  FORTY-SIX.
15            THE COURT:  KAY DICKINSON, SELF-EMPLOYED REAL
16   ESTATE.  SO, OBVIOUSLY, IF SHE DOESN'T WORK SHE DOESN'T GET
17   PAID.  WHAT DO YOU THINK?
18            MR. BALOGH:  I DON'T THINK IT'S A REAL HARDSHIP
19   EXCUSE.  AT THE SAME TIME, I THINK THE MARKET IS REALLY TOUGH
20   SO SHE'S IN A PLACE WHERE SHE'S PROBABLY HUSTLING AND TAKING
21   TIME OUT.  SHE'S PROBABLY NOT GOING TO MAKE ANY MONEY ANYWAY.
22   SHE MAY BE IN A PLACE WHERE SHE FEELS LIKE SHE'S TRYING TO.
23   IT'S NOT A REAL GOOD TIME TO BE A REAL ESTATE.  I AM FINE TO --
24            MR. PARRELLA:  I PRETTY MUCH AGREE WITH THAT.  I
25   THINK IT MIGHT BLEED OVER IN HER ABILITY TO FOCUS ON THE TRIAL.
```

```
 1             THE COURT:  BASED ON THAT THEN, I WILL EXCUSE HER.

 2   OTHERWISE, I WOULDN'T HAVE.

 3             PHILIPPE LEVY, WIFE ON JURY DUTY IN A MURDER TRIAL,

 4   GOING UNTIL MARCH 28TH, HAS TWO KIDS, NINE AND SIX.  I THINK --

 5             MR. BALOGH:  I WOULD REALLY LOVE HIM AS A JUROR, BUT

 6   I THINK THEY'RE DOING THEIR JURY SERVICE.

 7             MR. PARRELLA:  THAT MIGHT BE ENOUGH STRESS ON THE

 8   FAMILY.

 9             THE COURT:  WHO'S THE NEXT ONE?

10             THE CLERK:  WEE LEE WONG; IS THAT IT?

11             MR. PARRELLA:  NUMBER 48.

12             THE CLERK:  HER DAD DIED.

13             THE COURT:  I DON'T THINK WE SHOULD LET HER GO.

14             MR. PARRELLA:  THIS FRIDAY.

15             THE CLERK:  THERE'S ONE THURSDAY.  WE ARE NOT

16   SITTING.  I WOULD THINK SHE COULD STAY.

17             THE COURT:  THAT'S WHAT SHE SAID REALLY.  SOMETHING

18   JOHNSON.

19             THE CLERK:  KERMIT.

20             THE COURT:  KERMIT JOHNSON, NUMBER 49.

21   PSYCHIATRIST, SMALL CLINIC IN FREMONT, NO COVERAGE FOR PATIENTS

22   THREE DAYS A WEEK MONDAY, WEDNESDAY, THURSDAY.

23             MR. BALOGH:  IT'S REALLY NOT COMMENSURATE WITH THE

24   OTHER HARDSHIPS.  HE COULD RESCHEDULE HIS PATIENTS.

25             THE COURT:  I KIND OF AGREE.
```

```
 1              MR. BALOGH:  I AGREE WITH THAT.

 2              MR. PARRELLA:  EITHER WAY.  IF HE WERE EXCUSED, THAT

 3  WOULD BE FINE AS WELL.

 4              THE COURT:  NEXT ONE I HAVE IS DEBBIE SCHIMMELS,

 5  NUMBER 55.

 6              MR. BALOGH:  DEBBIE SCHIMMELS.

 7              THE COURT:  SHE HAS A BAD LEG.  SHE CAN'T SIT.  SHE

 8  REALLY WANTS OUT.

 9              MR. BALOGH:  A THINK THE HARDSHIP DOESN'T SOUND

10  GENUINE AS FAR AS A REAL HARDSHIP.  SHE'S SO EXPRESSLY WANTING

11  TO LEAVE, SHE'S WILLING TO MAKE THAT PRESENTATION.  I DON'T

12  THINK THOSE ARE JURORS TO HAVE SERVE.  I THINK SHE WOULD BE

13  DISTRACTED.

14              THE COURT:  IS THAT ALL RIGHT WITH YOU,

15  MR. PARRELLA?

16              MR. PARRELLA:  I HAVE NO OBJECTION.

17              THE COURT:  THAT WAS DEBBIE SCHIMMELS, NUMBER 55.

18              THE CLERK:  FOR CAUSE?

19              THE COURT:  HARDSHIP, YES.

20              MARIA --

21              MR. PARRELLA:  DELLAFOSSE.

22              THE COURT:  I THINK WE SHOULD PROBABLY LET --

23              MR. BALOGH:  THEY'RE IN THE SAME POD, YEAH.

24              THE COURT:  CAROL SOMETHING.

25              MR. BALOGH:  CAROL HODIL-MUNDY.
```

1           **THE COURT:**  SMALL PAINTING CONTRACTOR, NO WORK, NO

2    PAY.  SHE CONSULTS WITH --

3           **MR. PARRELLA:**  SHE'S AN INTERIOR DECORATOR OUT OF

4    HER HOME.

5           **THE COURT:**  I DON'T THINK IT'S A HARDSHIP.

6           **MR. PARRELLA:**  I AGREE.

7           **THE COURT:**  TINA SOMETHING.

8           **THE CLERK:**  CLEMENTINO.

9           **THE COURT:**  NUMBER SIXTY.  DOES NOT GET PAID AND HAS

10   A TRIP TO NEW YORK.  I THINK WE SHOULD PROBABLY LET HER GO.

11          **MR. BALOGH:**  THAT'S FINE.

12          **MR. PARRELLA:**  FINE.

13          **THE COURT:**  SUSAN SOMETHING.

14          **MR. PARRELLA:**  I THINK WE SKIPPED.  WE HAVE TO GO

15   BACK TO WEE LEE WONG AND SAMUEL REGEN.

16          **THE COURT:**  WHAT NUMBERS ARE THEY?

17          **MR. BALOGH:**  FIFTY-THREE AND FIFTY-FOUR.

18          **THE COURT:**  SAMUEL REGEN, HE'S NUMBER 54.  CLOSING

19   ON A HOUSE, HE'S GOT TWO 18-MONTH-OLD TWINS AND A THREE YEAR

20   OLD.  HE SAID BOTH OF THOSE THINGS SIMPLY FOR SYMPATHY.

21          **MR. BALOGH:**  HE SAID IT'S AS LONG AS IT'S THE 12TH,

22   HE'LL BE FINE.

23          **THE COURT:**  AND I THINK WE'LL BE FINE.

24          WEE LEE WONG, NUMBER 53.  ENGLISH IS POOR.  I

25   BELIEVE WHAT HE SAID IS HE DOESN'T GET PAID IF HE DOESN'T WORK,

1   SO I THINK --

2                   **MR. BALOGH:**  I THINK HE SHOULD BE EXCUSED.

3                   **MR. PARRELLA:**  RIGHT.

4                   **THE COURT:**  ALL RIGHT.

5                   WAS THERE AN ART TULLY?  WE'VE EXCUSED HIM?

6                   **THE CLERK:**  THE ONE WHOSE GRANDFATHER DIED, SHE'S

7   62.

8                   **MR. BALOGH:**  SHE HAS A VIEWING AND A FUNERAL THIS

9   WEEK.

10                  **THE COURT:**  OKAY.  I THINK WE SHOULD EXCUSE HER.

11                  **MR. BALOGH:**  AGREED.

12                  **THE COURT:**  CECILIA TAYLOR.

13                  **MR. BALOGH:**  SHE WORKS FOR MCKENNA CAPITAL.

14                  **THE COURT:**  SHE WAS GOING TO CHECK ON BREAK.  LET'S

15  LEAVE HER FOR NOW.

16                  **MR. BALOGH:**  SHE'S NUMBER 69.  I DON'T THINK WE ARE

17  GOING TO GET THAT DEEP.

18                  **THE COURT:**  PHIL SOMETHING.

19                  **THE CLERK:**  NUMBER 71.

20                  **MR. BALOGH:**  HE'S A GOT A BACK INJECTION SCHEDULED

21  NEXT WEEK AT 8:30.

22                  **THE COURT:**  YOU WANT TO LET HIM GO?

23                  **MR. BALOGH:**  I WANT TO KEEP HIM AS A JUROR.  I THINK

24  IT'S A GENUINE HARDSHIP.

25                  **THE COURT:**  MR. PARRELLA?

```
 1              MR. PARRELLA:  I AGREE.

 2              THE COURT:  HOW MANY HAVE WE EXCUSED?

 3              MR. BALOGH:  NINETEEN.

 4              THE COURT:  TRACY WILL READ OUT THE NAMES OF WHO HAS

 5   BEEN EXCUSED.  WE WILL LET THEM GO, AND START EVERYBODY ELSE.

 6              THE CLERK:  JUROR NUMBER ONE WENT OFF TO THE

 7   BATHROOM.

 8              THE COURT:  WE'LL EXCUSE HER.

 9              THE CLERK:  THERE'S A JUROR -- THERE WAS ONE JUROR,

10   THE ASIAN, I DON'T KNOW HIS NAME.  THERE'S AN ASIAN GENTLEMAN

11   THAT APPROACHED THE AGENT BECAUSE HE DOESN'T SPEAK ENGLISH

12   WELL.  I THINK IT MIGHT BE GLEN CHEN.  I'M NOT SURE.

13              THE COURT:  HE SAID, "I DON'T SPEAK WELL ENOUGH"?

14              THE CLERK:  AND HE APPROACHED THE AGENT AT THE

15   TABLE.

16              THE COURT:  ASK HIM TO COME OVER, PLEASE.

17              MR. BALOGH:  YOUR HONOR, ARE YOU GOING TO

18   PREINSTRUCT ON USE OF NOTES AND THINGS LIKE THIS?  NOTES FOR

19   JURORS, AND ARE YOU ALSO GOING TO INSTRUCT ON PAY CLOSE

20   ATTENTION BECAUSE READBACKS ARE DISCOURAGED AND DURING TRIAL

21   THEY SHOULD BE FOCUSED ON THIS?

22              (PROSPECTIVE JUROR CHEN CAME TO THE SIDEBAR.)

23              THE CLERK:  THIS IS MR. CHEN.

24              THE COURT:  MR. GLEN CHEN?

25              PROSPECTIVE JUROR CHEN:  YES.
```

```
 1              THE COURT:  WHAT NUMBER IS THAT?

 2              THE CLERK:  SIXTY-SIX.

 3              THE COURT:  I WANTED TO ASK YOU, ARE YOU ABLE TO

 4    UNDERSTAND ENGLISH WELL ENOUGH?

 5              PROSPECTIVE JUROR CHEN:  NO, NO.  VERY, VERY LITTLE

 6    BIT, ONLY LITTLE BIT.

 7              THE COURT:  ARE YOU WORRIED THAT YOU WOULD NOT

 8    UNDERSTAND THE TRIAL?

 9              PROSPECTIVE JUROR CHEN:  YEAH, ONLY LITTLE BIT.

10    YEAH.

11              THE COURT:  DO EITHER COUNSEL HAVE ANY QUESTIONS YOU

12    WOULD LIKE TO ASK?

13              MR. PARRELLA:  NO.

14              MR. BALOGH:  NO.

15              MR. NEDROW:  DO YOU THINK HE SHOULD BE EXCUSED?

16              THE COURT:  ALL RIGHT.  WE WILL EXCUSE YOU, SIR.

17    YOU CAN GO BACK TO THE JURY OFFICE AND TELL THEM.  THANK YOU,

18    SIR.  ALL RIGHT.  THANK YOU.

19              (PROCEEDINGS RESUMED IN THE HEARING OF THE

20              PROSPECTIVE JURORS.)

21              THE COURT:  LADIES AND GENTLEMEN, AT THIS POINT

22    TRACY WILL READ THE NAMES OF THOSE OF YOU WHO HAVE BEEN EXCUSED

23    BASED ON YOUR REQUEST FOR HARDSHIP.  AFTER SHE'S READ ALL THOSE

24    NAMES, WAIT UNTIL SHE'S FINISHED THE WHOLE LIST, THEN THOSE OF

25    YOU WHOSE NAMES HAVE BEEN READ MAY GET UP AND LEAVE AND GO BACK
```

1 TO THE JURY OFFICE.  TELL THEM YOU HAVE BEEN EXCUSED FROM THIS

2 TRIAL ON ACCOUNT OF HARDSHIP, AND THEY'LL LET YOU KNOW WHAT YOU

3 NEED TO DO NEXT.

4        THOSE OF YOU WHOSE NAMES ARE NOT READ, JUST STAY

5 PUT, AND WE'LL PROCEED TO THE NEXT PHASE.  THERE ARE STILL LOTS

6 OF JURORS, AND NOT EVERYONE WILL BE CHOSEN.  IF YOU'VE

7 REQUESTED HARDSHIP AND IT'S NOT BEEN GRANTED, DO NOT DESPAIR AT

8 THIS POINT.  WE WILL LET THOSE OF YOU GO ON WHOM WE'VE AGREED.

9        TRACY, WILL YOU READ THOSE NAMES, PLEASE?

10        **THE CLERK:**  ANNA ZHAO.  NATALYA GOMES.  SUSAN

11 MAC LEOD.  MATTHEW MOORE.  JARED MARCHESE.  ROBERTO PEREZ.

12 JOSEPH PONTES.  CAROL OAKLEY.  ARTHUR TULLY.  HONG WAY.  KAY

13 DICKINSON.  PHILIPPE LEVY.  WEE LEE WONG.  DEBBIE SCHIMMELS.

14 MARIA DELLAFOSSE.  TINA MARIE CLEMENTINO.  MIYOKO LAGUIO.  GLEN

15 CHEN.  AND PHILLIP PORTER.  OKAY.

16        **THE COURT:**  THOSE OF YOU WHOSE NAMES HAVE BEEN READ

17 MAY GO BACK TO THE JURY OFFICE AT THIS TIME.  THANK YOU.

18        (DESIGNATED PROSPECTIVE JURORS WERE EXCUSED.)

19        **THE COURT:**  LADIES AND GENTLEMEN, I FORGOT TO TELL

20 YOU ONE OTHER THING WHEN WE STARTED THIS MORNING.  AFTER I ASK

21 YOU SOME GENERAL QUESTIONS, AND I WILL POSE THEM TO EVERYONE AS

22 A GROUP AND ASK THAT YOU RAISE YOUR HANDS WHEN YOU ANSWER, AND

23 I'LL AGAIN TRY TO TAKE YOUR RESPONSES IN ORDER SO THAT WE CAN

24 KEEP TRACK OF WHO'S WHO.

25        AFTER I'VE DONE THAT AND BEFORE THE LAWYERS HAVE AN

1   OPPORTUNITY TO ASK YOU A FEW QUESTIONS, THERE WILL BE A POP

2   QUIZ.  I SHOULD HAVE TOLD YOU THAT EARLIER.  SO EACH OF YOU

3   WILL BE HANDED THE POP QUIZ, WILL BE REQUESTED TO STAND UP AND

4   ANSWER THE QUESTIONS.  HOWEVER, DO NOT FRET BECAUSE YOU WILL

5   KNOW THE ANSWER TO THESE QUESTIONS.  IT'S WHAT IS YOUR NAME,

6   WHERE DO YOU LIVE, WHAT DO YOU DO, THOSE KINDS OF THINGS.  IT'S

7   JUST SOME BASIC BACKGROUND DEMOGRAPHICS.  WE WILL ASK EACH OF

8   YOU TO ANSWER THOSE AND THEN THE LAWYERS WOULD HAVE AN

9   OPPORTUNITY --

10          WAS THERE A QUESTION BACK THERE, SIR?  I THINK YOU

11   HAVE BEEN EXCUSED.

12          **PROSPECTIVE JUROR TULLY:**  IF OUR NAME IS CALLED, WE

13   CAN GO BACK TO THE JURY ROOM?

14          **THE COURT:**  YES, SIR.

15          LET ME TELL YOU JUST A LITTLE BIT ABOUT THIS CASE

16   AND INTRODUCE YOU TO THE PEOPLE INVOLVED.  THE REASON THAT I DO

17   THIS IS SO THAT IF ANY OF THE MAJOR WITNESSES IN THIS CASE, OR

18   ONE OF THE LAWYERS, OR ONE OF THE PARTIES, WERE YOUR NEIGHBOR,

19   IT WOULD MAKE IT DIFFICULT FOR YOU TO SIT AS A JUROR ON THIS

20   CASE.  SO I WILL READ YOU THE NAMES OF THE WITNESSES WHOM WE

21   THINK WE MIGHT HEAR FROM, AND I WILL ASK THAT YOU TELL ME IF

22   YOU KNOW ANY OF THOSE FOLKS.

23          BEFORE THAT, LET ME TELL YOU THAT THE -- BEFORE

24   THAT, I WILL ASK THAT THE LAWYERS INTRODUCE THEMSELVES AND

25   INTRODUCE THEIR CLIENTS.  THIS IS A CRIMINAL TRIAL THAT WE WILL

1  BE HEARING OVER THE NEXT COUPLE OF WEEKS, AND I WOULD ASK NOW

2  THAT THE PARTIES INTRODUCE THEMSELVES.

3           MR. NEDROW?

4           **MR. NEDROW:**  YES.  THANK YOU VERY MUCH, YOUR HONOR.

5           GOOD MORNING, LADIES AND GENTLEMEN.  MY NAME IS JEFF

6  NEDROW.  I AM ONE OF THE PROSECUTORS ASSIGNED TO THIS CASE.

7           **MR. PARRELLA:**  THANK YOU.  MY NAME IS MATT PARRELLA.

8  GOOD MORNING.  I AM ASSISTANT UNITED STATES ATTORNEY AND ALSO

9  ONE OF THE PROSECUTORS.

10          **MR. NEDROW:**  AND THE CASE AGENT SITTING AT THE TABLE

11 WITH US TODAY IS IRS CI SPECIAL AGENT JEFF NOVITZKY.

12          **MR. NOVITZKY:**  GOOD MORNING.

13          **THE COURT:**  ALL RIGHT.  ANYBODY KNOW ANY OF THESE

14 FOLKS?

15          (NO RESPONSE.)

16          **THE COURT:**  ALL RIGHT.  MR. BALOGH.

17          **MR. BALOGH:**  THANK YOU, YOUR HONOR.  GOOD MORNING,

18 LADIES AND GENTLEMEN.  MY NAME IS ETHAN BALOGH.  I'M AN

19 ATTORNEY HERE IN SAN FRANCISCO, AND I REPRESENT MS. TAMMY

20 THOMAS.

21          **THE COURT:**  ANYBODY KNOW EITHER OF THESE FOLKS?  NO

22 HANDS.  ALL RIGHT.

23          I WILL NOW READ YOU A LIST OF THE POTENTIAL

24 WITNESSES.  I ALWAYS TELL THE LAWYERS IN ADVANCE THAT I'M GOING

25 TO DO THIS AND TELL THEM THE PURPOSE, WHICH IS TO MAKE SURE

1  THAT YOU DON'T KNOW ANY OF THESE FOLKS, AREN'T RELATED TO THEM.

2  I ASK THAT THEY ERR ON THE SIDE OF OVERINCLUSION, MEANING THIS

3  LIST IS VERY POSSIBLY LONGER THAN THE ACTUAL NUMBER OF

4  WITNESSES WE WILL HAVE, BUT I WILL READ THEM OFF.  ONCE I

5  COMPLETE READING THE LIST, I WILL ASK IF YOU KNOW ANY OF THESE

6  FOLKS.

7          JEFFREY NOVITZKY, YOU'VE ALREADY MET HIM.  PATRICK

8  ARNOLD.  KELCEY DALTON.  DR. DON H. CATLIN.  DR. MARGARET E.

9  WIERMAN.  JEFF JACK.  ROB BLENKINSOP.  JAN WALTON.  WENDY

10 BERGLAND.  JEREMY PRICE.  MYWANZA BALL.  BRIAN OSHINOMI, YOUSIF

11 WAHIDA, BRIAN BISHOP, FERESHTEH DELSHAD, BORISLAV STARCEVIC,

12 ANNABELLA LEUNG, CHRIS STARR, THOMAS MCVAY, KEVIN RYAN, SUSAN

13 KRIEDER, RANDY MONTESANO.  ANYBODY KNOW ANY OF THOSE FOLKS?  NO

14 HANDS.  ALL RIGHT.

15          AS I TOLD YOU, LADIES AND GENTLEMEN, THIS IS A

16 CRIMINAL MATTER THAT WE WILL BE HEARING.  THE CHARGES IN THIS

17 CASE, A CRIMINAL CASE IS INITIATED BY -- GENERALLY BY A GRAND

18 JURY INDICTMENT.  THE INDICTMENT BY THE GRAND JURY IS NOT

19 EVIDENCE.  IT IS SIMPLY A CHARGE.  THE WAY THE CHARGES BEING

20 BROUGHT ARE EXPLAINED.

21          IN THIS CASE, THE CHARGES THAT ARE BEING BROUGHT

22 INCLUDE FIVE COUNTS OF FALSE DECLARATIONS BEFORE A GRAND JURY,

23 WHICH MEANS GIVING FALSE TESTIMONY, FALSE STATEMENTS BEFORE A

24 GRAND JURY, AND ONE COUNT OF OBSTRUCTION OF JUSTICE.  THE

25 EVIDENCE THAT YOU WILL HEAR WILL INVOLVE TESTIMONY GIVEN BEFORE

JURY SELECTION

 1  A GRAND JURY IN THIS DISTRICT, AND THE CHARGES ARE THAT SOME OF

 2  THE RESPONSES WERE FALSE.  SO THAT'S WHAT YOU WILL BE HEARING.

 3          I WILL TELL YOU BY WAY OF BACKGROUND THAT SOME OF

 4  THE QUESTIONS INVOLVE THE USE OF ANABOLIC STEROIDS IN

 5  CONNECTION WITH ATHLETICS.  YOU WILL NOT BE REQUESTED TO PASS

 6  JUDGMENT ON THE WISDOM, APPROPRIATENESS OR OTHERWISE OF USE OF

 7  STEROIDS IN CONNECTION WITH ATHLETICS OR NOT.

 8          YOU WILL SIMPLY BE ASKED TO DECIDE WHETHER THE

 9  GOVERNMENT HAS PROVED BEYOND A REASONABLE DOUBT THAT THE

10  DEFENDANT GAVE FALSE TESTIMONY BEFORE THE GRAND JURY.  THAT

11  WILL BE THE -- OR OBSTRUCTED JUSTICE BEFORE THE GRAND JURY.

12  THAT WILL BE THE SPHERE THAT THE JURY WILL HAVE TO CONSIDER

13  WHEN IT DELIBERATES, BUT THE TOPIC WILL BE AS I'VE OUTLINED.

14          THE FIRST POINT TO BEAR IN MIND IS THIS IS A

15  CRIMINAL MATTER, NOT A CIVIL MATTER.  THOSE OF YOU WHO HAVE

16  EVER SAT ON A CIVIL JURY MAY KNOW THE BURDEN OF PROOF IN A

17  CIVIL CASE IS PREPONDERANCE OF THE EVIDENCE, THE LAWYERS

18  USUALLY HOLD THEIR HANDS OUT AND SAY, THE EVIDENCE

19  PREPONDERATES IF THE SCALE TIPS EVER SO SLIGHTLY TO ONE SIDE OR

20  THE OTHER.  THAT'S IN A CIVIL CASE.  THIS IS NOT A CIVIL CASE.

21          THIS IS A CRIMINAL CASE, AND THE BURDEN OF PROOF IN

22  A CRIMINAL CASE IS BEYOND A REASONABLE DOUBT.  YOU WILL BE

23  GIVEN INSTRUCTIONS THAT EXPLAIN EXACTLY WHAT THAT MEANS, BUT

24  IT'S A MUCH HIGHER BURDEN THAN IN A CIVIL CASE.

25          SO MY FIRST QUESTION TO YOU IS:  IS THERE ANYONE WHO

1  CANNOT FOLLOW MY INSTRUCTIONS, WHICH WILL BE THAT YOU CANNOT

2  CONVICT THE DEFENDANT UNLESS YOU FIND THAT THE GOVERNMENT HAS

3  PROVED ITS CASE BEYOND A REASONABLE DOUBT?  ANYBODY WHO COULD

4  NOT FOLLOW THAT INSTRUCTION?  NO HANDS.

5          THE NEXT REALLY IMPORTANT POINT THAT I WANT TO

6  EXPLORE WITH YOU IS THE PRESUMPTION OF INNOCENCE.  THE

7  DEFENDANT IS PRESUMED INNOCENT OF THESE CHARGES UNLESS AND

8  UNTIL THE GOVERNMENT PROVES THE CHARGES BEYOND A REASONABLE

9  DOUBT TO YOUR SATISFACTION.  SO AS SHE SITS HERE TODAY, THE

10 DEFENDANT IS INNOCENT OF THESE CHARGES, AND SHE CANNOT BE FOUND

11 GUILTY UNLESS YOU FIND BEYOND A REASONABLE DOUBT THAT THE

12 GOVERNMENT PROVED ITS CASE.

13         IS THERE ANYONE HERE WHO CANNOT FOLLOW OR WILL NOT

14 FOLLOW MY INSTRUCTIONS, WHICH IS THAT THE GOVERNMENT MUST PROVE

15 ITS CASE BEYOND A REASONABLE DOUBT AND THAT THE DEFENDANT IS

16 PRESUMED INNOCENT OF THESE CHARGES UNLESS AND UNTIL THE

17 GOVERNMENT DOES SO?  ANYBODY WHO WON'T FOLLOW THAT INSTRUCTION?

18 NO HANDS.

19         ANOTHER AND REALLY IMPORTANT FACTOR IS THAT THE

20 DEFENDANT, THIS DEFENDANT, EVERY DEFENDANT IS ENTITLED TO RELY

21 ON THE PRESUMPTION OF INNOCENCE IN A CRIMINAL TRIAL.  THE

22 DEFENDANT IS NOT REQUIRED TO PUT ON ANY EVIDENCE.  THE

23 DEFENDANT IS NOT REQUIRED TO TESTIFY.  THE DEFENDANT IS NOT

24 REQUIRED TO DO ANYTHING, BECAUSE IT IS ENTIRELY THE

25 GOVERNMENT'S BURDEN TO PROVE BEYOND A REASONABLE DOUBT THAT THE

1   DEFENDANT IS GUILTY.

2           IN PARTICULAR, THE DEFENDANT HAS AN ABSOLUTE RIGHT

3   TO REMAIN SILENT AND IS NOT OBLIGED IN ANY WAY TO TESTIFY OR

4   PUT ON OTHER EVIDENCE.  AND THOSE INSTRUCTIONS WILL BE GIVEN TO

5   YOU BOTH AT THE BEGINNING AND AT THE END OF THIS CASE.  IS

6   THERE ANYONE HERE WHO CANNOT FOLLOW THE COURT'S INSTRUCTION

7   THAT THE GOVERNMENT MUST PROVE ITS CASE AND THAT THE DEFENDANT

8   IS NOT REQUIRED TO PUT ON ANY CASE AT ALL AND MAY RELY ENTIRELY

9   ON HER PRESUMPTION OF INNOCENCE?  ANYBODY WHO WON'T FOLLOW THAT

10  INSTRUCTION?  NO HANDS.

11          I'M GOING TO ASK A WHOLE SERIES OF QUESTIONS NOW AND

12  ASK YOU RESPOND TO THEM, AND I'LL TELL YOU IN ADVANCE IF ANY OF

13  THESE QUESTIONS YOU WOULD PREFER TO ANSWER IN PRIVATE, YOU MAY

14  JUST LET ME KNOW THAT, AND WE'LL DO THEM UP AT SIDEBAR.  IT'S

15  NOT EXACTLY PRIVATE BECAUSE YOU HAVE TO TELL ME AND THE LAWYERS

16  AND THE COURT REPORTER, BUT IT'S LESS OPEN THAN THE FULL

17  COURTROOM.  ANYONE WHO FEELS HE OR SHE WOULD LIKE TO ANSWER IN

18  MORE PRIVACY THAN THE OPEN COURTROOM, YOU ARE ABSOLUTELY

19  WELCOME TO LET ME KNOW THAT, AND THAT'S WHAT WE WILL DO.

20          ARE THERE ANY OF YOU WHO HAVE BEEN THE VICTIM OF A

21  CRIME OR A WITNESS TO A CRIME, YOU AND -- I SHOULD SAY YOU OR

22  YOUR CLOSE FAMILY OR CLOSE FRIENDS WHO HAVE BEEN EITHER A

23  VICTIM OF A CRIME OR A WITNESS TO A CRIME?  LET ME SEE A SHOW

24  OF HANDS, AND I'LL TAKE YOU IN ORDER.  AND EACH TIME PLEASE

25  TELL ME YOUR NAME.

1           **PROSPECTIVE JUROR OLKEN:**  CHARLES OLKEN.  SOMEBODY

2   BROKE INTO OUR HOUSE AND STOLE SOME THINGS.

3           **THE COURT:**  HOW LONG AGO WAS THAT?

4           **PROSPECTIVE JUROR OLKEN:**  THIRTY-FIVE YEARS.

5           **THE COURT:**  DO YOU THINK THERE'S ANYTHING ABOUT THAT

6   EXPERIENCE THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR TO BOTH

7   SIDES IN THIS CASE?

8           **PROSPECTIVE JUROR OLKEN:**  NO, MA'AM.

9           **THE COURT:**  YES, SIR.

10          **PROSPECTIVE JUROR MONTILLA:**  MY NAME IS ROBERT

11  MONTILLA, AND LAST NOVEMBER MY CAR WAS BROKEN -- WAS

12  VANDALIZED.  SOMEONE HAD SMASHED THE PASSENGER -- THE FRONT

13  PASSENGER SIDE WINDOW.

14          **THE COURT:**  WAS IT DETERMINED WHO DID THAT EVER?

15          **PROSPECTIVE JUROR MONTILLA:**  NO.  I REPORTED IT TO

16  THE POLICE, BUT I WAS UNABLE TO -- AND I DID NOT SEE WHO DID

17  IT.

18          **THE COURT:**  IS THERE ANYTHING ABOUT THAT EXPERIENCE

19  THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE IN

20  THIS CASE?

21          **PROSPECTIVE JUROR MONTILLA:**  NO.  NO, YOUR HONOR.

22          **THE COURT:**  I SUPPOSE I SHOULD HAVE TOLD YOU, LADIES

23  AND GENTLEMEN, THE WHOLE POINT OF THIS QUESTION AND ANSWER

24  SESSION THAT WE'RE GOING THROUGH IS TO MAKE SURE THAT THE

25  JURORS WHO ARE SELECTED CAN BRING AN OPEN MIND TO THE CASE AND

1    CAN GIVE BOTH SIDES A FAIR HEARING, THAT BOTH SIDES START WITH

2    AN EVEN PLAYING FIELD.  SO THE REASON I'M ASKING THESE PERSONAL

3    QUESTIONS IS TO FIND OUT IF THERE IS SOMETHING IN YOUR LIFE

4    EXPERIENCE OR IN YOUR CONCERNS THAT WOULD MAKE IT HARD FOR YOU

5    TO BE FAIR TO EITHER SIDE.  THAT'S THE REASON FOR THESE.

6              OKAY.  NEXT HAND.  YES, MA'AM.

7              **PROSPECTIVE JUROR JAMES:**  NORALAINE JAMES.  IT'S NOT

8    ME PERSONALLY.  MY DAD WAS ATTACKED IN BROAD DAYLIGHT IN

9    OAKLAND ABOUT TEN YEARS AGO, BUT HIS ASSAILANT WAS CAPTURED.

10             **THE COURT:**  I DIDN'T HEAR THE LAST THING YOU SAID.

11             **PROSPECTIVE JUROR JAMES:**  MY DAD WAS ATTACKED,

12   MUGGED, TEN YEARS AGO, BUT THEY CAUGHT, YOU KNOW, THE

13   ASSAILANT.

14             **THE COURT:**  DID THE ASSAILANT HAVE A TRIAL?

15             **PROSPECTIVE JUROR JAMES:**  I DON'T REALLY KNOW

16   BECAUSE I WAS OUT OF STATE AT THE TIME.

17             **THE COURT:**  ALL RIGHT.  DID YOUR DAD RECOVER?

18             **PROSPECTIVE JUROR JAMES:**  YEAH.

19             **THE COURT:**  IS THERE ANYTHING ABOUT THAT EXPERIENCE

20   THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE IN

21   THIS CASE?

22             **PROSPECTIVE JUROR JAMES:**  NO, I DON'T THINK.

23             **THE COURT:**  NEXT HAND.  ANYBODY IN THE FRONT?

24             **PROSPECTIVE JUROR ROSS:**  HOME ROBBERY SOME YEARS

25   AGO.

1          **THE COURT:**  YOUR HOME WAS ROBBED?

2          **PROSPECTIVE JUROR ROSS:**  YES.

3          **THE COURT:**  DID YOU SAY HOW MANY YEARS AGO?

4          **PROSPECTIVE JUROR ROSS:**  ABOUT TWENTY YEARS AGO.

5          **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE THAT

6   WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

7          **PROSPECTIVE JUROR ROSS:**  (SHAKES HEAD).

8          **THE COURT:**  NEXT HAND.  VICTIM OR WITNESS TO A

9   CRIME?  ON THE LEFT, SIR.

10         **PROSPECTIVE JUROR STREET:**  MY NAME IS JOSEPH STREET.

11  I'VE HAD MY CAR BROKEN INTO AND ITEMS STOLEN ON SEVERAL

12  OCCASIONS.

13         **THE COURT:**  ANYTHING ABOUT THOSE EXPERIENCES THAT

14  WOULD MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE HERE?

15         **PROSPECTIVE JUROR STREET:**  NO.

16         **PROSPECTIVE JUROR CONWAY:**  DANIEL CONWAY.  I WORK AT

17  SAN QUENTIN STATE PRISON AS A CORRECTIONAL OFFICER, AND I'VE

18  WITNESSED NUMEROUS CRIMES.

19         **THE COURT:**  HOW LONG HAVE YOU WORKED AT SAN QUENTIN?

20         **PROSPECTIVE JUROR CONWAY:**  THIRTY-FIVE YEARS.

21         **THE COURT:**  WELL, LET ME ASK YOU THE QUESTION THEN,

22  SIR.  DO YOU THINK GIVEN YOUR LIFE EXPERIENCE AND YOUR JOB THAT

23  YOU COULD BE FAIR TO BOTH SIDES IN THIS CASE?

24         **PROSPECTIVE JUROR CONWAY:**  YES, I DO.

25         **THE COURT:**  NEXT HAND.

```
 1              THE CLERK:  JUDGE, SHOULD WE START PASSING THAT MIC

 2  BACK?

 3              THE COURT:  YES, IT'S WORKING GREAT TODAY, SO LET'S

 4  TRY IT.

 5              PROSPECTIVE JUROR HAROIAN:  MY NAME IS ANTHONY

 6  HAROIAN.  TWELVE YEARS AGO MY BROTHER --

 7              THE COURT:  I'M SORRY.  KEEP YOUR VOICE UP.

 8              PROSPECTIVE JUROR HAROIAN:  MY NEXT BROTHER WAS

 9  KILLED BY A DRUNK DRIVER.  IT WAS A LENGTHY TRIAL IN PHOENIX.

10  I AM A LITTLE BIT DUBIOUS OF THE LEGAL PROCESS AFTER THAT

11  TRIAL.  IT WAS HIS SIXTH OFFENSE.

12              THE COURT:  DID THE JURY REACH A RESULT IN THAT

13  CASE?

14              PROSPECTIVE JUROR HAROIAN:  YES, HE GOT PRISON TIME,

15  BUT VERY MARGINAL.

16              THE COURT:  DID YOU SIT THROUGH THE TRIAL?

17              PROSPECTIVE JUROR HAROIAN:  SAT THROUGH THE FIRST

18  PART OF IT AND LEFT.

19              THE COURT:  SO DO YOU THINK THAT YOU CAN BE FAIR TO

20  BOTH SIDES IN THIS CASE WITH THAT KIND OF AN EXPERIENCE?

21              PROSPECTIVE JUROR HAROIAN:  I'M A LITTLE TAINTED BY

22  THE LEGAL PROCESS.

23              THE COURT:  WHAT DO YOU MEAN BY THAT?

24              PROSPECTIVE JUROR HAROIAN:  POSSIBLY, THIS CASE, IN

25  THIS CASE I BELIEVE THAT BECAUSE IT'S NOT A VIOLENT CRIME OR A
```

1  REPEAT-TYPE SITUATION, I COULD BE FAIR.

2          **THE COURT:**  SO YOU THINK IF YOU WERE SITTING ON THE

3  MURDER TRIAL THAT OUR OTHER JUROR TOLD US ABOUT THIS MORNING,

4  YOU THINK THAT WOULD BE DIFFICULT FOR YOU?

5          **PROSPECTIVE JUROR HAROIAN:**  YES.

6          **THE COURT:**  BUT YOU THINK GIVEN THE NATURE OF THE

7  CHARGES THAT ARE PENDING HERE, YOU THINK YOU COULD BE FAIR IN

8  THIS CASE?

9          **PROSPECTIVE JUROR HAROIAN:**  I THINK SO, YES.

10          **THE COURT:**  WELL, ARE YOU HESITATING?

11          **PROSPECTIVE JUROR HAROIAN:**  I AM.

12          **THE COURT:**  ALL RIGHT.  AND WHICH WAY DO YOU THINK

13  YOU'RE --

14          **PROSPECTIVE JUROR HAROIAN:**  MY PREDISPOSITION IS?  I

15  KNOW THAT THIS CASE HAS GOT A LOT OF NOTORIETY ON IT ALREADY.

16  IT'S HARD FOR ME TO DETERMINE WHICH WAY I WOULD GO WITH THIS,

17  BUT I THINK THAT THE LEGAL SYSTEM FAILS US MORE OFTEN THAN NOT.

18          **THE COURT:**  THANK YOU, SIR.  NEXT?  WE'RE ALL OVER

19  THE MAP, BUT SPEAK UP REALLY LOUD.

20          **PROSPECTIVE JUROR HOUSE:**  RANDI HOUSE, YOUR HONOR.

21  MY MOTHER WAS A VICTIM OF IDENTITY FRAUD, AND MY OLDER SISTER

22  WAS A VICTIM OF STALKING, BOTH TWO YEARS AGO, AND BEFORE THAT

23  AS WELL, NUMEROUS TIMES ON BOTH OCCASIONS.

24          **THE COURT:**  DID TRIALS RESULT FROM EITHER OF THOSE

25  SITUATIONS?

1          **PROSPECTIVE JUROR HOUSE:**  A TRIAL RESULTED FROM THE

2    STALKING BUT NOT FROM THE IDENTITY FRAUD.

3          **THE COURT:**  OKAY.

4          **PROSPECTIVE JUROR HOUSE:**  AND I BELIEVE A DECISION

5    WAS REACHED AND A RESTRAINING ORDER WAS PUT ON THE STALKER, AND

6    HE HAS NOT BOTHERED HER SINCE.

7          **THE COURT:**  IS THERE ANYTHING ABOUT EITHER OF THOSE

8    EXPERIENCES THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR TO

9    EITHER SIDE IN THIS CASE?

10         **PROSPECTIVE JUROR HOUSE:**  I DON'T THINK SO, YOUR

11   HONOR.

12         **THE COURT:**  ALL RIGHT.  THANK YOU.

13         NEXT HAND.  AND IF THE MIC IS BACK THERE --

14         **PROSPECTIVE JUROR PELLY:**  COUPLE CAR BREAK-INS.  NO

15   ONE WAS APPREHENDED.

16         ALSO, I DON'T KNOW IF IT'S RELEVANT, BUT I THINK I

17   VAGUELY RECALL READING A NEWSPAPER ARTICLE ABOUT THE

18   OFFICIAL --

19         **THE COURT:**  OKAY.  I TELL YOU WHAT, WE'LL GET TO

20   THAT IN A MOMENT.  RIGHT NOW I NEED TO KNOW IF YOUR PRIOR

21   EXPERIENCES WITH THE CAR BREAK-INS WOULD MAKE IT HARD FOR YOU

22   TO BE FAIR TO EITHER SIDE IN THIS CASE?

23         **PROSPECTIVE JUROR PELLY:**  NO, NO.

24         **THE COURT:**  NEXT PERSON.

25         **PROSPECTIVE JUROR DEBRA SMITH:**  DEBRA SMITH, AND MY

1  DAUGHTER WAS A VICTIM OF IDENTITY THEFT, ALSO, BY ANOTHER

2  FAMILY MEMBER.

3         **THE COURT:**  ANYTHING ABOUT THAT SITUATION THAT WOULD

4  MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE IN THIS CASE?

5         **PROSPECTIVE JUROR DEBRA SMITH:**  NO.

6         **THE COURT:**  OKAY.

7         **PROSPECTIVE JUROR GILBRECH:**  HI, MY NAME IS KEN

8  GILBRECH.  WE HAD OUR CAR BROKEN INTO WHILE IT WAS PARKED IN

9  OUR DRIVEWAY AT HOME.  ONCE THEY GOT IN THE CAR, THEY USED THE

10 REMOTE CONTROL TO GET INTO THE GARAGE AT NIGHT WHILE WE WERE

11 HOME.  JUST MINOR THINGS WERE TAKEN, BUT NO ISSUES, NO WORRIES.

12        **THE COURT:**  ALL RIGHT.  AND DO YOU THINK THAT YOU

13 COULD BE FAIR TO BOTH SIDES IN THIS CASE?

14        **PROSPECTIVE JUROR GILBRECH:**  OH, YEAH.

15        **THE COURT:**  ALL RIGHT.  THANK YOU.

16        **PROSPECTIVE JUROR WINTON-HENRY:**  MY NAME IS STEPHEN

17 WINTON-HENRY.  I ACTUALLY WOULD LIKE TO SPEAK PRIVATELY.

18        **THE COURT:**  ALL RIGHT.  JUST COME ON UP HERE, SIR.

19 YOU COULD PROBABLY LEAVE THE MIC BACK THERE FOR THE NEXT

20 PERSON.

21        (PROSPECTIVE JUROR HENRY-WINTON CAME TO THE SIDEBAR.)

22        **THE COURT:**  YES, SIR.

23        **PROSPECTIVE JUROR WINTON-HENRY:**  I HAD A 17-YEAR-OLD

24 DAUGHTER WHO WAS RAPED WHEN SHE WAS 12, AND THERE WAS NEVER ANY

25 CHARGES BROUGHT, BUT IT WAS NOT A PLEASANT EXPERIENCE.  HER

1   PSYCHIATRIST AND WE WORKED A LOT ON THAT.  SHE DECIDED NOT TO

2   TRY -- TO BRING ANY CHARGES.

3          **THE COURT:**  DID SHE KNOW WHO IT WAS?

4          **PROSPECTIVE JUROR WINTON-HENRY:**  YEAH.

5          **THE COURT:**  HOW IS SHE NOW?

6          **PROSPECTIVE JUROR WINTON-HENRY:**  I THINK SHE'S

7   PRETTY WELL NOW.  SHE'S HAD A LOT OF GOOD SUPPORT, AND I THINK

8   SHE'S MADE SOME PRETTY REMARKABLE RECOVERY WITH IT.

9          **THE COURT:**  THAT'S WONDERFUL.

10         DO YOU THINK THAT WOULD AFFECT YOUR ABILITY TO BE

11  FAIR TO EITHER SIDE IN THIS CRIMINAL MATTER?

12         **PROSPECTIVE JUROR WINTON-HENRY:**  I DON'T THINK SO.

13         **THE COURT:**  DOES EITHER COUNSEL HAVE ANY QUESTION TO

14  ASK?

15         **MR. PARRELLA:**  NO, YOUR HONOR.

16         **MR. BALOGH:**  NO, I THINK THAT'S FINE.

17         (END OF SIDEBAR DISCUSSION; PROCEEDINGS RESUMED IN

18         THE HEARING OF THE PROSPECTIVE JURY.)

19         **THE COURT:**  ALL RIGHT.  NEXT HAND?

20         **PROSPECTIVE JUROR TARASOVSKY:**  NATALIA TARASOVSKY,

21  AND MY DAD WAS HIT BY A CAR FOUR YEARS AGO.  HE WAS IN THE

22  HOSPITAL FOR ABOUT SIX MONTHS AND DIED.

23         **THE COURT:**  I'M VERY SORRY.  DO YOU THINK ANYTHING

24  ABOUT THAT EXPERIENCE WOULD MAKE IT HARD FOR YOU TO BE FAIR TO

25  EITHER SIDE IN THIS CASE?

1          **PROSPECTIVE JUROR TARASOVSKY:**  I HOPE NOT.

2          **THE COURT:**  ARE YOU CONCERNED?  ARE YOU WORRIED THAT

3     IT MIGHT MAKE YOU UNCOMFORTABLE?

4          **PROSPECTIVE JUROR TARASOVSKY:**  MAYBE NOT.  I'M FINE.

5          **THE COURT:**  OKAY.  THANK YOU, MA'AM.

6          **PROSPECTIVE JUROR REGEN:**  SAM REGEN.  MINOR

7     AUTOMOBILE BREAK-INS ABOUT THREE TIMES IN MY LIFE.  I DON'T

8     THINK IT WILL AFFECT MY IMPARTIALITY.

9          **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

10         **PROSPECTIVE JUROR HUNTER:**  MY NAME IS DAVE HUNTER,

11    AND WE HAD AN ATTEMPTED HOUSE ROBBERY ABOUT FIVE YEARS AGO.

12         **THE COURT:**  WERE YOU HOME?

13         **PROSPECTIVE JUROR HUNTER:**  YES.

14         **THE COURT:**  WHAT HAPPENED?

15         **PROSPECTIVE JUROR HUNTER:**  THE SUSPECT WAS

16    APPREHENDED AND NOTHING, NO TRIAL, NO NOTHING WAS TAKEN, DONE.

17         **THE COURT:**  IS THERE ANYTHING ABOUT THAT EXPERIENCE

18    THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE IN

19    THIS CASE?

20         **PROSPECTIVE JUROR HUNTER:**  NO.

21         **THE COURT:**  ALL RIGHT.  THANK YOU.

22         ANYBODY ELSE VICTIM OF, WITNESS TO CRIME?  OKAY.

23         ONE OF THE -- ONE OF YOU MENTIONED, AND I'LL ASK

24    ABOUT IT RIGHT NOW.  ONE OF THE INSTRUCTIONS THAT YOU WILL GET

25    FROM ME OVER AND OVER AGAIN, ACTUALLY, IS THAT THE JURY IS TO

1   DECIDE THIS CASE BASED ON THE EVIDENCE THAT'S PRESENTED IN THIS

2   COURTROOM, AND THE EVIDENCE WILL COME FROM THE WITNESS STAND,

3   FROM WITNESSES UNDER OATH, FROM EXHIBITS THAT ARE ADMITTED INTO

4   EVIDENCE, AND YOU WILL BE -- YOU WILL TAKE AN OATH PROMISING

5   ONLY TO DECIDE THIS CASE BASED ONLY ON WHAT YOU HEAR IN THIS

6   COURTROOM.

7            I WILL GIVE YOU AN INSTRUCTION AT THE BEGINNING AND

8   PRETTY MUCH EVERY DAY OF THE TRIAL, YOU ARE NOT TO READ

9   ANYTHING ABOUT IT IN THE NEWSPAPER, YOU ARE NOT TO GO ON THE

10  INTERNET, YOU ARE NOT TO DO ANY RESEARCH.  YOU ARE SIMPLY TO

11  DECIDE THIS CASE BASED ON THE EVIDENCE YOU HEAR IN THIS

12  COURTROOM.  AND I'M ABOUT TO ASK ALL OF YOU TO TELL ME WHETHER

13  OR NOT YOU THINK YOU CAN DO THAT.

14           I RECOGNIZE THERE HAS BEEN SOME PUBLICITY ABOUT SOME

15  CASES AND SOME PUBLICITY ABOUT THIS CASE IN OUR LOCAL

16  NEWSPAPERS, AND SOME OF YOU MAY HAVE READ SOME OF THAT.

17  WHATEVER YOU'VE READ IN THE NEWSPAPER IS WHAT YOU'VE READ IN

18  THE NEWSPAPER.  IT IS NOT THE EVIDENCE IN THIS CASE IN THIS

19  COURTROOM.  AND YOU WILL NEED TO SWEAR TO ME THAT YOU WILL JUST

20  DECIDE THIS BASED ON THE EVIDENCE AND TESTIMONY THAT YOU HEAR

21  IN THIS CASE.

22           SO IS THERE ANYONE HERE WHO DOES NOT FEEL THAT HE OR

23  SHE CAN FOLLOW WHAT WILL BE MY INSTRUCTION TO YOU, WHICH IS

24  JUST DECIDE THE CASE BASED ON THE EVIDENCE THAT YOU HEAR IN

25  THIS COURTROOM; ANYBODY WHO CAN'T DO THAT?

1              YES, SIR.  YOUR NAME IS?

2              **PROSPECTIVE JUROR OLKEN:**  MY NAME IS CHARLES OLKEN.

3   I AIM -- I THINK I'M REALLY PREJUDICED AGAINST THE GOVERNMENT

4   IN THIS CASE.  I HAVE A BEST FRIEND WHO SAT ON THE FEDERAL

5   GRAND JURY DURING THE INITIAL BALCO HEARINGS.  I BELIEVE THAT

6   ALL THE BASEBALL PLAYERS ARE BEING PERSECUTED BEYOND WHAT'S

7   REASONABLE, AND SO MY CONCERN, REGARDLESS OF MY UNDERSTANDING

8   OF YOUR INSTRUCTIONS, IS THAT I'M NOT SURE THAT I THINK ALL OF

9   THIS IS FAIR TO BEGIN WITH.

10              **THE COURT:**  ALL RIGHT.  WELL, AS I MENTIONED

11   EARLIER, AND I'LL SAY IT FOR EVERYBODY'S PURPOSES, THE QUESTION

12   THAT THE JURY WILL BE ASKED TO RESOLVE IN THIS CASE IS WHETHER

13   OR NOT FALSE STATEMENTS WERE MADE TO THE GRAND JURY BASED ON

14   THE INSTRUCTION I GIVE YOU.  THERE'S A NUMBER ELEMENTS TO THAT

15   OFFENSE AND YOU WILL HAVE TO BE CONVINCED THAT ALL THOSE

16   ELEMENTS WERE MET BEYOND A REASONABLE DOUBT BEFORE YOU COULD

17   DECIDE THIS CASE, BEFORE YOU COULD COME TO A GUILTY VERDICT IN

18   THIS CASE.  AND IT WILL BE ONLY THAT QUESTION THAT WOULD BE

19   PRESENTED.

20              THERE WILL NOT ACTUALLY BE ANY ISSUES ABOUT BASEBALL

21   IN THIS CASE.  IT WILL BE ABOUT WHETHER THIS WITNESS IS GUILTY

22   OF MAKING FALSE DECLARATIONS AS I EXPLAIN THAT OFFENSE, AND

23   OBSTRUCTION OF JUSTICE AS I EXPLAIN THAT OFFENSE TO YOU.

24              THAT'S ALL THAT THE JURY WILL HAVE TO DECIDE.  SO

25   OPINIONS ABOUT THE GREATER SCHEME OF THINGS AND BASEBALL ARE

1   INTERESTING, BUT THEY WILL NOT BE PART OF THIS TRIAL.  HAVING

2   SAID ALL OF THAT, I WANT TO COME BACK NOW TO ASK YOU THE

3   QUESTION:  DO YOU THINK YOU COULD BE FAIR TO BOTH SIDES, OR DO

4   YOU THINK THAT YOUR VIEWPOINTS WOULD MAKE IT HARD FOR YOU TO BE

5   FAIR TO BOTH SIDES?

6           **PROSPECTIVE JUROR OLKEN:**  IT WOULD CERTAINLY BE MY

7   INTENTION TO BE FAIR TO BOTH SIDES.

8           **THE COURT:**  THAT'S A GREAT START, BUT IT'S NOT

9   ENOUGH.

10           **PROSPECTIVE JUROR OLKEN:**  THE SMALL PREJUDICE WOULD

11   CAUSE ME TO HAVE TO THINK CAREFULLY.  I DO BELIEVE IN THE RULE

12   OF LAW, AND I DO BELIEVE IN YOUR INSTRUCTION AND AGREE WITH

13   THEM.  I JUST HAVE SUCH STRONG FEELINGS ABOUT THIS THAT I

14   THOUGHT IT WAS FAIR TO PUT THEM OUT THERE.

15           **THE COURT:**  GOOD.  THANK YOU.  THAT'S EXACTLY RIGHT.

16   THE PURPOSE OF THIS PROCESS IS TO GET INFORMATION LIKE THAT

17   OUT, AND THEN WE'LL SEE WHERE WE GO FROM THERE.  THANK YOU,

18   SIR.

19           ANYBODY ELSE WHO FEELS THAT WAY?  OKAY.  TELL ME

20   YOUR NAME.

21           **PROSPECTIVE JUROR MONTILLA:**  MY NAME IS ROBERT

22   MONTILLA.  AND I HAVE BEEN -- MY FRIENDS, MY FAMILY, MY FRIENDS

23   AND MY CO-WORKERS ARE FOLLOWING THIS CASE, HAVE BEEN FOLLOWING

24   THIS CASE VERY CLOSELY.  WE HAVE BEEN DISCUSSING IT IN GREAT

25   DETAIL.  WE HAVE HEARD ABOUT IT ON THE NEWS AND ON WEBSITES

1  NEWS AND SPORTS-RELATED WEBSITES, AND BASED -- AND BASED ON

2  WHAT THE INFORMATION THAT HAS BEEN PRESENTED, I DON'T FEEL THAT

3  I FEEL I WOULD BE PRE- -- I WOULD BE INCLINED TO FIND IN FAVOR

4  OF THE DEFENSE.

5          **THE COURT:**  ALL RIGHT.  NOW, AGAIN, ONE OF THE

6  THINGS THAT ALL THE JURORS WILL BE TOLD IS, WHATEVER -- WE ALL

7  COME TO A COURTHOUSE WITH A LIFE BEHIND US AND WITH DISCUSSIONS

8  AND WITH HAVING READ NEWSPAPERS.  SO THE QUESTION WILL BE:  CAN

9  YOU PROMISE, AND THEN FOLLOW THROUGH ON THAT PROMISE, TO DECIDE

10 THE CASE JUST BASED ON THE EVIDENCE THAT YOU HEAR IN THE

11 COURTROOM AND NOT BASED ON THINGS THAT YOU HEARD OR READ PRIOR

12 TO COMING INTO COURT.  SO THAT'S THE QUESTION I'M ASKING YOU

13 NOW.  DO YOU THINK THAT YOU COULD DECIDE THE CASE JUST BASED ON

14 THIS EVIDENCE OR NOT?

15         **PROSPECTIVE JUROR MONTILLA:**  I CAN SAY THAT WITH NOT

16 ONE HUNDRED PERCENT CERTAINTY, BUT THAT I CAN.

17         **THE COURT:**  SO YOU'RE CONCERNED --

18         **PROSPECTIVE JUROR MONTILLA:**  YES.

19         **THE COURT:**  THANK YOU.

20         OTHER HANDS?  YES, SIR.

21         **PROSPECTIVE JUROR MASNACK:**  RAY MASNACK.  I AGREE

22 WITH THE FIRST GENTLEMAN.  THIS IS -- I DON'T KNOW.  SHAME ON

23 YOU PEOPLE.  THAT'S ALL.  AND, ONCE AGAIN, I FEEL, YOU KNOW,

24 PRETTY GOOD CHARGE ABOUT THE WHOLE THING, RIGHT NOW SITTING

25 HERE.  THAT PROBABLY WILL GO AWAY IN A WEEK OR TWO, I SUPPOSE.

1          ALSO, ANOTHER THING THAT KIND OF GETS ME IS TO SAY

2    THAT MY OPINION, YOU KNOW, OR HOW I FEEL ABOUT THINGS, I CAN'T

3    TAKE THAT INTO ACCOUNT EITHER, IT'S JUST THE RULES THAT YOU

4    GIVE ME TO, YOU KNOW -- SO IT'S ALMOST LIKE WHY HAVE ME HERE IF

5    I CAN'T --

6          **THE COURT:**  WELL, YOU PUT YOUR FINGER ON A VERY

7    IMPORTANT POINT, BECAUSE YOU WOULD HAVE TO AND ALL THE JURORS

8    HERE WOULD HAVE TO COMMIT TO DECIDE THE CASE BASED ON THE

9    EVIDENCE YOU HEAR IN THIS COURTROOM.  YOUR OPINIONS WOULD BE

10   IMPORTANT IN THAT YOU WOULD GET TO JUDGE THE CREDIBILITY OF THE

11   WITNESSES AND EVALUATE THE STRENGTHS OF THE EVIDENCE.  BUT YOU

12   WOULD HAVE TO PROMISE TO DECIDE THE CASE JUST BASED ON THE

13   EVIDENCE.  DO YOU THINK YOU COULD DO THAT?

14         **PROSPECTIVE JUROR MASNACK:**  WELL, STILL (GESTURES).

15   I WOULDN'T BET ON IT.

16         **THE COURT:**  ALL RIGHT.  ANYBODY ELSE FEELING THEY

17   WANT TO RESPOND ON THESE QUESTIONS?  IS THERE ANYBODY ELSE WHO

18   FEELS THAT HE OR SHE COULD NOT PROMISE TO DECIDE THE CASE BASED

19   ON THE EVIDENCE THAT YOU HEAR IN THE COURTROOM AND NOT BASED ON

20   ANYTHING YOU MAY HEAR OUTSIDE OF THE COURTROOM?  NO OTHER

21   HANDS.  OKAY.

22         IS THERE ANYBODY HERE WHO HAS HIMSELF OR HERSELF OR

23   YOUR CLOSE FRIENDS OR FAMILY EVER BEEN ARRESTED FOR OR CHARGED

24   WITH A CRIME?  ONCE AGAIN, ANYBODY WHO WANTS TO COME OVER TO

25   SIDEBAR MAY DO THAT.

```
1              PROSPECTIVE JUROR ROSS:  MY STEPDAUGHTER, DRUG USE,

2   DRUG ABUSE.

3              THE COURT:  OKAY.  WAS SHE PROSECUTED IN SOME WAY?

4              PROSPECTIVE JUROR ROSS:  YES.

5              THE COURT:  IS THERE ANYTHING ABOUT THAT EXPERIENCE

6   THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE IN

7   THIS CASE?

8              PROSPECTIVE JUROR ROSS:  NO.

9              THE COURT:  OTHER HANDS?  YES, SIR.

10             PROSPECTIVE JUROR LINDBERG:  RICHARD LINDBERG.

11   ABOUT 25 YEARS AGO MY WIFE, BEFORE I KNEW HER, WAS -- HAD A

12   DRUG CHARGE AND SERVED SOME TIME.

13             THE COURT:  ANYTHING ABOUT THAT EXPERIENCE THAT

14   WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

15             PROSPECTIVE JUROR LINDBERG:  NO.

16             THE COURT:  OKAY.  ANYBODY ELSE.  YES, SIR?

17             PROSPECTIVE JUROR MASNACK:  RAY MASNACK.  FEW YEARS

18   AGO I WAS ARRESTED FOR SOMEONE THAT WAS GROWING POT IN MY

19   GARAGE.

20             THE COURT:  OKAY.

21             PROSPECTIVE JUROR MASNACK:  NO, I DON'T THINK I

22   WOULD --

23             THE COURT:  THAT WOULD NOT AFFECT YOUR ABILITY TO BE

24   FAIR TO EITHER SIDE?

25             PROSPECTIVE JUROR MASNACK:  PROBABLY NOT.
```

1              **THE COURT:**  PROBABLY NOT?  I JUST NEED KNOW WHAT YOU

2    THINK.

3              **PROSPECTIVE JUROR MASNACK:**  NO.

4              **THE COURT:**  ALL RIGHT.  OTHER HANDS?  YES, SIR.

5              **PROSPECTIVE JUROR PELLY:**  TOM PELLY.  MY ROOMMATE IS

6    CURRENTLY FACING THREE CHARGES ABOUT ASSAULTING A POLICE

7    OFFICER.

8              **THE COURT:**  OKAY.  IN SAN FRANCISCO?

9              **PROSPECTIVE JUROR PELLY:**  YES.

10             **THE COURT:**  SO HE'S CURRENTLY IN THE PROCESS OF

11   THOSE CHARGES BEING RESOLVED?

12             **PROSPECTIVE JUROR PELLY:**  CORRECT.

13             **THE COURT:**  IS THERE ANYTHING ABOUT THAT THAT WOULD

14   MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE IN THIS CASE?

15             **PROSPECTIVE JUROR PELLY:**  NO.

16             **THE COURT:**  OTHER HANDS?  YES, MA'AM.

17             **PROSPECTIVE JUROR DEBRA SMITH:**  DEBRA SMITH.  MY

18   DAUGHTER WITH THE ONE CHARGE OF IDENTITY THEFT.

19             **THE COURT:**  ARE THOSE CHARGES COMPLETED?

20             **PROSPECTIVE JUROR DEBRA SMITH:**  YES.

21             **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE THAT

22   WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

23             **PROSPECTIVE JUROR DEBRA SMITH:**  NO.

24             **THE COURT:**  OKAY.  YES, MA'AM.

25             **PROSPECTIVE JUROR ALDAMA:**  ANGELINA ALDAMA.  MY

```
 1   SISTER'S BOYFRIEND HAS BEEN ARRESTED.  I DON'T KNOW WHAT FOR.

 2        THE COURT:  SO THAT'S GOING ON RIGHT NOW?

 3        PROSPECTIVE JUROR ALDAMA:  NO.  IT'S FULLY

 4   COMPLETED, BUT HE'S BEEN ARRESTED PRIOR.

 5        THE COURT:  ANYTHING ABOUT THAT THAT WOULD MAKE IT

 6   HARD FOR YOU TO BE FAIR TO EITHER SIDE IN THIS CASE?

 7        PROSPECTIVE JUROR ALDAMA:  NO.

 8        THE COURT:  OTHER HANDS.  YES, MA'AM.

 9        PROSPECTIVE JUROR O'BRIAN:  CAN I SPEAK IN PRIVATE,

10   THOUGH?

11        THE COURT:  OF COURSE.

12        (SIDEBAR DISCUSSION HELD OUT OF THE HEARING OF THE

13          PROSPECTIVE JURY.)

14        THE COURT:  WHAT IS YOUR NAME?

15        PROSPECTIVE JUROR O'BRIAN:  MARIE O'BRIAN.

16        MR. PARRELLA:  I'M SORRY?

17        PROSPECTIVE JUROR O'BRIAN:  MARIE O'BRIAN.  I'M

18   VERY, VERY CLOSE TO THE FAGANS WHO HAD THE BIG TRIAL HERE.

19        THE COURT:  THE WHO?

20        PROSPECTIVE JUROR O'BRIAN:  THE FAGANS, THE POLICE

21   OFFICERS.  THEY'RE VERY CLOSE FAMILY FRIENDS.  TO ME THAT WAS A

22   VERY DIFFICULT THING TO GO THROUGH.  THE DAUGHTER IS ONE OF MY

23   BEST FRIENDS, AND MY DAD TAUGHT WITH THE EX-WIFE.  SO I HAVE

24   KNOWN THAT FAMILY ALL MY LIFE.  THAT WAS A REALLY LONG PROCESS

25   TO GO THROUGH.
```

```
1              MR. BALOGH:  YEAH.

2              THE COURT:  AS YOU CAN PROBABLY TELL, THIS CASE IS

3   COMPLETELY UNRELATED TO THAT.

4              PROSPECTIVE JUROR O'BRIAN:  RIGHT, RIGHT.  IT'S JUST

5   THE WHOLE COURT PROCESS AND THE WHOLE, JUST, POLICE SYSTEM AND

6   EVERYTHING IS --

7              THE COURT:  DO YOU THINK IT WOULD MAKE IT HARD FOR

8   YOU TO BE FAIR TO EITHER SIDE IN THIS CASE?

9              PROSPECTIVE JUROR O'BRIAN:  IT MIGHT JUST BECAUSE IT

10  WAS SUCH A LONG PROCESS AND A LOT TO DO, SO --

11             MR. BALOGH:  CAN WE ASK YOU TO EXPLAIN HOW WOULD IT

12  AFFECT YOU IN THIS CASE AS FAR AS IN FAVOR OF ONE SIDE OR THE

13  OTHER?

14             PROSPECTIVE JUROR O'BRIAN:  I THINK IT'S MORE THE

15  WHOLE GOVERNMENT INVOLVEMENT, YOU KNOW.  YOU KNOW, I RESPECT

16  THE CITY, AND THAT WAS JUST A LOT FOR ME TO TAKE AS BEING A

17  CITIZEN OF THE CITY, YOU KNOW, AND TO HAVE THE GOVERNMENT, LIKE

18  THE POLICE, AND JUST NOT BEING ABLE TO TRUST IT.  I HAVE A LOT,

19  YOU KNOW, SO I THINK -- I MEAN, I THINK I COULD BE FAIR WITH

20  IT, BUT . . .

21             MR. BALOGH:  YOU WOULDN'T HOLD THAT AGAINST ME OR

22  THESE GENTLEMAN HERE, THAT EXPERIENCE?

23             PROSPECTIVE JUROR O'BRIAN:  NO.

24             MR. BALOGH:  AND TREAT THEM DIFFERENTLY?  YOU WOULD

25  LISTEN TO THE WITNESSES AND WHATEVER YOU BELIEVE THE FACTS
```

1  WERE, YOU WOULD BE ABLE TO DECIDE THIS CASE?

2          **PROSPECTIVE JUROR O'BRIAN:**  DEFINITELY.

3          **MR. NEDROW:**  MAY I ASK, CLARIFY?  IS THIS WHERE THE

4  SON ACTUALLY HAD THE PROSECUTION --

5          **MR. BALOGH:**  FAJITAVILLE?

6          **PROSPECTIVE JUROR O'BRIAN:**  YES.

7          **MR. NEDROW:**  DID THAT CASE GO TO TRIAL?

8          **PROSPECTIVE JUROR O'BRIAN:**  IT DID.

9          **MR. NEDROW:**  AND THERE WAS A RESOLUTION?

10          **PROSPECTIVE JUROR O'BRIAN:**  AND HE WAS ACQUITED.

11          **THE COURT:**  THAT WAS IN STATE COURT I THINK.

12          **PROSPECTIVE JUROR O'BRIAN:**  YES.

13          **THE COURT:**  SO, AS YOU KNOW, THIS IS FEDERAL COURT,

14  SO IT'S A SLIGHTLY DIFFERENT -- I'M SORRY.  I DIDN'T MEAN TO

15  INTERRUPT YOU, MR. NEDROW.

16          **MR. NEDROW:**  THANK YOU.  I APPRECIATE THE

17  CLARIFICATION.  THE PROCESS THAT YOUR FEELINGS ARE STEMMING

18  FROM ARE FROM THAT PROSECUTION OF THE YOUNG MAN ON THE ASSAULT

19  THING --

20          **PROSPECTIVE JUROR O'BRIAN:**  RIGHT.

21          **MR. NEDROW:**  THANK YOU VERY MUCH.

22          **THE COURT:**  I CAN -- OBVIOUSLY IT'S A MATTER OF SOME

23  CONCERN TO YOU, AND YOU BROUGHT IT TO OUR ATTENTION.  DO YOU

24  THINK, THOUGH, IN EXAMINING YOUR OWN CONSCIENCE, YOU COULD BE

25  FAIR TO BOTH SIDES IN THIS CASE?

```
1              PROSPECTIVE JUROR O'BRIAN:  YES.

2              THE COURT:  THANK YOU.

3          MR. NEDROW:  THANK YOU, YOUR HONOR.

4          MR. BALOGH:  THANK YOU, YOUR HONOR.

5          (END OF SIDE BAR DISCUSSION; PROCEEDINGS RESUMED IN

6          THE HEARING OF THE PROSPECTIVE JURORS.)

7              THE COURT:  ANYBODY ELSE?

8          PROSPECTIVE JUROR REGEN:  SAM REGION.  MINOR

9   POSSESSION OF A CONTROLLED SUBSTANCE IN 1982, LONG TIME AGO.

10             THE COURT:  OKAY.  ANYTHING ABOUT THAT EXPERIENCE

11  THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR TO EITHER SIDE IN

12  THIS CASE?

13             PROSPECTIVE JUROR REGEN:  I DON'T THINK SO.

14             THE COURT:  ANYBODY ELSE?  NO HANDS.  OKAY.

15             THERE WILL BE TESTIMONY FROM THE WITNESSES WHOSE

16  NAMES I READ YOU.  INCLUDED AMONG THOSE WITNESSES WILL BE

17  SOME -- THERE WILL AT LEAST BE ONE REPRESENTATIVE OF THE

18  INTERNAL REVENUE SERVICE, AND PERHAPS SOME OTHER LAW

19  ENFORCEMENT WITNESSES.  YOU'LL BE INSTRUCTED THAT YOU ARE TO

20  DECIDE THE CASE BASED ON THE EVIDENCE THAT YOU HEAR IN THIS

21  COURTROOM.  YOU ARE TO EVALUATE THE CREDIBILITY OF THE

22  WITNESSES WHOM YOU LISTEN TO BASED ON YOUR GOOD JUDGMENT AND

23  EXPERIENCE.

24             IS THERE ANYBODY WHO WOULD FIND IT DIFFICULT TO

25  FAIRLY EVALUATE THE TESTIMONY, FOR EXAMPLE, OF AN IRS AGENT
```

```
 1  EITHER POSITIVELY OR NEGATIVELY?  ANYBODY WHO FEELS THAT WAY?

 2           YES, MA'AM.  WHAT IS YOUR NAME?  I NEED YOUR NAME

 3  FIRST.

 4           PROSPECTIVE JUROR TAYLOR:  CECELIA TAYLOR.

 5           THE COURT:  AND SAY AGAIN NOW.

 6           PROSPECTIVE JUROR TAYLOR:  MY FIANCE IS A FORMER IRS

 7  AGENT.  I HEARD SO MANY STORIES I'M KIND OF ALREADY -- SCALE

 8  WEIGHTED MORE IN HIS FAVOR.

 9           THE COURT:  ALL RIGHT.  AGAIN, THE INSTRUCTION YOU

10  WOULD BE GIVEN IS TO EVALUATE THE CASE BASED YOUR ASSESSMENT OF

11  THE EVIDENCE YOU HEAR IN THIS COURTROOM.  DO YOU THINK YOU CAN

12  DO THAT, OR DO YOU THINK IT WOULD BE TOO HARD FOR YOU TO DO

13  THAT?

14           PROSPECTIVE JUROR TAYLOR:  HONESTLY, IT WOULD BE A

15  DIFFICULT THING, BECAUSE IT'S LIKE I THINK I WOULD RELATE A LOT

16  OF STORIES SIMILAR TO WHAT YOU'RE ALREADY MENTIONED A LITTLE

17  BIT ABOUT THIS CASE.  I'M ALREADY TIPPING THE SCALE.  OH, YEAH,

18  YEAH.

19           THE COURT:  ALL RIGHT.  THANK YOU.

20           PROSPECTIVE JUROR TAYLOR:  I'M SORRY.

21           THE COURT:  OKAY.  ANYBODY ELSE?  NO RESPONSE?

22           WE'VE TOUCHED ON THIS, BUT I WANT TO MAKE SURE I

23  COVER ALL OF THESE POINTS.

24           YOU WILL BE INSTRUCTED IF YOU ARE ON THE JURY THAT

25  IT'S YOUR DUTY AS A JUROR TO SET ASIDE YOUR PERSONAL FEELINGS
```

1  ABOUT WHAT THE LAW SHOULD BE AND FOLLOW THE LEGAL RULES THAT I

2  WILL GIVE YOU IN THE INSTRUCTIONS.  IS THERE ANYBODY WHO CANNOT

3  PROMISE TO FOLLOW THE INSTRUCTIONS THAT I GIVE YOU BOTH AT THE

4  BEGINNING AND AT THE END OF THE CASE AS TO WHAT THE LAW IS THAT

5  YOU'RE TO APPLY?  NO HANDS.

6          ASSUMING THAT AT THE CONCLUSION THE CASE THE

7  GOVERNMENT HAS NOT MET -- ASSUMING THAT YOU BELIEVE AT THE

8  CONCLUSION OF THE CASE THAT THE GOVERNMENT HAS NOT MET ITS

9  BURDEN OF PROVING THE CASE OR THE ELEMENTS, EACH ELEMENT OF THE

10 CASE BEYOND A REASONABLE DOUBT, IS THERE ANYONE WHO WOULD NOT

11 BE ABLE TO VOTE FOR ACQUITTAL IF YOU FEEL THE GOVERNMENT HAS

12 NOT PROVED ITS CASE BEYOND A REASONABLE DOUBT?  NO HANDS.

13         IF AT THE END OF THE CASE YOU FEEL THAT THE

14 GOVERNMENT DID PROVE EVERY ELEMENT THAT IT WAS OBLIGED TO PROVE

15 BY PROOF BEYOND A REASONABLE DOUBT, IF YOU THOUGHT THE

16 GOVERNMENT DID DO THAT, IS THERE ANYBODY HERE WHO WOULD NOT

17 VOTE TO CONVICT IF YOU THOUGHT THE GOVERNMENT HAD PROVED ITS

18 CASE BEYOND A REASONABLE DOUBT?  NO HANDS.

19         ALL RIGHT.  AT THIS TIME, LADIES AND GENTLEMEN, WE

20 WILL HAVE OUR POP QUIZ.

21         SO, TRACY, IF YOU WOULD GIVE THE FIRST GENTLEMAN IN

22 THE BACK THERE, THAT WOULD BE MR. -- IT WOULD HELP US IF YOU

23 STAND UP AND ANSWER THE QUESTIONS SLOWLY.

24         **PROSPECTIVE JUROR CHROBAK:**  MY NAME IS DAVE CHROBAK.

25 MY CITY OF RESIDENCE IS PLEASANT HILL, CALIFORNIA.  I'M

1   CURRENTLY WORKING FOR EXPRESS MOBILE START-UP.  ORGANIZATIONS,

2   NONE.  HOBBIES, COMPUTER, COMPUTER-RELATED PROGRAMMING AND

3   MUSIC.  MARITAL STATUS, MARRIED.  MY WIFE DOES NOT WORK.  SHE

4   TAKES CARE OF THE KIDS.  I HAVE TWO KIDS AGES ALMOST FOUR AND

5   FOUR MONTHS.  I WAS NEVER A JUROR IN ANOTHER CASE.  I WAS NEVER

6   A GRAND JUROR.  AND I WAS NEVER IN THE MILITARY.

7            **THE COURT:**  ALL RIGHT.  WHAT DO YOU DO FOR EXPRESS

8   MOBILE?

9            **PROSPECTIVE JUROR CHROBAK:**  I'M A PROGRAMMER, JAVA

10  PROGRAMMER.

11           **THE COURT:**  THANK YOU.

12           **PROSPECTIVE JUROR OLKEN:**  MY NAME IS CHARLES OLKEN.

13  I LIVE IN ALAMEDA.  I'M PUBLISHER OF A SMALL MAGAZINE.

14  ORGANIZATIONS THAT I BELONG TO?  OH, ASIDE FROM DEMOCRATIC

15  PARTY, WHICH MAY NOT BE AN ORGANIZATION DEPENDING ON WHICH DAY

16  YOU ARE WATCHING.  YOUTH SOCCER ORGANIZATIONS, SOME OTHER

17  THINGS LIKE THAT, LOCAL THINGS.  HOBBIES, POLITICS, SPORTS.

18  I'M MARRIED.  MY WIFE IS THE OFFICE MANAGER FOR MY BUSINESS.  I

19  HAVE TWO CHILDREN, 41 AND 37.  I HAVE NEVER BEEN A JUROR ON

20  ANOTHER CASE OR A GRAND JUROR.  I SERVED IN THE ARMY RESERVE

21  AND SERVED ON ACTIVE DUTY BACK IN 1970'S.

22           **THE COURT:**  WHAT DID YOU DO IN THE ARMY IN THE

23  1970'S?

24           **PROSPECTIVE JUROR OLKEN:**  I WAS IN ARMY

25  INTELLIGENCE.

1               **THE COURT:**  WHERE DID YOU SERVE?

2               **PROSPECTIVE JUROR OLKEN:**  AT THE PRESIDIO AND AT THE

3  PENTAGON.

4               **THE COURT:**  HOW LONG WERE YOU ON ACTIVE DUTY?

5               **PROSPECTIVE JUROR OLKEN:**  FOUR MONTHS, PLUS SUMMERS.

6               **THE COURT:**  AND DOES EITHER OF YOUR CHILDREN HAVE A

7  JOB OUTSIDE THE HOME?

8               **PROSPECTIVE JUROR OLKEN:**  YES, THEY DO.

9               **THE COURT:**  WHAT DO THEY DO?

10              **PROSPECTIVE JUROR OLKEN:**  MY SON WORKS FOR A

11 SOFTWARE COMPANY, AND MY DAUGHTER IS A HIGH SCHOOL PRINCIPAL.

12              **THE COURT:**  THANK YOU.

13              **PROSPECTIVE JUROR WARD SMITH:**  MY NAME IS WARD

14 SMITH, AND MY CITY OF RESIDENCE IS WALNUT CREEK, CALIFORNIA.

15 MY OCCUPATION STATUS IS I'M RETIRED.  I DON'T BELONG TO ANY

16 ORGANIZATIONS, AND I DON'T HAVE ANY REAL HOBBIES.  MY MARITAL

17 STATUS IS SINGLE, AND I HAVE NO CHILDREN.  I WAS ON ANOTHER

18 CASE FOR THE GRAND JURY, AND I'VE NEVER BEEN IN THE MILITARY.

19              **THE COURT:**  OKAY.  WHAT DID YOU DO BEFORE YOU

20 RETIRED?

21              **PROSPECTIVE JUROR WARD SMITH:**  I WAS A CUSTODIAN.

22              **THE COURT:**  OKAY.  FOR WHAT KIND OF COMPANY?

23              **PROSPECTIVE JUROR WARD SMITH:**  SCHOOL DISTRICT.

24              **THE COURT:**  OKAY.  ALL RIGHT.  DID YOU SIT ON A JURY

25 TRIAL BEFORE?

1          **PROSPECTIVE JUROR WARD SMITH:**  YEAH.

2          **THE COURT:**  DO YOU REMEMBER IF IT WAS A CRIMINAL

3  CASE OR A CIVIL CASE?

4          **PROSPECTIVE JUROR WARD SMITH:**  I'M NOT SURE.

5          **THE COURT:**  ALL RIGHT.  DON'T TELL ME WHAT HAPPENED,

6  BUT DID THE JURY REACH A VERDICT IN THAT CASE?

7          **PROSPECTIVE JUROR WARD SMITH:**  JURY CAME OUT -- IT

8  WAS A HUNG JURY.

9          **THE COURT:**  HUNG JURY, OKAY.  THANK YOU, SIR.

10          **PROSPECTIVE JUROR MONTILLA:**  MY NAME IS ROBERT

11  MONTILLA.  I LIVE IN AMERICAN CANYON, AND I WORK FOR THE

12  DOCTORS COMPANY, WHICH IS A MEDICAL MALPRACTICE INSURANCE

13  CARRIER, AS A POLICY ANALYST.  I DON'T BELONG TO ANY

14  ORGANIZATIONS.  MY HOBBIES INCLUDE SURFING THE INTERNET,

15  PLAYING VIDEO GAMES, FOLLOWING SPORTS AND DOING CROSSWORD

16  PUZZLES.  I'M SINGLE, AND I HAVE NO CHILDREN.  I WAS NEVER A

17  JUROR ON ANOTHER CASE, NOR WAS I EVER A GRAND JUROR.  AND I WAS

18  NEVER IN THE MILITARY.

19          **THE COURT:**  ALL RIGHT.  THANK YOU.

20          **PROSPECTIVE JUROR JAMES:**  MY NAME IS NORALAINE

21  JAMES, RESIDENT OF SAN BRUNO.  I WORK AS A TECHNICAL DESIGN

22  SPEC WRITER, AND I BELONG TO (UNINTELLIGLE) INTERNATIONAL,

23  (UNINTELLIGIBLE) ORGANIZATION.  I LIKE TO PLAY DRUMS, AFRICAN.

24  MARRIED.  MY HUSBAND WORKS FOR THE WATER DEPARTMENT.  NO

25  CHILDREN.  I'M 42.  I WAS AN ALTERNATE JUROR IN A CIVIL CASE.

```
 1   I THINK IT MIGHT BE LIKE IN THE '90'S.  AND MY HUSBAND WAS IN

 2   THE MILITARY.  OKAY.

 3          THE COURT:  WHEN YOU WERE AN ALTERNATE JUROR, DID

 4   YOU GET TO SIT IN ON THE DELIBERATIONS?

 5          PROSPECTIVE JUROR JAMES:  YES, I WAS JUST A SUB, A

 6   SUBSTITUTE, SO I GOT TO LISTEN TO THE WHOLE THING, BUT I -- YOU

 7   KNOW, I DIDN'T -- I DIDN'T -- I NEVER GOT TO REPLACE ANYBODY.

 8          THE COURT:  ALL RIGHT.  WAS THERE ANYTHING ABOUT

 9   THAT EXPERIENCE THAT WOULD MAKE IT HARD FOR YOU TO BE A FAIR

10   JUROR HERE?

11          PROSPECTIVE JUROR JAMES:  NO, NOTHING.

12          THE COURT:  ALL RIGHT.  THANK YOU.

13          PROSPECTIVE JUROR THIGPEN:  MY NAME IS SARA THIGPEN.

14   I LIVE IN SAN ANSELMO.  I WORK AT A STAFFING AGENCY PLACING

15   NANNIES AND HOUSEHOLD STAFF IN PRIVATE HOMES.  I DON'T BELONG

16   TO ANY ORGANIZATIONS.  HOBBIES, YOGA, RAISING KIDS.  I'M

17   MARRIED.  MY HUSBAND IS A SENIOR GRAPHIC DESIGNER.  I HAVE TWO

18   LITTLE BOYS WHO ARE SEVEN AND FIVE.  I WAS ON ANOTHER CASE, A

19   CRIMINAL CASE, IN THE '90'S.  WE FOUND THE DEFENDANT GUILTY.

20   NEVER ON A GRAND JURY, NEVER SERVED IN THE MILITARY.

21          THE COURT:  OKAY.  ANYTHING ABOUT YOUR EXPERIENCE ON

22   THAT CRIMINAL JURY THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR

23   TO EITHER SIDE HERE?

24          PROSPECTIVE JUROR THIGPEN:  (SHAKES HEAD.)

25          THE COURT:  THAT WAS A NO?
```

1            **PROSPECTIVE JUROR THIGPEN:**  NO.

2            **THE COURT:**  OKAY.  I NEED ALOUD.

3            AND, ACTUALLY, THE NEXT PERSON IN LINE FOR NO VERY

4   GOOD REASON IS THIS LADY DOWN HERE.

5            **PROSPECTIVE JUROR TEAL:**  HI.  MY NAME IS SUZANNE

6   TEAL.  I LIVE IN SANTA ROSA, CALIFORNIA.  I DO NOT WORK OUTSIDE

7   OF THE HOME.  I HAVE BEEN A TEACHER AND A SCHOOL COUNSELOR

8   BEFORE CHILDREN.  I DO BELONG TO A SPIRITUAL GROUP CALLED CORE

9   LIGHT, WHICH IS A -- WE MEDITATE, AND WE WORK ON ISSUES FOR

10  WORLD PEACE.  MY HOBBIES ARE NATURE, GARDENING, HIKING, MUSIC,

11  READING.  I'M MARRIED.  MY HUSBAND IS AN ATTORNEY IN SANTA

12  ROSA.  I HAVE FOUR CHILDREN.  OUR OLDEST ONE HAS PASSED.  THE

13  NEXT AGES ARE 31, 29 AND 27.  I WAS NOT A JUROR ON ANOTHER CASE

14  OR ON THE GRAND JURY.  AND I WAS NOT -- I HAVE NOT BEEN IN THE

15  MILITARY.

16            **THE COURT:**  OF YOUR THREE CHILDREN WHO ARE GROWN UP,

17  ANY OF THEM HAVE JOBS OUTSIDE THE HOME?

18            **PROSPECTIVE JUROR TEAL:**  YES.

19            **THE COURT:**  WHAT DO THEY DO?

20            **PROSPECTIVE JUROR TEAL:**  MY DAUGHTER IS AN ATTORNEY.

21  MY MIDDLE SON IS AN IT COMPUTER PERSON.  AND MY THIRD ONE IS A

22  MANAGER OF A PAINTING CONTRACTING BUSINESS.

23            **THE COURT:**  STARTING WITH YOUR HUSBAND, WHAT KIND OF

24  A LAWYER IS HE?

25            **PROSPECTIVE JUROR TEAL:**  HE DOES MEDICAL MALPRACTICE

```
 1   AND PRODUCT LIABILITY, AND HE IS SELF-EMPLOYED.  HE'S GOT HIS

 2   OWN FIRM.

 3              THE COURT:  DO YOU KNOW, DOES HE REPRESENT PEOPLE

 4   SUING FOR MEDICAL MALPRACTICE OR DEFENDING DOCTORS?

 5              PROSPECTIVE JUROR TEAL:  SUING FOR.  HE'S A . . .

 6              THE COURT:  AND YOUR DAUGHTER, THE ATTORNEY, WHAT

 7   KIND OF LAW DOES SHE PRACTICE?

 8              PROSPECTIVE JUROR TEAL:  SHE'S DOING A LITTLE BIT OF

 9   EVERYTHING.  SHE'S THE MOTHER WITH A TEN-MONTH OLD, AND SHE'S

10   WORKING OUTSIDE OF THE -- IN HER OWN HOME, WORKING FOR AN

11   ATTORNEY WHO DOES A MYRIAD OF THINGS.  I DON'T KNOW IF SHE'S

12   A -- JUST A VARIETY OF LAW.  BUT I'M TRYING TO THINK.  I DON'T

13   THINK IT'S DEFENSE WORK.  IT'S NOT DEFENSE WORK.

14              THE COURT:  ALL RIGHT.  DOES SHE DO ANY CRIMINAL

15   WORK?

16              PROSPECTIVE JUROR TEAL:  NO.

17              THE COURT:  ALL RIGHT.  THANK YOU.

18              PROSPECTIVE JUROR ROSS:  JACK ROSS.  I LIVE IN

19   OAKLAND.  I'M EMPLOYED AS A SUPPLY CHAIN MANAGER.  I DON'T

20   BELONG TO ANY ORGANIZATIONS.  CAR RESTORATION IS MY BIGGEST

21   HOBBY, AND WALKING AND RUNNING.  I'M MARRIED.  MY WIFE IS A

22   REALTOR.  FOUR CHILDREN.  THE OLDEST, DECEASED.  THE LIVING

23   CHILDREN, 40 YEARS OF AGE, AND A STEPDAUGHTER 21, AND A

24   DAUGHTER 21.

25              I WAS A JUROR ON A CRIMINAL CASE.
```

1      **THE COURT:**  OKAY.  LET ME JUST INTERRUPT YOU, AND

2   I'LL ASK EVERYBODY ELSE.  IF YOU TELL ME ABOUT CRIMINAL CASES,

3   I WILL WANT TO KNOW IF YOU REACHED A VERDICT, BUT I WILL NOT

4   WANT TO KNOW WHAT THE VERDICT WAS.

5      **PROSPECTIVE JUROR ROSS:**  IT WAS PLEA BARGAINED.  AND

6   I WAS NEVER A GRAND JUROR, AND I HAVE NOT BEEN IN THE MILITARY.

7      **THE COURT:**  OKAY.  ANY OF YOUR THREE CHILDREN HAVE

8   JOBS OUTSIDE THE HOME?

9      **PROSPECTIVE JUROR ROSS:**  YEAH, MY STEPSON OWNS HIS

10  OWN TREE SERVICE COMPANY.  AND MY STEPDAUGHTER WORKS AT A BAR,

11  AND MY DAUGHTER IS A STUDENT.

12     **THE COURT:**  ALL RIGHT.  THANK YOU.

13     **PROSPECTIVE JUROR LINDBERG:**  RICHARD LINDBERG.  I

14  LIVE IN NAPA.  I'M RETIRED.  BEFORE I WAS RETIRED, I WAS A

15  COMPUTER PROGRAMMER FOR THE DOCTORS COMPANY, MEDICAL LIABILITY

16  INSURANCE COMPANY.  I BELONG TO THE AMERICAN ORCHID SOCIETY,

17  SAN FRANCISCO ORCHID SOCIETY, AND THAT LEADS INTO MY HOBBY,

18  WHICH IS ORCHIDS.  I'M MARRIED.  MY WIFE IS RETIRED.  I HAVE

19  TWO SONS, 38 AND 36.  I HAVE BEEN A JUROR ON TWO TRIALS -- TWO

20  CRIMINAL TRIALS AND AN ALTERNATE JUROR ON A CRIMINAL TRIAL.

21  NEVER BEEN A GRAND JUROR.  I SERVED ON ACTIVE DUTY FROM 1966 TO

22  1970 IN -- ALONG THE EAST GERMAN BORDER.

23     **THE COURT:**  EAST GERMAN BORDER?

24     **PROSPECTIVE JUROR LINDBERG:**  YES.

25     **THE COURT:**  WERE YOU IN THE ARMY?

1          **PROSPECTIVE JUROR LINDBERG:**  IN THE ARMY, YES, I WAS

2  ARMY SECURITY AGENCY.

3          **THE COURT:**  EITHER OF YOUR SONS HAVE A JOB OUTSIDE

4  THE HOME?

5          **PROSPECTIVE JUROR LINDBERG:**  YES, THEY DO.  THE

6  OLDEST SON IS COMPUTER SECURITY CONTRACTOR.  THE OTHER WORKS

7  FOR THE GAP IN HUMAN RESOURCES.

8          **THE COURT:**  AND WHAT DID YOUR WIFE RETIRE FROM?

9          **PROSPECTIVE JUROR LINDBERG:**  SHE WAS A MANICURIST.

10  SHE RAN HER OWN SHOP.

11          **THE COURT:**  WITHOUT TELLING ME HOW THEY CAME OUT,

12  DID THE TWO CRIMINAL JURY TRIALS YOU SAT ON REACH VERDICTS?

13          **PROSPECTIVE JUROR LINDBERG:**  YES.

14          **THE COURT:**  IS THERE ANYTHING ABOUT ANY OF YOUR

15  TRIAL EXPERIENCES UP UNTIL NOW THAT WOULD MAKE IT HARD FOR YOU

16  TO BE FAIR TO EITHER SIDE IN THIS CASE?

17          **PROSPECTIVE JUROR LINDBERG:**  NO.

18          **THE COURT:**  OKAY, THANK YOU.

19          **PROSPECTIVE JUROR BULL:**  HI.  MY NAME IS GORDON

20  BULL.  I LIVE IN SAN MATEO.  MY OCCUPATIONAL STATUS, I'M A

21  COMPANY SALES MANAGER FOR A COMPANY NAMED JOHNSON CONTROLS.  NO

22  REAL HOBBIES, WORKING OUT POSSIBLY.  MARITAL STATUS, SINGLE.

23  NO CHILDREN.  I WAS IN A CRIMINAL TRIAL BACK IN THE EARLY

24  '80'S, AND THEY DID COME TO A RESOLUTION.

25          **THE COURT:**  THEY DID OR DID NOT?

1          **PROSPECTIVE JUROR BULL:**  DID.  WE DID.

2          NEVER ON A GRAND JURY, AND I HAVE NEVER BEEN IN THE

3  MILITARY.

4          **THE COURT:**  ANYTHING ABOUT THAT JURY EXPERIENCE THAT

5  WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

6          **PROSPECTIVE JUROR BULL:**  NO.

7          **THE COURT:**  ALL RIGHT.  THANK YOU.

8          **PROSPECTIVE JUROR NURU:**  MOHAMMED NURU.  I LIVE HERE

9  IN SAN FRANCISCO.  OCCUPATION, I WORK FOR THE CITY AND COUNTY

10  OF SAN FRANCISCO IN THE DEPARTMENT OF PUBLIC WORKS AS A DEPUTY

11  DIRECTOR OF OPERATIONS.  ORGANIZATIONS, I BELONG TO THE BAY

12  AREA RIDGE TRAIL AS A BOARD MEMBER.

13          **THE COURT:**  THE WHAT?

14          **PROSPECTIVE JUROR NURU:**  RIDGE.

15          **THE COURT:**  OH, RIDGE TRAIL.

16          **PROSPECTIVE JUROR NURU:**  YES.

17          **THE COURT:**  THANK YOU.

18          **PROSPECTIVE JUROR NURU:**  HOBBIES, I PLAY SOCCER AND

19  GARDEN AND SMALL WINE COLLECTION.  MARRIED.  I'M ACTUALLY

20  DIVORCED WITH FIVE CHILDREN, HAVE CUSTODY OF THE CHILDREN.

21  WHEN MY SPOUSE -- WHEN I WAS WITH MY SPOUSE, MY SPOUSE WORKED

22  IN CLOTHING STORE.  CHILDREN AGES 20, 18, 16, 14, AND 10.

23          **THE COURT:**  GOOD.  I WAS AFRAID THERE.

24          **PROSPECTIVE JUROR NURU:**  NEVER BEEN ON A JURY.  I

25  DID TESTIFY IN A GRAND JURY SEVERAL YEARS AGO FOR THE CITY AND

1   COUNTY ON A GRAFFITI GRAND JURY.  AND NEVER BEEN IN THE

2   MILITARY.

3            **THE COURT:**  OKAY.  THE REASON WE ASK ABOUT GRAND

4   JURIES IS TO MAKE SURE THAT YOU UNDERSTAND THAT THE FUNCTION OF

5   A JURY LIKE WE'RE PICKING HERE IS DIFFERENT FROM THE FUNCTION

6   OF A GRAND JURY.  IN THIS CASE YOU WILL BE ASKED TO DECIDE

7   WHETHER YOU FIND THAT THE GOVERNMENT HAS PROVED BEYOND A

8   REASONABLE DOUBT THAT THE DEFENDANT DID WHAT SHE'S CHARGED WITH

9   HAVING DONE.  THE STANDARDS ARE MUCH LOWER AND MUCH DIFFERENT

10  IN THE GRAND JURY SETTING.  DO YOU UNDERSTAND THAT, SIR?

11           **PROSPECTIVE JUROR NURU:**  YES, I DO.

12           **THE COURT:**  AND YOU WOULD FOLLOW THE COURT'S

13  DIRECTION ON THE BURDEN OF PROOF?

14           **PROSPECTIVE JUROR NURU:**  YES, I WILL.

15           **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

16           **PROSPECTIVE JUROR MASNACK:**  RAY MASNACK.  I LIVE IN

17  SONOMA.  I HAVE A SMALL ORGANIC DOG COOKIE COMPANY.

18           **THE COURT:**  A SMALL ORGANIC WHAT?

19           **PROSPECTIVE JUROR MASNACK:**  DOG COOKIES.  NO

20  HOBBIES.  PLAY WITH MY DOGGIE.  NOT MARRIED.  NO CHILDREN.  NO

21  JURY EXPERIENCE, GRAND OR REGULAR.  AND NEVER BEEN IN THE

22  MILITARY.

23           **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

24           **PROSPECTIVE JUROR STREET:**  MY NAME IS JOE STREET.  I

25  LIVE IN SAN FRANCISCO.  I AM CURRENTLY A GRADUATE STUDENT AT

1    STANFORD UNIVERSITY.  I'M ALSO A RESEARCH FELLOW IN THE

2    INSTITUTE OF MARINE SCIENCES AT U.C. SANTA CRUZ.  I AM A MEMBER

3    OF THE AMERICAN GEOPHYSICAL UNION AND SEVERAL ENVIRONMENTAL

4    ORGANIZATIONS.  I CAN NAME THEM IF YOU LIKE.

5            HOBBIES:  BEING OUTDOORS, EXERCISE, FOLLOWING SPORTS

6    AND MUSIC.  I AM MARRIED.  MY SPOUSE IS A SCHOOL TEACHER.  WE

7    HAVE NO CHILDREN, ALTHOUGH WE DO HAVE TWINS ON THE WAY.  I'VE

8    NEVER BEEN A JUROR ON ANOTHER CASE, NOR HAVE I EVER BEEN A

9    GRAND JUROR.  AND I'VE NEVER BEEN IN THE MILITARY.

10           **THE COURT:**  THANK YOU, SIR.

11           **PROSPECTIVE JUROR CONWAY:**  MY NAME IS DANIEL CONWAY.

12   I LIVE IN NOVATO, CALIFORNIA.  OCCUPATION, I WORK FOR THE STATE

13   OF CALIFORNIA DEPARTMENT OF CORRECTIONS AT SAN QUENTIN.

14   ORGANIZATIONS, NONE.  HOBBIES, OUTDOORS, FOLLOWING SPORTS.

15           I AM MARRIED.  MY WIFE WORKS AS A CLERK FOR A MOVING

16   COMPANY, BEKINS.  I HAVE TWO CHILDREN, AGES 20 AND 17, BOTH

17   ATTENDING SCHOOL.  I WAS ALSO A JUROR ONCE IN A CIVIL CASE THAT

18   SETTLED RIGHT BEFORE THE TRIAL ACTUALLY STARTED.  I WAS NEVER

19   IN THE GRAND JURY.  I WAS IN THE MILITARY FROM 1969 TO 1971.

20           **THE COURT:**  WHAT BRANCH OF THE MILITARY WERE YOU IN?

21           **PROSPECTIVE JUROR CONWAY:**  ARMY.

22           **THE COURT:**  WHERE DID YOU SERVE?

23           **PROSPECTIVE JUROR CONWAY:**  IN EUROPE.

24           **THE COURT:**  WHEREABOUTS IN EUROPE?

25           **PROSPECTIVE JUROR CONWAY:**  GERMANY.

1              **THE COURT:**  MAYBE YOU WERE NEIGHBORS.  THANK YOU.

2              **PROSPECTIVE JUROR HAROIAN:**  MY NAME IS ANTHONY

3    HAROIAN.  I LIVE IN SAN FRANCISCO.  I AM ELECTRICAL ENGINEER

4    FOR PG&E.  I DON'T BELONG TO ANY ORGANIZATIONS.  MY HOBBIES ARE

5    SWIMMING.  I FOLLOW BASEBALL A LITTLE BIT, NONE OF THE OTHER

6    MAJOR SPORTS, COLLEGE BASKETBALL.  I'M SINGLE.  I'M DIVORCED.

7    I HAVE NO KIDS.  I HAVE NEVER BEEN A JUROR ON ANOTHER CASE NOR

8    ON A GRAND JURY.  AND I HAVE NEVER BEEN IN THE MILITARY.

9              **THE COURT:**  WHAT DID YOUR EX-WIFE DO?

10             **PROSPECTIVE JUROR HAROIAN:**  SHE'S A TECHNICAL

11   WRITER.

12             **THE COURT:**  THANK YOU.

13             **PROSPECTIVE JUROR HAROIAN:**  I WILL SAY I'M ABOUT TO

14   GET REMARRIED TO A PRACTICING TAX ATTORNEY HERE IN SAN

15   FRANCISCO.

16             **PROSPECTIVE JUROR YOUNG:**  MY NAME IS LAURENCE YOUNG.

17   I LIVE IN SAN FRANCISCO.  I'M A SELF-EMPLOYED ATTORNEY DOING

18   CORPORATE LAW, OF COUNSEL TO A SMALL FIRM.  I BELONG TO THE

19   AMERICAN BAR ASSOCIATION.  HOBBIES, SPORTS FAN, PRIMARILY

20   FOOTBALL, TENNIS AND GOLF.

21             I'M MARRIED.  MY WIFE IS A CPA.  I HAVE TWO

22   CHILDREN, AGES THREE AND THIRTEEN MONTHS.  I HAVE BEEN ON A

23   CIVIL CASE WHICH SETTLED OUT OF COURT.  I HAVE NEVER BEEN A

24   GRAND JUROR.  AND I HAVE NOT BEEN IN THE MILITARY.

25             **THE COURT:**  ANYTHING ABOUT YOUR EXPERIENCE ON THE

1    CIVIL JURY THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

2              **PROSPECTIVE JUROR YOUNG:**  NO.

3              **THE COURT:**  SINCE YOU ARE AN ATTORNEY, I'LL ASK YOU

4    THIS:  CAN YOU PROMISE THAT YOU WOULD FOLLOW THE COURT'S

5    INSTRUCTIONS AS TO WHAT THE LAW IS WHETHER YOU AGREE WITH THAT

6    LAW OR NOT?

7              **PROSPECTIVE JUROR YOUNG:**  YES.

8              **THE COURT:**  ALL RIGHT.  THANK YOU.

9              **PROSPECTIVE JUROR THOMPSON:**  MY NAME IS MARILYN

10   THOMPSON.  I LIVE IN OAKLEY.  I WORK FOR LUCKY RETAIL STORES.

11   NO ORGANIZATIONS.  HOBBIES, ANYTHING OUTSIDE.  I'M DIVORCED.  I

12   HAVE TWO CHILDREN AGES 25 AND 22.  NEVER ON A JURY OR GRAND

13   JUROR.  AND NOT IN THE MILITARY.

14             **THE COURT:**  YOUR EX-HUSBAND, WHAT DID HE DO?

15             **PROSPECTIVE JUROR THOMPSON:**  FINANCIAL ADVISER.

16             **THE COURT:**  DOES EITHER OF YOUR CHILDREN HAVE A JOB

17   OUTSIDE THE HOME?

18             **PROSPECTIVE JUROR THOMPSON:**  YES.  MY DAUGHTER IS AN

19   ASSISTANT FINANCIAL ADVISER, AND MY OTHER DAUGHTER IS SECURITY

20   FOR SAN FRANCISCO AIRPORT.

21             **THE COURT:**  AND I MISSED WHAT IT IS YOU DO.

22             **PROSPECTIVE JUROR THOMPSON:**  OH, I WORK FOR LUCKY

23   GROCERY STORES.

24             **THE COURT:**  THANK YOU.

25             **PROSPECTIVE JUROR CARR:**  MY NAME IS BEVERLY CARR,

1  AND I LIVE IN SAN FRANCISCO.  I'M A RETIRED REAL ESTATE BROKER.

2  AND I DON'T BELONG TO ANY ORGANIZATIONS.  MY HOBBIES ARE MOVIES

3  AND COMPUTER GAMES.

4          MY MARITAL STATUS IS DIVORCED.  AND MY CHILDREN -- I

5  HAVE TWO CHILDREN, FIFTY, A SON 50 AND A DAUGHTER 44, AND I WAS

6  A JUROR ON TWO CIVIL CASES AND TWO CRIMINAL CASES.  AND I WAS

7  NEVER ON THE GRAND JURY.  AND I WAS NEVER IN THE MILITARY.

8          **THE COURT:**  OKAY.  THE JURIES THAT YOU SAT ON,

9  WITHOUT TELLING ME WHAT HAPPENED, DID ALL FOUR OF THOSE JURIES

10  REACH VERDICTS?

11          **PROSPECTIVE JUROR CARR:**  YES.

12          **THE COURT:**  WAS THERE ANYTHING ABOUT YOUR EXPERIENCE

13  ON ANY OF THOSE JURIES THAT WOULD MAKE IT HARD FOR YOU TO BE

14  FAIR TO EITHER SIDE IN THIS CASE?

15          **PROSPECTIVE JUROR CARR:**  NO.

16          **THE COURT:**  DO EITHER OF YOUR CHILDREN HAVE JOBS

17  OUTSIDE THE HOME?

18          **PROSPECTIVE JUROR CARR:**  YES.

19          **THE COURT:**  WHAT DO THEY DO?

20          **PROSPECTIVE JUROR CARR:**  MY SON IS A MORTGAGE

21  BROKER, AND MY DAUGHTER IS A GENERAL MANAGER OF STARLIGHT

22  BUILDING MAINTENANCE.

23          **THE COURT:**  OKAY.  AND YOUR EX-HUSBAND, DID HE HAVE

24  A JOB?

25          **PROSPECTIVE JUROR CARR:**  HE'S A RETIRED SAN

1    FRANCISCO POLICEMAN.

2                    **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU.

3                    **PROSPECTIVE JUROR HOUSE:**  MY NAME IS RANDI HOUSE.  I

4    LIVE IN PENNGROVE.  I CURRENTLY WORK AT A STORE THAT SELLS LOTS

5    AND LOTS OF SHARP POINTY THINGS AND ALSO PEPPER SPRAY.

6                    **THE COURT:**  WHAT DO YOU MEAN?

7                    **PROSPECTIVE JUROR HOUSE:**  WE SELL A LOT OF KNIVES,

8    KITCHEN CUTLERY, SWORDS.  WE DO A LOT OF BUSINESS WITH SOME SAN

9    FRANCISCO COPS.

10                   I BELONG TO THE UNITED STATES JUDO ASSOCIATION, AND

11   I ALSO BELONG TO THE SANTA ROSA JUNIOR COLLEGE JUDO CLUB.  MY

12   HOBBIES INCLUDE JUDO, OBVIOUSLY.  PLAYING WITH MY DOGS, PLAYING

13   IN THE DIRT, PLAYING ON THE COMPUTER.  I LIKE TO BE AMUSED.

14                   I AM CURRENTLY NOT MARRIED BUT IN A RELATIONSHIP.

15   MY BOYFRIEND WORKS WITH HIS BROTHER IN A TREE SERVICE.  I HAVE

16   NO CHILDREN, THANK THE LORD.  I'M A BIT YOUNG FOR THAT.

17                   I HAVE NEVER BEEN A JUROR, SO THIS IS A WHOLE BRAND

18   NEW FUN EXPERIENCE FOR ME.  I HAVE NEVER BEEN IN THE MILITARY

19   BECAUSE I REALLY DON'T THINK THEY WOULD WANT ME IN THERE.

20                   **THE COURT:**  ALL RIGHT.  THANK YOU.

21                   **PROSPECTIVE JUROR ALDAMA:**  MY NAME IS ANGELINA

22   ALDAMA.  I LIVE IN FREMONT, SOON TO BE SAN JOSE.  I'M A STORE

23   MANAGER AT WALGREEN'S.  I DON'T BELIEVE -- OR BELONG TO ANY

24   ORGANIZATIONS.  MY HOBBIES INCLUDE CRAFTS, SNOWBOARDING,

25   DANCING.  I'M NOT MARRIED.  MY BOYFRIEND HAS TWO KIDS.  THEY'RE

1  FIVE AND SIX.  I WAS NEVER A JUROR ANYWHERE.  AND I HAVE NEVER

2  BEEN IN THE MILITARY.

3         **THE COURT:**  WHAT DOES YOUR BOYFRIEND DO?

4         **PROSPECTIVE JUROR ALDAMA:**  HE WORKS AT WALGREEN'S.

5         **THE COURT:**  AT WALGREEN'S, OKAY.  AND YOU SAID

6  FREMONT SOON TO BE SAN JOSE.  HOW SOON?

7         **PROSPECTIVE JUROR ALDAMA:**  HOPEFULLY, WITHIN THE

8  NEXT TWO MONTHS.  WE'RE BUYING A HOUSE.

9         **THE COURT:**  YOU ARE SET FOR THE NEXT TWO WEEKS,

10  THOUGH?

11         **PROSPECTIVE JUROR ALDAMA:**  YES.

12         **PROSPECTIVE JUROR ALMQUIST-BALDWIN:**  MY NAME IS

13  SUSAN ALMQUIST-BALDWIN.  I LIVE IN SANTA ROSA.  I AM DIRECTOR

14  OF PERIOPTICAL SERVICES FOR KAISER IN SANTA ROSA.  I BELONG TO

15  ASSOCIATION OF OPERATING ROOM NURSES, AND DAUGHTERS OF REPUBLIC

16  OF TEXAS.  MY HOBBIES ARE GOLF AND BICYCLING AND READING.

17         MARITAL STATUS, I'M MARRIED.  MY HUSBAND IS A

18  RETIRED PLASTIC SURGEON.  I HAVE TWO CHILDREN, AGES 38 AND 40.

19  YES, I WAS A JUROR ON A CRIMINAL TRIAL, AND WE DID REACH A

20  VERDICT.  NEVER ON THE GRAND JURY AND NEVER IN THE MILITARY.

21         **THE COURT:**  ANYTHING ABOUT THAT CRIMINAL TRIAL

22  EXPERIENCE THAT WOULD MAKE IT HARD FOR YOU HERE?

23         **PROSPECTIVE JUROR ALMQUIST-BALDWIN:**  NO.

24         **THE COURT:**  TELL ME, DID YOU SAY YOU HAD CHILDREN?

25         **PROSPECTIVE JUROR ALMQUIST-BALDWIN:**  YES.  MY OLDEST

1  SON IS ASSISTANT AIRPORT MANAGER BACK IN TEXAS, AND MY YOUNGEST

2  SON IS A COMPUTER DRAFTER.

3          **THE COURT:**  I THINK THE REASON I DIDN'T HEAR ABOUT

4  THE CHILDREN IS I WAS STILL BACK AT THE DAUGHTERS OF THE

5  REPUBLIC OF TEXAS.  THAT'S A GREAT --

6          **PROSPECTIVE JUROR ALMQUIST-BALDWIN:**  CARD CARRYING

7  MEMBER.

8          **THE COURT:**  OKAY.

9          **PROSPECTIVE JUROR HICKMAN:**  MY NAME IS COSTEN

10 HICKMAN.  I LIVE IN BURLINGAME.  I AM A HOTEL REVENUE MANAGER

11 FOR A HOTEL HERE IN THE CITY.  BELONG TO VARIOUS HOSPITALITY

12 ORGANIZATIONS.  HOBBIES INCLUDE COOKING, WRITING AND SPORTS.

13         I AM MARRIED.  MY WIFE IS A MIDDLE SCHOOL TEACHER IN

14 SAN MATEO.  WE HAVE NO CHILDREN.  I HAVE NEVER BEEN A JUROR OR

15 A GRAND JUROR.  AND I HAVE NEVER BEEN IN THE MILITARY.

16         **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

17         **PROSPECTIVE JUROR HOYT:**  MY NAME IS CECILIA HOYT.  I

18 LIVE IN PETALUMA.  I WORK FOR WASHINGTON MUTUAL AS A SENIOR

19 VICE PRESIDENT FOR REGULATORY AUDIT RISK AND COMPLIANCE.  I

20 BELONG TO THE MARIN AGRICULTURAL LAND TRUST.  MY HOBBIES ARE

21 GARDENING, FARMING, THAT KIND OF STUFF.  SOCCER.

22         MY HUSBAND IS A FARMER AND A WRITER.  WE DON'T HAVE

23 ANY CHILDREN.  I WAS A JUROR ON A CRIMINAL CASE A YEAR AND A

24 HALF AGO.  I WAS NOT A GRAND JUROR.  I HAVE NEVER BEEN IN THE

25 MILITARY.

 1          **THE COURT:**  DID THE CRIMINAL MATTER REACH A VERDICT?

 2          **PROSPECTIVE JUROR HOYT:**  YES, MA'AM.

 3          **THE COURT:**  WAS THERE ANYTHING ABOUT THAT EXPERIENCE

 4   THAT WOULD MAKE IT HARD FOR YOU HERE?

 5          **PROSPECTIVE JUROR HOYT:**  NO.  IT WAS LONG AND

 6   HORRIBLE, BUT NO.

 7          **THE COURT:**  ALL RIGHT.  GOOD.

 8          **PROSPECTIVE JUROR MARTIN:**  MY NAME IS BRUCE MARTIN

 9   FROM SANTA ROSA.  I'M RETIRED.  I BELONG TO THE NRA, THE FARM

10   BUREAU.  HOBBIES ARE HORSEBACK RIDING, HUNTING, RAISING CATTLE.

11          I'M MARRIED.  MY WIFE IS ALSO RETIRED.  I HAVE TWO

12   CHILDREN IN THEIR, TWO BOYS IN THEIR FORTIES.  I HAVE NOT BEEN

13   A JUROR, GRAND JURY, OR IN THE MILITARY.

14          **THE COURT:**  WHAT ARE YOU RETIRED FROM, SIR?

15          **PROSPECTIVE JUROR MARTIN:**  WE HAD A RANCH SUPPLY

16   BUSINESS FOR 35 YEARS.

17          **THE COURT:**  YOUR WIFE ALSO?

18          **PROSPECTIVE JUROR MARTIN:**  YES.

19          **THE COURT:**  EITHER OF YOUR BOYS HAVE JOBS OUTSIDE

20   THE HOME?

21          **PROSPECTIVE JUROR MARTIN:**  THE OLDER BOY IS A

22   COMPUTER ENGINEER, AND THE YOUNGER ONE RUNS THE MANUFACTURING

23   PORTION OF OUR FORMER BUSINESS.

24          **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU, SIR.

25          **PROSPECTIVE JUROR PELLY:**  MY NAME IS TOM PELLY.  I

JURY SELECTION

1   LIVE IN SAN FRANCISCO.  MY OCCUPATIONAL STATUS IS UNEMPLOYED.

2   PRIOR TO THAT I WAS DOING MARKET RESEARCH FOR AN INSURANCE

3   COMPANY.  NO ORGANIZATIONS.  HOBBIES, PRETTY MUCH ANYTHING

4   OUTDOORS.  NEVER MARRIED, NO CHILDREN.  NEVER BEEN ON A --

5   NEVER BEEN A JUROR ON ANOTHER CASE.  NEVER BEEN ON A GRAND

6   JURY.  AND I WAS NEVER IN THE MILITARY.

7           **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

8           **PROSPECTIVE JUROR DEBRA SMITH:**  DEBRA SMITH, SANTA

9   ROSA, PROPERTY MANAGER WITH MY HUSBAND AT A SELF STORAGE

10  COMPANY.  DON'T BELONG TO ANY ORGANIZATIONS.  HOBBIES, MOVIES

11  AND KIDS.

12          MARRIED, FIVE CHILDREN:  26, 23, 20, 9 AND 5.  NEVER

13  BEEN A JUROR ON A CASE, NEVER BEEN A GRAND JUROR, AND NEVER IN

14  THE MILITARY.

15          **THE COURT:**  AND YOU WORK WITH YOUR HUSBAND?

16          **PROSPECTIVE JUROR DEBRA SMITH:**  YES.

17          **THE COURT:**  ALL RIGHT.  THANK YOU.

18          **PROSPECTIVE JUROR GILBRECH:**  MY NAME IS KEN

19  GILBRECH.  I LIVE IN MARTINEZ.  I WORK FOR CHEVRON IN THE

20  CORPORATE I.T. DEPARTMENT.  HOBBIES, OUTDOORS, HIKING, HUNTING,

21  FISH, SPORTS.

22          I'M MARRIED.  MY WIFE IS A REALTOR.  I HAVE THREE

23  CHILDREN AGES SEVENTEEN, FOURTEEN AND EIGHT.  NEVER A JUROR,

24  NEVER A GRAND JUROR.  NEVER SERVED IN MILITARY.  AND THE

25  ORGANIZATIONS, MOOSE LODGE, NRA.

1          **THE COURT:**  ALL RIGHT.  THANK YOU.

2          **PROSPECTIVE JUROR ZING:**  MY NAME IS VICTOR ZING.  I

3  LIVE IN ALAMEDA.  OCCUPATIONAL STATUS, I'M AN ENGINEER.

4  ORGANIZATIONS, AMERICAN SOCIETY OF MECHANICAL ENGINEERS.  MY

5  HOBBIES ARE SWIMMING, BIKING, AND PHOTOGRAPHY.

6          MARITAL STATUS, I'M MARRIED.  SPOUSE'S OCCUPATION IS

7  HUMAN RESOURCES.  I HAVE TWO DAUGHTERS AGES EIGHT AND NINE.

8  I'VE NEVER BEEN ON A JURY, JUROR ON A CASE.  I HAVE NEVER BEEN

9  ON A GRAND JURY.  AND I NEVER BEEN IN THE MILITARY.

10          **THE COURT:**  ALL RIGHT.  THANK YOU.

11          **PROSPECTIVE JUROR GHEEM:**  MY NAME IS MIKE GHEEM.  I

12  LIVE IN DALY CITY.  I WORK FOR WILLIAM SONOMA.  I DON'T BELONG

13  TO ANY ORGANIZATIONS.  HOBBIES WOULD BE SPORTS.

14          MARITAL STATUS, I AM SINGLE.  I HAVE NO CHILDREN.  I

15  HAVE NEVER BEEN ON A JURY.  AND I HAVE NEVER BEEN IN THE

16  MILITARY.

17          **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

18          OH, WE NEED FOR THE MIC TO GO TO THE FAR END FIRST.

19          **PROSPECTIVE JUROR WINTON-HENRY:**  MY NAME IS STEPHEN

20  WINTON-HENRY.  I LIVE IN ALAMEDA.  I AM A CHAPLAIN, HOSPICE

21  CHAPLAIN, WITH SUTTER VISITING NURSES AND HOSPICE.  I BELONG TO

22  THE ALAMEDA MINISTERIAL HOSPITAL AND NATIONAL HOSPICE AND

23  PALLIATIVE CARE ORGANIZATION.  I PLAY GUITAR AND RIDE BIKES,

24  AND WALK, READ BOOKS.

25          I'M MARRIED.  MY WIFE IS AN EDUCATOR AND FOUNDER OF

1   AN ORGANIZATION CALLED BODY WISDOM, INCORPORATED IN OAKLAND.  I

2   HAVE ONE DAUGHTER, AGE 17.  I HAVE NEVER BEEN A JUROR ON

3   ANOTHER CASE.  I HAVE NEVER BEEN A GRAND JUROR.  AND I HAVE

4   NEVER BEEN IN THE MILITARY.

5          **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

6          **PROSPECTIVE JUROR RYAN:**  HI.  MY NAME IS JANIS RYAN.

7   I LIVE IN SAN CARLOS.  MY OCCUPATION IS -- I'M AN R.N. AND

8   PROFESSOR OF NURSING.  I BELONG TO AN ORGANIZATION CALLED HEART

9   AND SOUL.  I SIT ON THE BOARD.  IT'S ACTUALLY A COMMUNITY-BASED

10  MENTAL HEALTH ORGANIZATION.  MY HOBBIES INCLUDE GARDENING AND

11  RESTING WHEN I CAN, I GUESS.

12          MARITAL STATUS, I'M MARRIED.  MY HUSBAND IS STARTING

13  HIS OWN COMPANY RIGHT NOW.  IT WILL BE A SOFTWARE COMPANY.  MY

14  CHILDREN ARE AGES 17 AND 15 NEXT MONTH.  THEY DO NOT WORK

15  OUTSIDE THE HOME.  I WAS A JUROR ON THREE TRIALS.  ONE --

16  THEY'RE ALL CRIMINAL, AND, YES, WE ALL REACHED VERDICTS ON ALL

17  THREE OF THOSE.  NEVER HAVE BEEN A GRAND JUROR.  AND I HAVE

18  NEVER BEEN IN THE MILITARY.

19          **THE COURT:**  OKAY.  ANYTHING ABOUT THE JURY

20  EXPERIENCES THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

21          **PROSPECTIVE JUROR RYAN:**  NO.

22          **THE COURT:**  WHERE DO YOU TEACH NURSING?

23          **PROSPECTIVE JUROR RYAN:**  COLLEGE OF SAN MATEO.

24          **THE COURT:**  ALL RIGHT.  THANK YOU.

25          **PROSPECTIVE JUROR TARASOVSKY:**  MY NAME IS NATALIA

1   TARASOVSKY.  I AM RESIDENT OF SAN FRANCISCO.  I'M A PROGRAM

2   ANALYST.  IN ONE WEEK I AM GOING TO RETIRE.  RIGHT NOW I'M

3   STILL EMPLOYED.  I LIKE READING, TRAVELING, BROWSING THE

4   INTERNET.

5           I'M MARRIED.  MY SPOUSE AND MY TWO CHILDREN, AGES 29

6   AND 33, BOTH WORK IN I.T.  I NEVER WAS -- NEVER BEEN ON

7   JUROR -- NEVER BEEN JUROR, AND NEVER BEEN GRAND JUROR.  AND

8   NEVER BEEN IN MILITARY.

9           **THE COURT:**  ALL RIGHT.  THANK YOU.

10          **PROSPECTIVE JUROR LODER:**  MY NAME IS BEVERLY LODER.

11  I LIVE IN WALNUT CREEK.  I WORK FOR MY HUSBAND, WHO IS A

12  DENTIST, IN THE DENTAL OFFICE.  I AM A TRUSTEE FOR THE DIABLO

13  REGIONAL ARTS.  MY HOBBIES ARE TRAVELING AND COOKING.

14          MARRIED, AS I SAID, TO A DENTIST.  CHILDREN, I HAVE

15  TWO SONS, 31 AND 29.  NEVER A JUROR.  NEVER A GRAND JUROR.

16  NEVER IN THE MILITARY.

17          **THE COURT:**  ALL RIGHT.  EITHER OF YOUR SONS HAVE

18  JOBS OUTSIDE THE HOME?

19          **PROSPECTIVE JUROR LODER:**  BOTH WORK.  ONE OF THEM IS

20  IN LAND DEVELOPMENT, AND ONE OF THEM WORKS FOR FRANKLIN

21  TEMPLETON.

22          **THE COURT:**  THANK YOU.

23          **PROSPECTIVE JUROR TORRES:**  MY NAME IS GENARO TORRES.

24  I LIVE IN SAN MATEO.  MY OCCUPATION IS A CLERK, MAIL CLERK, FOR

25  THE DEPARTMENT OF PUBLIC WORKS FOR THE CITY OF SAN FRANCISCO,

```
 1  CITY AND COUNTY OF SAN FRANCISCO.  I DON'T BELONG TO ANY

 2  ORGANIZATIONS.  I DON'T HAVE ANY HOBBIES.

 3          MY MARITAL IS SINGLE, DIVORCED.  I HAVE TWO

 4  CHILDREN.  ONE IS 28, AND ONE IS 25.  AND I WAS NEVER A JUROR

 5  ON ANY CASE AND WAS NEVER PART OF THE GRAND JURY.  AND I SERVED

 6  IN THE UNITED STATES ARMY.
```

 7          **THE COURT:**  WHEN WERE YOU IN THE ARMY?

 8          **PROSPECTIVE JUROR TORRES:**  1976-1980.

 9          **THE COURT:**  WHERE DID YOU SERVE?

10          **PROSPECTIVE JUROR TORRES:**  GERMANY.

11          **THE COURT:**  OKAY.  EITHER OF YOUR CHILDREN HAVE JOBS

12  OUTSIDE THE HOME?

13          **PROSPECTIVE JUROR TORRES:**  MY SON WORKS FOR SOME

14  COMPANY IN LAS VEGAS, AND MY DAUGHTER SOME GOLF CLUB IN

15  PACIFICA OR HALF MOON BAY.

16          **THE COURT:**  OKAY.  AND YOUR WIFE, DID SHE HAVE A JOB

17  OUTSIDE THE HOME?

18          **PROSPECTIVE JUROR TORRES:**  I'M NOT AWARE OF HER

19  STATUS.

20          **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU.

21          **PROSPECTIVE JUROR JEW-GOMES:**  MY NAME IS MIMI

22  JEW-GOMES.  I LIVE IN PINOLE, CALIFORNIA.  OCCUPATION, I'M AN

23  ADMIN ASSISTANT FOR A.C. TRANSIT.  I DON'T BELONG TO ANY

24  ORGANIZATIONS.  I LOVE TO WATCH TV.

25          I'M MARRIED.  MY HUSBAND IS A SAN FRANCISCO POLICE

JURY SELECTION

```
1   OFFICER.  WE HAVE NO HUMAN CHILDREN, BUT WE HAVE TWO

2   FOUR-LEGGED CHILDREN.  I WAS NEVER A JUROR ON A CASE AND NOT A

3   GRAND JUROR, AND NEVER IN THE MILITARY.

4           THE COURT:  ALL RIGHT.  THANK YOU.

5           PROSPECTIVE JUROR JOHNSON:  MY NAME IS KERMIT

6   JOHNSON.  I LIVE IN FREMONT.  I'M A PSYCHIATRIST.  I WORK IN A

7   SMALL CLINIC DURING THE WEEK, THREE DAYS A WEEK.  I WORK AT

8   JOHN GEORGE PSYCHE E.R. ON THE WEEKENDS USUALLY.  I DON'T

9   BELONG TO ANY ORGANIZATIONS.  MY HOBBY IS PHYSICS.

10          I'M MARRIED.  MY WIFE IS A HOUSEWIFE.  I HAVE THREE

11  KIDS.  THE OLDEST IS 26.  HE TEACHES ENGLISH IN JAPAN.  I NEVER

12  BEEN A JUROR, NEVER BEEN ON A GRAND JURY, NEVER BEEN IN THE

13  MILITARY.

14          THE COURT:  THANK YOU.

15          PROSPECTIVE JUROR VO:  MY NAME IS ANTHONY VO, AND I

16  LIVE IN OAKLAND.  I'M AN INDEPENDENT DISTRIBUTER FOR MONAVIE.

17  I DON'T BELONG TO ANY ORGANIZATIONS.  I FISH, GOLF AND

18  SNOWBOARD.

19          I'M SINGLE.  I HAVE NO CHILDREN.  I WAS NEVER A

20  JUROR ON ANY CASE OR A GRAND JUROR.  AND I HAVE NEVER BEEN IN

21  THE MILITARY.

22          THE COURT:  YOU'RE AN INDEPENDENT DISTRIBUTER FOR --

23          PROSPECTIVE JUROR VO:  MONAVIE.

24          THE COURT:  WHAT'S THAT?

25          PROSPECTIVE JUROR VO:  IT'S A NUTRITIONAL BEVERAGE,
```

1    BASICALLY.

2              **THE COURT:**  HOW DO YOU SPELL THAT?

3              **PROSPECTIVE JUROR VO:**  M-O-N-A-V-I-E.

4              **THE COURT:**  ALL RIGHT.  THANK YOU.

5              **PROSPECTIVE JUROR THRIFT:**  JOE THRIFT.  I LIVE IN

6    ST. HELENA.  MY OCCUPATION, I.T. MANAGER.  THE ORGANIZATIONS I

7    BELONG TO, I JUST DONATE TO THE BOYS AND GIRLS CLUB AND DOCTORS

8    WITHOUT BORDERS.  MY HOBBIES ARE BIKE RIDING AND HIKING AND

9    READING.

10             MARITAL STATUS, SINGLE.  I HAVE A 13-YEAR-OLD

11   DAUGHTER.  AND I WAS ON A JURY, THEN WE DID REACH A VERDICT.

12   NOT ON A GRAND JURY.  AND I HAVE NOT BEEN IN THE MILITARY.

13             **THE COURT:**  DO YOU REMEMBER IF IT WAS A CRIMINAL OR

14   CIVIL JURY THAT WERE YOU WERE ON?

15             **PROSPECTIVE JUROR THRIFT:**  I ACTUALLY DON'T

16   REMEMBER.

17             **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE THAT

18   WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

19             **PROSPECTIVE JUROR THRIFT:**  NO.

20             **PROSPECTIVE JUROR YUP:**  MY NAMES IS CHARLES YUP.  I

21   LIVE IN SOUTH SAN FRANCISCO.  I WORK FOR UNITED STATES POSTAL

22   SERVICE.  I DON'T BELONG TO ANY ORGANIZATION.  MY HOBBIES ARE

23   FOLLOWING SPORTS AND CAR RESTORATION.

24             MARITAL STATUS, I'M MARRIED.  MY WIFE ALSO WORKS FOR

25   THE U.S. POSTAL SERVICE.  SHE'S IN CUSTOMER SERVICE.  I HAVE

1   TWO CHILDREN, 24 AND 20.  AND I HAVE BEEN A JUROR TWO TIMES IN

2   SAN MATEO COUNTY, NEVER A GRAND JUROR.  AND NONE, MILITARY

3   SERVICE.

4         **THE COURT:**  DO YOU REMEMBER WHAT KIND OF JURIES THEY

5   WERE, CRIMINAL OR CIVIL?

6            **PROSPECTIVE JUROR YUP:**  IT WAS TWO CRIMINAL CASES.

7         **THE COURT:**  ALL RIGHT.  DID THEY REACH VERDICTS?

8            **PROSPECTIVE JUROR YUP:**  YES.

9         **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE THAT

10  WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

11           **PROSPECTIVE JUROR YUP:**  NO, MA'AM.

12        **THE COURT:**  EITHER OF YOUR CHILDREN HAVE JOBS?

13           **PROSPECTIVE JUROR YUP:**  BOTH ARE STUDENTS.

14        **THE COURT:**  STUDENTS, THANK YOU.

15           **PROSPECTIVE JUROR REGEN:**  GOOD MORNING.  MY NAME IS

16  SAM REGEN.  I LIVE IN RICHMOND, CALIFORNIA.  I WORK FOR BANK OF

17  AMERICA IN SORT OF A CROSS BETWEEN I.T. AND FINANCE.  I'M A

18  REGISTERED LIBERTARIAN.  MY OLD HOBBIES ARE BIKING AND HIKING,

19  NOW IT'S CHANGING DIAPERS.

20           I'M MARRIED.  THREE CHILDREN.  MY SPOUSE WORKS FOR

21  AT&T IN TECHNOLOGY.  MY OLDEST DAUGHTER IS THREE.  MY YOUNGEST

22  DAUGHTERS ARE BOTH 18 MONTHS OLD.  I WAS A FOREMAN IN A

23  CRIMINAL CASE THAT DID NOT REACH A VERDICT.  NEVER IN A GRAND

24  JURY.  AND NEVER IN THE MILITARY.

25        **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE ON THE

1   JURY THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

2             **PROSPECTIVE JUROR REGEN:**  NO.

3         **THE COURT:**  ALL RIGHT.  THANK YOU.

4             **PROSPECTIVE JUROR HODIL-MUNDY:**  MY NAME IS CAROL

5   HODIL-MUNDY.  I LIVE IN FOREST KNOLLS, AND I HAVE A PAINTING

6   AND COLOR CONSULTATION BUSINESS.  NO ORGANIZATIONS.  I'M A

7   BIRDER, DOG TRAINER AND DO LOT OF TAI CHI.

8             MY HUSBAND IS A BUILDING CONTRACTOR.  NO KIDS.  I'VE

9   NEVER BEEN A JUROR OR IN THE MILITARY, THANK YOU.

10            **PROSPECTIVE JUROR CUMMINGS:**  I AM LATISHA CUMMINGS.

11  I LIVE IN SAN LEANDRO.  I WORK FOR THE QUALITY MANAGEMENT

12  DEPARTMENT OF AETNA HEALTH OF CALIFORNIA.  I BELONG TO HOPE

13  YOUTH MINISTRIES OUT OF EAST OAKLAND.  I'M AN ACTIVE MEMBER OF

14  AMERICAN HEART ASSOCIATION AND AMERICAN CANCER SOCIETY.  MY

15  HOBBIES ARE BIKE RIDING AND DEEP SEA FISHING.

16            I AM SINGLE, NEVER MARRIED.  I HAVE A 15-YEAR-OLD

17  DAUGHTER.  I HAVE NEVER BEEN ON ANY JURY, NOR DO I WANT TO BE.

18  AND I HAVE NEVER BEEN IN THE MILITARY.

19            **THE COURT:**  YOU KNOW, WHAT?  I GOT LOST RIGHT AT THE

20  BEGINNING.  TELL ME WHAT YOU DO AGAIN.

21            **PROSPECTIVE JUROR CUMMINGS:**  I WORK FOR QUALITY

22  MANAGEMENT FOR AETNA HEALTH OF CALIFORNIA.

23            **THE COURT:**  ALL RIGHT.  THANK YOU.

24            **PROSPECTIVE JUROR CORY:**  MY NAME IS SANLIN CORY.  I

25  LIVE IN SAN FRANCISCO.  I'M THE EXECUTIVE ASSISTANT TO THE

1  HEADMASTER OF A COLLEGE PREP HIGH SCHOOL IN SAN FRANCISCO.  I'M

2  A FOUNDING TRUSTEE OF CHILDREN'S DAY SCHOOL, A FOUNDING

3  DIRECTOR OF SAN FRANCISCO LITTLE LEAGUE.  MY HOBBIES ARE

4  WATCHING MY SON PLAY BASEBALL AND GARDENING.

5          I'M MARRIED.  MY HUSBAND IS A CONSULTING REAL ESTATE

6  ECONOMIST WHO DOES FEASIBILITY STUDIES FOR RESORTS.  I HAVE ONE

7  SON WHO IS 16.  I HAVE SERVED ON A NUMBER OF BOTH CIVIL AND

8  CRIMINAL JURIES, AND WITH ONE EXCEPTION OF A CASE THAT WAS

9  DECLARED A MISTRIAL, THE OTHERS REACHED VERDICTS.  AND I'VE NOT

10 BEEN A GRAND JUROR, AND I'VE NOT BEEN IN THE MILITARY.

11         **THE COURT:**  ANYTHING ABOUT THOSE JURY EXPERIENCES

12 THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

13         **PROSPECTIVE JUROR CORY:**  NO.

14         **THE COURT:**  OKAY.  THANK YOU.

15         I THINK WE START WAY OVER ON THE RIGHT.

16         **PROSPECTIVE JUROR CONSTANTINO:**  MY NAME IS JOVITA

17 CONSTANTINO.  I LIVE IN AMERICAN CANYON.  I WORK AS AN

18 ACCOUNTANT WITH BLUE SHIELD OF CALIFORNIA.  I DON'T BELONG TO

19 ANY ORGANIZATION.  MY HOBBIES ARE GARDENING, MUSIC AND MOVIES.

20         I'M MARRIED, AND MY HUSBAND IS A SUPERVISOR IN A

21 PROPERTY MANAGEMENT.  I HAVE ONE CHILD, 18 YEARS OLD AND A FULL

22 TIME STUDENT.  I HAVE NEVER BEEN A JUROR, A GRAND JUROR.  AND I

23 NEVER BEEN IN THE MILITARY.

24         **THE COURT:**  I DIDN'T HEAR YOU IF YOU SAID, DO YOU

25 HAVE A JOB?

1              **PROSPECTIVE JUROR CONSTANTINO:**  I WORK AS AN

2    ACCOUNTANT WITH BLUE SHIELD OF CALIFORNIA.

3              **THE COURT:**  THANK YOU.

4              **PROSPECTIVE JUROR KENNY:**  MY NAME IS TOM KENNY.  I

5    LIVE IN SAN MATEO.  I'M A RETIRED PLUMBER FROM SAN FRANCISCO

6    HOUSING AUTHORITY.  I BELONG TO THE PLUMBERS UNION AND AARP.

7    MY HOBBIES ARE MORE WATCHING SPORTS AND STUFF, AND GOING ON THE

8    COMPUTER, AND A LITTLE BIT OF EXERCISE.

9              MY MARITAL STATUS IS SINGLE.  MY -- NO CHILDREN.  I

10   HAVE BEEN ON THREE DIFFERENT CASES THAT I REMEMBER, TWO OF THEM

11   WERE CRIMINAL, AND ONE WAS CIVIL.  WE REACHED A VERDICT IN ALL

12   THREE CASES, AND IT DIDN'T LEAVE A BAD EXPERIENCE.  I WAS NEVER

13   A GRAND JUROR, AND I WASN'T IN THE MILITARY.

14             **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

15             **PROSPECTIVE JUROR OSIAS:**  MY NAME IS NEAL OSIAS.  I

16   LIVE IN BELMONT.  I LOVE MY JOB AS A GARDENER WORKING FOR THE

17   CITY AND COUNTY OF SAN FRANCISCO.  I BELONG TO THE AMERICAN

18   SETATION/SATATION SOCIETY.  I BELONG TO THE CALIFORNIA PARKS

19   AND RECREATION SOCIETY.  I ALSO BELONG TO THE PEST CONTROL

20   ADVISERS SOCIETY.  MY HOBBIES ARE SNORKELING, SWIMMING, HIKING,

21   PHOTOGRAPHY.  OH, AND GARDENING.

22             I'M MARRIED.  MY WIFE WORKS AS A SCHOOL TEACHER.  I

23   HAVE A 16-YEAR-OLD SON WHO ATTENDS HIGH SCHOOL, AND HE ALSO HAS

24   A PART-TIME JOB WORKING IN SAFEWAY.  I WAS A JUROR ON A

25   CRIMINAL CASE.  WE REACHED A VERDICT.  I'VE NEVER BEEN A GRAND

1  JUROR.  AND NEVER BEEN IN THE MILITARY.

2          **THE COURT:**  ANYTHING ABOUT THAT JURY EXPERIENCE THAT

3  WOULD MAKE IT HARD FOR YOU TO BE FAIR HERE?

4          **PROSPECTIVE JUROR OSIAS:**  NEGATIVE.

5          **THE COURT:**  WHAT GRADE AND SUBJECT DOES YOUR WIFE

6  TEACH?

7          **PROSPECTIVE JUROR OSIAS:**  SHE'S AN ELEMENTARY SCHOOL

8  TEACHER, TYPICALLY THIRD AND FOURTH GRADE.

9          **THE COURT:**  ALL RIGHT.  THANK YOU.

10          **PROSPECTIVE JUROR HUNTER:**  MY NAME IS DAVE HUNTER.

11  I LIVE IN CONCORD, CALIFORNIA.  I AM A FINANCIAL CONSULTANT

12  WITH AETNA.  I BELONG TO THE NRA, ROCKY MOUNTAIN ELK

13  FOUNDATION.  MY HOBBIES ARE HUNTING, FISHING, HIKING, BIKING,

14  GOLF AND SCUBA.

15          MARITAL STATUS IS SINGLE.  NO CHILDREN, HAVE NEVER

16  BEEN A JUROR AND NEVER BEEN ON A GRAND JURY, AND NEVER SERVED

17  IN THE MILITARY.

18          **THE COURT:**  THANK YOU.

19          **PROSPECTIVE JUROR MAYHEW:**  MY NAME IS AMY MAYHEW.  I

20  LIVE IN WALNUT CREEK.  I'M UNEMPLOYED, PART-TIME STUDENT.  I

21  BELONG TO THE AMERICAN SOCIETY OF MICROBIOLOGY.  HOBBIES,

22  MOSTLY CRAFT KIND OF THINGS.

23          I'M MARRIED.  MY HUSBAND IS A BIOTECH CONSULTANT.

24  WE HAVE TWO CHILDREN, 23 AND 21.  I HAVE BEEN ON THREE JURIES,

25  TWO AS AN ALTERNATE AND ONE AS A JUROR.  I HAVE NEVER BEEN ON A

1   GRAND JURY AND NEVER BEEN IN THE MILITARY.

2              **THE COURT:**  THE ONE TIME YOU ACTUALLY SAT AS A

3   JUROR, WAS THAT CIVIL OR CRIMINAL?

4              **PROSPECTIVE JUROR MAYHEW:**  IT WAS CIVIL.

5              **THE COURT:**  WITH RESPECT TO ALL OF THOSE -- WELL,

6   DID IT REACH A VERDICT ON THE CIVIL ONE?

7              **PROSPECTIVE JUROR MAYHEW:**  YES.

8              **THE COURT:**  WITH RESPECT TO ALL OF THOSE

9   EXPERIENCES, ANYTHING ABOUT THEM THAT MAKE IT HARD FOR YOU TO

10  BE FAIR HERE?

11             **PROSPECTIVE JUROR MAYHEW:**  NO.

12             **THE COURT:**  AND DOES EITHER OF YOUR CHILDREN HAVE A

13  JOB OUTSIDE THE HOME?

14             **PROSPECTIVE JUROR MAYHEW:**  THEY ARE BOTH IN COLLEGE.

15             **THE COURT:**  THANK YOU.

16             **PROSPECTIVE JUROR O'BRIAN:**  MY NAME IS MARIE

17  O'BRIAN.  I LIVE IN ORINDA, CALIFORNIA.  MY OCCUPATION IS I'M A

18  MANAGER AT A COUNTRY CLUB.  ORGANIZATIONS I BELONG TO IS ACF,

19  WHICH IS AMERICAN CULINARY FEDERATION.  HOBBIES ARE COOKING,

20  FOLLOWING SPORTS AND JUST BEING OUTDOORS.

21             I'M SINGLE.  I HAVE NEVER BEEN ON A JURY OR A GRAND

22  JURY OR ANY OTHER CASE.  AND I HAVE NEVER BEEN IN THE MILITARY.

23             **THE COURT:**  OKAY.  THANK YOU.

24             **PROSPECTIVE JUROR TAYLOR:**  MY NAME IS CECILIA LEIGH

25  TAYLOR.  I LIVE IN SAN MATEO.  I WORK FOR A FINANCIAL

```
 1  INSTITUTION.  I HELP WITH CHRISTIAN FAMILIES.  I'M ACTIVE IN

 2  THE NIGHTS OF COLUMBUS; I HELP THEM.  MY HOBBIES ARE, I HAVE

 3  NUMEROUS NIECES AND NEPHEWS, AND I DO A LOT OF QUALITY THINGS

 4  WITH THEM.

 5          I'M SINGLE, ENGAGED TO BE MARRIED.  I HAVE NO

 6  CHILDREN.  I HAVE NEVER BEEN ON A JUROR CASE OR ANY GRAND JURY.

 7  AND I WAS NEVER IN THE MILITARY.

 8          THE COURT:  DOES YOUR FIANCE HAVE A JOB?

 9          PROSPECTIVE JUROR TAYLOR:  EXCUSE ME?

10          THE COURT:  WHAT DOES YOUR FIANCE DO?

11          PROSPECTIVE JUROR TAYLOR:  HE'S A FINANCIAL ADVISER

12  NOW AND TAX PREPARER.  HE WAS A FORMER IRS AGENT HERE IN SAN

13  FRANCISCO.

14          THE COURT:  OH, YES.  THANK YOU.

15          PROSPECTIVE JUROR ALEXANDER:  I'M DON ALEXANDER.  I

16  LIVE IN MORAGA.  I HAVE BEEN MARRIED FOR 54 YEARS.  AND I DON'T

17  BELONG TO ANY ORGANIZATIONS.  MY HOBBIES ARE TRAVEL AND

18  EUROPEAN HISTORY.  DID I SCREW UP?  THERE'S MORE.

19          I'M MARRIED.  MY SPOUSE IS A HOUSEKEEPER, HOMEMAKER.

20  CHILDREN ARE 52, 49, 47.  I WAS NEVER A JUROR ON ANY CASE ON

21  ANY TRIAL, NEVER A GRAND JURY.  I WAS IN THE MILITARY IN THE

22  KOREAN WAR, 21 MONTHS.

23          THE COURT:  WHAT YEARS?

24          PROSPECTIVE JUROR ALEXANDER:  PARDON?

25          THE COURT:  WHAT YEARS WERE YOU IN THE MILITARY?
```

1              **PROSPECTIVE JUROR ALEXANDER:**  I THINK IT WAS '50 --

2     '50, '51.

3              **THE COURT:**  THAT WAS IN THE ARMY?

4              **PROSPECTIVE JUROR ALEXANDER:**  NAVY.

5              **THE COURT:**  NAVY.  AND ANY OF YOUR CHILDREN HAVE

6     JOBS OUTSIDE THE HOME?

7              **PROSPECTIVE JUROR ALEXANDER:**  SURE.

8              **THE COURT:**  WHAT DO THEY DO?

9              **PROSPECTIVE JUROR ALEXANDER:**  STARTING AT THE TOP,

10    KAISER HOSPITAL.  SECOND ONE, KAISER HOSPITAL.  THIRD ONE,

11    HICKORY PIT, WALNUT CREEK, DAY MANAGER.

12             **THE COURT:**  AND WHAT DID YOU RETIRE FROM?

13             **PROSPECTIVE JUROR ALEXANDER:**  PARDON?

14             **THE COURT:**  WHAT WERE YOU DOING WHEN YOU RETIRED?

15             **PROSPECTIVE JUROR ALEXANDER:**  I WAS A MERCHANT.

16             **THE COURT:**  A MERCHANT.  ALL RIGHT.  THANK YOU, SIR.

17             ANYBODY ELSE ON THE PANEL?

18             **MR. BALOGH:**  THAT'S THE LAST ONE, YOUR HONOR.

19             **THE COURT:**  THAT WAS THE LAST?  WHY DOESN'T SOMEBODY

20    GO RETRIEVE THE MIC?

21             COULD I SEE COUNSEL AT SIDEBAR, PLEASE?

22             (SIDEBAR DISCUSSION HELD OUT OF THE HEARING OF THE

23             POTENTIAL JURORS.)

24             **THE COURT:**  YOU EACH HAVE THIRTY MINUTES TO DO VOIR

25    DIRE.  AT THE VERY LEAST, WE SHOULD TAKE A REST BREAK NOW.  BUT

1  MY QUESTION IS, DO YOU WANT TO GO AHEAD AND FINISH UP THE VOIR

2  DIRE NOW BEFORE LUNCH, OR DO YOU WANT TO GIVE THEM A LUNCH

3  BREAK AND COME BACK AFTER?

4           **MR. NEDROW:**  I BELIEVE WE ARE GOING TO USE NO MORE

5  THAN 15 MINUTES OF OUR QUESTIONING, IF THAT DOES HELP.

6           **MR. BALOGH:**  I'M GOING TO USE MY FULL HALF HOUR, IS

7  MY GUESS.  WHAT I WOULD SAY IS LET'S TAKE THE MORNING BREAK

8  NOW, THEN WE WILL HAVE 45 MINUTES, GIVE OR TAKE FOR QUESTIONS,

9  AND THERE ARE SOME PEOPLE EITHER SIDE MAY TRY TO REHABILITATE.

10  AT THAT POINT WE CAN BE HEARD FOR CAUSE, WE CAN SEAT OUR JURY,

11  HAVE THEM SWORN.

12           **THE COURT:**  THAT'S MY CONCERN.  THEY CAME VERY

13  EARLY, SO I DON'T KNOW IF THEY'RE REALLY HUNGRY.

14           **MR. BALOGH:**  I'M HAPPY TO GIVE THEM THE BREAK NOW.

15  IF YOU WANT TO GIVE THEM A LITTLE LONGER BREAK BECAUSE THEY

16  HAVE BEEN SO PATIENT, I'M ABSOLUTELY FINE WITH THAT.  IT

17  DOESN'T MAKE A DIFFERENCE.  I THINK WE'RE AS FAR AS WE'LL GET

18  TO OPENING TODAY.  WE WILL PROBABLY START WITH A WITNESS.

19           **THE COURT:**  MAYBE WE SHOULD DO THAT, GIVE THEM UNTIL

20  12:30 RIGHT NOW TO GO GRAB A SANDWICH.  THEN YOU'LL DO THE VOIR

21  DIRE, AND WE'LL PICK THEM AFTER LUNCH.  HOW'S THAT?

22           (END OF SIDEBAR DISCUSSION; PROCEEDINGS RESUMED IN

23           THE HEARING OF THE POTENTIAL JURORS)

24           **THE COURT:**  LADIES AND GENTLEMEN, I KNOW YOU CAME

25  HERE EARLY, AND WE ARE MOVING ALONG, BUT WE STILL -- THE

1  LAWYERS STILL HAVE AN OPPORTUNITY TO ASK YOU A FEW QUESTIONS.

2  WHAT WE'LL DO IS TAKE THE LUNCH BREAK RIGHT NOW.  I KNOW YOU

3  CAME EARLY.

4          SO IF YOU WOULD BE BACK HERE, PLEASE, AT 12:30.

5  THERE'S A SANDWICH SHOP ON THE SECOND FLOOR OF THIS BUILDING.

6  THERE'S ALSO A SANDWICH SHOP ON THE TENTH FLOOR OF THIS

7  BUILDING.  AND THERE ARE SOME SANDWICH SHOPS NEARBY.

8          IF YOU WOULD BE BACK AT 12:30?  AT THAT POINT, THE

9  LAWYERS WILL HAVE A CHANCE TO ASK YOU A FEW QUESTIONS.  WE'LL

10  GET THE JURY PICKED, AND THEN WE'LL MOVE ON WITH THE TRIAL.

11  SO, IN THE MEANTIME, PLEASE DO NOT SPEAK WITH EACH OTHER OR

12  ANYONE ELSE ABOUT THIS CASE.  YOU HAVEN'T HEARD ANY EVIDENCE

13  YET.  DON'T MAKE UP YOUR MINDS.  WE'LL SEE YOU AT 12:30.  THANK

14  YOU.

15          (THE PROSPECTIVE JURORS LEFT THE COURTROOM.)

16          **MR. PARRELLA:**  JUDGE, IF WE COULD?  A MATTER OF

17  SCHEDULING FOR TODAY.

18          **THE COURT:**  SCHEDULING?

19          **MR. PARRELLA:**  JUST TO INFORM THE COURT, WE ARE

20  PREPARED TO OPEN TODAY.  OUR FIRST WITNESS IS FLYING IN FROM

21  OUT OF STATE TONIGHT, AND WE WILL BE PREPARED TO START WITH

22  HER, WHICH IS DR. WIERMAN, TOMORROW MORNING.

23          I THINK, QUITE FRANKLY, WITH THE LENGTH OF TIME FOR

24  THE OPENINGS AND COMING BACK AT 12:30, WE WILL GO TO OR NEAR

25  THE 3:30 TIME LIMIT IN ANY CASE.

1          THE COURT:  THAT ACTUALLY SOUNDS RIGHT TO ME.

2          MR. BALOGH:  THAT'S FINE.  ARE WE GOING TO -- WE

3   WOULD ASK EVERY DAY TO HAVE AN ADVANCE NOTICE OF THE WITNESSES

4   FOR THE NEXT DAY.

5          THE COURT:  YES.  FOR TOMORROW, WHO DO YOU EXPECT TO

6   CALL?

7          MR. PARRELLA:  WE HAVE DR. WIERMAN, KELCEY DALTON,

8   PATRICK ARNOLD.

9          MR. NEDROW:  WENDY BERGLAND.

10         MR. PARRELLA:  THAT'S RIGHT.

11         MR. NEDROW:  THIS IS NOW POTENTIALLY, JEFF JACK AND

12  ROB BLENKINSOP -- IT'S EITHER BLANKENSOP OR BLENKINSOP.  WE ARE

13  NOT A HUNDRED PERCENT CERTAIN ON THE LAST NAME THERE.

14         I THINK THAT COVERS IT PRETTY MUCH FOR TOMORROW.

15         THE COURT:  I WOULD EXPECT WE FINISH OPENINGS TODAY.

16         MR. BALOGH:  I'M FINE WITH THAT SCHEDULE.

17         THE COURT:  ALL RIGHT.  THANK YOU.

18         MR. NEDROW:  THANK YOU, YOUR HONOR.

19         (LUNCHEON RECESS TAKEN.)

20         THE COURT:  WELCOME BACK, LADIES AND GENTLEMEN.

21  PLEASE BE SEATED.

22         (SIDEBAR DISCUSSION HELD OUT OF THE HEARING OF THE

23          POTENTIAL JURORS)

24         MR. BALOGH:  THANK YOU.  THERE ARE TWO ISSUES, THE

25  ONE ISSUE I THINK WAS THE MORE PRESSING ONE, WAS WE DIDN'T GIVE

1  AN INSTRUCTION TO THE JURORS YET WE CAN'T TALK TO THEM, AND

2  OVER THE RECESS TWICE I HAVE BEEN IN ELEVATOR RIDES WITH THE

3  JURORS.  I WAS ABLE TO NOD, ACKNOWLEDGE THEIR PRESENCE.

4          **THE COURT:**  OKAY.  I'LL MENTION IT.

5          **MR. BALOGH:**  THEY MAY PERCEIVE ME AS BEING RUDE OR

6  STANDOFFISH.  I WANT TO BE PROPER.  I WANT TO MAKE SURE THEY

7  GET THAT.  I WANT TO MAKE SURE ALL THE JURORS KNOW THAT WE

8  AREN'T BEING RUDE.  WE ARE FOLLOWING THE COURT'S INSTRUCTION.

9          THE OTHER ISSUE I WANTED TO BROACH NOW, WHICH CAME

10 UP BEFORE THE LUNCH HOUR, I UNDERSTOOD THE COURT'S PRETRIAL

11 RULING AT THE PRETRIAL HEARING TO BE THAT DR. WIERMAN'S

12 TESTIMONY -- MY MOTION TO EXCLUDE WAS DENIED WITHOUT PREJUDICE,

13 AND THE COURT EXPRESSED A BELIEF THAT SHE NEEDS TO HEAR THE

14 CASE BEFORE SHE COULD DETERMINE WHETHER DR. WIERMAN'S TESTIMONY

15 ABOUT MS. THOMAS'S 1998/1999 TESTOSTERONE USAGE THAT IS NOT

16 RELATED TO PATRICK ARNOLD AND NOT RELATED TO THE BALCO CASE

17 WOULD BE ADMISSIBLE.  SO THE RULING WAS WITHOUT PREJUDICE, AND

18 THE COURT EXPRESSED THE NEED TO EVALUATE THAT TESTIMONY WITHIN

19 THE CONTEXT OF THE BROADER TRIAL.

20         **THE COURT:**  LET'S TALK ABOUT THIS AFTER.

21         **MR. BALOGH:**  THAT'S FINE.  WE OBVIOUSLY HAVE SOME

22 CONCERNS.  I'M HAPPY TO TABLE THAT.  I WANT TO MAKE SURE THE

23 COURT IS AWARE I HAVE SOME GENUINE CONCERNS, AND I WOULD LIKE

24 TO BE HEARD.

25         **THE COURT:**  THANK YOU.

1              (END OF SIDEBAR DISCUSSION; PROCEEDINGS RESUMED IN

2         THE HEARING OF THE POTENTIAL JURORS)

3              **THE COURT:**   AT THIS TIME, LADIES AND GENTLEMEN, IT'S

4    THE OPPORTUNITY OF THE LAWYERS TO ASK YOU A FEW QUESTIONS.

5    BEFORE THEY DO THAT, LET ME MENTION SOMETHING THAT WILL BE A

6    STANDING INSTRUCTION THAT I WILL GIVE TO ALL THE JURORS WHO ARE

7    SELECTED IN THIS CASE, WHICH IS THAT IT'S REALLY IMPORTANT

8    DURING THE COURSE OF THE TRIAL THAT THE JURORS ONLY GET

9    EVIDENCE FROM THE WITNESS STAND IN TRIAL.   THEREFORE, WE ALWAYS

10   ORDER JURORS NOT TO TALK TO THE LAWYERS OR THE WITNESSES OR THE

11   PARTIES IN THIS CASE SO THERE'S NOT EVEN A QUESTION BUT THE

12   ONLY WAY YOU ARE GETTING YOUR INFORMATION FOR THE TRIAL IS HERE

13   IN THE COURTROOM.

14              AND I ALSO ALWAYS ORDER THE LAWYERS NOT TO TALK TO

15   YOU, THE JURORS.   SO IN THE HALLS OUT THERE AND ELEVATORS, IF

16   YOU FIND THE LAWYERS IN THE CASE ARE IGNORING YOU, OR LOOKING

17   THE OTHER WAY, OR OTHERWISE ACTING RUDE OR WEIRD, THAT'S

18   BECAUSE THEY ARE DOING WHAT I TOLD THEM TO DO, WHICH IS DON'T

19   TALK TO THE JURORS AT ALL.   THAT JUST REDUCES ANY CONCERN THAT

20   WE MIGHT HAVE ABOUT THE INFORMATION IN THE CASE.   SO I JUST

21   WANT TO MENTION THAT NOW BECAUSE YOU'LL FIND THEY WON'T TALK TO

22   YOU AND THAT'S WHY.

23              NOW IT'S THE OPPORTUNITY OF COUNSEL TO ASK A FEW

24   QUESTIONS, AND THE GOVERNMENT HAS THE BURDEN OF PROOF IN THIS

25   CASE, SO IT GETS TO GO FIRST.

1           MR. NEDROW.

2           **MR. NEDROW:**  YES, THANK YOU VERY MUCH, YOUR HONOR.

3           THANK YOU AGAIN, LADIES AND GENTLEMEN.  AGAIN, I

4    WANT TO TAKE THE OPPORTUNITY TO REINTRODUCE MYSELF AND OTHERS

5    AT GOVERNMENT TABLE.  AGAIN, MY NAME IS JEFF NEDROW FROM THE

6    U.S. ATTORNEY'S OFFICE.  THIS IS MATT PARRELLA, ALSO FROM THE

7    U.S. ATTORNEY'S OFFICE.  WE ARE THE PROSECUTORS ON THIS CASE.

8    THE CASE AGENT IS JEFF NOVITZKY, WHO IS A SPECIAL AGENT WITH

9    THE INTERNAL REVENUE SERVICE, CRIMINAL INVESTIGATION DIVISION.

10          THE FIRST QUESTION I WANTED TO -- OR FIRST, I GUESS,

11   TOPIC I WANT TO ADDRESS IS FOLLOW UP WITH SOME PEOPLE WHO HAD

12   PRIOR JURY EXPERIENCE.  AND, YOU KNOW, WE APPRECIATE PEOPLE

13   TALKING ABOUT WHAT THE -- THEIR JURY EXPERIENCE AND THE

14   PERSONAL EXPERIENCE IN THIS SETTING.  IT'S SOMETIMES A

15   DIFFICULT THING WITH A ROOMFUL OF STRANGERS TO GET HAULED IN ON

16   MONDAY MORNING AND ASKED ALL KIND OF QUESTIONS ABOUT WHAT YOU

17   DO FOR A LIVING AND KIND OF SUMMARIZE YOUR LIFE ON A PLASTIC

18   CARD.  WE APPRECIATE THAT.

19          THE REASON THE QUESTIONS ARE HAPPENING ARE TO MAKE

20   SURE THE GOVERNMENT AND DEFENSE HAVE A FAIR GROUP OF PEOPLE

21   WITH OPEN MINDS TO EVALUATE THE EVIDENCE IN THIS CASE.  I'M

22   GOING TO GO ACTUALLY STARTING BACKWARDS AND ASK A FEW QUESTIONS

23   OF SOME OF THE PEOPLE WHO HAD PRIOR JURY SERVICE.

24          I WOULD LIKE TO START WITH MS. MAYHEW, IF I MAY.

25   QUESTION IS SIMPLY IF YOU COULD SHARE WITH US WHAT YOU FOUND TO

 1   BE THE BEST AND MAYBE LEAST APPEALING ASPECTS OF YOUR JURY

 2   SERVICE, WITHOUT, OF COURSE, TALKING ABOUT THE RESULT OF THE

 3   TRIAL.  FIRST OF ALL, THE THING YOU LIKED BEST ABOUT IT.

 4               **PROSPECTIVE JUROR MAYHEW:**  THE THING I LIKED THE

 5   BEST -- MY NAME IS AMY MAYHEW.  I WAS A SUBSTITUTE JUROR ON TWO

 6   CASES, AND I FOUND IT BOTH INTERESTING AND FRUSTRATING BECAUSE

 7   AFTER SITTING THERE FOR A WHILE, I DIDN'T GET TO DO ANYTHING.

 8   I WASN'T ALLOWED TO GO INTO THE JURY ROOM.  IT WAS IN LOS

 9   ANGELES COUNTY; YOU WEREN'T ALLOWED IN THE JURY ROOM.

10               THE ONE I DID DO AS A JUROR WAS -- IT WAS ONLY ABOUT

11   THREE DAYS.  THERE WAS SOME BACK AND FORTH BETWEEN THE GROUP,

12   BUT PRETTY MUCH WE WERE CLOSE TO AGREEING, AND IT WAS PRETTY

13   PAINLESS, I THOUGHT.

14               **MR. NEDROW:**  DID YOU FIND IT TO BE -- WAS IT

15   SOMETHING YOU WERE HAPPY YOU HAD GONE THROUGH THE PROCESS IN

16   TERMS OF THE SYSTEM?

17               **PROSPECTIVE JUROR MAYHEW:**  YES.

18               **MR. NEDROW:**  I THINK YOU TOUCHED UPON IT.  WHAT WAS

19   THE PART YOU LIKED THE LEAST ABOUT IT?  WAS IT THE FACT YOU

20   WERE AN ALTERNATE AND COULDN'T DELIBERATE?

21               **PROSPECTIVE JUROR MAYHEW:**  I WOULD HAVE BEEN

22   INTERESTED TO HEAR OTHER PEOPLE'S OPINION ABOUT ALL OF US

23   HEARING THE SAME THING, SO THAT WAS A LITTLE FRUSTRATING.  I

24   DIDN'T HAVE ANYTHING REALLY NEGATIVE TO SAY ABOUT THE ACTUAL

25   JURY EXPERIENCE I HAD.

```
 1              MR. NEDROW:  OKAY.  THANK YOU.  THANK YOU VERY MUCH

 2   FOR SHARING THAT.  I APPRECIATE IT.

 3              THE NEXT PERSON I WANTED TO ASK ABOUT WAS MR. YUP.

 4   MR. YUP, YOU WERE ON A COUPLE OF JURIES, CORRECT?

 5              PROSPECTIVE JUROR YUP:  YES.  THE ONLY ONE -- THE

 6   EARLY ONE'S ABOUT TWENTY YEARS AGO, BUT THE LATEST ONE WAS A

 7   ONE DAY IN AND OUT.  SO IT WAS -- THE VOTE WAS 11-TO-1, AND THE

 8   ONE PERSON JUST DIDN'T WANT TO CHANGE HIS MIND.  WE TALKED BACK

 9   AND FORTH, BUT IT DIDN'T GET ANY FURTHER THAN THAT.

10              MR. NEDROW:  IN TERMS OF BOTH POSITIVES AND

11   NEGATIVES, WHAT WOULD YOU SAY YOU TOOK AWAY FROM THAT

12   EXPERIENCE?  WOULD YOU FEEL IT WAS A GOOD EXPERIENCE?

13              PROSPECTIVE JUROR YUP:  IT WAS AN EXPERIENCE.

14              MR. NEDROW:  OKAY.  DID YOU FIND IT EDUCATING IN

15   TERMS OF UNDERSTANDING A LITTLE MORE HOW THE LEGAL SYSTEM

16   WORKS?

17              PROSPECTIVE JUROR YUP:  YES, IT WAS.

18              MR. NEDROW:  LET ME ASK -- ACTUALLY, I BELIEVE IT

19   WAS MS. HOYT MADE A COMMENT THAT THE SERVICE IS LONG, AND I'M

20   NOT SURE IF YOU SAID HORRIBLE EXACTLY.  MAYBE YOU DID SAY

21   HORRIBLE.

22              PROSPECTIVE JUROR HOYT:  I DID.  I DID.

23              MR. NEDROW:  PLEASE GO AHEAD.

24              PROSPECTIVE JUROR HOYT:  I THINK, FROM MY

25   EXPERIENCE, THE PROCESS WAS REALLY INTERESTING TO LEARN ABOUT,
```

1  BUT IT WAS A FOUR-AND-A-HALF WEEK TRIAL.  IT WAS -- THE SUBJECT

2  MATTER WAS AROUND CHILD PORNOGRAPHY AND MOLESTATION.  AND,

3  PERSONALLY, AND I THINK FOR A LOT OF THE JURORS, IT WAS VERY

4  DISTURBING.  SO IT TOOK ME MONTHS TO SORT OF GET BACK TO MY

5  NORMALLY SUNSHINE HAPPY STATE I'M IN BECAUSE THERE WAS A LOT OF

6  VIDEO, TONS AND TONS OF VIDEO.  HE ENJOYED VIDEOTAPING WHILE HE

7  WAS DOING, AND ALL OF THAT WAS PART OF THE MATERIAL.

8           I LIKED THE EXPERIENCE.  I FOUND THE LAWYERS TO BE

9  BRILLIANT AND INTERESTING.  I FOUND IT TOOK ME A LONG TIME TO

10 RECOVER FROM IT.  YOU COULD SEE IT'S -- IT WAS HARD TO DO.

11          **MR. NEDROW:**  I APPRECIATE YOUR CLARIFYING WHAT YOU

12 MEANT BY IT.  I CAN CERTAINLY UNDERSTAND.  SO THANK YOU.

13          I'M JUMPING AROUND A LITTLE BIT.  MS. THIGPEN, YOU

14 SAID YOU HAD BEEN ON A JURY.  SAME THING, WHAT WAS THE MOST

15 POSITIVE ASPECT ABOUT IT?

16          **PROSPECTIVE JUROR THIGPEN:**  THE MOST POSITIVE ASPECT

17 WAS DEFINITELY JUST THE LEARNING EXPERIENCE ABOUT HOW THE

18 SYSTEM WORKS.  AND I WOULD SAY NEGATIVE OR MOST CHALLENGING

19 ASPECT WAS LEARNING ABOUT HOW IT ALL WORKS, BECAUSE PROVING

20 SOMETHING BEYOND A REASONABLE DOUBT IS REALLY, REALLY, REALLY

21 HARD.

22          **MR. NEDROW:**  OKAY.  AND ANY NEGATIVE ASPECTS OR

23 SUGGESTIONS TO THE COURT SYSTEM OR ANYTHING LIKE THAT, OR DID

24 IT SEEM --

25          **PROSPECTIVE JUROR THIGPEN:**  NEVER, NEVER DARE TO

1   OFFER.  NO.

2           **MR. NEDROW:**  ALL RIGHT.  THANK YOU.

3           MR. SMITH, YOU SAID YOU HAD BEEN ON A JURY OR TWO.

4   IF I COULD ASK YOU --

5           **PROSPECTIVE JUROR WARD SMITH:**  YEAH.

6           **MR. NEDROW:**  -- WHAT DID YOU LIKE THE MOST ABOUT THE

7   PROCESS, IF YOU COULD REMEMBER?  TELL US THAT.

8           **PROSPECTIVE JUROR WARD SMITH:**  JUST BASICALLY THE

9   TESTIMONIAL.

10          **MR. NEDROW:**  THE TESTIMONY?  YOU LIKED THE

11  TESTIMONY?  YOU FOUND IT HELPFUL?

12          **PROSPECTIVE JUROR WARD SMITH:**  YEAH.

13          **MR. NEDROW:**  OKAY.  WAS THERE ANYTHING YOU DIDN'T

14  LIKE, THAT YOU FOUND JUST WASN'T A GOOD THING FOR YOU FROM A

15  JUROR'S PERSPECTIVE?

16          **PROSPECTIVE JUROR WARD SMITH:**  NO.

17          **MR. NEDROW:**  THANK YOU VERY MUCH.  THANK YOU.

18          LET'S SEE.  MR. ROSS?

19          **PROSPECTIVE JUROR ROSS:**  YES.

20          **MR. NEDROW:**  KIND OF THE SAME THING, THE ASPECTS OF

21  YOUR PRIOR JURY SERVICE.

22          **PROSPECTIVE JUROR ROSS:**  IT WAS VERY INTERESTING TO

23  EXPERIENCE.  THE PROCESS DISAPPOINTED BECAUSE THERE HAD BEEN A

24  LOT OF BELIEVABLE EYEWITNESS TESTIMONY, AND WHEN IT WENT TO

25  PLEA BARGAIN, A LOT OF US WAS --

```
 1              MR. NEDROW:  SO YOU DIDN'T HAVE A CHANCE TO
 2   DELIBERATE BECAUSE THE CASE SETTLED PRE DELIBERATION?
 3              PROSPECTIVE JUROR ROSS:  CORRECT.
 4              MR. NEDROW:  BUT YOU HEARD A BUNCH OF THE PROCESS
 5   BEFORE THAT?
 6              PROSPECTIVE JUROR ROSS:  AROUND FOUR DAYS OF
 7   TESTIMONY.
 8              MR. NEDROW:  SO OTHER THAN NOT GETTING TO KIND OF
 9   CLOSE THE DEAL, YOU FOUND IT A POSITIVE EXPERIENCE?
10              PROSPECTIVE JUROR ROSS:  YES.
11              MR. NEDROW:  THANK YOU, SIR.
12              MR. LINDBERG, SAME QUESTION.  POSITIVE ASPECTS?
13              PROSPECTIVE JUROR LINDBERG:  I THOUGHT IT HELPED ME
14   UNDERSTAND THE PROCESS BETTER.  IT GAVE ME A LITTLE MORE
15   CONFIDENCE IN THE SYSTEM, I THINK.  I SOMETIMES HAD A FEELING
16   THAT PERHAPS SOMETIMES THE CHARGES WERE OVERZEALOUS, AND I GOT
17   A LITTLE BETTER FEELING MAYBE THERE WERE REASONS FOR TRIALS.
18              MR. NEDROW:  IF I MAY CLARIFY?  I SEE FROM OTHER
19   CASES YOU HEARD ABOUT, LIKE IN THE PAPERS OR SOMETHING, YOU GOT
20   THAT IMPRESSION, BUT NOT IN THE CASE YOU WERE ON, IT WAS
21   OVERZEALOUS, BUT ON OTHER CASES; IS THAT WHAT YOU --
22              PROSPECTIVE JUROR LINDBERG:  I HAD KIND OF GOTTEN
23   THE IMPRESSION.  AND, IN FACT, FROM MY WIFE'S EXPERIENCE, SHE
24   WAS -- WELL, SHE WAS -- SHE WAS GUILTY OF A FAIRLY LOW LEVEL
25   CRIME, AND WAS -- ONE OF THE CHARGES AGAINST HER WAS CONSPIRACY
```

1  AGAINST THE GOVERNMENT, AND IT WAS OBVIOUSLY A BIT OVERZEALOUS,

2  AND THAT WAS -- I JUST FELT -- GOT THAT GENERAL IMPRESSION.

3  AND BEING IN TRIAL, I GOT A BETTER IDEA THAT THERE WERE REASONS

4  FOR CHARGES.

5          **MR. NEDROW:**  OKAY.  SO IT LEFT YOU WITH -- I DON'T

6  WANT TO SPEAK FOR IT -- BUT A MORE POSITIVE FEELING ABOUT HOW

7  THE SYSTEM WORKS FOR THAT?

8          **PROSPECTIVE JUROR LINDBERG:**  YES.

9          **MR. NEDROW:**  MR. VO, SAME QUESTION?  POSITIVE

10 ASPECTS OR NEGATIVE?

11         **PROSPECTIVE JUROR VO:**  IT WAS A LONG TIME AGO.  IT

12 WAS POSITIVE.  I THINK THAT JUST THE WHOLE -- SEEING HOW THE

13 WHOLE PROCESS WORKED.  AND, ALSO, THE DELIBERATION, HOW

14 EVERYBODY CAME TOGETHER AND REALLY WERE CONCERNED ABOUT MAKING

15 THE RIGHT DECISION.  IT WASN'T A HURRIED PROCESS.  I THOUGHT IT

16 WAS -- I THOUGHT THAT WAS VERY NICE TO SEE.

17         **THE COURT:**  FOLLOWING UP ON THAT, DID THE JURY SIT

18 DOWN AND LOOK AT THE EVIDENCE AS THE JUDGE INSTRUCTED THE JURY

19 TO DO?

20         **PROSPECTIVE JUROR VO:**  YES.  YES, WE DID.

21         **MR. NEDROW:**  THANK YOU.

22         MS. JAMES, YOU HAD SOME JURY SERVICE?

23         **PROSPECTIVE JUROR JAMES:**  IT WAS ALSO VERY GOOD

24 LEARNING EXPERIENCE FOR ME.  IT WAS MY FIRST TIME BEING A

25 JUROR.

1          **MR. NEDROW:**  AND WAS IT SOMETHING THAT YOU WERE

2   AFTERWARDS HAPPY, YOU KNOW, THAT YOU'D BEEN INVOLVED WITH,

3   NOTWITHSTANDING THE INCONVENIENCE OF HAVING TO TAKE THE TIME TO

4   DO IT?

5          **PROSPECTIVE JUROR JAMES:**  THERE WAS SOMETHING

6   DIFFERENT ABOUT IT, SOMETHING DIFFERENT.  LIKE IT WAS A GOOD

7   LEARNING EXPERIENCE FOR ME.  BUT I DON'T REALLY HAVE ANY

8   NEGATIVE THING TO SAY ABOUT IT.

9          **MR. NEDROW:**  OKAY.  THAT'S GREAT.  THANK YOU.  THANK

10  YOU VERY MUCH.

11          MR. CONWAY, YOU HAD BEEN ON A JURY.  YOU HAVE A LAW

12  ENFORCEMENT BACKGROUND, CORRECT?

13          **PROSPECTIVE JUROR CONWAY:**  YES.

14          **MR. NEDROW:**  I'M INTERESTED WITH THE LAW ENFORCEMENT

15  BACKGROUND, YOU KNOW, YOU MAY HAVE HAD SOME PRECONCEPTIONS

16  ABOUT JURY SERVICE, I GUESS, WITH ALL THE PRECONCEPTIONS.  HOW

17  DID YOU FIND IT?

18          **PROSPECTIVE JUROR CONWAY:**  WELL, HAVING -- I HAVE

19  BEEN A WITNESS SEVERAL TIMES ON SEVERAL DIFFERENT CASES.  THE

20  FIRST JURY I SAT ON, AND IT WAS A CIVIL CASE, THOUGH, AND THEY

21  CAME TO AGREEMENT JUST STARTING THE CASE, SO WE REALLY DIDN'T

22  GET THAT INVOLVED WHERE I CAN REALLY SAY.

23          **MR. NEDROW:**  OH, I SEE.

24          **PROSPECTIVE JUROR CONWAY:**  THE JURY PART OF IT.  IT

25  WAS VERY INTERESTING THIS PART OF IT, THOUGH, CHOOSING OF THE

1  JURY AND PEOPLE AND THEIR DIFFERENT BACKGROUNDS ALL COME

2  TOGETHER.

3           **MR. NEDROW:** OKAY. THANK YOU VERY MUCH. I

4  APPRECIATE THAT.

5           OKAY. AND I APOLOGIZE IF I MISS ANYBODY. I AM JUST

6  JUMPING AROUND HERE, BUT MS. ALMQUIST-BALDWIN, YOU ALSO HAD

7  SOME JURY SERVICE, CORRECT?

8           **PROSPECTIVE JUROR ALMQUIST-BALDWIN:** YES.

9           **MR. NEDROW:** PLEASE, SAME QUESTION. HOW DID YOU

10  FIND IT?

11           **PROSPECTIVE JUROR ALMQUIST-BALDWIN:** IT WAS A GOOD

12  EXPERIENCE. I THINK ABOUT BEST THING WAS DURING DELIBERATIONS

13  WHAT PEOPLE DID WITH THE SAME INFORMATION. I FOUND IT

14  FASCINATING. NOTHING NEGATIVE.

15           **MR. NEDROW:** GREAT. AND THANK YOU.

16           MS. CARR, YOU HAVE BEEN ON SOME -- SEVERAL JURIES,

17  IF I RECALL CORRECTLY.

18           **PROSPECTIVE JUROR CARR:** YES.

19           **MR. NEDROW:** DID THEY STAND OUT? WERE THEY KIND

20  OF -- ALL KIND OF THE SAME THING? OR WERE THEY KIND OF

21  DIFFERENT IN TERMS OF MAKEUP OF THE INDIVIDUALS INVOLVED? OR

22  HOW WOULD YOU DESCRIBE THAT?

23           **PROSPECTIVE JUROR CARR:** THE FIRST ONE I WAS AN

24  ALTERNATE IN A CIVIL CASE, AND THEN AFTER THAT TWO CRIMINAL

25  CASES, AND I WAS JUST AMAZED HOW THE -- HOW THE PROGRESS -- HOW

1  THE PROCESS WORKS, BECAUSE I DIDN'T HAVE A CLUE.  AND I THOUGHT

2  WHAT WAS MOST VALUABLE WAS THE JUDGE'S INSTRUCTIONS TO THE JURY

3  ON HOW WE SHOULD VOTE, AND WE ABIDED BY THAT, AND WHATEVER WE

4  DECIDED WE DECIDED, BUT I THOUGHT IT WAS A VERY POSITIVE

5  EXPERIENCE.

6          **MR. NEDROW:**  THANK YOU VERY MUCH.  THANK YOU.

7          AND THERE WAS A MR. YOUNG ALSO.  YES, SIR.  YOU ARE

8  A LAWYER, CORRECT?

9          **PROSPECTIVE JUROR YOUNG:**  YES.

10          **MR. NEDROW:**  OKAY.  FROM A LAWYER'S PERSPECTIVE, HOW

11  DID YOU FIND THAT, TAKING, YOU KNOW, YOUR EDUCATION AND

12  TRAINING IN LAW AND AFTER SITTING IN A JURY?

13          **PROSPECTIVE JUROR YOUNG:**  I'M A CORPORATE ATTORNEY

14  BY TRADE, SO I DIDN'T GET TO GO TO THE COURTHOUSE VERY OFTEN.

15  I FIND IT INTERESTING TO SEE HOW THE OTHER SIDE PRACTICES.

16          **MR. NEDROW:**  AND --

17          **PROSPECTIVE JUROR YOUNG:**  IT WAS A GOOD EXPERIENCE.

18          **MR. NEDROW:**  AND WERE YOU SURPRISED BY ANYTHING IN

19  TERMS OF HOW THE -- HOW THE LAWYERS PERFORMED OR HOW THE

20  PROCESS WORKED?

21          **PROSPECTIVE JUROR YOUNG:**  THE CASE SETTLED DURING

22  TRIAL, SO WE DIDN'T GO THROUGH THE WHOLE PROCEDURE, BUT WHAT I

23  DID EXPERIENCE WAS INTERESTING.

24          **MR. NEDROW:**  OKAY.  THANK YOU.  WE TALKED TO

25  MS. HOYT.

1            THERE WAS A MS. RYAN WHO ALSO -- THANK YOU, MA'AM.

2   AGAIN, SAME QUESTION.  POSITIVE OR NEGATIVE SORT OF REACTIONS

3   TO THE PROCESS?

4            **PROSPECTIVE JUROR HOYT:**  IT'S NOT NEGATIVE.  IT'S

5   ALL BEEN POSITIVE.  I THINK WE ALSO WITH THE JUDGE'S

6   INSTRUCTIONS, THAT'S ALSO VERY HELPFUL TO MAKE SURE YOU ARE

7   FOCUSED ON WHAT THE EVIDENCE IS AS OPPOSED TO ANYTHING OUT

8   THERE.  IT WAS FINE.

9            **MR. NEDROW:**  THANK YOU.  THANK YOU VERY MUCH.

10           AND, MR. THRIFT, YOU HAD SOME JURY SERVICE AS WELL.

11   SAME QUESTION TO YOU.

12           **PROSPECTIVE JUROR THRIFT:**  YES, IT WAS A GOOD

13   EXPERIENCE.  IT WAS JUST ONE DAY, AND -- IT WAS JUST A ONE-DAY

14   TRIAL, AND THE VERDICT WAS UNANIMOUS.  IT WAS PRETTY OBVIOUS.

15           **MR. NEDROW:**  OKAY.  AGAIN, DID YOU FIND IT TO BE

16   SORT OF AN EDUCATIONAL OR POSITIVE THING, ALSO?

17           **PROSPECTIVE JUROR THRIFT:**  YES.

18           **MR. NEDROW:**  AND MR. -- I'M SORRY.  I APOLOGIZE FOR

19   MY PRONUNCIATION.  MR. OSIAS.

20           **PROSPECTIVE JUROR OSIAS:**  YES.

21           **MR. NEDROW:**  SAME QUESTION TO YOU, SIR.

22           **PROSPECTIVE JUROR OSIAS:**  IT WAS A TWO-WEEK TRIAL,

23   AND I THOUGHT IT WAS A REAL EDUCATIONAL EXPERIENCE.  VERY

24   POSITIVE.  THE DELIBERATIONS IN THE JURY ROOM ALSO EYE OPENING.

25   I THOUGHT VERY INTERESTING.  PROBABLY ONLY NEGATIVE WAS NEVER

1   FINDING OUT AFTER OUR VERDICT, NEVER FINDING OUT HAPPENED

2   AFTER, THAT IS.

3           **MR. NEDROW:**  WHEN YOU SAY EYE OPENING OR

4   INTERESTING, WOULD YOU ELABORATE A LITTLE BIT?

5           **PROSPECTIVE JUROR OSIAS:**  JUST THE DIFFERENT

6   VIEWPOINTS FROM DIFFERENT JURY MEMBERS, AFTER SITTING THROUGH

7   THE TRIAL, DIFFERENT FROM FACTS THAT WE HEARD DURING THE CASE,

8   BUT WE ALL CAME TOGETHER.

9           **MR. NEDROW:**  THANK YOU.  THANK YOU VERY MUCH.  I

10  APPRECIATE EVERYONE ADDRESSING THESE MATTERS FOR US.  IT'S VERY

11  HELPFUL.  I JUST HAVE A FEW MORE QUESTIONS, AND I'M GOING TO

12  SIT DOWN.

13          I JUST WANT TO ASK -- AND THE JUDGE ALREADY COVERED

14  THIS, OF COURSE, BUT I WANT TO CONFIRM.  DOES ANYBODY HAVE ANY

15  PROBLEMS UNDERSTANDING ENGLISH OR SPEAKING ENGLISH IN A MANNER

16  WHERE THEY HAVE CONCERNS WHERE THEY MAY BE ABLE TO FOLLOW

17  WHAT'S GOING ON?  DOES EVERYBODY FEEL COMFORTABLE WITH THE

18  PROCEEDINGS GOING FORWARD, ANY CONCERNS ABOUT THAT?  THANK YOU.

19          OBVIOUSLY, WE'VE HAD THIS ISSUE COME UP.  THERE'S

20  BEING ABLE TO HEAR THINGS, AND, OF COURSE, THE WITNESSES HAVE

21  MICROPHONES.  DOES ANYBODY HAVE ANY HEARING-RELATED ISSUES?  IF

22  SO, IT CAN BE ADDRESSED LATER, OF COURSE.  I JUST WANT TO MAKE

23  SURE EVERYBODY CAN HEAR OKAY THE WITNESSES' TESTIMONY BECAUSE

24  THAT'S AN IMPORTANT PART OF THE CASE.

25          ACTUALLY, THE SAME QUESTION VISUALLY IN TERMS OF THE

1    ABILITY TO SEE.  ANYBODY HAVE ANY CONCERNS ABOUT THEIR VISION

2    IN A WAY WHERE EXHIBITS ARE SHOWN THEY CAN APPRAISE THOSE OR

3    TAKE A LOOK AT THOSE?  OKAY.  THANK YOU.

4           AND DOES EVERYBODY UNDERSTAND -- AGAIN, THE COURT

5    ADDRESSED THIS, BUT I WOULD LIKE TO ADDRESS IT AGAIN JUST FOR A

6    SECOND.  DOES EVERYBODY UNDERSTAND THAT THE NATURE OF THE

7    CHARGES IN THIS CASE ARE CHARGES OF MAKING FALSE DECLARATIONS

8    BEFORE A GRAND JURY AND OBSTRUCTING JUSTICE?  PEOPLE UNDERSTAND

9    THOSE ARE THE NATURE OF THE CHARGES IN THIS CASE?  SO TO THE

10   EXTENT THERE WAS SOME DISCUSSION AS THE COURT AND -- OF

11   STEROIDS AND, YOU KNOW, WHAT THE PROPRIETIES OF STEROIDS IN

12   SPORTS AND THINGS, DO PEOPLE UNDERSTAND THAT'S NOT THE CHARGES

13   IN THIS CASE?  IT'S NOT A CHARGE OF STEROID USE, NOT A CHARGE

14   OF STEROID POSSESSION OR DISTRIBUTION.  IT'S A CHARGE OF FALSE

15   STATEMENT.  IS THERE ANY AMBIGUITY ABOUT THAT IN ANYBODY'S

16   MIND?

17           (NO RESPONSE.)

18           **MR. NEDROW:**  THANK YOU VERY MUCH.  THANK YOU VERY

19   MUCH, YOUR HONOR.  NO FURTHER QUESTIONS.

20           **THE COURT:**  THANK YOU.  MR. BALOGH.

21           **MR. BALOGH:**  THANK YOU, YOUR HONOR.

22           GOOD AFTERNOON, LADIES AND GENTLEMEN.  AS I

23   INTRODUCED MYSELF BEFORE, MY NAME IS ETHAN BALOGH.  I REPRESENT

24   TAMMY THOMAS, AND THIS IS GOING TO BE A FEDERAL CRIMINAL TRIAL.

25   THIS IS THE PART WHERE YOU GUYS GET TO TALK AND PARTICIPATE.

```
 1   AFTER THIS, WHEN WE HAVE A JURY SELECTED, YOU BEGIN THE ACTIVE

 2   LISTENING PART OF THE CASE WHERE YOU DON'T GET TO TALK.  THE

 3   JUDGE IS GOING TO ORDER YOU NOT TO TALK AMONGST YOURSELVES

 4   ABOUT THE CASE.  SHE IS GOING TO ORDER YOU TO SUSPEND JUDGMENT.

 5   THEN THERE'S GOING TO BE A THIRD STAGE FOR THE JURY TO BE

 6   PICKED, AND THEY ARE GOING TO DELIBERATE.

 7           NOW IS THE TIME TO TALK.  WE WANT TO LEARN A LITTLE

 8   BIT ABOUT YOU.  WHO LIKES PUBLIC SPEAKING HERE?  WE ONLY HAD

 9   ONE HAND.  IT'S A BIT OF A NERVOUS EXPERIENCE FOR MOST OF US.

10   APART FROM THE FELLOWS UP HERE, MOST PEOPLE -- IT'S A BIT

11   UNCOMFORTABLE.  WE ASK YOU TO BEAR WITH US.  THIS IS A CRITICAL

12   PART OF THE PROCEEDINGS.

13           FIRST THING I WANT TO KNOW IS, YOU WERE ASKED ABOUT,

14   YOU KNOW, IF YOU KNEW OF TAMMY THOMAS BEFORE TODAY.  HOW MANY

15   OF YOU HAD HEARD OF TAMMY THOMAS BEFORE TODAY, WOULD YOU RAISE

16   YOUR HANDS?  KEEP YOUR HANDS UP, PLEASE.  IF YOU KNOW ABOUT

17   TAMMY THOMAS BECAUSE YOU SAW HER RACE A BICYCLE, KEEP YOUR HAND

18   UP.  AND THAT'S MR. OLKEN, RIGHT?  AND YOU ARE A CYCLIST, OR

19   YOU ENJOY WATCHING CYCLING?

20           **PROSPECTIVE JUROR OLKEN:**  I GREW UP IN A FAMILY THAT

21   OWNED A BICYCLE STORE.

22           **MR. BALOGH:**  SO YOU KNOW WHAT -- YOU CAN PUT YOUR

23   HAND DOWN, SIR.

24           YOU KNOW WHAT MATCHED SPRINTS ARE; IS THAT RIGHT?

25           **PROSPECTIVE JUROR OLKEN:**  YES.
```

1           **MR. BALOGH:**  WAS THAT THE EVENT YOU SAW MS. THOMAS

2    COMPETE IN?

3           **PROSPECTIVE JUROR OLKEN:**  YES.

4           **MR. BALOGH:**  CAN YOU TELL REST OF THE PANEL, WHAT

5    ARE PATCHED SPRINTS?

6           **PROSPECTIVE JUROR OLKEN:**  YOU HAVE TWO PEOPLE ON THE

7    TRACK, AND THEY SORT OF PACE EACH OTHER AROUND THE TRACK, AND

8    AT THE LAST MINUTE THEY TRY TO OUTSPRINT EACH OTHER AT THE END.

9           **MR. BALOGH:**  FIRST ACROSS THE LINE WINS.

10          AGAIN, IF YOU HAD YOUR HANDS UP FOR TAMMY THOMAS,

11   GET YOUR HANDS UP AGAIN, WHO'S HEARD OF TAMMY THOMAS.  HAS THAT

12   BEEN FROM -- KEEP THEM UP IF IT'S BEEN FROM NEWSPAPER ARTICLES.

13   KEEP THEM UP IF IT'S BEEN READING THE BOOK "GAME OF SHADOWS."

14   OKAY.  SO, EVERYONE, THIS IS FROM THE PRESS.  OKAY.  CAN YOU

15   PUT YOUR HANDS UP AGAIN.

16          SO WE'LL START WITH MR. -- IT'S HAROIAN?

17          **PROSPECTIVE JUROR HAROIAN:**  "HAROIAN."

18          **MR. BALOGH:**  SORRY, SIR.  WHAT DO YOU UNDERSTAND

19   ABOUT THIS CASE THAT YOU HEARD BEFORE?

20          **PROSPECTIVE JUROR HAROIAN:**  WHAT I UNDERSTAND ABOUT

21   THE CASE IS THAT THERE WAS SOME ISSUES WITH THE BICYCLE RACING

22   FEDERATION ON STEROIDS.  I DON'T FOLLOW CYCLING, BUT SEVERAL

23   PROFESSIONAL RACERS HAD BEEN ACCUSED OF USING

24   PERFORMANCE-ENHANCING DRUGS IN COMPETITION.  IT'S NOT

25   NECESSARILY SPELLED OUT, THE ILLEGALITY OF IT.  I HAVE FRIENDS

1    THAT -- WE FIGURED OUT WHAT THIS CASE WAS GOING TO BE ABOUT A

2    WEEK AGO, AND WE TALKED ABOUT IT.

3             **MR. BALOGH:**  THAT'S YOUR UNDERSTANDING?

4             **PROSPECTIVE JUROR HAROIAN:**  THAT'S MY UNDERSTANDING.

5    WELL, THAT'S THE BACKGROUND.

6             MY UNDERSTANDING ABOUT THIS CASE IS THERE'S A GRAND

7    JURY TESTIMONY ABOUT USING ARNOLD'S COMPANY'S PRODUCT,

8    PERFORMANCE-ENHANCING, OR, I DON'T REMEMBER, A CHEMICAL THEY

9    WERE USING OR DEVELOPING, AND THAT THE QUESTIONS WERE RAISED IN

10   THE GRAND JURY ABOUT WHETHER OR NOT THESE PEOPLE HAD ACTUALLY

11   USED THESE DRUGS, AND THE ANSWERS CAME BACK THEY HADN'T, HAD NO

12   KNOWLEDGE OF IT, ALONG THOSE LINES.  AND THAT MAY -- THAT

13   TESTIMONY MAY HAVE NOT BEEN TRUE.

14            **MR. BALOGH:**  I WANT TO MAKE SURE I GET THIS RIGHT.

15   MR. STREET?

16            **PROSPECTIVE JUROR STREET:**  YES.

17            **MR. BALOGH:**  YOU RAISED YOUR HAND YOU HEARD ABOUT

18   MS. THOMAS BEFORE.  WHAT CAN YOU TELL US YOU LEARNED THROUGH

19   THE PRESS OVER THE PAST YEARS?

20            **PROSPECTIVE JUROR STREET:**  VERY LITTLE.  WHAT

21   MR. ANTHONY (SIC) SUMMARIZED FAIRLY WELL MY UNDERSTANDING OF

22   WHAT'S GOING, BUT WITH MORE DETAIL.

23            **MR. BALOGH:**  SO YOU HAD LESS DETAIL --

24            **PROSPECTIVE JUROR STREET:**  I HEARD OF MS. THOMAS AS

25   ONLY ONE OF A NUMBER OF PEOPLE, A NUMBER ATHLETES WHO WERE

1  CONNECTED WITH THIS COMPANY WHO MAY OR MAY NOT HAVE USED

2  PERFORMANCE.

3           **THE COURT:**  MR. CONWAY, WAS YOUR HAND RAISED?

4           **PROSPECTIVE JUROR CONWAY:**  NO, IT WAS --

5           **MR. BALOGH:**  WHY DON'T YOU TELL US WHAT YOU HEARD

6  ABOUT MS. THOMAS?

7           **PROSPECTIVE JUROR CONWAY:**  SAME AS WHAT EVERYBODY

8  ELSE.  I FOLLOWED IT IN THE OTHER STORY, AND WAS IN TODAY'S

9  PAPER, AND THAT REFRESHED MY MEMORY ABOUT IT, ABOUT HER NAME.

10          **MR. BALOGH:**  WHO ELSE'S HANDS WERE UP?  THAT'S

11 MR. THRIFT?  I'M SORRY, SIR.  MY CHART IS PROBABLY BACKWARD BY

12 NOW.

13          **PROSPECTIVE JUROR MARTIN:**  I'M MARTIN, AND I AGREE

14 WITH THESE FOLKS.  I'VE READ A LITTLE BIT ABOUT IT IN THE

15 PAPER.  I UNDERSTAND THERE WAS A DENIAL OF USAGE AND THAT'S

16 BEING CHALLENGED.  THAT'S ALL I KNOW ABOUT IT.

17          **MR. BALOGH:**  HAS ANYONE ELSE HEARD SOMETHING

18 DIFFERENT ABOUT THIS CASE?  SO CONSISTENT ALONG THESE LINES,

19 THIS IS WHAT YOU'VE HEARD?

20          HOW MANY OF YOU HAVE HEARD THAT MS. THOMAS WAS AN

21 OLYMPIC CYCLIST?  IF THE EVIDENCE AT THIS TRIAL WAS SHE WAS AN

22 OLYMPIC CYCLIST, WOULD YOU BE ABLE TO -- MR. STREET, YOU RAISED

23 YOUR HAND -- BASE YOUR DECISION AT THE TRIAL BASED ON THE

24 EVIDENCE, NOT WHAT YOU READ IN THE NEWSPAPER?

25          **PROSPECTIVE JUROR STREET:**  YES.

1              **MR. BALOGH:**  FOR EVERYONE, IS THERE ANYONE WHO IS

2    GOING TO HAVE DIFFICULTY NOT CONSULTING THE INTERNET, NOT

3    TRYING TO LEARN ABOUT THIS CASE ANY WAY OTHER THAN THROUGH THE

4    WITNESS TESTIMONY HERE TODAY, OR THIS WEEK, OR NEXT WEEK?  IS

5    EVERYBODY COMFORTABLE WITH THAT RULE?

6              NOW, HOW ABOUT A BROADER QUESTION, HOW MANY PEOPLE

7    HEARD OF THE BALCO CASE?  I THINK THAT'S EVERYONE.  AND HANDS

8    UP IF YOU'VE HEARD ABOUT IT FROM NEWSPAPERS.  HOW MANY OF YOU

9    HAVE READ "THE GAME OF SHADOWS"?

10             AGAIN, MR. OLKEN, YOU'RE PRETTY UP ON THIS STUFF.

11             FROM HEARING ABOUT THE BALCO CASE IF YOUR HANDS WERE

12   UP, HOW MANY OF YOU BELIEVE YOU HAVE A GOOD UNDERSTANDING OF

13   WHAT HAPPENED WITH THE BALCO GRAND JURY ALREADY, WOULD YOU

14   RAISE YOUR HANDS?

15             MR. YOUNG, WOULD YOU TELL US WHAT YOU UNDERSTAND

16   HAPPENED WITH THE BALCO GRAND JURY?

17             **PROSPECTIVE JUROR YOUNG:**  WELL, AS I RECALL, THEY

18   INDICTED THE OWNERS OF BALCO.  THERE WAS A TAX ISSUE INVOLVED

19   AND THEN THERE WAS SOME PERJURY INVOLVED.  PEOPLE SPENT SOME

20   TIME IN PRISON FOR THAT.

21             **MR. BALOGH:**  DID YOU LEARN ANYTHING ELSE ABOUT THE

22   BALCO GRAND JURY READING THAT YOU REMEMBER AND RECALL HERE

23   TODAY?

24             **PROSPECTIVE JUROR YOUNG:**  I KNOW IT'S GOING DOWN THE

25   PEOPLE -- IT STARTED FROM THE PEOPLE WHO WERE SELLING THE DRUGS

1  TO NOW THE PEOPLE WHO WERE USING IT. IT'S GOING DOWN THE CHAIN

2  TO THOSE PEOPLE.

3          **MR. BALOGH:** MR. WINTON-HENRY, I SAW YOUR HAND GO

4  UP, TOO. YOU HEARD ABOUT THE BALCO CASE. WHAT HAVE YOU

5  LEARNED OVER THE PAST YEARS ABOUT THIS?

6          **PROSPECTIVE JUROR WINTON-HENRY:** I LEARNED VERY

7  LITTLE, ACTUALLY. I HEARD ABOUT IT SORT OF IN GENERAL ABOUT

8  THE CASE. I DON'T RECALL. I JUST HEARD OF IT IN THE NEWS.

9          **MR. BALOGH:** HOW ABOUT YOU, MR. REGEN, IN THE BACK?

10 YOU RAISED YOUR HAND. AND YOU HEARD OF THE BALCO CASE?

11         **PROSPECTIVE JUROR REGEN:** I'VE HEARD OF BALCO, AND I

12 HEARD OF BALCO INVOLVED IN LOTS OF THINGS. I DIDN'T KNOW IT

13 WAS ABOUT CYCLING UNTIL SOMEBODY JUST MENTIONED IT. I THOUGHT

14 WE WERE HERE FOR BASEBALL. THAT'S ALL I KNOW. I REALLY DON'T

15 KNOW MUCH ABOUT IT.

16         **MR. BALOGH:** IS ANYTHING YOU HEARD OR READ IN THE

17 PRESS GOING TO AFFECT YOUR ABILITY TO SIT AS A JUROR AND VIEW

18 THE EVIDENCE IN THIS CASE?

19         **PROSPECTIVE JUROR REGEN:** NO, ABSOLUTELY NOT.

20 ABSOLUTELY NOT.

21         **MR. BALOGH:** NOW, ONE OF THE THINGS YOU HEARD IS

22 THIS CASE IS ABOUT, THERE'S SIX COUNTS. THE FIRST FIVE COUNTS

23 ARE CALLED MATERIAL FALSE DECLARATIONS TO THE GRAND JURY. DOES

24 EVERYONE KNOW WHAT FALSE MEANS? DOES ANYONE NOT?

25            WELL, "MATERIAL" IS A FANCY -- IT'S A LAWYER TERM,

1   AND THE JUDGE IS GOING TO INSTRUCT YOU ON THAT AT THE

2   CONCLUSION OF THE CASE WHAT IT MEANS TO THE COURT, WHAT IT

3   MEANS UNDER UNITED STATES LAW.  BUT, IN GENERAL, FOR OUR

4   PURPOSE TODAY, IT'S A FANCY TERM TODAY FOR WAS IMPORTANT.  AND

5   ONE OF THE THINGS THE EVIDENCE IN THIS TRIAL IS GOING TO HAVE

6   TO BE IS THAT THE STATEMENTS THEY ACCUSE MS. THOMAS OF MAKING

7   WERE IMPORTANT TO THE BALCO GRAND JURY.  IF THE JURY FINDS THEY

8   WERE NOT, THEY'RE GOING TO BE INSTRUCTED TO ACQUIT.  DOES

9   ANYONE HAVE A PROBLEM WITH THAT, IF THEY FIND STATEMENTS ARE

10  FALSE BUT WEREN'T IMPORTANT, DIDN'T MATTER, IS ANYONE BOTHERED

11  BY THAT THAT YOU WOULD BE INSTRUCTED TO ACQUIT MS. THOMAS ON

12  THAT BASIS?

13          LET'S DO IT THE OTHER WAY.  WHO AGREES IF THEY ARE

14  INSTRUCTED LIKE THAT, THEY WOULD HAVE NO PROBLEM ACQUITTING

15  MS. THOMAS?

16          SITTING HERE TODAY, DOES ANYBODY HAVE ANY OPINION

17  ABOUT WHETHER TAMMY A. THOMAS IS GUILTY OF ANYTHING?  ANY

18  OPINION WHATSOEVER?  AND THE RECORD SHOULD REFLECT WE SEE NO

19  HANDS.

20          NOW, WE'VE HEARD FROM A FEW GENTLEMEN, I THINK IT

21  WAS MR. MASNACK, MR. OLKEN, MR. MONTILLA, THEY HAVE SOME

22  FEELINGS ABOUT THE BALCO PROCEEDINGS, AND WE'RE GOING -- I WANT

23  TO FOLLOW UP AND TALK TO YOU GENTLEMEN ABOUT THAT IN A MOMENT.

24          AS WE LIVED HERE IN SAN FRANCISCO THE LAST FIVE

25  YEARS AND YOU'VE READ ABOUT THIS AND HEARD THIS CASE, HAS

1   ANYONE ELSE ENCOUNTERED ANY STRONG FEELINGS OR OPINIONS ABOUT

2   THE POLICING OF STEROIDS IN SPORTS?  WOULD YOU PLEASE RAISE

3   YOUR HAND IF YOU HAVE FORMED ANY STRONG OPINIONS?

4            MR. HAROIAN, WOULD YOU PLEASE TELL US ABOUT THE

5   OPINIONS YOU FORMED, SIR?

6            **PROSPECTIVE JUROR HAROIAN:**  THE OPINION I HAVE ABOUT

7   STEROIDS IS THAT I REALLY DON'T CARE WHAT ATHLETES DO, WHAT

8   THEY SHOVE INTO THEIR BODIES, OR WHERE.  IT DOESN'T MAKE ANY

9   DIFFERENCE TO ME.  BUT WHAT I DO HAVE A PROBLEM WITH, WHEN

10  THEY'RE ASKED THAT, THEY SEEM TO -- ATHLETES SEEM TO PUT

11  THEMSELVES ABOVE THE TRUTH IN A LOT OF WAYS IN THAT THEY'RE

12  WILLING TO LIE FOR NO REASON OTHER THAN THEIR OWN SELF

13  INTERESTS.

14           **MR. BALOGH:**  HAVE YOU FORMED ANY OTHER OPINIONS WITH

15  REGARD TO THE BALCO GRAND JURY?

16           **PROSPECTIVE JUROR HAROIAN:**  I THINK I RECALL THERE

17  WAS SOME LEAKING OF THE TESTIMONY IN THE GRAND JURY CASE, AND I

18  THINK THAT THAT MAY -- FOR THOSE THAT WERE PART OF THE PRESS

19  FRENZY WHEN THAT HAPPENED, THAT MAY HAVE TAINTED SOME PEOPLE'S

20  OPINIONS OF THE PROCEEDINGS.

21           **MR. BALOGH:**  CAN YOU ELABORATE ON THAT, SIR?  HOW

22  WOULD IT TAINT IT?  WOULD IT TAINT IT AS FAR AS -- IN WHICH

23  DIRECTION?

24           **PROSPECTIVE JUROR HAROIAN:**  WELL, THE PROCEEDINGS

25  ARE SUPPOSED TO BE IN SECRET, AND I THINK WHAT CAME TO LIGHT

1   WAS THAT THERE WAS SOME ADMISSIONS IN THERE OR OMISSIONS, BOTH,

2   REGARDING THE USE OF STEROIDS.

3            **THE COURT:**  MR. STREET, YOU HAD YOUR HAND UP AS

4   HAVING FORMED SOME STRONGER OPINIONS THAN YOUR AVERAGE CITIZEN,

5   SO TO SPEAK.

6            **PROSPECTIVE JUROR STREET:**  WELL, I THINK MY OPINIONS

7   CAN BE DESCRIBED AS SORT OF COMPLEX.  I AGREE WITH ANTHONY

8   HERE, THAT, FOR THE MOST PART, I DON'T CARE WHAT ACTUALLY THEY

9   ARE -- ATHLETES ARE USING.  BUT, AT THE SAME TIME, I DO RESENT

10  IT WHEN THEY ARE QUESTIONED ABOUT IT, THAT THEY LIE ABOUT IT.

11           BUT I ALSO FEEL THAT IN MANY CASES THE -- YOU KNOW,

12  THE ATHLETIC BODIES UNDER WHICH THESE ATHLETES ARE COMPETING

13  HAVE NOT OFTEN HAD VERY CLEAR RULES ABOUT THIS.

14           I GUESS THE OTHER OPINION THAT POPS IN MY HEAD IS I

15  SOMETIMES QUESTION WHAT EXACTLY THESE TRIALS ARE ABOUT, WHY ARE

16  WE SPENDING THIS MUCH EFFORT TO GO AFTER A CERTAIN NUMBER OF

17  ATHLETES FOR WHAT THEY MAY OR MAY NOT HAVE DONE.  I QUESTION

18  WHETHER IT'S A GOOD USE OF RESOURCES.

19           **MR. BALOGH:**  REGARDLESS OF THAT PERSONAL OPINION YOU

20  HAVE, WHEN THE JUDGE INSTRUCTS YOU ON THE LAW, WILL YOU BE ABLE

21  TO FOLLOW HER HONOR'S INSTRUCTION AND DECIDE MS. THOMAS'S

22  INNOCENCE OR GUILT BASED ON THOSE INSTRUCTIONS?

23           **PROSPECTIVE JUROR STREET:**  YES, I BELIEVE SO.

24           **MR. BALOGH:**  DOES ANYONE HERE HAVE OPINIONS ABOUT

25  WHETHER THE RULES OF SPORT SHOULD BE ENFORCED BY THE FEDERAL

1  GOVERNMENT?  DOES ANYONE BELIEVE THAT'S A GOOD IDEA?

2          MR. TORRES, THANK YOU VERY MUCH, SIR.  CAN YOU TELL

3  US A LITTLE BIT ABOUT THAT?

4          **PROSPECTIVE JUROR TORRES:**  I WAS THINKING,

5  BASICALLY, IF THE FEDERAL GOVERNMENT WOULD REGULATE SPORTS OR

6  ANYTHING ELSE, IT WOULD GIVE THEM AN OPPORTUNITY TO CONTROL

7  EVERYTHING THAT EVERYONE DOES.  IF IT'S SEPARATED, THEN

8  EVERYONE ELSE COULD BEGIN TO TAKE THEIR OWN APPROACH AT

9  CONTROLLING.  SO WHAT KIND OF LEVEL THAT WOULD COME OUT TO THE

10 GENERAL PUBLIC COULD GO FROM VERY HIGH POSITION TO A VERY LOW

11 ONE.  IF THE GOVERNMENT GIVES ITS OVERALL KIND OF LINE,

12 EVERYTHING IS EVEN.  I THINK MORE OR LESS THAT'S WHY I . . .

13         **MR. BALOGH:**  DOES ANYONE HERE SHARE MR. TORRES'

14 OPINION?  DOES ANYONE HERE HAVE STRONG OPINIONS ABOUT CHEATING

15 IN SPORT, THAT IT SO OFFENDS THEIR SENSIBILITY, IT WOULD BE

16 HARD TO JUDGE A CRIMINAL CASE?  EVEN IF THAT'S NOT THE DECISION

17 WHERE THE PERSON HAD BEEN SHOWN TO HAVE VIOLATED THE RULES OF

18 THEIR SPORT WHEN SHE COMPETED, WOULD THAT AFFECT ANYONE HERE AT

19 ALL?

20         I SEE A HAND IN THE BACK.  WOULD YOU PLEASE STAND UP

21 AND SAY YOUR NAME AND TELL US WHY YOU FEEL THAT WAY?

22         **PROSPECTIVE JUROR HODIL-MUNDY:**  MY NAME IS CAROL

23 HODIL-MUNDY.  IT WOULD BOTHER ME A LOT.  I THINK THERE SHOULD

24 BE A LEVEL PLAYING FIELD.  I KNOW THE ISSUE IS A COMPLICATED

25 ONE AND I UNDERSTAND WHY PEOPLE DO TAKE PERFORMANCE-ENHANCING

JURY SELECTION

1  DRUGS, BUT I JUST DON'T GO FOR IT AT ALL.

2           **MR. BALOGH:**  DO YOU THINK THAT WOULD AFFECT YOU EVEN

3  IF IT'S NOT A DECISION YOU HAVE TO MAKE IN THAT CASE, THOSE

4  FEELINGS, IF IT WAS SHOWN MS. THOMAS HAD VIOLATED THE RULES OF

5  SPORT?

6           **PROSPECTIVE JUROR HODIL-MUNDY:**  IT WOULD AFFECT ME.

7  IT DEFINITELY WOULD AFFECT ME.

8           **MR. BALOGH:**  YOU WOULD NOT BE ABLE TO PUT THAT OUT

9  OF YOUR HEAD?  THAT BOTHERS YOUR CONSTITUTION AS A PERSON?

10          **PROSPECTIVE JUROR HODIL-MUNDY:**  IT BOTHERS ME.

11          **MR. BALOGH:**  THANK YOU.

12          MR. MASNACK, AM I PRONOUNCING IT CORRECTLY, SIR?

13          **PROSPECTIVE JUROR MASNACK:**  YES.

14          **MR. BALOGH:**  YOU DEFINITELY HAVE SOME STRONG

15  OPINIONS ABOUT THE BALCO PROCEEDINGS, COURT PROCEEDINGS.  DO

16  THOSE FEELINGS RELATE TO THE TESTIMONY BEFORE CONGRESS, THE

17  MULTIPLE CONGRESSIONAL HEARINGS?

18          **PROSPECTIVE JUROR MASNACK:**  WELL, IT'S A BIG

19  SUBJECT.  SO, YOU KNOW, FROM ONE EXTREME, JUST, YOU KNOW,

20  PERSONAL CHOICES PEOPLE MAKE IN THEIR EVERYDAY LIFE, YOU KNOW,

21  AND THEN TO, LIKE SOMEONE ELSE POINTED, TO JUST THE HUGE WASTE

22  OF RESOURCES GOING INTO THESE, YOU KNOW, SHOULD BE -- NOBODY

23  LIKES TO BE LIED TO.  OKAY?  AND JUST TO GET, YOU KNOW, HONESTY

24  IS THE BEST POLICY, OBVIOUSLY, BUT I THINK THERE'S SOME

25  THINGS -- LIKE YOU SAY, THERE ARE SPORTING AUTHORITIES TO WORK

1   THESE THINGS OUT, AND MANUFACTURING ILLEGAL DRUGS, THERE IS

2   LAWS FOR THIS, THINGS TO BE DEALT WITH PEOPLE, I'M SURE, ARE IN

3   TROUBLE FOR THAT.  I DON'T KNOW.  IT JUST SEEMS THAT -- IT

4   SEEMS LIKE A --

5           **MR. BALOGH:**  IF YOU WERE MAKING A DECISION AS THE

6   HEAD OF THE EXECUTIVE BRANCH, YOU MIGHT PRIORITIZE DIFFERENTLY

7   THAN WHAT YOU'VE SEEN; IS THAT A FAIR ASSESSMENT, SIR?

8           **PROSPECTIVE JUROR MASNACK:**  PROBABLY.

9           **MR. BALOGH:**  REGARDLESS OF HOW YOU WOULD PRIORITIZE,

10  WOULD YOU BE ABLE TO, AS A JUROR, LISTEN TO HER HONOR, AND

11  WHATEVER INSTRUCTIONS SHE GIVES YOU ABOUT HOW A JUROR IS

12  SUPPOSED TO EVALUATE THIS CASE, WHAT A JUROR IS SUPPOSED TO DO

13  WITH THE LAW, COULD YOU APPLY THAT LAW TO THE FACTS THAT ARE

14  PRESENTED AND DO SO FAIRLY AND HONESTLY?

15          **PROSPECTIVE JUROR MASNACK:**  WELL, SAY -- IT DOES, IT

16  GIVES ME QUITE A PASSIONATE CHARGE, THE WHOLE SITUATION, THE

17  WHOLE SUBJECT MATTER HERE.

18          THE DEFENDANT IS HERE FOR NOT FOLLOWING THE

19  INSTRUCTIONS OF HER LOBBY, AND IF I HAVE TO GIVE MY WORD TO GO

20  ALONG WITH THESE INSTRUCTIONS, I DON'T KNOW IF I COULD

21  GUARANTEE THAT.  I DON'T KNOW IF THAT'S A COMMITMENT I WOULD

22  WANT TO MAKE.

23          **MR. BALOGH:**  I'M GOING TO FOLLOW UP IN A SECOND.  I

24  WANT TO MAKE SURE ONE THING.

25          RIGHT NOW MS. THOMAS IS PRESUMED ONE HUNDRED PERCENT

1  INNOCENT.  SHE'S NOT HERE FOR ANY LYING.  DOES ANYONE HAVE A

2  PROBLEM WITH THIS AT ALL?  CAN EVERYONE COMMIT THAT UNTIL THE

3  JURY BEGINS DELIBERATIONS AND BEGINS TO EVALUATE THE EVIDENCE,

4  MS. THOMAS IS ONE HUNDRED PERCENT --

5          **PROSPECTIVE JUROR REGEN:**  I DON'T HAVE A PROBLEM.

6  YOU ASKED IF WE WERE GOING TO COMMIT TO THAT.

7          **MR. BALOGH:**  YOU RAISED YOUR HAND BECAUSE YOU ARE

8  COMMITTED TO THAT.  WHO ELSE IS COMMITTED TO THAT?  THANK YOU.

9  SHE'S HERE BECAUSE SHE IS ACCUSED OF LYING.  DOES EVERYONE SEE

10  THE DIFFERENCE BETWEEN THOSE TWO THINGS?  I DON'T MEAN TO MAKE

11  AN EXAMPLE OF YOU.

12          **PROSPECTIVE JUROR MASNACK:**  THAT'S FINE.  IT'S GOOD

13  TO BE CLEAR.

14          **MR. BALOGH:**  WE REALLY WANT CLARITY.

15          ONE OF THE THINGS YOU ARE GOING TO HEAR ABOUT IN

16  THIS CASE IS ABUSE-OF-PROCESS DEFENSE, IS THAT THE GOVERNMENT

17  DIDN'T FOLLOW ITS OWN RULES.  IF THEY BROKE THE RULES, IT

18  PRESENTS A DEFENSE TO ALL THE CHARGES.

19          WHO HERE IS GOING TO BE ABLE TO JUDGE THE UNITED

20  STATES?  IS EVERYONE?  WHO IS GOING TO HAVE A PROBLEM JUDGING

21  THE UNITED STATES ON TRIAL?  SIR?

22          **PROSPECTIVE JUROR HUNTER:**  I'M SORRY.  I'M NOT.

23          **MR. BALOGH:**  SO EVERYONE IS COMFORTABLE WITH THAT;

24  IS THAT RIGHT?  AM I UNDERSTANDING CORRECTLY?  I SEE A LOT OF

25  HEAD NODS.  OKAY.

1              IN THAT REGARD, WE ARE GOING TO HEAR FROM WHAT IS

2    KNOWN AS GOVERNMENT WITNESSES.  MR. NOVITZKY IS GOING TO

3    TESTIFY.  WE ARE GOING TO HEAR FROM EXPERT WITNESSES.  WE ARE

4    GOING TO HEAR FROM DON H. CATLIN FROM THE UNIVERSITY OF

5    CALIFORNIA, LOS ANGELES.  AND WE ARE GOING TO HEAR FROM LAY

6    WITNESSES, WHICH IS EVERYONE ELSE.

7              WHEN IT COMES TO EVALUATING THE LAW ENFORCEMENT

8    WITNESSES, WHO HAS A BELIEF THAT LAW ENFORCEMENT OFFICERS ARE

9    MORE LIKELY TO TELL THE TRUTH THAN OTHER WITNESSES?  I DON'T

10   SEE ANY HANDS.  MR. REGEN?

11             **PROSPECTIVE JUROR REGEN:**  I HAVE SPECIFIC EXPERIENCE

12   RELATING TO THIS.  IN THE TRIAL I WAS IN INVOLVED RECANTED

13   TESTIMONY OF A DOMESTIC ABUSE WITNESS.  OKAY?

14             **MR. BALOGH:**  OKAY.

15             **PROSPECTIVE JUROR REGEN:**  SHE WAS UP THERE SAYING,

16   NO, HE DIDN'T BEAT ME, PUT A CIGARETTE OUT ON ME, WHICH HE

17   CLEARLY DID, BUT YOU ARE MAKING A GENERAL STATEMENT.

18             **MR. BALOGH:**  BUT DID YOU FIND THAT HER TESTIMONY WAS

19   UNBELIEVABLE BECAUSE A -- THE PERSON WHO SAID IT WAS

20   UNBELIEVABLE JUST BASED ON HIS OR HER STATUS AS A LAW

21   ENFORCEMENT OFFICER?  DID YOU FIND THAT WITNESS UNCREDIBLE

22   BECAUSE THE FACTS AND CIRCUMSTANCES OF THAT CASE CAUSED YOU TO

23   BELIEVE SHE WAS UNCREDIBLE?

24             **PROSPECTIVE JUROR REGEN:**  IT WAS THE FACTS THAT LED

25   TO MY JUDGMENT IN THE CASE.

1          **MR. BALOGH:**  SO YOU DON'T BELIEVE THAT CARRYING A

2     BADGE AND A GUN SOMEHOW ENHANCES YOUR ABILITY TO PERCEIVE OR

3     ENHANCES YOUR HONESTY IN ANY WAY, SHAPE OR FORM?

4          **PROSPECTIVE JUROR REGEN:**  I THINK IF YOU WERE TO

5     STERILIZE IT DOWN, THAT WOULD BE A TRUE STATEMENT.

6          **MR. BALOGH:**  MR. CONWAY, YOU WORK FOR SAN QUENTIN;

7     IS THAT CORRECT, SIR?

8          **PROSPECTIVE JUROR CONWAY:**  YES.

9          **MR. BALOGH:**  I THINK WE ASKED IN THE BEGINNING IF

10    YOU WERE A WITNESS TO A CRIME.  DID YOU RAISE YOUR HAND THEN,

11    SIR?

12         **PROSPECTIVE JUROR CONWAY:**  YES.

13         **MR. BALOGH:**  THAT WAS OF A PERSONAL NATURE?

14         **PROSPECTIVE JUROR CONWAY:**  I HAVE BEEN A WITNESS TO

15    SEVERAL CRIMES; BEING OUT OF BOUNDS TO MURDER.

16         **MR. BALOGH:**  AND YOU'VE TESTIFIED IN A COURT OF LAW;

17    IS THAT CORRECT?

18         **PROSPECTIVE JUROR CONWAY:**  TESTIFIED IN COURT OF

19    LAW.

20         **MR. BALOGH:**  ABOUT HOW MANY OCCASIONS, SIR?

21         **PROSPECTIVE JUROR CONWAY:**  ABOUT SIX, SEVEN.

22         **MR. BALOGH:**  DID YOU THINK BY BEING A CORRECTIONAL

23    OFFICER WITH THIRTY-PLUS YEARS OF EXPERIENCE THAT IN AND OF

24    ITSELF ENHANCED YOUR CREDIBILITY?

25         **PROSPECTIVE JUROR CONWAY:**  I BELIEVE I TOLD THE

1   TRUTH.  I DON'T KNOW THAT I WOULD BE -- THE JURY, IF THEY

2   BELIEVED BECAUSE I WAS AN OFFICER THAT I WAS TELLING, THAT MADE

3   ME MORE -- I DON'T KNOW.

4         **MR. BALOGH:**  WHEN YOU GET TRAINED AS A CORRECTIONAL

5   OFFICER, ARE YOU TRAINED ON HOW TO BECOME MORE CREDIBLE THAN

6   YOU WERE WHEN YOU WERE A REGULAR PERSON?

7         **PROSPECTIVE JUROR CONWAY:**  HAVING BEEN THERE 35

8   YEARS, I'VE SEEN PRISONS GO FROM ONE EXTREME TO WHERE THEY ARE

9   TODAY, AND PART OF OUR JOB IS NOT JUST TAKING CARE OF THE

10  INMATES.  IT'S WATCHING EACH OTHER, MAKING SURE THAT WE DON'T

11  STEP OVER THE LINE.

12        **MR. BALOGH:**  HAVE YOU EVER FOUND ONE OF YOUR

13  COLLEAGUES TO BE DISHONEST?

14        **PROSPECTIVE JUROR CONWAY:**  YES.

15        **MR. BALOGH:**  AND REGARDLESS OF THE FACT THAT PERSON

16  WAS WORKING FOR THE STATE OF CALIFORNIA IN A POSITION OF

17  AUTHORITY, THEY STILL HAVE PEOPLE THAT ARE DISHONEST ON

18  OCCASION?

19        **PROSPECTIVE JUROR CONWAY:**  YES, WE DO.

20        **MR. BALOGH:**  IT DOESN'T MAKE A DIFFERENCE THERE'S A

21  BADGE; EACH PERSON SHOULD BE EVALUATED BASED ON THE QUALITY OF

22  THEIR TESTIMONY?

23        **PROSPECTIVE JUROR CONWAY:**  PEOPLE ARE PEOPLE.

24        **MR. BALOGH:**  AND MS. CARR, YOU WERE, I BELIEVE,

25  MARRIED TO A POLICE OFFICER?

1          PROSPECTIVE JUROR CARR:  YES.

2          MR. BALOGH:  AND DID YOU HAVE A SIMILAR EXPERIENCE

3  AS FAR AS LAW ENFORCEMENT BEING AS CREDIBLE OR UNCREDIBLE AS

4  REGULAR FOLKS?

5          PROSPECTIVE JUROR CARR:  YEAH.

6          MR. BALOGH:  WHEN YOU WERE MARRIED TO A POLICE

7  OFFICER, YOU MET, I'M SURE, LOTS OF LAW ENFORCEMENT INDIVIDUALS

8  OVER THE YEARS; IS THAT RIGHT?

9          PROSPECTIVE JUROR CARR:  THAT'S CORRECT.

10          MR. BALOGH:  DID THEY RUN THE SPECTRUM FROM BOY

11  SCOUT TO --

12          PROSPECTIVE JUROR CARR:  YES.

13          MR. BALOGH:  -- THE OTHER END?

14          PROSPECTIVE JUROR CARR:  OTHER END.

15          MR. BALOGH:  IT DIDN'T MATTER THEY WERE VOICES OF

16  AUTHORITY IN THEIR JOB?

17          PROSPECTIVE JUROR CARR:  NO.

18          MR. BALOGH:  DOES ANYONE HAVE A CONTRARY OPINION

19  ABOUT LAW ENFORCEMENT OFFICERS?  AGAIN, I SEE NO HANDS.

20          NOW, AGAIN, THESE CHARGES HERE, THE FIRST FIVE

21  COUNTS, THEY'RE CALLED MATERIAL FALSE DECLARATION.  ONE OF THE

22  DEFENSES THE JURY -- THE JUDGE IS GOING TO INSTRUCT YOU ABOUT,

23  IF THE ANSWERS ARE LITERALLY TRUTHFUL, A JURY IS NOT ALLOWED TO

24  CONVICT.  THEY ARE ORDERED NOT TO CONVICT.  THEY ARE ORDERED TO

25  CONVICT -- EXCUSE ME.

1          IF THEY ANSWER LITERALLY TRUTHFUL, THE JURY WILL BE

2    DIRECTED IF THEY FIND THE FACTS, THAT THEY WERE LITERALLY

3    TRUTHFUL, THEY ARE DIRECTED TO ACQUIT THESE CHARGES.

4          DOES ANYONE FEEL THAT'S A TECHNICAL -- THAT'S

5    TICKY-TACK?  DOES THAT BOTHER ANYONE?  DOES ANYONE HAVE STRONG

6    FEELINGS MORE OR LESS ABOUT A WITNESS'S OBLIGATION TO ENLIGHTEN

7    VERSUS A QUESTIONER'S OBLIGATION TO ASK DIRECT QUESTIONS?  DOES

8    ANYONE HAVE ANY FEELINGS OF THAT AT ALL?

9          NOW, MR. YUP, YOU TOLD US YOU WERE ON A JURY AND IT

10   WAS A HUNG JURY, 11-TO-1?

11        **PROSPECTIVE JUROR YUP:**  YES.

12        **MR. BALOGH:**  THE ONE PERSON, WHATEVER SIDE YOU WERE

13   ADVOCATING FOR, DID YOU BELIEVE THEIR OPINION TO BE GENUINE; IN

14   OTHER WORDS, THERE WAS A GENUINE DISAGREEMENT WITH THE 11, OR

15   DO YOU THINK THERE WAS SOMETHING ELSE GOING ON THERE?

16        **PROSPECTIVE JUROR YUP:**  IT WAS A SHOPLIFTING CASE.

17   IT WAS A ONE-DAY CASE, AND THAT PERSON HAD HIS MIND MADE UP

18   BEFORE WE EVEN DELIBERATED.  WE COULDN'T CHANGE HIS MIND.

19        **MR. BALOGH:**  DO YOU THINK THAT PERSON'S BELIEF,

20   THOUGH, IS GENUINE BASED ON HIS OR HER EVALUATION OF THE

21   EVIDENCE?

22        **PROSPECTIVE JUROR YUP:**  YES.

23        **MR. BALOGH:**  DO YOU THINK IT WAS AN HONEST BELIEF HE

24   HELD?

25        **PROSPECTIVE JUROR YUP:**  TO HIM, YES.

1          **MR. BALOGH:**  YOU JUST DISAGREED WITH IT?

2          **PROSPECTIVE JUROR YUP:**  I DISAGREED WITH HIM.  I

3   BELIEVE HE BELIEVED HIS CHOICE ON WHAT HE VOTED.

4          **MR. BALOGH:**  IS THERE ANYONE HERE THAT -- WITHDRAWN.

5          WHEN YOU HAD YOUR BELIEF WITH THE OTHER TEN, WAS

6   YOUR BELIEF YOUR GENUINE BELIEF BASED ON THE EVIDENCE?

7          **PROSPECTIVE JUROR YUP:**  BASED ON THE EVIDENCE.

8          **MR. BALOGH:**  WAS HIS BELIEF THE SAME?

9          **PROSPECTIVE JUROR YUP:**  TO HIM.

10          **MR. BALOGH:**  AND THERE WAS A DIFFERENCE?

11          **PROSPECTIVE JUROR YUP:**  WE DISCUSSED IT IN THE JURY

12   ROOM, BUT HE BELIEVED WHAT HE BELIEVED.

13          **MR. BALOGH:**  HE COULDN'T CONVINCE THE 11 OF YOU?

14          **PROSPECTIVE JUROR YUP:**  OR VICE VERSA.

15          **MR. BALOGH:**  AND YOU COULDN'T CONVINCE HIM?

16          **PROSPECTIVE JUROR YUP:**  NO.

17          **MR. BALOGH:**  DOES ANYONE HERE THINK IF THEY ARE A

18   JUROR AND THEY HAVE A HONESTLY-HELD BELIEF, THAT THEY WOULD BE

19   WILLING TO STAND ON THAT BELIEF?  RAISE YOUR HAND IF YOU THINK

20   YOU COULD BE THAT PERSON.  RAISE YOUR HAND IF YOU COULDN'T BE

21   THAT PERSON, IF THE PRESSURE OF BEING ALONE, IF THE PRESSURE OF

22   BEING THE ONE WOULD BOTHER YOU.  WHO THINKS THAT WOULD JUST BE

23   TOO MUCH FOR THEM?  AGAIN, I SEE NO HANDS.

24          **THE COURT:**  YOU HAVE JUST A FEW MORE MINUTES.

25          **MR. BALOGH:**  I'M ALMOST DONE.  THANK YOU.

```
1            I DID WANT TO TALK TO YOU A LITTLE BIT, MS. TAYLOR.

2  YOU HAD TOLD US DURING VOIR DIRE THAT YOU HAD SOME POSITIVE

3  FEELINGS FOR THE IRS THAT MIGHT AFFECT THAT CASE.  GENERALLY,

4  WHO ELSE HAS POSITIVE FEELINGS FOR THE IRS?  TAX DAY'S

5  APPROACHING.  THIS HAS NOTHING TO DO WITH TAXES.

6            WHERE DO YOUR FEELINGS FROM THE IRS COME FROM?

7  COULD YOU STAND AND TELL US A LITTLE BIT?

8            PROSPECTIVE JUROR TAYLOR:  I HAVE A LOT OF RESPECT

9  BECAUSE OF THE PERSON I'M WITH HAS TOLD ME NUMEROUS STORIES

10 OVER THE YEARS, AND I'M JUST SURPRISED THAT PEOPLE REALLY TRY

11 TO GET AWAY WITH STUFF THINKING THE IRS HAS NEVER HEARD OF THIS

12 STORY, EVER, SO I JUST, YOU KNOW, HAVE A --

13           MR. BALOGH:  THIS RELATIONSHIP, HE'S AN HONEST

14 PERSON, RIGHT?

15           PROSPECTIVE JUROR TAYLOR:  VERY HONEST.  HE'S

16 KNIGHTS OF COLUMBUS TREASURER.  HE DEALS WITH PEOPLE'S LIVES

17 AND THEIR FORTUNES AND MONEY THEY ARE GOING TO MAKE.  HE'S A

18 FINANCIAL ADVISER.  THEY TRUST HIM.  HE'S AN HONEST MAN, GOOD

19 MAN.

20           MR. BALOGH:  DO YOU THINK IT WOULD BE HARD TO COME

21 HOME AND TELL HIM YOU ARE GOING TO VOTE TO ACQUIT THIS CRIMINAL

22 CASE?  DO YOU THINK THAT WOULD AFFECT YOU IF YOU ARE TO COME

23 DOWN AGAINST THE IRS?  WOULD THAT TROUBLE YOU?

24           PROSPECTIVE JUROR TAYLOR:  HE'S AN HONEST MAN.  HE

25 WOULD QUESTION WHAT HIS INTEGRITY AND WHAT HIS BACKGROUND IS.
```

1    AND HE IS THE KIND OF MAN THAT WILL LISTEN TO BOTH SIDES, AND I

2    AM, TOO.  THAT'S WHAT WE HAVE IN COMMON.

3            **MR. BALOGH:**  I'M ASKING, DO YOU THINK IT WOULD BE

4    HARD TO GO HOME AND TO BE JUDGING THE IRS, JUDGING IRS AGENTS,

5    AND POSSIBLY RULING AGAINST THEM?  WOULD THAT BE SOMETHING

6    THAT'S DIFFICULT FOR YOU BASED ON YOUR STRONG FEELINGS FOR THIS

7    MAN?

8            **PROSPECTIVE JUROR TAYLOR:**  YEAH, I THINK -- I THINK

9    THEY HAVE GOOD MORALS.  THEY'RE JUST GOOD PEOPLE.  THEY'RE OUT

10   TO HELP THE TAXPAYERS.  THEY'RE NOT AGAINST YOU.  EVEN THOUGH

11   IT'S -- EVERYBODY PAYS TAXES, THERE'S A REASON FOR IT.

12           **MR. BALOGH:**  DO YOU FEEL YOUR OWN PERSONAL

13   AFFECTIONS, IF YOU WILL, FOR THIS PERSON'S JOB WOULD MAKE YOU

14   NOT LIKELY TO BE A GOOD JUROR ON THIS CASE?

15           **PROSPECTIVE JUROR TAYLOR:**  YES.

16           **MR. BALOGH:**  THANK YOU.

17           ONE MORE SUBJECT MATTER, IF I CAN GET TO IT?  IT

18   WILL TAKE THREE MINUTES.

19           **THE COURT:**  YOU HAVE ABOUT ONE MINUTE.

20           **MR. BALOGH:**  THE LAST THING I WANT TO ASK ABOUT, YOU

21   ARE GOING TO HEAR SOMETHING IN THIS CASE, IT'S CALLED SECTION

22   6011.  IT'S A STATUTE BY WHICH IF THE HIGH CELS OF THE

23   DEPARTMENT OF JUSTICE CERTIFY THAT A WITNESS'S TESTIMONY IS SO

24   IMPORTANT THAT THEY ASK THE COURT TO STRIP THAT PERSON OF THEIR

25   RIGHT NOT TO TESTIFY AND COMPEL THEM TO TESTIFY, COMPEL THEM TO

1    A GRAND JURY ROOM, THEY CAN COMPEL THEM TO A JUDICIAL

2    COURTROOM.  DOES ANYONE HERE FEEL THAT THAT AUTHORITY IS TOO

3    MUCH, THAT IT WOULD BOTHER THEM TO LEARN THE GOVERNMENT COULD

4    TAKE AWAY SOMEONE'S CONSTITUTIONAL RIGHTS?

5              **PROSPECTIVE JUROR JOHNSON:**  I DON'T UNDERSTAND

6    WHAT -- COULD YOU EXPLAIN MORE WHAT THAT IS?

7              **MR. BALOGH:**  SURE.  EVERYONE IF YOU HAVE -- HAS A

8    RIGHT UNDER THE CONSTITUTION OF THE UNITED STATES AND FIFTH

9    AMENDMENT NOT TO TESTIFY.  AND THE STANDARD IS IF ANYTHING YOU

10   WOULD SAY, INCLUDING YOUR NAME, WOULD TEND TO LINK YOU TO ANY

11   CRIMINAL CONDUCT OF YOU OR SOMEONE ELSE, YOU COULD SAY NO, I

12   DON'T WANT TO SAY ANYTHING --

13             **THE COURT:**  ACTUALLY, IN THE END, OF COURSE, THE

14   COURT WILL TELL YOU WHAT THE LAW IS THAT YOU ARE TO APPLY, AND

15   THAT LAST LITTLE BIT WAS -- I THINK MAY BE NOT QUITE RIGHT.

16             IN ANY EVENT, IF YOUR CONCERN IS PEOPLE WHO ARE

17   GIVEN IMMUNITY, DOES IT --

18             **MR. BALOGH:**  I WANT TO UNDERSTAND IF THE JURY

19   BELIEVES -- IF THEY ARE SO UNCOMFORTABLE WITH 6001 IMMUNITY,

20   OBVIOUSLY, THEY ARE NOT ABLE TO BE JURORS ON THIS CASE.  IT

21   WOULD BE A STRIKE FOR CAUSE.  SO I WANT TO MAKE SURE THAT EVERY

22   JUROR THAT 6001 IS APPROVED BY CONGRESS.  THESE ARE NEW

23   EXPERIENCES.  MOST PEOPLE DON'T KNOW YOU CAN BE STRIPPED OF

24   YOUR FIFTH AMENDMENT RIGHTS.

25             **THE COURT:**  I'M NOT SURE THAT STRIPPING OF FIFTH

1  AMENDMENT RIGHTS IS A FAIR CHARACTERIZATION OF WHAT HAPPENS.

2        I THINK WHAT MR. BALOGH IS GETTING AT IS THAT

3  SOMETIMES IF THE GOVERNMENT FEELS LIKE A WITNESS'S TESTIMONY IS

4  NECESSARY AND THE WITNESS OTHERWISE COULD REFUSE TO TESTIFY

5  BECAUSE HIS OR HER TESTIMONY MIGHT INCRIMINATE HIM, THE

6  GOVERNMENT CAN SAY, ALL RIGHT, HERE'S AN ORDER THAT SAYS YOU

7  HAVE TO TESTIFY, BUT NOTHING YOU SAY IN YOUR TESTIMONY CAN BE

8  USED AGAINST YOU.  SO IT'S ABOUT BALANCING MORE THAN STRIPPING.

9        BUT, IN ANY EVENT, THERE IS A STATUTE THAT SAYS THAT

10  CAN HAPPEN.  IT'S A DECISION MADE BY THE EXECUTIVE BRANCH, ALL

11  THE WAY UP, I THINK, TO THE ATTORNEY GENERAL.  SO THAT'S THE

12  CONCEPT THAT MR. BALOGH IS ASKING ABOUT.  AND YOU CAN ASK --

13        **MR. BALOGH:**  THANK YOU.

14        DOES THAT ANSWER YOUR QUESTION, MR. JOHNSON?

15        **PROSPECTIVE JUROR JOHNSON:**  I'M STILL NOT CLEAR ON

16  THAT.  WHEN YOU SAY YOU "STRIP THEM AWAY," HOW CAN YOU MODIFY

17  THAT IF THAT'S THE FIFTH AMENDMENT?

18        **MR. BALOGH:**  UNDER THE LAW CONGRESS PASSED A STATUTE

19  AND SAID, UNDER THESE CIRCUMSTANCE WE CAN DO THIS, AND THEN IT

20  WAS CHALLENGED, AND THE COURT SAID, WELL, THE BALANCING AT THE

21  END, BECAUSE THE PERSON CAN'T -- THE TESTIMONY CAN ONLY BE USED

22  IN A TRIAL LIKE THIS, IT CAN'T BE USED SUBSTANTIVELY, THE COURT

23  SAID THAT WAS OKAY, IT'S IMPORTANT ENOUGH LAW, AND IT'S BEEN

24  UPHELD.  IT SEEMS TO TROUBLE YOU, SIR, THAT IT HAS BEEN UPHELD.

25        **PROSPECTIVE JUROR JOHNSON:**  I JUST WONDER.  A

 1  STATUTE DOES NOT CHANGE THE CONSTITUTION, REALLY.  WHAT COURT

 2  WAS THIS?

 3          **THE COURT:**  I DON'T KNOW HOW MUCH OF THE

 4  CONSTITUTION WE OUGHT TO GET INTO HERE.  BUT A PERSON HAS A

 5  RIGHT NOT TO INCRIMINATE HIMSELF.  IF THE GOVERNMENT SAYS,

 6  PROSECUTOR SAYS, YOUR TESTIMONY WILL NEVER BE USED TO

 7  INCRIMINATE YOU, THEN THAT RIGHT HAS NOT BEEN INFRINGED UPON,

 8  AND I THINK IT'S PROBABLY THAT THEORY.  AND I SUSPECT THE

 9  SUPREME COURT HAD SOMETHING TO SAY ABOUT THE STATUTE, ALTHOUGH

10  I DON'T ACTUALLY KNOW THAT TO BE TRUE.

11          IN ANY EVENT, I THINK THE QUESTION WOULD BE -- I

12  DON'T KNOW WHAT --

13          **MR. BALOGH:**  DOES ANYONE HAVE A STRONG OPINION THAT

14  THEY DON'T THINK THAT THEY SHOULD FOLLOW THE LAW?

15          **PROSPECTIVE JUROR JOHNSON:**  I WONDER, IF IT CAN'T BE

16  USED TO INCRIMINATE YOU, IT CAN'T BE USED TO DISCOVER ANYTHING

17  ELSE OR ANY -- ANYTHING.

18          **MR. BALOGH:**  THEY CAN USE THE INFORMATION YOU GIVE

19  THEM TO GO AND USE IT AGAINST OTHER PEOPLE.

20          **PROSPECTIVE JUROR JOHNSON:**  BUT NOT AGAINST YOURSELF

21  WITH FURTHER DISCOVERY, THEY FIND OUT SOMETHING ABOUT YOU

22  BECAUSE OF THAT TESTIMONY --

23          **MR. BALOGH:**  THEY STILL CANNOT USE THAT.

24          **PROSPECTIVE JUROR JOHNSON:**  THEY CANNOT USE THAT?

25          **MR. BALOGH:**  CANNOT.

1    DOES ANYONE THINK THIS IS A BAD IDEA?

2    MR. MASNACK?  DO YOU THINK YOU COULD PUT THAT ASIDE

3  AND IF THE JUDGE INSTRUCTS YOU THAT WHETHER WE THINK IT'S A

4  GOOD IDEA OR BAD IDEA, THAT IS THE LAW AND YOU ARE GOING TO

5  HAVE TO DECIDE THIS CASE ON THE FACTS PRESENTED AND THE LAW AS

6  GIVEN, WOULD YOU BE ABLE TO DO THAT?

7    **PROSPECTIVE JUROR MASNACK:**  ONCE AGAIN, STRONG

8  FEELINGS COME UP HERE.  I THINK THE GOVERNMENT HAS BEEN MAKING

9  A LOT OF THESE DECISIONS LATELY THAT -- I DON'T KNOW.  IF HER

10 HONOR SAYS, MAYBE TO BALANCE IT, I THINK WHEN ONE PARTY MAKES A

11 DECISION, THAT'S A LITTLE -- NOT QUITE BALD -- I UNDERSTAND

12 GETTING TO THE TRUTH IS IMPORTANT, BLAH-BLAH-BLAH, BUT SO ARE,

13 YOU KNOW, FEELING SECURE IN YOUR ABILITY TO -- I DON'T KNOW --

14 NOT BE ATTACKED BY YOUR GOVERNMENT.

15    **MR. BALOGH:**  BUT DO YOU THINK, WHETHER OR NOT ANYONE

16 HAS BEEN ATTACKED OR ANYTHING HAS BEEN DONE HERE RIGHT OR WRONG

17 BY ANYONE, YOU, AS A FINDER OF FACTS, COULD APPLY THE LAW AS

18 DIRECTLY GIVEN BY THE JUDGE AND NOT SUBSTITUTE YOUR OWN VISION

19 OF THE LAW BUT FOLLOW THE LAW AS GIVEN BY THE BENCH?

20    **PROSPECTIVE JUROR MASNACK:**  I MIGHT FEEL DIRTY ABOUT

21 DOING IT.  I'VE DONE HARD THINGS BEFORE.

22    **MR. BALOGH:**  YOU COULD DO THIS ONE, TOO?

23    **PROSPECTIVE JUROR MASNACK:**  PROBABLY.

24    **MR. BALOGH:**  DO I SEE ANY OTHER HANDS, THIS

25 SHOULDN'T BE THE LAW?  MR. PELLY?

1          **PROSPECTIVE JUROR PELLY:**  PERSONALLY, I WOULD FOLLOW

2     THE INSTRUCTIONS OF THE JUDGE.  I WOULDN'T HAVE ANY PROBLEM

3     WITH THAT.  BUT THE WAY YOU -- THE JUDGE DESCRIBED IT, YOU

4     DESCRIBED IT, IT SOUNDS LIKE IT COULD BE USED BY PROSECUTORS TO

5     GO FISHING TO LOOK FOR SOMETHING.  IT JUST DOESN'T SIT WELL.

6          **MR. BALOGH:**  EVEN THOUGH IT DOESN'T SIT WELL, YOU

7     ARE SURE WHEN THE JUDGE GIVES YOU THE LAW, YOU ARE GOING TO

8     FOLLOW THAT?

9          **PROSPECTIVE JUROR PELLY:**  ABSOLUTELY.

10         **THE COURT:**  MR. JOHNSON, YOU SPOKE ABOUT IT.  I'M

11    SORRY.  MS. HOUSE.

12         **PROSPECTIVE JUROR HOUSE:**  MS. HOUSE.  AGAIN, IT'S

13    SORT OF ON THE SAME PATH.  I WOULD FOLLOW THE LAW AS THE JUDGE

14    TOLD ME DO.  IT DOES NOT QUITE SIT RIGHT WITH ME.  BUT SINCE

15    THE WAY IT'S BEEN PRESENTED IS THAT IT'S NOT REALLY A STRIPPING

16    OF THE FIFTH AMENDMENT RIGHTS, IT'S A SLIGHT MODIFICATION OF

17    IT, NOT REMOVING IT OR CHANGING IT IN ITS ESSENTIAL, IT DOESN'T

18    BOTHER ME AS MUCH AS I THINK IT WOULD.  SO I BELIEVE I WOULD BE

19    ABLE TO PUT MY PERSONAL OPINION ASIDE.

20         **MR. BALOGH:**  MR. REGEN, DID YOU HAVE SOMETHING, SIR?

21         **PROSPECTIVE JUROR REGEN:**  SO IF THE COURT EXAMINES

22    THIS AND HEARD THIS AND THEY DETERMINED FIFTH AMENDMENT AND

23    THIS IS OKAY --

24         **MR. BALOGH:**  AS WE STAND HERE TODAY.

25         **PROSPECTIVE JUROR REGEN:**  I WAS TRYING TO CLARIFY

1   IT.  IT SOUNDS LIKE THERE'S TWO POINTS.  OKAY?  ONE OF THOSE

2   POINTS IS, IS IT OKAY FOR THE GOVERNMENT TO COMPEL SOMEBODY TO

3   TESTIFY TO INCRIMINATE ANOTHER PERSON, RIGHT?  AND THE SECOND

4   POINT IS, IS IT OKAY, IF THAT HAPPENS, FOR YOU TO LISTEN TO THE

5   JUDGE AND GO FORWARD, WHATEVER THE CONSEQUENCES WERE BECAUSE

6   THE LAW IS THE LAW?  THOSE ARE TWO KINDS OF DIFFERENT THINGS.

7            **MR. BALOGH:**  I JUST WANT TO KNOW IF SOMEONE IS SO

8   BOTHERED BY THE FACT SOMEONE COULD LOSE THEIR FIFTH AMENDMENT

9   RIGHTS IN THE SENSE OF BEING FORCED TO COMPEL TESTIMONY FROM

10  THEIR MOUTH AND THEY COULD BE ASKED ANYTHING THEY WANT ABOUT

11  THEMSELVES AND THEIR HISTORY.  THAT SORT OF COMPULSION MIGHT

12  BOTHER SOME PEOPLE, MIGHT BE INCONSISTENT WITH WHAT THEIR VIEW

13  OF THE CONSTITUTION IS.  I WANT TO FIND OUT IF THAT BOTHERS

14  ANYONE SO MUCH THAT THEY CANNOT FOLLOW THE JUDGE'S INSTRUCTION

15  AND CAN'T GIVE US A FAIR TRIAL HERE?

16           **PROSPECTIVE JUROR REGEN:**  I DON'T THINK SO.  I'M NOT

17  GOING TO SECOND GUESS THE CONGRESS OR THE LAWS AS WRITTEN.  I

18  WILL FOLLOW THE INSTRUCTIONS.

19           **MR. BALOGH:**  SO ARE THERE ANY HANDS UP?  I'M SORRY.

20  YES.  WOULD YOU AGAIN PLEASE STATE YOUR NAME?

21           **PROSPECTIVE JUROR HODIL—MUNDY:**  CAROL HODIL—MUNDY.

22  IT MAKES ME VERY UNCOMFORTABLE, I THINK.  IF IT'S THE FIFTH

23  AMENDMENT, IT SHOULD STAND AS IT IS WRITTEN.

24           **MR. BALOGH:**  YOU COULD PUT IT ASIDE IF YOU SIT AS A

25  JUROR HERE AND FOLLOW THE INSTRUCTIONS THE JUDGE GIVES YOU?

```
 1            PROSPECTIVE JUROR HODIL-MUNDY:  I AM NOT SURE ABOUT

 2   THAT.

 3            MR. BALOGH:  THAT'S FINE.  THANK YOU FOR YOUR

 4   HONESTY.

 5            THAT'S ALL I HAVE, YOUR HONOR.  THANK YOU.

 6            THE COURT:  ALL RIGHT.  AT THIS POINT, LADIES AND

 7   GENTLEMEN, WE ARE GOING TO HAVE A BRIEF SIDEBAR.  AFTER WE ARE

 8   DONE WITH THE SIDEBAR, THEN THERE WILL BE SOME PAPERWORK THAT

 9   THE LAWYERS WILL DO.  SO YOU CAN KIND OF STAY PUT WHILE THEY DO

10   THAT, BUT YOU DON'T HAVE TO PAY ATTENTION.  YOU CAN CHAT WITH

11   YOUR NEIGHBOR, JUST STAY IN PLACE.  WE WILL BE DONE WITH THIS

12   WHOLE PROCESS PRETTY SHORTLY.

13            MAY I SEE THE LAWYERS AT SIDEBAR, PLEASE?

14            (SIDEBAR DISCUSSION HELD OUT OF THE HEARING OF THE

15            POTENTIAL JURORS.)

16            THE COURT:  DOES ANYONE HAVE ANY CHALLENGES FOR

17   CAUSE?

18            MR. NEDROW:  YES, YOUR HONOR.

19            MR. PARRELLA:  YES, WE HAVE A NUMBER OF THEM.  FIRST

20   ONE WOULD BE NUMBER THREE, MR. OLKEN.  I BELIEVE HE SAID HE HAD

21   A FRIEND WHO SAT ON THE BALCO GRAND JURY, AND I'M NOT QUITE

22   SURE HOW HE FOUND THAT OUT.  HE SAID HE HAD A STRONG PREJUDICE

23   THAT WOULD CAUSE HIM TO FAVOR THE DEFENSE.  HE WOULD HAVE TO

24   THINK CAREFULLY, HE SAID, EVEN THOUGH WHEN THE COURT WAS

25   FOLLOWING UP ON THOSE QUESTIONS SAID THAT HE HAD SUCH STRONG
```

1  FEELINGS THAT HE WAS UNSURE WHETHER HE COULD BE FAIR.  THAT'S

2  NUMBER THREE, MR. OLKEN.

3         **THE COURT:**  DO YOU WISH TO BE HEARD?

4         **MR. BALOGH:**  I THOUGHT EVERYONE QUALIFIED THEIR

5  ANSWERS.  I THINK THEY ALL SAID THEY HAD THESE FEELINGS BUT

6  THEY WOULD FOLLOW YOUR INSTRUCTION.  I THINK THAT'S THE

7  STANDARD CORE FOR CAUSE.  THERE'S BEEN SOME VERY STRONG

8  FEELINGS HERE ELICITED BY LOTS OF THESE JURORS.  I FOUND THAT

9  ALL OF THEM AT THE END OF THE DAY, BY AND LARGE, SAID THEY

10 COULD FOLLOW THE COURT'S INSTRUCTION.  AND WITH THAT STANDARD,

11 I THINK MR. OLKEN IS A SUITABLE JUROR.  THE GOVERNMENT MAY WANT

12 TO EXERCISE A PEREMPTORY CHALLENGE AGAINST HIM.  HE'S

13 QUALIFIED.

14        **THE COURT:**  I'M GOING TO GRANT CHALLENGE FOR CAUSE.

15 MY RECOLLECTION IS THAT HE SAID HE WAS BIASED AGAINST

16 GOVERNMENT IN THIS CASE, THAT HE'S NOT SURE HE COULD BE FAIR,

17 HE JUST WAS NOT SURE, AND HE NEVER DISAVOWED THAT.  HE SAID HE

18 WAS NOT SURE HE COULD BE FAIR.  SO I'M GOING TO STRIKE HIM FOR

19 CAUSE.

20        ANYONE ELSE?

21        **MR. PARRELLA:**  YES.  NUMBER FIVE, MR. MONTILLA.  HE

22 SIMILARLY SAID HE WOULD FEEL INCLINED TO FIND IN FAVOR OF

23 DEFENSE.  HE CAN'T -- HE ALSO STATED UPON ATTEMPT AT

24 REHABILITATION THAT HE COULD NOT SAY WHETHER HE WOULD FOLLOW

25 INSTRUCTIONS ONE HUNDRED PERCENT; IN OTHER WORDS, TO DISREGARD

1    HIS PERSONAL FEELINGS.  THAT'S NUMBER FIVE.

2            **MR. BALOGH:**  I THINK HE WAS TOTALLY REHABILITATED.

3    I THINK IT'S CLOSE.

4            **THE COURT:**  I AGREE WITH THAT.  THAT'S DENIED.

5            ANYONE ELSE?  BY THE WAY, MAY I ASK YOU TO CONSIDER

6    MR. WARD SMITH?

7            **MR. BALOGH:**  YES, I WOULD CONSENT.

8            **MR. PARRELLA:**  HE HAS AN EYE PROBLEM OR SOMETHING AS

9    WELL.

10           **THE COURT:**  ALL RIGHT.  WHO ELSE?

11           **MR. NEDROW:**  FOURTEEN.

12           **MR. PARRELLA:**  FOURTEEN, MR. MASNACK.  QUITE

13   FRANKLY, DO I HAVE TO LIST THE AMOUNT OF TIMES THAT HE STATED

14   THAT HE WOULD NOT FOLLOW INSTRUCTIONS, INCLUDING SHAKING HIS

15   FINGER AT THE COURT?  HE LITERALLY REFUSED TO BE REHABILITATED.

16           **MR. BALOGH:**  I THOUGHT HE WAS TOTALLY REHABILITATED.

17           **THE COURT:**  THE VERY LAST THING HE SAID IS IT WOULD

18   MAKE HIM FEEL DIRTY.

19           **MR. BALOGH:**  BUT THEN HE WOULD --

20           **THE COURT:**  HE SAID, I PROBABLY COULD DO IT.

21           **MR. BALOGH:**  PROBABLY IS AN REPUTABLE ASSURANCE.

22   IT'S A REPUTABLE ASSURANCE HE COULD FOLLOW THE COURT'S

23   INSTRUCTION.

24           **THE COURT:**  I THINK HE OVER AND OVER DISAGREED WITH

25   THE PROCESS OF THIS CASE, AND I THINK HE WAS FAIRLY CLEAR HE

1   COULD NOT -- WASTE OF RESOURCES GOING INTO IT, NOT LIKING TO BE

2   LIED TO.  HE DID SAY THAT.

3          **MR. BALOGH:**  HE SAID A LOT OF THINGS I THINK WE CAN

4   ALL RELATE TO.  I THINK THE ULTIMATE QUESTION IS IF, AS THE LAW

5   SAYS, I HAVE TO SEND THIS WOMAN TO JAIL, I'D DO IT BUT I WOULD

6   JUST HAVE TO HOLD MY NOSE BECAUSE I THINK THE WHOLE THING

7   STINKS.  THAT MAKES HIM QUALIFIED TO SIT.  IT MAKES HIM SOMEONE

8   THE GOVERNMENT DOESN'T WANT TO SIT, BUT HE TOTALLY FITS THE

9   QUALIFICATION.  HE'S JUST GOING TO HOLD HIS NOSE THROUGH THE

10  PROCESS.  HE'S ENTITLED TO HOLD HIS NOSE.

11         **THE COURT:**  I GOT THE IMPRESSION HE COULD NOT.  HE

12  SAID IT GAVE HIM A PASSIONATE CHARGE TO BE HERE.  I DID NOT

13  FIND HE COULD SIT, AND I'LL GRANT THAT.  ANYTHING ELSE.

14         **MR. PARRELLA:**  THE LAST ONE, MS. HODIL-MUNDY, AT THE

15  VERY END, IT CAME ABOUT FROM A DISCUSSION OF THE FIFTH

16  AMENDMENT ISSUES.  I BELIEVE AT THE END SHE JUST SAID, RIGHT

17  BEFORE WE BROKE, THAT SHE DIDN'T FEEL SHE COULD EVALUATE THE

18  CASE BASED UPON THE DISCUSSION, AND, FRANKLY, THE SUMMARY OF

19  THE MANNER IN WHICH U.S. WAS SERVED AND TESTIMONY WAS

20  COMPELLED.  SHE DID SAY AT THE END, I DON'T THINK I WOULD BE

21  COMFORTABLE OR BE ABLE TO BE FAIR BASED UPON THAT PROCESS AS

22  DESCRIBED SPECIFICALLY, NOT SURE I COULD FOLLOW JURY

23  INSTRUCTIONS.  THAT'S THE BASIS OF OUR MOTION FOR CAUSE.

24         **MR. NEDROW:**  NUMBER 57, YOUR HONOR.

25         **THE COURT:**  WHAT'S HER NAME?

```
1              MR. PARRELLA:  CAROL HODIL-MUNDY.

2              THE COURT:  MR. BALOGH, IT MAY BE SORT OF A MOOT

3  POINT.

4              MR. BALOGH:  THAT'S WHERE I COME IN.  WE CAN'T GET

5  THERE WITH THE NUMBERS.  I AM SURE I DON'T HAVE ANY OBJECTION

6  FOR CAUSE.  I DON'T THINK I DO, AT LEAST NOT THAT WILL MAKE A

7  DIFFERENCE WITH THE JURY.  I DON'T THINK WE CAN GET THERE.  NO.

8  THAT'S FINE.

9              THE COURT:  ALL RIGHT.  I'LL STRIKE HER.

10             MR. BALOGH, DID YOU HAVE ANY MOTIONS FOR CAUSE?

11             MR. BALOGH:  NO.

12             THE COURT:  ALL RIGHT.  SO THEN WE NEED 32 TOTAL,

13  RIGHT?

14             MR. BALOGH:  I WANTED TO CHALLENGE MR. HAROIAN.  HE

15  DID STATE HE COULDN'T BE FAIR.

16             THE COURT:  THAT'S WHAT I THOUGHT.

17             MR. PARRELLA:  WE DON'T OBJECT.

18             THE COURT:  I WAS GOING TO COUNT THEM UP SO THAT

19  WE --

20             MR. BALOGH:  WE STRUCK HOW MANY FOR CAUSE?  WE

21  STRUCK TWO IN THE BOX.  MR. HAROIAN, THAT'S IT.  THAT MEANS WE

22  HAVE -- WHAT HAVE WE GOT?  NUMBER 35.  I GET DOWN TO MR. YUP,

23  DOES THAT SOUND RIGHT?

24             MR. PARRELLA:  TO MR. YUP?

25             MR. BALOGH:  IT MIGHT EVEN BE BEFORE THAT.  SO
```

1   STRIKING BELOW 52 WE'RE WASTING OUR TIME.

2           **MR. NEDROW:**  THAT'S A GOOD POINT.

3           **MR. BALOGH:**  THE WAY IT WORKS, USUALLY, IT IS A

4   DOUBLE PASS.  SO IF THEY PASS AND I DON'T WANT TO STRIKE, CAN I

5   JUST IDENTIFY WE'VE PASSED AND IT'S OVER?  AND THE SAME THING

6   FOR THEM?  IF I STRIKE, IF I HAVE TWO PICKS AND I STRIKE FOUR,

7   AND I LEAVE FIVE BLANK AND THEY'RE SATISFIED WITH THE JURY, THE

8   SIXTH BLANK, THEY CAN STAND UP AND SAY, WE HAVE A JURY?

9   WHATEVER POINT WE BOTH PASS CONSECUTIVELY, EXCEPT I CAN'T

10  PROBABLY PASS TWICE TO GET THERE.

11          **THE COURT:**  NO, THAT YOU CAN'T ALSO --

12          **MR. PARRELLA:**  PASS TO YOURSELF.

13          (END OF SIDEBAR DISCUSSION; PROCEEDINGS RESUMED IN

14          THE HEARING OF THE JURY.)

15          **THE COURT:**  LADIES AND GENTLEMEN, AT THIS POINT, WE

16  JUST HAVE THIS PAPERWORK TO BE DONE.  SO AT THIS POINT, YOU CAN

17  EVEN KEEP IT TO A DULL ROAR A LITTLE BIT.  YOU WON'T HAVE TO

18  LISTEN FOR A FEW MINUTES MORE.

19          (PAUSE IN PROCEEDINGS.)

20          **THE COURT:**  LADIES AND GENTLEMEN, WE'VE COMPLETED

21  THIS PROCESS NOW.  SO WHAT WILL HAPPEN IS TRACY WILL READ OUT

22  THE NAMES, FIRST OF THE 12 JURORS AND THEN OF THE TWO ALTERNATE

23  JURORS.  WHEN SHE'S COMPLETED READING THAT WHOLE LIST,

24  EVERYBODY WHOSE NAME WAS NOT READ IS EXCUSED FROM THIS

25  COURTROOM WITH OUR THANKS FOR HAVING BEEN HERE.  SO EVERYONE

PROCEEDINGS

1    SHOULD SIT QUIETLY UNTIL SHE'S READ THE ENTIRE LIST.  THEN

2    THOSE OF YOU WHOSE NAMES WERE NOT READ WILL BE EXCUSED.

3            SHE HAS TO SORT THROUGH THE LIST HERE FOR A SECOND.

4            FOR THOSE OF YOU WHO ARE SELECTED, AFTER SHE READS

5    THE LIST, WE'LL SWEAR YOU IN AS JURORS.  WE'LL TAKE A BRIEF

6    RECESS.  TRACY WILL TAKE YOU TO THE JURY ROOM, AND YOU'LL SEE

7    WHERE THAT IS.  SHE'LL GIVE YOU YOUR BADGES.  SHE'LL SHOW THE

8    WAY TO GET INTO THE BUILDING AND THE SECRET HANDSHAKE.

9            AFTER THAT BREAK, WE'LL COME BACK.  WE'LL HAVE

10   OPENING STATEMENTS FROM COUNSEL, AND THEN THE DAY WILL BE

11   COMPLETED.  THAT'S WHAT'S IN STORE.

12           THOSE OF YOU WHO ARE EXCUSED, SHOULD GO BACK TO THE

13   JURY ROOM AND TELL THEM YOU HAVE BEEN EXCUSED FROM THIS TRIAL,

14   AND THEY'LL LET YOU KNOW WHAT NEEDS TO HAPPEN NEXT.

15           **THE CLERK:**  DAVID CHROBAK.  NORALAINE JAMES.

16           **PROSPECTIVE JUROR JAMES:**  HERE I AM.

17           **THE CLERK:**  SARAH THIGPEN.  SUZANNE TEAL.  JACK

18   ROSS.  RICHARD LINDBERG.  GORDON BULL.  MOHAMMED NURU.

19   LAURENCE YOUNG.  MARILYN THOMPSON.  ANGELINA ALDAMA.  COSTEN

20   HICKMAN.  BRUCE MARTIN.  AND KENNETH GILBRECH.  IS THAT RIGHT,

21   OR YOU HAVE SOMETHING?

22           **MR. BALOGH:**  I THINK WE MISSED ONE.  MAY WE HAVE A

23   SIDEBAR?

24           (DISCUSSION HELD OFF THE RECORD BETWEEN THE COURTROOM

25           CLERK AND COUNSEL; NOT REPORTED.)

1       **THE COURT:** SO ARE BOTH SIDES SATISFIED THE JURY HAS

2   BEEN READ OUT CORRECTLY?

3       **MR. NEDROW:** YES, YOUR HONOR. YOU DON'T NEED TO

4   CORRECT IT. IT'S CORRECT. I APOLOGIZE.

5       **THE COURT:** LET ME START AGAIN. ARE BOTH SIDES

6   SATISFIED IT'S A CORRECT JURY?

7       **MR. NEDROW:** YES, YOUR HONOR, WE ARE.

8       **THE COURT:** MR. BALOGH?

9       **MR. BALOGH:** I AM, YOUR HONOR.

10      **THE COURT:** ALL RIGHT. LADIES AND GENTLEMEN, THOSE

11  OF YOU WHOSE NAMES WERE NOT READ, THANK YOU SO MUCH FOR

12  SPENDING TODAY WITH US. WE APPRECIATE YOUR EFFORT. AND YOU

13  ARE EXCUSED FROM THIS JURY.

14      TRACY WILL NOW TELL YOU HOW TO ARRAY YOURSELVES IN

15  THE JURY BOX.

16      **THE CLERK:** JUROR NUMBER ONE IS DAVID CHROBAK, SO

17  YOU'LL TAKE THE FIRST SEAT. THEN WE GO TO NORALAINE, IF YOU

18  WANT TO SIT --

19      **PROSPECTIVE JUROR JAMES:** IT'S "NORALAINE" BUT JUST

20  CALL ME NORA.

21      **THE CLERK:** THAT'S EASY. I COULD DO THAT.

22      JUROR NUMBER TWO.

23      SARA THIGPEN WILL BE THREE. AND, SUZANNE TEAL, YOU

24  WILL BE NUMBER FOUR IN THE BACK ROW. AND, JACK, YOU FOLLOW

25  HER. THAT WILL BE FOUR, FIVE. AND SIX WOULD ALSO GO BACK

1   THERE, AND YOU'RE MR. LINDBERG, RIGHT?  SO YOU ARE JUROR NUMBER

2   SIX IN THE BACK ROW.  AND THEN, MR. BULL, YOU COME DOWN HERE.

3   THEN MOHAMMED IS NEXT TO HIM.  THEN WE GO LAURENCE, MARILYN,

4   ANGELINA.  WHAT DOES THAT MAKE US?  THAT'S -- AND COSTEN.

5           THEN, BRUCE, YOU WOULD TAKE FRONT SEAT.  FRONT SEAT

6   IN THE BOTTOM ROW RIGHT HERE.  AND THEN, KENNETH, YOU WOULD BE

7   IN THE BACK SEAT.  SO I THINK THAT'S OUR SEATING ARRANGEMENT.

8           **THE COURT:**  WELL, CONGRATULATIONS, LADIES AND

9   GENTLEMEN.  YOU'VE ENDURED A GRUELING SELECTION PROCESS, AND

10  YOU WILL BE THE JURY IN THIS CASE.

11          AS I SAID, WHAT WILL HAPPEN NOW IS TRACY WILL SWEAR

12  YOU IN AS JURORS.  SHE WILL THEN TAKE YOU INTO THE JURY ROOM,

13  WHICH IS RIGHT THROUGH THAT DOOR, AND EXPLAIN TO YOU THE

14  PROCEDURES FOR GETTING IN AND GETTING OUT AND ALL OF THAT.

15          SO WE'LL HAVE APPROXIMATELY A 15-MINUTE BREAK FOR

16  THOSE PURPOSES, AND THEN WE'LL COME BACK, AND WE'LL DO THE

17  OPENING STATEMENTS OF COUNSEL, AND THEN YOU'LL BE -- AND I WILL

18  ALSO READ YOU SOME PRELIMINARY INSTRUCTIONS, WHICH WILL GIVE

19  YOU A SENSE AS HOW YOU SHOULD LISTEN TO THE EVIDENCE AS IT

20  COMES IN.

21          AT THE CONCLUSION OF THAT PROCESS, YOU WILL BE

22  RELEASED FOR TODAY, AND WE WILL START WITH EVIDENCE IN THE

23  MORNING AT 8:30.

24          SO, TRACY, CAN YOU SWEAR THE JURORS, PLEASE?

25          (THE JURY WAS SWORN.)

PROCEEDINGS

```
1              THE COURT:  ALL RIGHT.  SO, TRACY, CAN YOU TAKE THE

2    JURORS TO THE JURY ROOM?

3              THE CLERK:  YES.

4              (THE JURORS EXITED THE COURTROOM.)

5              THE COURT:  SO I WILL READ THE INSTRUCTIONS BEFORE

6    YOU GIVE YOUR OPENING STATEMENTS.  DO YOU HAVE ANY SENSE -- ARE

7    YOU GOING TO DO IT, OR, MR. PARRELLA, DO YOU HAVE ANY SENSE HOW

8    LONG YOU WILL BE?

9              MR. PARRELLA:  BETWEEN A HALF HOUR AND 45 MINUTES,

10   MAYBE.

11             THE COURT:  HOW ABOUT YOU, MR. BALOGH?

12             MR. BALOGH:  I WOULD ASSUME ABOUT THE SAME.

13             DO YOU WANT TO ADDRESS THE ORDER OF WITNESSES

14   TOMORROW THAT MAY ACTUALLY AFFECT THE PRESENTATION OF OPENINGS

15   AS WELL AND WHAT GETS EMPHASIZED OR DEEMPHASIZED, DEPENDING ON

16   THE COURT'S RULING?

17             THE COURT:  THERE WAS A RELEVANCE OBJECTION TO THE

18   DOCTOR, WHICH WAS DENIED WITHOUT PREJUDICE, DEPENDING ON WHAT

19   THE EVIDENCE IS, AND I DON'T HAVE ANY IDEA OF WHAT THAT

20   ACTUALLY IS YET.  SO HOW DO YOU WANT TO HANDLE THAT?

21             MR. NEDROW:  WELL, YOUR HONOR, WE WOULD LIKE TO MAKE

22   A PROFFER AS TO THE RELEVANCE BECAUSE -- TO BE --

23             THE COURT:  YOU'VE GOT TO SLOW DOWN, MR. NEDROW.  I

24   CAN'T EVEN UNDERSTAND YOU SOMETIMES.

25             MR. NEDROW:  DR. WIERMAN HAS A PREARRANGED VACATION,
```

PROCEEDINGS

1   WHICH, IN SOME WAYS, IS THE REASON WE WOULD LIKE TO CALL HER

2   FIRST.  SO IT'S WITH SOME SENSITIVITY TO THAT WE ARE SEEKING TO

3   CALL HER FIRST.  OUR PROFFER AS TO THE RELEVANCE OF

4   DR. WIERMAN'S TESTIMONY IS THAT IN 2000, DR. WIERMAN CREATED

5   MEDICAL RECORDS, AND SPECIFICALLY ON AUGUST 28TH, 2000, A

6   RECORD IN WHICH SHE WRITES ABOUT EFFECTS THAT SHE'S OBSERVED IN

7   MS. THOMAS AS A CONSEQUENCE, AND I QUOTE DIRECTLY FROM THE

8   DOCUMENT:  "TAKING EXOGENOUS STEROIDS," QUOTE/UNQUOTE.  I CAN

9   GET THE ACTUAL PAGE IF THE COURT SEEKS TO SEE IT.

10          THAT IS DIRECTLY RELEVANT TO COUNTS FOUR AND FIVE OF

11  THE INDICTMENT WHICH ALLEGE THAT MS. THOMAS TESTIFIED FALSELY

12  WHEN SHE SAID, NUMBER ONE, THAT SHE HAD NEVER TAKEN ANABOLIC

13  STEROIDS.  THAT'S THE SUM AND SUBSTANCE OF COUNT FOUR.  AND,

14  ALSO, IN COUNT FIVE WHEN SHE STATED, UP THROUGH, I BELIEVE IT'S

15  MARCH 2002, SHE HAD NOT BEEN TAKING ANABOLIC STEROIDS.  SO IT'S

16  RELEVANT IN TIME BECAUSE THERE IS NO TIME CONSTRAINT ON COUNT

17  FOUR.  IT'S RELEVANT AS TO THE TIMEFRAME THAT'S PUT IN THE

18  QUESTION WHICH IS THE BASIS OF COUNT FIVE.

19          AND, I GUESS, I JUST, OF COURSE, ALSO POINT OUT THAT

20  THE THRESHOLD FOR A 401 RELEVANCY DETERMINATION IS A LOW ONE.

21  IT'S HAVING A TENDENCY TO PROVE A FACT IN QUESTION AT THE

22  TRIAL.  AND GIVEN THAT FAIRLY LOW THRESHOLD, I THINK IT'S VERY

23  CLEAR THAT A STATEMENT FROM DR. WIERMAN THAT SHE FOUND -- OR,

24  RATHER -- I'M SORRY -- THAT SHE MADE RECOMMENDATIONS AND

25  PROVIDED THOUGHTS REGARDING HER MEDICAL OPINION TO MS. THOMAS,

PROCEEDINGS

1    BASED UPON A CONCERN ABOUT THE TAKING OF EXOGENOUS STEROIDS

2    CERTAINLY HAVE A TENDENCY TO SHOW THERE WAS SOME USE OF

3    STEROIDS IN 2000.  AND, AGAIN, FOR THE REASONS I'VE SAID,

4    THAT'S PERTINENT TO THOSE TWO COUNTS.

5            SO WE THINK WE'VE CROSSED A RELEVANCE THRESHOLD WITH

6    THAT PROFFER.  THANK YOU.

7            **THE COURT:**  ALL RIGHT.  MR. BALOGH?

8            **MR. BALOGH:**  I THINK WE ARE SHIPS PASSING IN THE

9    NIGHT.  DOES YOUR HONOR HAVE AVAILABLE THE TRANSCRIPT OF

10   MS. THOMAS, THE RELEVANT PORTION OF IT?

11           **THE COURT:**  OF MS. THOMAS?

12           **MR. BALOGH:**  MS. THOMAS.  I SUBMIT IT TO THE COURT.

13   I'LL READ -- HERE'S COUNT FIVE, AND I'LL READ --

14           **THE COURT:**  I HAVE COUNT FIVE.

15           **MR. BALOGH:**  HERE'S THE CONTEXT OF IT:  MR. NEDROW

16   READS TO HER THE VERBATIM CONCLUSION OF THE USADA HEARING, THE

17   VERBATIM CONCLUSION.  MR. NEDROW BEGINS READING ON LINE 14 OF

18   PAGE 30.  HE FINISHES THAT VERBATIM READING A FULL PAGE LATER

19   ON 15 OF 31.  THEN HE ASKS HER:

20           "IS THAT AN ACCURATE VERBATIM READING BY ME OF

21       THE CONCLUSION SECTION OF THE PANEL ARBITRATORS?

22           "ANSWER:  RIGHT."

23            NOW WE GET TO COUNT FIVE.

24           "ALL RIGHT.  I JUST WANT TO ASK YOU AGAIN, YOU

25       KNOW, MS. THOMAS, AND, AGAIN, MINDFUL THAT EVERYTHING

PROCEEDINGS

1     HAS GOT TO BE TRUTHFUL HERE, DID YOU EVER GET

2     ANABOLIC STEROIDS FROM ANYBODY IN CONNECTION WITH

3     YOUR TRAINING UP TO THE TIME OF MARCH 2002?

4          "ANSWER:  NO.

5          "DID YOU EVER TAKE, AT LEAST KNOWINGLY ANYWAY?

6          "ANSWER:  ONLY -- WHAT'S THAT'S REFERRING TO IS

7     1998 AND 1999 WHEN I HAD -- "

8            INTERRUPTED.

9          "RIGHT."

10           CONTINUING, MS. THOMAS:

11         "PUT THAT FORWARD TO MY ENDOCRINOLOGIST, AKA

12    DR. WIERMAN.  THAT'S WHAT MY MEDICAL RECORDS ARE

13    REFERRING TO, WHEN I HAD BEEN GIVEN SOME TESTOSTERONE

14    WITHOUT MY KNOWLEDGE.

15         "RIGHT.  I UNDERSTAND THAT PRIOR ONE. BUT --

16    RIGHT.

17         "BUT IN 2002, AND I KNOW I'VE ASKED IT, BUT I'LL

18    ASK IT AND THEN WE'LL BE DONE, OR AT LEAST I'LL BE

19    DONE, I MEAN, DID PATRICK ARNOLD EVER GIVE YOU

20    ANYTHING THAT WAS A STEROID?

21         "NO."

22           AND WHAT THIS TRANSCRIPT SHOWS IS WHAT THIS CASE IS

23    ABOUT, WHICH IS DID MS. THOMAS KNOWINGLY RECEIVE STUFF DIRECTLY

24    FROM PATRICK ARNOLD.  IT HAS NOTHING TO DO WITH ANYONE ELSE

25    GIVING HER TESTOSTERONE IN 1998 OR 1999.

PROCEEDINGS

1          AS WE ARE AWARE FROM MR. ARNOLD'S PLEA AND THE BALCO

2    PLEAS AND WE ARE AWARE FROM THE BALCO PLEAS, MR. ARNOLD CREATED

3    THC, TETRAHYDROGESTRINONE.  HE RECREATED NORBOLETHONE, A

4    DEFUNCT STEROID OF THE WYETH CORPORATION, AND THIS IS WHAT HE

5    DISTRIBUTED TO MR. CONTE FOR DISTRIBUTION TO PROFESSIONAL AND

6    HIGH CLASS AMATEUR ATHLETES.

7          MS. WIERMAN -- DR. WIERMAN'S TESTIMONY OF WHAT

8    OCCURRED IN 1998 AND 1999 IS IMMATERIAL TO INVESTIGATION OF

9    PATRICK ARNOLD, WHICH IS EXACTLY WHY MR. NEDROW INTERRUPTS HER,

10   WHICH IS EXACTLY WHY MR. NEDROW THEN REORIENTS HER TO, "I'M NOT

11   TALKING ABOUT 1998 AND 1999, I'M TALKING ABOUT ARNOLD."  AND

12   NOW, FIVE YEARS LATER THEY'RE SAYING, WELL, WE STILL WANT TO

13   USE THE EVIDENCE FROM 1998 AND 1999; WE DID NOT GET INTO IT, WE

14   DID NOT DEVELOP IT FULLY.  IT'S WHOLLY IRRELEVANT TO THE BALCO

15   GRAND JURY PROCEEDINGS, AND THAT IS A LARGE PART OF OUR

16   OBJECTIONS.

17          CLEARLY, EVEN IF SHE GOT NOTHING DIRECTLY FROM

18   ARNOLD, EVEN IF SHE TOLD THE TRUTH, WHAT THE GOVERNMENT SAYS IN

19   THEIR TRIAL BRIEF IS SHE'S A HARD CORE STEROID USER PREVIOUSLY,

20   AND THAT'S ENOUGH.  AND BY MR. NEDROW ORIENTING HER, WE KNOW

21   THAT'S NOT WHAT THEY WERE ASKING ABOUT.

22          I'D ALSO ASK THE COURT TO TAKE A LOOK AT 1623, WHICH

23   HAS A SAFE HARBOR PROVISION.  WHAT 1623 SAYS IS THAT IF A

24   WITNESS LIES BEFORE THE GRAND JURY, SAYS A FALSEHOOD, BUT

25   CORRECTS HERSELF EITHER ON THAT OCCASION OR A FUTURE OCCASION

PROCEEDINGS

1  BEFORE THE GRAND JURY IS DONE, HER WORK -- ITS WORK, THEY MAY

2  NOT BE USED AGAINST THEM.

3          AND THIS PASSAGE I'VE JUST READ IS CLEARLY

4  MS. THOMAS TRYING TO MAKE SURE WE ARE NOT TALKING ABOUT WHAT I

5  TALKED ABOUT WITH WIERMAN, WE ARE TALKING ABOUT WHAT YOU WANT

6  TO TALK ABOUT WITH ARNOLD.  AND MR. NEDROW ANSWERS, "YEAH,

7  YEAH, ARNOLD, WE'RE CONCERNED ABOUT ARNOLD," IT IS NOW

8  FUNDAMENTALLY UNFAIR TO LEAD OFF THIS TRIAL THAT'S ABOUT HER

9  CONNECTION WITH ARNOLD WITH TESTIMONY ABOUT 1998 AND 1999.

10  IT'S WHOLLY IRRELEVANT.  IT IS ONLY MEANT TO PREJUDICE HER, AND

11  403 ALONE IS A SUFFICIENT BASIS.

12          **THE COURT:**  OKAY.  I UNDERSTAND YOUR ARGUMENT.  I

13  THINK YOUR ARGUMENT IS ONE YOU WILL CERTAINLY BE ABLE TO MAKE

14  TO THE JURY, BUT I DON'T FIND IT PERSUASIVE THAT THIS EVIDENCE

15  IS NOT RELEVANT TO THE CHARGES.  I THINK IT -- I UNDERSTAND

16  YOUR POINT OF VIEW.  I THINK YOU CAN ARTICULATE THAT IT GOES TO

17  MATERIALITY.

18          AS FAR AS THE RELEVANCE THRESHOLD GOES, I THINK IT

19  IS RELEVANT.  SO I WILL NOT PRECLUDE YOU FROM STARTING THAT WAY

20  IF THAT'S HOW YOUR SCHEDULES ARE GOING TO COME OUT.  SO THAT'S

21  THAT.

22          HOW ABOUT AROUND 2:30, WILL YOU BE READY TO START?

23          **MR. NEDROW:**  YES.

24          **MR. PARRELLA:**  YES, YOUR HONOR.

25          **MR. NEDROW:**  THANK YOU VERY MUCH, YOUR HONOR.

PROCEEDINGS

```
 1              (RECESS TAKEN.)

 2              (PROCEEDINGS RESUMED IN OPEN COURT IN THE PRESENCE OF

 3              THE JURY.)

 4          THE COURT:  WELCOME BACK, LADIES AND GENTLEMEN.  YOU

 5   MAY ALL BE SEATED.

 6              WELCOME, LADIES AND GENTLEMEN.  AT THIS POINT THE

 7   TRIAL IS GOING TO BEGIN.  THE FIRST THING WE'LL DO IS, I WILL

 8   READ SOME PRELIMINARY INSTRUCTIONS THAT WILL GIVE YOU SOME

 9   GUIDANCE ON HOW YOU SHOULD LISTEN TO THE EVIDENCE AS IT COMES

10   IN IN THIS CASE.  THEREAFTER, IT WILL BE THE OPPORTUNITY OF

11   COUNSEL TO GIVE YOU OPENING STATEMENTS, WHICH WILL JUST BE

12   OUTLINES OF WHAT THEY EXPECT THE EVIDENCE WILL SHOW IN THE

13   CASE.  WE WILL THEN START AT 8:30 TOMORROW MORNING WITH ACTUAL

14   EVIDENCE IN THE MATTER.

15              AND LET ME SAY THIS:  WE WILL TAKE BREAKS AS THEY

16   NATURALLY HAPPEN, BOTH DURING THE TRIAL AND THIS AFTERNOON, SO

17   DEPENDING ON HOW LONG COUNSEL GO, IT MAY BE APPROPRIATE TO HAVE

18   A COMFORT STOP, A BRIEF ONE SOMEWHERE THIS AFTERNOON, BUT IF

19   ANY OF YOU SHOULD FIND THAT YOU WOULD LIKE TO HAVE A COMFORT

20   STOP, AND IT WOULD HELP YOUR ATTENTION IMPROVE IF YOU HAD ONE,

21   JUST RAISE YOUR HAND, AND WE'LL TAKE A LITTLE BREAK IF WE NEED

22   TO.  SO LET ME KNOW ABOUT THAT.

23              LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS

24   CASE, AND I WANT TO TAKE A FEW MOMENTS TO TELL YOU SOMETHING

25   ABOUT YOUR DUTIES AS JURORS AND TO GIVE YOU SOME INSTRUCTIONS.
```

1  THESE ARE PRELIMINARY INSTRUCTIONS, AND AT THE END OF THE TRAIL

2  I WILL GIVE YOU MORE DETAILED INSTRUCTIONS.  THOSE INSTRUCTIONS

3  WILL CONTROL YOUR DELIBERATIONS.

4          YOU SHOULD NOT TAKE ANYTHING THAT I MAY SAY OR DO

5  DURING THE TRIAL AS INDICATING WHAT I THINK OF THE EVIDENCE OR

6  WHAT YOUR VERDICT SHOULD BE.

7          THIS IS A CRIMINAL CASE BROUGHT BY THE UNITED STATES

8  GOVERNMENT.  THE INDICTMENT CHARGES SIX COUNTS AGAINST THE

9  DEFENDANT.  THE INDICTMENT IS SIMPLY A DESCRIPTION OF THE

10 CHARGES MADE BY THE GOVERNMENT AGAINST THE DEFENDANT.  IT IS

11 NOT EVIDENCE OF ANYTHING.

12          THE INDICTMENT CHARGES FIVE COUNTS OF SECTION 18

13 USC -- OF TITLE 18 USC, SECTION 1623(A) WHICH IS TITLED, "FALSE

14 DECLARATIONS BEFORE A GRAND JURY." THE INDICTMENT ALSO CHARGES

15 ONE COUNT OF TITLE 18 USC, SECTION 1503, WHICH IS TITLED

16 "OBSTRUCTION OF JUSTICE."

17          THE DEFENDANT HAS PLEADED NOT GUILTY TO THE CHARGES

18 AND IS PRESUMED INNOCENT UNLESS AND UNTIL PROVED GUILTY BEYOND

19 A REASONABLE DOUBT.  A DEFENDANT HAS THE RIGHT TO REMAIN SILENT

20 AND NEVER HAS TO PROVE INNOCENCE OR PRESENT ANY EVIDENCE.

21          THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT

22 THE FACTS ARE CONSISTS OF THE SWORN TESTIMONY OF ANY WITNESS,

23 THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE AND ANY FACTS TO

24 WHICH ALL THE LAWYERS AGREE OR STIPULATE.

25          THE FOLLOWING THINGS ARE NOT EVIDENCE, AND YOU MUST

1    NOT CONSIDER THEM AS EVIDENCE IN DECIDING THE FACTS OF THIS

2    CASE:

3            STATEMENTS AND ARGUMENTS OF THE ATTORNEYS ARE NOT

4    EVIDENCE.  QUESTIONS AND OBJECTIONS OF THE ATTORNEYS ARE NOT

5    EVIDENCE.  TESTIMONY THAT I INSTRUCT YOU TO DISREGARD IS NOT

6    EVIDENCE.  AND ANYTHING THAT YOU MAY SAY OR HEAR WHEN THE COURT

7    IS NOT IN SESSION, EVEN IF WHAT YOU SEE OR HEAR IS DONE OR SAID

8    BY ONE OF THE PARTIES OR ONE OF THE WITNESSES, IS NOT EVIDENCE.

9            SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE

10   ONLY.  WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE IS ADMITTED

11   FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT

12   LIMITED PURPOSE AND FOR NO OTHER.

13           EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

14   EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A

15   WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

16   CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS PROOF OF

17   ONE OR MORE FACTS FROM WHICH ONE COULD FIND ANOTHER FACT.  YOU

18   ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE.  THE

19   LAW PERMITS YOU TO GIVE EQUAL WEIGHT TO BOTH, BUT IT IS FOR YOU

20   TO DECIDE HOW MUCH WEIGHT TO GIVE ANY EVIDENCE.

21           THERE ARE RULES OF EVIDENCE WHICH CONTROL WHAT CAN

22   BE RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

23   OFFERS AN EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER SIDE

24   THINKS THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT

25   LAWYER MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE QUESTION

1    MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE

2    OBJECTION, THE QUESTION CANNOT BE ANSWERED, AND THE EXHIBIT

3    CANNOT BE RECEIVED.  WHENEVER I SUSTAIN AN OBJECTION TO A

4    QUESTION, YOU MUST IGNORE THE QUESTION AND MUST NOT GUESS WHAT

5    THE ANSWER WOULD HAVE BEEN.

6         SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM

7    THE RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

8    MEANS THAT WHEN YOU ARE DECIDING THE CASE YOU MUST NOT CONSIDER

9    THE EVIDENCE WHICH I TOLD YOU TO DISREGARD.

10        IN DECIDING THE FACTS OF THIS CASE, YOU HAVE TO

11   DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

12   BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF

13   IT OR NONE OF IT.

14        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY

15   TAKE INTO ACCOUNT THE OPPORTUNITY AND ABILITY OF THE WITNESS TO

16   SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO; THE WITNESS'S

17   MEMORY; THE WITNESS'S MANNER WHILE TESTIFYING; THE WITNESS'S

18   INTEREST IN THE OUTCOME OF THE CASE, AND ANY BIAS OR PREJUDICE;

19   WHETHER THE -- WHETHER OTHER EVIDENCE CONTRADICTED THE

20   WITNESS'S TESTIMONY; THE REASONABLENESS OF THE WITNESS'S

21   TESTIMONY IN LIGHT OF ALL THE EVIDENCE; AND ANY OTHER FACTORS

22   THAT BEAR ON BELIEVABILITY.

23        THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

24   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY TO

25   IT.

1           I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS

2    JURORS.

3           FIRST, YOU ARE NOT TO DISCUSS THIS CASE WITH ANYONE,

4    INCLUDING YOUR FELLOW JURORS, MEMBERS OF YOUR FAMILY, PEOPLE

5    INVOLVED IN THE TRIAL OR ANYONE ELSE, NOR ARE YOU ALLOWED TO

6    PERMIT OTHERS TO DISCUSS THE CASE WITH YOU.  THIS IS VERY, VERY

7    IMPORTANT.  PEOPLE WILL WANT TO KNOW WHAT YOU'RE DOING, AND

8    THEY ARE GOING TO WONDER WHAT HAPPENED WHEN YOU SHOWED UP FOR

9    JURY DUTY TODAY.  YOU MAY TELL THEM YOU HAVE BEEN SELECTED FOR

10   A JURY AND THAT YOU WILL BE ON THE JURY PROBABLY FOR ABOUT TWO

11   WEEKS.  THAT'S ALL YOU CAN TELL THEM.  DON'T TELL THEM ANY MORE

12   ABOUT THE CASE.  DON'T TELL THEM WHAT IT'S ABOUT OR ANYTHING

13   ELSE.  DON'T LET THEM TALK TO YOU ABOUT IT.

14          THE PROBLEM IS, IF WE TALK ABOUT THINGS, WE

15   SOMETIMES START TO MAKE UP OUR MINDS AS WE TALK ABOUT THEM.

16   IT'S VERY IMPORTANT THAT YOU KEEP YOUR MINDS OPEN UNTIL THE

17   VERY END OF THE TRIAL WHEN YOU'VE HEARD ALL THE EVIDENCE BEFORE

18   YOU START TO DECIDE THE CASE.  SO PLEASE DON'T TALK TO ANYBODY

19   AND DON'T LET ANYBODY TALK TO YOU.  IF ANYONE APPROACHES YOU

20   AND TRIES TO TALK TO YOU ABOUT THE CASE, PLEASE LET ME KNOW

21   ABOUT THAT IMMEDIATELY.

22          SECOND, DO NOT READ ANY NEWS STORIES OR ARTICLES OR

23   LISTEN TO ANY RADIO OR TELEVISION REPORTS ABOUT THE CASE OR

24   ABOUT ANYONE WHO HAS ANYTHING TO DO WITH IT.  THIS IS AN

25   IMPORTANT ONE AS WELL.  YOU ARE GOING TO NEED TO BE VERY

1  CAREFUL NOT TO READ ANYTHING IN THE PAPERS. DON'T GO ON THE

2  INTERNET. DON'T LISTEN TO THE RADIO. DON'T LISTEN TO THE TV

3  ABOUT THIS CASE. IT'S VERY IMPORTANT THAT YOU AVOID THAT.

4         THIRD, DO NOT DO ANY RESEARCH, SUCH AS CONSULTING

5  DICTIONARIES, SEARCHING THE INTERNET, OR USING OTHER REFERENCE

6  MATERIALS, AND DO NOT MAKE ANY INVESTIGATION ABOUT THE CASE ON

7  YOUR OWN.

8         FOURTH, IF YOU NEED TO COMMUNICATE WITH ME, SIMPLY

9  GIVE A SIGNED NOTE TO TRACY, AND SHE'LL GIVE IT TO ME.

10         AND, FIFTH, DO NOT MAKE UP YOUR MIND ABOUT WHAT THE

11  VERDICT SHOULD BE UNTIL AFTER YOU HAVE GONE TO THE JURY ROOM TO

12  DECIDE THE CASE AND YOU AND YOUR FELLOW JURORS HAVE DISCUSSED

13  THE EVIDENCE. KEEP AN OPEN MIND UNTIL THEN.

14         AT THE END OF THE TRIAL, YOU WILL HAVE TO MAKE YOUR

15  DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE, YOU WILL NOT

16  HAVE A WRITTEN TRANSCRIPT OF THE TRIAL. THIS IS VERY

17  IMPORTANT. JURORS OFTEN SAY, GOLLY, WE WOULD LIKE TO KNOW WHAT

18  WITNESS JOE JOKES SAID ABOUT THE SUN BEING UP THAT DAY. WE

19  DON'T HAVE A TRANSCRIPT TO GIVE TO YOU, SO THE ONLY WAY THAT

20  COULD BE PROVIDED TO YOU AFTER THE CASE IS OVER IS THROUGH A

21  READ BACK BY THE COURT REPORTER, WHICH IS VERY TIME CONSUMING.

22  IT WILL MEAN YOU WAIT AROUND A LOT.

23         SO IT'S VERY IMPORTANT TO LISTEN CAREFULLY AS THE

24  EVIDENCE IS PRESENTED BECAUSE YOU WON'T HAVE A TRANSCRIPT TO

25  CONSULT.

 1          IF YOU WISH TO TAKE NOTES TO HELP YOU REMEMBER WHAT

 2   A WITNESS SAID, YOU MAY DO SO.  IF YOU DO TAKE NOTES, PLEASE

 3   KEEP THEM TO YOURSELF UNTIL YOU AND YOUR FELLOW JURORS GO TO

 4   THE JURY ROOM TO DECIDE THE CASE.  DO NOT LET NOTE TAKING

 5   DISTRACT YOU SO YOU DO NOT HEAR OTHER ANSWERS BY THE WITNESSES.

 6          WHEN YOU LEAVE, YOUR NOTES SHOULD BE LEFT IN THE

 7   JURY ROOM, AND WHENEVER YOU TAKE A BREAK, TAKE YOUR NOTES WITH

 8   YOU INTO THE JURY ROOM.

 9          WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON

10   YOUR OWN MEMORY OF WHAT WAS SAID.  NOTES ARE ONLY TO ASSIST

11   YOUR MEMORY.  YOU SHOULD NOT BE OVERLY INFLUENCED BY NOTES.

12          THE TRIAL WILL NOW BEGIN.

13          FIRST, EACH SIDE MAY MAKE AN OPENING STATEMENT.  AN

14   OPENING STATEMENT IS NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO

15   HELP YOU UNDERSTAND WHAT THAT PARTY EXPECTS THE EVIDENCE WILL

16   SHOW.  A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.

17          THE GOVERNMENT WILL THEN PRESENT EVIDENCE, AND

18   COUNSEL FOR THE DEFENDANT MAY CROSS-EXAMINE.  THEN IF SHE

19   WISHES TO, THE DEFENDANT MAY PRESENT EVIDENCE, AND COUNSEL FOR

20   THE GOVERNMENT MAY CROSS-EXAMINE.

21          AFTER THE EVIDENCE HAS BEEN PRESENTED, THE ATTORNEYS

22   WILL MAKE CLOSING ARGUMENTS, AND I WILL INSTRUCT YOU ON THE LAW

23   THAT APPLIES TO THE CASE.  AFTER THAT, YOU WILL GO TO THE JURY

24   ROOM TO DELIBERATE THE VERDICT.

25          AT THIS POINT, IT IS THE OPPORTUNITY OF COUNSEL FOR

 1  THE GOVERNMENT TO MAKE ITS OPENING STATEMENT.  MR. PARRELLA?

 2          **MR. PARRELLA:**  THANK YOU, YOUR HONOR.

 3              **OPENING STATEMENT BY MR. PARRELLA**

 4          **MR. PARRELLA:**  MAY IT PLEASE THE COURT, COUNSEL,

 5  MEMBERS OF THE JURY.  ONCE AGAIN, MY NAME IS MATT PARRELLA.

 6  I'M ASSISTANT UNITED STATES ATTORNEY, ALONG WITH JEFF NEDROW.

 7  WE WILL BE PRESENTING THE EVIDENCE ON BEHALF OF THE GOVERNMENT

 8  IN THE NEXT FEW DAYS.

 9          ON NOVEMBER 6TH, 2003, A FEDERAL GRAND JURY IN SAN

10  FRANCISCO WAS IN THE MIDST OF A VERY IMPORTANT, VERY COMPLEX,

11  AND VERY LENGTHY INVESTIGATION.  THIS INVESTIGATION WAS

12  TARGETING THE BALCO LABORATORIES, WHICH WAS A SO-CALLED BLOOD

13  TESTING AND NUTRITION LAB LOCATED IN BURLINGAME, CALIFORNIA.

14          BALCO AND ITS ASSOCIATES WERE BEING INVESTIGATED FOR

15  THE DISTRIBUTION OF CONTROLLED SUBSTANCES, AMONG THEM ANABOLIC

16  STEROIDS, OTHER PERFORMANCE ENHANCING DRUGS, AND MONEY

17  LAUNDERING WITH THE PROCEEDS FROM THE SALES OF THESE ILLEGAL

18  DRUGS.

19          THE EVIDENCE WILL SHOW THAT BALCO RELIED HEAVILY ON

20  SO-CALLED DESIGNER STEROIDS.  THAT IS ANABOLIC STEROIDS THAT

21  WERE SPECIFICALLY DESIGNED BY CHEMISTS TO EVADE DETECTION BY

22  ANTIDOPING ORGANIZATIONS FOR ATHLETES.

23          THE EVIDENCE WILL SHOW THAT THESE CHEMISTS CREATED

24  THESE DESIGNER STEROIDS TO ALLOW ATHLETES TO REAP THE BENEFITS

25  OF TAKING ANABOLIC STEROIDS BUT NOT HAVE TO FACE THE

1  CONSEQUENCES TO THEIR ANTIDOPING AGENCIES AND THEIR ATHLETIC

2  LICENSING AGENCIES FOR DOING SO.

3          BUT THE EVIDENCE WILL SHOW THAT BALCO NEEDED A

4  SOURCE FOR THESE DESIGNER STEROIDS, AND THE EVIDENCE AT THIS

5  TRIAL WILL SHOW THAT THAT SOURCE OF UNDETECTABLE DESIGNER

6  STEROIDS FROM BALCO WAS A MAN NAMED PATRICK ARNOLD.

7          PATRICK ARNOLD WAS A CHEMIST WHO OPERATED HIS OWN

8  BUSINESS, LPJ RESEARCH, IN CHAMPAIGN, ILLINOIS.  ARNOLD

9  PRODUCED A LONG FORGOTTEN STEROID BY THE NAME OF NORBOLETHONE,

10 WHICH HAD BEEN ORIGINALLY PIONEERED IN THE '60'S BY WYETH

11 PHARMACEUTICALS AND THEN ABANDONED.

12         THEN HE TOOK IT TO THE NEXT STEP, AND HE INVENTED A

13 DESIGNER STEROID CALLED TETRAHYDROGESTRINONE, WHICH IS THG FROM

14 NOW ON.  THIS WAS A TRUE DESIGNER STEROID THAT WAS, AT THE TIME

15 IT WAS CREATED, UNDETECTABLE, BECAUSE, AS THE EVIDENCE WILL

16 SHOW, NO ONE KNEW WHAT TO TEST FOR.  THE EVIDENCE WILL SHOW

17 THAT IN GENERAL, BALCO -- WITHDRAWN -- PATRICK ARNOLD DEVELOPED

18 AND MANUFACTURED THESE DESIGNER ANABOLIC STEROIDS AND SENT THEM

19 TO BALCO FOR THEN DISTRIBUTION TO THE END USERS, IN MOST CASES

20 ATHLETES; IN SOME CASES, PROFESSIONAL ATHLETES; IN OTHER CASES,

21 ELITE ATHLETES ON A WORLD CLASS OF NONPROFESSIONAL-TYPE SPORTS.

22         THAT WAS THE GENERAL PATHWAY THAT THE DESIGNER

23 STEROIDS GOT FROM PATRICK ARNOLD IN CHAMPAIGN, ILLINOIS THROUGH

24 BALCO LABORATORIES IN BURLINGAME, CALIFORNIA, TO THE VARIOUS

25 ATHLETES.

OPENING STATEMENT — PARRELLA

```
 1              BUT THERE WAS ONE ATHLETE INVOLVED WHOSE NAME CAME

 2   UP IN THE BALCO INVESTIGATION WHO OBTAINED THESE DESIGNER

 3   STEROIDS AND THESE DRUGS DIRECTLY FROM PATRICK ARNOLD.  THIS

 4   WAS A CRUCIAL IMPORTANT WITNESS AT THIS STAGE -- AT THAT STAGE

 5   OF THE INVESTIGATION, A WITNESS WHO WOULD LINK PATRICK ARNOLD

 6   NOT ONLY TO SENDING THESE PERFORMANCE ENHANCING DRUGS TO BALCO,

 7   BUT WHO WOULD LINK HIM TO ACTUAL DISTRIBUTION ON HIS OWN.

 8              THE EVIDENCE WILL SHOW THAT PERSON WHO WAS A WORLD

 9   CLASS CYCLIST, WHO COMPETED IN THE UNITED STATES AND

10   INTERNATIONALLY IN MATCH SPRINT CYCLING RACE, THE EVIDENCE WILL

11   SHOW THAT WORLD CLASS CYCLIST HAD DIRECT CONTACT WITH PATRICK

12   ARNOLD IN A WAY THAT THE OTHER ATHLETES WHOSE NAMES WERE

13   DISCOVERED IN THE BALCO INVESTIGATION DID NOT AND IN A WAY THAT

14   MADE HER A CRITICAL WITNESS AND AN IMPORTANT WITNESS.

15              THIS ATHLETE RECEIVED PERFORMANCE-ENHANCING DRUGS

16   DIRECTLY FROM PATRICK ARNOLD.  SHE SPOKE ON THE PHONE DIRECTLY

17   WITH PATRICK ARNOLD.  SHE PAID PATRICK ARNOLD FOR HIS SERVICES,

18   BOTH WITH CHECKS, MONEY ORDERS, AND WITH A BICYCLE THAT SHE

19   SENT IN BARTER TO OBTAIN THESE DRUGS.

20              THE EVIDENCE WILL SHOW THAT THE ONE WITNESS WHO HAD

21   THAT IMPORTANT INFORMATION AT THIS JUNCTURE IN THE

22   INVESTIGATION IN NOVEMBER OF 2003, THE ONE WITNESS WHO HAD

23   DIRECT CONTACT WITH BOTH THE PRINCIPAL OF BALCO AND PATRICK

24   ARNOLD, WAS THE DEFENDANT, TAMMY THOMAS.  THAT IS WHY THE

25   DEFENDANT WAS SUBPOENAED TO APPEAR BEFORE THE GRAND JURY ON
```

 1  NOVEMBER 6TH, 2003.

 2          THE BALCO/PATRICK ARNOLD INVESTIGATION HAD

 3  ENCOMPASSED MANY WITNESS INTERVIEWS; HAD ENCOMPASSED A VAST

 4  REVIEW OF RECORDS; HAD ENCOMPASSED TRASH LINES AT BALCO WHERE

 5  THE ITEMS THAT WERE THROWN AWAY FROM BALCO WERE SEARCHED TO

 6  DISCOVER EVIDENCE.  AND ALL THOSE THINGS, AND MANY OTHERS, LED

 7  TO THE EXECUTION OF A FEDERAL SEARCH WARRANT AT BALCO

 8  LABORATORIES ON SEPTEMBER 3RD, 2003.

 9          AT THE EXECUTION OF THAT SEARCH WARRANT, AMONG THE

10  PERFORMANCE-ENHANCING DRUGS THAT WERE FOUND, AMONG THE LEDGERS

11  AND THE DOCUMENTS AND OTHER ITEMS, WERE TWO ITEMS THAT LINKED

12  VICTOR CONTE, WHO WAS THE PRESIDENT OF BALCO, PATRICK ARNOLD,

13  WHO, AS YOU KNOW, WAS THE CHEMIST FROM CHAMPAIGN, ILLINOIS WHO

14  CREATED THE DESIGNER STEROIDS, AND TAMMY THOMAS.

15          THOSE TWO ITEMS WERE, FIRST, AN E-MAIL FROM PATRICK

16  ARNOLD TO VICTOR CONTE DATED MAY 1ST, 2002, RECEIVED AT ABOUT

17  2:44 P.M. FROM PATRICK ARNOLD TO VICTOR CONTE, SUBJECT, RE:

18  NORBOLETHONE.  SO THERE'S NO DOUBT WHAT THEY'RE TALKING ABOUT

19  IN THIS E-MAIL.  THIS IS THE CHEMIST TALKING TO THE DISTRIBUTOR

20  STRAIGHT UP ABOUT NORBOLETHONE.  THE E-MAIL IS PRETTY SHORT.

21  IT STATES, AND YOU'LL SEE IT IN EVIDENCE:

22          "I KNOW THE GIRL WHO THEY JUST SNAGGED FOR

23       NORBOLETHONE.  IT IS NOT THE SAME GIRL I WAS HELPING

24       IN THE OLYMPICS, BUT A CYCLIST GIRL.  I SAW HER TESTS

25       AND EVERYTHING.  SHE IS TRYING TO FIGHT IT, AND I AM

1        ADVISING HER TECHNICALLY HOW TO DO IT."

2            THAT'S THE TEXT THAT PATRICK ARNOLD WROTE.  THE

3    EVIDENCE IN THIS TRIAL WILL SHOW THAT THE CYCLIST GIRL IS THE

4    DEFENDANT, TAMMY THOMAS.

5            AND THE SECOND DOCUMENT THAT WAS FOUND IN THE BALCO

6    SEARCH WARRANTS THAT'S RELEVANT TO THIS TRIAL PROVES THAT.

7    THAT DOCUMENT IS A FAX, PAPER FAX, NOT ELECTRONIC FAX, FROM LPJ

8    RESEARCH -- REMEMBER, THAT IS PATRICK ARNOLD'S COMPANY IN

9    CHAMPAIGN, ILLINOIS -- TO THE BALCO FAX NUMBER, AND IT'S FOUND

10   IN THE FILES AT BALCO.

11           THIS FAX HAS A HEADER ON IT WHICH STATES THAT IT WAS

12   SENT ON MAY 1ST, 2002, AT ABOUT -- EXCUSE ME -- AT ABOUT

13   3:32 P.M., LESS THAN AN HOUR AFTER THE E-MAIL.  THIS FAX

14   CONTAINS THE LAB TESTS -- EXCUSE ME.  THE FAX CONTAINS THE

15   RESULTS OF THE LAB TESTS FROM THE UCLA OLYMPIC ANALYTICAL

16   TESTING LAB ON A URINE SAMPLE RESULTING IN A POSITIVE TEST FOR

17   NORBOLETHONE.  THE TEST RESULTS CONTAIN THE UNITED STATES

18   ANTIDOPING AGENCY -- WHICH YOU WOULD LEARN THROUGH THE EVIDENCE

19   IN THIS CASE IS AN ANTIDOPING ORGANIZATION THAT HAS AUTHORITY

20   OVER CYCLISTS, IS NOT PART OF THE GOVERNMENT.  THIS IS A

21   PRIVATE CORPORATION THAT DOES TESTING AND CAN LEVY SANCTIONS

22   ACCORDING TO THOSE TESTS.

23           SO THE TEST RESULTS CONTAIN THE USADA, WHICH IS

24   SHORT FOR U.S. ANTIDOPING AGENCY, THE USADA SAMPLE NUMBER, AND

25   THE UCLA LAB NUMBER OF THE URINE SAMPLE THAT RESULTED IN THE

1   POSITIVE TEST FOR NORBOLETHONE.

2          THOSE LABS NUMBERS ARE MATCHED -- THE SAMPLE NUMBER

3   AND THE LAB NUMBER ARE MATCHED TO SAMPLE NUMBERS AND LAB

4   NUMBERS OF A URINE SAMPLE THAT TAMMY THOMAS GAVE TO THE USADA

5   COLLECTOR ON MARCH 14TH, 2002.

6          LIKE MANY FAXES, THIS FAX CONTAINS A PREVIOUS HEADER

7   FROM WHERE LPJ RESEARCH, PATRICK ARNOLD, RECEIVED IT.  THAT

8   PREVIOUS FAX SHOWS THAT IT WAS SENT ON APRIL 12TH, 2002, FROM

9   THE USOC OLYMPIC CENTER, WHICH IS IN COLORADO SPRINGS,

10  COLORADO.  YOU'LL SEE THAT ON APRIL 10TH, 2002, COLLECTORS FROM

11  USADA TOOK ANOTHER SAMPLE FROM TAMMY THOMAS, THIS TIME ALSO AT

12  COLORADO SPRINGS, THE SAME LOCATION.

13         THAT WAS THE CONTEXT THAT EXISTED WHEN THE DEFENDANT

14  WAS SUBPOENAED TO TESTIFY, ALONG WITH MANY OTHERS WHOSE NAMES

15  WERE FOUND AT BALCO, BEFORE THE FEDERAL GRAND JURY HERE IN SAN

16  FRANCISCO.

17         IT'S IMPORTANT TO REMEMBER THAT AT THAT POINT, YOU

18  WILL HEAR EVIDENCE TAMMY THOMAS WAS NOT A TARGET.  SHE WAS NOT

19  CHARGED WITH DISTRIBUTING PERFORMANCE-ENHANCING DRUGS OR

20  ANABOLIC STEROIDS.  SHE WAS MERELY A WITNESS.  AND TO THAT END,

21  TAMMY THOMAS WAS GIVEN COURT-ORDERED IMMUNITY FOR ANYTHING SHE

22  SAID IN THE GRAND JURY.

23         SHE HAD COMPLETE IMMUNITY, NOTHING SHE SAID IN THE

24  GRAND JURY COULD BE USED AGAINST HER IN ANY CRIMINAL -- IN ANY

25  CRIMINAL PROSECUTION.  ALL SHE HAD TO DO WAS TELL THE TRUTH.

1    SHE WAS FREE TO TELL THE TRUTH, NOTHING COULD BE USED AGAINST

2    HER FROM HER TESTIMONY.

3         THERE WAS ONLY ONE EXCEPTION.  HER TESTIMONY COULD

4    BE USED AGAINST HER IN A PROSECUTION FOR FALSE DECLARATIONS AND

5    FOR FAILING TO COMPLY WITH THE COURT'S ORDER, WHICH IS WHERE

6    THE OBSTRUCTION OF JUSTICE CHARGE COMES IN.

7         AGAIN, SHE WAS FREE TO TELL THE TRUTH.  NOTHING SHE

8    SAID COULD BE USED AGAINST HER.  ALL SHE HAD TO DO WAS TELL THE

9    TRUTH.  SHE IS CHARGED HERE TODAY WITH COUNTS THAT REFLECT HER

10   KNOWING AND INTENTIONAL FAILURE TO TELL THE TRUTH AT THAT GRAND

11   JURY.

12        THE EVIDENCE WILL SHOW THAT ON NOVEMBER 6TH, 2003,

13   TAMMY THOMAS DID NOT TELL THE TRUTH BEFORE THAT GRAND JURY.

14   SHE MADE A NUMBER OF PARTICULAR FALSE STATEMENTS ON MATERIAL

15   ISSUES AND THAT HER TESTIMONY AS A WHOLE WAS EVASIVE AND

16   MISLEADING TO SUCH AN EXTENT THAT IT OBSTRUCTED JUSTICE IN THE

17   GRAND JURY INVESTIGATION.

18        THE FIRST COUNT -- I'LL GO THROUGH THESE STATEMENTS

19   BRIEFLY, BUT THE FIRST COUNT LAYS OUT ONE FALSE STATEMENT.

20   I'LL GO THROUGH THESE, AND I'LL DISCUSS SOME OF THE EVIDENCE

21   YOU WILL SEE THAT RELATES TO THESE DIFFERENT FALSE STATEMENTS.

22        THE QUESTION WAS:

23        "DID YOU EVER, BESIDES THIS ONE INSTANCE OF

24        GETTING THE 1-AD FROM MR. ARNOLD, DID YOU EVER GET

25        ANY OTHER SERVICES FROM MR. ARNOLD OR ANY PRODUCTS?"

1            AND THE ANSWER TO THAT THAT IS ALLEGED TO BE

2    KNOWINGLY MADE AS FALSE WAS:  "NO, NO OTHER PRODUCTS."

3            COUNT TWO, THE STATEMENT IS:

4        "DID YOU EVER, IN ADDITION TO ANYTHING I SAID,

5        GET ANY KIND OF WHAT YOU KNEW TO BE BANNED OR ILLEGAL

6        PERFORMANCE-ENHANCING DRUGS FROM MR. ARNOLD?"

7            THE ANSWER IS "NO."

8            COUNT THREE:

9        "DID YOU TAKE ANYTHING THAT PATRICK ARNOLD GAVE

10       YOU?"

11           THE ANSWER WAS "NO."

12           COUNT FOUR:

13       "NOW LET ME ASK YOU:  AS YOU SIT HERE NOW AND

14       BEFORE THIS GRAND JURY TODAY, HAVE YOU EVER TAKEN

15       ANABOLIC STEROIDS?"

16           ANSWER WAS "NO."

17           AND THE LAST COUNT OF FALSE DECLARATIONS BEFORE THE

18   GRAND JURY IS:

19       "QUESTION:  ALL RIGHT.  I JUST WANT TO ASK YOU

20       AGAIN, YOU KNOW, MS. THOMAS, AND, AGAIN, MINDFUL THAT

21       EVERYTHING HAS GOT TO BE TRUTHFUL HERE, DID YOU

22       GET -- WITHDRAWN -- DID YOU EVER GET AN ANABOLIC

23       STEROID FROM ANYBODY IN CONNECTION WITH YOUR TRAINING

24       UP TO THE TIME OF MARCH 2002?"

25           HER ANSWER WAS "NO."

1           NOW, AFTER THE DEFENDANT'S TESTIMONY ON

2   NOVEMBER 6TH, 2003, THE INVESTIGATION INTO PATRICK ARNOLD

3   CONTINUED, BUT NOW IT WAS COMPLICATED, AND AN ADDITIONAL BURDEN

4   WAS PLACED ON IT BY THE INVESTIGATION INTO HER STATEMENTS AND

5   THE TRUTHFULNESS OF HER STATEMENTS.

6           THE EVIDENCE WILL SHOW OVERWHELMING PROOF THESE

7   STATEMENTS WERE FALSE, AND THEY WERE KNOWINGLY FALSE WHEN THEY

8   WERE MADE.

9           THE DEFENDANT'S OWN GRAND JURY TESTIMONY STATES:

10  SHE WAS CONFRONTED WITH HER PRIOR TESTIMONY AT HER ATHLETIC

11  SUSPENSION HEARING, AT WHICH TIME SHE SAID SHE DIDN'T KNOW

12  PATRICK ARNOLD.

13          YOU WILL HEAR TESTIMONY -- WHEN YOU HEAR HER GRAND

14  JURY TESTIMONY READ TO YOU, YOU WILL HEAR TESTIMONY THAT IN HER

15  GRAND JURY TESTIMONY SHE WAS CONFRONTED WITH THE FACT THAT ON A

16  PREVIOUS TIME WHEN SHE WAS -- WHEN SHE TESTIFIED SHE DENIED

17  KNOWING PATRICK ARNOLD, AND YET, ON NOVEMBER 6TH, 2003, SHE

18  CHANGED HER STORY TO SAY SHE DID KNOW HIM, THAT SHE SPOKE ON

19  THE PHONE TO HIM, BUT THAT SHE HAD ONLY RECEIVED LEGAL

20  SUPPLEMENTS FROM HIM, WHICH SHE HAD THEN RETURNED TO HIM

21  WITHOUT USING.

22          WELL, IN ORDER TO FULLY FLESH OUT THE CONTEXT OF

23  THESE STATEMENTS, WE WENT BACK AND FOUND A DOCTOR, AN

24  ENDOCRINOLOGIST FROM THE UNIVERSITY OF COLORADO HEALTH SCIENCE

25  CENTER, DR. MARGARET WIERMAN, WHO TREATED THIS DEFENDANT IN

1   AUGUST OF 2000.  AND ON AUGUST OF 22ND OF 2000, YOU WILL HEAR

2   EVIDENCE, AND YOU WILL SEE THE MEDICAL RECORDS, WHICH STATE

3   THAT THE DEFENDANT WENT TO DR. WIERMAN FOR A QUESTION AS TO A

4   POSITIVE TEST.

5          DR. WIERMAN WILL TESTIFY AS TO THE MANY BLATANT AND

6   APPARENT PHYSICAL SIDE EFFECTS OF ANABOLIC STEROID ABUSE THAT

7   SHE SAW ON THIS DEFENDANT AT THAT TIME:  A FULL BEARD THAT WAS

8   SHAVED, FULL CHEST HAIR THAT WAS SHAVED, SEVERE VIRILIZATION,

9   AND MANY OTHER SIDE EFFECTS.

10         IN ADDITION, THE MEDICAL RECORDS WILL SHOW THAT

11  TAMMY THOMAS WAS INTERVIEWED BY DR. WIERMAN, AND TAMMY THOMAS

12  TOLD DR. WIERMAN THAT SHE HAD NEVER TAKEN ANABOLIC STEROIDS.

13         DR. WIERMAN WILL TESTIFY THAT IN ORDER TO RULE OUT

14  OTHER POTENTIAL EXPLANATIONS FOR THESE BLATANT AND APPARENT

15  SIDE EFFECTS, DR. WIERMAN ORDERED TESTS WHICH ENDOCRINOLOGISTS

16  UNDERSTAND CAN HELP TO DETERMINE WHETHER THERE ARE OVARIAN

17  CYSTS, TO DETERMINE WHETHER THERE WERE ADRENAL GLAND

18  MALFUNCTIONS, AND OTHER THINGS, AND SHE DID THAT IN THE COMING

19  DAYS.  AND DR. WIERMAN WILL TESTIFY THEY CAME BACK NEGATIVE.

20  THERE WAS NO ORGANIC MALFUNCTION THAT WOULD HAVE CAUSED THESE

21  SEVERE SIDE EFFECTS AND THE SEVERE VIRILIZATION.

22         THE MEDICAL RECORDS WILL ESTABLISH THAT TAMMY THOMAS

23  WAS INTERVIEWED AGAIN BY DR. WIERMAN AND THIS TIME ON

24  OCTOBER -- EXCUSE ME -- THIS TIME ON AUGUST 28TH, 2000.  AND,

25  UNLIKE, SIX DAYS EARLIER WHERE SHE STATED SHE HAD NEVER TAKEN

1   ANABOLIC STEROIDS, THIS TIME SHE CHANGED HER STORY AND ADMITS

2   SHE HAD BEEN TAKING EXOGENOUS, WHICH MEANS FROM OUTSIDE THE

3   BODY, EXOGENOUS STEROIDS, IN PARTICULAR DEPOTESTOSTERONE

4   PROPIONATE.  YOU WILL HEAR THAT IS A POWERFUL ANABOLIC STEROID,

5   ESPECIALLY IN THE DOSAGES THAT THIS DEFENDANT WAS TAKING IT AT

6   THAT TIME.

7           ON OCTOBER 6TH, 2005, APPROXIMATELY TWO YEARS AFTER

8   THE SEARCH WARRANT AT BALCO AND ABOUT THE SAME AMOUNT OF

9   TIME -- A LITTLE LESS FROM THE TIME OF THIS DEFENDANT'S GRAND

10  JURY TESTIMONY, THE INVESTIGATION RELATING TO PATRICK ARNOLD

11  HAD PROGRESSED TO A POINT WHERE A SEARCH WARRANT WAS SIGNED BY

12  A FEDERAL MAGISTRATE FOR AN -- AND EXECUTED ON PATRICK ARNOLD'S

13  BUSINESS IN CHAMPAIGN, ILLINOIS.

14          THAT SEARCH WARRANT ALSO TURNED UP EVIDENCE THAT

15  THIS DEFENDANT WAS LINKED TO PATRICK ARNOLD.  THERE WAS AN

16  E-MAIL RECOVERED FROM PATRICK ARNOLD'S COMPUTER FROM AN

17  INDIVIDUAL BY THE NAME OF ANN FRANK, WHOSE E-MAIL ADDRESS WAS

18  FEMLIFTER@YAHOO.COM.  THE EVIDENCE WILL SHOW THESE WERE NAMES

19  USED BY THE DEFENDANT, TAMMY THOMAS, WHEN SHE E-MAILED.

20          THE E-MAIL READ AS FOLLOWS:  "FROM ANN FRANK TO

21  PATRICK ARNOLD."  THE DATE WAS OCTOBER 5TH, 2003, LESS THAN A

22  MONTH BEFORE HER GRAND JURY TESTIMONY.

23          SOMEWHAT LENGTHY E-MAIL.  SOME OF THE PORTIONS THAT

24  INDICATE WHAT WAS GOING ON AT THAT POINT IN TIME ARE:

25          "THEY FOUND A RECORD OF MY NAME AT VC," WHICH THE

1      EVIDENCE WILL SHOW IS VICTOR CONTE, "AND THEY SAID

2      THAT VC AND PA," PATRICK ARNOLD, "WERE GIVING

3      STEROIDS TO ATHLETES."

4           THIS IS TAMMY THOMAS WRITING TO PATRICK ARNOLD ON

5  THE RUN UP TO HER GRAND JURY TESTIMONY.

6      "HE WAS SUPPOSED TO CLEAN HOUSE AFTER IT WAS ALL

7      OVER, BUT, APPARENTLY, HE DID NOT."

8           THE EVIDENCE WILL SHOW THAT SHE'S REFERRING TO THE

9  FACT THAT VICTOR CONTE WAS SUPPOSED TO GET RID OF THE RECORDS,

10 BUT HE DIDN'T, AND THAT'S WHY SHE'S IN THIS SITUATION.

11      "AND IT WOULD BE HELPFUL IF I KNEW WHAT DOCUMENTS

12      VC STILL HAD THAT THE FEDS GOT THEIR HANDS ON."

13           NOW, PATRICK ARNOLD WILL TESTIFY HERE.  PATRICK

14 ARNOLD WAS CHARGED, AND HE PLEADED GUILTY, TO DISTRIBUTING

15 CONTROLLED SUBSTANCES FOR HIS PART IN THIS, AND HE WENT TO JAIL

16 FOR IT.  HE WAS SUBPOENAED BEFORE THE GRAND JURY, AND HIS

17 TESTIMONY WAS TAKEN.  HE WILL COME HERE AND TESTIFY THAT HE DID

18 KNOW THIS DEFENDANT, CONTRARY TO HER TESTIMONY AT THE USADA

19 HEARING, AND THAT HE SHIPPED THG, THE DESIGNER STEROID, TO THIS

20 DEFENDANT FOR MONEY, BLATANTLY CONTRADICTING HER GRAND JURY

21 TESTIMONY.

22           AN INDIVIDUAL BY THE NAME OF KELCEY DALTON WILL ALSO

23 TESTIFY HERE.  KELCEY DALTON IS, OR WAS I SHOULD SAY, THE

24 GIRLFRIEND OF PATRICK ARNOLD BACK IN THE TIMEFRAME WHEN PATRICK

25 ARNOLD AND THIS DEFENDANT KNEW EACH OTHER.

1          KELCEY DALTON WILL STATE THAT SHE HAD NUMEROUS

2   TELEPHONE CONVERSATIONS WITH THIS DEFENDANT NUMEROUS TIMES, AND

3   SHE DISCUSSED DURING THOSE CONVERSATIONS THE USE OF ANABOLIC

4   STEROIDS.

5          KELCEY DALTON WAS A POWER LIFTER WHO, YOU MIGHT NOT

6   BE SURPRISED, SINCE SHE WAS THE GIRLFRIEND OF PATRICK ARNOLD,

7   ALSO USED FOR A PERIOD OF TIME PERFORMANCE-ENHANCING DRUGS AND

8   ANABOLIC STEROIDS.  AND IN THESE TELEPHONE CONVERSATIONS SHE

9   SPOKE TO THIS DEFENDANT, AND THEY SPOKE ABOUT HOW TO USE

10  ANABOLIC STEROIDS AND STRENGTH GAINS, AND, MOST IMPORTANTLY,

11  ABOUT THE SIDE EFFECTS ESPECIALLY ON WOMEN OF ANABOLIC

12  STEROIDS, AGAIN, DIRECTLY CONTRADICTING THE DEFENDANT'S GRAND

13  JURY TESTIMONY.

14          FINALLY, AN INDIVIDUAL BY THE NAME OF DR. DON CATLIN

15  WILL TESTIFY, AND DR. CATLIN IS ONE OF THE WORLD LEADERS IN

16  ANABOLIC STEROIDS AND PERFORMANCE-ENHANCING DRUG TESTING IN THE

17  WORLD.  IN FACT, HE FOUNDED AND RAN THE UCLA OLYMPIC ANALYTICAL

18  LAB FOR, I BELIEVE, OVER 20 YEARS.  IT WAS FOUNDED AROUND THE

19  TIME OF THE L.A. OLYMPICS SO THAT A CERTIFIED LAB WOULD BE ON

20  HAND FOR THOSE OLYMPICS.

21          DR. CATLIN WILL TESTIFY THAT THE UCLA TESTED THREE

22  URINE SAMPLES COLLECTED FROM TAMMY THOMAS.  FIRST ONE WAS

23  COLLECTED ON AUGUST 30TH OF 2001.  IT WAS TESTED BY THE LAB.

24  IT WAS POSITIVE FOR NORBOLETHONE.  THE SECOND WAS COLLECTED ON

25  MARCH 14TH OF 2002.  IT WAS POSITIVE FOR NORBOLETHONE.  THE

1   THIRD WAS COLLECTED ON APRIL 10TH OF '02, AND IT WAS POSITIVE

2   FOR NORBOLETHONE.

3           BUT AT THE TIME WHEN THOSE TESTS WERE DONE, THE

4   ANTIDOPING ORGANIZATIONS DID NOT KNOW WHAT THG WAS, SO THEY

5   COULDN'T TEST FOR IT.  AFTER THE BALCO SEARCH WARRANTS, WHEN

6   THE ANTIDOPING ORGANIZATIONS REVIEWED THE CHEMICALS THAT WERE

7   FOUND AND DISCOVERED THE ACTUAL STRUCTURE OF THG, DR. CATLIN

8   WAS ABLE TO GO BACK AND RETEST THOSE SAMPLES TO SEE WHETHER

9   THEY CONTAINED THG.  I SHOULD SAY HE WAS ABLE TO GO BACK AND

10  RETEST TWO OF THEM.

11          THE AUGUST 30TH, 2001 SAMPLE, RETEST, AGAIN POSITIVE

12  FOR NORBOLETHONE, AND THIS TIME ALSO POSITIVE FOR THG.  THE

13  MARCH 14TH, 2002, SAMPLE WAS USED UP IN THE PREVIOUS TESTING

14  AND COULD NOT BE RETESTED.

15          THE EVIDENCE WILL SHOW THAT ON APRIL 10TH, 2002, THE

16  SAMPLE COLLECTED ON APRIL 10TH, 2002, WAS RETESTED BY THE UCLA

17  LAB; AGAIN, POSITIVE FOR NORBOLETHONE AND THIS TIME ALSO

18  POSITIVE FOR THG.

19          AND THE EVIDENCE WILL SHOW NORBOLETHONE, THE ONLY

20  MANUFACTURER WAS PATRICK ARNOLD.  THG, INVENTED, AND THE ONLY

21  MANUFACTURER WAS PATRICK ARNOLD.

22          MEMBERS OF THE JURY, AT THE CONCLUSION OF THE

23  EVIDENCE, WE WILL REQUEST A VERDICT OF GUILTY ON ALL THE

24  COUNTS, AND I THANK YOU FOR YOUR TIME.

25          **THE COURT:**  THANK YOU, MR. PARRELLA.

1          MR. BALOGH.

2          **MR. BALOGH:**  THANK YOU, YOUR HONOR.

3          **THE COURT:**  LADIES AND GENTLEMEN, ARE WE GOOD TO GO

4  OR DO WE NEED A FIVE-MINUTE BREAK AT THIS TIME?  I THINK WE CAN

5  GO AHEAD.

6          **MR. BALOGH:**  GOOD AFTERNOON.

7          TAMMY THOMAS TOLD THE TRUTH TO THE BALCO GRAND JURY.

8  THE GOVERNMENT DIDN'T LISTEN.  INDEED, WHEN IT ASKED QUESTIONS,

9  THEY DIDN'T FOLLOW UP; INDEED, THEY DIDN'T ASK THE RIGHT

10  QUESTIONS.

11          AS YOU'VE ALREADY HEARD, TAMMY THOMAS'S TESTIMONY

12  BEFORE THE BALCO GRAND JURY CAME ON A RAID OF BALCO

13  LABORATORIES AND FOUR RELATED LOCATIONS ON SEPTEMBER 3RD, 2003.

14  THAT RAID SHOULD HAVE ENDED THE CASE THEN.  THAT RAID WAS THE

15  CULMINATION OF MORE THAN A YEAR OF WORK BY SPECIAL AGENT JEFF

16  NOVITZKY.

17          ON THAT DAY THE GOVERNMENT FOUND A MOUNTAIN OF

18  EVIDENCE AGAINST VICTOR CONTE AND THE OTHER PRINCIPAL OF BALCO

19  LABORATORIES, AGAINST PATRICK ARNOLD.  THESE MEN WERE DEAD TO

20  RIGHT.  THEIR RIGHTS WERE USELESS AS OF THAT DAY, WHICH IS WHY

21  THEY PLEADED GUILTY.

22          ON THAT DAY THIS EVEREST OF EVIDENCE, INCLUDING

23  DOPING CALENDARS, FEDERAL EXPRESS RECEIPTS, ILLEGAL ANABOLIC

24  STEROIDS LIKE TESTOSTERONE, WHICH WERE THEN CONTROLLED BY TITLE

25  21 OF THE UNITED STATES CODE, AND OTHER MATERIALS THAT THEY

1   WERE SHIPPING TO ATHLETES, THESE PEOPLE -- ON THAT DAY AGENT

2   NOVITZKY INTERVIEWED CONTE AND VALENTE, THE PRINCIPALS OF

3   BALCO, AND GREG ANDERSON, A TRAINER THEY HAD USED TO DISTRIBUTE

4   TESTOSTERONE AND OTHER ANABOLIC STEROIDS AND NON-ANABOLIC

5   STEROIDS, OTHER SUBSTANCES, TO ELITE PROFESSIONALS AND AMATEUR

6   ATHLETES.

7          THEY CONFESSED.  NOT ONLY DID THEY CONFESS, THEY

8   TOLD THEM THAT PATRICK ARNOLD WAS THE MAN WHO MANUFACTURED THG,

9   THAT PATRICK ARNOLD WAS THE MAN THAT MANUFACTURED THE CLEAR;

10  THAT PATRICK ARNOLD WAS THE ONE THAT CREATED NORBOLETHONE.

11         THEY TOLD THEM PATRICK ARNOLD, WITH THE ASSISTANCE

12  OF A MAN NAMES MILES WERRE IN TEXAS, WORKED WITH VICTOR CONTE

13  TO CREATE A CREAM, WHERE VICTOR CONTE WOULD TEND TESTOSTERONE

14  TO MR. WERRE IN TEXAS, MR. ARNOLD WOULD SEND THG TO MR. WERRE

15  IN TEXAS, AND MR. WERRE WOULD MIX THEM TOGETHER TO CREATE A

16  CREAM, AND BECAUSE OF THE TESTOSTERONE CONTENT WAS IN VIOLATION

17  OF LAW TITLE 21, A CONTROLLED SUBSTANCE, BECAUSE TESTOSTERONE

18  IS AN ANABOLIC STEROID.  AS I SAID, THESE MEN WERE DEAD TO

19  RIGHTS.

20         THE CASE -- THIS YEAR LONG INVESTIGATION COULD HAVE

21  BEEN OVER THAT DAY.  BUT THE GOVERNMENT DIDN'T WANT IT TO BE.

22  THE GOVERNMENT HAD A DIFFERENT AGENDA, AN AGENDA TO CLEAN UP

23  SPORT.  SO THEY TOOK UP A RARELY USED STATUTE 6011, USUALLY

24  USED IN MOB CASES, COMPLEX DRUG CONSPIRACIES TO GET PEOPLE ON

25  THE INSIDE OUT.

1           THEY USED THIS TO CONVENE A GRAND JURY CALLED THE

2   BALCO GRAND JURY IN SEPTEMBER 2003, AND THE BALCO GRAND JURY

3   WOULD USE THIS SECTION TO HAVE ATHLETES COME IN AND, IN

4   ESSENCE, CONFESS THEIR SINS.  AND BY THIS TESTIMONY, THE

5   GOVERNMENT WOULD BE ABLE TO CLEAN UP SPORT; WE WOULD BE ABLE TO

6   TAKE AWAY RECORDS FROM THE RECORD BOOKS AND CLEAN UP THE RECORD

7   BOOKS; WE WOULD BE ABLE TO TAKE AWAY GOLD MEDALS AND SILVER

8   MEDALS FROM OLYMPIADS WHO HAD WON THEM IMPROPERLY.

9           AFTER THREE MONTHS, THIS IS WHAT THEY DID -- TAMMY

10  THOMAS HAD ZERO TO DO WITH THIS.  TAMMY THOMAS WAS NOT SUCH A

11  PERSON.  SHE HAD BEEN PREVIOUSLY BANNED FOR LIFE IN

12  AUGUST 2002.  SHE HAD NEVER BEEN TO THE OLYMPICS.  SHE HELD NO

13  MEDALS.  SHE HAD NO RECORDS.  SHE HAD NOTHING.  SHE HAD BEEN

14  STRIPPED OF EVERYTHING SHE HAD DONE BECAUSE SHE HAD ALREADY

15  BEEN FOUND, MORE THAN A YEAR BEFORE, TO HAVE VIOLATED THE RULES

16  OF SPORT.  INDEED, SHE WAS AN OBSCURE ATHLETE IN AN OBSCURE

17  SPORT.  SHE HAD NO CONNECTION TO THE BALCO DISTRIBUTION, AND

18  THAT WAS WHAT THE BALCO GRAND JURY WAS INVESTIGATING.

19          NONETHELESS, TAMMY THOMAS WAS HAULED BEFORE THIS

20  GRAND JURY, AND THE PURPOSE, YOU WILL SEE IN THE EVIDENCE, WAS

21  SOLELY TO PUNISH HER IN THIS CASE, TO PUNISH HER FOR HER PRIOR

22  VIOLATION OF THE RULE OF SPORT, TO PUNISH HER FOR HAVING THE

23  TEMERITY WHEN SHE WAS CAUGHT FOR VIOLATING THE RULES OF SPORT,

24  TO HAVE FOUGHT THAT CASE, TO HAVE FOUGHT IT ALMOST TO THE END,

25  TO HAVE STOOD UP FOR HER RIGHTS, TO CHALLENGE SPORTS

 1   AUTHORITIES.

 2          YOU WILL HEAR VERY SHORTLY HER GRAND JURY TESTIMONY.

 3   LISTEN TO IT CAREFULLY.  IT IS NOT AIMED AT LEARNING OR

 4   INQUIRING INFORMATION.  AND THE WONDER OF A JURY TRIAL IS YOU

 5   WILL SEE HOW WITNESSES ARE EXAMINED AND HOW WITNESSES -- HOW

 6   INFORMATION IS ELICITED FROM WITNESSES, HOW QUESTIONS ARE ASKED

 7   TO DERIVE, AND YOU WILL LEARN THIS WAS NOT THE PURPOSE OF THE

 8   GRAND JURY TESTIMONY.  IT WAS AIMED SOLELY AT CONFIRMING PRIOR

 9   TESTIMONY SHE HAD GIVEN IN THE USADA HEARING; IF WE CAN GET HER

10   DENIALS, WE CAN CHARGE HER IN THIS CASE.

11          BUT IT WAS SO FOCUSED ON THAT END, THAT ILLEGITIMATE

12   END, IT WAS SO FOCUSED ON IT, THE GOVERNMENT'S QUESTIONER

13   DIDN'T LISTEN, DIDN'T FOLLOW UP, DIDN'T ASK THE RIGHT

14   QUESTIONS.  LIKE ANY SCIENCE PROJECT, GARBAGE IN, GARBAGE OUT.

15   YOU WILL SEE TAMMY THOMAS ANSWERED ACCURATELY.

16          THIS CASE IS VERY MUCH ABOUT THE TRUTH.  BUT IT'S

17   ABOUT MUCH MORE THAN THAT, TOO.  PART OF IT IS ALSO ABOUT THE

18   MATERIALITY.  SHE WAS CHARGED WITH MATERIAL FALSE DECLARATIONS.

19   AS WE DISCUSSED A LITTLE BIT EARLIER TODAY, THAT'S A FANCY TERM

20   FOR, DID IT MATTER TO THIS GRAND JURY.  IT DIDN'T MATTER ONE

21   BIT.  AS THE EVIDENCE WILL SHOW, IF WE CHANGED EVERY NO ANSWER

22   TO YES, IT WOULDN'T HAVE MADE A DIFFERENCE AT ALL, FOR MULTIPLE

23   REASONS.

24          ONE, AS THE EVIDENCE WILL ESTABLISH, PATRICK ARNOLD,

25   JUST LIKE THE BALCO DEFENDANTS, THEY HAD THE MOUNTAIN OF

1   EVIDENCE AGAINST THEM ON SEPTEMBER 3.  THEY HAD THE E-MAILS TO

2   VICTOR CONTE SHOWING HE HAD CREATED THE CLEAR.  THEY HAD FED-EX

3   RECEIPTS.  THEY HAD FINANCIAL INSTRUMENTS OF PAYMENTS FROM

4   CONTE TO ARNOLD.  THEY HAD CONTE AND VALENTE'S TESTIMONY

5   AGAINST MR. ARNOLD INDICATING THAT HE WAS, IN FACT, THE CREATE

6   TORE OF THE CLEAR.  THEY HAD MR. WERRE, THE PHARMACIST IN

7   TEXAS, WHO MR. CONTE AND MR. VALENTE ALERTED THE PROSECUTION

8   AUTHORITIES, FOR THE FIRST TIME, THAT THIS MAN, MILES WERRE,

9   EXISTS, HE'S IN TEXAS; WE MET HIM THROUGH ARNOLD; HE'S ARNOLD'S

10  CONNECTION, AND HE IS THE ONE THAT MAKES THE CREAM FOR US.

11          THIS CASE IS ALSO ABOUT AN ABUSE OF PROCESS.  YOU'LL

12  SEE THAT THE SOLE REASON TO STRIP SOMEONE -- WITHDRAWN.

13          THE PURPOSE OF A GRAND JURY IS TO OPERATE WITHIN A

14  JURISDICTION, TO INVESTIGATE CRIMES WITHIN A DISTRICT.  WE SIT

15  HERE IN THIS COURTROOM, WE ARE KNOWN AS THE NORTHERN DISTRICT

16  OF CALIFORNIA.  WHAT A GRAND JURY CAN DO HERE IS INVESTIGATE

17  CRIME THAT IS CONNECTED TO THE NORTHERN DISTRICT OF CALIFORNIA.

18  THEY CAN'T INVESTIGATE WHAT'S GOING ON IN NEW YORK OR CHICAGO

19  OR FLORIDA.  THAT'S FOR THOSE AUTHORITIES.  BUT IF SOMEONE FROM

20  CHICAGO OR NEW YORK OR FLORIDA IS DOING SOMETHING HERE IN THE

21  NORTHERN DISTRICT, THEN THEY CAN.

22          IN THIS CASE, THEIR THEORY WAS THAT PATRICK ARNOLD,

23  WHILE IN ILLINOIS, MUST HAVE SENT SOMETHING TO TAMMY THOMAS

24  WHEN SHE WAS IN COLORADO OR FLORIDA.  THAT HAS NOTHING TO DO

25  WITH THIS DISTRICT.

1        IF TAMMY THOMAS TOLD THE GOVERNMENT THAT PATRICK

2    ARNOLD SENT A POUND OF HEROIN AND COCAINE AND MILLIONS OF

3    ANABOLIC STEROIDS FROM ILLINOIS TO FLORIDA, THE BALCO GRAND

4    JURY COULD HAVE LEGALLY DONE NOTHING WITH IT.

5        BECAUSE IT WAS SO MEANINGLESS IS WHY MS. THOMAS MADE

6    SUCH A PERFECT ANIMAL FOR SPORT, BECAUSE THE ONLY PURPOSE WAS

7    THIS INDICTMENT, THIS PRESENTATION, AND THAT GRAND JURY

8    TESTIMONY DID TAKE PLACE IN THE NORTHERN DISTRICT.

9        LET ME SHIFT BACK UP A LITTLE BIT.

10       WHEN WE TALK ABOUT THE EVIDENCE, YOU ARE GOING TO

11   GET TO LEARN FOR THE FIRST TIME WHAT THEY UNCOVERED AT THE

12   BALCO RAID.  IT BEGAN BEFORE THAT.  IT BEGAN IN AUGUST OF 2002

13   WITH AN INVESTIGATION BY SPECIAL AGENT JEFF NOVITZKY.  IT BEGAN

14   WITH, IN ESSENCE, DUMPSTER DIVING AND GOING TO BALCO GARBAGE

15   CANS, WHOLLY LEGAL, TO GET EVIDENCE AGAINST BALCO WHO THEY

16   SUSPECTED OF DISTRIBUTING ANABOLIC STEROIDS TO ATHLETES.

17       BY THE SUMMER OF 2002, TWO IMPORTANT THINGS

18   HAPPENED.  USADA THE ANTI-DOPING AGENCY, BY THEIR OWN

19   INVESTIGATION, THEIR OWN WORK, IDENTIFIED PATRICK ARNOLD AS THE

20   LIKELY MANUFACTURER OF NORBOLETHONE.  NORBOLETHONE WAS A

21   ANABOLIC STEROID -- WITHDRAWN.  NORBOLETHONE WAS A STEROID THAT

22   WAS MANUFACTURED IN 1960'S BY WYETH LABORATORIES BUT NEVER WENT

23   TO MARKET.

24       PATRICK ARNOLD WAS FREQUENT POSTER ON THE INTERNET

25   ABOUT NORBOLETHONE AND OTHER PRODUCTS HE WAS MAKING.

1   MR. ARNOLD, YOU MAY HAVE HEARD, OF WAS THE CREATOR OF ANDRO,

2   WHICH GOT SOME FAME IN 1998 WHEN MARK MACGUIRE BROKE THE HOME

3   RUN RECORD BY USING THIS PROHORMONE WHICH WAS SHORT TO ANDRO.

4   HE WAS A WELL-KNOWN FIGURE.  HE WAS WELL-KNOWN TO USADA, AND

5   USADA INFORMED AGENT NOVITZKY OF HIS CONNECTION TO THIS CASE.

6           THE OTHER THING THAT HAPPENED IS AGENT NOVITZKY,

7   THROUGH HIS ACTIVITIES IN DIVING IN DUMPSTERS, THROUGH HIS

8   SEARCH OF BALCO'S TRASH, WAS ABLE TO UNCOVER THAT BALCO WAS

9   ACTUALLY USING ILLEGAL SUBSTANCES AND HAD GOTTEN E-MAILS FROM

10  THE TRASH AND RECEIPTS FROM THE TRASH BY WHICH HE WAS ABLE TO

11  GET A SURREPTITIOUS SEARCH WARRANT, BY WHICH HE WAS ABLE TO

12  SEARCH THE E-MAIL OF BALCO, OF VICTOR CONTE, WITHOUT MR. CONTE

13  KNOWING IT.

14          THESE E-MAILS HAVE A CONNECTION TO SHOW THAT PATRICK

15  ARNOLD WAS DISTRIBUTING THE CLEAR TO VICTOR CONTE FOR

16  DISTRIBUTION OUT OF THE NORTHERN DISTRICT TO ELITE ATHLETES AND

17  PROFESSIONAL ATHLETES.

18          SO THEY HAVE THE RAID.  THE RAID SHOWS THAT CONTE'S

19  ATHLETES ARE VERY WELL DOCUMENTED.  EACH HAS A DOPING CALENDAR.

20  EACH IS LISTED BY NAME.  THEY HAVE CHECKS FOR THEM.  THERE ARE

21  FED-EX RECEIPTS SHOWING THEM GETTING SENT THE PRODUCTS.

22          THERE'S TWO IMPORTANT SUBSTANCES.  ONE, AGAIN,

23  TESTOSTERONE, IS BANNED BY FEDERAL LAW CONTROLLED BY FEDERAL

24  LAW.  HE'S DEAD TO RIGHTS, AS IS ARNOLD.   THEY ARE ALSO

25  DISTRIBUTING TWO OTHER PRODUCTS, NORBOLETHONE AND THG.

```
 1              ONE OF THE THINGS THE EVIDENCE IS GOING TO SHOW
 2  UNDER TITLE 21, NEITHER NORBOLETHONE NOR THG WAS LISTED AS AN
 3  ANABOLIC STEROID AT ANY POINT RELEVANT TO THIS CASE.  AS A
 4  RESULT OF AGENT NOVITZKY'S WORK, IN OCTOBER 2004 CONGRESS
 5  CHANGED THE LAW AND NOW LISTS BOTH OF THEM.  BUT AS OF THE TIME
 6  MS. THOMAS TESTIFIED, AS OF THE TIME RELEVANT TO ANY ACTIVITY
 7  IN THIS CASE, THESE WERE NOT CONTROLLED BY FEDERAL LAW.
 8              SIMILARLY, THEY WERE NOT BANNED BY THE RULES OF
 9  SPORT, WHICH IS EXACTLY WHY ATHLETES SOUGHT SUCH MATERIALS,
10  BECAUSE EACH SPORT HAD A LIST OF BANNED SUBSTANCES, AND THESE
11  WEREN'T ON THE LIST, AND THEY WANTED TO USE THAT AS A BASIS --
12  USE THEM AND SAY, WELL, UNTIL YOU BAN THEM, WE CAN USE THEM.
13  WHETHER THAT'S RIGHT OR WRONG DOESN'T MATTER FOR THIS TRIAL.
14  WHAT MATTERS IS NEITHER WERE BANNED BY THE RULES OF SPORT AT
15  ANY TIME RELEVANT TO THIS CASE.
16              NOW, WE DISCUSSED HOW THE OTHER ATHLETES CAME IN AND
17  THE OTHER ATHLETES THAT CAME TO THE BALCO GRAND JURY HAD A
18  BALCO RELATIONSHIP.  THESE WERE THE PEOPLE FROM THE DOPING
19  CALENDARS, FROM THE LISTS.  THEY HAD TWO THINGS IN COMMON.
20  THEY WERE CONSISTENT WITH WHO VICTOR CONTE WAS.
21              THEY WERE EITHER, ONE, PROFESSIONAL ATHLETES, TO A
22  MAN MILLIONAIRES, EACH OF THEM MAKING MILLIONS OF DOLLARS A
23  YEAR FOR THEIR PERFORMANCE ON THE ATHLETIC FIELD; AND, TWO,
24  THEY WERE THE ELITE OF THE TRACK AND FIELD WORLD, THE FASTEST
25  MAN IN THE WORLD, THE FASTEST WOMAN IN THE WORLD, THE LONGEST
```

1    SHOTPUTTER.  THESE ARE WHO VICTOR CONTE'S ATHLETES WERE.

2           THERE WAS NO DOPING CALENDARS ABOUT TAMMY THOMAS

3    BECAUSE SHE WAS NOT AN ATHLETE WHO HAD A RELATIONSHIP WITH

4    VICTOR CONTE.  SHE WAS AN OBSCURE ATHLETE WITH NO SPONSORSHIP

5    IN AN OBSCURE SPORT.

6           INDEED, THE GOVERNMENT KNEW THIS.  MR. PARRELLA

7    TALKED ABOUT THE E-MAILS YOU'LL SEE.  AND, AGAIN, THESE E-MAILS

8    WILL SHOW ONE THING VERY CLEARLY.  THEY ESTABLISH THAT THE

9    GOVERNMENT WELL KNEW THAT MS. THOMAS DIDN'T KNOW CONTE AT THAT

10   TIME.

11          THE FIRST E-MAIL MR. PARRELLA SPOKE TO WAS FROM

12   ARNOLD TO CONTE SAYING, I KNOW THE GIRL THEY SNAGGED FOR

13   NORBOLETHONE.  THE EVIDENCE WILL SHOW HE IS REFERRING TO TAMMY

14   THOMAS, BUT IT SHOWS THAT ARNOLD KNEW HER AND HE'S INFORMING

15   VICTOR CONTE THAT HE KNOWS HER.  SO THE INFERENCE WHICH THE

16   GOVERNMENT KNOWS, AND THEY'VE ADMITTED IN PRIOR TESTIMONY

17   BEFORE THE GRAND JURY, IS THAT CONTE DIDN'T KNOW MS. THOMAS AT

18   THAT TIME.  AND WITHIN AN HOUR OF THAT, ARNOLD FAXES A REPORT

19   TO VICTOR CONTE.

20          NOW, VICTOR CONTE, FOR HIS ATHLETES, FOR THE WORK OF

21   THE BALCO GRAND JURY, HIS ATHLETES, VICTOR CONTE TOOK BLOOD

22   TESTS.  VICTOR CONTE TOOK URINE TESTS.  VICTOR CONTE HAD HIS

23   ATHLETES COME IN GIVE THEIR SAMPLES.  AND VICTOR CONTE WOULD

24   SEND THEM TO QUEST LABORATORIES TO HAVE A SCREEN, ARE THESE

25   SUBSTANCES WORKING, WITH QUEST, A REPUTABLE THIRD-PARTY LAB, TO

1    UNCOVER WHAT YOU'RE DOING.

2            AGAIN, THIS EVIDENCE SHOWS THAT ARNOLD KNEW

3    MS. THOMAS, BUT MR. CONTE DIDN'T.  THOMAS HAD NO CONNECTION TO

4    BALCO.

5            BUT THE GOVERNMENT SEIZED UPON THIS EVIDENCE AND

6    PRETENDED IT WAS A CONNECTION.  IT SHOWS SHE'S IN THE MIDDLE.

7    WE NOW HEAR SHE'S A CRITICAL, CRUCIAL WITNESS TO FIGURE OUT HOW

8    THIS WORKS.  THAT IS A MATERIAL FALSE DECLARATION.

9            VICTOR CONTE ON MARCH ON SEPTEMBER 3RD TOLD THEM HOW

10   IT WORKS.  HE TOLD THEM PATRICK ARNOLD MANUFACTURED IT AND SENT

11   IT TO HIM.

12           JAMES VALENTE ON NOVEMBER 3RD, 2003 TOLD THEM HOW IT

13   WORKS.  PATRICK ARNOLD CREATES IT, HE SENT IT TO US.  MILES

14   WERRE KNOWS HOW IT WORKS, GO TALK TO HIM.

15           INDEED, WHEN THE GOVERNMENT FINALLY TALKED TO

16   MR. WERRE DURING A DIFFERENT GRAND JURY INVESTIGATION, THE

17   ARNOLD GRAND JURY INVESTIGATION, WERRE CONFIRMED ALL OF THIS:

18   THE DOCUMENTS THEY HAD ON WERRE AT THE TIME, THE CHECKS, THE

19   RECEIPTS, THE SAME MOUNTAIN OF EVIDENCE.  THE FIRST TIME THEY

20   WENT TO CHECK ON IT, THEY CORROBORATED EVERY BIT OF IT.

21           BUT THEY DIDN'T CALL MS. THOMAS TO THE ARNOLD GRAND

22   JURY.  THAT'S A DIFFERENT GRAND JURY.  THAT'S GRAND JURY 04-1.

23   THEY BROUGHT HER TO THE BALCO GRAND JURY.  THEY WERE

24   INVESTIGATING BALCO.  MS. THOMAS HAD NOTHING TO SAY ABOUT

25   BALCO.

1          SO LET'S LOOK AT WHAT MS. THOMAS DID SAY TO THE

2    GRAND JURY.  AS WE SAID BEFORE, THE EVIDENCE WILL SHOW THE

3    GOVERNMENT WAS SO BENT AND FOCUSED ON CONFIRMING PRIOR

4    TESTIMONY, THEY DIDN'T LISTEN TO HER ANSWERS, AND THEY DIDN'T

5    FOLLOW UP.

6          MS. THOMAS TOLD THE BALCO GRAND JURY SHE TESTED

7    POSITIVE FOR NORBOLETHONE.  THAT'S TRUE.  MS. THOMAS TOLD THE

8    BALCO GRAND JURY SHE KNEW PATRICK ARNOLD.  THE EVIDENCE IS

9    GOING TO COME IN SHE DID DENY KNOWING HIM PRIOR.  SHE'S NOT

10   CHARGED WITH PERJURY BEFORE USADA.  THAT HAS NOTHING TO DO WITH

11   THIS CASE.  WHATEVER SHE TOLD USADA SHE TOLD USADA, AND THEY

12   TOOK HER EFFORTS ON HER AND BANNED HER FOR LIVE.  WHEN ASKED

13   BEFORE THE BALCO GRAND JURY, DO YOU KNOW PATRICK ARNOLD.  YES,

14   SHE DID.  SHE ADMITTED IT.

15         WHAT ELSE DID SHE TELL THEM?  SHE SAID SHE RECEIVED

16   PRODUCTS, NOT FROM ARNOLD, SHE RECEIVED PRODUCTS FROM KELCEY

17   DALTON.  KELCEY DALTON WAS THE LIVE-IN GIRLFRIEND OF PATRICK

18   ARNOLD FOR A TIME.  BY THE TIME MS. THOMAS TESTIFIED, SHE WAS

19   THAN EX-GIRLFRIEND.  SHE TOLD THE BALCO GRAND JURY, I ORDERED

20   1-AD; I ORDERED FROM IT FROM KELCEY DALTON.  THE GOVERNMENT

21   DIDN'T LISTEN:  OKAY, YOU GOT IT FROM ARNOLD THROUGH KELCEY.

22         THEY WENT BACK -- FROM THE REST OF THE TRANSCRIPT,

23   THEY'LL SAY, SO YOU GOT IT FROM ARNOLD.  BUT MS. THOMAS'S

24   TESTIMONY WAS, I GOT IT FROM DALTON.

25         NOW 1-AD, THIS IS A PRODUCT WE ARE GOING TO TALK

1    ABOUT, IT'S A LEGAL PROHORMONE.  IT'S NOW BEEN BANNED BY THE

2    SAME LAW IN OCTOBER 2004.  IT'S BEEN ADDED TO THE LIST.  BUT

3    WHAT A LEGAL PROHORMONE IS, IT'S A SUBSTANCE WHICH IS A LEGAL

4    SUPPLEMENT TO HAVE, BUT IF YOU INGESTED IT, YOUR OWN BODY'S

5    PROCESSES WOULD CONVERT IT INTO TESTOSTERONE.

6            ANY ATHLETE THAT'S BEING TESTED REGULARLY, AS

7    MS. THOMAS WAS AT THE TIME, WOULD THEN HAVE AN ELEVATED

8    TESTOSTERONE LEVEL.  WHEN YOU EXCEED A SIX-TO-ONE RATIO, IT'S

9    CONSIDERED A POSITIVE TEST.  SO ALTHOUGH SHE COULD LEGITIMATELY

10   BUY THIS PRODUCT.  IT WAS FOR SALE AT GNG AND OTHER

11   OVER-THE-COUNTER RETAILERS.  IF SHE TOOK IT, SHE WOULD RISK A

12   TEST, AND SHE WAS CLEAR THE LAST THING SHE EVER WANTED TO DO

13   AGAIN WAS TEST DIRTY, AND THAT'S ABSOLUTELY TRUE, BECAUSE A

14   DIRTY TEST FOR AN ATHLETE, ONE MORE DIRTY TEST FOR HER WOULD

15   LEAD TO A BAN FOR LIFE.

16           MS. THOMAS TOLD HER THAT DALTON SENT THE 1-AD, BUT

17   THE GOVERNMENT IGNORED THE ANSWER, AND THEY TRANSLATED, AS YOU

18   YOU WILL HEAR.  THOMAS TOLD THE GRAND JURY SHE SPOKE ALMOST

19   NEVER TO PATRICK AFTER HER INITIAL CONVERSATIONS WITH HIM.  SHE

20   SPOKE TO DALTON.

21           THE BICYCLE YOU HEARD ABOUT THAT IS GOING TO COME IN

22   IN TESTIMONY WAS A BICYCLE THAT MS. THOMAS GAVE TO DALTON, AND

23   NO MATTER OF OFTEN SHE SAID DALTON, THEY DIDN'T FOLLOW UP.

24   THEY DIDN'T ASK.  THEY JUST WANTED TO HEAR ARNOLD.

25           NOW, INTERESTING ABOUT THE GRAND JURY, AFTER YOU

1  HEAR HIS EX-GIRLFRIEND WHO'S LIVING WITH HIM AND HAS ALL THIS

2  KNOWLEDGE AND INFORMATION ABOUT HIS ACTIVITIES; AGAIN, PATRICK

3  ARNOLD, IF THERE'S AN INVESTIGATION, IF THIS IS A CRITICAL

4  WITNESS, WE'D CALL HER, RIGHT?  THE EVIDENCE WILL BE THAT THE

5  BALCO GRAND JURY WAS DISINTERESTED IN WHAT KELCEY DALTON HAD TO

6  SAY.  THEY NEVER CALLED HER.  THAT'S BECAUSE THEY WEREN'T

7  INVESTIGATING PATRICK ARNOLD.  THEY WERE INVESTIGATING VICTOR

8  CONTE.  THAT WEALTH OF INFORMATION WAS LEFT UNTAPPED.

9           AND WHEN THE ARNOLD GRAND JURY WAS CONVENED, AGAIN

10  THEY DIDN'T CALL KELCEY DALTON TO THE ARNOLD GRAND JURY WHEN

11  THEY WERE SPECIFICALLY INVESTIGATING PATRICK ARNOLD.  WHY?

12  BECAUSE THEY DIDN'T NEED THAT EVIDENCE.  THEY HAD THE EVEREST

13  WE TALKED ABOUT EARLIER.

14           THE ONLY GRAND JURY THEY CALLED MS. DALTON TO WAS

15  THOMAS GRAND JURY, THE LAST ONE.  THEY CALLED HER AS THE LAST

16  WITNESS, AFTER ARNOLD'S TESTIMONY AT THE GRAND JURY

17  CORROBORATED MS. THOMAS'S.  PATRICK ARNOLD TESTIFIED, WHEN SHE

18  CALLED UP, SHE SPOKE TO MY GIRLFRIEND, KELCEY.  ALL THE TIME

19  THE CONVERSATIONS ARE WITH KELCEY.  THEY DIDN'T FOLLOW UP.

20           BY THE TIME THEY ARE FINISHED WITH THE ARNOLD

21  TESTIMONY, THEY REALIZED, WE BETTER GET DALTON IN HERE, WE

22  BETTER SEE IF WE CAN CLOSE THIS, AND THEY DON'T.  ARNOLD'S

23  TESTIMONY CONFIRMS THE SAME.

24           MR. PARRELLA JUST TOLD YOU, SHE'S ONLY TALKING TO

25  KELCEY DALTON ABOUT STEROIDS, ABOUT THEIR USE, ABOUT THEIR

1    RESULTS.  THOSE ARE CONVERSATIONS WITH KELCEY DALTON, AND

2    BEFORE THE BALCO GRAND JURY THE GOVERNMENT SIMPLY DIDN'T ASK

3    ABOUT THEM.

4            NOW, YOU'LL GET TO HEAR THE GRAND JURY TRANSCRIPT.

5    YOU SHOULD PAY ATTENTION VERY, VERY CAREFULLY.  ILLUSTRATIVE OF

6    THE FOCUS OF THE GOVERNMENT IS A QUESTION LIKE THIS.

7            "QUESTION:  AFTER THIS CIRCUMSTANCE WHERE YOU

8        SENT THE 1-AD BACK TO MR. ARNOLD, DID YOU EVER HAVE

9        ANY DEALINGS WITH HIM IN GETTING PRODUCTS OR SERVICES

10       FROM HIM.

11           "NO."

12           STATEMENT IS COMPLETELY TRUE.  THOMAS DEALT WITH

13   DALTON.

14           YOU'LL SEE THE TESTIMONY BEFORE THIS.  SHE RETURNED

15   THE 1-AD FROM DALTON AND SHE GOT THE 1-AD FROM DALTON.  AGAIN,

16   THEY ARE TRANSLATING WHAT THEY WANT TO HEAR, BUT ARNOLD SAID

17   THE SAME THING TO THE GRAND JURY.  DALTON SAID THE SAME THING

18   TO THE GRAND JURY, AND THAT'S WHY THIS STATEMENT IS ISN'T

19   CHARGED.  INDEED, AFTER THOSE INITIAL MEETINGS, ALL THE CONTACT

20   WITH IS DALTON AND MS. THOMAS ABOUT ANY SUBSTANCE SHE USED.

21           THE FIRST CHARGE IN THIS CASE IS AS FOLLOWS; THE

22   QUESTION IS ALLEGED -- THE FALSE ANSWER COMES FROM THIS

23   QUESTION:

24           "DID YOU EVER, BESIDES THIS ONE INCIDENT OF

25       GETTING 1-AD FROM MR. ARNOLD, DID YOU EVER GET ANY

1          OTHER SERVICES FROM MR. ARNOLD OR PRODUCTS?

2              "ANSWER:  NO, NO OTHER PRODUCTS."

3              AND THE FOLLOW-UP QUESTION FOR THE LAWYER OR ANYONE

4      IS:  "WELL, WHAT OTHER SERVICES DID YOU GET FROM MR. ARNOLD?"

5      THAT WASN'T ASKED.

6              BUT THE QUESTION IS TRUE BECAUSE KELCEY FIRST TOLD

7      HIM THE PREMISE IS WRONG, SHE GOT THE 1-AD FROM KELCEY.  AND

8      EVEN -- AND, TWO, SHE TOLD THEM KELCEY SENT IT TO HER.

9              EVEN WORSE, THE RESPONSE FROM THE GOVERNMENT, AS

10     OPPOSED TO FOLLOWING UP WITH, "WHAT OTHER SERVICES DID YOU

11     GET," THERE'S A CUE THERE, WE SHOULD PAY ATTENTION, WE'RE

12     SEEKING INFORMATION, WAS A VERY EXITED MOMENT FOR THE

13     PROSECUTION.  IMMEDIATELY THEREAFTER:  OH, IF THE ANSWER IS NO,

14     LET'S GO THROUGH IT QUICKLY.  AND THEN HE ASKS HER A SERIES OF

15     QUESTIONS.  THEY'RE NOT CHARGED HERE.

16             HE'S SO EXCITED, HE'S NOT PAYING ATTENTION.  HE'S

17     NOT LISTENING TO WHAT SHE'S TELLING THEM.  BUT THAT'S ALL THEY

18     WANTED IN THE CASE.  THEY GOT IT.  THEY HAD THE CHANCE TO HAVE

19     THE TRIAL, BUT THEY DON'T HAVE THE EVIDENCE THESE STATEMENTS

20     ARE INACCURATE BECAUSE THEY ARE ALL LITERALLY TRUE.  IF THEY

21     HAD LISTENED, THEY COULD HAVE SEEN WHAT MS. THOMAS HAD TO

22     OFFER, THEY JUST WEREN'T INTERESTED.  IN FACT, ALL FIVE

23     QUESTIONS IN THIS CASE SUFFER FROM THESE FLAWS.

24             THE SECOND QUESTION IS:

25             "DID YOU EVER, IN ADDITION TO ANYTHING I'VE SAID,

```
 1        GET ANY KIND OF WHAT YOU KNEW TO BE BANNED OR ILLEGAL

 2        PERFORMANCE-ENHANCING DRUGS FROM MR. ARNOLD?"

 3            NONE OF THE SUBSTANCES SHE'S ACCUSED OF USING WERE

 4   BANNED, NONE WERE ILLEGAL.  SHE DIDN'T GET THEM FROM ARNOLD.

 5   THREE STRIKES.

 6            THE THIRD QUESTION SHE ASKED:

 7        "DID YOU TAKE ANYTHING PATRICK ARNOLD GAVE YOU?"

 8            HE DIDN'T GIVE HER ANYTHING, AND SHE CERTAINLY

 9   DIDN'T TAKE ANYTHING FROM HIM.

10            THEY'RE STRETCHING SO MUCH TO FIND ANYTHING IN

11   TRANSCRIPT BECAUSE THERE'S NOTHING THERE.  INDEED, THEIR CASE

12   IS SO WEAK, LET'S GO TO QUESTIONS FOUR AND FIVE, WHICH HAVE

13   NOTHING TO DO WITH THE BALCO GRAND JURY, AND EVEN BY THE

14   GOVERNMENT'S NEW TRIAL THEORY, NOTHING TO DO WITH ARNOLD.

15            THEY ASK TWO QUESTIONS.  COUNTS FOUR AND FIVE ARE,

16   IN ESSENCE, HAVE YOU EVER TAKEN ANABOLIC STEROIDS.  AS YOU

17   HEAR, THE EVIDENCE IN THE CASE WILL NOT BE THAT ANYTHING SHE

18   GOT FROM ARNOLD WAS AN ANABOLIC STEROID.  IT WAS NOT.  ANYTHING

19   SHE GOT FROM DALTON WAS AN ANABOLIC STEROID.  IT WAS NOT.  THAT

20   EITHER ONE OF THESE SUBSTANCES WERE DEFINED BY THAT.

21            INSTEAD, THEY WANT TO BRING IN HER PERSONAL

22   PHYSICIAN TO TALK ABOUT 1998 AND 1999 WHEN SHE HAD INGESTED

23   TESTOSTERONE.  NOW, OBVIOUSLY, THAT HAS NOTHING TO DO WITH THE

24   BALCO GRAND JURY'S INVESTIGATION.  WHETHER OR NOT IN COLORADO

25   OR FLORIDA SHE USED TESTOSTERONE HAS NOTHING TO DO WITH WHAT
```

 1  THE PATRICK ARNOLD IS A CRITICAL WITNESS IS THE CENTER OF THIS

 2  CASE.  WHETHER SHE INGESTED ANYTHING PERIOD IS IMMATERIAL,

 3  BECAUSE THE GRAND JURY CAN'T INDICT ANYONE BECAUSE OF WHAT

 4  MS. THOMAS PUT IN HER BODY.

 5          BUT IT SHOWS THAT IN THIS EFFORT TO MAKE THIS

 6  PROSECUTION, THAT THIS IMMATERIAL EVIDENCE IS WHAT THEY'RE

 7  RELYING ON.

 8          BUT WHAT'S WORSE IS, IF WE LOOK AT THE GRAND JURY

 9  TRANSCRIPT, THAT'S NOT WHAT THEY SAID TO MS. THOMAS THAT DAY.

10  WHEN THEY ASKED MS. THOMAS THESE QUESTIONS ABOUT ANABOLIC

11  STEROIDS, SHE INTERJECTD AND SAID, WELL, THAT'S REFERRING TO

12  198 AND 1999, WHEN I HAD PUT FORWARD TO MY ENDOCRINOLOGIST,

13  THAT'S MEDICAL RECORDS ARE REFERRING TO.

14          AND THE QUESTIONER IMMEDIATELY INTERRUPTS HER:

15          "RIGHT, I UNDERSTAND THAT PRIOR ONE, BUT IN

16          2002 -- AND I'VE ASKED IT, BUT I'LL ASK IT, AND THEN

17          WE'LL BE DONE, OR AT LEAST I'LL BE DONE.  I MEAN, DID

18          PATRICK ARNOLD GIVE YOU ANYTHING THAT WAS A STEROID?"

19          AND YOU'LL SEE FROM THE TRANSCRIPT WHAT THE

20  QUESTIONER IS TELLING MS. THOMAS THEN IS, WE DON'T CARE ABOUT

21  1998 AND 1999, WE DON'T CARE ABOUT YOUR TESTOSTERONE USE, WE'RE

22  INVESTIGATING BALCO, WE'RE INVESTIGATING ARNOLD.

23          BUT NOW AT TRIAL, THREE YEARS LATER, THEY'RE SAYING

24  THAT LIMITATION SHOULD NOT APPLY TO THE PETIT JURY, THAT YOU

25  SHOULD NOT LOOK AT IT, BECAUSE SHE HAD PREVIOUSLY INGESTED

1    STEROIDS.

2          THE TRANSCRIPT WILL SHOW THEY INTERRUPTED HER.  THE

3    TRANSCRIPT WILL SHOW SHE TRIED TO EXPLAIN.  THE TRANSCRIPT WILL

4    SHOW THEY KNEW IT WASN'T RELEVANT AND THEY KNEW IT BY POINTING

5    HER TO PATRICK ARNOLD.  IT WILL SHOW THEY HAVE A VERY WEAK

6    CASE, WHEN YOU ARE LEADING WITH AN ISSUE OF WHETHER HER

7    TESTOSTERONE USE WAS RELATING TO THE WORK OF THE BALCO GRAND

8    JURY.

9          I'M ONLY GOING TO TOUCH BRIEFING ON COUNT SIX, THIS

10   IS THE OBSTRUCTION COUNTS.  BECAUSE THE EVIDENCE WILL SHOW THAT

11   EACH OF THESE FIVE STATEMENTS IS LITERALLY TRUE, ESPECIALLY IN

12   THE CONTEXT OF THE WORK OF THE BALCO GRAND JURY, BECAUSE THE

13   EVIDENCE WILL SHOW THAT EACH OF THESE QUESTIONS WAS IMMATERIAL

14   TO THE BALCO GRAND JURY BECAUSE THEY WERE NOT INVESTIGATING

15   PATRICK ARNOLD, YOU CAN'T MEET ANY OF THE PREDICATES FOR THE

16   OBSTRUCTION COUNT, WHICH IS YOU HAVE TO BASE IT ON THE FALSE

17   STATEMENT HERE, AND THERE ARE NONE.  BUT EVEN IF THEY COULD, IT

18   WOULDN'T MATTER, BECAUSE SHE DIDN'T OBSTRUCT ANY JUSTICE.

19          THE BALCO DEFENDANTS, AFTER THE WORK OF THE BALCO

20   GRAND JURY WAS DONE, THEY ALL PLEADED GUILTY.

21          THEN CONVENED THE ARNOLD GRAND JURY.  THE ARNOLD

22   GRAND JURY RELIED ON THE SAME EVIDENCE OBTAINED IN THE

23   SEPTEMBER 3RD RAID.  THEY FILED CHARGES AGAINST MR. ARNOLD.  HE

24   PLEADED GUILTY ALMOST IMMEDIATELY.  HE DIDN'T EVEN FILE A

25   MOTION.

1           THEY WERE, ALL AS I SAID, DEAD TO RIGHTS.

2           AT THE END WHAT YOU'LL SEE IS SHE OBSTRUCTED NOTHING

3  AND SHE ANSWERED ACCURATELY.  WHATEVER FLAWS ARE IN THE

4  PRESENTATION BEFORE THE GRAND JURY, THOSE FLAWS BEGIN AND END

5  AT THIS TABLE.  THEY COULD HAVE GOT MORE INFORMATION WITH HER

6  IF THEY WERE INTERESTED, BUT THEIR GOAL OF OBTAINING THIS

7  INDICTMENT BLINDED THEM FROM LISTENING AND BLINDED THEM FROM

8  ASKING THE RIGHT QUESTIONS.  BECAUSE IT REST HERE AND STAYS

9  HERE, THEY WILL NOT BE ABLE TO MUSTER A CONVICTION.

10          THE EVIDENCE WILL ALSO SHOW IN THIS CASE THAT TAMMY

11 THOMAS HAD NO MOTIVE TO DO ANYTHING BUT BE ACCURATE.  DON'T GET

12 ME WRONG, SHE WAS A RECALCITRANT WITNESS.  THAT'S ABSOLUTELY

13 TRUE.  YOU ARE GOING TO SEE IN THIS TRIAL RECALCITRANT WITNESS

14 AFTER RECALCITRANT WITNESS.  IT'S WHAT WITNESSES DO.  IT IS THE

15 QUESTIONER'S RESPONSIBILITY TO PIN THEM DOWN TO GET THE

16 INFORMATION FROM THEM.  THAT RESPONSIBILITY RESTS HERE.  YOU'LL

17 SEE FROM EVERY WITNESS HERE, WHAT DO YOU MEAN BY THAT?  THEY'LL

18 BOB.  THEY'LL WEAVE.  IT'S WHAT IS WITNESSES DO AS LONG AS

19 THEIR TESTIMONY IS ACCURATE.

20          SHE HAD NO MOTIVE TO PROTECT ANYONE AT THIS POINT IN

21 TIME.  THIS OBSCURE ATHLETE FROM THIS OBSCURE SPORT HAD

22 NOTHING.  SHE WAS BANNED FOR LIFE.  AND THOUGH SHE MAY HAVE NOT

23 WANTED TO BE WITH THESE PEOPLE IN THIS SITUATION, SHE HAD NO

24 MOTIVE TO LIE.  SHE HAD EVERYTHING TO LOSE.  SHE WALKED THAT

25 LINE AND SHE PERFORMED ADEQUATELY.

1          INDEED, MS. THOMAS WAS ASKED MORE THAN 200 QUESTIONS

2   BEFORE THE BALCO GRAND JURY.  THE GOVERNMENT ASSERTS FIVE OF

3   THEM ARE FALSE.  BY THAT ANALYSIS SHE SCORES AN A-PLUS.  WE

4   AGREE.  INDEED, WE ARE GOING TO SHOW SHE SCORED A HUNDRED

5   PERCENT OF EVEN THE FIVE THEY CALLED THE FOUL LINE WERE

6   ANSWERED ACCURATELY.

7          THIS CASE ISN'T EVEN CLOSE.  AT THE END OF IT, WE

8   ARE GOING TO ASK YOU TO RETURN THE ONLY POSSIBLE VERDICT YOU

9   CAN BASED ON THE EVIDENCE, AND THAT IS A VERDICT OF NOT GUILTY

10  ON ALL SIX COUNTS.

11          THANK YOU VERY MUCH.

12          **THE COURT:**  THANK YOU, MR. BALOGH.

13          WELL, LADIES AND GENTLEMEN, THAT COMPLETES THE

14  OPENING STATEMENTS, WHICH MEANS WE COMPLETE OUR DAY TODAY.

15          AT THIS POINT, WE'LL TAKE A RECESS, AND I'LL LET YOU

16  GO HOME, AND WE'LL RESUME AT 8:30 TOMORROW MORNING WITH THE

17  FIRST WITNESS IN THIS CASE.

18          AS I'VE TOLD YOU, I KNOW PEOPLE ARE GOING TO BE VERY

19  CURIOUS TO FIND OUT FROM YOU WHAT YOU'RE UP TO.  IT'S VERY,

20  VERY IMPORTANT YOU NOT TALK TO ANYONE ABOUT THIS CASE.  YOU MAY

21  SAY YOU HAVE BEEN SELECTED TO SIT ON A JURY, IT IS GOING TO BE

22  A COUPLE OF WEEKS.  DON'T TELL THEM ANYTHING MORE THAN THAT.

23  DON'T LET THEM ASK YOU QUESTIONS.  DON'T LET THEM PRY IT OUT OF

24  YOU.  IF ANYONE SHOULD TRY TO ASK YOU QUESTIONS AND KEEP AT IT,

25  LET ME KNOW, BECAUSE IT'S VERY IMPORTANT THAT THAT NOT HAPPEN

PROCEEDINGS

1   UNTIL THE CASE IS ALL OVER WITH.  WE WANT TO MAKE SURE YOUR

2   MINDS ARE OPEN THE WHOLE TIME.

3              SO HAVE A GREAT EVENING.  WE WILL SEE YOU 8:30

4   TOMORROW MORNING.  THANK YOU.

5              (THE JURY EXITED THE COURTROOM.)

6              **THE COURT:**  IS THERE ANYTHING ELSE ON THE RECORD

7   BEFORE WE LET THE REPORTER GO?

8              **MR. BALOGH:**  NOT FROM THE DEFENSE, YOUR HONOR.

9              **THE COURT:**  I'LL SEE YOU ALL AT 8:30 TOMORROW

10  MORNING.

11             (PROCEEDINGS ADJOURNED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4          I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING PROCEEDINGS IN CR 06-803 SI, UNITED

7    STATES OF AMERICA V. TAMMY THOMAS, WERE REPORTED BY ME, A

8    CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED

9    UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A

10   FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY

11   ME AT THE TIME OF FILING.

12          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

13   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

14   COURT FILE.

15

16                    /S/ JOAN MARIE COLUMBINI

17             JOAN MARIE COLUMBINI, CSR 5435, RPR

18                  TUESDAY, JUNE 24, 2008

19

20

21

22

23

24

25