1                                   VOLUME 4

2                            PAGES 684 – 932

3             UNITED STATES DISTRICT COURT

4           NORTHERN DISTRICT OF CALIFORNIA

5        BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

6  UNITED STATES OF AMERICA,    )
                                )

7          PLAINTIFF,     )
                                )

8   VS.                )  NO. CR 06-0803 SI
                                )

9  TAMMY A. THOMAS,        )
                                )  SAN FRANCISCO, CALIFORNIA

10         DEFENDANT.     )  THURSDAY, MARCH 27, 2008
  _____)

11

12             **TRANSCRIPT OF TRIAL PROCEEDINGS**

13  **APPEARANCES:**

14  FOR THE GOVERNMENT:     JOSEPH P. RUSSONIELLO
                            UNITED STATES ATTORNEY

15                            150 ALMADEN ROAD, SUITE 900
                            SAN JOSE, CALIFORNIA  95113

16               **BY:**  **JEFFREY DAVID NEDROW, ESQUIRE**
                     **MATTHEW A. PARRELLA, ESQUIRE**

17

18  FOR DEFENDANT:         COLEMAN & BALOGH, LLP
                            255 KANSAS STREET, SUITE 340

19                            SAN FRANCISCO, CALIFORNIA  94103
               **BY:**  **ETHAN A. BALOGH, ESQUIRE**

20

21

22  **REPORTED BY:   JOAN MARIE COLUMBINI, CSR 5435, RPR**
          OFFICIAL COURT REPORTER, U.S. DISTRICT COURT

23

24

25

1            <u>**PROCEEDINGS; THURSDAY, MARCH 27, 2008**</u>

2

3            (PROCEEDINGS HELD IN OPEN COURT IN THE PRESENCE OF

4            THE JURY)

5        **THE COURT:**  WELCOME BACK, LADIES AND GENTLEMEN.  YOU

6    MAY BE SEATED.

7            ALL RIGHT.  MR. PARRELLA, THE GOVERNMENT MAY CALL

8    ITS NEXT WITNESS.

9        **MR. PARRELLA:**  THANK YOU, YOUR HONOR.  THE

10   GOVERNMENT WILL CALL BRIAN BISHOP.

11            (THE WITNESS' PHOTOGRAPH WAS TAKEN.)

12                    **BRIAN BISHOP,**

13   HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

14   DULY SWORN AND EXAMINED AS FOLLOWS:

15        **THE WITNESS:**  I DO.

16        **THE CLERK:**  IF YOU COULD PLEASE STATE YOUR FULL NAME

17   FOR THE RECORD?

18        **THE WITNESS:**  BRIAN CARL BISHOP.

19        **THE CLERK:**  B-R-I- ?

20        **THE WITNESS:**  YES.

21        **THE CLERK:**  I'M SORRY.

22        **MR. PARRELLA:**  THANK YOU, YOUR HONOR.

23            <u>**DIRECT EXAMINATION BY MR. PARRELLA**</u>

24   **BY MR. PARRELLA**

25   **Q**   GOOD MORNING, MR. BISHOP.

1   **A**   GOOD MORNING.

2   **Q**   CAN YOU TELL US WHERE YOU'RE EMPLOYED?

3   **A**   WORK AT UCLA OLYMPIC LABORATORY.

4   **Q**   HOW LONG HAVE YOU BEEN EMPLOYED THERE?

5   **A**   SINCE 2001.

6   **Q**   WHAT ARE YOUR DUTIES AT UCLA OLYMPIC LAB?

7   **A**   I'M A RECEIVING CHEMIST, RECEIVING THE SAMPLES, ACCESSION

8   THEM AND ALIQUOT THEM.

9   **Q**   WERE YOU A RECEIVING CHEMIST IN 2002?

10  **A**   YES.

11  **Q**   AND HAVE YOU MAINTAINED THAT PARTICULAR TITLE THROUGHOUT

12  YOUR EMPLOYMENT?

13  **A**   YES.

14  **Q**   OKAY.  LET ME DRAW YOUR ATTENTION TO APRIL OF 2002.

15            **MR. PARRELLA:**  I'M GOING TO SHOW THE WITNESS

16  PORTIONS OF GOVERNMENT EXHIBIT 12.  THOSE PORTIONS WILL BE,

17  LOOKING AT THE BOTTOM OF IT, A CHAIN OF CUSTODY DOCUMENTATION

18  ON THE BOTTOM WITH NUMERAL -- EXCUSE ME -- NUMERAL FOUR,

19  NUMERAL FIVE, AND NUMERAL 12, IN THE CENTER OF THE BOTTOM.

20  **BY MR. PARRELLA**

21  **Q**   MR. BISHOP, CAN YOU TAKE WHAT'S BEEN MARKED -- EXCUSE ME --

22  PAGE 4 OF GOVERNMENT EXHIBIT 12?  TELL ME IF YOU RECOGNIZE

23  THAT.

24  **A**   YES.

25  **Q**   WHAT IS THAT?

1  **A**   THIS IS A BOTTLE CHAIN OF CUSTODY FOR THE PARTICULAR

2  BOTTLE, UY 304.

3  **Q**   AND WHAT DOES UY 304 REFER TO?

4  **A**   THAT IS A LABORATORY CODE THAT IS GIVEN WHEN THE SAMPLE

5  ARRIVES AT THE LABORATORY.

6  **Q**   AND DO YOU KNOW THE IDENTITY OF THAT DONOR?

7  **A**   NO.

8  **Q**   SO, COULD YOU TAKE THE CHAIN OF CUSTODY AND TAKE A LOOK AT

9  THAT AND TELL US WHETHER YOU HAD ANY INTERACTION WITH BOTTLE A

10 OF UY 304 ON OR ABOUT APRIL 17TH, 2002?

11 **A**   YES, I DID.

12 **Q**   WHAT DID YOU DO?

13 **A**   I TAKE -- IT WAS RELEASED BY THE COLD ROOM.  I TOOK IT FROM

14 THE COLD ROOM.  IT WAS RELEASED TO ME FOR THE PURPOSE OF

15 ALIQUOTING IN ROOM 108.  THEN THAT SAME DAY I TOOK IT AND

16 PLACED IN THE POSITIVE FREEZER FOR STORAGE.

17 **Q**   OKAY.  SO JUST TO BE CLEAR, YOU ALIQUOTED BOTTLE A AND

18 RETURNED BOTTLE A TO THE ABOVE FREEZER?

19 **A**   THAT IS CORRECT.

20 **Q**   COULD YOU EXPLAIN TO THE JURY WHAT AN ALIQUOT IS?

21 **A**   BASICALLY, THAT'S WHEN THERE IS A TEST REQUESTED FOR A

22 SAMPLE, THE SAMPLE BOTTLE IS TAKEN AND TUBES ARE MADE UP WITH

23 URINE FOR THE PARTICULAR TEST THAT IS -- THAT WAS REQUESTED.

24 **Q**   DID YOU HAVE INTERACTION WITH BOTTLE A OF UY 304 AGAIN IN

25 2006?

1  **A**   YES.

2  **Q**   DO YOU RECALL HOW THAT CAME ABOUT?

3  **A**   NO, I DON'T RECALL EXACTLY HOW THAT CAME ABOUT, BUT I'M

4  SURE I WAS GIVEN A REQUEST TO ALIQUOT THAT SAMPLE.

5  **Q**   SO WHAT DID YOU DO WITH BOTTLE A IN 2006?

6  **A**   I REMOVED IT FROM THE POSITIVE FREEZER, ALIQUOTED IT FOR

7  WHATEVER PURPOSE WAS REQUESTED, THEN STORED IT BACK INTO THE

8  POSITIVE FREEZER ONCE AGAIN.

9  **Q**   WHAT DATE WAS THAT?

10  **A**   OCTOBER 26TH, 2006.

11  **Q**   DID YOU HAVE CONTACT WITH BOTTLE A AGAIN?

12  **A**   YES, I DID.

13  **Q**   WHEN WAS THAT?

14  **A**   THAT WAS NOVEMBER 14, 2006.

15  **Q**   WHAT DID YOU DO ON THAT DAY WITH IT?

16  **A**   ON THAT DAY I REMOVED IT FROM THE POSITIVE FREEZER, TO ME

17  FOR THE PURPOSE OF ALIQUOTING AND CONFIRMATION.  THEN I

18  RETURNED IT BACK TO THE POSITIVE FREEZER FOR STORAGE ON THE

19  SAME DAY, NOVEMBER 14, 2006.

20  **Q**   TO BE CLEAR, ON OCTOBER 26, 2006, THERE'S AN ALIQUOT,

21  WHAT'S CALLED AN ALIQUOT, AND THEN ON NOVEMBER 14TH, 2006, IT'S

22  AN ALIQUOT CONFIRMATION?

23  **A**   RIGHT.

24  **Q**   IS THERE ANY DIFFERENCE IN THE ACTUAL PROCEDURE, WHAT YOU

25  DO?

1    A    YEAH.

2    Q    WHAT IS THAT?

3    A    ON OCTOBER 26TH, THE ALIQUOT WOULD BE FOR A SCREEN.  THAT

4    WOULD BE AN INITIAL SCREEN FOR WHATEVER ASSAY WAS REQUESTED.

5    AND THEN ON NOVEMBER 14TH, 2006, THE ALIQUOTING -- THE

6    CONFIRMATION, WE WOULD ALIQUOT A CONFIRMATION IN THE CASE THAT

7    A SCREEN WAS POSITIVE.

8    Q    SO YOU KNEW WHEN YOU ARE DOING AN ALIQUOT CONFIRMATION THAT

9    THE PRIOR SCREEN HAD BEEN POSITIVE?

10   A    THAT IS CORRECT.

11   Q    AND WHAT -- HOW DID YOUR JOB DIFFER IN THE ALIQUOT FROM THE

12   ALIQUOT STAGE WHEN YOU WERE DOING THE ALIQUOT CONFIRMATION?

13   A    WELL, FOR THE SCREEN ALIQUOT, WE WOULD ALIQUOT SEVERAL

14   DIFFERENT SAMPLES, JUST AS WE WOULD WHEN THEY COME INTO THE

15   LABORATORY FOR AN INITIAL SCREEN.  AND THEN FOR THE -- FOR A

16   POSITIVE SAMPLE, AN ALIQUOTING OF A CONFIRMATION, A MEMO WOULD

17   BE ISSUED FOR THAT PARTICULAR SAMPLE AND THAT SAMPLE ONLY.

18   Q    OKAY.

19   A    AND WE WOULD ALIQUOT IT ACCORDING TO A MEMO THAT WOULD

20   BE -- THAT WAS ISSUED.

21   Q    LET ME SEE IF I HAVE IT STRAIGHT.  THE INITIAL ALIQUOT,

22   THIS SAMPLE, UY 304, MIGHT BE RUN ON A RACK WITH UY 305, 306,

23   307?

24   A    THAT'S CORRECT, YES.

25   Q    AND ON THE ALIQUOT CONFIRMATION, IT'S ONLY AN ALIQUOT FROM

1  UY 304?

2  A    UY 304 FOR A PARTICULAR SUBSTANCE.

3  Q    ASIDE FROM CONTROLS?

4  A    RIGHT.

5  Q    OKAY.  THANK YOU.

6         SO AFTER -- AFTER YOU DO THE ALIQUOT CONFIRMATION,

7  YOU MIGHT HAVE TESTIFIED TO THIS, BUT WHAT DID YOU DO WITH THE

8  BOTTLE A?

9  A    AFTER ALIQUOTING THE CONFIRMATION, THE BOTTLE WAS PLACED

10 BACK INTO THE POSITIVE FREEZER FOR STORAGE.

11 Q    THANK YOU.  COULD YOU TURN TO THE CHAIN OF CUSTODY

12 DOCUMENTATION WHICH HAS A FIVE ON THE VERY BOTTOM?

13 A    YES.

14 Q    THANK YOU.  THAT IS, JUST TO MAKE SURE WE'RE ON THE SAME

15 PAGE, ALIQUOT CHAIN OF CUSTODY FOR ALIQUOT FROM BOTTLE A?

16 A    THAT'S CORRECT, YES.

17 Q    OKAY.  SO COULD YOU TELL US ON OCTOBER 26TH, 2006, WHAT, IF

18 ANYTHING, YOU DID WITH THE ALIQUOT YOU TOOK FROM BOTTLE A?

19 A    OKAY.  WELL, THE ALIQUOT FOR BOTTLE A -- BASICALLY, ONCE

20 THE ALIQUOT IS MADE, I WOULD TAKE THE ALIQUOT AND PLACE IT IN

21 REFRIGERATOR 12 WHERE WE STORE ALIQUOTS FOR THE CHEMIST TO

22 TAKE, AND IT'S JUST PLACED IN THERE FOR STORAGE.

23 Q    THAT IS SO THE PERSON DOWN THE LINE, WHOEVER THAT MIGHT BE,

24 KNOWS WHERE IT IS?

25 A    EXACTLY, YES.

1    Q    THANKS.  DID YOU HAVE ANY OTHER CONTACT WITH THE

2    OCTOBER 26TH, 2006 ALIQUOT FROM BOTTLE A?

3    A    NO.

4    Q    I MEAN AFTER YOU PUT IT IN REFRIGERATOR 12.

5    A    NO, I DON'T.

6    Q    OKAY.  THANK YOU.

7         COULD YOU TAKE THE NEXT PAGE, WHICH IS 12, AND IT'S

8    TITLED, "CHAIN OF CUSTODY DOCUMENTATION, ALIQUOT FROM BOTTLE A

9    INDIVIDUAL CONFIRMATION"?

10   A    YES.

11   Q    WHAT IS THIS DOCUMENT?

12   A    ONCE A SAMPLE SCREENS POSITIVE AND A MEMO IS ISSUED FOR A

13   CONFIRMATION, I WOULD ALIQUOT THE SAMPLE FOR A CONFIRMATION,

14   AND ON THIS PARTICULAR DATE OF NOVEMBER 14, 2006, I ALIQUOTED

15   THE SAMPLE AND PLACED IT IN -- PLACED THE ALIQUOTS IN

16   REFRIGERATOR 12 FOR STORAGE.

17   Q    DID YOU HAVE ANY FURTHER CONTACT WITH THAT SAMPLE AFTER

18   THAT?

19   A    NO.

20   Q    I SHOULD SAY -- WE ARE TALKING ABOUT THE ALIQUOT

21   CONFIRMATION HERE.  DID YOU HAVE ANY FURTHER CONTACT WITH THE

22   ALIQUOT CONFIRMATION?

23   A    NO.

24   Q    ARE THESE FORMS THAT ARE THE THREE PAGES IN FRONT OF YOU,

25   THESE FORMS THAT ARE KEPT IN THE REGULAR COURSE OF BUSINESS OF

1    THE UCLA OLYMPIC LAB?

2    **A**    YES.

3    **Q**    AND THEY ARE REQUIRED TO BE KEPT?

4    **A**    YES.

5              **MR. PARRELLA:**  THANK YOU.

6              JUDGE, I'M GOING TO OFFER THOSE THREE.

7              **MR. BALOGH:**  NO OBJECTION.

8              **THE COURT:**  THANK YOU.  ALL THREE WILL BE RECEIVED.

9              (PORTIONS OF GOVERNMENT'S EXHIBIT 12 RECEIVED IN

10             EVIDENCE.)

11             **MR. PARRELLA:**  THANK YOU.  YOU CAN SET THEM ASIDE SO

12   YOU DON'T GET THEM CONFUSED WITH THE OTHER ONE.

13             NOW, YOUR HONOR, I WOULD LIKE TO APPROACH THE

14   WITNESS AND DIRECT HIS ATTENTION TO DOCUMENTS FROM

15   GOVERNMENT 10, WHICH WILL BE PAGES, AGAIN AT THE CENTER BOTTOM,

16   FOUR, FIVE AND TWELVE.

17             **THE COURT:**  MR. PARRELLA, I DON'T BELIEVE I HAVE

18   THOSE.  WE CAN FIX IT LATER, BUT I DON'T SEE THEM IN HERE.  YOU

19   CAN GO AHEAD, MR. PARRELLA.

20             **MR. PARRELLA:**  THANK YOU, YOUR HONOR.  WE'LL GIVE

21   YOU A NEW SET.

22   **BY MR. PARRELLA**

23   **Q**    MR. BISHOP, CAN YOU TELL US WHAT THOSE PAGES ARE?

24   **A**    I HAVE A BOTTLE CHAIN OF CUSTODY FOR THE A BOTTLE, AN

25   ALIQUOT CHAIN OF CUSTODY FOR THE A BOTTLE FOR A SCREEN, AND AN

1   ALIQUOT CHAIN OF CUSTODY FOR A BOTTLE FOR AN INDIVIDUAL

2   CONFIRMATION.

3   **Q**   OKAY.  THANK YOU.

4           LET'S TURN TO THE ONE THAT'S PAGE 4 ON THE CENTER

5   BOTTOM, AND IS THAT THE BOTTLE CHAIN OF CUSTODY FOR BOTTLE A?

6   **A**   YES, IT IS.

7   **Q**   AND THIS IS SMP 03?

8   **A**   YES.

9   **Q**   OKAY.  AND DID YOU HAVE CONTACT WITH THAT POSITIVE --

10  EXCUSE ME.

11          DID YOU HAVE CONTACT WITH THAT BOTTLE, BOTTLE A FROM

12  SMP 03, IN OCTOBER 26TH, 2006?

13  **A**   YES.

14  **Q**   CAN YOU TELL US WHAT THAT WAS?

15  **A**   LET'S SEE.  I TAKE IT FROM THE POSITIVE FREEZER AGAIN TO

16  ALIQUOT FOR A SCREEN AND THEN PLACED IT BACK INTO THE POSITIVE

17  FREEZER FOR STORAGE.

18  **Q**   AND I SEE YOU HAVE A STAMP THERE IN THE PURPOSE PART WHERE

19  IT'S ORIGINALLY ALIQUOT CONFIRMATION, BUT CONFIRMATION PART IS

20  CROSSED OUT?

21  **A**   YES.

22  **Q**   DO YOU RECALL HOW THAT HAPPENED?

23  **A**   I MISTAKENLY PICKED UP THE WRONG STAMP, AND -- BECAUSE I

24  HAVE SEVERAL STAMPS ON MY DESK.

25  **Q**   JUST TO BE CLEAR, THE OCTOBER 26TH, '06 ALIQUOT IS JUST AN

BISHOP / DIRECT - PARRELLA

1   ALIQUOT, NOT AN ALIQUOT CONFIRMATION?

2   **A**   THAT IS CORRECT.

3   **Q**   SO WHAT DID YOU DO WITH THE BOTTLE AFTER THAT?

4   **A**   AFTER THE BOTTLE WAS ALIQUOTED, I PLACED IT INTO THE

5   POSITIVE FREEZER FOR STORAGE.

6   **Q**   AND DID YOU HAVE CONTACT WITH THAT BOTTLE AGAIN?

7   **A**   YES, I DID.

8   **Q**   AND WHEN WAS THAT?

9   **A**   NOVEMBER 14TH, 2006.

10  **Q**   AND WHAT WAS THE PURPOSE?

11  **A**   THE PURPOSE WAS TO ALIQUOT A CONFIRMATION.

12  **Q**   AND WHAT DID YOU DO?

13  **A**   I REMOVED IT FROM THE POSITIVE FREEZER, ALIQUOTED IT FOR

14  THE CONFIRMATION, AND PLACED IT BACK INTO THE POSITIVE FREEZER

15  FOR STORAGE.

16  **Q**   OKAY.  THANK YOU.

17          LET'S TURN TO PAGE 5.  JUST TO BE CLEAR, THIS IS A

18  CHAIN OF CUSTODY FOR ALIQUOT FROM BOTTLE A?

19  **A**   YES.

20  **Q**   THIS IS THE ALIQUOT FROM 10/16/06?

21  **A**   YES.

22  **Q**   AND CAN YOU TELL US WHAT CONTACT YOU HAD WITH THAT ALIQUOT

23  THAT THIS DOCUMENT REPRESENTS?

24  **A**   ONCE I COMPLETED ALIQUOTING THE SAMPLE, I PLACED IT INTO

25  REFRIGERATOR 12 FOR STORAGE.

1  Q    OKAY.  AND DID YOU HAVE ANY FURTHER CONTACT WITH THIS

2  ALIQUOT?

3  A    NO.

4  Q    OKAY.  LET'S MOVE TO THE NEXT PAGE, PAGE 12.  THIS IS CHAIN

5  OF CUSTODY FOR AN ALIQUOT CONFIRMATION?

6  A    YES.

7  Q    CAN YOU TELL US IF YOU HAD ANY CONTACT, OR WHAT CONTACT, IF

8  ANY, YOU HAD WITH THE ALIQUOT CONFIRMATION REPRESENTED ON THIS

9  PAGE?

10  A    I ALIQUOTED THE SAMPLE, PLACED THE ALIQUOTS INTO

11  REFRIGERATOR 12 FOR STORAGE.

12  Q    THIS WAS AN ALIQUOT CONFIRMATION, SO IT WAS A DIFFERENT

13  TYPE OF RUN?

14  A    YES, THAT IS CORRECT.

15  Q    DID YOU HAVE ANY FURTHER CONTACT WITH THAT SAMPLE?

16  A    NO.

17  Q    OKAY.  THANK YOU.  YOU CAN SET THAT ASIDE.

18          ARE THOSE FORMS KEPT IN THE REGULAR COURSE OF

19  BUSINESS OF UCLA OLYMPIC LAB?

20  A    YES.

21  Q    AND THEY ARE REQUIRED TO BE KEPT?

22  A    YES.

23          **MR. PARRELLA:**  JUDGE, I'LL OFFER THEM AS WELL.

24          **MR. BALOGH:**  NO OBJECTION.

25          **THE COURT:**  THANK YOU.  THOSE THREE WILL BE

BISHOP / DIRECT — PARRELLA

1    RECEIVED.

2              (PORTIONS OF GOVERNMENT'S EXHIBIT 10 RECEIVED IN

3              EVIDENCE.)

4              **MR. PARRELLA:**  THANK YOU.  I HAVE NOTHING FURTHER OF

5    THIS WITNESS.

6              **MR. BALOGH:**  THANK YOU, YOUR HONOR.

7              MR. PARRELLA, I WOULD LIKE TO USE ALL OF

8    GOVERNMENT'S 10, 11 AND 12.  ARE THEY UP HERE?

9              MAY I APPROACH THE WITNESS, YOUR HONOR?

10             **THE COURT:**  YOU MAY.

11             **MR. BALOGH:**  I'LL TAKE THESE FROM YOU, SIR.  THANK

12   YOU.  I'LL TAKE 11, TOO, PLEASE.

13             **THE CLERK:**  ELEVEN IS PROBABLY IN THE BINDER.

14             **MR. BALOGH:**  THANK YOU.

15             **THE CLERK:**  ELEVEN IS NOT ADMITTED, SO I DON'T HAVE

16   IT.

17             **MR. BALOGH:**  MAY I APPROACH THE WITNESS, YOUR HONOR?

18             **THE COURT:**  YOU MAY.

19             **MR. BALOGH:**  THANK YOU.  THE RECORD SHOULD REFLECT I

20   PROVIDED THE WITNESS EXHIBITS MARKED AS GOVERNMENT'S EXHIBITS

21   10, 11 AND 12.  WE RECOGNIZE ALL THE PAGES OF THESE EXHIBITS

22   ARE NOT IN.  I WILL QUESTION THE WITNESS ABOUT THOSE AT THE

23   APPROPRIATE TIME.

24             **CROSS-EXAMINATION BY MR. BALOGH**

25

1  **BY MR. BALOGH**

2  **Q**   GOOD MORNING, MR. BISHOP.

3  **A**   GOOD MORNING.

4  **Q**   IF I MAY BEGIN OUR DISCUSSION THIS MORNING WITH YOUR

5  EDUCATIONAL BACKGROUND.  COULD YOU TELL US, DID YOU ATTEND

6  COLLEGE, SIR?

7  **A**   DID -- EXCUSE ME?

8  **Q**   DID YOU ATTEND COLLEGE, SIR?

9  **A**   NO, I DIDN'T.

10 **Q**   YOU BECAME A -- YOU BECAME A RECEIVING CHEMIST AT A CERTAIN

11 POINT IN TIME AT UCLA LAB; IS THAT RIGHT?

12 **A**   THAT IS CORRECT.

13 **Q**   WHAT YEAR DID YOU GET THIS JOB AT UCLA?

14 **A**   2001.

15 **Q**   AND YOU HAVE BEEN ENGAGED AS A RECEIVING CHEMIST AT UCLA

16 FOR THE PREVIOUS SEVEN YEARS; IS THAT RIGHT?

17 **A**   THAT IS CORRECT, YES.

18 **Q**   AND YOU ARE EMPLOYED THERE TODAY?

19 **A**   YES.

20 **Q**   BEFORE REVIEWING THE DOCUMENTS I PUT IN FRONT OF YOU AS

21 MR. PARRELLA DID, I WANTED TO ASK A COUPLE GENERAL QUESTIONS

22 ABOUT THE ALIQUOT PROCESS.

23 **A**   OKAY.

24 **Q**   THAT'S PART OF YOUR JOB --

25 **A**   OKAY.

1  Q   -- AS A RECEIVING CHEMIST?

2        YOUR JOB IS TO, AS FAR AS USADA CLIENTS, TO RECEIVE

3  SPECIMEN PACKAGES AND ENGAGE IN A PROTOCOL TO ENSURE THEY HAVE

4  BEEN ALIQUOTED PROPERLY; IS THAT RIGHT?

5  A   THAT IS CORRECT, YES.

6  Q   AND AS I UNDERSTAND IT THE TWO PARTS OF THAT PROCESS ARE

7  CALLED ACCESSIONING AND ALIQUOTING; IS THAT CORRECT?

8  A   YES, YES.

9  Q   OKAY.  AS A RECEIVING CHEMIST, WHEN A SPECIMEN PACKAGE

10 COMES IN, YOU NEED A MEMO TO UNDERSTAND WHAT YOU ARE SUPPOSED

11 TO DO TO FULFILL YOUR JOB RESPONSIBILITIES?

12 A   THAT IS CORRECT.

13 Q   YOU UNDERSTAND, UPON RECEIPT, YOU ARE SUPPOSED TO FIRST

14 INITIATE THE CHAIN OF CUSTODY FROM THE UCLA LABORATORY'S POINT

15 OF VIEW?

16 A   YES.

17 Q   IN THE CHAIN OF CUSTODY, ONE OF THE THINGS YOU DO IS YOU

18 HAVE THE DELIVERER OF THE PACKAGE SIGN A UCLA CHAIN OF CUSTODY

19 FORM ATTESTING THAT THEY PERSONALLY HANDED YOU THE PACKAGE WITH

20 THE AIR BILL NUMBER AND THE USADA CLIENT'S NUMBER ON IT; IS

21 THAT CORRECT?

22 A   THAT'S CORRECT.

23 Q   AND THEN ONCE YOU HAVE DONE THAT, YOU BEGIN THE

24 ACCESSIONING PROCESS?

25 A   YES.

1   Q   I'M SORRY.  I INTERRUPTED.

2          CAN YOU READ THE LAST QUESTION AND ANSWER, PLEASE?

3          (RECORD READ.)

4   BY MR. BALOGH

5   Q   AND THE ACCESSIONING PROCESS IS THE WAY BY WHICH YOU CREATE

6   A NEW CODE, A UCLA CODE, TO IDENTIFY THE SPECIMEN SAMPLES AS

7   THEY WORK THEIR WAY THROUGH THE UCLA LAB?

8   A   THAT IS CORRECT.

9   Q   AFTER THE ACCESSIONING PROCESS IS DONE -- WITHDRAWN.

10          AS PART OF THE ACCESSIONING PROCESS AND SECURING THE

11  CHAIN OF CUSTODY OF THE SPECIMENS, YOU ALSO INSPECT THE

12  SPECIMENS TO ENSURE THAT THEY ARE IN PROPER CONDITION AND THEY

13  HAVEN'T BEEN TAMPERED WITH OR BROKEN OR ANYTHING HAS OCCURRED

14  TO AFFECT THE SPECIMEN SAMPLE?

15  A   YES, WE WOULD DO THAT.

16  Q   AND THIS IS PART OF YOUR JOB YOU DO AS A RECEIVING CHEMIST

17  EVERY TIME A PACKAGE COMES IN, CORRECT?

18  A   YES.

19  Q   AFTER THE ACCESSIONING PROCESS IS DONE, YOU ALSO THEN TAKE

20  THIS PACKAGE, AND YOU BEGIN TO PREPARE IT SO IT MAY BE USED BY

21  THE ANALYTICAL SCIENTIST EMPLOYED BY UCLA; IS THAT RIGHT?

22  A   YES.

23  Q   AND THAT'S WHAT WE'VE CALLED ALIQUOTING; IS THAT RIGHT?

24  A   RIGHT, RIGHT.

25  Q   ALIQUOTING, IN ESSENCE, IS THE TRANSFER OF URINE SPECIMENS

1   INTO TUBES, WHATEVER SPECIFIED NUMBER OF TUBES, FOR THAT

2   CLIENT'S PACKAGE; IS THAT RIGHT?

3   **A**   YES.

4   **Q**   UCLA HAS A NUMBER OF CLIENTS WHO ENGAGE IT TO PERFORM

5   TESTING ON URINE SPECIMENS; IS THAT RIGHT?

6   **A**   YES.

7   **Q**   ONE OF THEM IS USADA?

8   **A**   YES.

9   **Q**   WITH RESPECT TO USADA, DO THEY HAVE A COMMON COURIER THEY

10  USE TO DELIVER PACKAGES TO UCLA?

11  **A**   A COMMON COURIER?

12  **Q**   A TYPICAL COURIER THEY USE WITH REGULARITY.

13  **A**   YES.

14  **Q**   WHICH IS THAT COURIER, SIR?

15  **A**   UPS.

16  **Q**   APART FROM UPS, HAVE YOU HAD OCCASION TO SEE OTHER CARRIERS

17  BY USADA?

18  **A**   YES.

19  **Q**   WHICH CARRIERS ARE THOSE?

20  **A**   WORLD COURIER.

21  **Q**   APART FROM WORLD COURIER, HAVE YOU HAD OCCASION TO SEE

22  COURIERS OTHER THAN THOSE TWO?

23  **A**   YES, ALSO THE DCO'S WOULD HAND DELIVER SAMPLES AS WELL.

24  **Q**   A DCO?

25  **A**   YES.

1  Q    THAT MEANS DOPING CONTROL OFFICER?

2  A    YES.

3  Q    HOW OFTEN DO DOPING CONTROL OFFICERS HAND DELIVER PACKAGES

4  TO UCLA?

5  A    I REALLY COULDN'T SAY HOW OFTEN.

6  Q    OVER THE LAST SEVEN YEARS, HOW MANY PACKAGES HAVE YOU

7  RECEIVED AT THE UCLA LAB ON BEHALF OF USADA CLIENTS --

8  WITHDRAWN.

9         OVER THE PAST SEVEN YEARS, HOW MANY TIMES -- BEST

10  APPROXIMATION, OF COURSE -- HAVE YOU RECEIVED PACKAGES AT UCLA

11  THAT WERE DELIVERED ON BEHALF OF UCLA'S CLIENT USADA?

12  A    COULD YOU REPEAT THE QUESTION?  I DIDN'T UNDERSTAND WHAT

13  YOU WERE SAYING.

14  Q    SURE.  HOW MANY USADA PACKAGES HAVE YOU PERSONALLY RECEIVED

15  AS A RECEIVING CHEMIST OVER THE PAST SEVEN YEARS?

16  A    I REALLY COULDN'T SAY.

17  Q    MORE THAN A HUNDRED?

18  A    YES.

19  Q    MORE THAN FIVE HUNDRED?

20  A    PROBABLY, YES.

21  Q    MORE THAN A THOUSAND?

22  A    I WOULDN'T KNOW.

23  Q    OF THE -- SO BETWEEN FIVE HUNDRED AND A THOUSAND.  COULD

24  YOU GIVE US ANY BETTER ESTIMATE BETWEEN THAT RANGE?

25  A    NO.

BISHOP / CROSS - BALOGH

```
 1  Q   OF THAT WHATEVER NUMBER YOU RECEIVED, ON HOW MANY OCCASIONS

 2  WOULD YOU ESTIMATE IT WAS HAND DELIVERED BY A DCO?

 3  A   I REALLY COULDN'T SAY.

 4  Q   IS IT MORE THAN TEN TIMES?

 5  A   YES, IT IS.

 6  Q   IT IS MORE THAN A HUNDRED TIMES?

 7  A   PROBABLY, YEAH.

 8  Q   SO ABOUT 20 PERCENT OF THE TIME, IS THAT A FAIR ESTIMATE?

 9  A   YEAH, I DON'T REALLY KEEP COUNT.

10  Q   CAN YOU GIVE US ANY ESTIMATE AT ALL?

11  A   NO.

12  Q   OKAY.  NOW, YOU'VE DESCRIBED THE TYPICAL PROCESS OF

13  ALIQUOTING -- ACCESSIONING AND ALIQUOTING FOR A PACKAGE THAT

14  COMES IN THE FRONT DOOR?

15  A   MM-HMM.

16  Q   HAVE WE MISSED ANYTHING IN THAT PROCESS ON HOW YOU PERFORM

17  YOUR JOB AS A RECEIVING CHEMIST?

18  A   NOT THAT I CAN RECALL, NO.

19  Q   IN ADDITION TO THAT TYPE OF ALIQUOTING, THERE'S ALSO

20  ALIQUOTING THAT OCCURS ON THE DIRECTION FROM AN ANALYTICAL

21  SCIENTIST OR SUPERVISOR; IS THAT RIGHT?

22  A   THAT'S CORRECT.

23  Q   AND THAT COMES IN A MEMO FORM TO DIRECT YOU TO TAKE THE

24  SPECIFIC TASK WITH RESPECT TO A BOTTLE THAT'S ALREADY WITHIN

25  UCLA'S CUSTODY AND CONTROL?
```

1   **A**    THAT'S CORRECT.

2   **Q**    AND ALIQUOTING -- WITHDRAWN.

3          AND THAT INCLUDES, ONE, ALIQUOTING NEW SAMPLES FROM

4   A BOTTLE THAT'S ALREADY BEEN MAINTAINED BY UCLA?

5   **A**    YES.

6   **Q**    AND THAT ALSO INCLUDES TRANSFERRING THE ALIQUOTS YOU MAKE

7   TO WHATEVER AREA YOU HAVE BEEN DIRECTED TO DELIVER THEM FOR

8   WHATEVER TESTS ARE GOING TO BE DONE; IS THAT RIGHT?

9   **A**    YES.

10  **Q**    THERE'S A PRIORITY ON DOCUMENTATION AT UCLA; IS THAT RIGHT,

11  AT THE UCLA LAB?

12  **A**    COULD YOU REPEAT THE QUESTION?

13  **Q**    IT'S EMPHASIZED THAT YOU NEED TO DOCUMENT EVERY STEP YOU

14  TAKE WHEN YOU INTERACT WITH A BOTTLE OR ALIQUOT AT THE UCLA

15  LAB?

16  **A**    THAT'S CORRECT.

17  **Q**    YOU ARE NOT ALLOWED TO MOVE A BOTTLE FROM ONE PLACE TO

18  ANOTHER WITHOUT CREATING OR MARKING A CHAIN OF CUSTODY FORM

19  SHOWING THE STEPS YOU TOOK?

20  **A**    THAT'S CORRECT.

21  **Q**    AND YOU ARE NOT ALLOWED TO MOVE AN ALIQUOT FROM ONE PLACE

22  TO ANOTHER WITHOUT SIGNING -- CREATING OR SIGNING A CHAIN OF

23  CUSTODY FORM INDICATING THE STEPS THAT YOU TOOK; IS THAT RIGHT?

24  **A**    THAT'S CORRECT.

25  **Q**    WHY IS THERE SUCH AN EMPHASIS ON DOCUMENTING ANY STEPS YOU

1  TAKE WITH A SPECIMEN BOTTLE OR ALIQUOT?

2  **A**   BECAUSE WE HAVE TO KEEP THE CHAIN OF CUSTODY.

3  **Q**   IF THERE'S A STEP MISSING IN THE CHAIN THERE'S A GENUINE

4  QUESTION ABOUT WHETHER UCLA LAB IS PERFORMING ITS FUNCTION

5  PROPERLY; IS THAT RIGHT?

6  **A**   IF THERE'S A STEP -- REPEAT THE QUESTION, PLEASE.

7  **Q**   IF THE BOTTLE GOES FROM POINT A TO POINT B AND THERE'S NO

8  DOCUMENTATION, THERE'S A BREAK IN THE CHAIN OF CUSTODY, A

9  GENUINE QUESTION ARISES INTO HOW UCLA IS PERFORMING ITS

10  RESPONSIBILITIES?

11  **A**   IF THERE'S A BREAK IN THE CHAIN OF CUSTODY?

12  **Q**   YES.

13  **A**   YEAH.

14  **Q**   YOU DESCRIBED REFRIGERATOR 12 TO US.  CAN YOU TELL US, WHAT

15  IS REFRIGERATOR 12 AT THE UCLA ANALYTICAL LAB?

16  **A**   IT'S A REFRIGERATOR WHERE ALIQUOTS ARE KEPT.

17  **Q**   WHAT KIND OF ALIQUOTS ARE KEPT THERE?

18  **A**   URINE.

19  **Q**   WHAT?

20  **A**   URINE.

21  **Q**   ARE POSITIVE ALIQUOTS -- ARE ALIQUOTS FROM URINE BOTTLES

22  THAT HAVE TESTED POSITIVE OR SCREENED POSITIVE MAINTAINED IN

23  REFRIGERATOR 12?

24  **A**   ARE THEY MAINTAINED THERE?

25  **Q**   YES.

1  **A**   THEY'RE KEPT THERE FOR STORAGE.

2  **Q**   AFTER THEY'RE TESTED POSITIVE?

3  **A**   AFTER THEY HAVE BEEN ALIQUOTED, YES.

4  **Q**   OKAY.  I'M TRYING TO FIND OUT WHETHER ALL OF THE BOTTLES IN

5  REFRIGERATOR 12 ARE NEGATIVE, ALL OF THEM ARE POSITIVE, OR

6  THERE'S A MIXTURE OF BOTH WITHIN REFRIGERATOR 12?

7            **MR. PARRELLA:**  I'M GOING TO OBJECT.  THIS IS

8  MISCHARACTERIZING TESTIMONY.  THE WITNESS IS TESTIFYING ABOUT

9  ALIQUOTS, NOT ABOUT THE BOTTLES.  THAT WAS CLEAR THE QUESTION

10  WAS ABOUT --

11            **THE COURT:**  PERHAPS YOUR QUESTION IS A LITTLE

12  UNCLEAR.  CAN YOU STATE IT AGAIN?

13            **MR. BALOGH:**  CERTAINLY.

14  **BY MR. BALOGH**

15  **Q**   IN REFRIGERATOR 12, ARE THE BOTTLES THAT ARE MAINTAINED IN

16  REFRIGERATOR 12, ARE ANY OF THEM BOTTLES THAT HAVE BEEN

17  IDENTIFIED AS POSITIVE TESTS?

18  **A**   WE DON'T KEEP BOTTLES IN REFRIGERATOR 12.

19  **Q**   ARE ANY ALIQUOTS MAINTAINED IN REFRIGERATOR 12 AFTER THEY

20  HAVE BEEN SCREENED POSITIVE?

21  **A**   YES.

22  **Q**   SO TAKE US THROUGH THE STEPS OF HOW AN ALIQUOT IS SCREENED

23  POSITIVE AND WHERE IT WOULD GO IN THE NORMAL COURSE OF ITS

24  JOURNEY THROUGH UCLA LAB.

25  **A**   I REALLY COULDN'T TELL YOU.  ALL I DO IS ALIQUOT THE

1   SAMPLE, PUT IT IN REFRIGERATOR 12, AND I'M DONE WITH IT.

2   Q   OKAY.  LET'S TAKE A -- WHEN YOU ALIQUOT THE SAMPLE THE

3   FIRST TIME -- LET'S TAKE A -- ACTUALLY, LET'S RUN THROUGH THE

4   EXHIBIT.  MAYBE THIS WILL BE EASIER THAT WAY.

5          I'D ASK YOU TO TAKE OUT EXHIBIT 10, WHICH IS IN

6   FRONT OF YOU.  WE ARE GOING TO FLIP THROUGH IT.

7          **MR. BALOGH:**  AND FOR JUDGE AND JURY, EXHIBIT 10 IS

8   WITH RESPECT TO UCLA SAMPLE SMP 03 COLLECTED ON AUGUST 30TH,

9   2001.

10  **BY MR. BALOGH**

11  Q   MR. BISHOP, I'D ASK YOU TO TURN TO PAGE -- IT HAS AN -- IN

12  THE UPPER RIGHT CORNER -- THIS IS A NEW 10, SO I SHOULD

13  ACTUALLY USE THIS ONE -- TO THE PAGE THAT BEARS PAGE 4 ON THE

14  BOTTOM CENTER.  DO YOU SEE THIS PAGE, SIR?

15  A   YES.

16  Q   AND THIS INDICATES THAT THIS IS SAMPLE IS DEALING WITH A

17  BOTTLE FOR SAMPLE NUMBER SMP 03, CORRECT?

18  A   THAT'S CORRECT.

19  Q   AND THIS BOTTLE, YOUR FIRST INTERACTION WITH IT OCCURRED ON

20  OCTOBER 6TH, 2006?

21  A   THAT IS CORRECT.

22  Q   THIS BOTTLE WAS -- YOU FOUND IT IN THE POSITIVE FREEZER ON

23  THAT DAY, CORRECT?

24  A   YES.

25  Q   AND THE LAST TIME THIS BOTTLE HAD ANY INTERACTION WITH UCLA

BISHOP / CROSS - BALOGH

1   PERSONNEL WAS ON APRIL 18TH, 2002; AM I READING THE FORM

2   CORRECTLY?

3   **A**   THAT IS CORRECT.

4   **Q**   AND ON APRIL 18TH, 2002, MS. DELSHAD PLACED IT IN THE

5   POSITIVE FREEZER; IS THAT CORRECT?

6   **A**   THAT IS CORRECT.

7   **Q**   AND THAT INDICATES TO YOU, WHEN YOU READ THE UCLA CHAIN OF

8   CUSTODY, THAT THE SAMPLE HAS EITHER SCREENED, TESTED OR BEEN

9   CONFIRMED POSITIVE BY THE ANALYTICAL SCIENTISTS AT THE UCLA

10  LAB?

11  **A**   I DON'T MAKE THAT ASSUMPTION.

12  **Q**   WHAT DO YOU INTERPRET THE POSITIVE FREEZER FOR --

13  WITHDRAWN.

14          DO YOU KNOW ANY NEGATIVE SAMPLES THAT ARE KEPT IN

15  THE POSITIVE FREEZER?

16  **A**   DO I KNOW OF ANY NEGATIVE SAMPLES KEPT IN THE POSITIVE

17  FREEZER?

18  **Q**   YES.

19  **A**   YEAH.

20  **Q**   SO NEGATIVE SAMPLES ARE KEPT IN THE POSITIVE FREEZER?

21  **A**   ON OCCASION.

22  **Q**   WHAT OCCASIONS ARE THOSE?

23  **A**   TO SAVE SAMPLES.

24  **Q**   TO SAVE SAMPLES.  SO CAN YOU EXPLAIN TO US HOW THAT OCCURS?

25  **A**   WE MAY BE ASKED TO SAVE A SAMPLE ON OCCASION.

1   Q    AND THESE SAMPLES ARE SAVED IN THE POSITIVE FREEZER?

2   A    ON OCCASION.

3   Q    ON HOW MANY OCCASIONS IN YOUR SEVEN YEARS AT UCLA LAB HAS

4   THIS OCCURRED?

5   A    I CAN'T RECALL.

6   Q    CAN YOU GIVE US ANY ROUGH ESTIMATE OF THE 500 PLUS --

7   WITHDRAWN.

8         HOW MANY TIMES HAVE YOU INTERACTED WITH BOTTLES,

9   OVER THE LAST SEVEN YEARS, OF URINE AT THE UCLA LAB?

10  A    COULD YOU REPEAT THE QUESTION?

11  Q    SURE.

12        HOW MANY BOTTLES HAVE YOU INTERACTED WITH AS A

13  RECEIVING CHEMIST AT UCLA FOR THE LAST SEVEN YEARS?

14  A    SEVERAL.

15  Q    SEVERAL?

16  A    SEVERAL, YES.

17  Q    DOES SEVERAL INCLUDE A NUMBER GREATER THAN 500?

18  A    YES.

19  Q    DOES SEVERAL INCLUDE A NUMBER GREATER THAN 1,000?

20  A    YES.

21  Q    DOES SEVERAL INCLUDE A NUMBER GREATER THAN 2,000?

22  A    YES.

23  Q    DOES SEVERAL INCLUDE A NUMBER GREATER THAN 3,000?

24  A    YES.

25  Q    DOES SEVERAL INCLUDE A NUMBER GREATER THAN 4,000?

BISHOP / CROSS / BALOGH

```
1  A   YES.

2  Q   DOES SEVERAL INCLUDE A NUMBER GREATER THAN 5,000?

3  A   YES.

4  Q   DOES SEVERAL INCLUDE A NUMBER GREATER THAN 10,000?

5  A   YES.

6  Q   OKAY.  I'LL LEAVE IT AT THAT.

7          SO SEVERAL EQUALS 10,000 OR MORE; IS THAT RIGHT?

8  A   YES.

9  Q   OKAY.  AND OF THAT 10,000 OR MORE, CAN YOU GIVE US ANY

10 ESTIMATE OF HOW MANY TIMES A NEGATIVE -- A SAMPLE THAT SCREENED

11 NEGATIVE IS MAINTAINED IN THE POSITIVE FREEZER?

12 A   MAY HAVE BEEN ONCE OR TWICE.

13 Q   SO IT WOULD BE FAIR TO SAY THEN THERE'S BEEN OVER 10,000

14 SAMPLES YOU'VE INTERACTED WITH, AND ONCE OR TWICE A NEGATIVE

15 SAMPLE HAS BEEN PLACED IN THE POSITIVE FREEZER; IT'S SAFE TO

16 SAY THIS IS A RARE OCCURRENCE?

17 A   YES.

18 Q   OKAY.  AND THEN IN A TYPICAL CASE, WHENEVER YOU TAKE A

19 BOTTLE OUT OF THE POSITIVE FREEZER, THE BELIEF OF THE PERSON

20 FINDING THE BOTTLE IN THE POSITIVE FREEZER WOULD BE THAT BOTTLE

21 HAS BEEN FOUND TO BE POSITIVE; IS THAT CORRECT?

22 A   THAT WOULD BE CORRECT.

23          MR. PARRELLA:  OBJECTION, JUDGE.  THIS CALLS FOR

24 SPECULATION.

25          THE COURT:  SUSTAINED.  I'LL STRIKE THE QUESTION AND
```

1  THE ANSWER, AND YOU ARE TO DISREGARD THEM.

2           YOU MAY ASK ANOTHER, THOUGH.

3  **BY MR. BALOGH**

4  **Q**   REGARDING PAGE 4 THAT SITS IN FRONT OF YOU, WHICH INDICATES

5  THAT THE BOTTLE COLLECTED ON AUGUST 30, 2001, PLACED IN THE

6  POSITIVE FREEZER ON APRIL 12, 2002, YOU DIDN'T KNOW AT THE TIME

7  YOU TOOK IT OUT WHETHER OR NOT IT HAD BEEN SCREENED POSITIVE OR

8  NEGATIVE, IS THAT RIGHT?  BASED ON YOUR TRAINING AND

9  SIGNIFICANT EXPERIENCE, YOUR BELIEF WAS IT HAD BEEN TESTED

10  POSITIVE; IS THAT CORRECT?

11  **A**   I WOULDN'T MAKE THAT ASSUMPTION.

12  **Q**   SO YOU, WHEN YOU APPROACHED ON OCTOBER 26, THIS MAY HAVE

13  BEEN THE ONE OF TWO TIMES THAT IT COULD HAVE BEEN A NEGATIVE

14  SAMPLE; IS THAT RIGHT?

15  **A**   I WOULDN'T MAKE THAT ASSUMPTION, AGAIN.

16  **Q**   OKAY.  NOW WHEN YOU TAKE -- WITHDRAWN.

17           WHEN YOU TAKE SOMETHING TO THE POSITIVE FREEZER AND

18  YOU ASK TO GET AN ALIQUOT, EXCEPT FOR THESE ONE OF TWO TIMES

19  WHERE THERE'S BEEN A NEGATIVE SAMPLE STORED IN A POSITIVE

20  FREEZER -- WITHDRAWN.

21           OUT OF THE -- TAKING ASIDE THESE ONE OR TWO

22  OCCASIONS WHEN A NEGATIVE SAMPLE HAS BEEN STORED, CAN WE DO

23  THAT FOR THE PURPOSE OF MY QUESTION?

24  **A**   SAY IT AGAIN.

25  **Q**   EXCLUDING ONE OR TWO OCCASIONS WHERE A NEGATIVE SAMPLE WAS

BISHOP / CROSS - BALOGH

1    HELD IN THE POSITIVE FREEZER, WHEN YOU ARE DEALING WITH

2    ALIQUOTS FROM THE POSITIVE FREEZER ON EVERY OTHER OCCASION,

3    ALIQUOT TAKEN FROM THE POSITIVE FREEZER IS FOR ALIQUOT

4    CONFIRMATION?

5    A    I WOULDN'T TAKE AN ALIQUOT FROM THE POSITIVE FREEZER.  I

6    WOULD TAKE A BOTTLE.

7    Q    I AM BEING INEXACT.  I APOLOGIZE.

8         WHEN YOU TAKE A BOTTLE FROM THE POSITIVE FREEZER TO

9    MAKE AN ALIQUOT OUT OF THESE GREATER THAN 10,000 CASES, ALL OF

10   THEM HAVE BEEN FOR ALIQUOT CONFIRMATION; IS THAT RIGHT?

11   A    I WOULD SAY THE MAJORITY OF THEM.

12   Q    AND BY "THE MAJORITY," YOU MEAN EVERY ONE EXCEPT THE ONE OR

13   TWO TIMES A NEGATIVE SAMPLE WAS STORED IN THE POSITIVE FREEZER?

14   A    I COULDN'T MAKE THAT ASSUMPTION.

15   Q    CAN YOU GIVE US ANY MORE DETAIL ABOUT AN OCCASION WHERE YOU

16   WOULD TAKE A BOTTLE FROM THE POSITIVE FREEZER AND ALIQUOT IT

17   FOR SOMETHING OTHER THAN ALIQUOT CONFIRMATION?

18   A    REPEAT THE QUESTION.

19   Q    SURE.  CAN YOU GIVE US AN EXAMPLE OF ANY OCCASION WHERE YOU

20   WOULD TAKE A BOTTLE FROM THE POSITIVE FREEZER AND ALIQUOT IT

21   FOR SOMETHING OTHER THAN CONFIRMATION?

22   A    NO.

23   Q    I APOLOGIZE, SIR.  I WENT TO GET A GLASS OF WATER.  YOUR

24   ANSWER WAS NO?

25   A    THAT'S CORRECT.

1   Q   THANK YOU.

2           I'D LIKE YOU TO TURN TO PAGE 5 OF EXHIBIT 10, WHICH

3   IS SITTING IN FRONT OF YOU.  THIS SHOWS AN ALIQUOT ON AUGUST --

4   WITHDRAWN.  THIS SHOWS AN ALIQUOT THAT BEGAN ON OCTOBER 26TH;

5   DO YOU SEE THAT?

6   A   THAT'S CORRECT, YES.

7   Q   AND THIS IS THE ALIQUOT THAT'S REFLECTED ON THE PRIOR PAGE

8   TO SHOW THAT -- YOU MADE AN ALIQUOT OCTOBER 26TH, AND THEN YOU

9   STARTED A NEW CHAIN OF CUSTODY FOR ALIQUOT A WITH THE SAME

10  SAMPLE NUMBER AND BEGAN THIS BOTTLE ON ITS JOURNEY, CORRECT?

11  A   NO.  I BEGAN THE ALIQUOT ON ITS JOURNEY.

12  Q   BEGAN THE ALIQUOT ON ITS JOURNEY.  LET ME DO THAT AGAIN,

13  BECAUSE I THINK I UNDERSTAND YOU, BUT --

14          **THE COURT:**  MR. BALOGH, DO YOU WANT THE JURY TO SEE

15  ANY OF THIS STUFF?

16          **MR. BALOGH:**  THANK YOU.  I WOULD LOVE TO HAVE

17  EXHIBIT 4 DISPLAYED.  THANK YOU, YOUR HONOR.

18  **BY MR. BALOGH**

19  Q   SO, MR. BISHOP, NOW WE ARE LOOKING ON PAGE 5.

20          **MR. BALOGH:**  ACTUALLY, CAN I GET 4 AND 5

21  SIDE-BY-SIDE?

22          (DOCUMENT DISPLAYED.)

23          **MR. BALOGH:**  THANK YOU, AGENT.  COULD WE TURN ON

24  MR. BISHOP'S MADDEN SCREEN?

25          **THE CLERK:**  WHAT SCREEN?

1      **MR. BALOGH:**  THE MADDEN SCREEN.

2          **THE CLERK:**  IT SHOULD BE ON.  ALL HE HAS TO DO IS,

3   IF YOU WANT TO CIRCLE -- IT'S NOT SHOWING A COLOR -- JUST PRESS

4   AND WRITE HERE.

5   **BY MR. BALOGH**

6   Q    SO, MR. BISHOP, IF YOU CAN SHOW US, SHOW THE JURY ON PAGE 4

7   WHERE YOU INTERACT WITH BOTTLE A, THE FIRST STEP?  WHY DON'T

8   YOU --

9   A    THE FIRST STEP, I REMOVED IT FROM THE POSITIVE FREEZER.

10  Q    THEN SHOW US WHERE YOU MADE THE ALIQUOT, WHERE IT INDICATES

11  THE PURPOSE OF YOUR ACTIVITY.

12  A    (INDICATING.)

13  Q    AND BASED ON THAT, THAT ALIQUOT ACTION IS WHAT CAUSED YOU

14  TO MAKE THE CHAIN OF CUSTODY FOR THE ALIQUOT THAT IS PAGE 5; IS

15  THAT RIGHT?

16  A    THAT IS CORRECT.

17  Q    CAN YOU SHOW US ON PAGE 5 HOW WE KNOW THAT'S THE ALIQUOT

18  FROM BOTTLE A THAT YOU JUST SHOWED US ON PAGE 4?

19  A    THAT'S THE SAMPLE NUMBER.

20  Q    OKAY.  IS THERE A PLACE ON THE FORM WHERE IT SHOWS IT'S AN

21  ALIQUOT, AS OPPOSED TO A BOTTLE?

22  A    (INDICATING.)

23  Q    AND WILL THE RECORD REFLECT THE WITNESS INDICATED BY

24  CIRCLING THE WORD "ALIQUOT" IN THE UPPER LEFT-HAND CORNER OF

25  PAGE 5 OF EXHIBIT 10.

1          AND BY CREATING THIS ALIQUOT, THIS IS A NEW CHAIN OF

2     CUSTODY; IS THAT RIGHT?

3     **A**    YES.

4     **Q**    AND THEN CAN YOU SHOW US WHERE ON PAGE 5 YOU PUT THE

5     ALIQUOT WHEN YOU WERE DONE WITH THAT PROJECT?

6     **A**    (INDICATING.)

7     **Q**    AND YOU PLACED IT IN REFRIGERATOR 12?

8     **A**    THAT IS CORRECT.

9     **Q**    OKAY.  AND AT THAT POINT, WITH RESPECT TO THIS ALIQUOT, THE

10    REST OF THE CHAIN OF CUSTODY SHOWS THAT YOU NEVER INTERACTED

11    WITH IT AGAIN?

12    **A**    THAT IS CORRECT.

13    **Q**    AND HAD YOU AT ANY POINT IN TIME INTERACTED WITH THIS

14    ALIQUOT, YOU WOULD HAVE INDICATED SUCH ACTION ON THE CHAIN OF

15    CUSTODY FORM, CORRECT?

16    **A**    THAT IS CORRECT.

17    **Q**    IF YOU MOVED IT AT ALL WITHIN THE LAB FROM ONE ROOM OR

18    REFRIGERATOR TO ANOTHER ROOM OR REFRIGERATOR, YOU ARE REQUIRED

19    TO INDICATE YOUR ACTION WITH A STAMP AND SIGNATURE ON THAT

20    FORM?

21    **A**    THAT IS CORRECT.

22    **Q**    I ASK YOU, SIR, TO TURN TO PAGE 12 OF EXHIBIT 10.

23          MAY I HAVE IT ON THE SCREEN, PLEASE.  ACTUALLY, CAN

24    I GET THAT SIDE-BY-SIDE WITH PAGE 4, PLEASE?  THANK YOU.

25          (DOCUMENT DISPLAYED.)

1    **BY MR. BALOGH**

2    **Q**   NOW, SIR, AGAIN WE ARE LOOKING AT PAGE 4, WHICH IS THE

3    CHAIN OF CUSTODY FOR BOTTLE A THAT WAS COLLECTED ON

4    AUGUST 30TH, 2001.

5    **A**   YES.

6    **Q**   AND THEN YOU CAN YOU SHOW US ON PAGE -- WITHDRAWN.

7          AND PAGE 12 IS A CHAIN OF CUSTODY THAT YOU BEGAN ON

8    NOVEMBER 14TH, 2006; IS THAT RIGHT?

9    **A**   YES.

10   **Q**   AGAIN, CAN YOU SHOW US THE PLACE ON PAGE 4 WHICH WOULD SHOW

11   YOUR CHAIN OF CUSTODY OF TRANSFERRING URINE FROM THE BOTTLE A

12   TO MAKE AN ALIQUOT?

13   **A**   (INDICATING.)

14          **MR. BALOGH:**   AND THE WITNESS HAS CIRCLED "ALIQUOT

15   CONFIRMATION" ON THE SECOND TO LAST LINE.

16   **BY MR. BALOGH**

17   **Q**   IS THAT RIGHT, SIR?

18   **A**   YES.

19   **Q**   AND WE KNOW, AGAIN, THIS IS A BOTTLE, BECAUSE IN THE UPPER

20   LEFT CORNER BOTTLE A IS INDICATED; IS THAT RIGHT?

21   **A**   YES.

22   **Q**   AND THEN ON THE FORM THAT IS NOW PAGE 12 OF THE CHAIN OF

23   CUSTODY, CAN YOU SHOW TO THE JURY HOW WE UNDERSTAND THIS IS AN

24   ALIQUOT FROM THE SAME SPECIMEN SAMPLE THAT WAS MAINTAINED BY

25   UCLA?

1    **A**    (INDICATING.)

2    **Q**    SO YOU'VE CIRCLED THE SPECIMEN SAMPLE THAT'S SMP 03?

3    **A**    THAT IS CORRECT.

4    **Q**    AND WE KNOW IT'S AN ALIQUOT BECAUSE YOU CIRCLED -- WHEN YOU

5    CREATED THE CHAIN OF CUSTODY FORM, YOU CIRCLED "ALIQUOT" IN THE

6    UPPER LEFT CORNER; IS THAT RIGHT?

7    **A**    YES.

8    **Q**    AND YOU CREATED THIS ON NOVEMBER 14TH BY PUTTING THE

9    ALIQUOTS YOU MADE INTO REFRIGERATOR 12; IS THAT RIGHT?

10    **A**    YES.

11    **Q**    AND FROM THE THREE PAGES WE'VE JUST SEEN, WE CAN BE ASSURED

12    THAT THE SPECIMENS ON PAGE 5, WHICH IS NOT ON YOUR SCREEN, AND

13    THE SPECIMENS ON PAGE 12 CAME FROM THE SAME BOTTLE THAT'S

14    INDICATED ON PAGE 4 AS BOTTLE NUMBER 457239, UCLA CODE NUMBER

15    SMP 03; IS THAT RIGHT, SIR?

16    **A**    WELL, FOR THESE TWO I HAVE IN FRONT OF ME, YEAH.

17    **Q**    FOR THE TWO YOU HAVE IN FRONT OF YOU; IS THAT RIGHT?

18    **A**    YES, YES.

19    **Q**    I'D ASK YOU PLEASE, SIR, TO TURN TO EXHIBIT 11.

20            MAY I APPROACH, YOUR HONOR?

21            **THE COURT:**  YOU MAY.

22            **MR. BALOGH:**  I JUST WANT TO ORGANIZE 10 TO GIVE IT

23    BACK TO THE GOVERNMENT.

24    **BY MR. BALOGH**

25    **Q**    I HAVE A FEW MORE QUESTIONS ABOUT EXHIBIT 10 BEFORE WE

1   MOVE, SIR.

2           IF YOU LOOK THROUGH EXHIBIT 10, IS THERE ANYTHING IN

3   THE CHAIN OF CUSTODY THAT APPEARS IN EXHIBIT 10 THAT SHOWS OR

4   EXPLAINS HOW BOTTLE NUMBER 457239 COLLECTED ON AUGUST 30TH,

5   2001, WAS PLACED IN A POSITIVE FREEZER ON APRIL 18TH, 2002?

6   **A**   YES.

7   **Q**   AND HOW DO YOU DIVINE THAT INFORMATION?  WHERE WOULD THE

8   JURY BE ABLE TO FIND THAT INFORMATION?

9   **A**   PAGE 3.

10          **MR. BALOGH:**  WOULD YOU PLEASE PUT PAGE 3 UP FOR ME?

11          **THE COURT:**  IS PAGE 3 IN EVIDENCE YET?

12          **MR. BALOGH:**  PAGE 3 IS IN EVIDENCE.  THIS IS THE

13  FORM THAT YOUSIF WAHIDA TESTIFIED TO YESTERDAY ABOUT HIS ROLE

14  AS A RECEIVING CHEMIST.

15          **MR. NEDROW:**  YES, YOUR HONOR.  WE ARE BACK TO

16  EXHIBIT 10.  YES, EXHIBIT 10, THAT'S CORRECT.

17          **THE COURT:**  THEN YOU MAY PUT IT UP, PLEASE.

18          (DOCUMENT DISPLAYED.)

19  **BY MR. BALOGH**

20  **Q**   CAN YOU EXPLAIN TO THE JURY HOW THIS CHAIN OF CUSTODY

21  EXPLAINED THAT BOTTLE A WAS PUT IN POSITIVE FREEZER, THAT WAS

22  WHERE IT WAS FOUND ON APRIL 18TH?

23  **A**   IT APPEARS THAT MR. WAHIDA PLACED IT INTO THE POSITIVE

24  FREEZER FOR STORAGE.

25  **Q**   THAT WAS ON AUGUST 31ST, 2001?

1  **A**    THAT IS CORRECT.

2  **Q**    AND APART FROM THIS DOCUMENT, THERE'S NO OTHER INDICATION

3  OF HOW OR WHY THIS WAS -- THIS BOTTLE ENDED UP IN THE POSITIVE

4  FREEZER; IS THAT CORRECT?

5  **A**    COULD YOU REPEAT THE QUESTION?

6  **Q**    THIS IS SOLE EVIDENCE, IN EXHIBIT 11 -- EXCUSE ME.

7             THIS IS THE SOLE EVIDENCE, IN EXHIBIT 10, WHICH

8  GIVES US AN UNDERSTANDING OF HOW THIS BOTTLE ENDED UP IN THE

9  POSITIVE FREEZER; IS THAT CORRECT?

10  **A**    THAT'S CORRECT.

11  **Q**    AS A RECEIVING CHEMIST, SIR, HAVE YOU EVER RECEIVED A

12  PACKAGE FOR A USADA CLIENT AND IMMEDIATELY PLACED IT IN THE

13  POSITIVE FREEZER?

14  **A**    I CAN'T RECALL.

15  **Q**    SO THERE'S NOT ONE OCCASION YOU COULD SHARE WITH THE JURY

16  WHERE YOU REMEMBER DOING THAT?

17  **A**    I CAN'T RECALL.  I DON'T REMEMBER.

18  **Q**    THAT'S FINE.  CAN YOU PLEASE TURN TO EXHIBIT 11, AND I'LL

19  TAKE EXHIBIT 10 FROM YOU AND RETURN IT TO THE GOVERNMENT.

20             I'M SORRY, YOUR HONOR.  MAY I APPROACH?

21             IN FRONT OF YOU I PLACED GOVERNMENT'S EXHIBIT 11.

22  WOULD YOU PLEASE REVIEW THAT DOCUMENT TO SEE WHETHER AT LEAST

23  ANY OF IT SEEMS FAMILIAR TO YOU, WHETHER YOU RECOGNIZE ANY OF

24  IT AS DOCUMENTS MAINTAINED BY THE UCLA ANALYTICAL LABORATORY ON

25  BEHALF OF ITS USADA CLIENT?

1  **A**   YES.

2  **Q**   WITH RESPECT TO THE EXHIBIT THAT APPEARS ON THE CHAIN OF

3  CUSTODY MATERIAL -- WITHDRAWN.

4         ARE ANY OF THE DOCUMENTS THAT APPEAR IN GOVERNMENT'S

5  EXHIBIT 11, ARE ANY OF THESE DOCUMENTS WHICH REFLECT YOUR

6  INTERACTION WITH A USADA CLIENT WHILE WORKING AS A RECEIVING

7  CHEMIST AT THE UCLA LAB?

8  **A**   YES.

9  **Q**   AND WHAT PAGE IS THAT, SIR?  IF THERE'S A FAX LINE ON THE

10 TOP OF IT, CAN YOU TELL US THE FAX PAGE?  OR IF THERE'S A CHAIN

11 OF CUSTODY DOCUMENTATION PAGE NUMBER, CAN YOU TELL US THAT?

12 **A**   IT'S PAGE 12.

13        **MR. BALOGH:**  PAGE 12.  FOR COURT AND COUNSEL, THE

14 COUNT OF THE EXHIBITS AS COMPRISE EXHIBIT 11 AS GIVEN TO ME --

15        **THE COURT:**  IS THAT PAGE 12 UP AT THE TOP?

16        **THE WITNESS:**  YES.

17 **BY MR. BALOGH**

18 **Q**   AND IT BEARS A FAX PAGE NUMBER 8; IS THAT RIGHT?

19 **A**   YES.

20 **Q**   OKAY.

21        **MR. BALOGH:**  AND FOR COURT AND COUNSEL, THIS IS --

22 WITHDRAWN.

23 **BY MR. BALOGH**

24 **Q**   MR. BISHOP, WHAT USADA SAMPLE NUMBER DOES THIS INVOLVE?

25 **A**   THE BOTTLE NUMBER IS 462019.

1  Q    AND DOES IT HAVE A UCLA CODE?

2  A    YES.  THE UCLA CODE IS URA 05.

3          MR. BALOGH:  AND I WOULD LIKE, FOR COURT AND

4  COUNSEL, THE RECORD TO REFLECT THAT THIS IS THE MARCH 4TH,

5  2002, SAMPLE THAT IS INDICATED ON THE FIRST CHAIN OF CUSTODY

6  FORM OF EXHIBIT 11.

7  BY MR. BALOGH

8  Q    MR. BISHOP, WHAT WAS YOUR INTERACTION WITH BOTTLE NUMBER

9  462019?  WHAT IS INDICATED BY THE CHAIN OF CUSTODY FORM?

10  A    IT APPEARS THAT MR. SAN JOSE TRANSFERRED CUSTODY OF THE

11  SAMPLE TO ME FOR THE PURPOSE OF TRANSFERRING IT TO POSITIVE

12  FREEZER.  THEN I PLACED THE POSITIVE -- THE SAMPLE IN THE

13  POSITIVE FREEZER FOR STORAGE.

14  Q    DO YOU HAVE ANY RECOLLECTION OF WHY ON APRIL 2ND, 2002, YOU

15  TRANSFERRED A BOTTLE FROM THE COLD ROOM TO THE POSITIVE

16  FREEZER?

17  A    NO, I DON'T.

18  Q    IS IT TYPICAL FOR THERE TO BE A WRITTEN MEMO WHEN YOU'RE

19  TRANSFERRING A BOTTLE FROM THE COLD ROOM TO THE POSITIVE

20  FREEZER INDICATING THAT YOU ARE TO DO SO?

21  A    YES.

22  Q    AND THAT WOULD BE A WRITTEN DOCUMENT SETTING FORTH YOUR

23  RESPONSIBILITIES WITH RESPECT TO CHANGING THE LOCATION OF A

24  BOTTLE FROM COLD ROOM TO THE POSITIVE FREEZER; IS THAT RIGHT?

25  A    NOT ALWAYS.

BISHOP / CROSS - BALOGH

1   Q   NOT ALWAYS?

2   A   NO.

3   Q   ON WHAT OCCASIONS ARE THERE NOT WRITTEN MEMORANDA THAT YOU

4   DESCRIBED BEFORE ON YOUR DIRECT EXAMINATION?

5   A   WE MAY HAVE VERBAL INSTRUCTION.

6   Q   OKAY.  AND WHO HAS AUTHORITY TO GIVE YOU SUCH VERBAL

7   INSTRUCTIONS?

8   A   A SUPERVISOR.

9   Q   DO YOU HAVE ANY NAMES OF SUCH SUPERVISORS?

10   A   NO, I DON'T.

11   Q   YOU DON'T REMEMBER WHO THE SUPERVISORS ARE?

12   A   I DON'T REMEMBER WHO WOULD TELL ME THAT.

13   Q   CAN YOU TELL US THE ROSTER OF PEOPLE WHO ARE POSSIBLE?

14   A   I CAN'T RECALL.

15   Q   YOU CAN'T RECALL WHO THE SUPERVISORS WERE THAT SUPERVISED

16   YOU IN APRIL OF 2002?

17   A   WELL, ANNA REYES WOULD BE A SUPERVISOR.

18   Q   WHAT WAS THAT?

19   A   ANNA REYES.

20   Q   ANYONE ELSE?

21   A   THAT'S IT.  SHE IS HE MY DIRECT SUPERVISOR.

22   Q   SO IT WOULD BE ANNA REYES OR WRITTEN MEMO WHICH THAT WOULD

23   GIVE YOU THE DIRECTIVE TO TRANSFER THIS BOTTLE FROM COLD ROOM

24   TO THE POSITIVE FREEZER?

25   A   YES.

1   Q   SITTING HERE TODAY, YOU HAVE NO UNDERSTANDING OF WHY THIS

2   OCCURRED WITH RESPECT TO BOTTLE NUMBER 462019 ON AUGUST 2ND,

3   2002?

4   A   WOULD YOU REPEAT THE QUESTION?

5   Q   YES, BECAUSE I GOT THE DATE WRONG.  THANK YOU.

6          SITTING HERE TODAY, YOU CANNOT TELL US THE REASON

7   WHY -- WITHDRAWN.  YOU CAN'T TELL US WHO DIRECTED YOU TO

8   TRANSFER THIS BOTTLE 462019 ON APRIL 2ND, 2002?

9   A   NO.

10  Q   IS THAT CORRECT?

11  A   NO.

12  Q   IT'S NOT CORRECT?

13  A   REPEAT THE QUESTION.  I MISUNDERSTOOD YOU.

14  Q   SITTING HERE TODAY, YOU DON'T REMEMBER WHO DIRECTED YOU TO

15  MOVE THIS BOTTLE ON APRIL 2ND, 2002?

16  A   NO, I DON'T REMEMBER.

17  Q   AND YOU DON'T -- WITHDRAWN.

18          AND IN EXHIBIT 11, YOU DON'T SEE ANY WRITTEN

19  DOCUMENTATION INDICATING THE REASON INDICATING THERE WAS A MEMO

20  ISSUED FOR THIS KIND OF TRANSFER; IS THAT CORRECT?

21  A   I DON'T SEE A MEMO.

22  Q   I WOULD ASK YOU TO TURN TO WHAT'S LISTED AS PAGE 31 OF

23  EXHIBIT 11.

24  A   I DON'T SEE A PAGE 31.

25  Q   OKAY.  YOU DON'T?  IT'S IN THE UPPER RIGHT CORNER AFTER

1   PAGE 12.  IT'S THREE PAGES DOWN.  IT GOES PAGE 12, PAGE 13,

2   PAGE 14, PAGE 31.

3   **A**   NO.  OH.

4   **Q**   DO YOU SEE IT, SIR?

5   **A**   YES, SIR.

6   **Q**   CAN I -- LET ME ASK, ON PAGE 12 -- LET'S JUST GO TO

7   PAGE 12.  I'M GOING TO ENTER IT, THEN I CAN GET IT ON THE

8   SCREEN.

9           **THE COURT:**  HE'S BACK TO PAGE 12 NOW.

10          **MR. BALOGH:**  I APOLOGIZE, MR. BISHOP.

11  **BY MR. BALOGH**

12  **Q**   PAGE 12, THIS IS A CHAIN OF CUSTODY DOCUMENT THAT IS

13  MAINTAINED IN THE NORMAL COURSE OF BUSINESS BY THE UCLA LAB; IS

14  THAT CORRECT?

15  **A**   YES.

16  **Q**   AND IT IS THE RESPONSIBILITY OF THE PERSONS AT UCLA LAB TO

17  MAKE THE NOTATIONS OF THEIR ACTIONS WITH RESPECT TO THIS BOTTLE

18  ON OR ABOUT THE DATE INDICATED ON THIS FORM; IS THAT CORRECT?

19  **A**   YES.

20          **MR. BALOGH:**  I MOVE THIS PAGE 12 INTO EVIDENCE.

21          **THE COURT:**  ANY OBJECTION?

22          **MR. PARRELLA:**  NO, YOUR HONOR.

23          **THE COURT:**  THANK YOU.  IT WILL BE RECEIVED.

24          (GOVERNMENT'S EXHIBIT 11, PAGE 12 RECEIVED IN

25          EVIDENCE.)

1   **BY MR. BALOGH**

2   Q    I'D ASK YOU TO TURN BACK TO PAGE 31.  PAGE 31, IS THIS A

3   DOCUMENT THAT IS MAINTAINED IN THE NORMAL COURSE OF BUSINESS BY

4   THE UCLA ANALYTICAL LAB?

5            **MR. PARRELLA:**  YOUR HONOR, I HAVE NO OBJECTION IF

6   COUNSEL IS GOING TO OFFER THIS EITHER.

7            **MR. BALOGH:**  I'LL OFFER PAGE 31.

8            **THE COURT:**  THANK YOU.  THEY WILL BE RECEIVED.

9            (GOVERNMENT'S EXHIBIT 11, PAGE 31 RECEIVED IN

10           EVIDENCE.)

11           **MR. BALOGH:**  MAY THEY BE DISPLAYED ON THE --

12           **MR. NEDROW:**  YOUR HONOR, MR. NOVITZKY IS OUT

13   BRIEFLY.  UNFORTUNATELY, WE ARE CHALLENGED BY THE COMPUTER.

14           **THE COURT:**  WE'LL DO THAT PRESENTLY.

15           **MR. BALOGH:**  I AM GOING TO MOVE FROM PAGE 12 THEN.

16   ACTUALLY, I'LL ASK MY QUESTIONS.  WE WILL GET THEM UP.  I WILL

17   LAY THE FOUNDATION.

18   **BY MR. BALOGH**

19   Q    CAN YOU TELL US, IF WE COMPARE EXHIBITS PAGE 12 TO PAGE 31,

20   MR. BISHOP, IS IT FAIR TO SAY THESE ARE THE SAME -- THESE ARE

21   BOTH CHAIN OF CUSTODY DOCUMENTS -- WITHDRAWN.

22           ACTUALLY, I'LL WAIT FOR MR. NOVITZKY.

23           **THE COURT:**  HE JUST CAME BACK.  HE CAN DO IT FOR US.

24   **BY MR. BALOGH**

25   Q    WE CAN SEE FROM A COMPARISON OF PAGE 12 AND 13 -- 31, THESE

1   ARE CHAIN OF CUSTODIES FOR -- WITHDRAWN.

2             PAGE 12 IS THE CHAIN OF CUSTODY FOR THE A BOTTLE FOR

3   SAMPLE NUMBER UCLA CODE URA 05, CORRECT?

4   **A**   THAT IS CORRECT.

5   **Q**   AND CAN YOU CIRCLE FOR THE JURY HOW WE KNOW THAT'S THE

6   SAMPLE NUMBER URA 05?

7             **MR. BALOGH:**  THE WITNESS HAS CIRCLED "BOTTLE NUMBER

8   462019."  AND THEN IF WE LOOK, HE CIRCLED IT ON BOTH PAGES.

9   **BY MR. BALOGH**

10  **Q**   AND WOULD YOU INDICATE HOW WE KNOW THAT 462019 IS UCLA

11  SAMPLE NUMBER URA 05?

12            **MR. BALOGH:**  AND THE WITNESS HAS DONE SO BY CIRCLING

13  THOSE LETTERS ON EACH DOCUMENT.

14  **BY MR. BALOGH**

15  **Q**   NOW, HOW CAN THE JURY TELL, WHEN THEY LOOK AT THESE

16  DOCUMENTS THAT ONE IS FOR BOTTLE A AND ONE IS BOTTLE B?  YOU

17  CAN JUST TELL US FIRST --

18  **A**   A AND B ARE CIRCLED ON THE RESPECTIVE CHAIN OF CUSTODIES.

19  **Q**   AND WOULD YOU CIRCLE THOSE FOR THE JURY ON THE SCREEN?

20  **A**   (COMPLYING.)

21  **Q**   AND SO BY THESE TWO -- WITHDRAWN.

22            YOU CREATED THESE TWO DOCUMENTS ON APRIL 2ND, 2002,

23  CORRECT?

24  **A**   YES.

25  **Q**   IS THAT A "YES," SIR?

1    A    YES.

2    Q    AND YOU MADE THESE TO CREATE A CHAIN OF CUSTODY TO SHOW

3    THAT YOU HAD TRANSFERRED BOTH THE A BOTTLE AND THE B BOTTLE

4    FROM COLD STORAGE TO THE POSITIVE FREEZER; IS THAT CORRECT?

5    A    YES.

6    Q    AND THEN IF WE LOOK AT PAGE 12, YOUR NEXT INTERACT --

7    WITHDRAWN.

8         AFTER APRIL 12TH, 2002, YOU HAD NO FURTHER

9    INTERACTION WITH THAT BOTTLE, CORRECT?

10   A    THAT IS CORRECT.

11   Q    AND PAGE 31, WITH RESPECT TO THE B BOTTLE, AFTER YOU

12   TRANSFERRED IT TO THE POSITIVE FREEZER, YOU HAD NO MORE

13   INTERACTION WITH THE B BOTTLE; IS THAT CORRECT?

14   A    YES.

15   Q    AND WITH RESPECT TO PAGE 31, ARE YOU ABLE TO TELL US WHY

16   YOU TOOK THE ACTIONS OF TRANSFERRING THE B BOTTLE TO THE

17   POSITIVE FREEZER ON APRIL 2ND, 2002?

18   A    WOULD YOU REPEAT THE QUESTION?

19   Q    CAN YOU TELL US TODAY WHY YOU TOOK THOSE ACTIONS WITH THE B

20   BOTTLE ON APRIL 2ND, 2002?

21   A    THE A AND THE B BOTTLE REMAIN TOGETHER WHEN THEY ARE

22   TRANSFERRED.

23   Q    CAN YOU TELL US WHERE YOU WERE TRANSFERRING THEM TO THE

24   POSITIVE FREEZER FROM THE COLD ROOM ON THAT DATE?

25   A    NO, I CAN'T.

1    Q    I'M DONE WITH THESE EXHIBITS.  THANK YOU.

2              **MR. BALOGH:**  I WOULD LIKE YOU NOW TO TURN TO EXHIBIT

3    12, GOVERNMENT'S EXHIBIT 12, AND I'D FIRST LIKE TO LOOK AT PAGE

4    4.  CAN WE HAVE PAGE 4 ON THE SCREEN, PLEASE?

5              (DOCUMENT DISPLAYED.)

6    **BY MR. BALOGH**

7    Q    SAMPLE NUMBER UY 304, DO YOU HAVE THAT IN FRONT OF YOU,

8    SIR?

9    A    REPEAT THE PAGE.

10   Q    PAGE 4.  I THINK IT'S ON THE SCREEN NEXT TO YOU.  IT JUST

11   MIGHT BE EASIER, SIR.  DO YOU SEE IT?  YOU CAN LOOK ON THE

12   SCREEN.

13             **THE CLERK:**  DO WE NEED TO CLEAR THE SCREEN?

14             **MR. BALOGH:**  I THINK THAT'S RIGHT -- OH, YEAH.  CAN

15   WE CLEAR IT?  THANK YOU, TRACY.

16   **BY MR. BALOGH**

17   Q    MR. BISHOP, PAGE 4 OF GOVERNMENT EXHIBIT 12 IS A CHAIN OF

18   CUSTODY DOCUMENTATION FOR THE A BOTTLE OF UCLA CODE NUMBER

19   UY 304; ISN'T THAT TRUE?

20   A    YES.

21   Q    AND ON -- ACCORDING TO CHAIN OF CUSTODY, YOU TRANSFERRED

22   THIS BOTTLE FROM THE COLD ROOM TO THE POSITIVE FREEZER ON

23   APRIL 17TH, 2002, CORRECT?

24   A    YES.

25             **MR. BALOGH:**  AND FOR COURT AND COUNSEL, WE ARE NOW

1    DISCUSSING THE SAMPLE THAT RELATES TO THE TEST TAKEN ON

2    APRIL 10TH, 2002, ONE WEEK EARLIER.

3    **BY MR. BALOGH**

4    **Q**   MR. BISHOP?

5    **A**   REPEAT THE QUESTION.

6    **Q**   I WAS JUST IDENTIFYING WHICH SAMPLE SO WE CAN -- WE'RE

7    DEALING WITH THREE IN THIS CASE, SO WE KNOW WHEN THEY WERE

8    OBTAINED AND WHERE WE ARE IN THE PROCESS.

9            ON APRIL 17TH DID YOU RECEIVE A MEMO DIRECTING YOU

10   TO MOVE THIS BOTTLE NUMBER 463189 FROM THE COLD ROOM TO THE

11   POSITIVE FREEZER?

12   **A**   ON WHICH DATE AGAIN?  CAN YOU REPEAT THE DATE?

13   **Q**   ON APRIL 17TH, 2002.

14   **A**   YES.

15   **Q**   AND WAS THAT A WRITTEN MEMO?

16   **A**   YES.

17   **Q**   AND WHEN YOU LOOKED THROUGH EXHIBIT 1, CAN YOU FIND FOR US

18   A WRITTEN MEMO ANYWHERE WITHIN THERE?

19   **A**   NO, IT'S NOT HERE.

20   **Q**   IT'S NOT IN THERE.

21           CAN YOU TELL US TODAY THE REASONS WHY SAMPLE NUMBER

22   463189 WAS TRANSFERRED BY YOU FROM THE COLD ROOM TO THE

23   POSITIVE FREEZER ON APRIL 17TH, 2002?

24   **A**   TO ALIQUOT -- EXCUSE ME.  TO ALIQUOT IN ROOM 108.

25   **Q**   BUT CAN YOU TELL US WHY, AS OPPOSED TO BEING RETURNED TO

1   THE COLD ROOM, THIS BOTTLE FOUND ITS WAY TO THE POSITIVE

2   FREEZER AFTER IT HAD BEEN ALIQUOTED?

3   **A**   NO, I CAN'T, NOT WITHOUT A MEMO IN FRONT OF ME.

4   **Q**   AND WHEN YOU ALIQUOTED IT, THE ALIQUOT WAS FOR THE PURPOSE

5   OF HAVING THE SAMPLE GO THROUGH TESTING TO DETERMINE WHETHER OR

6   NOT THE URINE CONTAINED SUBSTANCES THAT WERE BANNED BY THE

7   RULES OF SPORT; IS THAT RIGHT?

8   **A**   THAT'S WHAT WE TEST ALL SAMPLES FOR.

9   **Q**   AND SO THE ALIQUOTING PROCESS -- WITHDRAWN.  ON OCTOBER --

10  WITHDRAWN.

11          SO THE -- WHEN YOU TOOK THE ALIQUOT, IT WAS FOR THE

12  PURPOSE OF TESTING THE SAMPLE; IS THAT RIGHT?

13  **A**   THAT'S CORRECT.

14  **Q**   AND IF YOU WERE TO TAKE THE SAMPLE FOR ALIQUOT CONFIRMATION

15  ON APRIL 17TH, 2002, YOU WOULD HAVE USED A STAMP THAT SAID

16  "ALIQUOT CONFIRMATION" AS THE PURPOSE, CORRECT?

17  **A**   THAT'S NOT -- NO.

18  **Q**   WOULD YOU HAVE INDICATED THE PURPOSE OF IT BY -- WITHDRAWN.

19          CAN YOU EXPLAIN THE DIFFERENCE BETWEEN THE STAMPS

20  "ALIQUOT AND ROOM 108" AND "ALIQUOT CONFIRMATION" THAT APPEAR

21  ON THE FIRST AND THIRD LINE OF THIS CHAIN OF CUSTODY DOCUMENT?

22  **A**   AT THE TIME IN 2002 WE WERE ALIQUOTING CONFIRMATIONS IN

23  ROOM 108.

24  **Q**   MY QUESTION IS:  IF YOU WERE DOING AN ALIQUOT CONFIRMATION,

25  WOULD YOU HAVE INDICATED ALIQUOT CONFIRMATION IN THE PURPOSE

1  BOX ON THE CHAIN OF CUSTODY FORM?

2  **A**   NOT AT THAT TIME, NO.

3  **Q**   YOU WOULD JUST WOULD SAY ALIQUOT FOR ANY ALIQUOTING

4  PURPOSE?

5  **A**   SAY ALIQUOT IN ROOM 108.

6  **Q**   IT DOESN'T INDICATE WHETHER IT'S FOR AN INITIAL SCREEN OR

7  AN ALIQUOT CONFIRMATION; IS THAT TRUE?

8  **A**   THAT'S TRUE.

9  **Q**   THERE'S A DIFFERENCE BETWEEN AN ALIQUOT FOR INITIAL SCREEN

10 AND ONE FOR CONFIRMATION; IS THAT CORRECT?

11 **A**   I WOULD BE ALIQUOTING THE SAMPLE.  I WOULD BE ALIQUOTING

12 THE SAMPLE.

13 **Q**   I DON'T UNDERSTAND, SIR.

14 **A**   ALIQUOTING IS ALIQUOTING.

15 **Q**   BUT YOU ALIQUOT FOR DIFFERENT PURPOSES, CORRECT?

16 **A**   YES.

17 **Q**   AND THOSE TWO PURPOSES ARE SCREENING AND CONFIRMATION,

18 CORRECT?

19 **A**   YES.

20 **Q**   AND AS WE KNOW FROM AT SOME POINT -- WITHDRAWN.

21        SO FROM THIS FORM, WE DON'T -- IS THERE ANY WAY TO

22 DERIVE WHAT THE PURPOSE OF THE ALIQUOTING WAS FOR ON

23 APRIL 17TH, 2002?

24 **A**   NO.  THAT'S WHY WE MAKE AN ALIQUOT CHAIN OF CUSTODY.

25 **Q**   AND ALIQUOTING HERE WAS -- DOES IT INDICATE WHAT THE

BISHOP / CROSS / BALOGH

1   PURPOSE OF THE ALIQUOTING WAS?

2   **A**   FOR WHAT DATE?

3   **Q**   APRIL 17TH, 2002.

4   **A**   YES.  IT SAYS TO ALIQUOT IN ROOM 108.

5   **Q**   DOES THAT INDICATE WHETHER IT'S AN ALIQUOT FOR A SCREEN OR

6   AN ALIQUOT FOR A CONFIRMATION?

7   **A**   NO, IT DOESN'T INDICATE THAT.

8   **Q**   IS THERE ANY WAY TO DERIVE FROM THE DOCUMENTS THAT COMPRISE

9   GOVERNMENT'S EXHIBIT 11 WHAT THE PURPOSE OF THE ALIQUOTING WAS

10  FOR ON APRIL 17TH, 2002?

11  **A**   NOT FOR THE 17TH OF 2002, NO.

12  **Q**   AND ON OCTOBER 26TH, ON THE SAME FORM, THERE IS AN

13  INDICATION OF WHAT THE PURPOSE OF THE ALIQUOTING WAS FOR ON

14  OCTOBER 26TH, 2006; IS THAT RIGHT?

15  **A**   IT SAYS TO ALIQUOT.

16  **Q**   WHEN SAYS "ALIQUOT," THERE YOU ORIGINALLY USED A STAMP

17  "ALIQUOT CONFIRMATION"; IS THAT RIGHT?

18  **A**   THAT IS CORRECT.

19  **Q**   AND THEN YOU REALIZED YOU WERE IN ERROR FOR THE PURPOSE,

20  AND YOU STRUCK OUT THE WORD "CONFIRMATION" AND INITIALED THE

21  DOCUMENT AND THE DATE THAT YOU HAD MADE THAT STRIKE, CORRECT?

22  **A**   THAT'S CORRECT.

23  **Q**   AND YOU HAD USED THE ALIQUOT CONFIRMATION STAMP --

24  WITHDRAWN.

25          AND WHEN YOU STRUCK "CONFIRMATION," THAT YOU WERE

1  ALIQUOTING SOLELY FOR THE PURPOSE OF THE SCREEN ON

2  OCTOBER 26TH, 2006?

3  **A**    THAT IS CORRECT.

4  **Q**    AND WHEN YOU ALIQUOT FOR A CONFIRMATION, YOU USE AN ALIQUOT

5  CONFIRMATION STAMP; IS THAT RIGHT?

6  **A**    YES.

7  **Q**    WHEN DID THAT STAMP OR THIS CHANGE OF PROTOCOL COME INTO

8  EXISTENCE?

9  **A**    I CAN'T RECALL.

10  **Q**    HAVE YOU DISCUSSED YOUR TESTIMONY HERE TODAY WITH ANYBODY

11  PRIOR TO DELIVERING IT ON THE STAND?

12  **A**    I CAN'T RECALL.

13  **Q**    WITHIN THE LAST TWO DAYS, HAVE YOU DISCUSSED YOUR TESTIMONY

14  HERE TODAY WITH ANYBODY ON THE STAND?

15          **THE COURT:**  WITH ANYBODY ON THE STAND?

16          **MR. BALOGH:**  I'M SORRY.  THANK YOU, YOUR HONOR.

17  **BY MR. BALOGH**

18  **Q**    HAVE YOU DISCUSSED WITHIN THE LAST TWO DAYS THE TESTIMONY

19  YOU'VE GIVEN HERE TODAY?

20  **A**    I CAN'T RECALL.

21  **Q**    HAVE YOU HAD MEMORY PROBLEMS OVER THE LAST TWO DAYS THAT WE

22  SHOULD KNOW ABOUT?

23  **A**    NO.

24  **Q**    YOU JUST DON'T KNOW ONE WAY OR THE OTHER?

25  **A**    I DON'T KNOW IF I SPOKE ABOUT THIS CASE.

1   Q   DID YOU TALK ABOUT IT WITH GOVERNMENT COUNSEL?

2   A   YES.

3   Q   YOU RECALL THAT?

4   A   YES.

5   Q   DID YOU TALK ABOUT IT WITH AGENT NOVITZKY?

6   A   NO.

7   Q   IN THOSE CONVERSATIONS, DID YOU -- WAS IT PART OF TO

8   DESCRIBE THE QUESTIONS YOU WOULD BE ASKED BOTH BY THE

9   PROSECUTION AND THE DEFENSE?

10  A   COULD YOU REPEAT THE QUESTION?

11  Q   WAS PART OF THOSE DISCUSSIONS BEING INFORMED OR DISCUSSING

12  WHAT YOU WOULD BE ASKED BOTH BY THE PROSECUTION AND DEFENSE

13  WHILE YOU TESTIFIED?

14  A   YES.

15  Q   NOW, MR. BISHOP, DO YOU HAVE ANY BIASES AGAINST MS. THOMAS?

16  A   NOT AT ALL.

17  Q   IS THERE -- HAS ANYTHING OCCURRED WITH RESPECT TO HER AND

18  YOU IN YOUR INTERACTIONS THAT WOULD GIVE RISE TO AN INFERENCE

19  THAT YOU MAY HAVE HARD FEELINGS AGAINST HER?

20  A   COULD YOU REPEAT THAT?

21  Q   HAS SHE EVER DONE ANYTHING TO YOU THAT WOULD MAKE YOU UPSET

22  WITH HER?

23  A   NO.

24  Q   SHE SUED YOU, THOUGH, CORRECT?

25  A   NO, NOT THAT I KNOW OF.

1  Q    YOU ARE UNAWARE YOU WERE NAMED IN THE LAWSUIT AGAINST THE

2  UCLA LAB FOR THE TREATMENT OF THESE SAMPLES?

3  A    YES.

4  Q    SO YOU WERE AWARE THAT YOU WERE NAMED IN THE COMPLAINT THAT

5  SHE HAD FILED AGAINST YOUR EMPLOYER FOR THE TREATMENT OF HER

6  SAMPLES?

7  A    NO, I WAS NOT AWARE OF --

8  Q    SO THIS IS THE FIRST TIME YOU HEARD OF IT, SIR?

9  A    YES.

10          **THE CLERK:**  I WILL TENDER THE WITNESS.

11          **THE COURT:**  THANK YOU.

12          ANYTHING FURTHER, MR. PARRELLA?

13          **MR. PARRELLA:**  YES, YOUR HONOR.  JUST BRIEFLY.

14          **REDIRECT EXAMINATION BY MR. PARRELLA**

15  BY MR. PARRELLA

16  Q    MR. BISHOP, IS IT PART OF YOUR JOB TO FOCUS ON WHETHER

17  BOTTLES RETURN SAMPLES THAT ARE POSITIVE OR NEGATIVE?

18  A    NO, I DON'T MAKE THAT DETERMINATION.

19  Q    AND IF SOMETHING IS PUT IN A -- WITHDRAWN.

20          IF SOMETHING IS NOT PUT IN THE POSITIVE FREEZER, A

21  BOTTLE IS NOT PUT IN THE POSITIVE FREEZER, WHAT IS THE TYPICAL

22  RETENTION TIME FOR THE LAB?

23  A    IF IT'S NOT PUT IN THE POSITIVE FREEZER, THE SAMPLE IS

24  DISCARDED TWO WEEKS AFTER IT'S RECORDED AT THAT TIME.

25  Q    IF A SAMPLE -- IF THE LAB WANTED TO KEEP THE SAMPLE FOR A

1  LONG PERIOD OF TIME, WOULD THE POSITIVE FREEZER BE USED?

2          **MR. BALOGH:**  OBJECTION.  CALLS FOR SPECULATION,

3  HYPOTHETICAL.

4          **THE COURT:**  SUSTAINED.

5  **BY MR. PARRELLA**

6  **Q**   TELL ME HOW THE POSITIVE FREEZER WOULD BE USED, IF YOU

7  KNOW, IN A CASE WHERE A SAMPLE NEEDS TO BE KEPT.

8  **A**   WELL, THE SAMPLES IN THE POSITIVE FREEZER ARE GENERALLY NOT

9  THROWN OUT ON A REGULAR BASIS.

10  **Q**   HOW LONG ARE THEY KEPT, IF YOU KNOW?

11  **A**   POSITIVE SAMPLES ARE RETAINED FOR TWO YEARS AFTER THEY

12  REPORTED POSITIVE.

13          **MR. PARRELLA:**  THANK YOU.  NOTHING FURTHER.

14          **THE COURT:**  THANK YOU.  MAY THE WITNESS BE EXCUSED?

15          **MR. PARRELLA:**  YES, YOUR HONOR.

16          **MR. BALOGH:**  YES.

17          **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH, SIR.

18  YOU'RE EXCUSED.

19          **THE WITNESS:**  THANK YOU.

20          (THE WITNESS STEPPED DOWN FROM THE WITNESS STAND.)

21          **THE COURT:**  AT THIS TIME, I THINK WE SHOULD TAKE OUR

22  FIRST MORNING BREAK.  LADIES AND GENTLEMEN, IF YOU WOULD BE

23  READY TO COME BACK, PLEASE, AT TEN MINUTES AFTER 10:00.  IN THE

24  MEANTIME, DON'T SPEAK WITH EACH OTHER OR ANYONE ELSE ABOUT THE

25  CASE.  DON'T MAKE UP YOUR MINDS.  YOU HAVE NOT HEARD ALL THE

```
 1   EVIDENCE YET.

 2           (RECESS TAKEN.)

 3           THE COURT:  WELCOME BACK, LADIES AND GENTLEMEN.  YOU

 4   MAY ALL BE SEATED.

 5           THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

 6           MR. PARRELLA:  THANK YOU, YOUR HONOR.  WE WOULD CALL

 7   BRIAN OSHINOMI.

 8           THE CLERK:  GO AHEAD AND HAVE A SEAT.  I'M GOING TO

 9   TAKE YOUR PICTURE.

10           (THE WITNESS' PHOTOGRAPH WAS TAKEN.)

11           THE CLERK:  RAISE YOUR RIGHT HAND.

12                       BRIAN OSHINOMI

13   HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

14   DULY SWORN AND EXAMINED AS FOLLOWS:

15           THE WITNESS:  I DO.

16           THE COURT:  GO AHEAD AND STATE YOUR FULL NAME FOR

17   THE RECORD.

18           THE WITNESS:  BRIAN OSHINOMI.

19           THE CLERK:  SPELL YOUR LAST NAME, PLEASE.

20           THE WITNESS:  O-S-H-I-N-O-M-I.

21           THE CLERK:  THANK YOU.

22       MR. PARRELLA:  MAY I PROCEED, YOUR HONOR?

23       THE COURT:  YOU MAY.

24       MR. PARRELLA:  THANK YOU.

25              DIRECT EXAMINATION BY MR. PARRELLA
```

1  **BY MR. PARRELLA**

2  **Q**    MR. OSHINOMI, HOW ARE YOU EMPLOYED?

3  **A**    I WAS A CHEMIST AT THE UCLA OLYMPIC LAB.

4  **Q**    WHAT DO YOU DO NOW?

5  **A**    I WORK AS AN ACCOUNTANT AT PRAGER & FENTON.

6  **Q**    WHAT TIME PERIOD WERE YOU A CHEMIST AT THE UCLA LAB?

7  **A**    I STARTED IN SEPTEMBER OF '01.  I LEFT ABOUT FIVE AND A

8  HALF YEARS LATER IN MAY.

9  **Q**    I'M SORRY.  FIVE YEARS LATER?

10  **A**    FIVE AND A HALF YEARS LATER OR SO.  IT WAS LIKE LAST YEAR.

11  **Q**    SO MAY OF '07?

12  **A**    I THINK THAT'S WHAT IT WAS.

13  **Q**    WHAT WAS YOUR TITLE DURING THE TIME WHEN YOU WERE AT THE

14  UCLA LAB?

15  **A**    AT THE END OF MY LAB, I WAS PROMOTED TO CHEMISTRY

16  SUPERVISOR, BUT I STARTED OUT AS ASSAY CHEMIST.

17  **Q**    LET ME ASK YOU, IN THE TIMEFRAME OF OCTOBER 2006, WHAT WAS

18  YOUR TITLE?

19  **A**    I WOULD HAVE BEEN CHEMISTRY SUPERVISOR.

20  **Q**    WHAT ARE THE DUTIES OF CHEMISTRY SUPERVISOR?

21  **A**    IT'S JUST MORE OF A MANAGEMENT ROLE.  I STILL HAVE ASSAY

22  CHEMIST RESPONSIBILITIES, BUT I WAS IN CHARGE OF, YOU KNOW,

23  MAKING THE SCHEDULE, APPROVING VACATION, SICK, ORDERING

24  SUPPLIES, AND THINGS OF THAT NATURE.

25  **Q**    OKAY.  WOULD YOU MAKE ANY DECISIONS ABOUT WHERE ITEMS ARE

1  STORED, OR IS THAT ABOVE YOUR PAY GRADE?

2  **A**   A LITTLE BIT.  I MEAN, WE HAD A SAFETY OFFICER.  SO,

3  OBVIOUSLY, YOU KNOW, WE WOULD TALK WITH THE CHEMISTS WITH

4  REGARDS TO WHAT THEIR SUGGESTIONS WOULD BE, BUT, OBVIOUSLY, WE

5  HAD TO HAVE SAFETY REGULATIONS AND THINGS OF THAT NATURE.

6  **Q**   OKAY.  LET ME DIRECT YOUR ATTENTION NOW TO OCTOBER 27TH,

7  2006.

8          YOUR HONOR, I'LL ASK THAT THE SAMPLE FOR

9  GOVERNMENT'S 10, PAGE 5, SMP 03, WHICH IS IN EVIDENCE NOW --

10  OKAY.  CAN YOU -- CAN WE HAVE THAT PUT ON THE SCREEN?  IS THAT

11  ON?

12          **THE CLERK:**  SURE.  WAIT.  I'VE GOT TO PUBLISH IT.

13  SORRY.

14          (DOCUMENT DISPLAYED.)

15          **MR. PARRELLA:**  THANK YOU.

16  **BY MR. PARRELLA**

17  **Q**   IS THAT ON UP THERE, MR. OSHINOMI?

18  **A**   YEAH.

19  **Q**   OKAY.  THANK YOU.

20          CAN YOU TAKE A LOOK AT THAT AND TELL ME IF YOU

21  RECOGNIZE THAT?

22  **A**   YEAH, IT'S OUR STANDARD CHAIN OF CUSTODY.

23  **Q**   ALL RIGHT.  AND IS THAT A DOCUMENT YOU HAD PERSONAL CONTACT

24  WITH?

25  **A**   YES.

1  Q    ALL RIGHT.  WHAT DAY DID YOU FIRST HAVE CONTACT WITH THAT?

2  A    OCTOBER 27TH, 2006.

3  Q    OKAY.  AND WHAT UCLA NUMBER IS THAT REFERRING TO?

4  A    THIS IS SAMPLE CODE?

5  Q    YES.

6  A    SMP 03.

7  Q    THANK YOU.

8  A    SORRY.

9  Q    AND CAN YOU TELL US WHAT DID YOU DO WITH SAMPLE CODE

10 SMP 03?

11 A    OKAY.  BASICALLY, I TOOK THE SAMPLE OUT OF REFRIGERATOR 12,

12 AND I BASICALLY STAMPED AND SIGNED OUT THAT I TOOK CUSTODY OF

13 THE SAMPLE.

14         ON THE RIGHT SIDE, THE PURPOSE IS TO PERFORM THE

15 ASSAY, SO IN THIS CASE, IT'S THE --

16 Q    LET ME STOP YOU THERE.  WAS THIS A BOTTLE OR AN ALIQUOT?

17 A    IT WAS AN ALIQUOT IN A TEST TUBE.

18 Q    SO IT'S TEST TUBES?

19 A    YES.

20 Q    COULD YOU DESCRIBE THE TEST TUBES?

21 A    IN THIS CASE, IT PROBABLY WOULD HAVE BEEN IN A ROUND BOTTOM

22 TUBE 15 MILLILITER.  IT'S A STANDARD TEST TUBE THAT CAN FIT IN

23 A RACK.  BASICALLY, THERE'S -- A SAMPLE CODE IS LISTED.  WE'RE

24 SUPPOSED TO MAKE SURE THE CHAIN OF CUSTODY MATCHES UP WITH THE

25 CODE ON THE TUBE ITSELF, MAKE SURE THERE'S NO DISCREPANCIES,

1    AND THEN, DEPENDING ON WHAT ASSAYS NEED TO BE DONE, I PERFORMED

2    THE ASSAY ON THE TWO SAMPLES IN THE RACK.

3    **Q**    LET ME STOP YOU.  DID YOU CHECK THE SAMPLE CODE NUMBERS?

4    **A**    YES.

5    **Q**    DID THEY MATCH UP?

6    **A**    YES.

7    **Q**    AND DID YOU KNOW WHETHER THIS AT THE TIME -- WELL,

8    WITHDRAWN.

9            AT THE TIME WHEN YOU BEGAN YOUR PROCESS, DID YOU

10   KNOW WHETHER THIS WAS FOR AN ALIQUOT OR FOR AN ALIQUOT

11   CONFIRMATION?

12   **A**    LOOKING AT THE CHAIN OF CUSTODY, NO, BUT I REALLY DON'T

13   REMEMBER QUITE HONESTLY.

14   **Q**    DID IT MAKE ANY DIFFERENCE TO WHAT YOU DID?

15   **A**    NO.  THE PROCEDURE IS THE SAME.

16   **Q**    OKAY.  SO YOU SAID THAT YOU TOOK THE ALIQUOT FROM

17   REFRIGERATOR 12 TO PERFORM AN ASSAY.  CAN YOU TELL US WHAT AN

18   ASSAY IS?

19   **A**    IN THIS CASE, FOR OUR LAB, IT'S JUST A CHEMICAL PROCEDURE.

20   WE'RE BASICALLY PREPARING THE SAMPLE FOR INSTRUMENTATION, AND

21   IN THIS CASE IT'S LC/MS/MS.

22   **Q**    HOLD ON.  WHAT IS LC/MS?

23   **A**    I COULD TELL YOU WHAT IT STANDS FOR, BUT I CAN'T TELL YOU

24   WHAT IT ACTUALLY IS.

25   **Q**    TELL US WHAT IT STANDS FOR.

1    **A**    LIQUID CHROMATOGRAPHY MASS SPECTROMETRY.

2    **Q**    DID YOU HAVE ANY PART IN THAT ACTUAL SECTION?

3    **A**    NO.  AS SOON AS I FINISHED THE ASSAY I PUT THE SAMPLE IN

4    TEMPORARY STORAGE.

5    **Q**    SO LET'S TALK ABOUT THE ASSAY, IF WE COULD.  TELL US WHAT

6    ASSAY YOU PERFORMED IN THIS CASE.

7    **A**    WE CALL IT THE THG ASSAY.  BASICALLY, THE SAMPLE IS -- WE

8    ADD AN ENZYME, AND WE INCUBATE IT FOR AN HOUR.  AFTERWARDS, WE

9    DO A LIQUID-LIQUID EXTRACTION.  WE ADD SOME PENTANE ETHER,

10   SHAKE IT AND CENTRIFUGE IT.  WE TAKE THE ETHER PENTANE LAYER

11   OFF, AND WE DRY IT DOWN TO CONCENTRATE IT FOR LC/MS/MS.  THEN

12   THERE'S A SPECIAL BUFFER THAT THIS PARTICULAR FOOT INSTRUMENT

13   THAT WE USE TO RECONSTITUTE IT.

14   **Q**    SO WHAT IS -- WITHDRAWN.

15          IN WHAT FORM IS THIS BUFFER?

16   **A**    THE FIRST BUFFER OR THE LAST BUFFER?  THERE'S A BUFFER AT

17   THE VERY BEGINNING THAT WE ADD TO THE SAMPLE.  THAT'S THE --

18   NOTHING REALLY SPECIAL.  THE SECOND BUFFER IS JUST -- I'M NOT

19   TOO SURE WHAT THE SPECIFICS OF IT, BUT IT'S GOOD FOR THE

20   INSTRUMENT FOR WHEN IT RUNS.

21   **Q**    SO LET ME SEE IF I HAVE THIS STRAIGHT.  SO YOU TAKE THE

22   ALIQUOT, CORRECT?  YES?

23   **A**    YES.

24   **Q**    YOU HAVE TO ANSWER OUT LOUD.

25   **A**    SORRY.  YES.

OSHINOMI / DIRECT — PARRELLA

1  Q    AND YOU PREPARE IT FOR THE ASSAY BY ADDING A BUFFER?

2  A    RIGHT.

3  Q    AND THEN YOU GO THROUGH THE STEPS YOU DESCRIBE AND

4  ULTIMATELY DRY DOWN THE SAMPLE?

5  A    CORRECT.

6  Q    AND WHAT DOES IT BECOME AT THAT POINT?

7  A    BASICALLY --

8  Q    LET ME WITHDRAW THAT.  SORRY.  I DON'T MEAN CHEMICALLY.  I

9  JUST MEAN WHAT FORM DOES IT TAKE.

10 A    OKAY.  I GUESS THE BEST WAY TO PICTURE IT IS YOU START OFF

11 WITH THE SAMPLE WITH THE URINE IN THE TUBE.  AFTER YOU SHAKE IT

12 AND CENTRIFUGE IT AND ADD THE PENTANE EITHER -- WHEN YOU

13 CENTRIFUGE IT, IT SEPARATES.  SO THERE'S A CLEAR LAYER OF

14 ORGANIC, WHICH IS THE ETHER AND PENTANE, AND THERE'S THE URINE.

15         SO USING A PIPETTE, WE TAKE OFF THE ETHER PENTANE

16 LAYER INTO A CLEAN TUBE, WHICH WE DRY IT DOWN.  SO, BASICALLY,

17 IT'S -- IT'S CLEAR, BECAUSE THE EITHER PENTANE IS CLEAR.  SO,

18 THERE'S BASICALLY NOTHING VISIBLE IN THE TUBE AFTER WE DRY IT

19 DOWN.

20         THEN AFTER DRYING IT DOWN, WE RECONSTITUTE IT,

21 BASICALLY ADDING -- I THINK IT'S A HUNDRED MICROLITERS, BUT I

22 DON'T REMEMBER EXACTLY -- OF PHOSPHATE -- I MEAN OF

23 RECONSTITUTION BUFFER, AND THEN YOU VORTEX IT.  THEN YOU

24 TRANSFER THAT TO A CHROMATOGRAPHY VIAL, AND THAT'S THE WAY THE

25 INSTRUMENT ANALYZES THE SAMPLE, I GUESS IS THE BEST WAY TO PUT

1    IT.

2    Q    SO DID YOU PERFORM THAT PROCEDURE ON SMP 03 ON OCTOBER 27TH

3    '06?

4    A    YES.

5    Q    AFTER YOU GOT IT INTO THE VIAL, WHAT DID YOU DO WITH IT?

6    A    I WOULD HAVE WALKED IT OVER TO TEMPORARY STORAGE, AND I

7    WOULD HAVE SIGNED IT OUT THERE.

8    Q    I'M SORRY.  DID YOU NOTE THAT ON THE FORM THAT'S ON THE

9    COMPUTER THERE, PAGE 5 OF EXHIBIT 10?

10   A    YEAH, THAT'S LINE THREE.  MY SIGNATURE IS ON THE LEFT, AND

11   THEN I SIGNED IT TO TEMPORARY STORAGE, AND THE PURPOSE IS

12   TEMPORARY STORAGE.

13   Q    DID YOU HAVE ANY FURTHER CONTACT WITH THE ALIQUOT FROM

14   SMP 03?

15   A    NOT AFTER THAT.

16   Q    OKAY.  THANK YOU.  LET'S TURN TO A DIFFERENT SAMPLE, IF WE

17   COULD, SAME DATE.  DID YOU HAVE CONTACT WITH SAMPLE -- EXCUSE

18   ME -- WITH AN ALIQUOT FROM SAMPLE UY 304?

19   A    IT DIDN'T SHOW UP.

20          MR. PARRELLA:  HOLD ON ONE SEC.  I'LL ASK THAT PAGE

21   5 OF GOVERNMENT 12 -- IS THAT PUBLISHED?  PAGE 5 OF GOVERNMENT

22   12?

23          (DOCUMENT DISPLAYED.)

24   BY MR. PARRELLA

25   Q    CAN YOU TAKE A LOOK AT THAT, MR. OSHINOMI?

1   **A**   SURE.

2   **Q**   DID YOU HAVE ANY CONTACT WITH AN ALIQUOT FROM SAMPLE

3   UY 304?

4   **A**   YES, I DID.

5   **Q**   WHAT WAS YOUR CONTACT?

6   **A**   BASICALLY, THE SAME AS THE LAST ONE.  I TOOK THE SAMPLE OUT

7   OF REFRIGERATOR 12 AND PERFORMED THE ASSAY.

8   **Q**   WAS THIS THE SAME ASSAY?

9   **A**   YES, IT WAS.

10  **Q**   DID YOU PERFORM THE SAME STEPS AS YOU DID IN THE -- WITH

11  THE OTHER SAMPLE; IN OTHER WORDS, MATCHING THE SAMPLE CODE

12  NUMBERS?

13  **A**   YES.

14  **Q**   AND DID EVERYTHING MATCH IN THIS CASE?

15  **A**   YES, IT DID.

16  **Q**   DID -- WITHDRAWN.

17          WERE YOU DOING THESE AT THE SAME TIME OR

18  SUBSEQUENTLY, OR WHAT?

19  **A**   I CAN'T TELL FROM THE CHAIN OF CUSTODY, BUT MY GUESS IS,

20  YES, I DID THEM AT THE SAME TIME.

21  **Q**   WAS THAT UNCOMMON?

22  **A**   NO, NOT REALLY.

23  **Q**   SO AFTER YOU -- WELL, WITHDRAWN.

24          HOW LONG DOES THE ASSAY TAKE, OR THIS PARTICULAR

25  ASSAY?

1    A    I'D SAY ABOUT THREE AND A HALF HOURS, MAYBE LESS, DEPENDING

2    ON HOW MANY SAMPLES TOTALLY WERE WORKED UP.

3    Q    AND WHAT DID YOU DO -- WELL, WITHDRAWN.

4              YOU GOT TO THE SAME POINT AS YOU TESTIFIED ON

5    SMP 03, YOU GOT TO THAT POINT WITH UY 304 WHERE YOU HAD

6    PREPARED THE SAMPLE FOR TESTING IN THE LC/MS?

7    A    YEAH.

8    Q    AND WHAT WAS THE FINAL FORMAT THAT YOU HAD THE SAMPLE IN

9    UY 304?

10   A    THE SAME AS THE LAST ONE.  IT WAS RECONSTITUTED AND

11   TRANSFERRED TO A CHROMATOGRAPHY VIAL AND THEN TRANSFERRED TO

12   TEMPORARY STORAGE FOR THE NEXT STEP.

13   Q    AND AFTER YOU PUT IT IN TEMPORARY STORAGE, DID YOU HAVE ANY

14   FURTHER CONTACT WITH IT?

15   A    NO.

16           **MR. PARRELLA:**  YOUR HONOR, I HAVE NOTHING FURTHER.

17           **THE COURT:**  THANK YOU.

18           MR. BALOGH?

19           **MR. BALOGH:**  WE HAVE NO QUESTIONS.  HE MAY BE

20   EXCUSED.

21           **THE COURT:**  THANK YOU VERY MUCH, SIR.  YOU ARE

22   EXCUSED.

23           GOVERNMENT MAY CALL ITS NEXT WITNESS.

24           **MR. PARRELLA:**  THANK YOU, YOUR HONOR.  WE CALL

25   JEREMY PRICE.

1              (THE WITNESS' PHOTOGRAPH WAS TAKEN.)

2                          **JEREMY PRICE**

3    HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

4    DULY SWORN AND EXAMINED AS FOLLOWS:

5              **THE CLERK:**  PLEASE STATE YOUR FULL NAME FOR THE

6    RECORD.

7              **THE WITNESS:**  JEREMY DAVID PRICE.

8              **THE CLERK:**  AND SPELL YOUR LAST NAME FOR THE RECORD?

9              **THE WITNESS:** P-R-I-C-E.

10             **THE CLERK:**  THANK YOU.

11                  **DIRECT EXAMINATION BY MR. PARRELLA**

12             **MR. PARRELLA:**  THANK YOU.

13   **BY MR. PARRELLA**

14   **Q**   MR. PRICE, CAN YOU TELL US HOW YOU'RE EMPLOYED?

15   **A**   CURRENTLY I WORK FOR ANTIDOPING RESEARCH.

16   **Q**   WHAT DO YOU DO FOR THEM?

17   **A**   I AM A RESEARCH ASSOCIATE.  I DO MOSTLY MASS SPECTORMETRY

18   WORK NOW.

19   **Q**   AND BACK IN -- WELL, WITHDRAWN.

20             DID YOU ONCE WORK FOR THE UCLA ANALYTICAL

21   LABORATORY?

22   **A**   I DID.

23   **Q**   CAN YOU TELL US WHEN?

24   **A**   I STARTED THERE I BELIEVE AROUND 2002 AND LEFT AROUND 2004,

25   2005.

1  Q   WHAT WAS YOUR TITLE WHEN YOU STARTED THERE?

2  A   RESEARCH -- I'M SORRY.  LAB ASSISTANT THREE.

3  Q   WHAT WAS YOUR TITLE WHEN YOU LEFT?

4  A   I'M SORRY.  WHEN I STARTED THERE, IT WAS LAB ASSISTANT ONE.

5  WHEN I LEFT IT WAS LAB ASSISTANT TWO.

6  Q   WHAT WERE YOUR DUTIES THERE?

7  A   I STARTED IN THE CHEMISTRY DEPARTMENT AND EVENTUALLY WORKED

8  IN GC/MS AND LC/MS COMPARTMENTS.

9  Q   BEFORE WE GET TO THAT, WHAT IS YOUR EDUCATION?

10  A   I HAVE A BACHELOR OF SCIENCE IN BIOLOGY.

11  Q   CAN YOU TELL US WHAT YOUR DUTIES WERE WITH REGARDS TO THE

12  LC/MS?

13  A   MINOR MAINTENANCE OF THE INSTRUMENT, LOADING SAMPLES,

14  WRITING SEQUENCES, UNLOADING SAMPLES.

15  Q   AND TELL US WHAT THE LC/MS IS.

16  A   LC/MS STANDS FOR LIQUID CHROMATOGRAPHY/MASS SPECTROSCOPY.

17  Q   WHAT DOES IT DO?

18  A   IT'S -- BASICALLY, IT SEPARATES COMPONENTS OF WHATEVER YOU

19  INJECT AND THEN DETECTS THEM ON THE MASS SPEC.

20  Q   AND WHAT SORT OF DOCUMENTS DOES IT GENERATE, IF ANY?

21  A   YOU CAN DOCUMENT -- YOU CAN GET RAW DATA, WHICH ARE

22  BASICALLY JUST NUMBERS, OR YOU CAN GET CHROMATOGRAMS, OR BOTH.

23          MR. PARRELLA:  AND IF WE COULD HAVE ON

24  GOVERNMENT 10, PAGE 5 PULLED UP?

25          (DOCUMENT DISPLAYED.)

1  **BY MR. PARRELLA**

2  **Q**   CAN YOU TAKE A LOOK AT WHAT'S ON THE SCREEN, GOVERNMENT 10,

3  PAGE 5?  TELL ME IF YOU RECOGNIZE THAT DOCUMENT.

4  **A**   I DO.

5  **Q**   WHAT IS THAT?

6  **A**   THAT'S A WORKING CHAIN OF CUSTODY.

7  **Q**   DID YOU HAVE ANY CONTACT WITH THAT DOCUMENT?

8  **A**   I DID.

9  **Q**   WHAT WAS YOUR CONTACT?

10 **A**   WELL, I REMOVED THE SAMPLES FROM THE TEMPORARY STORAGE IN

11 LC/MS DEPARTMENT.

12 **Q**   WHAT DATE WAS THAT?

13 **A**   THAT WAS THE 27TH OF OCTOBER 2006.

14 **Q**   OKAY.  AND WHAT ELSE DID YOU DO WITH IT?

15 **A**   I TRANSFERRED THOSE SAMPLES TO THE LC/MS AUTO SAMPLER, THE

16 SEQUENCE WAS RUN, AND THEN I TRANSFERRED THEM OFF OF THE AUTO

17 SAMPLER TO THE TRASH CAN FOR DISPOSAL.

18 **Q**   SO WHAT FORM WERE THESE SAMPLES IN WHEN YOU GOT THEM?

19 **A**   THEY WERE IN VIALS.

20 **Q**   IS THAT TYPICAL?

21 **A**   VERY TYPICAL, YES.

22 **Q**   IN FACT, IS IT REQUIRED FOR THE MACHINE TO RUN THE AUTO

23 SAMPLER?

24 **A**   EXACTLY.

25 **Q**   WAS THERE ANYTHING ABOUT -- WELL, WITHDRAWN.

1          DID YOU CHECK THE CODE NUMBER TO SEE IF IT MATCHED?

2   **A**   YES, SIR.  THAT'S STANDARD OPERATING PROCEDURE.

3   **Q**   DID IT MATCH?

4   **A**   YES.

5   **Q**   AND WAS THERE ANYTHING ABOUT THE VIALS THAT WOULD

6   DISQUALIFY THESE SAMPLES FROM BEING RUN IN THE AUTO SAMPLER?

7   **A**   NO, SIR.  IF THERE WERE, I WOULDN'T HAVE RUN THEM.

8   **Q**   TELL US HOW THE AUTO SAMPLER WORKS.  WITHDRAWN.

9          IS THE AUTO SAMPLER PART OF THE LC/MS MACHINE?

10  **A**   THE -- YES, THE AUTO SAMPLER IS A PORTION OF THE LC/MS.

11  **Q**   OKAY.  COULD YOU TELL US HOW THAT WORKS WITH THE LC/MS?

12  **A**   THE AUTO SAMPLER BASICALLY PICKS UP THE SAMPLE, DELIVERS IT

13  TO THE INDUCTION PORT, AND THAT'S ABOUT IT.  IT BASICALLY JUST

14  INJECTS THE SAMPLE.

15  **Q**   AND THEN WHAT DOES THE LC/MS DO RELEVANT TO THE INJECTION

16  PORT?

17  **A**   WELL, ONCE THE SAMPLE IS INJECTED, THE LC IS -- IT'S

18  BASICALLY JUST THE PUMPS THAT PUSH THE SAMPLE THROUGH THE

19  TUBING, THROUGH THE LC COLUMN, AND DELIVER IT TO THE MASS SPEC.

20  **Q**   CAN YOU BRIEFLY DESCRIBE WHAT PHYSICALLY THE LC/MS DOES

21  WITH THE SAMPLE?

22  **A**   WELL, BASICALLY, THE SAMPLE IS RETRIEVED THROUGH A SYRINGE,

23  DELIVERED TO AN INJECTION PORT.  ONCE IT HITS THE INJECTION

24  PORT, IT'S COMPLETELY SEALED.  THE SAMPLE TRAVELS THROUGH

25  TUBING TO A COLUMN.  THE LC COLUMN IS WHAT SEPARATES THE

 1  SAMPLE, SEPARATES THE COMPOUNDS IN THE SAMPLE, AND THEN THE

 2  SAMPLE GOES TO THE MASS SPEC WHERE IT'S ANALYZED.

 3  Q    OKAY.  IS THERE A PORTION OF THE RUN THAT CHECKS ON THE

 4  QUALITY OF THAT RUN?

 5  A    WELL, AT THE END OF THE SEQUENCE, YOU CAN CHECK THE DATA TO

 6  MAKE SURE THAT THE INTERNAL STANDARD CAME OUT CORRECTLY.

 7  THAT'S BASICALLY WHAT WE GO BY TO MAKE SURE THE SEQUENCE WAS

 8  INJECTED PROPERLY, THE SAMPLE RAN PROPERLY.

 9  Q    WERE THERE ANY INDICATIONS THAT THIS SAMPLE RAN IMPROPERLY?

10  A    NO, SIR.

11  Q    LET ME SHOW YOU FROM GOVERNMENT 10, THIS IS THE BOTTOM

12  CENTER PAGES, BECAUSE THE TOP PAGES ARE SLIGHTLY DIFFERENT,

13  PAGES 6 THROUGH 11.  DO YOU RECOGNIZE THOSE PAGES?

14  A    YES.  THIS ONE OF THEM IS THE SEQUENCE AND THE REST LOOK TO

15  BE CHROMATOGRAMS.

16  Q    OKAY.  AND ARE THOSE RELEVANT TO THE LC/MS THAT YOU RAN ON

17  SMP 03 ON OCTOBER 27TH, '06?

18  A    NOT -- ACTUALLY, I'M SORRY.  NO.  SMP IS NOT HERE.  THE

19  SEQUENCE -- THE SEQUENCE HAS THE SAMPLE SMP 03, BUT I DON'T

20  HAVE A CHROMATOGRAM FOR SMP 03.

21  Q    OKAY.  LET ME TAKE THESE BACK.

22          ARE THOSE -- WHAT PAGE DO YOU HAVE THERE?  THAT'S

23  PAGE 6?

24  A    THIS IS -- IT'S PAGE 6, CORRECT.

25  Q    IS THAT REQUIRED TO BE KEPT AS PART OF THE DUTIES OF THE

1    UCLA OLYMPIC LAB?

2    **A**    YES, SIR.

3    **Q**    HOW IS THAT ACTUALLY GENERATED?

4    **A**    THIS IS GENERATED THROUGH SOFTWARE ON THE COMPUTER THAT

5    CONTROLS THE MASS SPEC.

6    **Q**    IT'S KEPT AS PART OF THE RECORDS OF UCLA LAB?

7              **MR. BALOGH:**  YOUR HONOR, I THINK MR. PARRELLA, WHEN

8    YOU SAID "PAGE 6," YOU ARE TALKING ABOUT THE UPPER RIGHT CORNER

9    WHICH IS LISTED AS SEVEN ON THE BOTTOM, THE SCREEN SHEET.  I

10   DON'T KNOW WHICH PAGE WE ARE WORKING WITH.

11             **THE COURT:**  IT SOUNDS LIKE SEVEN.

12             **MR. PARRELLA:**  YES, I'M SORRY.  CORRECT.  CORRECT.

13   I'M SORRY ABOUT THAT, THAT'S PAGE 7.  I'LL OFFER THAT.

14             **THE COURT:**  ANY OBJECTION?

15             **MR. BALOGH:**  NO.

16             **THE COURT:**  THANK YOU.  IT WILL BE RECEIVED.

17             (GOVERNMENT'S EXHIBIT 10, PAGE 7 RECEIVED IN

18             EVIDENCE.)

19   **BY MR. PARRELLA**

20   **Q**    SO –– ONE MOMENT.

21             (PAUSE IN PROCEEDINGS.)

22             **MR. PARRELLA:**  I'M SHOWING THE WITNESS PAGE, AT THE

23   BOTTOM, 8 THROUGH 11 OF GOVERNMENT 10.

24   **BY MR. PARRELLA**

25   **Q**    NOW, CAN YOU TAKE A LOOK AT THOSE?  I THINK I HANDED YOU

1   THE WRONG SAMPLE.  IS THAT RELEVANT TO SMP 03?

2   **A**   CORRECT.

3   **Q**   JUST DESCRIBE WHAT THEY ARE, PLEASE.

4   **A**   THESE ARE CHROMATOGRAMS FOR FOUR DIFFERENT SAMPLES -- WELL,

5   THE SAMPLE SMP 03, THE NEGATIVE QC, THE UNEXTRACTED CAL, AND

6   THE POSITIVE QC ASSOCIATED WITH THE SEQUENCE THAT SMP 03 WAS

7   RUN IN.

8   **Q**   THOSE DOCUMENTS ALL REFLECT THE RUN THAT SMP 03 WAS IN?

9   **A**   CORRECT.

10  **Q**   ARE THOSE RECORDS KEPT IN THE REGULAR COURSE OF BUSINESS OF

11  UCLA LAB?

12  **A**   YES, SIR.

13  **Q**   HOW WERE THEY CREATED?

14  **A**   THEY WERE ALSO CREATED THROUGH THE SOFTWARE THAT RUNS THE

15  MASS SPEC.

16          **MR. PARRELLA:**  I'LL OFFER THEM AS PART OF

17  GOVERNMENT'S 10.

18          **MR. BALOGH:**  NO OBJECTION.

19          **THE COURT:**  THANK YOU.  SO THAT'S AT THE BOTTOM

20  PAGES 8 THROUGH 11?

21          **MR. PARRELLA:**  YES.

22          **THE COURT:**  OKAY.  THEY WILL BE RECEIVED.

23          (GOVERNMENT'S EXHIBIT 10, PAGES 8 THROUGH 11 RECEIVED

24          IN EVIDENCE.)

25          **MR. PARRELLA:**  CAN WE CALL UP GOVERNMENT'S 10?

1          **MR. NOVITZKY:**  TEN OR ELEVEN?

2          **MR. PARRELLA:**  TEN.

3          (DOCUMENT DISPLAYED.)

4    **BY MR. PARRELLA**

5    **Q**   CAN YOU TAKE A LOOK AT THAT AND -- WELL, CAN WE GO BACK TO

6    PAGE 8?

7          **MR. NOVITZKY:**  WHAT DO YOU WANT?

8          **MR. PARRELLA:**  PAGE 8 OF THAT SAME SAMPLE.

9    **BY MR. PARRELLA**

10   **Q**   TAKE A LOOK AT THAT AND TELL US WHAT THAT IS.

11   **A**   THAT IS A SERIES OF CHROMATOGRAMS FOR THE NEGATIVE QC.

12   **Q**   WHAT IS THE NEGATIVE QC?

13   **A**   THE NEGATIVE QC IS BASICALLY JUST A KNOWN NEGATIVE URINE

14   SAMPLE WITH INTERNAL STANDARD ALONE.  THAT'S ALL THAT'S IN IT.

15   **Q**   WHAT IS THE PURPOSE OF IT?

16   **A**   THE PURPOSE IS TO, I GUESS, MAKE SURE THAT THERE'S NO

17   CONTAMINATION CARRIED OVER FROM THE WORKUP OF THE SAMPLE OR THE

18   INJECTION ANALYSIS OF THE SAMPLES --

19   **Q**   OKAY.

20   **A**   -- IN THE SEQUENCE.

21   **Q**   COULD WE HAVE PAGE 9?  WHAT IS PAGE 9?

22   **A**   PAGE 9 IS AGAIN CHROMATOGRAMS, BUT THIS TIME FOR THE

23   UNEXTRACTED CALIBRATOR.

24   **Q**   WHAT IS THE UNEXTRACTED CALIBRATOR?

25   **A**   THE UNEXTRACTED CALIBRATOR IS -- IT'S, BASICALLY, JUST A

PRICE / DIRECT - PARRELLA

1  SAMPLE.  IT'S NOT EVEN REALLY A SAMPLE.  IT'S NOT URINE AT ALL.

2  IT'S SIMPLE STANDARDS, METHANOL STANDARDS DRIED DOWN,

3  RECONSTITUTED WITH THE SAME BUFFER WE USE FOR ALL THE REST OF

4  THE SAMPLES AND THEN INJECTED.

5  Q    WHAT DO YOU MEAN BY STANDARD?

6  A    STANDARD IS A PURE FORM OF A COMPOUND.

7  Q    OKAY.  AND WHY IS THAT NEEDED IN THE LC/MS PROCESS?

8  A    USED UNEXTRACTED CALIBRATOR JUST TO VERIFY RETENTION TIMES,

9  VERIFY THAT THE TRANSITIONS THAT YOU'RE USING TO IDENTIFY A

10 COMPOUND ARE, IN FACT, CORRECT.

11 Q    SO, WOULD IT BE FAIR TO SAY YOU PICK A STANDARD ACCORDING

12 TO THE TEST THAT YOU RUN?

13 A    CORRECT.

14 Q    AND WHAT STANDARDS WERE PICKED IN THIS CASE?

15 A    IN THIS CASE WE PICKED THG AND NORBOLETHONE.

16 Q    OKAY.  AND SO PAGE 9 REPRESENTS THE STANDARDS OF THOSE TWO

17 COMPOUNDS?

18 A    CORRECT.

19 Q    I'M SORRY.  THE CHROMATOGRAMS REPRESENTING THE STANDARDS?

20 A    CORRECT.

21 Q    THANKS.  LET'S GO TO PAGE TEN.

22       AND WHAT IS PAGE 10?

23 A    PAGE 10 IS CHROMATOGRAMS FOR THE POSITIVE QC.

24 Q    AND WHAT IS A POSITIVE QC?

25 A    POSITIVE QC IS NO NEGATIVE URINE, SPIKED WITH THE STANDARDS

1  THAT YOU CHOOSE AND THEN EXTRACTED JUST THE SAME AS THE REST OF

2  THE SAMPLES.

3  **Q**    SO IF I UNDERSTAND YOU CORRECTLY, YOU HAVE URINE THAT IS

4  KNOWN TO BE NEGATIVE FOR THESE COMPOUNDS OR FOR ANY COMPOUNDS?

5  **A**    FOR THESE.

6  **Q**    FOR THESE COMPOUNDS?

7  **A**    FOR ALMOST ALL COMPOUNDS OR ANY COMPOUNDS.

8  **Q**    THEN YOU ADD THG AND NORBOLETHONE IN THIS PARTICULAR CASE?

9  **A**    CORRECT.

10  **Q**    AND THEN THAT GETS RUN AS WELL?

11  **A**    CORRECT.

12  **Q**    AND WHAT IS THE PURPOSE OF DOING THAT?

13  **A**    THE PURPOSE IS TO VERIFY THAT NOTHING IN THE URINE OR IN

14  URINE IN GENERAL IS INTERFERING WITH THE COMPOUNDS IN QUESTION

15  AND THAT THE EXTRACTION WENT PROPERLY.

16  **Q**    OKAY.  SO WE HAVE THE NEGATIVE QC, THE STANDARDS, AND THE

17  POSITIVE QC?

18  **A**    CORRECT.

19  **Q**    SO CAN YOU TURN TO PAGE 11, OR GO TO PAGE 11?  WHAT DOES

20  THIS REPRESENT?

21  **A**    THESE ARE CHROMATOGRAMS FOR SAMPLE SMP 03.

22  **Q**    SO THIS IS THE ACTUAL SAMPLE?

23  **A**    CORRECT.

24  **Q**    THE ACTUAL RESULTS OF THE SAMPLE?

25  **A**    CORRECT.

1    Q    OKAY.  THANK YOU.

2              WHAT DO YOU DO WITH THESE RESULTS?  WHERE DO THEY

3    GO?

4    A    THE RESULTS ARE STORED IN THE LAB'S SYSTEM, AND THAT'S

5    PRETTY MUCH IT.

6    Q    WHO REVIEWS THEM?

7    A    A CONFIRMATION CHEMIST, AND I THINK EVENTUALLY THE

8    SCIENTIFIC DIRECTOR OF THE LAB.

9    Q    ALL RIGHT.  THANK YOU.

10             WHO WAS THE SCIENTIFIC DIRECTOR OF THE LAB AT THIS

11   TIME?

12   A    MICHAEL SEKERA.

13   Q    I SAID "AT THIS TIME."  I SHOULD HAVE SAID OCTOBER 2006.

14   A    MICHAEL SEKERA.

15   Q    I WOULD LIKE TO TURN TO A DIFFERENT SAMPLE, UY 304.  AND IF

16   WE COULD CALL UP GOVERNMENT 12, PAGE 5 IN EVIDENCE.

17             (DOCUMENT DISPLAYED.)

18   BY MR. PARRELLA

19   Q    AND CAN YOU TAKE A LOOK AT THAT DOCUMENT?  AND WHAT IS

20   THAT?

21   A    THAT'S A WORKING CHAIN OF CUSTODY.

22   Q    DID YOU HAVE ANY CONTACT WITH THAT?

23   A    I DID.

24   Q    WHAT IS THAT A CHAIN OF CUSTODY FOR?

25   A    IT'S A CHAIN OF CUSTODY FOR SAMPLE -- OR A SAMPLE AND

1   SAMPLE CODE IS UY 304.

2   **Q**   AND IS THAT AN ALIQUOT OR A BOTTLE?

3   **A**   THAT'S AN ALIQUOT.

4   **Q**   AND WHAT CONTACT DID YOU HAVE WITH THAT?

5   **A**   I RETRIEVED THE SAMPLE FROM TEMPORARY STORAGE.  I

6   TRANSFERRED IT TO THE LC/MS AUTO SAMPLER FOR ANALYSIS AND THEN

7   BASICALLY TRANSFERRED IT OFF THE AUTO SAMPLER TO THE TRASH CAN

8   FOR DISPOSAL.

9   **Q**   SO WHEN YOU RETRIEVED THE SAMPLES FROM TEMPORARY STORAGE,

10  IN WHAT FORM WERE THEY?

11  **A**   THEY WERE IN A BOTTLE.

12  **Q**   THE LC/MS FILE?

13  **A**   CORRECT.

14  **Q**   DID YOU COMPARE THE CODE NUMBERS TO SEE IF THEY MATCHED?

15  **A**   I DID.

16  **Q**   DID THEY MATCH?

17  **A**   YES.

18  **Q**   WAS THERE ANYTHING ABOUT THE VIALS THAT WOULD HAVE

19  DISQUALIFIED THEM FROM BEING RUN THROUGH THE AUTO SAMPLER?

20  **A**   NO, SIR.

21  **Q**   DID YOU, IN FACT, RUN THE SAMPLE OF UY 304?

22  **A**   I DID.

23  **Q**   WAS THERE ANY PROBLEM WITH THAT RUN?

24  **A**   NOT THAT I RECALL.

25  **Q**   WAS THERE ANYTHING IN THE PAPERWORK INDICATING THAT?

 1 **A**   NO.

 2 **Q**   SO WHAT DID YOU DO AFTER THAT?

 3 **A**   AFTER I DISPOSED OF THE SAMPLES?

 4 **Q**   NO.  WELL, AFTER -- WELL, WITHDRAWN.  LET ME TAKE IT BACK.

 5          HOW LONG DOES THE LC/MS RUN TAKE?

 6 **A**   IT DEPENDS ON THE METHOD THAT YOU ARE USING, BUT IT CAN

 7 RANGE ANYWHERE FROM THREE OR FOUR MINUTES UP TO TEN, FIFTEEN,

 8 TWENTY MINUTES PER SAMPLE.

 9 **Q**   PER SAMPLE.  AND HOW MANY SAMPLES WERE IN THIS RUN; IF YOU

10 RECALL?

11 **A**   WELL, FROM THE SEQUENCE, IT LOOKED LIKE UNEXTRACTED CAL,

12 POSITIVE QC AND NEGATIVE QC, SIX SAMPLES TOTAL IN THE SEQUENCE.

13 SO APPROXIMATELY SEVEN.

14 **Q**   MAYBE I CAN HELP YOU OUT.

15 **A**   OR MAYBE MORE, ACTUALLY.  I'M SORRY.

16 **Q**   PAGE 7 OF GOVERNMENT'S 12, WHAT IS THAT?

17 **A**   THAT IS A SEQUENCE.

18 **Q**   AND I'M ALSO GOING TO SHOW PAGES 8 THROUGH 11.  AND WHAT

19 ARE THOSE?

20 **A**   THESE ARE CHROMATOGRAMS.

21 **Q**   ARE THOSE CHROMATOGRAMS FOR UY 304?

22 **A**   YES, SIR.

23 **Q**   OKAY.

24 **A**   WELL, ONE OF THEM IS.  THE REST ARE FOR QC AND CALS.

25 **Q**   BUT THEY WERE FROM THE SAME RUN?

1   **A**   CORRECT.

2   **Q**   SO —— AND ARE THOSE DOCUMENTS, WHICH I GUESS ARE SEVEN

3   THROUGH ELEVEN, RECORDS THAT ARE KEPT IN THE ORDINARY COURSE ——

4   REGULAR COURSE OF BUSINESS FOR THE UCLA LAB?

5   **A**   YES, SIR.

6   **Q**   HOW ARE THEY CREATED?

7   **A**   THEY ARE CREATED THROUGH THE SOFTWARE THAT CONTROLS THE

8   LC/MS.

9   **Q**   AND THEY'RE REQUIRED TO BE KEPT?

10  **A**   YES, SIR.

11          **MR. PARRELLA:**  JUDGE, I'LL OFFER THOSE.

12          **MR. BALOGH:**  NO OBJECTION.

13          **THE COURT:**  THANK YOU.  THEY WILL ALL BE RECEIVED.

14          (GOVERNMENT'S EXHIBIT 12, PAGES 7 THROUGH 11 RECEIVED

15          IN EVIDENCE.)

16          **MR. PARRELLA:**  OKAY.  COULD WE CALL UP GOVERNMENT 12

17  STARTING WITH —— THAT'S FINE.  PAGE 7.

18          (DOCUMENT DISPLAYED.)

19  **BY MR. PARRELLA**

20  **Q**   IS THAT THE —— TAKING A LOOK AT PAGE 7 ON THE SCREEN

21  ACTUALLY MIGHT BE EASIER.  WHAT IS THAT AGAIN?

22  **A**   THAT IS THE SEQUENCE.

23  **Q**   AND SO HOW MANY SAMPLES WERE RUN —— AND LET ME JUST SAY I'M

24  USING THE WORD "SAMPLE" TO MEAN VIALS.

25  **A**   OKAY.  LOOKS LIKE TEN.

1  Q   WHAT WERE THEY, IF YOU WANT TO GO THROUGH THEM, IF YOU

2  REMEMBER?

3  A   IT WAS AN EXTRACTED CAL, A CAL, A POSITIVE QC, A NEGATIVE

4  QC, AND SIX URINE SAMPLES, ACTUAL URINE SAMPLES.

5  Q   DOES SMP 03 APPEAR ON THAT LIST?

6  A   YES, SIR.

7  Q   AND DOES -- WHAT SAMPLE NUMBER -- WITHDRAWN.

8          WHAT PART IN THE SEQUENCE DOES IT APPEAR UNDER?

9  A   IT'S IN POSITION SEVEN.

10 Q   THANK YOU.  DOES THAT SIGNIFY ANYTHING?

11 A   THE COLUMN ON THE LEFT IS JUST A RUN, LIKE BASICALLY A RUN

12 TOTAL OF SAMPLES.  TO ACTUALLY VERIFY THE VIAL POSITION, YOU

13 HAVE TO GO A FEW COLUMNS OVER.

14 Q   WHAT COLUMN WOULD THAT BE UNDER?

15 A   IT'S THE COLUMN ENTITLED "VIAL POSITION."

16 Q   DOES THAT SHOW WHERE IT WAS, THE VIAL POSITION?

17 A   CORRECT.

18 Q   WHAT DOES THAT MEAN?  IS THAT THE VIAL POSITION IN THE AUTO

19 SAMPLER?

20 A   CORRECT.

21 Q   WHAT DOES THE AUTO SAMPLER ACTUALLY LOOK LIKE?

22 A   THE AUTO SAMPLER IS JUST A -- IT'S A MACHINE, BUT THE

23 ACTUAL TRAY THAT SAMPLE SITS IN IS JUST A STANDARD TRAY.  I

24 BELIEVE THIS ONE HELD APPROXIMATELY 105 SAMPLES, AND THIS

25 PARTICULAR SAMPLE WAS IN POSITION SEVEN ON THAT TRAY.

PRICE / DIRECT - PARRELLA

1   Q    WHAT ABOUT UY 304, WHERE WAS THAT?

2   A    THAT WAS IN POSITION TEN ON THE TRAY.

3   Q    DID YOU AT ANY TIME KNOW THE NAME OF THE PERSON WHO DONATED

4   THOSE SAMPLES?

5   A    NO, SIR.

6   Q    AFTER YOU RAN UY 304 -- WELL, WITHDRAWN.

7            MAYBE WE COULD CALL UP THE NEXT PAGE.

8            (DOCUMENT DISPLAYED.)

9   BY MR. PARRELLA

10  Q    WHAT IS THAT?

11  A    THAT'S A CHROMATOGRAM FOR THE NEGATIVE QC, OR ASSET OF

12  CHROMATOGRAMS FOR THE NEGATIVE QC.

13  Q    OKAY.  AND THE NEGATIVE QC IN THIS CASE HOLDS THE SAME

14  DEFINITION AS THE PREVIOUS SAMPLE?

15  A    CORRECT.

16  Q    OKAY.  LET'S MOVE TO THE NEXT PAGE.  WHAT IS THAT?

17  A    THAT IS A SET OF CHROMATOGRAMS FOR THE UNEXTRACTED CAL.

18  Q    AND SAME DEFINITION?

19  A    CORRECT.

20  Q    AND NEXT, WHAT IS THAT?

21  A    THAT IS A SET OF CHROMATOGRAMS FOR THE POSITIVE QC.

22  Q    AGAIN, SAME REFERENCE AS THE PRIOR?

23  A    CORRECT.

24  Q    AND LAST, WHAT IS THAT?

25  A    SET OF CHROMATOGRAMS FOR SAMPLE UY 304.

PRICE / DIRECT — PARRELLA

1    Q    AND THAT'S FOR THE ACTUAL SAMPLE?

2    A    YES, SIR.

3    Q    OKAY.  WHAT DID YOU DO WITH THE SAMPLE AFTER IT CAME OUT OF

4    THE AUTO SAMPLER?

5    A    AFTER THE SAMPLE WAS DONE INJECTING?

6    Q    IS -- I'M SORRY.  LET ME WITHDRAW THAT.

7    A    YEAH.

8    Q    WHAT DID YOU DO WITH THE SAMPLE AFTER IT CAME OUT OF THE

9    LC/MS?

10   A    AFTER IT COMES OUT OF THE LC/MS, THE DATA IS RECORDED ON

11   THE HARD DRIVE, AND I DON'T DO ANYTHING WITH IT.

12   Q    OKAY.  WELL, TAKE A LOOK AT PAGE 5 WHICH IS ON THE SCREEN

13   NOW.  WHAT'S YOUR NEXT -- WHAT'S YOUR NEXT STEP AFTER THE LC/MS

14   AUTO SAMPLE?

15   A    AFTER THE LC/MS SEQUENCE IS DONE RUNNING, THE SAMPLES ARE

16   TRANSFERRED TO THE TRASH CAN FOR DISPOSAL.

17   Q    SO THESE ARE -- JUST TO BE CLEAR, THESE ARE THE ACTUAL

18   ALIQUOT TUBES THAT ARE -- I'M SORRY.  THESE ARE THE ACTUAL

19   VIALS THAT ARE THROWN OUT?

20   A    THE VIALS, CORRECT.

21   Q    WHAT ARE DONE WITH THE ALIQUOT TUBES?

22   A    THE TUBES THAT THE SAMPLE IS ACTUALLY ALIQUOTED INTO?

23   Q    YES.

24   A    THAT IS HANDLED BY CHEMISTRY.  I HAVE NOTHING TO DO WITH

25   THAT.

1  Q    THANK YOU.  DID YOU HAVE ANY OTHER CONTACT WITH UY 304

2  AFTER THIS?

3  A    NO, SIR.

4        **MR. PARRELLA:**  OKAY.  THANK YOU.  WE HAVE NOTHING

5  FURTHER, YOUR HONOR.

6        **THE COURT:**  THANK YOU.

7        MR. BALOGH.

8        **MR. BALOGH:**  THANK YOU, YOUR HONOR.

9              <u>**CROSS—EXAMINATION BY MR. BALOGH**</u>

10 BY MR. BALOGH

11 Q    GOOD MORNING, MR. PRICE.

12 A    GOOD MORNING.

13 Q    COULD WE START OUR DISCUSSION WITH YOUR EDUCATIONAL

14 BACKGROUND?  DID YOU ATTEND UNIVERSITY, SIR?

15 A    DID I ATTEND UNIVERSITY?

16 Q    YES, SIR.

17 A    YES, SIR.

18 Q    AND YOU OBTAINED A BACHELOR OF SCIENCE?

19 A    CORRECT.

20 Q    FROM WHICH UNIVERSITY?

21 A    SAN DIEGO STATE UNIVERSITY.

22 Q    WHAT YEAR DID YOU OBTAIN YOUR BACHELOR OF SCIENCE DEGREE?

23 A    I FINISHED IN FALL SEMESTER OF '01, I BELIEVE.

24 Q    AND SHORTLY THEREAFTER YOU TOOK A JOB AT THE UCLA

25 ANALYTICAL LAB?

PRICE / CROSS - BALOGH

1  **A**   APPROXIMATELY A LITTLE OVER A YEAR AFTERWARDS.

2  **Q**   AND YOUR INITIAL POSITION WAS LAB ASSISTANT ONE; IS THAT

3  CORRECT SIR?

4  **A**   I'M PRETTY SURE.

5  **Q**   YOU WERE THERE UNTIL -- WHAT DATE DID YOU LEAVE THE UCLA

6  LAB?

7  **A**   I LEFT IN DECEMBER, OR IT WOULD HAVE BEEN THE VERY END OF

8  NOVEMBER OF '04, I BELIEVE.

9  **Q**   SO THANKSGIVING '04, ROUGHLY?

10 **A**   AFTER THANKSGIVING.  I STARTED MY -- THE NEW LABORATORY

11 DECEMBER 1ST SO --

12 **Q**   THIS IS 2004?

13 **A**   I DON'T RECALL EXACTLY, BUT I BELIEVE IT WAS 2004.

14 **Q**   AND DOES -- YOU NOW WORK FOR -- YOU LEFT IN DECEMBER 1ST,

15 2004, TO BEGIN A JOB WITH THE ANTIDOPING RESEARCH ORGANIZATION?

16 **A**   CORRECT.

17 **Q**   IT IS ANTIDOPING RESEARCH INSTITUTE?

18 **A**   ITS OFFICIAL TITLE IS INCORPORATED, BUT WE REFER TO IT BOTH

19 WAYS.

20 **Q**   SO ANTIDOPING RESEARCH, INC.?

21 **A**   CORRECT.

22 **Q**   WHAT WAS YOUR POSITION AT ANTIDOPING, INC.?

23 **A**   RESEARCH ASSOCIATE.

24 **Q**   DO YOU MAINTAIN THAT POSITION TODAY, SIR?

25 **A**   I DO.

PRICE / CROSS - BALOGH

1  Q   WHAT IS THE RELATIONSHIP, IF ANY, BETWEEN ANTIDOPING

2  RESEARCH, INCORPORATED AND THE UCLA ANALYTICAL LABORATORY?

3  A   ANTIDOPING RESEARCH IS HEADED BY THE FORMER LAB DIRECTOR AT

4  UCLA.

5  Q   APART FROM -- AND YOU ARE REFERRING TO DON H. CATLIN?

6  A   CORRECT.

7  Q   DR. CATLIN?

8  A   CORRECT.

9  Q   APART FROM HAVING THE FORMER DIRECTOR AND FOUNDER OF THE

10 UCLA LAB BE THE FOUNDER OF ANTIDOPING RESEARCH, INC., IS THERE

11 ANY OTHER CONTINUING RELATIONSHIP BETWEEN TWO ORGANIZATIONS?

12 A   WE DON'T AFFILIATE, BUT THERE ARE A FEW PEOPLE THAT I

13 WORKED WITH AT UCLA WORKING WITH ME AT ANTIDOPING RESEARCH.

14 Q   IF I UNDERSTAND YOU CORRECTLY, SOME OF THE PEOPLE THAT

15 WORKED AT UCLA CAME WITH DR. CATLIN TO ANTIDOPING?

16 A   CORRECT.

17 Q   APART FROM THE COMMONALITY OF EMPLOYEES, IS THERE ANY

18 RELATIONSHIP BETWEEN THE TWO ORGANIZATIONS?

19 A   NOT THAT I KNOW OF.

20 Q   AND WITH RESPECT -- WHEN YOU WERE AT UCLA ANALYTICAL LAB,

21 YOU WERE RESPONSIBLE FOR PERFORMING CHEMICAL ANALYSIS WITH

22 RESPECT TO UCLA CLIENTS; IS THAT RIGHT?

23 A   WITH THE CLIENTS DIRECTLY, NO.

24 Q   THE SPECIMENS YOU WERE PERFORMING TESTS ON WERE ON BEHALF

25 OF UCLA CLIENTS?

1   **A**   CORRECT.

2   **Q**   AND THOSE WOULD INCLUDE USADA, CORRECT?

3   **A**   YES.

4   **Q**   THE NFL, CORRECT?

5   **A**   YES.

6   **Q**   DOES ANTIDOPING RESEARCH, INC. MAINTAIN A RELATIONSHIP WITH

7   USADA OF WHICH YOU ARE AWARE?

8   **A**   I DON'T -- I'M NOT AWARE.  I DON'T KNOW.

9   **Q**   ARE YOU IN THE PROCESS OF TESTING SAMPLES ON BEHALF OF

10  USADA AS A CLIENT CURRENTLY IN YOUR RESPONSIBILITIES AT THE

11  ANTIDOPING RESEARCH, INCORPORATED?

12  **A**   I PERSONALLY DON'T DEAL WITH ANY USADA SAMPLES.

13  **Q**   I'D ASK YOU TO TURN TO PAGE 5 OF GOVERNMENT EXHIBIT 10,

14  PLEASE.  DO YOU HAVE THAT IN FRONT OF YOU, SIR?

15  **A**   I'M SORRY.  WHICH ONE?

16  **Q**   I'LL REORGANIZE.

17          COULD YOU PUT EXHIBIT 5 ON THE SCREEN -- PAGE 5 ON

18  THE SCREEN?

19          (DOCUMENT DISPLAYED.)

20          **MR. BALOGH:**  THANK YOU.

21  **BY MR. BALOGH**

22  **Q**   SIR, DO YOU SEE PAGE 5 IN FRONT OF YOU?

23  **A**   YES, SIR.

24  **Q**   THIS IS --

25  **A**   OKAY.  I'M SORRY.  IT LOOKED LIKE SIX BUT --

PRICE / CROSS - BALOGH

1   Q    YOU WERE DISCUSSING WITH GOVERNMENT COUNSEL CHAIN OF

2   CUSTODY FORM WITH RESPECT TO SAMPLE SMP 03 AS REFLECTED ON

3   PAGE 5, CORRECT?

4   A    CORRECT.

5   Q    THIS IS A UCLA ANALYTICAL LABORATORY FORM, CORRECT?

6   A    CORRECT.

7   Q    YOU PERFORMED YOUR FUNCTIONS, AS YOU'VE DESCRIBED THEM HERE

8   TODAY, ON OCTOBER 27TH, 2006?

9   A    CORRECT.

10  Q    CAN YOU EXPLAIN HOW, AS A RESEARCH ASSOCIATE AT ANTIDOPING

11  RESEARCH, INCORPORATED, YOU CAME TO TAKE THESE ACTS WITH

12  RESPECT TO UCLA SAMPLE NUMBER SMP 03 NEARLY TWO YEARS AFTER YOU

13  LEFT EMPLOY AT UCLA?

14  A    OH.  I'M SORRY.  WHEN DID I SAY I LEFT UCLA?

15  Q    YOU MAINTAIN YOUR POSITION AT UCLA TO THIS DAY?

16  A    NO, NO.

17  Q    YOU TOOK A JOB AT THE ANTIDOPING RESEARCH, INCORPORATED, ON

18  DECEMBER 1ST, 2004?

19  A    NOT 2004.  2006.

20  Q    2006?

21  A    I'M SORRY.  DID I SAY 2004?

22  Q    THAT'S WHAT I HEARD.

23  A    I'M SORRY.

24  Q    SO THIS HAPPENED SHORTLY BEFORE YOU LEFT TO GO TO THE --

25  A    CORRECT.

PRICE / CROSS - BALOGH

1  Q   THAT EXPLAINS THAT.

2        I'D ASK YOU TO TURN TO PAGES 7 THROUGH 11.

3  ACTUALLY, I'LL SHOW THEM TO YOU BECAUSE I WANT YOU TO REVIEW

4  THEM.  OF EXHIBIT 10.

5        MAY I APPROACH, YOUR HONOR?

6        **THE COURT:**  MM-HMM.

7        **MR. BALOGH:**  WOULD THE RECORD REFLECT I HANDED THE

8  WITNESS GOVERNMENT EXHIBIT 10?

9  **BY MR. BALOGH**

10  Q   YOU DESCRIBED FOR THE JURY THAT PAGE 7 IS A LIST -- CAN YOU

11  ACTUALLY DESCRIBE WHAT THE TITLE OF THIS SHEET IS?  COULD YOU

12  TELL ME WHAT PAGE 7 IS AGAIN?

13  A   PAGE 7 IS -- LET ME MAKE SURE IT'S THE CORRECT ONE.  YEAH,

14  THIS IS THE SEQUENCE FROM THE WORK THAT I DID.

15  Q   OKAY.  AND THE SEQUENCE INDICATES THAT, AS FAR AS URINE

16  SPECIMENS PROVIDED BY UCLA CLIENTS, THERE ARE ONE, TWO, THREE,

17  FOUR, FIVE -- SIX TEST SPECIMENS BEING RUN IN THE SEQUENCE,

18  CORRECT, SIR?

19  A   CORRECT.

20  Q   IN ADDITION TO THAT, THERE IS FOUR SPECIMENS THAT ARE DONE

21  FOR ANALYTIC PURPOSES THAT DO NOT RELATE TO ANY ATHLETES BEING

22  TESTED; IS THAT RIGHT?

23  A   YOU SAID FOUR, CORRECT.

24  Q   AND THE FIRST ONE IS CALLED CAL ONE UNEXTRACTED?

25  A   CORRECT.

PRICE / CROSS - BALOGH

1  Q   WHAT IS THAT AGAIN, SIR?

2  A   IT'S, BASICALLY, JUST STANDARDS, METHANOL STANDARDS, PUT

3  INTO A BOTTLE, DRIED DOWN, AND RECONSTITUTED WITH THE BUFFER

4  THAT WE USE.

5  Q   WHY WOULD YOU USE A METHANOL STANDARD FOR THIS GAS

6  CHROMATOGRAPH?

7  A   IT WASN'T A GAS CHROMATOGRAM.

8  Q   WHAT WAS THE MACHINE?

9  A   LIQUID CHROMATOGRAM.

10 Q   LIQUID --

11 A   CHROMATOGRAPHY.

12 Q   WHY WOULD YOU USE THAT KIND OF UNEXTRACTED STANDARD; WHAT

13 PURPOSE DOES IT SERVE?

14 A   THE PURPOSE OF THE UNEXTRACTED CAL?  PURPOSE OF UNEXTRACTED

15 CAL IS TO VERIFY RETENTION TIMES, MAKE SURE THAT THE COMPOUNDS

16 OF INTEREST ARE ACTUALLY BEING DETECTED BY THE INSTRUMENT.

17 Q   FOR THE UNEXTRACTED CAL, WHAT SUBSTANCE WERE YOU USING,

18 SIR?

19 A   I CAN --

20 Q   IF YOU COULD FIND THAT, I'D APPRECIATE IT.

21 A   FOR THE UNEXTRACTED CAL, WE WERE USING THG AND

22 NORBOLETHONE.

23 Q   SO YOU ARE TAKING THE ACTUAL SAMPLE OF WHAT YOU WANT TO

24 TEST FOR, AND THAT'S WHAT THE UNEXTRACTED CAL IS MADE OUT OF?

25 A   WE TAKE THE ACTUAL -- A PURE FORM OF THE COMPOUND.

PRICE / CROSS - BALOGH

1  Q    PURE FORM OF THE COMPOUND.

2          THE NEXT TEST SAMPLE IS CALLED CAL TWO.  DO YOU SEE

3  THAT, SIR, ON PAGE 7?

4  A    YES, SIR.

5  Q    WHAT IS CAL TWO?

6  A    I'M NOT SURE EXACTLY WHAT CAL TWO IS.  I ASSUME IT'S --

7  Q    I DON'T WANT YOU TO ASSUME, SIR.  DO YOU HAVE AN

8  UNDERSTANDING FROM YOUR EXPERIENCE AT THE LAB BY WHICH YOU

9  COULD -- WITHDRAWN.

10          DO YOU HAVE AN UNDERSTANDING OF WHAT CAL TWO IS?

11  A    NO, SIR.

12  Q    OKAY.  IS CAL TWO -- THE TEST RUN ON CAL TWO INDICATED

13  ANYWHERE IN GOVERNMENT'S EXHIBIT 10?

14  A    CAL TWO DOESN'T EXTRACT -- CAL TWO DOESN'T APPEAR ANYWHERE

15  IN THE CHROMATOGRAMS.

16  Q    IN GENERAL, IS IT -- DURING YOUR TIME WORKING AS A LAB

17  ASSISTANT ONE, LAB ASSISTANT TWO AT UCLA, WAS IT PART OF YOUR

18  STANDARD SCREEN TO RUN A TEST FOR CAL TWO?

19  A    FOR A STANDARD SCREEN SAMPLE?

20  Q    YES.

21  A    WELL, STANDARD SCREENS WERE NORMALLY, I BELIEVE -- AGAIN, I

22  BELIEVE THEY WERE NORMALLY RUN WITH A POSITIVE QC AND A

23  NEGATIVE QC ONLY.

24  Q    SO APART FROM THIS DOCUMENT, YOU HAVE NO ABILITY TO INFORM

25  THE JURY OF WHY CAL TWO WAS RUN WITH THIS SEQUENCE; IS THAT

PRICE / CROSS - BALOGH

```
 1   RIGHT?

 2   A   NO, SIR.

 3   Q   AND YOU CAN'T TELL US WHAT CAL TWO WAS MEANT TO SHOW WHEN

 4   IT WAS RUN IN THE SEQUENCE?

 5   A   NO, SIR.

 6   Q   AND WE DO NOT HAVE THE RESULTS OF THAT CHROMATOGRAPH TO

 7   UNDERSTAND WHAT THEY SHOWED AFTER THE SEQUENCE WAS RUN,

 8   CORRECT?

 9   A   CORRECT.

10   Q   THE NEXT LINE, IT SAYS "POSITIVE QC TWO"; DO YOU SEE THAT?

11   A   YES, SIR.

12   Q   AND IF I UNDERSTOOD YOUR DIRECT TESTIMONY, THAT MEANS YOU

13   TOOK URINE KNOWN TO BE NEGATIVE, YOU SPIKED WITH THE STANDARD

14   THAT WAS USED IN CAL ONE, EXTRACTED, AND YOU INCLUDED THAT TEST

15   TUBE AS PART OF THE SEQUENCE TO BE RUN?

16   A   I DIDN'T ACTUALLY SPIKE THE SAMPLE, BUT THAT'S WHAT IT IS

17   AND HOW I RECEIVED IT.

18   Q   WHO SPIKED THE SAMPLE?

19   A   WHOEVER PREPARED THE SAMPLES FOR EXTRACTION.

20   Q   THAT WOULD BE THE ASSAY THAT PRECEDED YOUR INVOLVEMENT WITH

21   THIS SEQUENCE?

22   A   CORRECT.

23   Q   IF WE TAKE A LOOK AT THE CHAIN OF CUSTODY THAT APPEARS ON

24   PAGE 5, WOULD YOU BE ABLE TO IDENTIFY WHO SPIKED THE SAMPLE?

25   A   I DON'T KNOW WHO EXACTLY IS INVOLVED IN SPIKING THE SAMPLE.
```

1    I BELIEVE IT'S THE RESPONSIBILITY OF THE LAB DIRECTOR, I THINK

2    DESIGNATES WHO SPIKES THE SAMPLE.  I BELIEVE IT IS THE PERSON

3    WHO ALIQUOTS THE SAMPLE, THOUGH.

4    Q    BUT BY LOOKING AT THE CHAIN OF CUSTODY FORM THAT APPEARS AT

5    PAGE 5 OF EXHIBIT 10, CAN YOU IDENTIFY THE PERSON AT THE UCLA

6    LAB WHO DID THAT JOB ON OR ABOUT OCTOBER 27TH, 2006?

7    A    I CAN -- ON PAGE 5 I CAN IDENTIFY WHO ALIQUOTED THE SAMPLE.

8    Q    WHO ALIQUOTED THE SAMPLE?

9    A    BRIAN BISHOP.

10   Q    SO IT WOULD BE YOUR BELIEF THAT MR. BISHOP WOULD HAVE BEEN

11   THE ONE TO SPIKE THE SAMPLE; IS THAT CORRECT?

12   A    AGAIN, I DON'T KNOW.

13   Q    YOU DON'T KNOW.  AND APART FROM HIS IDENTIFICATION AS THE

14   PERSON WHO ALIQUOTED THE SAMPLE, YOU WOULDN'T BE ABLE TO

15   IDENTIFY WHO SPIKED THE SAMPLE THAT WOULD BE TESTED AS TO

16   POSITIVE QC?

17   A    I DON'T HAVE ANY KNOWLEDGE OF WHO SPIKED THE SAMPLE.

18   Q    ARE YOU THE PERSON WHO IS RESPONSIBLE WHEN YOU RUN THE

19   SEQUENCE FOR GATHERING THE UNEXTRACTED CAL THAT WOULD BE RUN IN

20   THE SEQUENCE?

21   A    SORRY.  CAN YOU REPEAT?

22   Q    ARE YOU THE PERSON WHO OBTAINS THE SAMPLE THAT IS USED FOR

23   THE CAL ONE UNEXTRACTED STANDARD?

24   A    AM I THE PERSON WHO OBTAINS THE STANDARD?

25   Q    CREATES THE TEST TUBE.

PRICE / CROSS - BALOGH

1   **A**   I DIDN'T CREATE ANY OF THESE SAMPLES.

2   **Q**   SO THESE ARE HANDED TO YOU, AND YOU TAKE THEM ON FAITH THAT

3   THEY CONTAIN THE THINGS YOU JUST TESTIFIED TO?

4   **A**   CORRECT.

5   **Q**   BUT YOU DON'T KNOW WHETHER OR NOT WHAT WAS IN CAL ONE

6   UNEXTRACTED WAS, IN FACT, A STANDARD FOR NORBOLETHONE, DO YOU?

7   **A**   I DON'T HAVE ANY DIRECT KNOWLEDGE, BUT, ACCORDING TO THE

8   CHROMATOGRAM, THAT'S WHAT IT WAS.

9   **Q**   THE CHROMATOGRAM SHOWED -- THAT'S FINE.

10          THE NEGATIVE QC, HOW IS -- DO YOU HAVE ANY ROLE IN

11   OBTAINING THAT SAMPLE ITSELF?

12   **A**   THE NEGATIVE QC?

13   **Q**   YES.

14   **A**   NO, SIR.

15   **Q**   SO IF I UNDERSTAND YOU CORRECTLY, ALL TEN OF THE VIALS THAT

16   ARE INDICATED IN THE SEQUENCE WERE GIVEN TO YOU BY OTHERS, AND

17   YOUR JOB IS TO LOAD THEM, RUN THE MACHINE, REMOVE THEM AND

18   PRINT OUT THE GRAPHS, IF YOU WILL?

19   **A**   IN MOST CASES, YES.  IN THIS CASE I DON'T BELIEVE I PRINTED

20   OUT THE CHROMATOGRAMS.

21   **Q**   SO IN MOST CASES IT WOULD INCLUDE THAT ADDITIONAL STEP, AND

22   IN THIS CASE THAT STEP WAS REMOVED; IS THAT RIGHT?

23   **A**   YES.  I REMOVED THE SAMPLES FROM TEAM STORAGE, PLACED THEM

24   ON THE INSTRUMENT, RAN THE SEQUENCE.

25   **Q**   WHO RAN THE GRAPHS THAT WE HAVE SEEN NOW AS PART OF

1   GOVERNMENT'S EXHIBIT 10?

2   **A**   WHO -- COULD YOU SAY --

3   **Q**   WHO PRINTED THE GRAPHS?

4   **A**   IN THIS CASE IT LOOKS LIKE LOUISE LEIGHTON.  I RECOGNIZE

5   THE INITIALS.  THAT'S THE ONLY WAY I WOULD BE ABLE TO --

6   **Q**   THOSE INITIALS, ARE THOSE ONES THAT APPEAR ON THE BOTTOM OF

7   PAGES 8, 9, 10 AND 11, SIR?

8   **A**   YES.

9   **Q**   COULD YOU CIRCLE THEM ON THE SCREEN THERE FOR THE JURY SO

10  WE CAN IDENTIFY WHO -- WHOSE INITIALS YOU'RE REFERRING TO WHEN

11  YOU IDENTIFY WHO PRINTED THE GRAPHS?

12  **A**   CIRCLE IT?

13  **Q**   YES.  I THINK YOU CAN USE YOUR FINGER.  I THINK WE HAVE A

14  JOHN MADDEN SCREEN.

15  **A**   YOU WANT ME TO JUST IDENTIFY THE INITIALS I RECOGNIZE?

16  **Q**   YES.  EXACTLY.

17  **A**   (INDICATING).

18  **Q**   AND THE RECORD SHOULD REFLECT THAT THE INITIALS THAT APPEAR

19  ON THE BOTTOM OF PAGE 9 AND ARE CONSISTENT THROUGH 9, 10 AND 11

20  AS THE UPPER INITIALS HAVE BEEN CIRCLED BY THE WITNESS.

21          **THE CLERK:**  I CAN TRY TO CAPTURE THAT AS ANOTHER

22  EXHIBIT.

23          **MR. BALOGH:**  IT'S OKAY.  I JUST ...

24  **BY MR. BALOGH**

25  **Q**   NOW, I WANT YOU TO TURN TO THE SETS OF GRAPHS THAT APPEAR

PRICE / CROSS - BALOGH

1   ON PAGES 7 THROUGH 11 OF GOVERNMENT EXHIBIT 10.  IT'S -- WE'LL

2   START WITH THE NEGATIVE QC WHICH APPEARS ON PAGE 8.

3            IS THIS -- CAN YOU TELL US FROM THIS DOCUMENT, IS

4   THIS A NEGATIVE QC RUN FOR THG, NORBOLETHONE, OR A DIFFERENT

5   SUBSTANCE?

6   **A**   FROM THIS PARTICULAR CHROMATOGRAM, IT'S NOT SPECIFIED.

7   THERE AREN'T LABELS; HOWEVER, IF -- IF YOU LOOK AT THE

8   UNEXTRACTED CAL, ACCORDING TO THE TRANSITIONS USED --

9   **Q**   YES?

10  **A**   THOSE LABELS IDENTIFY THE TRANSITIONS AS THG AND

11  NORBOLETHONE.

12  **Q**   SO I'M UNDERSTANDING HOW WE READ THESE CORRECTLY, IF WE

13  LOOK AT THE LEFT SIDE OF PAGES 8, 9, 10 AND 11, WE SEE THE

14  TESTS RUN ON THE SAMPLE FOR THG, AND IF WE LOOK AT THE RIGHT

15  SIDE OF THE SAMPLES, WE SEE THE TESTS RUN FOR THE -- FOR

16  NORBOLETHONE?

17  **A**   THE LEFT SIDE IS THG, AND THE RIGHT SIDE IS NORBOLETHONE,

18  YES.

19  **Q**   WHEN YOU READ THE CHROMATOGRAPH -- AM I USING THAT WORD

20  CORRECTLY, CHROMATOGRAPH?

21  **A**   CHROMATOGRAPH OR CHROMATOGRAM.

22  **Q**   ONE OF THE WORDS YOU USED IS "RETENTION TIME"; DID I HEAR

23  THAT CORRECTLY, SIR?

24  **A**   CORRECT.

25  **Q**   IS THAT WHAT THE X AXIS IS ON EACH OF THESE GRAPHS, THE

1  RETENTION TIME AS SHOWN BY THE LC/MS?

2  **A**    CORRECT.

3  **Q**    AND THE RIGHT SIDE IS INTENSITY.  DO YOU SEE THAT, SIR?

4  **A**    YES, SIR.

5  **Q**    CAN YOU TELL US WHAT THAT IS?

6  **A**    INTENSITY IS JUST THE INTENSITY OF THE SIGNAL.  WE CALL IT

7  COUNTS.

8  **Q**    COUNTS.  AND WHAT KIND OF FACTORS, IF YOU KNOW, SIR, WOULD

9  AFFECT THE INTENSITY OF THE SIGNAL?

10 **A**    THE INTENSITY OF THE SIGNAL WOULD BE, BASICALLY, JUST BE

11 THE INTENSITY OF THE COMPOUND IN THE SAMPLER.

12          **MR. BALOGH:**  IS THAT -- WITHDRAWN.  I'LL TENDER THE

13 WITNESS.

14          **THE COURT:**  THANK YOU.

15          **MR. BALOGH:**  THANK YOU.

16          **THE COURT:**  ANYTHING FURTHER, MR. PARRELLA?

17          **MR. PARRELLA:**  JUST ONE QUESTION, YOUR HONOR.

18            **REDIRECT EXAMINATION BY MR. PARRELLA**

19 **BY MR. PARRELLA**

20 **Q**    I BELIEVE YOU TESTIFIED ON CROSS-EXAM THAT DR. CATLIN WAS

21 THE DIRECTOR OF THE LAB DURING THIS TIMEFRAME?

22 **A**    CORRECT.

23 **Q**    AND THAT NOW HE IS THE DIRECTOR OF ANTIDOPING RESEARCH,

24 INC.?

25 **A**    CORRECT.

1  Q    YOU ALSO MENTIONED SOMEBODY WHO WAS CHIEF OF CHEMISTRY --

2  A    WELL --

3  Q    -- DURING THAT TIMEFRAME?

4  A    THE SCIENTIFIC DIRECTOR?

5  Q    YES.

6  A    THAT WAS MICHAEL SEKERA.

7  Q    OKAY.  WHAT IS THEIR RELATIONSHIP; IN OTHER WORDS, IS

8  DR. CATLIN HIS SUPERIOR?

9  A    CORRECT.

10 Q    OKAY.  THANK YOU.

11         **MR. PARRELLA:**  I HAVE NOTHING FURTHER, YOUR HONOR.

12         **THE COURT:**  MAY THE WITNESS BE EXCUSED?

13         **MR. BALOGH:**  HE MAY, YOUR HONOR.

14         **MR. PARRELLA:**  YES.

15         **THE COURT:**  THANK YOU VERY MUCH, SIR.  YOU ARE

16 EXCUSED.

17         (THE WITNESS STEPPED DOWN FROM THE WITNESS STAND.)

18         **THE COURT:**  THE GOVERNMENT MAY CALL ITS NEXT

19 WITNESS.

20         **MR. NEDROW:**  YES.  THANK YOU, YOUR HONOR.  THE

21 UNITED STATES CALLS ANABELLA LEUNG.  I BELIEVE, L-E-U-N-G.

22         (THE WITNESS' PHOTOGRAPH WAS TAKEN.)

23                 **SZEMAN ANABELLA LEUNG**

24 HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

25 DULY SWORN AND EXAMINED AS FOLLOWS:  AND THE WITNESS WAS SWORN

```
 1                THE WITNESS:  YES.

 2                THE CLERK:  THANK YOU.  PLEASE STATE YOUR FULL NAME

 3  FOR THE RECORD.

 4                THE WITNESS:  MY FULL NAME IS SZEMAN ANABELLA LEUNG.

 5                THE CLERK:  SPELL YOUR FIRST NAME.

 6                THE WITNESS:  FIRST NAME, S-Z-E-M-A-N.  AND THEN

 7  ANABELLA.

 8                THE CLERK:  OKAY.  THANK YOU.

 9                MR. NEDROW:  THANK YOU, YOUR HONOR.

10                DIRECT EXAMINATION BY MR. NEDROW

11  BY MR. NEDROW

12  Q    MS. LEUNG, GOOD MORNING.

13  A    GOOD MORNING.

14  Q    IF YOU COULD JUST MAKE SURE THE MICROPHONE IS CLOSE TO YOUR

15  MOUTH?  THANK YOU.  THANK YOU.

16                MS. LEUNG, WHERE DO YOU WORK?

17  A    I WORK IN UCLA OLYMPIC LAB.

18  Q    YOU'RE A RESIDENT OF SOUTHERN CALIFORNIA; IS THAT CORRECT?

19  A    YES.

20  Q    HOW LONG HAVE YOU WORKED AT THE UCLA LAB?

21  A    MORE THAN THREE AND A HALF YEARS.

22  Q    DO YOU HAVE ANY EDUCATIONAL TRAINING THAT ASSISTS YOU IN

23  YOUR WORK AT THE LAB?

24  A    YES, I HAVE A BACHELOR DEGREE IN BIOCHEMISTRY IN UCLA.

25  Q    WHAT'S YOUR POSITION AT THE LAB NOW IN 2008?
```

1   **A**   CURRENTLY, I'M THE SAMPLE PROCESSING SUPERVISOR.

2   **Q**   WHAT WAS YOUR POSITION AT THE LAB IN 2006?

3   **A**   2006, I WAS AN ASSAY CHEMIST.

4   **Q**   MS. LEUNG, I WOULD LIKE TO SHOW YOU WHAT IS IN EVIDENCE AS

5   PAGE 12 OF EXHIBIT 10.  ACTUALLY -- I'M SORRY.  LET'S ACTUALLY

6   START WITH PAGE 1 OF -- I'M SORRY -- PAGE 12 OF EXHIBIT 10.

7               **MR. NEDROW:**  YOUR HONOR, MAY I APPROACH THE WITNESS?

8               **THE COURT:**  YOU MAY.

9               (DOCUMENT DISPLAYED.)

10   **BY MR. NEDROW**

11   **Q**   MS. LEUNG, THAT'S BOTH BEFORE YOU AND ON THE SCREEN; DO YOU

12   SEE THAT DOCUMENT?

13   **A**   YES.

14   **Q**   IS THAT A DOCUMENT THAT'S FAMILIAR TO YOU FROM YOUR TIME

15   WORKING AT THE UCLA LAB?

16   **A**   YES.

17   **Q**   WHAT IS IT?

18   **A**   IT'S A CHAIN OF CUSTODY.

19   **Q**   AND DOES THIS DOCUMENT REFLECT WORK THAT YOU DID ON A

20   PARTICULAR UCLA CODE SAMPLE IN 2006?

21   **A**   YES.

22   **Q**   AND WHAT UCLA CODE SAMPLE DID YOU WORK WITH AS REFLECTED ON

23   THIS DOCUMENT?

24   **A**   SMP 03.

25   **Q**   AND GOING DOWN THIS DOCUMENT, DO YOU SEE YOUR NAME AND

1    SIGNATURE ON THE DOCUMENT?

2    **A**    MM-HMM.

3    **Q**    IF YOU COULD PLEASE RESPOND YES OR NO?

4    **A**    YES.

5    **Q**    THANK YOU.  ALL RIGHT.  ALL RIGHT.

6              WHAT ARE THE WORDS INDICATED WITH RESPECT TO YOUR

7    INVOLVEMENT WITH THIS PARTICULAR SAMPLE?

8    **A**    SO I TOOK THE SAMPLE OUT OF THE REFRIGERATOR NUMBER 12, AND

9    I DID AN ASSAY FOR THE SMP 03 SAMPLE, AND I PUT IT BACK TO

10   TEMPORARY STORAGE.

11   **Q**    COULD YOU JUST TELL US BRIEFLY WHAT IT MEANS TO PERFORM AN

12   ASSAY?

13   **A**    TO PERFORM THE CONFIRMATION ASSAY, I NEED TO ADD BUFFER AND

14   THEN SODIUM SULFATE, AND THEN ADD SOLVENTS TO EXTRACT THE

15   ANOLYTES THAT WE ARE LOOKING FOR.  THEN WE WOULD DRY IT DOWN IN

16   THE DRIER, AND RECONSTITUTE IT, AND TRANSFER IT TO A VIAL TO BE

17   READ ON LC/MS INSTRUMENT AND STORAGE.

18   **Q**    THIS IS PART OF A PREPARATION PROCESS FOR RUNNING A SAMPLE

19   ON THE LC/MS MACHINE; IS THAT CORRECT?

20   **A**    YES.

21   **Q**    WERE YOU INVOLVED ON THIS SAMPLE, ACTUALLY RUNNING THE AUTO

22   SAMPLER MACHINE?

23   **A**    AM I INVOLVED IN RUNNING --

24   **Q**    YES.

25   **A**    NO.

1  Q   OKAY.  SO AFTER RETURNING -- AFTER PERFORMING THE ASSAY AND

2  RETURNING IT TO TEMPORARY STORAGE AS TO SMP 03, DID THAT

3  INCLUDE YOUR INVOLVEMENT WITH THE SAMPLE?

4  A   YES.

5  Q   THANK YOU, MS.  LEUNG.

6       LET'S THEN GO TO, IF WE CAN, EXHIBIT 12, PAGE 12,

7  WHICH ALSO I ALSO BELIEVE IS IN EVIDENCE.  IF WE COULD PUT THAT

8  UP ON THE SCREEN?

9       **THE CLERK:**  OKAY.  LET ME PUBLISH IT.

10      (DOCUMENT DISPLAYED.)

11 **BY MR. NEDROW**

12 Q   MS. LEUNG, DO YOU ALSO RECOGNIZE THIS DOCUMENT AS ONE THAT

13 BEARS YOUR SIGNATURE IN CONNECTION WITH YOUR ACTIVITIES AT THE

14 UCLA LAB?

15 A   YES.

16 Q   AND IS IT ANOTHER CHAIN OF CUSTODY DOCUMENT?

17 A   YES.

18 Q   AND WHAT DOES IT PERTAIN TO IN THE UPPER LEFT?  IS IT WITH

19 RESPECT TO A BOTTLE OR AN ALIQUOT, OR WHAT DOES IT PERTAIN TO?

20 A   REPEAT THE QUESTION.

21 Q   WHAT IS THE THING THAT YOU ARE PERFORMING THE ASSAY ON ON

22 THIS DOCUMENT, WHAT IS THE ITEM?

23 A   WHAT IS THE ITEM?  THE CONFIRMATION.

24 Q   IT'S A CONFIRMATION OF WHAT?

25 A   OF THG AND NORBOLETHONE.

1  Q    OKAY.  IS THAT FROM A BOTTLE OR AN ALIQUOT?

2  A    IT'S FROM THE ALIQUOT.

3  Q    OKAY.  AND ON THIS DOCUMENT, WHAT'S THE CODE NUMBER ON THIS

4  ALIQUOT YOU PERFORMED THE ASSAY ON?

5  A    UY 304.

6  Q    DOES YOUR NAME AND SIGNATURE APPEAR ALSO ON THIS CHAIN OF

7  CUSTODY DOCUMENT?

8  A    YES.

9  Q    WHAT DID YOU DO ON THIS UY 304 ALIQUOT IN NOVEMBER OF 2006?

10  A    THIS -- IT'S SIMILAR TO THE LAST SAMPLE, WHICH IS ADDING

11  BUFFER, SODIUM SULFATE, AND THEN ADD SOLVENT, EXTRACT, DRY

12  DOWN, RECONSTITUTE AND TRANSFER.

13  Q    THAT'S, AGAIN, IN PREPARATION FOR THE SAMPLE TO BE RUN ON

14  THE LC/MS MACHINE?

15  A    YES.

16  Q    WHAT DID YOU DO WITH THE SAMPLE AFTER PERFORMING THE ASSAY?

17  A    I DIDN'T DO ANYTHING AFTER PERFORMING ASSAY.  I PUT IT BACK

18  TO TEMP STORAGE.

19  Q    SO YOU DID PUT IT BACK INTO STORAGE?

20  A    YEAH, YEAH.

21  Q    AFTER THAT, DID YOU HAVE ANY FURTHER INVOLVEMENT WITH THIS?

22  A    NO.

23       **MR. NEDROW:**  THANK YOU, YOUR HONOR.  I HAVE NO

24  FURTHER QUESTIONS FOR MS. LEUNG.

25       **THE COURT:**  THANK YOU.

```
 1                    MR. BALOGH.

 2              MR. BALOGH:  SHE MAY BE EXCUSED.

 3              THE COURT:  THANK YOU VERY MUCH, MA'AM.  YOU MAY BE

 4   EXCUSED.

 5              THE WITNESS:  THANK YOU.

 6         (THE WITNESS STEPPED DOWN FROM THE WITNESS STAND.)

 7              THE COURT:  GOVERNMENT MAY CALL ITS NEXT WITNESS.

 8              MR. NEDROW:  THANK YOU, YOUR HONOR.  THE

 9   GOVERNMENT'S NEXT WITNESS IS BORIS STARCEVIC.

10              THE CLERK:  WHAT WAS HIS NAME AGAIN?

11              MR. NEDROW:  YOU COULD HAVE HIM CONFIRM IT.  I THINK

12   IT'S BORISLAV STARCEVIC, S-T-A-R-C-E-V-I-C.

13         (THE WITNESS' PHOTOGRAPH WAS TAKEN)
```

## BORISLAV STARCEVIC

```
15   HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

16   DULY SWORN AND EXAMINED AS FOLLOWS: AND THE WITNESS WAS SWORN.

17              THE WITNESS:  I DO.

18              THE CLERK:  THANK YOU.  AND IF YOU COULD PLAY --

19   PLEASE STATE YOUR NAME FOR THE RECORD.

20              THE WITNESS:  MY FIRST NAME IS BORISLAV, LAST NAME

21   STARCEVIC.

22              THE CLERK:  SPELL YOUR FIRST NAME.

23              THE WITNESS:  B-O-R-I-S-L-A-V.

24              THE CLERK:  OKAY.  LAST NAME.

25              THE WITNESS:  S-T-A-R-C-E-V-I-C.
```

<u>**DIRECT EXAMINATION BY MR. NEDROW**</u>

1

2  **BY MR. NEDROW**

3  **Q**   SIR, GOOD MORNING.

4  **A**   GOOD MORNING.

5  **Q**   SIR, PLEASE STATE YOUR CITY AND STATE OF RESIDENCE.

6  **A**   LOS ANGELES, CALIFORNIA.

7  **Q**   FOR WHOM DO YOU CURRENTLY WORK?

8  **A**   I WORK FOR THE UCLA OLYMPIC LAB.

9  **Q**   HOW LONG HAVE YOU WORKED THERE?

10  **A**   I WORK THERE FOR 17 YEARS.

11  **Q**   YOU HAVE FORMAL TRAINING THAT HELPS YOU WITH YOUR POSITION

12  AT THE LAB?

13  **A**   YES.  I HAVE BACHELOR DEGREE IN CHEMISTRY.

14  **Q**   PLEASE STATE YOUR CURRENT POSITION AT THE LAB.

15  **A**   I'M NOW SCIENTIFIC SPECIALIST IN CHARGE OF THE OPERATION OF

16  THE CHEMISTRY AT THE LAB AND INSTRUMENTATION.  I AM SCIENTIFIC

17  SPECIALIST.  I'M IN CHARGE OF THE CHEMISTRY AND INSTRUMENTATION

18  OPERATIONS WITH MY CO-COLLEAGUE, ANOTHER SCIENTIFIC SPECIALIST.

19  **Q**   DID YOU HAVE THAT SAME POSITION IN 2006?

20  **A**   NO.  AT THAT TIME I WAS IN CHARGE OF LC/MS UNIT.

21  **Q**   AND PLEASE BRIEFLY SUMMARIZE FOR US AGAIN WHAT THE LC/MS

22  UNIT IS.

23  **A**   LC/MS UNIT IS AN INSTRUMENT THAT'S MADE OF TWO INSTRUMENTS

24  LIQUID CHROMATOGRAPH AND MASS SPECTROMETER.  IT'S USED TO

25  SEPARATE AND IDENTIFY COMPOUNDS IN THE -- IN THE MIXTURES OR IN

1   THE DIFFERENT MATTERS, URINE, OR BLOOD, OR SERUM, OR ANY OTHER

2   MASSES.

3            **MR. NEDROW:**  YOUR HONOR, MAY I APPROACH THE WITNESS?

4            **THE COURT:**  YOU MAY.

5            **MR. NEDROW:**  THANK YOU.

6   **BY MR. NEDROW**

7   **Q**   MR. STARCEVIC, I'M GOING TO HAND YOU A SERIES OF DOCUMENTS,

8   AND I'D LIKE TO START WITH WHAT'S ALREADY IN EVIDENCE AS

9   EXHIBIT 10, PAGE 12.

10           IF WE'D PUT THAT ON THE SCREEN, PLEASE?

11           **THE WITNESS:**  MM-HMM.

12  **BY MR. NEDROW**

13  **Q**   IT'S ALSO GOING TO COME UP ON THAT SCREEN, WHICHEVER ONE

14  YOU WANT TO REFER TO.  WHILE WE ARE WAITING FOR THAT,

15  MR. STARCEVIC, BASED ON THE PAPER COPY, DO YOU RECOGNIZE THIS

16  DOCUMENT?

17  **A**   YES, I RECOGNIZE THIS IS CHAIN OF CUSTODY.

18           (DOCUMENT DISPLAYED.)

19  **BY MR. NEDROW**

20  **Q**   AND IS YOUR NAME AND SIGNATURE ON THAT DOCUMENT?

21  **A**   YEAH, IT IS.  IT'S RIGHT HERE (INDICATING).

22  **Q**   IS THERE A DATE WITH RESPECT TO CONTACT YOU'VE HAD WITH

23  THIS PARTICULAR SAMPLE?

24  **A**   YES, THERE'S NOVEMBER 15, 2006.

25  **Q**   AND WHAT WAS THE CODE NUMBER ON THIS PARTICULAR SAMPLE?

STARCEVIC / DIRECT - NEDROW

1  **A**   SMP 03.

2  **Q**   AND WHAT WAS THE SAMPLE BEING RUN ON?  WAS IT A BOTTLE OR

3  AN ALIQUOT?

4  **A**   THIS WAS A VIAL.  IT WAS ALREADY PROCESSED SAMPLE THAT WAS

5  IN THE VIAL.

6  **Q**   IT WAS IN A VIAL, OKAY.  WHAT'S THE SIGNIFICANCE OF THE

7  TERM "ALIQUOT" IN THE UPPER LEFT CORNER OF THIS DOCUMENT?

8  **A**   ALIQUOT MEANS THAT IT'S A PART OF THE -- IT'S A PORTION OF

9  THE SAMPLE THAT WAS COLLECTED.

10 **Q**   OKAY.  SO IT'S A PORTION OF THE SMP 03?

11 **A**   YES.

12 **Q**   PLEASE DESCRIBE WHAT YOU DID WITH THIS SAMPLE IN CONNECTION

13 WITH YOUR RESPONSIBILITIES OPERATING THE LC/MS MACHINE IN

14 NOVEMBER 2006.

15 **A**   OKAY.  WHAT I DID, I TOOK THE RACK THAT CONTAINED SAMPLES

16 FROM THE TEMPORARY STORAGE THAT WAS PUT THERE BY THE CHEMIST.

17 THEN I STARTED THE INSTRUMENT, CALIBRATED IT.  THEN I WROTE THE

18 SEQUENCE FILE, WHICH IS THE FILE THAT TELLS THE INSTRUMENT HOW

19 TO RUN THE SAMPLES.  AND THEN I PUT THE SAMPLES ON THE ALPHA

20 SAMPLER, WHICH IS THE PART WHERE YOU PUT THE SAMPLES SO THEY

21 CAN BE INTRODUCED INTO THE INSTRUMENT.

22           AND AFTER CALIBRATION, I START THE INSTRUMENT AND

23 RUN THE SAMPLES, THE SEQUENCE THROUGH.  AFTER THE SAMPLES WERE

24 RUN, I THEN PRINTED THE CHROMATOGRAMS AND PREPARED THE

25 DOCUMENTS -- PREPARED THE DOCUMENTATION THAT THEN WENT TO THE

1 CONFIRMATION CHEMIST.

2 Q   OKAY.  THANK YOU, MR. STARCEVIC.

3        NOW, BEFORE I MOVE ON FROM THIS DOCUMENT, ONE OTHER

4 QUESTION.  YOU SEE IN THE RIGHT THERE'S THE WORDS "INDIVIDUAL

5 CONFIRMATION"?

6 A   MM-HMM.

7 Q   I'M SORRY.  COULD YOU PLEASE RESPOND FOR THE RECORD?

8 A   YES.

9 Q   THANK YOU.

10        DOES THE -- CAN YOU EXPLAIN IN YOUR CAPACITY WHAT

11 THE TERM "INDIVIDUAL CONFIRMATION" MEANS WHEN YOU SEE THAT ON A

12 CHAIN OF CUSTODY DOCUMENT?

13 A   THAT MEANS THAT IT'S A TAKE -- IT'S A CONFIRMATION THAT IS

14 PERTAINED TO THAT SAMPLE.

15 Q   SO THIS WAS A CONFIRMATION RUN ON THIS ALIQUOT FROM SMP 03,

16 CORRECT?

17 A   YES, YES.

18 Q   OKAY.  THANK YOU.

19        LET'S MOVE ON, IF WE CAN, ON THE SCREEN TO PAGE 14

20 OF EXHIBIT 10, AND THAT SHOULD BE THE NEXT DOCUMENT BEFORE YOU,

21 MR. STARCEVIC.  DO YOU SEE THAT?

22 A   MM-HMM.  YES.

23 Q   IS THIS ONE OF THE DOCUMENTS YOU -- OR DOES THIS DOCUMENT

24 REFLECT ONE OF THE PROCESSES YOU DESCRIBED JUST A MOMENT AGO IN

25 TERMS OF YOUR WORK ON THIS ALIQUOT CONFIRMATION?

1   **A**   YES.

2   **Q**   AND DESCRIBE WHAT THAT PAGE 14 THERE REFLECTS.

3   **A**   PAGE 14 REFLECTS THE SEQUENCE FILE THAT I WAS TALKING

4   ABOUT.  IT TELLS WHAT THE SAMPLES WERE RUN ON THE INSTRUMENT.

5   **Q**   AND WE'LL START DESCRIBING THOSE.  IF WE PUT THAT ON THE

6   SCREEN WHEN IT'S AVAILABLE?

7           (DOCUMENT DISPLAYED.)

8   **BY MR. NEDROW**

9   **Q**   WHAT WAS THE CONFIRMATION ON THIS PARTICULAR SAMPLE FOR; IN

10  OTHER WORDS, WHAT WAS BEING RUN ON THIS PARTICULAR -- WHAT KIND

11  OF TEST WAS BEING RUN BASED ON THIS DOCUMENT?

12  **A**   WOULD YOU REPEAT THAT, PLEASE?

13  **Q**   LET ME ASK THIS:  WHAT'S THE HEADING AT THE TOP OF THIS

14  SEQUENCING?

15  **A**   LC/MS 400QT.

16  **Q**   YES?

17  **A**   THAT'S THE INSTRUMENT THAT WE RUN THE SAMPLES ON, IS --

18  IT'S THE NAME OF THE INSTRUMENT.

19  **Q**   WHAT WAS THE CONFIRMATION BEING RUN FOR?

20  **A**   IT WAS RUN FOR NORBOLETHONE AND THG.

21  **Q**   OKAY.  AND THEN THERE'S A COLUMN ON THE LEFT, IF YOU SEE

22  THAT, GOING DOWN?

23  **A**   MM-HMM.

24  **Q**   CAN YOU SUMMARIZE FOR US WHAT THOSE ENTRIES ARE, STARTING

25  WITH CAL ONE?

1  A    YEAH, THESE ARE THE NAMES THAT WE ASSIGN TO THE SAMPLE.  SO

2  WE HAVE TWO CALIBRATORS.  THEN AFTER THAT, WE RUN A POSITIVE

3  QC.  CALIBRATORS ARE UNEXTRACTED MIXTURE OF THE COMPOUNDS THAT

4  WE ARE -- NORBOLETHONE AND THG.  AND THEN POSITIVE QC IS A

5  SAMPLE THAT -- SPIKED URINE THAT WENT TO THE EXTRACTION

6  PROCESS, WHICH CONTAINS ALSO THG AND NORBOLETHONE.  AND THEN WE

7  RUN NEGATIVE QC, WHICH IS A CERTIFIED NEGATIVE URINE THAT

8  DOESN'T CONTAIN -- SHOULDN'T CONTAIN ANY OF THE COMPOUNDS THAT

9  WE ARE LOOKING FOR.  THEN THERE ARE TWO SAMPLES THAT WE ARE

10  TESTING TRY TO CONFIRM.

11  Q    OKAY.  THANK YOU.  AND BEFORE WE GO ON -- AND I APOLOGIZE,

12  I SHOULD HAVE COVERED THIS BEFORE WE GOT TO THIS QUESTION.

13          YOU HAVE A SERIES OF DOCUMENTS BEFORE YOU THAT

14  YOU'VE LOOKED AT NOW BOTH, PAGE 1 AND ALSO PAGES 14 THROUGH 19;

15  DO YOU SEE THOSE BEFORE YOU, MR. STARCEVIC?

16  A    YES.

17  Q    DO THEY REFLECT THE WORK THAT YOU ACTUALLY DID IN TERMS OF

18  RUNNING THESE SAMPLES THROUGH THE LC/MS MACHINE?

19  A    WHAT I DID, I PROCESSED PROCESS -- I MEAN, PRINTED OUT THIS

20  GRAPHS.  THESE ARE CALLED CHROMATOGRAMS, AND -- AND THAT'S ALL

21  WHAT I DID, ACTUALLY.

22  Q    OKAY.  AND DO THESE DOCUMENTS -- WERE THEY GENERATED BY

23  MACHINE IN THE COURSE OF YOUR REGULAR WORK RESPONSIBILITIES IN

24  THE LAB?

25  A    YES.

1  Q   AND AT THE TIME YOU RAN THEM, DID YOU BELIEVE THE MACHINE

2  TO BE WORKING PROPERLY?

3  A   YEAH, MACHINE WAS WORKING PROPERLY, AND WE ACTUALLY HAVE A

4  PROCEDURE TO -- TO QUALIFY THE MACHINE.  WE HAVE A -- WE RUN A

5  TUNE AND CALIBRATION EVERY TWO MONTHS.  AND THAT SHOULD BE IN

6  THE DOCUMENT, TOO.

7  Q   AND WERE THOSE PROCESSES COMPLETED IN CONNECTION WITH THE

8  TEST RUN ON THE SAMPLES ON THIS OCCASION?

9  A   YEAH.  THE MACHINE WAS AT THAT TIME IN GOOD CONDITION.

10  Q   OKAY.  AND I DON'T THINK I SHOWED THESE TO YOU, BUT LET ME

11  ALSO SHOW YOU PAGES 19 AND 20.  I THINK I STOPPED AT PAGE --

12  ARE 19 AND 20 ALSO A PART OF THE READOUT THAT COMES FROM

13  OPERATING THE MACHINE?

14  A   YEAH, THE NUMBERS THAT ARE HERE IN THE COLUMN, IN THE FIRST

15  COLUMN?

16  Q   YES.

17  A   ON THE LEFT.  AND I'M READING FROM -- THE PEAK HEIGHTS AND

18  COMPOUNDS RT, WHICH MEANS RETENTION TIMES, THAT ARE COMING THE

19  MACHINE.

20  Q   SO ALL OF THESE DOCUMENTS I'VE SHOWN YOU NOW WERE A PART OF

21  YOUR WORK THAT YOU PERSONALLY DID ON THIS SAMPLE THAT WE'VE

22  DISCUSSED NOVEMBER 2006?

23  A   YES.  ACTUALLY, I DIDN'T PREPARE THESE DOCUMENTS.  THAT WAS

24  PREPARED BY CONFIRMATION CHEMIST, BUT I -- THE NUMBERS ARE

25  COMING FROM THE PRINTOUTS AND I GAVE TO THE CONFIRMATION

1    CHEMIST.

2    **Q**    OKAY.  BUT THE DATA ON THERE --

3    **A**    THE DATA, YES.

4    **Q**    -- IS FROM THE WORK YOU DID, THE LC/MS?

5    **A**    YES.

6              **MR. NEDROW:**  YOUR HONOR, THE GOVERNMENT AT THIS

7    POINT WOULD OFFER PAGE 12 -- I'M SORRY.  PAGE 12, I THINK, IS

8    ALREADY IN, BUT PAGES 14 THROUGH 20 OF EXHIBIT 10 INTO

9    EVIDENCE.

10             **MR. BALOGH:**  I WOULD LIKE TO RESERVE ON 19 AND 20.

11   HE HASN'T LAID A FOUNDATION, BUT TO THE REST NO OBJECTION.

12             **THE COURT:**  DO YOU WANT TO LAY A FOUNDATION FOR 19

13   AND 20 RIGHT NOW?

14             **MR. NEDROW:**  YES, THANK YOU.  YOUR HONOR.

15   **BY MR. NEDROW**

16   **Q**    AS TO PAGE 19 AND 20, MR. STARCEVIC, THERE WAS A FURTHER

17   REVIEW DONE AS TO SOME CONCLUSIONS ON THERE BY A CONFIRMING

18   CHEMIST, CORRECT?

19   **A**    YES.

20   **Q**    BUT AS FAR AS THE RAW DATA THAT'S ON THERE, THAT'S A

21   PRODUCT OF YOUR WORK, CORRECT?

22   **A**    THAT'S CORRECT.

23   **Q**    AND ARE YOU FAMILIAR WITH THE PROCESS THAT THE CONFIRMING

24   CHEMIST GOES THROUGH IN DRAWING THEIR CONCLUSIONS FROM THE

25   WORK?

1  **A**   I'M FAMILIAR, BUT I DIDN'T DO THE WORK.

2         **MR. NEDROW:**  WELL, YOUR HONOR, I REQUEST THAT 19 AND

3  20 BE OFFERED WITH THE UNDERSTANDING THAT HE'S REFERRING TO THE

4  DATA PORTION, AND HE'LL QUALIFY -- HE CAN BE BOTH

5  CROSS-EXAMINED AND EXPLAIN THE PARTS HE'S KNOWLEDGEABLE OF.

6         **MR. BALOGH:**  I WOULD ASK TO RESERVE UNTIL I FINISH

7  MY EXAMINATION.

8         **THE COURT:**  I TELL YOU WHAT.  I'LL LET THEM IN AT

9  THIS TIME, SUBJECT TO TAKING THEM BACK UP IN THE EVENT YOU

10 ESTABLISH THEY SHOULD BE TAKEN OUT IN YOUR CROSS-EXAMINATION.

11 YOU CAN DISPLAY THEM IF YOU WANT.

12        **MR. NEDROW:**  THANK YOU, YOUR HONOR.

13        (GOVERNMENT'S EXHIBIT 10, PAGES 14 THROUGH 20

14        RECEIVED IN EVIDENCE.)

15        **MR. NEDROW:**  WHAT I WOULD LIKE TO DO IS DISPLAY 14

16 AT THIS POINT, AND IF WE COULD HIGHLIGHT THE TOP HALF SO IT'S A

17 LITTLE MORE LEGIBLE?  WE WILL BRIEFLY TALK ABOUT THIS.

18        (DOCUMENT DISPLAYED.)

19 **BY MR. NEDROW**

20 **Q**   OH -- ANYWAY, THE SEQUENCE, MR. STARCEVIC, IS WHAT YOU

21 TESTIFIED EARLIER --

22 **A**   MM-HMM.

23 **Q**   -- TO BEING THE SEQUENCING THAT YOU RAN ON THE SAMPLES AS

24 THEY WENT THROUGH THE MACHINE; IS THAT CORRECT?

25 **A**   THAT'S CORRECT, YEAH.

1   Q    OKAY.  THAT'S FINE.  WHY DON'T WE GO ON TO THE NEXT PAGE,

2   WHICH IS PAGE 15.  CAN YOU TELL US WHAT THAT PAGE REPRESENTS?

3   A    JUST A MINUTE.

4        PAGE 15 REPRESENTS NEGATIVE QC SAMPLES, WHICH IS

5   WRITTEN ON THE TOP OF IT.  THIS IS CHROMATOGRAM SHOWING THE --

6   AT THE TOP THERE IS A -- THAT'S A COMBINED CHROMATOGRAM THAT

7   CONTAINS ALL THE CIRCLED TRANSITIONS THAT WERE PERFORMED DURING

8   THE ANALYSIS.  AND AT THE BOTTOM, THESE ARE THE SEPARATE

9   TRANSITIONS EACH FOR THE THG ON THE LEFT-HAND SIDE AND THE

10  NORBOLETHONE ON THE RIGHT-HAND SIDE.

11  Q    OKAY.  AND THIS, AGAIN, WAS THE NEGATIVE QUALITY CONTROL,

12  CORRECT?

13  A    EXACTLY.

14  Q    WHAT DOES THAT MEAN AGAIN?

15  A    THAT MEANS THAT IF WE RUN THAT SAMPLE TO SHOW THAT THERE IS

16  NO CROSS-CONTAMINATION HAPPENING DURING THE ANALYSIS, BECAUSE

17  THAT SAMPLES HAS GONE THROUGH WITH THE OTHER SAMPLES, AND WE

18  SHOULDN'T SEE ANY PEAK COMING FROM NORBOLETHONE OR THG IN THESE

19  THREE WINDOWS PRESENTED AT THE BOTTOM.

20  Q    SO WHY DON'T WE TURN THEN TO THE PAGE MARKED ON THE BOTTOM

21  PAGE 16?  IS THIS A SIMILAR CHROMATOGRAM ON A DIFFERENT PART OF

22  THE LC/MS RUN ON THIS SAMPLE?

23  A    YEAH.

24  Q    AND WHAT'S THIS ONE?

25  A    THIS ONE IS A COLUMN ONE.  EACH CONTAINS THG AND

1  NORBOLETHONE, AND YOU CAN SEE THAT IN THE -- IN THIS AT THE

2  BOTTOM IS ONLY THREE TRANSITIONS FOR BOTH COMPOUNDS.  THERE IS

3  A PERMANENT PEAK THERE.  WE CALL THIS TRACES PEAKS.

4  **Q**   OKAY.  AND -- LET'S TURN THEN TO PAGE 17.  THIS ONE IS

5  CAPTIONED THE "POS QC TWO" PART OF THE SAMPLE; IS THAT CORRECT?

6  **A**   IT'S THE POSITIVE SAMPLE.

7  **Q**   YES, THE POSITIVE SAMPLE.  OKAY.  AND WHAT IS THE POSITIVE

8  SAMPLE?

9  **A**   THE POSITIVE SAMPLE IS SPIKED NEGATIVE URINE THAT WENT

10  THROUGH THE SAME PROCEDURE AS THE SAMPLES AND WHICH WAS SPIKED

11  WITH THE THG AND NORBOLETHONE TO SHOW THAT THE ASSAY CHEMISTRY

12  IS WORKING AND THAT THE INSTRUMENT IS PERFORMING.  SO, AGAIN,

13  YOU CAN SEE THAT -- WE CAN SEE PEAKS THAT REPRESENT PRESENCE OF

14  THG AND NORBOLETHONE IN THAT, IN THAT CHROMATOGRAM.

15  **Q**   OKAY.  THE LAST CHROMATOGRAM IN THE SEQUENCE IS THE ONE

16  CAPTURING THE SMP 03 AT THE TOP; IS THAT CORRECT?

17  **A**   THAT'S CORRECT, YES.

18  **Q**   DOES THIS CHROMATOGRAM ALSO PROVIDE INFORMATION THAT WAS

19  USED IN THE ANALYSIS OF THE SAMPLE?

20  **A**   YES.

21  **Q**   AND WHAT DOES IT REFLECT ON --

22  **A**   THAT'S A SAMPLE SMP 03, AND THAT ALSO SHOWS THE COMBINED

23  CHROMATOGRAM IN THE TOP AND THEN THE SEPARATE TRANSITIONS AT

24  THE BOTTOM AND SHOWS THE PRESENCE OF THE NORBOLETHONE AND THG.

25  **Q**   OKAY.

1    A    PEAKS.

2    Q    AND THEN PAGES 19 AND 20, LET ME JUST ASK YOU A COUPLE

3    OTHER QUESTIONS ABOUT THAT.  AS TO 19 AND 20, MR. STARCEVIC,

4    ARE YOU FAMILIAR -- I UNDERSTAND WITH THE QUALIFICATION YOU

5    MADE EARLIER THAT YOU DIDN'T PERSONALLY PREPARE EVERY BIT OF

6    INFORMATION, BUT ARE YOU FAMILIAR WITH THESE DOCUMENTS AS PART

7    OF YOUR EMPLOYMENT AT UCLA LAB?

8    A    YES.

9    Q    AND IS IT A PART OF THE UCLA LAB POLICY TO MAINTAIN THESE

10   DOCUMENTS IN CONNECTION WITH ITS ORDINARY COURSE OF BUSINESS?

11   A    YES.

12   Q    IS THE INFORMATION PLACED UPON THEM, TO YOUR KNOWLEDGE,

13   PLACED ON THEM AT OR NEAR THE TIME THE PERSON FILLING THEM OUT

14   IS DIAGNOSING OR FIGURING OUT THE INFORMATION?

15   A    YES.  YES.

16   Q    OKAY.  ALL RIGHT.  THANK YOU.  AND WITH RESPECT TO 19 AND

17   20, IS THERE KIND OF A BOTTOM LINE CONCLUSION THAT WAS REACHED

18   WITH RESPECT TO WHAT THESE SAMPLES CONTAINED?

19   A    YES.

20   Q    WHAT WAS THAT?

21   A    IT WAS POSITIVE.

22   Q    POSITIVE FOR WHAT?

23   A    POSITIVE FOR -- CONTAINS -- IT SAYS CONTAINS

24   TETRAHYDROGESTRINONE, THG, AND NORBOLETHONE.

25   Q    WHY DON'T WE MOVE ON TO A SEPARATE SET OF DOCUMENTS, WHICH

1   IS GOING TO CONTAIN GOVERNMENT'S EXHIBIT 12, AND THE FIRST OF

2   THESE IS ALREADY IN EVIDENCE.  SO WHY DON'T I -- IF I COULD

3   PLEASE ASK THAT IN EXHIBIT 12, PAGE 12 BE CALLED UP?  YOU KNOW

4   WHAT?  I'M GOING TO TAKE BACK SOME OF THESE DOCUMENTS FROM YOU

5   TO KEEP THEM ORGANIZED.  THANK YOU.

6            (DOCUMENT DISPLAYED.)

7   **BY MR. NEDROW**

8   **Q**   ACTUALLY -- AND YOU HAVE THE SCREEN THERE, SIR, AND I'LL

9   GIVE YOU A PAPER COPY AS WELL.

10           PAGE 12, EXHIBIT 12, DO YOU RECOGNIZE THIS AS A

11  CHAIN OF CUSTODY DOCUMENT ON A SEPARATE SAMPLE?

12  **A**   YES, I DO.

13  **Q**   AND WHAT WAS THE SAMPLE THAT WAS THE SUBJECT OF THE WORK ON

14  THIS OCCASION?

15  **A**   THIS WAS THE SAME, THG AND NORBOLETHONE.

16  **Q**   AND THAT WAS UCLA CODE NUMBER FOR THIS SEPARATE SAMPLE?

17  **A**   CODE NUMBER UY 304.

18  **Q**   SO IT'S A SEPARATE SAMPLE THAT THE WORK IS BEING DONE ON,

19  CORRECT?

20  **A**   YES.

21  **Q**   DOES THIS DOCUMENT REFLECT ESSENTIALLY THE SAME PROCESS

22  BEING ENGAGED IN BY YOURSELF ON THE SAMPLE?

23  **A**   YES.

24  **Q**   AND THAT IS TO RUN THE SAMPLE IN THE LC/MS MACHINE?

25  **A**   THAT'S CORRECT.

1   Q   AND IS IT ALSO FOR THG AND NORBOLETHONE, AS YOU TESTIFIED?

2   A   YEAH, IT IS.

3   Q   OKAY.  THEN LET'S MOVE FORWARD TO -- AND THESE ARE NOT YET

4   IN EVIDENCE, BUT WE WILL GO TO EXHIBIT 12, PAGES 14 THROUGH 20,

5   AND IF I COULD JUST ASK YOU, MR. STARCEVIC, TO PAGE THROUGH

6   THOSE FOR MOMENT, PLEASE?

7           MR. STARCEVIC, DO YOU RECOGNIZE THOSE DOCUMENTS IN

8   CONNECTION WITH THE WORK YOU DID ON SAMPLE UY 304 IN

9   NOVEMBER 2006?

10  A   I DO.

11  Q   AND ARE THEY DOCUMENTS THE UCLA LAB MAINTAINS AS A MATTER

12  OF POLICY?

13  A   YES.

14  Q   AND YOU ARE RESPONSIBLE FOR ENTERING MUCH OF THE

15  INFORMATION, IF NOT MOST OF IT, ON ALL THESE DOCUMENTS,

16  CORRECT?

17  A   YEAH, I ENTER -- YEAH.  YES.

18  Q   I SAY THAT IN TERMS OF TRANSMITTING THE LC/MS DATA INTO A

19  FORMAT ON THESE REPORTS, CORRECT?

20  A   YES.

21  Q   AND THE -- YOU'RE FAMILIAR WITH THE UCLA LAB'S POLICY OF

22  MAINTAINING THESE RECORDS AND MAINTAINING THEM ACCURATELY,

23  CORRECT?

24  A   I DO, YEAH.

25           MR. NEDROW:  YOUR HONOR, I MOVE EXHIBITS 14 THROUGH

1  20 INTO EVIDENCE AT THE TIME.

2          MR. BALOGH:  WITH THE SAME REQUESTS ON 19 AND 20.

3          THE COURT:  IT WILL BE THE SAME RULING.  YOU CAN

4  VOIR DIRE ON THAT WHEN THE TIME COMES.  IF NECESSARY, I'LL TAKE

5  THEM BACK OUT.  RIGHT NOW THEY ARE RECEIVED.

6          (GOVERNMENT'S EXHIBIT 12, PAGES 12 THROUGH 20

7          RECEIVED IN EVIDENCE.)

8          MR. NEDROW:  THANK YOU, YOUR HONOR.

9  BY MR. NEDROW

10 Q   LET'S START, IF WE CAN, WITH EXHIBIT 14 AND -- EXCUSE ME --

11 14 WITHIN EXHIBIT 12, PAGE 14 WITHIN EXHIBIT 12.  IS THIS AGAIN

12 A SEQUENCING FOR SAMPLE UY 304 SIMILAR TO WHAT YOU DESCRIBED

13 PREVIOUSLY ON SMP 03?

14 A   YES, IT IS.

15 Q   DID YOU GO THROUGH A SIMILAR --

16 A   YES, YES.  UNDER LEFT COLUMN WE HAVE SAMPLE NAME THAT TELLS

17 WHAT THE SAMPLE IS.  SO IT'S CAL ONE, CAL TWO, POSITIVE QC,

18 NEGATIVE QC, SAMPLE SMP 03 AND UY 304.  THIS IS THE SEQUENCE

19 FILE THAT I PREPARED TO PUT ON -- TO TELL THE INSTRUMENT HOW TO

20 RUN THE SAMPLES.

21 Q   ARE THOSE YOUR INITIALS ON THE LOWER RIGHT JUST BELOW THE

22 LAST SEQUENCING?

23 A   ACTUALLY, I SIGNED.  YEAH.

24 Q   IT'S YOUR SIGNATURE, I SHOULD SAY.

25 A   MY SIGNATURE.

1  Q    THANK YOU.  OKAY.

2             LET'S GO ON TO THE NEXT PAGE WHICH WOULD BE PAGE 15

3  WITHIN EXHIBIT 12.

4  A    MM-HMM.  YES.  THIS IS A NEGATIVE QC SAMPLE, WHICH I

5  EXPLAINED BEFORE, AND, AGAIN, WE HAVE THE CHROMATOGRAM,

6  COMBINED CHROMATOGRAM, AT THE TOP, AND THEN WE HAVE SEPARATE

7  TRANSITIONS AT THE BOTTOM, SHOWING THAT THERE'S NO THG OR

8  NORBOLETHONE PRESENT IN THE NEGATIVE QC SAMPLE.

9  Q    THANK YOU.  COULD WE MOVE ON TO THE NEXT PAGE?

10 A    YEAH, THE NEXT PAGE IS CAL SAMPLE THAT SHOWS, AGAIN,

11 COMBINED CHROMATOGRAM AT THE TOP AND SHOWS THE PRESENCE OF THG

12 AND NORBOLETHONE AND THE TRANSITIONS AT THE BOTTOM.

13 Q    AND IF WE COULD GO ON TO THE NEXT PAGE AND LINE, WHICH

14 WOULD BE PAGE 17?

15 A    ON PAGE 17, IT'S A POSITIVE QC SAMPLE, WHICH WAS SPIKED

16 URINE, AND IT SHOWS AGAIN COMBINED CHROMATOGRAM AT THE TOP, AND

17 THEN THERE IS TRANSITIONS AT THE BOTTOM THAT SHOWS THE PRESENCE

18 OF THG AND NORBOLETHONE.

19 Q    AND THE NEXT PAGE AND LINE, PAGE 18?

20 A    AND PAGE 18 SHOWS THE SAMPLE.  NAME CODE OF THE SAMPLE IS

21 UY 304.  AND IT SHOWS THE -- ON TOP THE COMBINED CHROMATOGRAM,

22 AND THEN BOTTOM SHOWS THE CHROMATOGRAM SHOWING THE PRESENCE OF

23 THG AND NORBOLETHONE.

24 Q    AND THEN PAGES 19 AND 20, WHAT ARE THOSE PAGES?

25 A    THOSE PAGES ARE CONFIRMATION SUMMARIES THAT WERE PREPARED

1    BY THE CONFIRMATION CHEMIST AND THEY CONTAINS DATA THAT CAME

2    FROM THIS CHROMATOGRAM.

3    **Q**    WHAT WAS THE CONCLUSION BASED UPON THE REVIEW OF THE

4    SAMPLES IN THIS INSTANCE?

5    **A**    YEAH, THE PAGE 20, THE CONCLUSION, WAS THAT UY 304 CONTAINS

6    TETRAHYDROGESTRINONE, THG CALLED, ACRONYM, AND NORBOLETHONE.

7              **MR. NEDROW:**    IF I MAY HAVE A QUICK MOMENT, YOUR

8    HONOR, PLEASE.

9              **THE COURT:**    YOU MAY.

10   **BY MR. NEDROW**

11   **Q**    JUST A COUPLE OF QUICK FOLLOW-UPS, MR. STARCEVIC.

12             THE TERMS CAL ONE AND CAL TWO WE DESCRIBED?

13   **A**    MM-HMM.

14   **Q**    COULD YOU JUST PLEASE REMIND US WHAT THE TERM CAL IS

15   SHORTHAND FOR?

16   **A**    IT'S A CALIBRATOR.

17   **Q**    AND, AGAIN, WHAT'S THE SIGNIFICANCE OF THE CALIBRATOR?

18   **A**    THE CALIBRATOR IS JUST -- IT MEANS THAT IT'S AN UNEXTRACTED

19   MIXTURE OF COMPOUNDS THAT WE ARE SEARCHING FOR OR TRYING TO

20   CONFIRM THAT HAS PUT IN -- IT SERVES TO SHOW THAT AN INSTRUMENT

21   IS WORKING PROPERLY.  IT DOESN'T TEST FOR THE EXTRACTION

22   BECAUSE IT DOESN'T GO THROUGH EXTRACTION, BUT IT'S -- IT'S USED

23   TO BE -- TO SHOW THAT THE INSTRUMENT IS WORKING CORRECTLY.

24   **Q**    AND AS A PART OF YOUR ROLE OPERATING THE MACHINE HERE, ON

25   BOTH OF THE SAMPLES WE DISCUSSED, YOU REVIEWED THE

1   CHROMATOGRAMS FOR THE CALIBRATION SAMPLES, CORRECT?

2   **A**   YES, CALIBRATION SAMPLES AND POSITIVE QC.  ACTUALLY, I

3   LOOKED AT ALL THE CHROMATOGRAMS TO BE SURE THAT EVERYTHING WAS

4   RUN AS ACCORDING TO SOP.

5   **Q**   AND DID YOU DO THAT HERE ON THESE TWO SAMPLES?

6   **A**   YES.

7   **Q**   WAS THE MACHINE RUNNING PROPERLY, TO THE BEST OF YOUR

8   KNOWLEDGE?

9   **A**   THE MACHINE WAS RUNNING PROPERLY.

10          **MR. NEDROW:**  THANK YOU, MR. STARCEVIC.  THE

11  GOVERNMENT HAS NO FURTHER QUESTIONS.

12          **THE COURT:**  MR. BALOGH, I'LL GIVE YOU A CHOICE.  DO

13  YOU WANT TO DO IT NOW OR AFTER LUNCH?

14          **MR. BALOGH:**  WE ARE GOING TO GO BEYOND THE LUNCH

15  BREAK, BUT I WOULD TAKE THE 15 MINUTES NOW TO GO THROUGH, BUT I

16  WOULD BE HAPPY TO SCHEDULE MY BREAK AT THE NOON HOUR.

17              **CROSS-EXAMINATION BY MR. BALOGH**

18  **BY MR. BALOGH**

19  **Q**   GOOD MORNING, MR. STARCEVIC.

20  **A**   GOOD MORNING.

21  **Q**   COULD WE BEGIN OUR DISCUSSION THIS MORNING WITH YOUR

22  EDUCATIONAL BACKGROUND?

23  **A**   YES.

24  **Q**   DID YOU ATTEND UNIVERSITY, SIR?

25  **A**   YES, I DID.

1   Q   WHERE DID YOU ATTEND UNIVERSITY?

2   A   IN ZAGREB, CROATIA.  NOW CROATIA, FORMERLY YUGOSLAVIA.

3   Q   IN ZAGREB?

4   A   YES.

5   Q   DID YOU OBTAIN A DEGREE?

6   A   YES.

7   Q   WHAT UNIVERSITY DID YOU ATTEND, SIR?

8   A   UNIVERSITY OF ZAGREB.

9   Q   YOU OBTAINED A BACHELOR OF SCIENCE DEGREE?

10  A   BACHELOR OR SCIENCE, YES.

11  Q   DID YOU HAVE A CONCENTRATION IN SCIENCE?

12  A   YES.

13  Q   WHAT WAS THAT, SIR?

14  A   I TOOK ALL THE CLASSES THAT ARE -- I TOOK ORGANIC

15  CHEMISTRY, ANALYTICAL CHEMISTRY, INORGANIC CHEMISTRY.  THIS IS

16  VERY SPECIFIC.  THE CHEMISTRY DEGREE CONTAINS ALL THE CHEMISTRY

17  SUBJECTS THAT ARE NEEDED.  SO PHYSICAL CHEMISTRY.

18  Q   AND DID YOU -- WHAT YEAR DID YOU OBTAIN THIS DEGREE, SIR?

19  A   SORRY.  I OBTAINED THAT DEGREE IN 1970.

20  Q   1970?

21  A   YES.

22  Q   THEREAFTER, DID YOU CONTINUE YOUR EDUCATION IN ANY WAY?

23  A   YEAH, I STARTED A GRADUATE SCHOOL THERE, AND -- BUT I

24  DIDN'T FINISH.

25  Q   WHY DIDN'T YOU FINISH, SIR?

1    A    I WAS WORKING IN THE INDUSTRY AT THE SAME TIME, SO I DIDN'T

2    HAVE TIME ACTUALLY TO DO THIS.

3    Q    DID THERE COME A TIME YOU IMMIGRATED TO UNITED STATES, SIR?

4    A    YES.

5    Q    AND YOU TOOK A LAB -- DIRECTING YOUR ATTENTION TO 2004, YOU

6    TOOK A JOB WITH THE UCLA ANALYTICAL LABORATORY?

7    A    NO.  I STARTED WORKING THERE IN 1991.

8    Q    THAT'S RIGHT.  MY NOTES ARE FOR MS. LEUNG.

9              YOU HAVE BEEN THERE FOR 17 YEARS?

10   A    SEVENTEEN YEARS, YEAH.

11   Q    WHAT WAS YOUR INITIAL POSITION AT THE UCLA ANALYTICAL

12   LABORATORY?

13   A    MY INITIAL POSITION, I WAS VISITING RESEARCHER.  I WAS

14   DOING RESEARCH.

15   Q    WHAT IS YOUR TITLE NOW TODAY?

16   A    MY TITLE NOW IS SCIENTIFIC SPECIALIST.

17   Q    I WANT YOU TO TURN TO EXHIBIT 10, IF YOU WILL, WHICH I

18   BELIEVE YOU HAVE IN FRONT OF YOU, BUT IF NOT, I WILL GATHER IT

19   AND PRESENT IT TO YOU.  DO YOU HAVE EXHIBIT 10, SIR?

20             **MR. NEDROW:**  RIGHT HERE.

21             **MR. BALOGH:**  MAY I APPROACH?

22             **THE COURT:**  YOU MAY.

23             **MR. BALOGH:**  THANK YOU.

24   **BY MR. BALOGH**

25   Q    I'D LIKE YOU TO LOOK AT PAGE -- WELL, BEFORE I ASK THAT

1 QUESTION, LET ME ASK YOU THIS, SIR:  WHEN YOU DO AN LC/MS FOR

2 INDIVIDUAL CONFIRMATION, DO YOU DO THAT ANY DIFFERENTLY THAN

3 YOU WOULD DO AN LC/MS FOR ANY OTHER VIALS THAT YOU RUN THROUGH

4 THE INSTRUMENT?

5 **A**   WELL, THERE'S A -- WE HAVE A SCREEN AND CONFIRMATION

6 ASSAYS, SO THE SCREEN ASSAYS ARE USUALLY FASTER ASSAY THAT WE

7 RUN.  THAT ALSO TAKES CARE -- THAT LOOKS FOR THE OTHER

8 COMPOUNDS.  AND FOR THE CONFIRMATION WE TARGET ONLY SPECIFIC

9 COMPOUNDS THAT WE FOUND IN THE SCREEN.  SO THE CONFIRMATION

10 ASSAY WILL BE ON A LONGER COLUMN, AND IT WILL BE SPECIFIC ONLY

11 FOR THESE COMPOUNDS.

12 **Q**   OKAY.  NOW, IF WE LOOK THROUGH EXHIBIT 10 TO GET TO PAGE 7,

13 THIS IS A LC/MS SCREEN FOR TWO SPECIFIC COMPOUNDS; AM I

14 CORRECT, SIR?

15 **A**   PAGE 10?

16 **Q**   PAGE 7.

17 **A**   SEVEN.  OKAY.

18          THE EXTRACTION WAS -- YEAH, I CAN SEE THAT THERE

19 ARE -- EXTRACTED CHROMATOGRAMS ARE FOR TWO SPECIFIC COMPOUNDS,

20 BUT I COULDN'T -- WELL, YEAH, IT'S FOR TWO SPECIFIC COMPOUNDS.

21 **Q**   AND THOSE TWO SPECIFIC COMPOUNDS ARE WHAT, SIR?

22 **A**   ACCORDING TO THE TRANSITION, I WOULD GUESS THEY ARE -- I

23 WILL SAY THEY ARE FOR THG AND NORBOLETHONE.

24 **Q**   AND THIS IS THE SAME TYPE OF LC/MS SCREEN YOU PERFORMED

25 WITH RESPECT TO THE DOCUMENT THAT BEGINS ON PAGE 10, PAGE 12;

1   AM I CORRECT, SIR?  PAGE 14.

2   **A**   YES, THEY ARE SIMILAR.

3   **Q**   CAN WE GO BACK TO PAGE 7, SIR?

4   **A**   MM-HMM.

5   **Q**   YOU WERE EMPLOYED BY THE UCLA ANALYTICAL LAB IN 2004,

6   RIGHT?

7   **A**   YES, I WAS.

8   **Q**   IF WE LOOK AT PAGE 7, THIS IS CALLED PROJECT D\ANALYST

9   DATA\PROJECTS\TRENBOLONE --

10  **Q**   -- _GESTRINONE?

11  **A**   YES.

12  **Q**   IT INDICATES THIS PROJECT WAS AS OF THIS DATE MAY 18TH,

13  2004; DO YOU SEE THAT, SIR?

14  **A**   YES.

15  **Q**   CAN YOU TELL US WHAT THIS PROJECT WAS?

16  **A**   THAT'S JUST THE NAME OF THE FOLDER.  THE PROJECT THAT'S --

17  I HAVE TO EXPLAIN THAT.

18          ANALYST DATA AND THE PROJECT, THAT'S LIKE THE FULL

19  NAMES THAT ARE GIVEN BY THE SOFTWARE, SO IT'S NOT SOMETHING

20  THAT WE BROUGHT.  AND TRENBOLONE_GESTRINONE, THIS IS JUST THE

21  NAME OF THE FOLDER THAT WE PUT THE DATA IN OF THE SCREENS.

22  **Q**   SO ALL THE SCREENS FOR NORBOLETHONE AND TRENBOLONE ARE IN

23  THIS FOLDER; IS THAT CORRECT?

24  **A**   THAT'S THE FOLDER, AND THERE IS A SUBFOLDER FOR EACH RUN

25  THAT WE RUN.

1   Q    CAN YOU EXPLAIN THAT IN A LITTLE MORE DETAIL?  I'M NOT SURE

2   WHAT YOU MEAN.

3   A    WELL, THE PROJECT --

4   Q    COULD WE PUT UP -- MAY I ASK TO PUT UP PAGE 7 AND HIGHLIGHT

5   THE COMPUTER SCREEN PORTION OF IT?

6           **MR. NOVITZKY:**  SMP?

7           **MR. BALOGH:**  YES.

8           **THE WITNESS:**  SO, THE WAY THE SOFTWARE ORGANIZES THE

9   DATA AND WE ORGANIZE THE DATA IS THAT WE HAVE THE TOP FOLDER

10  WHICH IS ANALYST DATA.  THEN THERE IS A PROJECTS WHERE WE KEEP

11  DIFFERENT PROJECTS, WHICH ARE MOSTLY OUR ASSAYS.  AND THEN

12  THERE IS A TRENBOLONE_GESTRINONE, WHICH IS JUST A NAME THAT WE

13  GAVE AT THE TIME THAT WE PRODUCED THAT FOLDER.  AND THEN, THEN

14  AFTER -- AND ALL THE DATA THAT GO INTO THE SUBFOLDERS IN THAT

15  PARTICULAR FOLDER WHICH IS CALLED TRENBOLONE_GESTRINONE.

16  Q    WHAT DOES THE DATE -- AM I READING IT CORRECTLY -- WHEN I

17  SEE TRENBOLONE_GESTRINONE_05182004, AM I CORRECT TO INTERPRET

18  THAT DATE AS MAY 18TH, 2004?

19  A    YES.

20  Q    OKAY.  WHAT IS THE SIGNIFICANCE OF THAT DATE WITH RESPECT

21  TO THE SAMPLES THAT ARE BEING PRESERVED IN ANALYST PROJECT

22  TRENBOLONE_GESTRINONE?

23  A    THERE IS NO -- THERE IS NO -- THAT'S WHEN THAT PROJECT WAS

24  STARTED.

25  Q    THAT WAS WHEN THAT PROJECT WAS STARTED.

1           SO IF I UNDERSTAND YOU CORRECTLY, WHAT THIS IS --

2  THE "D" THAT BEGINS THIS LINE IS THE DIRECTORY LABEL ON THE

3  COMPUTER?

4  **A**   THAT'S RIGHT.

5  **Q**   AND THE DIRECTORY SHOWS THAT THERE'S A LARGE FOLDER THAT

6  HAS ANALYST DATA, CORRECT?

7  **A**   CORRECT.

8  **Q**   AND WITHIN THAT THERE'S A SUBFOLDER CALLED "PROJECTS,"

9  CORRECT?

10 **A**   YES.

11 **Q**   AND ONE OF THE PROJECTS YOU FIND IN THE ANALYST DATA IS

12 TRENBOLONE_GESTRINONE PROJECT; IS THAT CORRECT?

13 **A**   CORRECT.

14 **Q**   AND THIS PROJECT WAS BEGUN ON MAY 18TH, 2004; IS THAT

15 RIGHT?

16 **A**   THAT'S HOW WE NAMED THE PROJECT.

17 **Q**   IS HOW I INTERPRETED --

18 **A**   YES.

19 **Q**   WE UNDERSTAND HOW TO READ THIS LINE NOW?

20          NOW, WHEN YOU ARE DOING TESTS FOR LC/MS ON BEHALF OF

21 UCLA CLIENTS, ARE ALL OF THOSE CLIENTS -- ALL THOSE TESTS, DO

22 THEY ALL HAVE A PROJECT THEY FIT WITH UNDER?

23 **A**   NO, WE DON'T SEPARATE PROJECTS BY CLIENTS.  WE SEPARATE

24 PROJECTS BY WHAT WE -- BY THE ASSAYS OR THE WAY WE RUN IT.  SO

25 THIS WILL BE ONE PROJECT WHERE WE USUALLY RUN STEROIDS.

1    Q   CAN YOU EXPLAIN THAT?  IN A NORMAL CASE, IN A TYPICAL CASE,

2    WHAT WOULD THAT D LINE READ WITH RESPECT TO, LET'S SAY, AN NFL

3    PLAYER'S URINE BEING TESTED OR AN NFL CLIENT BEING TESTED?

4    A   IT WOULD BE THE SAME.  IT WOULD HAVE THE SAME LINE.  AND

5    YOU SEE AT THE END AFTER THE GESTRINONE PROJECT, THERE'S A

6    BATCH.  THAT'S ANOTHER FOLDER WHICH CONTAINS -- ACTUALLY,

7    THIS -- THIS IS A SEQUENCE FILE.  I THINK WE ARE READING

8    SEQUENCE FILE.  AND SO THAT'S WHERE THE SEQUENCE FILE WILL GO.

9    Q   WHERE WOULD THE SEQUENCE FILE GO, SIR?

10   A   BATCH, BATCH.  ALL THE SEQUENCE FILE GO TO BATCH UNDER THIS

11   PROJECT.

12   Q   AND THIS INDICATES A NEW BATCH?

13   A   YES.

14   Q   NOW I WANT YOU TO COMPARE PAGE 7 TO PAGE 14 OF EXHIBIT 10.

15   COULD I GET THOSE SIDE-BY-SIDE, PLEASE?

16   A   PAGE 6 AND PAGE?

17   Q   SEVEN AND TEN.  I THINK, ACTUALLY, MR. STARCEVIC, I THINK

18   I'M GOING TO TRY TO PUT IT ON THE SCREEN, WHICH YOU DON'T HAVE

19   TO WORK AS HARD, UNLESS YOU -- UNLESS THAT'S TOO SMALL -- PAGE

20   14.

21   A   I DON'T SEE ANYTHING NOW.

22           (DOCUMENT DISPLAYED.)

23   BY MR. BALOGH

24   Q   SEVEN AND FOURTEEN.  NOW, I BELIEVE THESE -- IF WE JUST

25   ENLARGE -- WE CAN JUST HIGHLIGHT THE BOXES ON BOTH PAGES.

1        **THE COURT:**  CAN YOU ASK --

2          **MR. BALOGH:**  I WANTED HIM TO SEE IT --

3    **BY MR. BALOGH**

4    **Q**    LOOK AT SEVEN AND TEN.  ARE THESE BOTH THE COMPUTER SCREENS

5    WHICH REFLECT THE VIALS THAT ARE GOING TO GO INTO THE LC/MS

6    MACHINE FOR LC/MS SCREENING?

7    **A**    YEAH, I THINK SO.

8    **Q**    CAN YOU TELL US WHY THEY APPEAR DIFFERENT FOR THIS -- THE

9    SAME SAMPLE FOR SMP 03?

10   **A**    THIS ISN'T THAT ON THE LEFT SIDE.  I THINK THAT'S THE

11   SCREEN DATA, OR, ACTUALLY, A SCREEN BATCH BECAUSE -- LET ME

12   LOOK AT THIS.  I DON'T SEE --

13   **Q**    YOU CAN USE THE PAPER DOCUMENT.

14   **A**    I'LL LOOK AT THE PAPER DOCUMENT.

15   **Q**    I THINK THAT WILL BE EASIER.

16   **A**    OKAY.  THESE ARE DIFFERENT.  THESE ARE TWO DIFFERENT RUNS.

17   THEY ARE NOT THE SAME RUNS.

18   **Q**    I UNDERSTAND THEY ARE NOT THE SAME RUNS.  CAN YOU TELL ME

19   WHY THE FORMAT -- WITHDRAWN.

20        THEY ARE THE SAME METHOD, THOUGH; THEY ARE THE SAME

21   STEP IN THE PROCESS OF AN LC/MS RUN, CORRECT?

22   **A**    YES.

23   **Q**    CAN YOU TELL US WHY THE FIRST LC/MS RUN IS DEPICTED AS IT

24   IS ON PAGE 7 AND THE ONE YOU RAN IS DEPICTED DIFFERENTLY?

25   **A**    YEAH.  THIS IS JUST A MATTER OF FORMATTING THE ONES ON THE

1  RIGHT-HAND -- THE CONFIRMATION WAS PRINTED DIRECTLY AS IT COMES

2  OUT FROM THE -- FROM THE BATCH FILE, AND ON THE LEFT-HAND SIDE

3  IT'S FROM THE QUAN. FILE.

4  **Q**   FROM THE WHAT FILE?

5  **A**   QUANTITATION FILE, I THINK.  YEAH.

6          **MR. PARRELLA:**  MAY I ASK THAT THE WITNESS --

7          **THE WITNESS:**  NO, NO.  THIS IS -- I'M SORRY.  THIS

8  IS A BATCH FILE.  IT WAS OBVIOUSLY IMPORTED INTO AN EXCEL AND

9  THEN PRINTED OUT.  SO THAT HAS -- WHICH WAS THE WAY IT WAS

10 DONE, BUT I DIDN'T DO ANY FORMATTING, SO THERE IS NO -- THERE

11 IS NO -- THERE IS NO -- SO THAT'S WHY THEY LOOK DIFFERENT.

12 **BY MR. BALOGH**

13 **Q**   WELL, THEY CONTAIN DIFFERENT INFORMATION; IS THAT CORRECT?

14         **MR. NEDROW:**  YOUR HONOR, OBJECTION.  JUST MAKE A

15 CLARIFICATION ON EXHIBIT NUMBERS.  THEY CONTAIN DIFFERENT

16 EXHIBIT NUMBERS.  IT'S VAGUE.  CAN YOU CLARIFY IT, PLEASE?

17         **MR. BALOGH:**  OKAY.

18         **MR. NEDROW:**  THANK YOU.

19 **BY MR. BALOGH**

20 **Q**   WE ARE COMPARING PAGES 7 AND 14 OF THE GOVERNMENT'S

21 EXHIBIT 10, BOTH PAGES OF WHICH HAVE BEEN ADMITTED TO EVIDENCE.

22 **A**   YES.

23 **Q**   YOU MAY EXPLAIN, SIR.

24 **A**   OKAY.  SO WE SEE THEY BOTH CONTAIN INFORMATION THAT'S --

25 THAT'S SIGNIFICANT, WHICH MEANS THAT THEY CONTAIN WHAT VIAL

1  POSITION WAS THERE, WHAT WAS SAMPLE INJECTION VOLUME, WHAT

2  ACCESSION METHOD WAS USED, ON THE RIGHT-HAND SIDE ON THE -- AND

3  OUT OF FILE.  ON THE LEFT-HAND SIDE, IT DOESN'T -- YOU CANNOT

4  SEE THE ACQUISITION METHOD.  I'M TALKING ABOUT PAGE 7.

5  **Q**   PAGE 7 IS WHAT WE -- PAGE 7 IS WHAT WOULD APPEAR WHEN YOU

6  HIT "PRINT" AFTER AN LC/MS BATCH IS LOADED TO BE RUN ON THE

7  AUTO SAMPLER, CORRECT?

8  **A**   THAT'S -- NO, IT'S NOT DONE LIKE THAT.

9  **Q**   HOW IS PAGE 7 CREATED BY THE UCLA LAB?

10  **A**   PAGE 7 WAS CREATED BY -- YOU EXPORT THAT FILE THAT WAS

11  PRODUCED BY THE MACHINE.  IT'S A BATCH FILE.  AND IT'S THEN

12  TRANSFERRED INTO EXCEL, AND THEN IT WAS FORMATED LIKE THIS AND

13  PRINTED OUT.

14  **Q**   IS THAT HOW BATCH FILES ARE NORMALLY PRINTED AT THE UCLA

15  LABORATORY?

16  **A**   YEAH, WE PRINT THEM BOTH WAYS.  USUALLY, MOST OFTEN, WE

17  PRINT THEM THE WAY I PRINTED IT ON PAGE 14.

18  **Q**   SO THE ONE ON PAGE 7 IS ATYPICAL; IS THAT CORRECT?

19  **A**   ONLY THAT IN THAT CASE IT DOESN'T CONTAIN THE METHOD FILE.

20  **Q**   THE ONE ON PAGE 7 CONTAINS MORE INFORMATION THAT IS

21  REVEALED THAN THE ONE YOU PREPARED FOR PAGE 14; ISN'T THAT

22  CORRECT?

23  **A**   WELL, ONLY IF YOU -- IF YOU CONSIDER THE RATE CODE IS MORE

24  INFORMATION.  THAT'S THE ONLY THING THAT'S DIFFERENT.

25  **Q**   LET'S TAKE A LOOK, AND I WANT TO COMPARE -- I WANT YOU TO

1    TAKE A -- ACTUALLY, THIS MIGHT BE A GOOD TIME FOR A BREAK.

2          **THE COURT:**  ALL RIGHT, LADIES AND GENTLEMEN.  WE'LL

3    TAKE OUR LUNCH BREAK AT THIS TIME.  IF YOU WOULD BE READY TO

4    COME BACK PLEASE AT 25 MINUTES UNTIL 1:00.  IN THE MEANTIME, DO

5    NOT SPEAK WITH EACH OTHER OR ANYONE ELSE ABOUT THIS CASE.  DO

6    NOT MAKE UP YOUR MINDS.  YOU HAVEN'T HEARD ALL THE EVIDENCE

7    YET.

8          (LUNCHEON RECESS TAKEN.)

9          **THE COURT:**  WELCOME BACK, LADIES AND GENTLEMEN.  YOU

10   MAY ALL BE SEATED.

11          MR. BALOGH, YOU MAY PROCEED.

12          **MR. BALOGH:**  THANK YOU, YOUR HONOR.

13   **BY MR. BALOGH**

14   **Q**    MR. STARCEVIC?

15   **A**    YES.

16   **Q**    WHEN WE LEFT BEFORE LUNCH WE WERE LOOKING AT GOVERNMENT'S

17   EXHIBIT 10?

18   **A**    MM-HMM.

19   **Q**    AND, IN PARTICULAR, NOW I WANT TO COMPARE THE CHROMOGRAPHS

20   THAT APPEAR FROM PAGES 8 THROUGH 11 WITH THE ONES YOU APPEAR,

21   THAT YOU TESTIFIED ABOUT, ON PAGES 15 THROUGH 18.  WE'LL BEGIN

22   BY A COMPARISON OF THE NEGATIVE QC'S FROM BOTH CHROMOGRAPHS

23   PAGES 8 AND PAGE 15?

24   **A**    OKAY.

25   **Q**    IF YOU COMPARE PAGE 8 OF GOVERNMENT'S EXHIBIT 10 AND 15 OF

1  GOVERNMENT'S EXHIBIT 10, THESE BOTH ARE NEGATIVE QUALITY

2  CONTROL CHROMOGRAPHS CREATED BY THE UCLA ANALYTIC LABORATORY;

3  ISN'T THAT TRUE?

4  **A**   YES, THEY ARE.

5  **Q**   ONE OF THE THINGS YOU TESTIFIED ABOUT -- WITHDRAWN.

6          WHEN WE LOOK AT PAGE 15 THERE, THE WORD "ABSENT" IS

7  WRITTEN ON SIX OF THE GRAPHS; IS THAT CORRECT?

8  **A**   YES.

9  **Q**   IS THAT YOUR HANDWRITING, SIR?

10 **A**   NO.

11 **Q**   THAT IS THE HANDWRITING OF, YOU WOULD BELIEVE, THE

12 CONFIRMING CHEMIST, CORRECT?

13 **A**   CORRECT.

14 **Q**   BUT YOU DON'T KNOW THAT TO BE TRUE; IS THAT RIGHT?

15 **A**   SORRY?

16 **Q**   YOU DON'T KNOW WHO WROTE "ABSENT" ON THE QUALITY CONTROL

17 CHROMATOGRAPH THAT APPEARS ON PAGE 15?

18 **A**   I THINK IT WAS -- I DON'T RECALL RIGHT NOW, BUT IT SHOULD

19 BE --

20 **Q**   BUT YOU DON'T KNOW?

21 **A**   I COULDN'T SAY EXACTLY THAT IT WAS -- LET ME SEE.  YEAH,

22 FOR THE PROCEDURE, IT SHOULD BE -- I HAVE TO CORRECT MYSELF.

23 THE PROCEDURE SHOULD BE BY THE CONFIRMATION CHEMIST.

24 **Q**   I UNDERSTAND THAT.

25          CAN YOU IDENTIFY FOR US TODAY THE INDIVIDUAL THAT

1   DETERMINED THAT THE SIX QUALITY CONTROL CHROMOGRAPHS THAT

2   APPEAR ON PAGE 15, CAN YOU IDENTIFY THE INDIVIDUAL THAT WROTE

3   "ABSENT"?

4   **A**   THAT MUST BE THE TATIANA SARGEVA (PHONETIC).

5   **Q**   AND, AGAIN, YOUR ANSWER WAS IT MUST BE, THAT'S BECAUSE YOU

6   ARE MAKING A PRESUMPTION; AM I CORRECT IN THAT?

7   **A**   YEAH, YOU ARE CORRECT.

8   **Q**   AGAIN, SIR, YOU DON'T KNOW WHO WROTE "ABSENT" ON ANY OF

9   THESE GRAPHS?

10  **A**   YES, BUT ACCORDING TO OUR PROCEDURE, IT SHOULD BE DONE BY

11  THE CONFIRMATION CHEMIST.

12  **Q**   OKAY.  IS THERE ANY REASON WHY YOU ARE LOOKING OVER THERE,

13  SIR?

14  **A**   NO, I AM NOT.  I HAVE NO REASON.

15  **Q**   UNDERSTOOD.  AND CAN YOU EXPLAIN WHERE WHY THE GRAPHS --

16  WITHDRAWN.

17          I WANT TO TURN NEXT TO THE CAL ONE UNEXTRACTED

18  GRAPHS THAT APPEAR ON PAGES 9 AND 16; DO YOU SEE THAT?

19  **A**   NINE AND?

20  **Q**   SIXTEEN.

21  **A**   YES.

22  **Q**   OKAY, NOW I WANT TO START WITH THE -- THESE ARE -- IF WE

23  CAN GET THOSE SHOWN, IF WE CAN, PLEASE?  THESE ARE FOR THE CAL

24  ONE UNEXTRACTED SAMPLE RUNS.

25  **A**   YES.

1  Q   IT MEANS AT THIS POINT THE LC/MS DEVICE WAS TESTING A PURE

2  SAMPLE OF NORBOLETHONE AND PURE SAMPLE -- A STANDARD OF THG TO

3  IDENTIFY A GRAPH OF WHAT THOSE --

4  A   YES, PLUS INTERNAL STANDARD.

5  Q   EXCUSE ME?

6  A   PLUS INTERNAL STANDARD.

7  Q   PLUS INTERNAL STANDARD?

8  A   YES.

9  Q   WHAT'S AN INTERNAL STANDARD?

10 A   INTERNAL STANDARD IS A COMPOUND THAT'S ADDED TO EACH SAMPLE

11 JUST TO SHOW THAT -- IT'S ADDED TO THE SAMPLES TO SHOW THAT

12 EXTRACTION WENT WELL.  IN THIS CASE, IT DOESN'T TEST THE

13 EXTRACTION, BUT IT'S DATED JUST SO THAT ALL SAMPLES HAVE THE

14 SAME COMPOUNDS IN IT.

15 Q   IF WE LOOK AT THE SECOND GRAPH DOWN --

16        MR. BALOGH:  COULD WE GET THAT UP, POSSIBLY, 9 AND

17 16 OF EXHIBIT --

18        MR. NOVITZKY:  PAGE WHAT?

19        MR. BALOGH:  NINE AND SIXTEEN, SIDE-BY-SIDE, PLEASE.

20 NINE AND SIXTEEN?  THANK YOU.  I'M GOING TO WAIT FOR THE SCREEN

21 FOR THE JURY.  I THINK THIS IS SOMETHING DEMONSTRATIVE.

22        MR. NOVITZKY:  GOT IT.

23        (DOCUMENT DISPLAYED.)

24 BY MR. BALOGH

25 Q   NOW, IF WE LOOK AT THE SECOND GRAPH DOWN, ONE IS THG ON THE

1  LEFT-HAND SIDE, AND ONE IS NORBOLETHONE ON THE RIGHT-HAND SIDE?

2  A    YES.

3  Q    NOW, EACH OF THESE SHOW A PEAK ON THE GRAPH; DO YOU SEE

4  THAT, SIR?

5  A    YES.

6  Q    FOR THG THE PEAK IS AT 325 -- 3.25; IS THAT RIGHT, SIR?

7  A    YES.

8  Q    AND FOR NORBOLETHONE THE PEAK IS AT 3.45?

9  A    THAT'S CORRECT.

10 Q    CAN YOU EXPLAIN WHAT THOSE PEAKS MEAN FOR EACH OF THESE

11 SUBSTANCES?

12 A    THIS PEAKS MEANS THAT THERE IS COMPOUND THAT'S -- THAT'S

13 AT -- THAT RETENTION TIME, WHICH MEANS AT THAT TIME, FROM

14 LOOKING FROM THE COLUMN AND COMING INTO THE DETECTOR OF THE

15 MASS SPECTROMETER.  IT'S RECORDING THE SIGNAL.  THIS IS

16 RECORDING OF THE SIGNAL THAT COMES FROM THE DETECTOR.

17 Q    OKAY.  AND IF I'VE UNDERSTOOD THAT CORRECTLY AS WE HAVE --

18 WHEN IT RUNS THROUGH THE SPECTROMETER, AS THE SUBSTANCE RUNS

19 THROUGH THE COIL, THERE'S A RETENTION TIME FROM THE TIME THE

20 SAMPLE BEGINS UNTIL IT ENDS, AND THIS GRAPH SHOWS THE PEAK OF

21 THE RETENTION TIME FOR WHATEVER SUBSTANCE IT'S TESTING FOR?

22 A    WELL, THIS IS -- I WOULD EXPLAIN THE RETENTION TIME BEING

23 SUCH TIME IT TAKES THE COMPOUND TO GO THROUGH THE COLUMN AND

24 ENTERS THE DETECTOR.

25 Q    AND EVERY SUBSTANCE THAT YOU TEST FOR HAS A DIFFERENT

1    RETENTION TIME; IS THAT CORRECT?

2    **A**    EVERY SUBSTANCE COULD HAVE DIFFERENT TIME, BUT IT COULD BE

3    SOME SUBSTANCE THAT COULD HAVE THE SAME RETENTION TIME.

4    **Q**    OKAY.  AND THAT IS WHY THE LC/MS IS NOT THE FINAL ANALYSIS

5    TO DETERMINE WHETHER A SUBSTANCE IS PRESENT IN A TEST SAMPLE,

6    CORRECT?

7    **A**    NO, THAT'S NOT CORRECT.  I WOULDN'T SAY THAT'S CORRECT.  I

8    WOULD SAY THAT MASS SPECTROMETER -- THAT'S WHY WE USE MASS

9    SPECTROMETERS, BECAUSE MASS SPECTROMETER GIVES YOU SELECTIVITY,

10   WHICH MEANS IF YOUR CHROMATOGRAM -- IF YOU PUT IN SEPARATE

11   COMPOUNDS, YOUR MASS SPECTROMETER IS ABLE TO CONFIRM THAT THIS

12   IS DEFINITELY THIS COMPOUND.

13   **Q**    HOW WOULD THE MASS SPECTROMETER DO THAT?

14   **A**    BY BREAKING THAT COMPOUND INTO FRAGMENTS.  AND THEN EACH

15   COMPOUND HAS -- I WOULD CALL IT A FINGERPRINT THAT SHOWS -- HAS

16   A SPECIFIC FINGERPRINT FOR THAT SPECIFIC COMPOUND.

17   **Q**    SO IF I UNDERSTAND, A MASS SPECTROMETER, YOU WILL -- IT'S

18   THE EQUIVALENT OF DROPPING A PLATE, AND EVERY TIME YOU DROP THE

19   SAME TYPE OF PLATE, IT WILL BREAK INTO THE SAME NUMBER OF

20   FRAGMENTS?

21   **A**    IT WILL BREAK IN -- YEAH, DEPENDING ON THE CONDITIONS IN

22   THE MASS SPECTROMETER, OF COURSE.

23   **Q**    SO, FOR NORBOLETHONE, WHEN YOU RUN NORBOLETHONE THROUGH A

24   MASS SPECTROMETER, IT WILL BREAK INTO A CERTAIN NUMBER OF

25   FRAGMENTS SO YOU CAN CONFIRM THAT IT IS NORBOLETHONE?

1    A    EXACTLY.

2    Q    AND THG WILL HAVE A DIFFERENT NUMBER OF FRAGMENTS WHEN IT

3    IS SMASHED IN THE MASS SPECTROMETER?

4    A    NOT DIFFERENT NUMBER, BUT IT WILL HAVE DIFFERENT FRAGMENTS.

5    Q    DIFFERENT FRAGMENTS.

6    A    OR COMMON FRAGMENTS BUT THE COMPOUND WILL BE DIFFERENT.  SO

7    YOU CAN -- IN SOME CASES YOU CAN HAVE FRAGMENTS THAT ARE COMMON

8    TO SOME, ESPECIALLY COMPOUNDS THAT ARE VERY SIMILAR, BUT THE

9    STARTING COMPOUND IS DIFFERENT.

10   Q    AND SO IF WE COMPARE THE RESULTS OF THE LC/MS WITH

11   RETENTION TIME FOR SUBSTANCE AND WE USE THE MASS SPECTROMETER

12   FOR FRAGMENTS OF A SUBSTANCE, IF THEY MATCH FOR THE SAME

13   SUBSTANCE, WE KNOW IT'S BEEN A POSITIVE TEST?

14   A    THAT'S CORRECT.

15   Q    DOES THE MASS SPECTROMETER HAVE ANYTHING TO DO WITH

16   RETENTION TIME?

17   A    NO.

18   Q    SO RETENTION TIME IS SOLELY THROUGH THE LIQUID

19   CHROMATOGRAPH PORTION OF THIS TEST?

20   A    CORRECT.

21   Q    AND I UNDERSTAND THAT FROM THIS, THAT THG HAS A RETENTION

22   TIME OF 3.25 MINUTES; IS THAT RIGHT?

23   A    THAT'S CORRECT.

24   Q    AND NORBOLETHONE HAS A RETENTION TIME OF 3.145 MINUTES?

25   A    YEAH, THAT'S FOR THE EXHIBIT NO. -- ON PAGE NUMBER 9.

1  Q   AND THIS IS TESTING THE STANDARD, THE PURE FORM --

2  A   THAT'S CORRECT.

3  Q   -- OF THE SUBSTANCE?

4  A   YES.

5  Q   AND WHEN WE TEST FOR SUBSTANCE IN THE URINE, IT HAS TO BE

6  WITHIN A CERTAIN RANGE?

7  A   RANGE, YEAH.

8  Q   WHAT IS THAT RANGE, SIR?

9  A   THAT RANGE IS, ACCORDING TO THE WADA RULES, THAT RANGE IS

10  EITHER .04 MINUTES OR TWO PERCENT.

11  Q   SO IT HAS -- IT'S A PLUS OR MINUS TWO PERCENT TO HAVE A

12  CONFIRMED TEST?

13  A   YES, YES.

14  Q   AND SO WE LOOK AT -- THIS IS THE CAL -- I NOTICE WHEN WE GO

15  BACK TO -- THOSE ARE COMPARISONS -- WITHDRAWN.

16        WE WERE LOOKING AT PAGE 9 FOR THE STANDARDS FOR THG

17  AND NORBOLETHONE.  WE'VE ESTABLISHED THEY'RE 3.25 AND 3.45?

18  A   THAT'S CORRECT.

19  Q   LET US LOOK AT THE CAL ONE UNEXTRACTED THAT YOU TESTED FOR

20  AND DISCUSSED.

21  A   YES.

22  Q   WHICH WE MAY FIND ON PAGE 16.

23  A   THAT'S CORRECT.

24  Q   ON PAGE 16 IT SHOWS ON THE FIRST COLUMN THAT -- WHERE IT

25  GETS DIVIDED, THAT THG HAS A RETENTION TIME OF 3.55?

1    **A**    THAT'S CORRECT.

2    **Q**    AND THAT IS THE RETENTION TIME FOR THE SAMPLE THAT'S BEEN

3    USED IN THIS CASE THE -- WITHDRAWN "SAMPLE" -- THE STANDARD; IS

4    THAT CORRECT?

5    **A**    YEAH, THAT'S FOR WHEN WE RUN THE CALCULATION.

6    **Q**    AND --

7    **A**    SORRY.  THE CONFIRMATION.

8    **Q**    THE CONFIRMATION.

9          AND IT SHOWS HERE THAT NORBOLETHONE HAS A RETENTION

10    TIME OF 4.28 MINUTES; IS THAT CORRECT?

11    **A**    THAT IS CORRECT.

12    **Q**    DOING THE MATH QUICKLY, THAT FAR EXCEEDS TWO PERCENT?

13    **A**    THAT'S CORRECT.  BUT THESE ARE SAMPLES THAT WERE RUN TWO

14    DIFFERENT INSTRUMENTS ON TWO -- AND RETENTION TIME DEPENDS

15    ON -- NOT ONLY DEPENDS ON THE COLUMN, DEPENDS HOW THE

16    CONNECTIONS BETWEEN THE COLUMN AND THE MASS SPEC.  SO YOU CAN

17    HAVE TWO INSTRUMENTS THAT ARE -- THAT WILL GIVE YOU DIFFERENT

18    RETENTION TIMES, AND THE ONLY -- THE CRITERIA THAT I WAS

19    TALKING ABOUT AND I TOLD YOU WAS -- IS FOR THE COMPOUNDS THAT

20    ARE RUN ON THE SAME INSTRUMENT.  SO IF -- WE SHOULD BE

21    COMPARING POSITIVE QC AND THE SAMPLES RUN ON THE -- LOOK IN THE

22    CALIBRATION, NOT COMPARING WITH THE SAMPLES RUN ON THE

23    DIFFERENT INSTRUMENT.

24    **Q**    OKAY.

25    **A**    SO THESE ARE TWO DIFFERENT INSTRUMENTS.

STARCEVIC / CROSS — BALOGH

1  Q   I UNDERSTAND THAT.  LET'S TALK ABOUT SAMPLES FOR A MOMENT,

2  AND LET'S TALK ABOUT SOMETHING LIKE A NATURALLY-PRODUCED

3  TESTOSTERONE IN THE HUMAN BODY.

4  A   YES.

5  Q   THAT HAS ITS OWN RETENTION TIME, CORRECT?

6  A   YES.

7  Q   IF I TESTED AT THE LAB AT UCLA, I SHOULD BE ABLE TO

8  DETERMINE THAT RETENTION TIME BY USING AN LC/MS MACHINE,

9  CORRECT?

10 A   YES.

11 Q   AND IF I GO TO THE ACCREDITED LABORATORY AT THE UNIVERSITY

12 OF INDIANA AND I TEST THAT SAME TESTOSTERONE, IT SHOULD COME

13 OUT WITH THE SAME RETENTION TIME?

14 A   NO, IT WILL NOT COME OUT THE SAME RETENTION TIME.

15 Q   IT WILL BE A DIFFERENT RETENTION TIME?

16 A   YEAH, IT COULD BE BY ACCIDENT, BE SAME RETENTION TIME, BUT

17 COULD BE COMPLETELY DIFFERENT RETENTION TIME.

18 Q   WHY IS THAT?

19 A   BECAUSE THEY COULD BE USED COMPLETELY DIFFERENT COLUMN TO

20 TEST.

21 Q   SO IT'S THE LENGTH OF THE COLUMN THAT DETERMINES THE

22 RETENTION TIME?

23 A   IT'S THE LENGTH OF THE COLUMN AND THE CHEMISTRY OF THE

24 COLUMN.

25 Q   WHAT DO YOU MEAN BY THE CHEMISTRY OF THE COLUMN?

STARCEVIC / CROSS — BALOGH

1  **A**    THE COLUMN IS FILLED WITH A MATERIAL THAT'S CHEMICALLY

2  TREATED.  SO THEY ARE DIFFERENT POLARITIES, WHAT WE CALL

3  POLARITIES OF COLUMNS.  SO THERE ARE COLUMNS THAT ARE MORE

4  POLAR, WHICH MEANS THEY WILL RETAIN THE COMPOUNDS.  MORE POLAR

5  WILL TAKE LONGER TIME TO GO TO THIS COLUMN.  AND THEY ARE

6  DIFFERENT.

7            SO THERE ARE MANY, MANY DIFFERENT TYPES OF COLUMNS.

8  SO CHEMISTS COULD USE THEIR OWN JUDGMENT WHAT THEY THINK IS THE

9  BEST FOR THE CASE.

10  **Q**    SO IF I UNDERSTAND YOUR TESTIMONY CORRECTLY, IT DOESN'T

11  MATTER THAT NORBOLETHONE HAS DIFFERENT RETENTION TIMES --

12  **A**    NO.

13  **Q**    -- WHEN TESTED BY THE SAME LABORATORY?

14  **A**    NO, BECAUSE THAT WAS -- FIRST TIME, AS I SAID, YOU CAN EVEN

15  HAVE TWO COLUMNS, BUT BY THE CONFIGURATION -- SAME COLUMN, BUT

16  THE CONFIGURATION OF THE INSTRUMENT, BECAUSE THERE ARE -- WHEN

17  YOU INJECT THE SAMPLE, IT HAS TO GO THROUGH THE TUBINGS.  AND

18  SO THE LENGTH OF THE TUBINGS ALSO DETERMINES THE RETENTION

19  TIME.  SO YOU CAN HAVE EXACTLY SAME COLUMN, BUT IF YOUR TUBING

20  IS LONGER, YOU HAVE LONGER RETENTION TIMES.

21  **Q**    WHAT ABOUT PAGES 9 TO 16 INDICATES THAT THEY WERE USED --

22  THAT THEY WERE TESTED ON DIFFERENT MACHINES?

23  **A**    THAT'S NOT SHOWN HERE, BUT THAT'S -- IF WE COULD GO BACK TO

24  THE SEQUENCE FILES?  THE BATCH FILES?  THAT'S ALSO ONE OF THE

25  REASONS WHY THE BATCH FILES ARE DIFFERENT, BECAUSE THEY WERE

1   RUN ON A DIFFERENT INSTRUMENTS, AND NOT ONLY DIFFERENT

2   INSTRUMENTS IN TERMS OF MASS SPEC AS A DETECTOR, IT WAS RUN ON

3   THE DIFFERENT AUTO SAMPLER.  SO THE OUTPUT OF THE AUTO SAMPLER

4   DATA IS ALSO DIFFERENT.

5   **Q**   LET'S TAKE A LOOK THEN ON PAGES 7 TO 14 SO WE'RE SURE WE

6   UNDERSTAND.  WHEN WE'RE LOOKING AT PAGES 7 TO 14, HOW DO WE

7   KNOW THEY WERE -- THE SAMPLES WERE RUN ON DIFFERENT MACHINES?

8   **A**   WELL, SPECIFICALLY, IT WILL BE TOLD BY THE -- ON THE

9   CONFIRMATION, THERE'S A SPECIFIED THE MACHINE IT WAS RUN ON.

10  THAT'S LC/MS 4000 Q TRAP.  AS YOU SEE, THE WIRE POSITION AND

11  SAMPLE, VOLUME AND DIRECT POSITION AND PLAY POSITION, THAT'S

12  HOW THEY'RE PRINTED OUT, AS I EXPLAINED.

13           ON THE OTHER -- ON THE OTHER -- ON THE PAGE 7, YOU

14  CAN SEE THAT THERE'S A -- POSITION METHOD IS DIFFERENT, AND IT

15  SAYS MS 1, WHICH IS OUR CODE FOR LC/MS 1, WHICH IS A DIFFERENT

16  MACHINE THAN LC/MS 4000 Q TRAP.

17  **Q**   CAN YOU SAY THAT AGAIN?  LET'S TAKE OUR TIME.

18  **A**   SURE.  IF WE LOOK AT THE FIRST LINE, WE WERE TALKING ABOUT,

19  PROJECT?

20  **Q**   YES.

21  **A**   IT SAYS "PROJECT"?  AND IF YOU LOOK ALL THE WAY TO THE

22  RIGHT, YOU WILL SEE THERE'S A POSITION METHOD.  IT SAYS,

23  NOR_THG, CODE TWO MS 1?

24  **Q**   YES.

25  **A**   MS 1 IS OUR 3000 -- API 3000 MACHINE.

1  Q   SO THAT INDICATES THIS WAS RUN ON THAT MACHINE?

2  A   YEAH.

3  Q   FAIR ENOUGH.

4          AND THAT MACHINE, HOW DOES THAT MACHINE DIFFER FROM

5  LC/MS 4000 QT?

6  A   THAT MACHINE HAS A DIFFERENT LIQUID CHROMATOGRAPH CONNECTED

7  TO IT.  IT IS ALSO DIFFERENT -- IT'S THE SAME TYPE OF THE

8  TRIPLE QUAD MASS SPECTROMETER, BUT THE 4000 Q TRAP MACHINE IS

9  OUR -- IT'S MORE SENSITIVE, AND IT HAS ADDITIONAL QUALITY THAT

10 IT CAN ALSO REGISTER SPECTRA AT THE SAME TIME THAT IT'S

11 RUNNING.  SO I WOULD SAY IT'S A BETTER MACHINE THAN 3000.

12 Q   AS A BETTER MACHINE, HOW ABOUT THE LENGTH OF THE COIL WHICH

13 TIMES THE RETENTION TIME THAT WE HAVE BEEN DISCUSSING; IS THAT

14 THE SAME?

15 A   THAT -- I DON'T HAVE A DATA RIGHT NOW IN FRONT OF ME FOR

16 THIS, ESPECIALLY FOR THE SCREEN, BUT I THINK IT WAS THE

17 DIFFERENT COLUMN.

18 Q   CAN YOU -- IS THAT WHAT YOU'RE TESTIFYING TO BE TRUE OR YOU

19 DON'T KNOW?

20 A   I DON'T KNOW FOR THE SCREEN.  I KNOW EXACTLY WHAT IT WAS

21 FOR THE CONFIRMATION.

22 Q   AND THE KEY FOR THE RETENTION TIME IS THE LENGTH THE GAS

23 MUST TRAVEL, THE NUMBER OF COILS, AND THE LENGTH OF TIME TO

24 DETERMINE HOW LONG IT RETAINS BEFORE IT BEGINS THE ANALYSIS?

25 A   YEAH, I HAVE TO CORRECT YOU.  I'M SORRY.  BUT WE ARE NOT

1   TALKING ABOUT GAS.  IT'S LIQUID CHROMATOGRAPHY.

2   **Q**   SORRY.  LIQUID CHROMATOGRAPHY.

3   **A**   YES.

4   **Q**   THE RETENTION TIME DEPENDS ON THE LENGTH OF THE COIL TO

5   DETERMINE HOW LONG IT TAKES FOR IT TO TRAVEL TO THE END?

6   **A**   THAT'S ONE THING IT DEPENDS ON, BUT IT DOESN'T DEPEND ONLY

7   ON THAT.

8   **Q**   WHAT ELSE DOES THE RETENTION TIME DEPEND ON?

9   **A**   IT DEPENDS ON -- ON THE -- AS I TOLD YOU BEFORE, CHEMISTRY

10  OF THE COLUMN, WHICH MEANS WHAT KIND OF FILLING IT HAS, WHAT

11  KIND OF BACKING THE COLUMN IS FILLED WITH.  AND, ALSO, IT

12  DEPENDS VERY STRONGLY ON THE MIXTURE OF THE SOLVENTS YOU APPLY

13  TO ELUDE THE COMPOUNDS FROM THE COLUMN.  SO YOU CAN ADJUST YOUR

14  SOLVENT THAT IT NEVER ELUDES OR IT WILL ELUDE VERY FAST, SO --

15  **Q**   I HATE TO SAY THIS, SIR.  I DIDN'T FOLLOW ANY OF THAT.  CAN

16  YOU REPEAT YOUR ANSWER AND DO IT A BIT MORE SLOWLY, PLEASE?

17  **A**   OKAY.  I WILL.  IT DEPENDS.  THIS IS A LIQUID

18  CHROMATOGRAPHY, SO THE WAY WE PUSH THE SAMPLE THROUGH THE

19  SYSTEM, WE USE A LIQUID, AND THE LIQUID IS USUALLY, IN LIQUID

20  CHROMATOGRAPHY --

21  **Q**   USUALLY IN?

22  **A**   IN LIQUID CHROMATOGRAPHY, IT CONTAINS, USUALLY, I WOULD

23  SAY, BUT IT COULD VARY, DIFFERENT SOLVENTS.  SO BY THE

24  COMPOSITION OF THE SOLVENT MIXTURE, YOU DEFINE HOW FAST YOUR

25  COMPOUNDS WILL TRAVEL THROUGH THE COLUMN.  SO THE RETENTION

1  TIME DEPENDS ON THAT.

2  **Q**   AS WELL AS THE LENGTH OF THE COLUMN?

3  **A**   LENGTH OF THE COLUMN, CHEMISTRY OF THE COLUMN.

4  **Q**   NOW, LET'S TAKE A FLIP BACK -- WE'RE STARTING AT PAGE --

5  WE'LL GO BACK TO PAGE 14 AGAIN.  WHEN YOU DESCRIBE -- YOU

6  DESCRIBED WHAT CAL ONE IS, AND I BELIEVE THAT WAS THE

7  UNEXTRACTED STANDARD THAT WE HAVE BEEN DISCUSSING.

8  **A**   YES.  JUST A MINUTE; SORRY.  PAGE 14?  PAGE 16?

9  **Q**   YES.  NO PAGE 14.

10 **A**   FOURTEEN?

11 **Q**   I'M GOING THROUGH THE LIST OF THE SAMPLE NAMES, AND I BEGAN

12 WITH CAL ONE.

13 **A**   FOURTEEN, YES.

14 **Q**   WHICH WE UNDERSTAND TO BE THE UNEXTRACTED STANDARD; IS THAT

15 RIGHT?

16 **A**   YES.

17 **Q**   DID YOU PREPARE THE VIAL WITH THE --

18 **A**   I DIDN'T.

19 **Q**   FROM WHERE DID YOU GET IT?

20 **A**   IT WAS PREPARED BY THE CHEMIST.  ACTUALLY, IT WAS PREPARED

21 BY THE RECEIVING -- SORRY -- BY THE -- YEAH, BY THE ALIQUOTERS,

22 AND THEN IT WAS GIVEN TO ME.  I JUST RECEIVED THE VIALS.

23 **Q**   IT WAS PREPARED BY WHO?

24 **A**   IT WAS -- THE CALS ARE PREPARED, WE HAVE A -- WE HAVE A --

25 BY THE ALIQUOTERS WHEN THEY PREPARE THE SEQUENCE.

1   Q   THE OUTPUTTERS?

2   A   ALIQUOTERS.

3   Q   ALIQUOTERS.

4           SO, IN THIS CASE, I UNDERSTAND THE PERSON TO HAVE

5   ALIQUOTED THIS SAMPLE TO BE BRIAN BISHOP, IF WE LOOK AT PAGE

6   12'S; IS THAT CORRECT?

7   A   YES.

8   Q   SO BRIAN BISHOP WAS THE PERSON WHO PREPARED THE

9   CALIBRATION?

10  A   YES.

11  Q   THE SECOND LIST OF THE SAMPLES WE RUN IS A CAL TWO; DO YOU

12  SEE THAT?

13  A   YES.

14  Q   AND IF YOU LOOK THROUGH THE NEXT PAGES OF THE PAGES OF THE

15  LIQUID CHROMATOGRAPHS, WE DON'T SEE ANY CHROMATOGRAPHS FOR CAL

16  TWO; IS THAT RIGHT?

17  A   YES, THAT'S CORRECT.

18  Q   WHAT WAS CAL TWO?

19  A   I DON'T REMEMBER WHAT WAS CAL TWO.

20  Q   WHO PREPARED CAL TWO?

21  A   IT'S SUPPOSED TO BE THE SAME.

22  Q   WHEN YOU RUN A TEST IN YOUR NORMAL COURSE OF BUSINESS AS A

23  SCIENTIFIC ADVISER AT UCLA LAB, IS IT YOUR PRACTICE TO PRINT

24  ALL THE CHROMATOGRAPHS FOR ALL THE SAMPLES THAT ARE RUN THROUGH

25  THE LC/MS DEVICE?

1   A   IT DEPENDS WHAT WE INTENDED TO DO WITH THE CAL TWO, BUT I

2   THINK IT'S -- YOU DON'T HAVE TO PRINT ALL THE SAME EVERYTHING.

3   Q   IS IT YOUR NORMAL PRACTICE TO PRINT ALL THE CHROMATOGRAPHS?

4   A   THAT DEPENDS ON THE -- THAT DEPENDS ON THE DECISION OF THE

5   CONFIRMATION CHEMIST AND SCIENTIFIC DIRECTOR.

6   Q   SO THEY MAKE THAT DECISION, NOT YOU?

7   A   YES.

8   Q   DO YOU KNOW WHO MADE THAT DECISION IN THIS CASE?

9   A   I DON'T KNOW.

10  Q   NOW, I WANT TO TURN TO PAGES 19 AND 20, AND I JUST WANT TO

11  ASK A COUPLE OF FOUNDATIONAL QUESTIONS.  YOU RECOGNIZE BOTH

12  PAGES 19 AND 20, CORRECT, SIR?

13  A   JUST A MINUTE.  I HAVE TO FIND THEM.

14  Q   OKAY.

15  A   YES.

16  Q   THESE ARE THE CONFIRMATION SUMMARIES?

17  A   YES.

18  Q   AND YOU RECOGNIZE THESE DOCUMENTS?  THESE DOCUMENTS ARE

19  NORMALLY PREPARED BY PERSONNEL OF -- YOU RECOGNIZE THESE

20  DOCUMENTS TO BE DOCUMENTS PREPARED IN THE NORMAL COURSE OF

21  BUSINESS OF THE PERSONNEL AT UCLA OLYMPIC ANALYTICAL

22  LABORATORIES?

23  A   YES, I DO.

24  Q   DO YOU RECOGNIZE THE INITIALS THAT APPEAR IN THE BOTTOM OF

25  PAGES 19 AND 20?

1    **A**   YES.

2    **Q**   WHO ARE THE INITIALS OF T.S.?

3    **A**   TATIANA SARGAVA (PHONETIC).

4    **Q**   WHO IS THAT?

5    **A**   THAT IS A CONFIRMATION CHEMIST.

6    **Q**   THERE ARE INITIALS BENEATH THAT ARE INDECIPHERABLE AS FAR

7    AS LETTERS, BUT THEY APPEAR TO BE INITIALS.  CAN YOU TELL US

8    WHO THOSE ARE?

9    **A**   BE MIKE SEKERA.

10   **Q**   WHO IS THAT?

11   **A**   THAT'S THE SCIENTIFIC DIRECTOR.

12   **Q**   AND YOU RECOGNIZE THAT IN THE NORMAL COURSE OF BUSINESS AT

13   THE UCLA ANALYTIC LABORATORY, SUPERVISORS ARE SUPPOSED TO

14   REVIEW FOR QUALITY THE PAPERWORK; IS THAT RIGHT?

15   **A**   YES.

16   **Q**   AND THEY ARE TRAINED TO PUT THEIR -- SIGN THEIR INITIALS

17   AND DATE IT ON OR ABOUT THE DATE THEY DO THAT QUALITY CONTROL?

18   **A**   YES.

19   **Q**   THEY ARE ACTUALLY SUPPOSED TO DATE IT EXACTLY ACCURATELY ON

20   THAT DATE, CORRECT?

21   **A**   YES.

22   **Q**   AND IS THE PRACTICE AT UCLA TO MAKE THESE DOCUMENTS AS PART

23   OF CREATING A COMPLETE LAB PACKET IDENTIFICATION --

24   **A**   YES.

25   **Q**   I'LL START AGAIN.  WITHDRAWN.

1           IS THE PRACTICE AT UCLA TO PREPARE THESE DOCUMENTS

2    SO THEY MAKE A COMPLETE DOCUMENT PACK FOR WHATEVER TESTS HAVE

3    BEEN RUN ON THE URINE SPECIMEN BY THE UCLA CLIENT?

4    **A**   YES.

5           **MR. BALOGH:**  I'M SATISFIED WITH THE FOUNDATION FOR

6    THIS DOCUMENT.

7           **THE COURT:**  THANK YOU.  SO THE TWO PAGES --

8           **MR. BALOGH:**  PAGES 19 AND 20 OF EXHIBIT 10 SHOULD BE

9    ADMITTED FOR ALL PURPOSES.

10          **THE COURT:**  THEY WON'T BE WITHDRAWN.  THEY'LL STAY

11   ADMITTED THEN.

12   **BY MR. BALOGH**

13   **Q**   MY QUESTION, MR. STARCEVIC, IS WHERE CAN WE FIND ON THE

14   CONFIRMATION ANALYSIS THE MASS SPECTROGRAPHY ANALYSIS?

15   **A**   SORRY?

16   **Q**   ON THE CONFIRMATION ANALYSIS, PAGES 19 AND 20, WHERE WOULD

17   WE BE ABLE TO FIND THE MASS SPECTROGRAPHY ANALYSIS OF SAMPLE

18   SMP 03?

19   **A**   YEAH, HERE YOU WILL SEE --

20   **Q**   I CAN'T SEE UNLESS YOU TELL US WHAT PAGE WE ARE ON.

21   **A**   SURE.  FOR EXAMPLE, LET'S START WITH NORBOLETHONE.

22   **Q**   OKAY.

23   **A**   LET ME SEE.  SM -- I HAVE A WRONG -- I HAVE 19 AND 20, BUT

24   FROM THE SAMPLE UY 304.  SORRY.  I DON'T HAVE THAT PAGE.  I'M

25   MISSING PAGES.

1        **MR. BALOGH:**  MAY I APPROACH, YOUR HONOR?

2        **THE COURT:**  YOU MAY.

3   **BY MR. BALOGH**

4   **Q**   I'LL HAND YOU MY COPY OF EXHIBIT 10, AND PAGES 19 AND 20

5   WILL BE PRESENTED.

6   **A**   YES.

7   **Q**   THE MASS SPECTROGRAPHY ANALYSIS REGARDING THE --

8   **A**   YES.

9   **Q**   -- FINGERPRINT.

10  **A**   YES.

11  **Q**   WHERE IS THAT?

12  **A**   THAT'S -- IF YOU LOOK AT THE SUBSTANCE, IT SAYS -- IT'S A

13  CONFIRMATION DATA.  AND AFTER THAT IS SUBSTANCE DATA,

14  TETRAHYDROGESTRINONE.  THEN MASS DATA ARE HERE Q1, Q3 MASSES IS

15  CREATINE/Q41.  THERE'S A TRANSITION THAT WE WERE MONITORING.

16  THAT'S ONE OF THE DATA THAT WE -- THAT'S PART OF THE MASS SPEC

17  DATA.  SO THEN --

18  **Q**   I'M NOT WITH YOU.  OKAY.

19          SO IT SAYS "SUBSTANCE:  NORBOLETHONE"?

20  **A**   "SUBSTANCE:  TETRAHYDROGESTRINONE."

21  **Q**   SO THG?

22  **A**   THG, YES.

23  **Q**   IT SAYS Q1/Q3 MASSES: 313.4/241.1AMU?

24  **A**   THAT'S CORRECT.

25  **Q**   WHAT DOES THAT MEAN, SIR?

STARCEVIC / CROSS / BALOGH

1  A    THAT MEANS -- THAT EXPLAINS -- THAT'S A FRAGMENTATION.  IT

2  MEANS THAT 313 IS MOLECULAR WEIGHT PLUS ONE OF THE

3  TETRAHYDROGESTRINONE MOLECULE, AND 241 IS A FRAGMENT, MASS OF

4  THE FRAGMENT.

5  Q    AND THAT IS THE STANDARD; IS THAT CORRECT?  ARE THOSE

6  STANDARDS, OR IS THAT WHAT WAS TESTED THAT WAS WHAT WAS --

7  WITHDRAWN.

8         IS THAT THE STANDARD NUMBERS FOR THG, OR IS THAT

9  WHAT WAS SHOWN UP BY TESTING THESE SAMPLES WITH A MASS

10  SPECTROMETER?

11  A    THAT'S WHAT THG WILL FRAGMENT TO.

12  Q    OKAY.  DOES THIS SHOW THE FRAGMENTATION ANALYSIS DONE --

13  WITHDRAWN.

14         DOES THIS SHOW THE FRAGMENTATION ANALYSIS DONE ON

15  THE MASS SPECTOGRAPHER?

16  A    YES.  THAT ARE THE -- THESE ARE THE SIGNALS THAT WE ARE

17  COLLECTING.

18  Q    OKAY.

19  A    SO THIS IS ONE SIGNAL, THIS OTHER SIGNAL IS 313.4.  I'M

20  READING BELOW THAT FIRST TABLE.  115, THAT'S THE SECOND

21  FRAGMENT.  AND THEN WE HAVE 313.4/159.1.  THAT'S THE THIRD

22  FRAGMENT.

23  Q    OKAY.  AND DO THOSE FRAGMENTS -- I'M NOT UNDERSTANDING HOW

24  THOSE FRAGMENTS WORK.  ARE THOSE FRAGMENTS DEPICTED ON THE

25  GRAPHS WE SHOW --

1    A    YES.

2    Q    CAN WE SEE ON THE -- WHICH PAGE OF THE CHROMATOGRAPH?

3    LET'S START WITH THE -- I THINK IT WOULD BE PAGE -- ACTUALLY,

4    YOU HAVE MINE IN FRONT OF YOU.  WHICH OTHER PAGE WOULD YOU GO

5    TO FOR THE -- WITHDRAWN.

6            MR. BALOGH:  YOUR HONOR, CAN I SWITCH THESE PAGES

7    WITH HIM SO I CAN HAVE SOMETHING TO WORK WITH IT?

8            THE COURT:  IT MIGHT MAKE IT EASIER.

9            MR. BALOGH:  ESPECIALLY FOR ME.

10   BY MR. BALOGH

11   Q    IF YOU CAN TELL US FROM PAGE 19 -- AND, LET'S USE THE TEST

12   SAMPLE, WHICH I BELIEVE IS PAGE 17.  ACTUALLY, IT'S NOT.

13   SORRY.  PAGE 18.

14           CAN YOU SHOW US WHERE THE MASS SPECTROGRAPHY IS

15   REVEALED ON THE CHARTS?

16   A    I'M SORRY.  IT SEEMS I AGAIN DON'T HAVE THAT PAGE.

17   Q    YOU DON'T HAVE THE CHART TO EXHIBIT 10?

18   A    I DON'T HAVE THE SAMPLE CODE PAGE.

19   Q    THIS IS 12.  THANK YOU.  I'LL SHOW YOU WHAT'S A DIFFERENT

20   COPY OF EXHIBIT 18.

21   A    YES.  ON THAT PAGE, I'M TALKING ABOUT PAGE 18?

22   Q    PAGE 18.

23   A    YES.  ON PAGE 18, ON THE ONE, TWO, THREE -- THIRD ROW AND

24   FIRST COLUMN, IT'S -- YOU CAN SEE THERE'S 313/241.

25   Q    WHY DON'T YOU USE YOUR FINGER AND CIRCLE IT ON THE TV

1    SCREEN?  I THINK THAT WILL HELP US.

2    **A**    HERE.

3    **Q**    YOU ARE CIRCLING THE X AXIS OF THE SECOND CHART?

4    **A**    YES.

5    **Q**    AND THAT'S THE RETENTION TIME AXIS; IS THAT CORRECT?

6    **A**    NO, NO.  I'M SHOWING BELOW THAT, BELOW THE RETENTION

7    TIME --

8    **Q**    WHERE IT SAYS --

9    **A**    -- AXIS.

10   **Q**    WHERE IT --

11   **A**    WHERE IT SAYS AXIS OF MRM.  IT BEARS 313.

12   **Q**    AND THAT'S THE MASS SPECTROMETER ANALYSIS THAT'S HAPPENING

13   SIMULTANEOUSLY; IS THAT CORRECT?

14   **A**    YES.

15   **Q**    THANK YOU.

16            DO YOU ALSO HAVE A MACHINE AT THE UCLA ANALYTIC

17   LABORATORY KNOWN AS MS/DA 10?

18   **A**    YEAH, THAT'S GC.

19   **Q**    THAT'S A GAS CHROMATOGRAPHY?

20   **A**    YES, IT'S GAS CHROMATOGRAPHY.

21   **Q**    WHEN YOU RUN THESE SAMPLES THROUGH GAS CHROMATOGRAPHY, YOU

22   WOULD GET DIFFERENT RETENTION TIME?

23   **A**    COMPLETELY.

24   **Q**    THAT'S BECAUSE THE LENGTH OF THE GAS CHROMATOGRAM IS MUCH

25   LONGER THAN THE LIQUID CHROMATOGRAPH --

1   A    AND IT'S DIFFERENT MECHANISM IN THE WAY.

2   Q    AND I THINK YOU TESTIFIED ON DIRECT EXAMINATION THAT YOU

3   CALIBRATE THESE MACHINES.  THEY'RE CALIBRATED ONCE EVERY TWO

4   MONTHS?

5   A    YES.

6   Q    THAT IS A STANDARD PRACTICE AT THE UCLA LAB?

7   A    YES.

8   Q    THERE'S NO NEED TO CALIBRATE THEM EVERY DAY; IS THAT RIGHT?

9   A    NOT IN THE CASE OF THE LC/MS MACHINES.

10  Q    HOW ABOUT THE GAS CHROMATOGRAPH?

11  A    GAS CHROMATOGRAPHS ARE CALIBRATED MORE OFTEN.

12  Q    EVERY DAY?

13  A    TWENTY-FOUR HOURS, 24 HOURS.

14  Q    EVERY 24 HOURS?

15  A    YES.

16  Q    ALL RIGHT.

17          MR. BALOGH:  MAY I JUST HAVE A MOMENT, YOUR HONOR?

18  I THINK I MAY BE DONE.

19          (PAUSE IN PROCEEDINGS.)

20          MR. BALOGH:  THANK YOU, YOUR HONOR.  I HAVE NO

21  FURTHER QUESTIONS.  I'LL TENDER THE WITNESS.

22          THE COURT:  THANK YOU.  MR. NEDROW, ANYTHING

23  FURTHER?

24          MR. NEDROW:  YES.  THANK YOU, YOUR HONOR.  JUST A

25  FEW QUESTIONS.

1              **REDIRECT EXAMINATION BY MR. NEDROW**

2    **BY MR. NEDROW**

3    **Q**   MR. STARCEVIC, YOU WERE ASKED ABOUT THE ABSENCE OF THE

4    CALIBRATION TWO PRINTOUT FROM THAT PACKET YOU HAVE; DO YOU

5    RECALL THAT?

6    **A**   YES, YES.

7    **Q**   DOES ITS ABSENCE FROM THE PACKET AFFECT YOUR JUDGMENT AS TO

8    THE ACCURACY OF THE WORK YOU PERFORMED?

9    **A**   NO.

10   **Q**   ON THE -- ON BOTH SAMPLE SMP 03 AND UY 304?

11   **A**   NOT IN MY OPINION.

12   **Q**   I'M SORRY -- YES.  OKAY.

13            YOU WERE ASKED ABOUT RETENTION METHODS AND TIMES AS

14   TO, I THINK, THE UNIVERSITY OF INDIANA COMPARED TO THE UCLA

15   LAB; DO YOU RECALL THAT?

16   **A**   YES.

17   **Q**   HOW THE UNIVERSITY OF INDIANA, DOES THE TESTING HAVE AN

18   IMPACT ON THE ACCURACY OF YOUR ANALYSIS HERE BASED ON MEDICINE

19   RESULTS?

20   **A**   NO.

21   **Q**   YOU WERE ALSO ACTUALLY ASKED A NUMBER OF QUESTIONS ABOUT A

22   SEPARATE ANALYSIS ON A SEPARATE LC/MS MACHINE BY A SEPARATE

23   PERSON; IS THAT ACCURATE?

24   **A**   THAT'S CORRECT.

25   **Q**   AND IS HOW THAT SEPARATE PERSON ANALYZED A SEPARATE SAMPLE

1    ON A SEPARATE MACHINE -- WELL, I'M SORRY -- A SEPARATE PART OF

2    THAT SAMPLE ON A SEPARATE MACHINE AFFECT YOUR ANALYSIS AS

3    REFLECTED IN THIS WORK?

4    **A**    NO.

5    **Q**    IS YOUR CONCLUSION AT ALL IMPACTED AFTER GOING THROUGH ALL

6    THOSE OTHER QUESTIONS?

7    **A**    NO.

8    **Q**    AND, AGAIN, WHAT WAS THE BOTTOM LINE CONCLUSION AS TO BOTH

9    SMP 03 AND UY 304?

10   **A**    THAT THEY ARE POSITIVE FOR THG AND NORBOLETHONE.

11              **MR. BALOGH:**  THANK YOU.  NO FURTHER QUESTIONS, YOUR

12   HONOR.

13              **THE COURT:**  MAY THE WITNESS BE EXCUSED?

14              **MR. BALOGH:**  YES.

15              **THE COURT:**  THANK YOU VERY MUCH, SIR.  YOU'RE

16   EXCUSED.

17              ALL RIGHT.  THE GOVERNMENT MAY CALL ITS NEXT

18   WITNESS.

19              **MR. NEDROW:**  THANK YOU, YOUR HONOR.  THE UNITED

20   STATES CALLS SPECIAL AGENT JEFF NOVITZKY.

21              (THE WITNESS' PHOTOGRAPH WAS TAKEN.)

22                        **JEFFREY NOVITZKY,**

23   HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

24   DULY SWORN AND EXAMINED AS FOLLOWS:

25              **THE WITNESS:**  YES, I DO.

1          **THE CLERK:**  PLEASE STATE YOUR FULL NAME FOR THE

2   RECORD.

3          **THE WITNESS:**  JEFF NOVITZKY.

4          **THE CLERK:**  SPELL YOUR LAST NAME.

5          **THE WITNESS:**  N-O-V-I-T-Z-K-Y.

6          **THE CLERK:**  THANK YOU.

7               **DIRECT EXAMINATION BY MR. NEDROW**

8   **BY MR. NEDROW**

9   **Q**   GOOD AFTERNOON, SIR.

10  **A**   GOOD AFTERNOON.

11  **Q**   COULD YOU PLEASE TELL US WHAT YOU DO FOR A LIVING?

12  **A**   EXCUSE ME?

13  **Q**   WHAT YOU DO FOR A LIVING?

14  **A**   SURE.  I'M A SPECIAL AGENT WITH THE IRS CRIMINAL

15  INVESTIGATION DIVISION ALSO KNOWN AS IRS/CI.

16  **Q**   HOW LONG HAVE YOU WORKED WITH THE IRS?

17  **A**   I HAVE BEEN AN IRS SPECIAL AGENT FOR THE LAST 15 YEARS.

18  **Q**   WHAT KIND OF THINGS DO YOU DO AS A SPECIAL AGENT WITH THE

19  IRS CRIMINAL INVESTIGATION DIVISION?

20  **A**   PRIMARILY INVESTIGATE FEDERAL CRIMINAL VIOLATIONS OF THREE

21  NATURES:  LARGE SCALE TAX EVASION, FEDERAL MONEY LAUNDERING

22  VIOLATIONS, AND CURRENCY REPORTING VIOLATIONS.

23  **Q**   IN WORKING ON -- SO THESE ARE PRIMARILY FINANCIAL CRIMES;

24  IS THAT CORRECT?

25  **A**   THAT'S CORRECT.

1  Q   I WANT TO FOCUS ON MONEY LAUNDERING.  CAN YOU BRIEFLY

2  EXPLAIN THE RELATIONSHIP BETWEEN MONEY LAUNDERING VIOLATIONS

3  AND OTHER CRIMES?

4  A   SURE.  MONEY LAUNDERING IN VERY SIMPLE TERMS IS TAKING

5  MONEY FROM AN ILLICIT OR ILLEGAL SOURCE AND CONDUCTING A

6  TRANSACTION WITH IT.  IT'S A LOT MORE COMPLEX, BUT IN SIMPLE

7  TERMS, THAT'S WHAT IT IS.

8           SO THERE'S TWO ASPECTS TO A MONEY LAUNDERING

9  INVESTIGATION.  THE FIRST, OF COURSE, AND, YOU KNOW, THE THING

10 THAT NEEDS TO COME FIRST IS INVESTIGATING THE ILLEGAL ACTIVITY.

11 IF THE MONEY IS NOT FROM CERTAIN ILLEGAL ACTIVITY, THE RELATED

12 FINANCIAL TRANSACTION CANNOT BE CONSIDERED A MONEY LAUNDERING

13 TRANSACTION.

14           THE SECOND, OF COURSE, IS FOLLOWING THE MONEY, WHICH

15 IS SPECIALTY OF IRS/CI AGENTS.

16 Q   IN YOUR APPROXIMATELY 15 YEARS AS AN IRS SPECIAL AGENT,

17 HAVE YOU WORKED ON FINANCIAL INVESTIGATIONS WHICH HAVE BEEN THE

18 PRODUCT OR OUTGROWTH OF OTHER CRIMINAL ACTIVITY?

19 A   YES, I HAVE.

20 Q   CAN YOU PLEASE JUST GIVE US A LIST OF THE KINDS OF THINGS

21 YOU'VE INVESTIGATED AS A PART OF YOUR FINANCIAL INVESTIGATIONS,

22 KINDS OF OTHER CRIMINAL ACTIVITY?

23 A   SURE.  A WIDE RANGE IN MY CAREER, EVERYTHING FROM

24 RECREATIONAL STREET DRUGS, COCAINE, HEROIN, MARIJUANA,

25 CORPORATE CRIME, HIGH-TECH CRIME.  I WORK OUT OF THE SAN JOSE,

1   CALIFORNIA OFFICE, SO OBVIOUSLY, SILICON VALLEY, A LOT OF THAT

2   DOWN THERE.

3           I'VE ACTUALLY WORKED CASES INVOLVING EXTORTION,

4   FRAUD, MAIL FRAUD, WIRE FRAUD.  REALLY A WIDE RANGE OF MONEY

5   LAUNDERING CASES THAT HAD DIFFERENT UNDERLYING ILLEGAL

6   ACTIVITIES, WHICH I ALSO WAS A PART OF THAT PART OF THE

7   INVESTIGATION.

8   **Q**   AND YOU'RE FAMILIAR WITH OTHER IRS AGENTS THROUGH YOUR

9   DUTIES AND THEIR INVESTIGATIONS, CORRECT?

10  **A**   YES, I AM.

11  **Q**   AND IS IT NOT UNCOMMON FOR OTHER AGENTS IN THE SERVICE TO

12  WORK ON OTHER UNDERLYING INVESTIGATIONS IN THE MANNER YOU'VE

13  DESCRIBED?

14          **MR. BALOGH:**  OBJECTION.  LEADING.

15          **THE COURT:**  OVERRULED.  IT'S FOUNDATIONAL, BUT

16  PLEASE START BEING DIRECT.

17          **MR. NEDROW:**  THANK YOU, YOUR HONOR.  I APOLOGIZE.

18  THANK YOU.

19  **BY MR. NEDROW**

20  **Q**   IT WAS OVERRULED.  YOU MAY ANSWER.

21  **A**   IT IS COMMON, AND IT GOES TO VARYING DEGREES.  SOME AGENTS

22  FOCUS MORE ON THE FINANCIAL SIDE OF THINGS AND LEAVE THE

23  UNDERLYING CRIMINAL VIOLATION TO OTHER AGENCIES.

24          TYPICALLY, WHEN YOU WORK A MONEY LAUNDERING

25  INVESTIGATION, WE WILL BE WORKING WITH ANOTHER AGENCY.  STREET

1  DRUG INVESTIGATIONS ARE ALMOST ALWAYS WORKED WITH THE DEA.  A

2  LOT OF OUR INVESTIGATIONS ARE WORKED WITH THE FBI.

3            AND IT REALLY VARIES FROM CASE TO CASE AND AGENT TO

4  AGENT FROM AN IRS PERSPECTIVE IN TERMS OF HOW MUCH OF THE TIME

5  IS SPENT ON THE UNDERLYING INVESTIGATION.  THERE'S ALWAYS GOING

6  TO BE TIME SPENT ON THE FINANCIAL SIDE OF THE MONEY LAUNDERING

7  INVESTIGATION, BUT IT VARIES ON THE UNDERLYING ILLEGAL

8  ACTIVITY, DEPENDING ON THE CASE, WHAT THE AGENCY WANTS, AND

9  WHAT THE AGENT, YOU KNOW, PREFERS.

10 **Q**   IN 2002, DID YOU BECOME INVOLVED IN A CRIMINAL

11 INVESTIGATION THAT, AS A BACKGROUND MATTER, HAS A RELATIONSHIP

12 TO THE TRIAL THAT WE'RE ALL AT TODAY OF TAMMY THOMAS?

13 **A**   YES, I DID.

14 **Q**   CAN YOU PLEASE DESCRIBE IN 2002 THE INVESTIGATIVE

15 ACTIVITIES YOU WERE INVOLVED WITH THAT HAVE A RELATIONSHIP TO

16 TODAY'S TRIAL?

17 **A**   SURE.  IN THE SUMMER OF 2002, MY AGENCY INITIATED WHAT IS

18 WIDELY KNOWN AS THE BALCO INVESTIGATION, AND IT INVOLVED AN

19 INVESTIGATION OF THE ILLEGAL DISTRIBUTION OF PERFORMANCE

20 ENHANCING DRUGS, SOME OF WHICH YOU WE'VE HEARD THIS WEEK, AS

21 WELL AS THE RELATED MONEY LAUNDERING OF THE PROFITS FROM THE

22 DISTRIBUTION OF THOSE DRUGS.

23 **Q**   COULD YOU PLEASE DESCRIBE HOW YOU BECAME INVOLVED AT THE

24 BEGINNING OF THE BALCO INVESTIGATION?

25 **A**   SURE.  IT REALLY DATES BACK QUITE A FEW YEARS AND HAS A

1  LITTLE BIT TO DO WITH MY BACKGROUND PERSONALLY, IN THAT I GREW

2  UP IN THE BAY AREA, WAS A HIGH SCHOOL AND COLLEGE ATHLETE, AND

3  THROUGHOUT MY LIFETIME COMPETED WITH, SOCIALIZED WITH A LOT OF

4  OTHER ATHLETES.  I STILL DO TO THIS DAY.  AND MY FATHER WAS A

5  HIGH SCHOOL BASKETBALL COACH FOR ABOUT 35 YEARS, 40 YEARS IN

6  THE AREA.  SO BETWEEN TWO OF US --

7          **MR. BALOGH:**  I'M GOING TO OBJECT AS VOUCHING,

8  NON-RESPONSIVE AND MOVE TO STRIKE AS THE PERSONAL BACKGROUND

9  HERE.

10          **THE COURT:**  OVERRULED.  YOU MAY PROCEED.

11          **THE WITNESS:**  BETWEEN THE TWO OF US, WE HAD A LOT OF

12  EXPOSURE TO A LOT OF PEOPLE INVOLVED IN SPORTS, AND I CAN'T

13  QUITE PINPOINT IT, BUT I WOULD SAY SOMETIME IN THE LATE '80'S

14  WAS THE FIRST TIME I HEARD ABOUT A LABORATORY IN BURLINGAME,

15  CALIFORNIA AND AN INDIVIDUAL BY THE NAME OF VICTOR CONTE.

16          AND WHAT I HEARD INITIALLY WAS THAT HE WAS PROVIDING

17  NUTRITIONAL CONSULTATION TO ATHLETES.  AS TIME WENT ON, BEING,

18  YOU KNOW, A FAN OF SPORTS, A FORMER PARTICIPANT OF SPORTS, I

19  OCCASIONALLY WOULD HEAR, READ STORES ABOUT THIS LABORATORY AND

20  ABOUT THIS INDIVIDUAL.  AND THE STORIES RANGE FROM -- I RECALL

21  IN '88 A STORY ABOUT HIM BEING THE NUTRITIONIST TO FOUR WEIGHT

22  THROWERS GOING TO THE SEOUL OLYMPICS.  IN FACT, THERE WAS A

23  PICTURE OF THESE THROWERS HOLDING VICTOR CONTE UP ON THEIR

24  SHOULDERS AND BASICALLY GIVING HIM CREDIT FOR THE NUTRITIONAL

25  BACKGROUND AT LEAST AND THEIR SUCCESS IN LEADING UP TO THE

1   OLYMPICS.

2          AGAIN, AS TIME WENT ON, THERE WOULD BE OCCASIONAL

3   STORIES, AND NOTHING I PAID PARTICULAR ATTENTION TO, BUT THIS

4   IS JUST HOW I CAME TO KNOW ABOUT IT.

5          MOVING ON LATER TO THE LATE '90S, MAYBE EARLY 2000S,

6   I DID HEAR PARTICULARLY FROM A COUPLE OF SOURCES OF THESE, YOU

7   KNOW, FRIENDS, COACHES, ATHLETES, FAMILY, THAT VICTOR CONTE HAD

8   MOVED ON FROM THIS NUTRITIONAL SUPPLEMENT-TYPE BUSINESS TO

9   ACTUALLY PROVIDING ATHLETES WITH PERFORMANCE ENHANCING DRUGS.

10          I RECOGNIZED HIM AT THE 2000 OLYMPICS AFTER

11  C. J. HUNTER, WHO WAS FORMALLY THE HUSBAND OF MARION JONES, WHO

12  TESTED POSITIVE AND HAD A PRESS CONFERENCE AT THE SYDNEY GAMES,

13  AND VICTOR CONTE STOOD UP AS HIS NUTRITIONIST DEFENDING HIM AT

14  THE PRESS CONFERENCE.

15          OBVIOUSLY, HAVING KNOWN ABOUT THIS GUY, GOING BACK

16  TEN, 12 YEARS, JUST ON A CASUAL MATTER, IT SPARKED MY INTEREST.

17          **THE COURT:**  PERHAPS YOU COULD WORK ON A QUESTION AND

18  ANSWER?  THIS IS KIND OF NARRATIVE.

19  **BY MR. NEDROW**

20  **Q**   THANK YOU.  LET'S MOVE ON.  I APPRECIATE THE BACKGROUND.

21  LET'S MOVE ON TO 2002.  I WOULD LIKE TO GET A LITTLE BIT MORE

22  INTO DETAIL ABOUT THE INVESTIGATION ITSELF.

23          IN 2002 DID YOU, IN PART BASED ON THE REASONS YOU

24  SUMMARIZED, BEGIN TO LOOK INTO THE ACTIVITIES OF WHAT BALCO

25  LABORATORIES WAS DOING AT THAT TIME?

1  **A**   YES, I DID.

2  **Q**   AND WHAT DID IN 2002 -- AND LET'S START WITH OFFICIAL

3  REGISTRATION WITH THE STATE OF CALIFORNIA AND ANY OTHER

4  ENTITIES.  WHAT DID BALCO LABORATORIES APPEAR TO BE INVOLVED

5  IN?

6  **A**   THEY WERE A BLOOD TESTING LABORATORY THAT ADVERTISED TAKING

7  BLOOD FROM INDIVIDUALS AND TESTING IT THROUGH MACHINES SIMILAR

8  TO WHAT WE'VE HAD TESTIMONY FROM TODAY AND DETERMINING TRACE

9  VITAMIN AND MINERAL DEFICIENCIES WITHIN THOSE PERSONS' BLOOD,

10 AND THEN, BASED ON THAT, RECOMMENDING A NUTRITIONAL SUPPLEMENT

11 PROGRAM TO BRING THOSE DEFICIENCIES UP TO A REGULAR LEVEL.

12 **Q**   WHO WAS THE REGISTERED OWNER OF BALCO WITH THE STATE?

13 **A**   VICTOR CONTE.

14 **Q**   AND IN ADDITION TO BALCO, IS THERE A SEPARATE FINANCIAL

15 ENTITY THAT VICTOR CONTE WAS INVOLVED WITH?

16 **A**   YES.

17 **Q**   WHAT WAS THAT?

18 **A**   IT WAS A BUSINESS BY THE NAME OF SNAC SYSTEMS, S-N-A-C

19 SYSTEMS.

20 **Q**   DID SNAC SYSTEMS SELL A PARTICULAR LEGAL NUTRITIONAL

21 SUPPLEMENT THAT YOU BECAME AWARE OF?

22 **A**   THEY SOLD SEVERAL, YES.

23 **Q**   WAS THERE ONE IN PARTICULAR THAT WAS SUCCESSFUL?

24 **A**   YES, THERE WAS.

25 **Q**   WHAT WAS THAT?

1   **A**   ZMA, WHICH WAS A ZINC MAGNESIUM ASPARTATE PRODUCT THAT WAS

2   LEGALLY SOLD OVER-THE-COUNTER AND WAS ADVERTISED TO HELP

3   PROMOTE A DEEP SLEEP AND POTENTIALLY RAISE TESTOSTERONE LEVELS.

4   **Q**   NOW, TURNING TO 2002 AND TOWARDS THE END OF 2002, DID YOU

5   BEGIN TO DEVELOP INFORMATION THAT CAUSED YOU TO FOCUS ON

6   POSSIBLE ILLEGAL ACTIVITIES AT BALCO APART FROM LEGAL BLOOD

7   TESTING AND NUTRITIONAL SUPPLEMENT SALES?

8   **A**   YES.

9   **Q**   START WITH WHAT WAS THE ACTIVITY THAT CAUSED THAT CAUGHT

10  YOUR ATTENTION?

11  **A**   WELL, AGAIN, BASED UPON THESE VARIOUS SOURCES OF

12  INFORMATION, THAT BALCO HAD NOW MOVED ON TO -- FROM THE

13  NUTRITIONAL BUSINESS TO THE PERFORMANCE-ENHANCING DRUGS

14  BUSINESS, I WENT BACK AND DID SOME INTERNET RESEARCH AND BEGAN

15  TO FIND INTERNET POSTINGS, SOME OF WHICH PATRICK ARNOLD

16  DESCRIBED TO YOU ABOUT, THIS BLOG SITE, MISCELLANEOUS FITNESS

17  AND WEIGHTS.  AND ON THAT SITE THERE WAS A VICTOR CONTE

18  POSTING, AND QUITE NOTICEABLY TALKING ABOUT AN INTRICATE

19  KNOWLEDGE OF PERFORMANCE-ENHANCING DRUGS, POSING QUESTIONS

20  ABOUT CERTAIN DRUGS, HOW MUCH THEY COST, WHAT THEY CAN DO.

21          I WENT BACK, FURTHER INTERNET RESEARCH, AND FOUND

22  ARTICLES WHERE HE WAS TALKING ABOUT KNOWING ATHLETES THAT WERE

23  ON PERFORMANCE-ENHANCING DRUGS AND THE SUCCESS THEY WERE

24  HAVING.

25          BASED UPON THAT, WE HAD A PROGRAM AT THE TIME --

1  ACTUALLY, BACKING UP A STEP, WE HAVE A FINANCIAL DATABASE THAT

2  CONTAINS WHAT'S KNOWN AS CURRENCY TRANSACTION REPORTS.  AND

3  THAT MEANS WHEN YOU GO TO A BANK AND YOU CONDUCT CURRENCY

4  TRANSACTION IN EXCESS OF $10,000, A REPORT IS FILED BY THE

5  BANK, AND IT'S PUT INTO THIS DATABASE THAT IRS/CI AGENTS HAVE

6  ACCESS TO.  920 AGENTS OFTEN QUERY THAT DATABASE WHEN WE ARE

7  LOOKING INTO POSSIBLE ILLEGAL ACTIVITY, BECAUSE DEALING IN CASH

8  THESE DAYS WITH THE CONVENIENCE OF INTERNET BANKING AND DEBIT

9  CARDS AND THINGS LIKE THAT IS NOT UNUSUAL.

10 **Q**   AND DID YOU LOOK IN THAT DATABASE FOR INDICATORS OF

11 ACTIVITY AS TO MR. CONTE AND BALCO?

12 **A**   YES, I DID.

13 **Q**   WHAT DID YOU FIND?

14 **A**   I FOUND WHAT I INITIALLY THOUGHT WERE TWO, TURNED OUT BEING

15 ONE CURRENCY TRANSACTION REPORT.  TWO CAME UP.  ONE WAS LISTED

16 UNDER BALCO, AND ONE WAS LISTED UNDER VICTOR CONTE.  THEY WERE

17 ACTUALLY THE SAME ONE.  AND IT WAS A $14,000 CASH WITHDRAWAL.

18 **Q**   OKAY.  AND WE'LL ACTUALLY GET BACK TO SOME OF THE FINANCIAL

19 INVESTIGATION.  I WOULD LIKE TO ACTUALLY ASK, IS THAT YOU AFTER

20 SOME OF THIS PRELIMINARY INVESTIGATION, DID YOU UNDERTAKE OTHER

21 TECHNIQUES REALLY OVER THE NEXT YEAR TO INVESTIGATE WHAT BALCO

22 LABORATORIES WAS DOING?

23 **A**   YES, I DID.

24 **Q**   LET ME ASK, BEFORE WE GET TO THOSE DETAILS, IS THERE A

25 DISTINCTION AS INVESTIGATOR WITH YOUR EXPERIENCE BETWEEN A

1   COVERT PHASE OF INVESTIGATION AND AN OVERT PHASE?

2   **A**   YES.

3   **Q**   CAN YOU JUST BRIEFLY DESCRIBE HOW YOU DISTINGUISH THOSE TWO

4   TYPES OF INVESTIGATION?

5   **A**   SURE.  COVERT PHASE IS WHEN THE SUBJECT OR TARGET OF THE

6   INVESTIGATION, HOPEFULLY, DOESN'T KNOW THEY ARE BEING

7   INVESTIGATED.  AND THERE'S MANY MORE THINGS YOU CAN DO DURING

8   THE COVERT STAGE BECAUSE, HOPEFULLY, THEY DON'T KNOW THEY ARE

9   BEING LOOKED AT AND ARE NOT BEING SUSPICIOUS.

10          THE OVERT PHASE OF INVESTIGATION IS AFTER, IN SOME

11  WAY, SHAPE OR FORM, YOU MADE CONTACT WITH THE SUBJECT OR TARGET

12  OF THE INVESTIGATION AND THEY KNOW THAT YOU'RE INQUIRING ABOUT

13  THEM.

14  **Q**   AND BETWEEN 2002 AND SEPTEMBER 2003, IS IT FAIR TO

15  CHARACTERIZE THAT STAGE OF THE BALCO INVESTIGATION AS THE

16  COVERT STAGE PHASE?

17  **A**   THAT'S CORRECT.

18  **Q**   TELL US SOME OF THE THINGS YOU DID DURING THE COVERT PHASE

19  OF THE INVESTIGATION TO DEVELOP EVIDENCE AS TO WHAT WAS GOING

20  ON BALCO.

21  **A**   OBVIOUSLY, I LOOKED AT FINANCIAL RECORDS.  GRAND JURY

22  SUBPOENA WAS ISSUED FOR FINANCIAL RECORDS OF BOTH BALCO

23  LABORATORIES AND VICTOR CONTE PERSONALLY.  BEGAN SEEING MANY

24  CHECKS WRITTEN TO VICTOR CONTE PERSONALLY FROM A WIDE RANGE OF

25  ELITE ATHLETES.

1          I ALSO BEGAN THE EXAMINATION OF THE DISCARDED

2   GARBAGE OR TRASH OF BALCO.  AND WHAT WOULD HAPPEN IS EVERY

3   MONDAY NIGHT BEFORE WHOEVER LAST LEFT THE BUSINESS, THEY WOULD

4   TAKE THE GARBAGE FROM INSIDE AND PUT IT OUT TO A PUBLICLY

5   ACCESSIBLE AREA IN THE REAR.  A FEW WEEKS, THAT KIND OF TIME,

6   WHEN PEOPLE WERE LEAVING AND WHEN THEY WERE COMING BACK IN THE

7   MORNING, IN THE MIDDLE OF THE NIGHT I WOULD GO AND TAKE THE

8   GARBAGE AND BRING IT TO A WELL-LIT AREA AND GO THROUGH IT.  AND

9   I FOUND QUITE A BIT OF EVIDENCE OF THE DISTRIBUTION OF THESE

10  PERFORMANCE-ENHANCING DRUGS TO ELITE ATHLETES.

11          ONE THING I WAS FINDING A LOT OF WERE DISCARDED

12  NEEDLE WRAPPERS BUT NOT THE NEEDLES THEMSELVES.  I WOULD FIND

13  OFTEN DOZENS OF TORN, EMPTY NEEDLE WRAPPERS.  AND SO THE

14  THOUGHT CROSSED MY MIND OF, WHERE ARE THE NEEDLES GOING?

15          MOVING BACK TO MY FINANCIAL INVESTIGATION, I FOUND

16  CHECKS BEING WRITTEN TO A MEDICAL WASTE COMPANY, STERICYCLE.

17  WE ISSUED, ACTUALLY, A GRAND JURY SUBPOENA FOR THE -- I THINK

18  IT WAS MONTHLY COLLECTION OF MEDICAL WASTE FROM BALCO, AND WENT

19  OVER TO THE EAST BAY WITH A COUPLE OF THE THICKEST GLOVES THAT

20  I COULD FIND AND WENT THROUGH THIS MEDICAL WASTE, WHICH

21  CONTAINED USED SYRINGES, CONTAINED USED VIALS OF HUMAN GROWTH

22  HORMONE, EPO, WHICH IS A BLOOD DOPING PRODUCT, AND ANABOLIC

23  STEROIDS.

24  Q    HOW OFTEN DID YOU ATTEMPT TO LOOK INTO THE TRASH AT BALCO

25  LABORATORIES?

1  A    JUST ABOUT EVERY WEEK.

2  Q    FOR APPROXIMATELY HOW LONG?

3  A    FOR ABOUT A YEAR.

4  Q    I WANT TO ASK YOU ABOUT A TERM YOU USED.  YOU USED THE TERM

5  "PERFORMANCE-ENHANCING DRUGS" IN THIS TESTIMONY TODAY, CORRECT?

6  A    CORRECT.

7  Q    NOW, OF COURSE, THAT TERM DOESN'T NECESSARILY MEAN A

8  PERFORMANCE-ENHANCING DRUG IS ILLEGAL, CORRECT?

9  A    CORRECT.

10  Q    SO CAN YOU DESCRIBE FOR US A LITTLE BIT MORE WHAT THE LAW

11  ENFORCEMENT INTEREST WOULD BE IN PERFORMANCE-ENHANCING DRUGS,

12  YOU KNOW, FROM YOUR PERSPECTIVE AS AN INVESTIGATOR?

13  A    SURE.  WELL, THEY INCLUDED AMONGST PERFORMANCE-ENHANCING

14  DRUGS OR ANABOLIC STEROIDS, WHICH ARE A SCHEDULED CONTROLLED

15  SUBSTANCE UNDER FEDERAL LAW AND ARE ILLEGAL TO DISTRIBUTE

16  WITHOUT A VALID DOCTOR'S PRESCRIPTION.  THEY ALSO -- THE

17  DISTRIBUTION OF WHICH ARE ILLEGAL ACTIVITY UNDER THE MONEY

18  LAUNDERING VIOLATION.  SO DISTRIBUTING ANABOLIC STEROIDS AND

19  GETTING MONEY FROM IT, WHAT YOU DO WITH THAT MONEY COULD BE

20  CONSIDERED MONEY LAUNDERING.

21  Q    SO FOR PURPOSES OF YOUR TESTIMONY, WE'RE TALKING ABOUT

22  PERFORMANCE-ENHANCING DRUGS.  YOU'RE TALKING ABOUT THE ILLEGAL

23  DISTRIBUTION OF PERFORMANCE-ENHANCING DRUGS UNDER FEDERAL LAW?

24  A    IN THIS CASE, CORRECT.

25  Q    IN THIS CASE.  YES.  OKAY.

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page167 of 250

1          IN ADDITION TO REVIEWING THE BALCO TRASH AND THE

2    MEDICAL WASTE, PLEASE DESCRIBE, AS THE INVESTIGATION ENTERED

3    2003, OTHER TECHNIQUES YOU USED COVERTLY TO INVESTIGATE BALCO.

4    **A**   WELL, GOING BACK TO THE TRASH, I FOUND A FEW E-MAILS AND

5    WAS ABLE TO LOCATE SOME E-MAIL ACCOUNTS.  AND SO I AUTHORED

6    SEARCH WARRANT AFFIDAVITS FOR COURT PERMISSION TO GO IN AND

7    COVERTLY SEARCH THE CONTENT OF SOME OF THESE E-MAIL ACCOUNTS.

8    SO WE DID THAT ON A FEW OCCASIONS.

9    **Q**   DID YOU ALSO CONDUCT SURVEILLANCE ACTIVITIES AT BALCO?

10   **A**   YES, I DID.

11   **Q**   TELL US A LITTLE BIT ABOUT WHAT YOU AND OTHER AGENTS SAW AT

12   BALCO THROUGHOUT 2003 AS THE INVESTIGATION PROGRESSED.

13   **A**   OUR SURVEILLANCE INCLUDED INSTANCES WHERE WE SAW ELITE

14   ATHLETES ARRIVING AT BALCO, GOING IN FOR SHORT PERIODS OF TIME

15   AND LEAVING.

16          IN ONE INSTANCE WE ACTUALLY SAW SOMEONE ASSOCIATED

17   WITH BALCO ARRIVE AT BALCO, GO IN FOR A SHORT PERIOD OF TIME,

18   AND GO DIRECTLY TO PACIFIC BELL PARK, I THINK IT WAS AT THAT

19   TIME, THE SAN FRANCISCO GIANTS PLAYED, SPENT A BRIEF PERIOD OF

20   TIME THERE AND THEN LEAVE.

21   **Q**   IN ADDITION TO THAT SURVEILLANCE ACTIVITY, LET'S RETURN TO

22   THE FINANCIAL ANALYSIS AS IT DEVELOPED THROUGHOUT 2003.  DID

23   YOU DEVELOP A BETTER UNDERSTANDING OF BOTH THE BALCO BUSINESS

24   ACCOUNTS AND THE -- AND OTHER ACCOUNTS PERTINENT TO THE

25   INVESTIGATION?

1    A    YES.

2    Q    PLEASE DESCRIBE IN GENERAL THE PERTINENT ACCOUNTS AND THE

3    KINDS OF THINGS YOU FOUND IN THEM.

4    A    WELL, THERE WERE TWO PERTINENT ACCOUNTS.  THERE WAS THE

5    BALCO BUSINESS ACCOUNT, WHICH BALCO AND SNAC SYSTEM -- I'M NOT

6    SURE IF THEY WERE TWO SEPARATE ONES OR COMBINED -- BUT WHAT YOU

7    WOULD SEE GOING INTO THOSE ACCOUNTS WERE THE PROCEEDS OF, YOU

8    KNOW, THEIR STATED ACTIVITY, EITHER THE MINERAL -- THE BLOOD

9    TESTING FOR MINERAL AND VITAMIN DEFICIENCY OR THE DISTRIBUTION

10   OF THESE NUTRITIONAL LEGAL SUPPLEMENTS.

11        THE PERSONAL ACCOUNT OF VICTOR CONTE WAS WHERE ALL

12   OF THE CHECKS WERE GOING FROM THE ELITE ATHLETES IN

13   MULTI-HUNDRED AND MULTI-THOUSAND DOLLAR AMOUNTS.

14   Q    DID YOU ALSO FIND ANY EVIDENCE OF THE USE OF OTHER

15   SUBSTANCES THAT PLAYED A ROLE WITH THE DISTRIBUTION OF STEROIDS

16   IN CONCEALING THEIR PRESENTATION IN AN ATHLETE'S BLOOD OR

17   URINE?

18   A    I DID.

19   Q    PLEASE DESCRIBE THAT ASPECT OF THE INVESTIGATION.

20   A    IN ONE OF THE TRASH RUNS, AS WELL AS IN MY ANALYSIS OF THE

21   FINANCIAL DOCUMENTS, I LOCATED EVIDENCE THAT BALCO WAS

22   PURCHASING A SUBSTANCE BY THE NAME OF EPITESTOSTERONE FROM A

23   CHEMICAL COMPANY IN THE MIDWEST, SIGMA.

24        AND WHEN I FIRST SAW THIS, I DIDN'T KNOW WHAT

25   EPITESTOSTERONE WAS.  I MADE CONTACT WITH EXPERTS IN THE FIELD

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page169 of 250

1   AND LEARNED WHAT WE'VE LEARNED THIS WEEK, THAT IT'S SOMETHING

2   THAT IS EXCRETED IN THE URINE.  IT DOESN'T HAVE ANY REAL

3   PURPOSE IN THE BODY THAT SCIENTISTS COULD FIND, BUT IT IS USED

4   IN PERFORMANCE-ENHANCING DRUG TESTS TO DETERMINE IF AN

5   INDIVIDUAL IS USING TESTOSTERONE.  THEY LOOK AT THE LEVEL OF

6   TESTOSTERONE EXCRETED IN THE URINE VERSUS THE LEVEL OF

7   EPITESTOSTERONE EXCRETED IN THE URINE.

8           AND WHEN WE FIRST STARTED THIS THEY ALLOWED A

9   SIX-TO-ONE RATIO OF TESTOSTERONE TO EPITESTOSTERONE.  NOW IT'S

10  COME DOWN A LITTLE BIT.  THEY ONLY ALLOW FOUR-TO-ONE RATIO.  I

11  GUESS THE SIGNIFICANCE IS MOST -- AND, AGAIN, THIS IS FROM

12  TALKING WITH EXPERTS, BUT MOST INDIVIDUALS EXCRETE A ONE-TO-ONE

13  LEVEL.  SO THEY ALLOW, YOU KNOW, FOR SOME LEEWAY NOW UP TO

14  FOUR-TO-ONE, BUT IF YOU ARE GREATER THAN THAT, IT'S ABNORMAL

15  AND CAN BE CONSIDERED POSITIVE TESTS FOR SPORT PURPOSES.

16  **Q**   IN ADDITION, THE FINANCIAL ANALYSIS UNCOVERED CHECKS

17  WRITTEN FROM BALCO TO ANOTHER ENTITY THAT PLAYED A ROLE IN THE

18  INVESTIGATION?

19  **A**   CORRECT.

20  **Q**   DESCRIBE THAT FOR US.

21  **A**   THERE WERE HUNDREDS OF CHECKS WRITTEN TO QUEST DIAGNOSTICS,

22  WHICH IS A LAB THAT DOES VARIOUS KINDS OF TESTING.  IN MANY OF

23  THESE CHECKS, THE NOTATION "STEROIDS" WAS WRITTEN IN THE MEMO

24  SECTION OF THE CHECK.

25           IN DOING SOME RESEARCH, I DETERMINED THAT QUEST

1   DIAGNOSTICS OFFERED A TEST, A STEROID PANEL TEST, SO YOU COULD

2   SEND IN URINE, AND THEY WOULD TEST IT FOR STEROIDS, SIMILAR TO

3   WHAT THIS JURY HAS HEARD FROM THE UCLA LAB, AND DETERMINE THE

4   PRESENCE OF ANABOLIC STEROIDS IN URINE.

5   **Q**   IN APPROXIMATELY AUGUST 2003, DID YOU CONSULT WITH A

6   NON-GOVERNMENT ENTITY THAT ASSISTED YOU IN THE INVESTIGATION --

7   I'M SORRY.  LET ME START THAT OVER.

8            IN 2003 DID A NON-GOVERNMENTAL ENTITY PROVIDE YOU

9   WITH INFORMATION THAT ASSISTED YOU IN THE INVESTIGATION?

10  **A**   YES, THEY DID.

11  **Q**   HOW DID -- WHO WAS THAT ENTITY?

12  **A**   THAT ENTITY WAS UNITED STATES ANTIDOPING AGENCY, OR USADA.

13  **Q**   HOW DID YOU OBTAIN INFORMATION FROM THEM?

14  **A**   WELL, I WAS CONNECTED WITH THEM THROUGH DR. DON CATLIN OF

15  THE UCLA ANALYTICAL LABORATORY WHEN I FIRST STARTED DOING THESE

16  TRASH EXAMINATIONS AND FINDING THINGS, THE DRUGS, THE

17  EPITESTOSTERONE EVIDENCE.  MYSELF, BEING AN IRS INVESTIGATOR

18  WHO HAD NEVER INVESTIGATED THESE TYPES OF DRUGS, DIDN'T KNOW

19  WHAT I WAS LOOKING AT, AND DID A LITTLE RESEARCH AND FOUND

20  WHO -- WHAT I LEARNED WAS THE WORLD EXPERT IN THIS AREA, WAS

21  DR. CATLIN.

22            SO I MADE A COLD CALL TO HIM AND DIDN'T GIVE HIM

23  SPECIFIC INFORMATION, BUT GENERALLY SAID, I WORK IN THE SAN

24  FRANCISCO BAY AREA, HERE'S WHAT I DO, I'M INVOLVED IN

25  INVESTIGATION WHERE FROM TIME TO TIME I THINK I'M GOING TO NEED

1  SOMEONE TO PROVIDE ME WITH SOME ANSWERS TO THINGS, WOULD YOU

2  MIND DOING THAT.  AND HE SAID HE WOULD BE MORE THAN HAPPY TO DO

3  IT.  THIS WAS IN 2002.

4          FAST FORWARD TO 2003.  THE UNITED STATES ANTIDOPING

5  AGENCY RECEIVED A SYRINGE WITH AN AMOUNT OF FLUID IN IT FROM

6  WHAT INITIALLY WAS AN ANONYMOUS SOURCE, SINCE HAS BEEN

7  DISCLOSED TO BE A TRACK AND FIELD COACH.  BUT THE SOURCE TOLD

8  UNITED STATES ANTIDOPING AGENCY, THIS IS A DESIGNER STEROID

9  THAT'S BEING DISTRIBUTED ON THE TRACK AND FIELD CIRCUIT; AN

10 INDIVIDUAL IN THE SAN FRANCISCO BAY AREA BY THE NAME OF VICTOR

11 CONTE IS DOING IT; YOU GUYS BETTER LOOK INTO THIS.

12         UNITED STATES ANTIDOPING AGENCY INFORMED DR. CATLIN

13 OF THIS, BECAUSE THEY SENT HIM THE SYRINGE SO HE COULD TEST TO

14 FIND OUT WHAT IT WAS, AND HE GOT BACK TO THEM AND SAID, YOU

15 KNOW, I HAVE BEEN TALKING TO AN AGENT IN THE BAY AREA, I THINK

16 YOU GUYS NEED TO TALK TO HIM BECAUSE I THINK YOU MIGHT BE

17 LOOKING AT THE SAME PERSON OR ENTITY.

18 Q   WHAT MECHANISM DID YOU USE TO OBTAIN INFORMATION FROM THE

19 U.S. ANTIDOPING AGENCY?

20 A   WE ISSUED THEM A GRAND JURY SUBPOENA.

21 Q   DID YOU SERVE THE SUBPOENA ON THEM?

22 A   YES.

23 Q   DID THEY PROVIDE YOU WITH RECORDS THAT ASSISTED YOU IN THE

24 INVESTIGATION?

25 A   CORRECT.  THEY PROVIDED ME WITH RECORDS, AND THEY PROVIDED

1   ME WITH THE SYRINGE THAT HAD BEEN TURNED IN.  IT HAD ALREADY

2   BEEN TO UCLA.  THE FLUID HAD BEEN EXTRACTED AND ANALYZED, BUT,

3   NEVERTHELESS, THE SYRINGE WAS TURNED OVER TO ME.

4   **Q**    AND WHAT DID THAT SYRINGE ULTIMATELY PROVE TO CONTAIN?

5   **A**    IT CONTAINED TETRAHYDROGESTRINONE, OR THG.

6   **Q**    IN AUGUST, SEPTEMBER, ABOUT, 2003, DID YOU MAKE AN

7   INVESTIGATIVE DECISION TO TAKE THE INVESTIGATION INTO ANOTHER

8   PHASE?

9   **A**    YES.

10  **Q**    AND WHAT PHASE WAS THAT?

11  **A**    THAT PHASE WAS THE OVERT PHASE, THE EXECUTION OF THE SEARCH

12  WARRANT.  IT WAS DONE SO BECAUSE UNITED STATES ANTIDOPING

13  AGENCY FOUND FIVE ATHLETES THAT TESTED POSITIVE FOR THG, AND

14  THEY INFORMED ME THEY WERE GOING TO GO PUBLIC WITH THESE

15  POSITIVE TESTS.  AND WE THOUGHT AT THAT PERIOD OF TIME IT WOULD

16  BE A SMART MOVE FROM AN INVESTIGATIVE STANDPOINT TO GO FOR A

17  SEARCH WARRANT ON BALCO BEFORE THEY BECAME AWARE THIS THG HAD

18  BEEN DISCOVERED.

19  **Q**    WHAT'S YOUR CONCERN AS AN INVESTIGATOR IF THAT INFORMATION

20  HAD, SAY, BECOME AVAILABLE IN THE MEDIA?

21  **A**    THE CONCERN WOULD BE THAT THE INDIVIDUAL WOULD DESTROY

22  RECORDS, WOULD BE LESS LIKELY TO PROVIDE INFORMATION IF THEY

23  WERE CONTACTED KNOWING IT WAS LIKELY THEY WERE GOING TO BE

24  CONTACTED AS OPPOSED SHOWING UP COLD.

25  **Q**    LET ME ACTUALLY HAVE YOU LOOK AT AN EXHIBIT WHICH HAS BEEN

1   MARKED AS GOVERNMENT'S EXHIBIT 15 AND -- ACTUALLY, YOU KNOW,

2   WE'LL COME BACK TO THIS IN A MINUTE.  LET ME INSTEAD GO TO A

3   SEPARATE MATTER.

4          AGENT NOVITZKY, DID YOU, IN FACT, PREPARE A SEARCH

5   WARRANT DURING THAT PERIOD OF TIME?

6   **A**   YES, I DID.

7   **Q**   AND DID YOU SUBMIT IT TO A MAGISTRATE JUDGE IN THIS

8   DISTRICT FOR APPROVAL?

9   **A**   YES, I DID.

10  **Q**   AND WAS IT EXECUTED SEPTEMBER OF 2003?

11  **A**   YES, IT WAS.  SEPTEMBER 3RD, 2003.

12  **Q**   I'M SORRY?

13  **A**   I'M SORRY.  SEPTEMBER 3RD, 2003.

14  **Q**   WHERE WERE SEARCH WARRANTS EXECUTED ON THAT DAY?

15  **A**   IN BURLINGAME, CALIFORNIA AND IN SAN MATEO, CALIFORNIA.

16  **Q**   WERE THEY JUST THE BALCO BUSINESS PREMISES, OR DID THEY

17  ALSO INCLUDE OTHER RESIDENCES, OTHER FACILITIES, AND THINGS OF

18  THAT SORT?

19  **A**   THAT DAY WE CONDUCTED SEARCH WARRANTS ON THE BUSINESS

20  PREMISES OF BALCO, THE PERSONAL RESIDENCE OF VICTOR CONTE, THE

21  PERSONAL RESIDENCE OF GREG ANDERSON, AND I THINK FOUR PERSONAL

22  MAILBOXES IN THE AREA.

23  **Q**   IN GENERAL PLEASE SUMMARIZE THE KINDS OF THINGS YOU FOUND

24  DURING THOSE SEARCH WARRANTS.  AND WE'LL START WITH BALCO.

25  **A**   AT BALCO WE FOUND A LOT OF INFORMATION ON THE DISTRIBUTION

1  OF THESE PERFORMANCE-ENHANCING DRUGS TO ELITE ATHLETES.  WE

2  FOUND VIALS WITH THE NAMES OF ATHLETES ON THEM.  INCLUDED IN

3  THE FILES WERE WHAT HAS BEEN REFERRED TO AS DOPING CALENDARS,

4  OR A GO-BY AS TO WHAT DRUGS TO TAKE IN WHAT AMOUNTS ON WHAT

5  DAYS.

6           WE FOUND HUNDREDS OF THESE STEROID TESTS WHERE BALCO

7  HAD TAKEN ATHLETES' URINE AND SENT IT TO QUEST AND DONE A

8  SAMPLE RUN ON IT, WE FOUND INVOICES WITH ATHLETES' NAMES ON

9  THEM, AMOUNTS OF MONEY OWED.  OTHER FINANCIAL DOCUMENTS SHOWING

10 THE RELATIONSHIP BETWEEN BALCO, VICTOR CONTE AND ELITE

11 ATHLETES.  WE FOUND A LOT OF THE DRUGS THEMSELVES.

12          LET ME CLARIFY THAT IN ADDITION TO BALCO, VICTOR

13 CONTE THAT DAY GAVE US CONSENT TO SEARCH A PUBLIC STORAGE

14 LOCKER, ALSO IN BURLINGAME, AND THE STORAGE LOCKER IS WHERE WE

15 FOUND THE MAJORITY OF THE DRUGS AND SOME OF THE ATHLETE FOLDERS

16 CONTAINING THESE ITEMS.

17 **Q**   DID YOU HAVE A CHANCE TO SPEAK TO MR. CONTE ON THE DATE OF

18 THE EXECUTION OF THE SEARCH WARRANT?

19 **A**   YES, I DID.

20 **Q**   DID MR. CONTE AGREE TO ANSWER QUESTIONS YOU POSED TO HIM

21 DURING THE EXECUTION OF THE SEARCH WARRANT?

22 **A**   YES, HE DID.

23 **Q**   IN GENERAL WHAT KINDS OF THINGS DID HE TELL YOU THAT DAY?

24          **THE COURT:**  COULD WE HAVE A SIDEBAR, PLEASE?

25          **MR. NEDROW:**  YES.

1          (SIDEBAR DISCUSSION HELD OUT OF THE HEARING OF THE

2      JURY.)

3          **THE COURT:**  YOU HAVE NO OBJECTION?

4          **MR. BALOGH:**  NO.  HERE'S THE REASON WHY:  OUR VIEW

5  IS THAT BECAUSE THE PROSECUTION IN THEIR OPENING STATEMENT IN

6  THE TRIAL SAID MS. THOMAS WAS A CRITICAL WITNESS IN BOTH THE

7  ABUSE OF PROCESS AND MATERIALITY.  A LOT OF THE STUFF MR. --

8  EXCUSE ME -- AGENT NOVITZKY LEARNED AT THE TIME IS NOT

9  NECESSARILY HEARSAY.  I WANT TO ELICIT IT BECAUSE I WANT A

10  NON-HEARSAY PERSON, WHICH IS THE EFFECT HERE AND THE EFFECT ON

11  HIS INVESTIGATION.  IF HE LEARNED SOMETHING VICTOR CONTE SAID

12  TO HIM, THIS OBVIOUSLY AFFECTED AND GUIDED HIM IN THE DECISION

13  IN HOW TO PROCEED IN HIS INVESTIGATIONS OF PATRICK ARNOLD,

14  MS. THOMAS AND OTHERS.  I'M GOING TO WANT TO GET INTO IT.  FOR

15  THOSE PURPOSES IT'S NOT HEARSAY.

16          I WOULD BE HAPPY FOR THE COURT TO GIVE AN

17  INSTRUCTION WITH REGARD TO HEARSAY, AND I'LL MAKE AN OBJECTION

18  EVERY TIME IT COMES UP.  AND THE GOVERNMENT CAN DO THE SAME

19  THING SO THE RECORD IS CLEAR THIS IS ALL BEING OFFERED FOR

20  NON-HEARSAY PURPOSE, WHICH IS THE EFFECT IT HAD ON AGENT

21  NOVITZKY AND HOW HE AND HIS TEAM DECIDED TO PROCEED AS THEY

22  WENT THROUGH THE INVESTIGATION.

23          THAT'S HOW I WOULD PROPOSE HANDLING IT.  I

24  UNDERSTAND THE COURT'S --

25          **MR. NEDROW:**  I APPRECIATE THE CONCERN, AND I'M

 1  CERTAINLY NOT GOING TO HAVE AGENT NOVITZKY READ MR. CONTE'S

 2  STATEMENT OR MR. VALENTE'S STATEMENTS.

 3          THE DEFENSE ACTUALLY ALREADY ARGUED THAT, FOR

 4  EXAMPLE, THE GOVERNMENT HAD ALL IT NEEDED AFTER IT TALKED TO

 5  MR. CONTE AND MR. VALENTE.  SO, IN PART --

 6          **THE COURT:**  LET ME -- I DON'T MEAN TO CUT YOU OFF.

 7  DO YOU AGREE WITH WHAT MR. BALOGH HAS JUST SAID, IT'S FOR A

 8  NON-HEARSAY PURPOSE THAT IT'S BEING OFFERED?

 9          **MR. NEDROW:**  YES, YOUR HONOR.  I AGREE WITH THAT.

10  MY ONLY THOUGHT WOULD BE IF THE COURT CAN -- I HAVE NO

11  OBJECTION TO THE INSTRUCTION, AND I WOULD LIKE TO DO IT THAT

12  WAY RATHER THAN HAVE US BOTH CONTINUING TO HAVE TO OBJECT.

13          **MR. BALOGH:**  ONCE FOR EVERY TIME WE HAVE HEARSAY

14  FROM A WITNESS, I'LL OBJECT ONCE, AND YOU CAN SAY NON-HEARSAY

15  PURPOSE, AND YOU'LL AGREE WITH IT.  OR THE COURT CAN SAY --

16  WHAT I ACTUALLY PREFER, IF THE COURT GAVE A GENERAL INSTRUCTION

17  TO THE JURY THAT DURING THE COURSE OF THIS EXAMINATION WHAT

18  MR. NOVITZKY LEARNED OR HEARD FROM OTHERS IS TECHNICALLY

19  HEARSAY, AND IT'S NOT BEING ALLOWED IN FOR THAT'S ACTUALLY WHAT

20  HAPPENED, IT'S BEING ALLOWED IN FOR THAT'S WHAT MR. NOVITZKY

21  HEARD AND THE EFFECT IT HAD ON HIM TO HIS INVESTIGATION, IT IS

22  RELEVANT TO THIS TRIAL.  THAT'S THE ONLY REASON.  IT WILL

23  PROTECT ALL THE INTERESTS THAT WANT THIS TESTIMONY, BUT THE

24  UNTOWARD INTERESTS THAT COULD BENEFIT FROM THIS WOULD BE

25  PROTECTED.

1          **THE COURT:**  IS A GENERAL INSTRUCTION OF THAT SORT

2     AGREEABLE TO YOU?

3          **MR. NEDROW:**  I THINK THAT'S FINE FOR NOW AS TO

4     MR. CONTE AND MR. VALENTE, BUT I DON'T BELIEVE HIS

5     INVESTIGATION IS GOING TO HAVE LENGTHY AREA OF ALL THESE OTHER

6     PEOPLE HE TALKED TO.

7          **THE COURT:**  WE'VE ALREADY HAD HEARSAY IN THIS TRIAL

8     THAT I HAVE BEEN A LITTLE WORRIED ABOUT, AND NOW WE ARE

9     PROPOSING TO ENTER INTO VAST FIELDS OF IT.

10         **MR. BALOGH:**  THAT'S WHY I HAVEN'T BEEN OBJECTING.  I

11    DO UNDERSTAND IT HAS TO DO IN THIS CASE WHAT HE LEARNED ABOUT

12    PEOPLE, MILES WERRE, WHAT HE LEARNED ABOUT PATRICK ARNOLD, WHAT

13    HIS OTHER OPTIONS ARE.  SO THE EFFECT IT HAD ON HIM IS VERY

14    IMPORTANT TO OUR DEFENSE.  THAT'S THE NON-HEARSAY PURPOSE.  I

15    DON'T WANT ANY HEARSAY IN.  I DIDN'T WANT TO APPEAR AS I WAS

16    PLAYING BOTH SIDES, SO I DIDN'T OBJECT.

17         OUT OF RESPECT FOR THE GOVERNMENT'S POSITION, WE

18    WERE ONLY GOING TO ELICIT STATEMENTS HE LEARNED FOR NON-HEARSAY

19    PURPOSES.  IT DOESN'T MATTER WHETHER OR NOT MR. CONTE --

20         **THE COURT:**  WAIT.

21         **MR. BALOGH:**  WHETHER MR. NOVITZKY --

22         **THE COURT:**  WHAT I'LL DO, UNLESS EITHER OF YOU

23    OBJECTS TO IT, IS JUST GIVE A GENERAL STATEMENT ABOUT HEARSAY

24    AND SAY THAT'S WHY WE ARE ALLOWING THIS IN.  THEN SHOULD

25    ANYTHING SPECIFIC COME UP THAT EITHER OF YOU WANTS TO HANDLE

1 DIFFERENT, SAY SO AT THAT TIME.

2          **MR. NEDROW:**  GREAT.

3          **MR. BALOGH:**  AND JUST -- I HAVE BEEN DOING MY BEST

4 THROUGHOUT THIS TRIAL; I'M TRYING, TO THE EXTENT WE CAN, AVOID

5 SAYING NAMES.  IT'S JUST WHAT THE INFORMATION IS AND HOW IT

6 AFFECTED HIM IS MORE IMPORTANT THAN THIS ATHLETE OR THAT

7 ATHLETE, BY MY PERSPECTIVE.  I DON'T WANT TO INFRINGE ON

8 MR. NEDROW'S RIGHTS AS HE SEES FIT.

9          **THE COURT:**  THAT'S ONE OF THE THINGS THAT CONCERNS

10 ME.  THERE ARE OTHER CASES PENDING.

11          **MR. NEDROW:**  ABSOLUTELY, YOUR HONOR.  I WANT TO

12 STEER CLEAR OF THAT.

13          THERE IS A SPECIFIC ISSUE THE DEFENSE HAS RAISED WE

14 FEEL WE NEED TO ADDRESS, WHICH IS THE REPEAT FOCUS ON CELEBRITY

15 ATHLETES.  AND, IN FACT, I JUST INTENDED JUST NOW TO ASK AGENT

16 NOVITZKY ABOUT THE FACT THAT THERE ARE NUMEROUS ATHLETES THAT,

17 FRANKLY, ARE NOT THE BARRY BONDS OF THE WORLD THAT WERE A PART

18 OF THIS, AND THAT'S IN DIRECT RESPONSE TO THE TOPIC RAISED BY

19 THE DEFENSE IN BOTH OPENING --

20          **THE COURT:**  THE OBSCURE ATHLETE IN AN OBSCURE SPORT

21 IS WHAT YOU ARE GETTING AT?

22          **MR. NEDROW:**  YES, YOUR HONOR.  THE IDEA IS MAKING

23 SURE IT'S CLEAR IT'S NOT JUST BARRY BONDS.

24          **THE COURT:**  WELL, I PREFER THAT THERE BE AS FEW

25 NAMES USED AS POSSIBLE, INCLUDING THAT ONE.

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page179 of 250

1              **MR. NEDROW:**  FAIR ENOUGH.

2              **THE COURT:**  THE CELEBRITY STATUS QUESTION YOU CAN

3    CERTAINLY GO INTO.  I DON'T THINK WE NEED NAMES.

4              **MR. NEDROW:**  THAT'S FINE.

5              **THE COURT:**  SO, AS I SAY, I'LL GIVE THAT SORT OF

6    GENERAL INSTRUCTION, AND THEN IF EVER EITHER OF YOU FEELS IT

7    NEEDS TO BE ADJUSTED OR CHANGED, LET ME KNOW.

8              **MR. NEDROW:**  THANK YOU VERY MUCH.

9              (END OF SIDEBAR DISCUSSION; PROCEEDINGS RESUMED IN

10             THE HEARING OF THE JURY.)

11             **THE COURT:**  LADIES AND GENTLEMEN, WHAT WE HAVE BEEN

12   TALKING ABOUT AT SIDEBAR IS THE HEARSAY RULE.  THAT'S A RULE OF

13   EVIDENCE THAT LAWYERS AND JUDGES LOVE TO TALK ABOUT.  WE COULD

14   GO ON FOR HOURS, IF YOU LIKE, ABOUT IT.  THERE'S A GENERAL

15   HEARSAY RULE, AND THEN THERE ARE SO MANY EXCEPTIONS THAT IT

16   WOULD MAKE YOUR HEAD SPIN.

17             ONE OF THE QUESTIONS THAT WAS JUST ASKED IS, WHAT

18   DID MR. CONTE TELL YOU, BASICALLY.  THAT GETS US INTO HEARSAY.

19   HEARSAY -- GENERALLY, THE TESTIMONY THAT YOU'RE ALLOWED TO RELY

20   ON IS THE TESTIMONY GIVEN BY A WITNESS UNDER OATH IN YOUR

21   PRESENCE AT TRIAL.  THAT'S TESTIMONY.

22             IF A WITNESS -- IF A WITNESS IS NOT PRESENT TO

23   TESTIFY, IS NOT UNDER OATH, YOU HAVE NO WAY TO EVALUATE THE

24   CREDIBILITY OF THAT PERSON GIVING THE STATEMENT.

25             SO THE HEARSAY RULE GENERALLY SAYS THAT YOU CAN'T

Case3:06-cr-00803-SI  Document145  Filed07/01/08  Page180 of 250

1  BRING IN EVIDENCE OF WHAT SOMEBODY SAID THAT WAS OUT OF COURT

2  AND NOT UNDER OATH.  WE DON'T HAVE ANY WAY TO EVALUATE ITS

3  CREDIBILITY.  BUT THERE ARE, AS I SAY, NUMEROUS EXCEPTIONS, AND

4  THERE ARE PURPOSES FOR WHICH SUCH TESTIMONY MAY BE GIVEN EVEN

5  IF IT'S NOT FOR THE TRUTH.

6          SO THE LAST QUESTION WAS, WHAT DID MR. CONTE TELL

7  YOU.  BUT, OBVIOUSLY, MR. CONTE IS NOT HERE.  HE'S NOT UNDER

8  OATH.  WE DON'T HAVE ANY IDEA IF HE WAS TELLING MR. NOVITZKY

9  THE TRUTH OR NOT.  BUT THE INFORMATION IS BEING ELICITED NOT

10  FOR THE PURPOSE OF WHETHER IT WAS TRUE OR NOT, BUT TO

11  DEMONSTRATE WHAT MR. NOVITZKY KNEW AND WHAT HE WAS TOLD AND WHY

12  HE, THEREFORE, DID THE OTHER THINGS HE DID IN CONNECTION WITH

13  HIS INVESTIGATION.

14          SO IT'S NOT BEING OFFERED TO SHOW WHAT MR. CONTE

15  SAID WAS TRUE, BUT, RATHER, TO EXPLAIN MR. NOVITZKY'S ACTIONS.

16  SO I'M ALLOWING THIS LINE OF QUESTIONING WITH THAT LIMITATION.

17  AND TO THE EXTENT THAT OTHER QUESTIONS ARE ASKED OF THIS

18  WITNESS ABOUT WHAT PEOPLE TOLD HIM, OR WHAT HE READ, OR OTHER

19  INFORMATION HE GOT FROM SOURCES THAT ARE NOT HERE UNDER OATH IN

20  YOUR PRESENCE, IT'S BEING OFFERED NOT FOR THE TRUTH OF THOSE

21  THINGS, BUT, RATHER, TO SHOW WHY HE DID WHAT HE DID AND TO

22  INFORM HIS INVESTIGATION.

23          SO WITH THAT LIMITATION, I'M GOING TO ALLOW THESE

24  QUESTIONS TO GO FORWARD.

25          ALL RIGHT, MR. NEDROW.

1      **MR. NEDROW:**  THANK YOU, VERY MUCH.  YOUR HONOR.

2    **BY MR. NEDROW**

3    **Q**   MAYBE TO FOLLOW UP VERY QUICKLY ON THAT TOPIC THE COURT HAS

4    SPOKE ABOUT BEFORE WE GO FORWARD, DID THE STATEMENT MR. CONTE

5    PROVIDED YOU INFLUENCE YOU IN TERMS OF THE COURSE OF YOUR

6    INVESTIGATION?

7    **A**   YES.

8    **Q**   IN GENERAL, WHEN YOU ARE DOING AN INVESTIGATION AND SOMEONE

9    GIVES A STATEMENT WHO APPEARS TO BE INVOLVED IN THE ACTIVITY,

10   IS THAT THE KIND OF THING THAT PLAYS A ROLE IN THE SUBSEQUENT

11   DECISIONS YOU MAKE AS TO THE COURSE OF AN INVESTIGATION?

12   **A**   YES.

13   **Q**   FOR THE NEXT COUPLE OF QUESTIONS, PLEASE DON'T NAME THE

14   NAMES OF ANY ATHLETES INVOLVED WITH BALCO.  DO YOU UNDERSTAND

15   THAT?

16   **A**   YES, I DO.

17   **Q**   BUT WHAT I WOULD LIKE TO ASK YOU IS THIS:  DID MR. CONTE

18   GENERALLY PROVIDE STATEMENTS AS TO THE KINDS OF ACTIVITIES HE

19   WAS ENGAGED IN THAT PERTAINED TO THE SUBJECT MATTER YOU WERE

20   INTERESTED IN INVESTIGATING?

21   **A**   YES, HE DID.

22   **Q**   WITHOUT NAMING THE ATHLETES' NAMES FOR THIS QUESTION IN ANY

23   WAY, PLEASE ANSWER THAT.

24   **A**   HE GENERALLY TOLD ME THAT HE DISTRIBUTED TWO SUBSTANCES.

25   SUBSTANCE HE REFERRED TO "THE CLEAR," WHICH HE SAID THE

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page182 of 250

1   ANABOLIC-LIKE PROPERTIES BUT HE DIDN'T REALLY KNOW WHAT IT WAS,

2   AND A SUBSTANCE CALLED "THE CREAM," WHICH HE SAID WAS

3   TESTOSTERONE-BASED, CONTAINED TESTOSTERONE, AND THAT HE KNEW IT

4   WAS ILLEGAL TO DISTRIBUTE.

5   **Q**   DID HE TELL YOU WHERE HE WAS GETTING "THE CLEAR" FROM?

6   **A**   YES, HE DID.

7   **Q**   AND WHAT DID HE TELL YOU ABOUT THAT?

8   **A**   HE SAID HE WAS GETTING "THE CLEAR" FROM AN INDIVIDUAL BY

9   THE NAME OF PATRICK ARNOLD.

10  **Q**   AND WAS THE CLEAR A SUBSTANCE THAT SUBSEQUENTLY HAS BECOME

11  KNOWN BY ANOTHER NAME?

12  **A**   SEVERAL NAMES, CORRECT.

13  **Q**   WHY DON'T YOU LIST THE OTHER NAMES THAT "THE CLEAR" IS

14  ASSOCIATED WITH, JUST TO AVOID CONFUSION?

15  **A**   THE NICKNAME "THE CLEAR" HAS BEEN ASSOCIATED WITH

16  NORBOLETHONE, THG AND DMT, THE THREE DESIGNER STEROIDS THAT

17  PATRICK ARNOLD PLED GUILTY TO MANUFACTURING.

18  **Q**   NOW, IF YOU COULD CLARIFY A LITTLE BIT, THOSE ARE ACTUALLY

19  THREE SEPARATE SUBSTANCES, TO YOUR UNDERSTANDING, CORRECT?

20  **A**   CORRECT.

21  **Q**   DO YOU HAVE AN UNDERSTANDING FROM THE INVESTIGATION WHERE

22  THE TERM "THE CLEAR" CAME FROM?

23  **A**   I BELIEVE -- MY RECOLLECTION IS IT CAME FROM VICTOR CONTE.

24  IT WAS SOMETHING HE MADE UP.

25  **Q**   AND SO IS YOUR UNDERSTANDING IT WAS LOOSELY APPLIED TO BOTH

1  NORBOLETHONE AND THG?

2  **A**   CORRECT.  I HAVE A RECOLLECTION OF EVIDENCE OF THERE BEING

3  DIFFERENT VERSIONS OF THE CLEAR.  I DON'T KNOW WHETHER IT WAS

4  AN E-MAIL OR STATEMENT MADE TO ME.

5  **Q**   OKAY.  DID YOU SPEAK —— AND, AGAIN, AT THIS POINT NO

6  ATHLETE NAMES, BUT DID YOU SPEAK WITH MR. CONTE ABOUT THE

7  ATHLETES WITH WHOM HE WAS WORKING?

8  **A**   YES.

9  **Q**   AND WITHOUT NAMING NAMES, PLEASE DESCRIBE WHAT HE

10  ACKNOWLEDGED AS TO THE ATHLETES YOU ASKED HIM ABOUT.

11  **A**   HE TOLD ME HE WAS DISTRIBUTING THE CLEAR AND THE CREAM TO

12  THEM.

13  **Q**   WERE ALL OF THOSE ATHLETES VERY FAMOUS MULTIMILLIONAIRE

14  ATHLETES?

15  **A**   NO.

16  **Q**   WITHOUT NAMING NAMES, ELABORATE FOR US A LITTLE BIT ON THE

17  SPORTS AND THE LIFESTYLES YOU CAME TO UNDERSTAND BEING LED BY

18  SOME OF THESE OTHER ATHLETES WITH WHOM MR. CONTE WAS WORKING.

19  **A**   THE MAJORITY OF ATHLETES WERE FROM THE SPORT OF TRACK AND

20  FIELD, BUT THERE WERE ATHLETES FROM VARIOUS SPORTS.  BASEBALL,

21  FOOTBALL.  AND IT RANGED FROM SOME OF THE MOST WELL-KNOWN AND

22  FAMOUS ATHLETES IN THE WORLD TO ATHLETES THAT, WERE IT NOT FOR

23  MY INVOLVEMENT IN THE INVESTIGATION AND BEING A SPORTS FAN

24  MYSELF, I WOULDN'T HAVE PROBABLY RECOGNIZED.

25  **Q**   THAT, AGAIN, INCLUDED EVEN ATHLETES FROM THE BIG SPORTS OF

1  FOOTBALL AND BASEBALL?

2  **A**   CORRECT.

3  **Q**   NOW LET'S TURN TO JAMES VALENTE.  WHO IS JAMES VALENTE IN

4  THIS INVESTIGATION?

5  **A**   JAMES VALENTE WAS THE VICE PRESIDENT OF BALCO, AND HE WAS

6  REFERRED TO AS VICTOR CONTE'S RIGHT-HAND MAN BY SEVERAL

7  INDIVIDUALS IN THIS INVESTIGATION.

8  **Q**   DID HIS STATEMENT ALSO PLAY A ROLE IN PROVIDING WITH

9  INFORMATION THAT HELPED DICTATE THE COURSE OF YOUR

10 INVESTIGATION?

11 **A**   YES.

12 **Q**   AND, AGAIN WITHOUT NAMING ANY ATHLETES, PLEASE SUMMARIZE

13 YOUR DISCUSSION WITH HIM AS TO BALCO'S ACTIVITIES AND WHAT IT

14 WAS DOING WITH HIS CLIENTS.

15 **A**   ALONG THE SAME LINES AS THE STATEMENT BY VICTOR CONTE THAT

16 BALCO DISTRIBUTED A CLEAR AND A CREAM TO PROFESSIONAL ATHLETES,

17 THAT THE CLEAR WAS SOMEWHAT OF AN UNKNOWN SUBSTANCE THAT HAD

18 ANABOLIC OR STEROID-LIKE PROPERTIES, AND THE CREAM CONTAINED

19 TESTOSTERONE.

20 **Q**   DID MR. VALENTE ALSO PROVIDE, SEPARATE FROM MR. CONTE, AS

21 TO HIS UNDERSTANDING OF WHERE THE CLEAR WAS COMING FROM?

22 **A**   YES.

23 **Q**   AND WHAT DID HE TELL YOU?

24 **A**   HE INDICATED ALSO THAT IT WAS HIS UNDERSTANDING IT CAME

25 FROM PATRICK ARNOLD.

1  Q   DID YOU ALSO INTERVIEW GREG ANDERSON IN CONNECTION WITH

2  THIS INVESTIGATION ON SEPTEMBER 3RD, 2003?

3  A   YES, I DID.

4  Q   TELL US BRIEFLY HOW YOU WENT FROM BALCO TO ENCOUNTER

5  MR. ANDERSON THAT NIGHT, JUST AN INVESTIGATIVE MATTER,

6  SUMMARIZING HOW YOU GOT TO GREG ANDERSON.

7  A   THAT DAY INITIALLY WE HAD JUST SEARCH WARRANTS FOR BALCO,

8  VICTOR CONTE'S RESIDENCE, AND THE PRIVATE MAILBOXES.  DURING

9  THE COURSE OF THE BALCO SEARCH WARRANT, I INTERVIEWED VICTOR

10 CONTE AND JAMES VALENTE.  BOTH OF THEM PROVIDED ME WITH

11 INFORMATION THAT GREG ANDERSON WAS GETTING SOME OF THEIR

12 PRODUCTS AND FURTHER SUBDISTRIBUTING IT TO BASEBALL PLAYERS IN

13 PARTICULAR.

14      WE TOOK THOSE STATEMENTS.  I RELAYED IT TO AN AGENT

15 DOWN IN SAN JOSE WHO AUTHORED ANOTHER SEARCH WARRANT AFFIDAVIT.

16 AND LATER IN THE AFTERNOON OF SEPTEMBER 3, 2003, A JUDGE IN SAN

17 JOSE SIGNED OFF ON A SEARCH WARRANT FOR THE PERSONAL RESIDENCE

18 OF GREG ANDERSON.

19 Q   AND YOU EXECUTED THAT WARRANT ON MR. ANDERSON'S RESIDENCE

20 THAT EVENING?

21 A   CORRECT.

22 Q   WHAT KINDS OF THINGS IN GENERAL DID YOU FIND AT

23 MR. ANDERSON'S, AGAIN WITHOUT NAMING ANY ATHLETE NAMES?

24 A   PERFORMANCE-ENHANCING DRUGS, VIALS WITH ATHLETES' NAMES ON

25 THEM, DOPING CALENDARS WITHIN THE FILES, INVOICES, LARGE AMOUNT

1   OF CURRENCY, CASE WITH THE CURRENCY THAT -- SOME OF IT WAS FROM

2   SOME OF THESE ATHLETES.

3   **Q**   DID MR. ANDERSON PROVIDE A STATEMENT TO YOU AS WELL?

4   **A**   YES, HE DID.

5   **Q**   DID IT IMPACT THE COURSE OF YOUR INVESTIGATION?

6   **A**   YES.

7   **Q**   AND WITHOUT NAMING ATHLETE NAMES, PLEASE DESCRIBE IN

8   GENERAL THE TYPES OF THINGS MR. ANDERSON TOLD YOU HE WAS DOING.

9   **A**   HE AS WELL INDICATED THAT HE WAS DISTRIBUTING THE CLEAR AND

10  THE CREAM.  HE ALSO STATED THAT HE WAS DISTRIBUTING SOME

11  TRADITIONAL ANABOLIC STEROIDS, SO ANABOLIC STEROIDS YOU WOULD

12  GET FROM A PHARMACY THAT WERE MADE BY PHARMACEUTICAL COMPANIES.

13  **Q**   DID MR. ANDERSON PROVIDE YOU WITH ANY STATEMENT THAT HE

14  KNEW ABOUT WHERE THE CLEAR WAS COMING FROM?

15  **A**   NO.

16  **Q**   AND I GUESS I SHOULD CLARIFY, DID HE -- WHEN I SAY "COMING

17  FROM," EITHER MR. CONTE OR MR. ARNOLD?

18  **A**   YES, HE DID INDICATE THAT HE WAS GETTING CLEAR FROM

19  MR. CONTE, BUT HE DID NOT GIVE AN INDICATION THAT MR. CONTE WAS

20  THE MANUFACTURER OR WHERE MR. CONTE WAS GETTING IT FROM.

21  **Q**   DID MR. ANDERSON TELL YOU HE THOUGHT OR KNEW PATRICK ARNOLD

22  WAS THE MANUFACTURER OF THE CLEAR?

23  **A**   NO.

24             **THE COURT:**  MR. NEDROW, WHENEVER YOU REACH A

25  CONVENIENT SPOT, WE'LL TAKE A BRIEF BREAK.

1      **MR. NEDROW:**  IT'S A PERFECT TIME.  THANK YOU VERY

2  MUCH.

3      **THE COURT:**  LADIES AND GENTLEMEN, IF YOU'LL BE READY

4  TO COME BACK, PLEASE, AT 20 MINUTES AFTER 2:00.  IN THE

5  MEANTIME DON'T SPEAK WITH EACH OTHER OR ANYONE ELSE ABOUT THE

6  CASE.  DON'T MAKE UP YOUR MINDS.  YOU HAVEN'T HEARD ALL THE

7  EVIDENCE YET.

8      (RECESS TAKEN.)

9      **THE COURT:**  WELCOME BACK, LADIES AND GENTLEMEN.  YOU

10  MAY BE SEATED.

11      MR. NEDROW, YOU MAY PROCEED.

12      **MR. NEDROW:**  YES.  THANK YOU, YOUR HONOR.

13  **BY MR. NEDROW**

14  **Q**   AGENT NOVITZKY, WE LEFT OFF AFTER YOU HAD DESCRIBED

15  CONDUCTED INTERVIEWS WITH MR. CONTE, MR. VALENTE AND

16  MR. ANDERSON.  DO YOU RECALL THAT?

17  **A**   YES.

18  **Q**   AFTER EXECUTING THE SEARCH WARRANT, DID YOU EVALUATE THE

19  ITEMS SEIZED FROM BALCO AND THE OTHER LOCATIONS SEARCHED?

20  **A**   YES.

21  **Q**   DID YOU FIND -- SETTING ASIDE THE DRUGS, MAYBE YOU COULD

22  SUMMARIZE THE TYPES OF DOCUMENTS YOU FOUND THAT WERE PERTINENT

23  TO YOUR INVESTIGATION.

24  **A**   THERE WERE HUNDREDS OF THEM, AND I TALKED ABOUT THEM

25  PREVIOUSLY.  BUT DOPING CALENDARS, INVOICES, FINANCIAL

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page188 of 250

1  DOCUMENTS, HANDWRITTEN INVOICES WITH THE ATHLETES' NAMES ON

2  THEM, E-MAIL CORRESPONDENCE.

3          WE HAD SEVERAL COMPUTERS WHOSE HARD DRIVES WERE

4  IMAGED BY A COMPUTER INVESTIGATIVE SPECIALIST, BROUGHT BACK TO

5  OUR OFFICE, AND FORENSIC WORK WAS DONE ON THE HARD DRIVES TO

6  RETRIEVE WHAT WAS ON THERE.  THERE WERE A COUPLE OF COMPUTERS

7  WITH QUITE EXTENSIVE E-MAIL COMMUNICATION, MUCH OF IT BACK AND

8  FORTH BETWEEN VICTOR CONTE AND THE ATHLETES.

9  **Q**   DID YOU PERSONALLY PICK UP EVERY PIECE OF PAPER AND

10  DOWNLOAD EVERY SINGLE E-MAIL FROM THE SEARCH AT BALCO?

11  **A**   NO.  AS A MATTER OF FACT, I DIDN'T DO ANY OF THAT DURING

12  THE SEARCH OF BALCO.

13  **Q**   WHY NOT?

14  **A**   I WAS INTERVIEWING INDIVIDUALS.  I INTERVIEWED VICTOR CONTE

15  AND THEN JAMES VALENTE.

16  **Q**   DESCRIBE FOR US HOW YOUR AGENCY WORKS, THE PROCESS OF

17  CONDUCTING A SEARCH OF A BUSINESS PREMISES SUCH AS BALCO.

18  **A**   WELL, TYPICALLY, THE CASE AGENT OR THE INVESTIGATING AGENT,

19  WHICH WAS ME IN THIS CASE, WILL BE FREE FROM OTHER DUTIES

20  RELATIVE TO THE ACTUAL SEARCHING DURING SEARCH WARRANT.  IN

21  MANY INSTANCES IT'S TO DO INTERVIEWS.  IN OTHER INSTANCES IT'S

22  TO CONTACT OTHERS ON THE PHONE OR KIND OF WANDER AROUND AND

23  MAKE SURE CERTAIN AREAS ARE LOOKED AT AND CERTAIN THINGS ARE

24  TAKEN.  IF THERE'S ANY QUESTIONS.

25          IN THIS CASE MY DUTY WAS TO ATTEMPT TO INTERVIEW

1  VICTOR CONTE AND JAMES VALENTE.  SO, OBVIOUSLY, I DIDN'T HAVE

2  TIME TO CONDUCT ANY OTHER ASPECTS OF THE SEARCH.

3  **Q**    DESCRIBE HOW BIG THE BALCO PREMISES WAS.

4  **A**    IT WAS FAIRLY SIGNIFICANT.  I WOULD ESTIMATE THAT THERE WAS

5  ON THE BOTTOM FLOOR EIGHT OR NINE ROOMS; A COUPLE OF OFFICES,

6  SOME LAB EQUIPMENT IN ONE ROOM.  THERE WAS QUITE A BIG WEIGHT

7  ROOM IN THE BACK OF BALCO WITH SOME PRETTY IMPRESSIVE WEIGHTS.

8  JERSEYS OF ATHLETES HANGING ON THE WALL ALL OVER THE PLACE IN

9  THE WEIGHT ROOM.  THEN THERE WAS AN UPSTAIRS STORAGE AREA WITH

10 A BUNCH OF BOXES, INCLUDING DOCUMENTS IN THE BOXES.

11 **Q**    APPROXIMATELY HOW MANY AGENTS WERE INVOLVED IN CONDUCTING

12 THE SEARCH OF THE PREMISES ON THAT DAY?

13 **A**    I THINK APPROXIMATELY 20.

14 **Q**    WAS THAT AN ABNORMAL NUMBER FOR BUSINESS PREMISES OF THIS

15 SIZE?

16 **A**    NO.

17 **Q**    AND ASIDE FROM SEIZING ALL THE DOCUMENTS, WERE THERE OTHER

18 REASONS WHY A RELATIVELY LARGE NUMBER OF AGENTS IS NECESSARY TO

19 EXECUTE A SEARCH OF BUSINESS SUCH AS THIS?

20 **A**    WELL, SAFETY IS TAKEN INTO CONSIDERATION WHEN YOU EXECUTE

21 SEARCH WARRANTS, YOU KNOW.  OBVIOUSLY, YOU ARE GOING INTO

22 SOMEWHAT OF AN UNKNOWN TERRITORY, ESPECIALLY IN INSTANCES WHERE

23 YOU ARE TALKING ABOUT DRUG DISTRIBUTION.  SO, YOU KNOW, THERE

24 WAS DEFINITELY ENOUGH AGENTS TO COVER ALL OF THE ROOMS, YOU

25 KNOW, IN A PRETTY QUICK TIME PERIOD.

1  Q    WERE THERE ALSO AGENTS ASSIGNED TO SPECIFIC SUBTASKS

2  PERTAINING TO SEARCHING CERTAIN TYPES OF MEDIA OR CERTAIN

3  AREAS, THINGS OF THAT SORT?

4  A    THERE WERE -- THERE ARE A FEW COMPUTER INVESTIGATIVE

5  SPECIALISTS WHOSE SOLE JOB WAS TO LOOK AT THE COMPUTERS,

6  DETERMINE IF WE WERE GOING TO IMAGE THE HARD DRIVES, IN WHICH

7  WE DID IN SEVERAL CASES DURING BALCO.

8  Q    DO YOU KNOW AN IRS AGENT NAMED WENDY BERGLAND?

9  A    YES, I DO.

10  Q    WAS SHE INVOLVED IN THE SEARCH THAT DAY?

11  A    YES, SHE WAS.

12  Q    WHAT WAS HER INVOLVEMENT THAT DAY?

13  A    HER ROLE WAS THE TEAM LEADER.  AS A TEAM LEADER, AS SHE

14  TESTIFIED EARLIER THIS WEEK, SHE PREPARED THE BRIEFING SHEET

15  FOR THE WARRANT.  SHE PREPARED THE OPERATION PLAN.  AND DURING

16  ACTUAL EXECUTION OF WARRANT, BECAUSE I WAS TIED UP, IT WAS HER

17  JOB TO ROAM THE WARRANT LOCATION, TO BE NOTIFIED BY SEARCHING

18  AGENTS OF ITEMS THEY THOUGHT FIT UNDER THE SCOPE OF THE

19  WARRANT.

20          AGENT BERGLAND WOULD THEN COME OVER, EXAMINE

21  WHATEVER THE FINDING AGENT THOUGHT WAS WITHIN THE SCOPE, AND

22  MAKE A DECISION ON WHETHER OR NOT TO SEIZE THE ITEM.

23  Q    UNDER HER AUTHORITY WERE A NUMBER OF ITEMS SEIZED?

24  A    YES.

25  Q    AND WHAT TYPES OF ITEMS WERE SEIZED AT AGENT BERGLAND'S

1 DIRECTION AND UNDER HER AUTHORITY?

2 **A**   AGAIN, A LOT OF THE THINGS I TALKED ABOUT, DOCUMENTS,

3 IMAGES OF COMPUTER HARD DRIVES, DRUGS.

4 **Q**   I WOULD LIKE TO CALL YOUR ATTENTION TO EXHIBIT 18, WHICH IS

5 ACTUALLY IN EVIDENCE.

6          AND, ACTUALLY, MAY I APPROACH, YOUR HONOR?

7          **THE COURT:**  YOU MAY.

8          **MR. NEDROW:**  I'LL BRIEFLY DISPLAY THIS TO THE JURY

9 USING A DIFFERENT TECHNOLOGY NOW, WHICH IS -- I'M SORRY.  18,

10 YES, 18, WHICH IS THIS OVERHEAD.  AND IF THE JURY WILL BEAR

11 WITH ME, IT'S UP ON THE SCREEN.  THAT'S GOOD.

12          (DOCUMENT DISPLAYED.)

13 **BY MR. NEDROW**

14 **Q**   AGENT NOVITZKY, DO YOU RECOGNIZE THE IMAGE ON THE SCREEN?

15 **A**   YES.

16 **Q**   WHAT DOES THAT IMAGE REPRESENT?  WHAT DOES IT REPRESENT?

17 **A**   THIS IS A PHOTO OF A GROUP OF DOCUMENTS THAT WAS TAKEN AS

18 AN ITEM FROM THE SEARCH WARRANT AT BALCO LABORATORIES.

19 **Q**   DO YOU ACTUALLY PERSONALLY RECALL GOING THROUGH THIS BOX OF

20 DOCUMENTS?

21 **A**   NOT AT BALCO LABORATORIES, BUT AFTER IT WAS TAKEN OFF THE

22 PREMISES, AS AGENT BERGLAND TESTIFIED TO, SHE PUT IT IN MY

23 SECURE OFFICE AREA IN SAN JOSE, AND I WAS ABLE TO MATCH UP THE

24 BOX BECAUSE IT HAD A LABEL ON IT WITH THIS PICTURE.  THAT'S HOW

25 I KNOW THAT THE ITEMS IN THAT BOX CAME FROM THE ITEMS DEPICTED

1    IN THIS PICTURE.

2    **Q**    THANK YOU FOR THE CLARIFICATION.

3            NOT AT BALCO, BUT AT YOUR OFFICE AFTER THEY HAVE

4    BEEN TRANSPORTED, YOU WENT THROUGH THIS BOX OF DOCUMENTS,

5    CORRECT?

6    **A**    YES, I DID.

7    **Q**    AND I WOULD LIKE TO CALL YOUR ATTENTION TO GOVERNMENT'S

8    EXHIBIT 16 WHICH IS BEFORE YOU.  IT'S BEEN MARKED, BUT IT'S NOT

9    BEEN PUBLISHED TO THE JURY.  DO YOU HAVE EXHIBIT 16 BEFORE YOU,

10   AGENT NOVITZKY?

11   **A**    YES, I DO.

12   **Q**    AND JUST DESCRIBE WHAT EXHIBIT 16 IS.

13   **A**    EXHIBIT 16 IS A SEVEN-PAGE DOCUMENT THAT WAS LOCATED WITHIN

14   THE BOX OR LOCATED WITHIN THE SERIES OF DOCUMENTS DEPICTED IN

15   THE PICTURE THAT WAS JUST UP.

16   **Q**    AND AT SOME POINT IN GOING THROUGH THE BOX DEPICTED IN

17   EXHIBIT 18, DID YOU ENCOUNTER THIS DOCUMENT?

18   **A**    YES, I FOUND THESE WITHIN THOSE DOCUMENTS.

19   **Q**    OKAY.  AND A COPY FOR YOU IS THAT ORIGINAL DOCUMENT YOU

20   SEIZED -- AGAIN, THAT YOU SEIZED IN THE SEARCH THAT DAY THAT

21   YOU PULLED OUT OF THE BOX, CORRECT?

22   **A**    YES.

23           **MR. NEDROW:**  YOUR HONOR, THE GOVERNMENT WOULD MOVE

24   IN EXHIBIT 16 AT THIS TIME AS EVIDENCE.

25           **MR. BALOGH:**  NO OBJECTION.

1          **THE COURT:**  THANK YOU.  IT WILL BE RECEIVED.

2          (GOVERNMENT'S EXHIBIT 16 RECEIVED IN EVIDENCE.)

3          **MR. NEDROW:**  YOUR HONOR, IF I MAY, I'M GOING TO

4    PUBLISH IT TO THE JURY.

5          **THE COURT:**  YOU MAY.

6          (DOCUMENT DISPLAYED.)

7    **BY MR. NEDROW**

8    **Q**   AGENT NOVITZKY, I'M GOING TO PUBLISH EXHIBIT 16, AND WE'LL

9    TALK ABOUT A FEW DIFFERENT COMPONENTS OF THIS.  LET'S START

10   WITH THE TOP PART OF EXHIBIT 16.

11          BASED ON WHAT YOU KNOW NOW, THE OVERALL

12   INVESTIGATION IN THIS CASE, DO YOU KNOW WHAT THE HEADER OF THIS

13   DOCUMENT REPRESENTS?

14   **A**   YES.

15   **Q**   WHAT IS THAT?

16   **A**   THE BUSINESS NAME OF THE BUSINESS ASSOCIATED WITH PATRICK

17   ARNOLD.

18   **Q**   AND WHAT'S THE DATE AND TIME OF THE FAX INDICATION ON THE

19   HEADER?

20   **A**   MAY 1ST, 2002, AT 3:32 P.M.

21   **Q**   THERE'S A FAX NUMBER JUST TO THE RIGHT OF THAT HEADER; DO

22   YOU SEE THAT?

23   **A**   YES, I DO.

24   **Q**   WHAT'S INDICATED ON THE DOCUMENT BELOW THE LPJ RESEARCH

25   HEADER THAT YOU JUST DESCRIBED?  THERE WE GO.  WHY DON'T YOU

1   TELL US?  AND I'LL TRY TO FOCUS BETTER.  CAN YOU READ THE

2   HEADER BELOW LPJ RESEARCH?

3   **A**   YES, I CAN.

4   **Q**   AND WHAT DOES THAT SAY?

5   **A**   IT'S ANOTHER FAX HEADER.  IT SAYS, "FROM USOC ATHLETE

6   CENTER,' AND IT'S DATED APRIL 12TH, 2002.  THERE'S A NUMBER

7   WITH A 719 AREA CODE, WHICH I KNOW TO BE AN AREA CODE FROM

8   COLORADO SPRINGS, COLORADO.

9   **Q**   HAD YOU BECOME FAMILIAR WITH WHAT THE USOC ATHLETE CENTER

10  IS IN THIS INVESTIGATION?

11  **A**   YES.

12  **Q**   JUST GENERALLY WHAT IS THAT?

13  **A**   UNITED STATES OLYMPIC COMMITTEE ATHLETE CENTER.  IT'S A

14  TRAINING CENTER WHERE ATHLETES OFTEN RESIDE AND TRAIN FOR

15  OLYMPIC SPORTS.

16  **Q**   NOW LET'S GO LOWER ON THIS DOCUMENT.  WHAT'S CONTAINED

17  UNDER THE WORDS "CONFIDENTIAL" AND "DOCUMENTATION"?  CAN YOU

18  JUST TAKE US THROUGH THE INFORMATION BELOW THE WORD

19  "DOCUMENTATION" ON THIS DOCUMENT?

20  **A**   SURE.  IT INDICATES A DATE OF SAMPLE COLLECTION OF

21  MARCH 14TH, 2002.  IT HAS USADA SAMPLE CODE NUMBER OF 462019

22  AND THE UCLA CODE OF URA05.  IT THEN INDICATES SUBSTANCE

23  IDENTIFIED AS NORBOLETHONE.

24  **Q**   NOW THAT NUMBER CODE URA05 IS LINKED TO EXHIBIT 11 THAT'S

25  BEEN DISCUSSED IN THIS CASE; IS THAT CORRECT?

1  **A**   RIGHT.

2  **Q**   AND ARE YOU FAMILIAR WITH WHAT THAT SAMPLE CODE NUMBER

3  REPRESENTS?

4  **A**   YES.

5  **Q**   WHAT DOES IT REPRESENT?

6  **A**   IT REPRESENTS A SAMPLE TAKEN FROM TAMMY THOMAS.

7  **Q**   AND BASED ON EXHIBIT 11, HOW IS THAT CODE ASSIGNED TO THIS

8  SAMPLE FROM TAMMY THOMAS?

9  **A**   URA05?

10  **Q**   YES, YES.  I'M SORRY.  HOW WAS IT ASSIGNED?  WAS IT

11  ASSIGNED BY TAMMY THOMAS OR BY SOME OTHER ORGANIZATION?  DO YOU

12  GENERALLY KNOW HOW THAT NUMBER WAS ASSIGNED IT TO?

13            **MR. BALOGH:**  OBJECTION.  FOUNDATION.

14            **THE COURT:**  SUSTAINED.

15            **MR. NEDROW:**  I'LL MOVE ON TO A DIFFERENT TOPIC.

16  THAT'S FINE.

17  **BY MR. NEDROW**

18  **Q**   LET ME ASK THIS, THOUGH:  WHAT'S LISTED AS THE ORGANIZATION

19  REQUESTING THE TEST?

20  **A**   USADA.

21  **Q**   AND THAT'S THE U.S. ANTIDOPING AGENCY.

22  **A**   CORRECT.

23  **Q**   OKAY.  LET'S GO DOWN THE DOCUMENT, AND, ACTUALLY, LET'S

24  NOT -- LET'S JUST HAVE YOU SUMMARIZE PORTIONS OF THIS DOCUMENT.

25            WHAT IS ON THE SUCCEEDING PAGES AFTER THE COVER

1   PAGE?

2   **A**   THESE GRAPHS THAT PREVIOUS WITNESSES TODAY TESTIFIED ABOUT.

3   **Q**   WELL, TO BE CLEAR, THERE'S BEEN TESTIMONY ABOUT SOME

4   CHROMATOGRAPHS TODAY, CORRECT?

5   **A**   CORRECT.

6   **Q**   HAS THERE BEEN TESTIMONY TODAY ABOUT THESE EXACT

7   CHROMATOGRAPHS?

8   **A**   NO.  IN GENERAL, THE SAME TYPE OF GRAPHS THAT WERE

9   TESTIFIED TO TODAY.

10  **Q**   THANK YOU.

11          AND, OF COURSE, YOU ARE NOT A SCIENTIST, CORRECT,

12  SIR?

13  **A**   NO, I'M NOT.

14  **Q**   YOU ARE NOT A CHEMIST?

15  **A**   NO.

16  **Q**   BUT YOU HAVE BECOME FAMILIAR IN THIS INVESTIGATION WITH

17  ASPECTS OF HOW DRUG TESTERS TEST URINE SAMPLES FOR DRUGS,

18  CORRECT?

19  **A**   CORRECT.

20  **Q**   AND IN GENERAL WHAT KINDS OF TECHNIQUES DO THEY USE TO TRY

21  TO TEST DRUGS -- I MEAN TEST URINE SAMPLES FOR DRUGS?

22  **A**   MASS SPECTROMETERS, GAS CHROMATOGRAMS.

23  **Q**   ALL RIGHT.  LET'S MOVE ON FROM THIS DOCUMENT TO ASK YOU

24  ABOUT WHERE THE INVESTIGATION WENT AFTER SEPTEMBER 3RD.

25          AFTER YOU EVALUATED STATEMENTS OF WITNESSES AND

1   EVIDENCE SEIZED AT THE SEARCHES, DID YOU MAKE OTHER DECISIONS

2   ABOUT THE COURSE OF THE INVESTIGATION?

3   **A**   YES.

4   **Q**   AND WHAT WAS THE NEXT TECHNIQUE YOU THOUGHT TO USE IN TERMS

5   OF PURSUING THE INVESTIGATION?

6   **A**   THE NEXT PORTION OF THE INVESTIGATION INVOLVED THE

7   SUBPOENAING OF ATHLETES BEFORE A FEDERAL GRAND JURY TO HELP US

8   EXPLAIN WHAT WE HAD FOUND AT BALCO LABORATORIES AND VARIOUS

9   OTHER LOCATIONS.

10  **Q**   BEFORE I PROCEED, I'VE FALLEN INTO A TRAP THE EXAMINER

11  CURED AS WELL.  I USED THE TERM GAS CHROMATOGRAPHY.  DID YOU

12  HEAR ME SAY THAT A MOMENT AGO?

13  **A**   I THINK I SAID IT AS WELL.

14  **Q**   DOES UCLA USE GAS OR LIQUID CHROMATOGRAPHY; DO YOU KNOW?

15  **A**   I'M NOT SURE.

16  **Q**   OKAY.  LET'S GO BACK TO THE TOPIC OF THE SUBPOENAS.  WHY

17  DID YOU WANT TO SUBPOENA ATHLETES TO PROVIDE INFORMATION ABOUT

18  THE RELATIONSHIP WITH BALCO?

19  **A**   WELL, WE HAD THESE DOCUMENTS BUT NOBODY TO EXPLAIN WHO THEY

20  WERE.  VICTOR CONTE AND JAMES VALENTE, WHO SUBMITTED TO AN

21  INTERVIEW THE DAY OF THE SEARCH WARRANT, AND VICTOR CONTE WHOM

22  I SPOKE WITH THE DAY AFTER THE SEARCH WARRANT, SHORT TIME

23  THEREAFTER RETAINED ATTORNEYS.  THEIR ATTORNEYS CONTACTED ME

24  AND SAID THEY WOULD NO LONGER BE TALKING WITH ME AND ANYTHING

25  FURTHER NEEDED TO GO THROUGH THE ATTORNEYS AND THEY WEREN'T

1   INTERESTED IN PROVIDING ANY MORE INFORMATION.

2   Q   I'M SORRY.  LET ME INTERRUPT YOU TO FOLLOW UP ON THAT

3   ISSUE.

4           SO THE DATE OF THE SEARCH, MR. CONTE, MR. VALENTE

5   AND MR. ANDERSON PROVIDED YOU WITH STATEMENTS, CORRECT?

6           **MR. BALOGH:**  OBJECTION.  LEADING.

7           **THE COURT:**  OVERRULED BECAUSE IT'S FOUNDATIONAL.

8           **MR. NEDROW:**  THANK YOU, YOUR HONOR.

9           **THE COURT:**  YOU CAN ANSWER.

10          **MR. NEDROW:**  THANK YOU.

11          **THE WITNESS:**  THAT'S CORRECT.

12  **BY MR. NEDROW**

13  Q   WERE YOU ABLE -- ON THAT DAY WHAT WAS YOUR THOUGHTS AS TO

14  HOW YOU MIGHT BE ABLE TO USE THOSE INDIVIDUALS TO FURTHER THE

15  INVESTIGATION?

16  A   I THOUGHT IF THEY CONTINUED TO COOPERATE, THEY COULD

17  CONTINUE TO INFORM ME OF THINGS, INCLUDING THE DOCUMENTS THAT

18  WERE LOCATED, SEIZED DURING THE SEARCH WARRANT.

19  Q   WAS ONE TOPIC YOU THOUGHT TO FOLLOW UP ON WAS WHERE THEY

20  WERE GETTING THEIR DRUGS?

21  A   SURE.

22  Q   AFTER THAT DAY WERE YOU ABLE TO CONTINUE TO EFFECTIVELY USE

23  THOSE THREE INDIVIDUALS AS WITNESSES?

24  A   NO.

25  Q   AND --

1    **A**    OTHER THAN VICTOR CONTE, WHO I SPOKE WITH BRIEFLY THE DAY

2    AFTER THE SEARCH WARRANT ON THE TELEPHONE.

3    **Q**    OKAY.  SO I SAID AFTER THAT DATE.  THE NEXT DAY YOU HAD A

4    CONVERSATION WITH MR. CONTE ON THE TELEPHONE?

5    **A**    SEPTEMBER 4TH, CORRECT.

6    **Q**    AFTER SEPTEMBER 4TH, WERE YOU ABLE TO CONTINUE USING THOSE

7    THREE INDIVIDUALS AS WITNESSES TO CONSULT WITH AS YOU PROCEEDED

8    WITH YOUR INVESTIGATION?

9    **A**    NO.

10   **Q**    WHY NOT?

11   **A**    BECAUSE I WAS CONTACTED BY AN ATTORNEY OR ATTORNEYS

12   REPRESENTING THEM WHO TOLD ME THAT THEY WERE NO LONGER

13   INTERESTED IN COOPERATING.

14   **Q**    AS A GOVERNMENT AGENT IS IT OKAY FOR YOU TO GO BACK, EVEN

15   THOUGH YOU HEARD FROM A LAWYER, AND KEEP TRYING TO TALK TO

16   THOSE PEOPLE TO SEE IF THEY'LL PROVIDE YOU INFORMATION?

17   **A**    NO.

18   **Q**    DID YOU?

19   **A**    NO, I DIDN'T.

20   **Q**    DID THAT IMPACT THE INVESTIGATION?

21   **A**    YES, IT DID.

22   **Q**    DID IT SLOW IT DOWN?

23   **A**    SURE.

24   **Q**    OKAY.  TURNING BACK THEN TO YOUR DECISION TO WANT TO

25   SUBPOENA THE ATHLETES, WHAT SORTS OF THINGS WERE YOU HOPING --

1   WHAT TYPE OF INFORMATION WERE YOU HOPING TO GET FROM THE

2   ATHLETES?

3   **A**    A LOT OF INFORMATION.  HELPING US TO CLARIFY AND DECIPHER

4   SOME OF THE DOPING CALENDARS.  THERE'S A LOT OF ABBREVIATIONS

5   USED.  TRYING TO FIGURE OUT WHAT ABBREVIATIONS STOOD FOR WHAT

6   DRUGS.

7            OBVIOUSLY, BEING A FINANCIAL INVESTIGATOR, I WAS

8   VERY INTERESTED IN THE FINANCIAL SIDE OF THE PICTURE.  I COULD

9   SEE A MULTI-THOUSAND DOLLAR CHECK GOING INTO A BANK ACCOUNT

10  FROM AN ATHLETE, BUT UNLESS I'M ABLE TO PROVE THAT THAT CHECK

11  INCLUDED IN PART PAYMENT FOR THESE CONTROLLED SUBSTANCES, THE

12  TRANSACTION OF PUTTING THAT CHECK IN THE BANK ACCOUNT MIGHT NOT

13  BE CONSIDERED A MONEY LAUNDERING CHARGE.

14           SO THERE WERE MANY THINGS -- I MEAN, EVERYTHING WE

15  WANTED ANSWERS TO, EVEN SOME OF THE THINGS THAT VICTOR CONTE

16  AND JAMES VALENTE TOLD US, BECAUSE THERE APPEARED TO BE SOME

17  INCONSISTENCIES IN THOSE STATEMENTS.  SO I DON'T KNOW

18  NECESSARILY THAT I COULD HAVE TRUSTED EVERYTHING THEY TOLD ME

19  WHEN THEY WERE COOPERATING.

20  **Q**   AT THE TIME OF THE SEARCH WARRANT, WHAT WAS THE PRIMARY

21  UNDERLYING CRIMINAL ACTIVITY BEHIND THE FINANCIAL TRANSACTIONS

22  THAT YOU WERE INVESTIGATING BY CONDUCTING THE SEARCH AT BALCO?

23  **A**   THE DISTRIBUTION OF CONTROLLED SUBSTANCES IN THE FORM OF

24  ANABOLIC STEROIDS.

25  **Q**   IS IT A CRIME TO UNKNOWINGLY DISTRIBUTE ANABOLIC STEROIDS?

1  **A**  NO.

2  **Q**  AND SO AS PART OF YOUR INVESTIGATION, WHAT TYPE OF

3  INFORMATION WERE YOU HOPING TO GET FROM THE ATHLETES THAT WOULD

4  ASSIST YOU IN DETERMINING WHETHER THERE WAS A VIOLATION OF

5  KNOWING DISTRIBUTION OF ANABOLIC STEROIDS HERE?

6  **A**  WHAT WERE YOU TOLD WHEN YOU GOT THESE SUBSTANCES BY THE

7  PEOPLE GIVING THEM TO YOU?  HOW DID YOU REQUEST THEM?  WHAT DID

8  YOU REQUEST?

9          IN THE CASE OF THESE DESIGNER STEROIDS, WHAT

10  SPECIFICALLY DID THEY TELL YOU THEY WERE?  DID THEY SAY THEY

11  WERE ANABOLIC STEROIDS, AND WE'LL JUST TELL PEOPLE WE DON'T

12  KNOW WHAT THEY ARE, THEY'RE SOME VARIATION OF STEROIDS?  OR DID

13  THEY SAY, WE DON'T KNOW WHAT THIS IS, TAKE IT, IT WILL MAKE YOU

14  STRONGER?

15  **Q**  IN SPEAKING WITH MR. CONTE AND MR. VALENTE AND

16  MR. ANDERSON, WERE YOU CERTAIN THAT YOU HAD ALL OF THE PEOPLE

17  INVOLVED WITH THEM IN DISTRIBUTING ANABOLIC STEROIDS?

18  **A**  NO.

19  **Q**  IN FACT, DID YOU HAVE REASON TO THINK THERE WERE OTHERS?

20  **A**  SURE.

21  **Q**  PLEASE ELABORATE UPON THAT.

22  **A**  EVIDENCE THAT WE FOUND, THERE WAS ANOTHER ATHLETE ACTUALLY

23  IN THE ORIGINAL THREE THG POSITIVES THAT UNITED STATES

24  ANTIDOPING AGENCY CONDUCTED THAT DIDN'T APPEAR TO HAVE ANY

25  RELATION TO BALCO LABORATORIES.

1  Q   SO IT WAS THE THOUGHT THAT OTHER ATHLETES MIGHT PROVIDE

2  INFORMATION ABOUT OTHERS INVOLVED IN DISTRIBUTING ANABOLIC

3  STEROIDS?

4  A   ABSOLUTELY.  OTHER TRAINERS, OTHER COACHES.  YOU KNOW, THE

5  ATHLETES WERE FROM ALL OVER THE COUNTRY, AND WE WERE CURIOUS

6  ABOUT HOW THE DISTRIBUTION CHAIN WORKED.  WAS IT GOING TO THESE

7  OTHER TRAINERS AND COACHES OF THE ATHLETES, OR WERE THEY COMING

8  OUT AND VISITING BALCO?  SO THERE WERE MANY UNANSWERED

9  QUESTIONS.

10 Q   IN FACT, WE WON'T GO INTO ALL THE TENTACLES OF IT, BUT YOUR

11 INVESTIGATION HAS, IN FACT, RESULTED IN IDENTIFYING AND

12 INVESTIGATING OTHER PEOPLE BEYOND BALCO INVOLVED IN ILLEGAL

13 DISTRIBUTION OF ANABOLIC STEROIDS, CORRECT?

14 A   CORRECT.

15 Q   NOW LET'S TURN TO PATRICK ARNOLD.  WAS HE A PERSON AMONG

16 THOSE YOU IDENTIFIED SOME INFORMATION ABOUT?

17 A   YES.

18 Q   AND IF YOU CAN RECALL, WOULD YOU SUMMARIZE FOR US PRIOR TO

19 THE SEARCH OF SEPTEMBER 3RD, 2003, IN GENERAL, WHAT YOUR

20 UNDERSTANDING WAS OF PATRICK ARNOLD AS IT PERTAINED TO THIS

21 INVESTIGATION?

22 A   WELL, DURING ONE OF THE E-MAIL SEARCH WARRANTS WE DID

23 DURING THE COVERT OPERATION OF THE INVESTIGATION, WE GOT AN

24 E-MAIL THAT WAS BETWEEN VICTOR CONTE AND A TRACK AND FIELD

25 COACH IN GREECE, AND THE E-MAIL WAS REFERRING TO THE CLEAR MAN

1  AND MADE REFERENCE TO THE CLEAR MAN WAS A PATRICK AND/OR A

2  PATRICK ARNOLD.  AND THIS WAS IN THE EARLY STAGE OF THE

3  INVESTIGATION WHERE I DIDN'T KNOW WHAT CLEAR WAS OR WHAT A

4  CLEAR MAN WAS, BUT THAT WAS THE FIRST TIME PATRICK ARNOLD'S

5  NAME SURFACED IN THE INVESTIGATION.

6  **Q**   AND CERTAINLY NOT AN EXACT DATE, BUT GIVE US SOMEWHAT OF A

7  TIMEFRAME WHEN YOU RECALL FIRST LEARNING OF THAT E-MAIL.

8  **A**   APPROXIMATELY THE SPRING OF 2003.

9  **Q**   AND DID YOU COME TO ASSOCIATE THAT E-MAIL BETWEEN MR. CONTE

10  AND THIS OTHER PERSON WITH AN ASPECT OF THE INVESTIGATION THAT

11  ULTIMATELY LINKED UP TO PATRICK ARNOLD?

12  **A**   YES.

13  **Q**   AND WHO DID THAT ULTIMATELY LINK UP TO?

14  **A**   WHO DID IT LINK UP TO?

15  **Q**   YES.  I'M SORRY.  LET ME BE MORE SPECIFIC.

16       WERE THERE ANY OVERSEAS ATHLETES OR TRAINERS OR

17  COACHES WHO THAT E-MAIL ULTIMATELY LINKED UP TO IN YOUR

18  INVESTIGATION OF PATRICK ARNOLD?

19  **A**   YES.

20  **Q**   WHO WAS THAT?

21  **A**   WELL, ANOTHER GREEK TRACK AND FIELD COACH, NOT THE SUBJECT

22  OR THE COMMUNICATOR IN THIS E-MAIL, BUT CHRIS TSEKOS, ALSO A

23  GREEK TRACK AND FIELD COACH.  THERE WAS ALSO MENTION OF CHRIS

24  TSEKOS IN THIS E-MAIL BETWEEN MR. CONTE AND ANOTHER GREEK TRACK

25  AND FIELD COACH.

1   Q    THANK YOU.  I WANT TO MAKE CLEAR THE E-MAIL WASN'T TO

2   MR. TSEKOS?

3   A    NO, IT WAS NOT.

4   Q    HOWEVER, HIS NAME WAS REFERENCED IN THIS E-MAIL, CORRECT?

5   A    CORRECT, HIS NAME AND THE TWO ATHLETES.  I THINK THERE WAS

6   PREVIOUS TESTIMONY ABOUT THEM FAILING TESTS IN 2004 OLYMPICS.

7   Q    ALL RIGHT.  WHEN YOU SPOKE TO MR. CONTE AND MR. VALENTE ON

8   SEPTEMBER 3RD, 2003 THAT WASN'T THE FIRST TIME YOU HEARD OF

9   PATRICK ARNOLD?

10  A    CORRECT.

11  Q    HOWEVER, ON THAT DATE, DID YOU SEARCH MR. ARNOLD'S

12  RESIDENCE OR BUSINESS?

13  A    NO.

14  Q    WHY NOT?

15  A    BECAUSE WE WERE A LONG WAY FROM SHOWING THAT MR. ARNOLD HAD

16  INVOLVEMENT IN THIS INVESTIGATION FROM PROVING THAT HE HAD

17  INVOLVEMENT IN ILLEGAL ACTIVITIES BEING INVESTIGATED.

18  Q    PLEASE DESCRIBE A LITTLE BIT MORE ANY OTHER INFORMATION YOU

19  HAD ABOUT PATRICK ARNOLD PRIOR TO SEPTEMBER 3RD, 2003, BESIDES

20  THAT E-MAIL YOU REFERENCED.

21  A    WELL, DOING SOME INVESTIGATING AGAIN ON THE INTERNET, I

22  LOCATED A NEWSPAPER ARTICLE ACTUALLY HAVING TO DO WITH THE

23  DEFENDANT, TAMMY THOMAS' POSITIVE NORBOLETHONE TEST, AND THIS

24  NEWSPAPER ARTICLE ACTUALLY QUOTED PATRICK ARNOLD AND ASKED HIM

25  IF HE WAS THE ONE THAT MADE NORBOLETHONE.  AND HIS RESPONSE IN

Case3:06-cr-00803-SI  Document145  Filed07/01/08  Page205 of 250

1  SUM AND SUBSTANCE WAS, I MAY HAVE MADE A PORTION OF IT, BUT I'M

2  NOT SURE, I'M NOT CLEAR, I THINK.

3  **Q**    WAS THERE ANY OTHER ASPECT OF THE INVESTIGATION THAT HAD

4  ALSO UNCOVERED INFORMATION ABOUT PATRICK ARNOLD THAT YOU CAN

5  THINK OF PRIOR TO SEPTEMBER 3RD, 2003?

6  **A**    YES, THERE WAS.

7  **Q**    PLEASE DESCRIBE IT.

8  **A**    THERE WAS THE FINANCIAL SIDE OF THE INVESTIGATION.  WE SAW

9  SEVERAL AROUND THE THOUSAND DOLLAR RANGE OF CHECKS FROM VICTOR

10  CONTE TO PATRICK ARNOLD.

11  **Q**    AND WERE YOU ABLE TO DETERMINE WHERE PATRICK ARNOLD WAS

12  LOCATED DURING THIS PERIOD OF TIME?

13  **A**    I BELIEVE THAT I WAS DURING THAT PERIOD OF TIME.

14  **Q**    IN GENERAL, ANYWAY?

15  **A**    IN GENERAL IN THE MIDWEST IN ILLINOIS.

16  **Q**    BASED ON THE FINANCIAL RECORDS, WERE YOU ABLE TO ESTABLISH

17  WHERE -- KIND OF THE FLOW OF THE MONEY, WHERE IT APPEARED TO BE

18  GOING FROM AND TO, YOU KNOW, BASED ON THOSE RECORDS?

19  **A**    YES.

20  **Q**    PLEASE DESCRIBE THAT.

21  **A**    FROM VICTOR CONTE TO PATRICK ARNOLD.

22  **Q**    AND, GEOGRAPHICALLY, PLEASE DESCRIBE HOW THAT MONEY

23  APPEARED TO BE FLOWING, FROM WHERE TO WHERE?

24  **A**    IT WOULD BE FLOWING FROM, I THINK IT WAS A WELLS FARGO BANK

25  ACCOUNT IN THE SAN FRANCISCO BAY AREA TO A BANK OF ILLINOIS

1   ACCOUNT IN OR AROUND CHAMPAIGN, ILLINOIS.

2   Q   AFTER THE SEARCH OF SEPTEMBER 3RD, 2003, YOU WENT THROUGH

3   AGAIN A NUMBER OF DOCUMENTS, CORRECT?

4   A   CORRECT.

5   Q   AND DID YOU FIND AT SOME POINT AN E-MAIL IN THE RECORDS OF

6   BALCO THAT SUGGESTED A CONNECTION BETWEEN VICTOR CONTE AND

7   PATRICK ARNOLD?

8   A   YES, I DID.

9   Q   I'LL CALL YOUR ATTENTION TO EXHIBIT 14 WHICH IS IN

10   EVIDENCE, AND I'LL CALL YOUR ATTENTION TO THE SCREEN --

11           THE CLERK:  YOU SAID 14?

12           MR. NEDROW:  FOURTEEN.

13           THE CLERK:  FIRST PAGE ONLY?

14           MR. NEDROW:  ACTUALLY, WE ENDED UP MAKING IT A

15   ONE-PAGE EXHIBIT.

16           THE CLERK:  OKAY.

17           MR. NEDROW:  WE'LL CLARIFY THAT, BUT, YES,THIS IS

18   EXHIBIT 14 AS IT'S BEEN ENTERED.

19           THE CLERK:  THANK YOU.

20           (DOCUMENT DISPLAYED.)

21   BY MR. NEDROW

22   Q   CALLING YOUR ATTENTION TO THE SCREEN, AGENT NOVITZKY, IS

23   THIS EXHIBIT 14?

24   A   YES.

25   Q   AND CAN YOU JUST -- WELL, LET'S ACTUALLY SUMMARIZE PORTIONS

1   OF THIS THAT RELATE TO MR. ARNOLD STARTING WITH THE DATE AND

2   THE E-MAIL HEADER AT THE TOP OF THIS DOCUMENT.  CAN YOU

3   SUMMARIZE THAT STARTING THE FIFTH LINE DOWN?

4   **A**   YES, WEDNESDAY, MAY 1ST, 2002.

5   **Q**   AND WHO'S THE SENDER OF THE E-MAIL, DOES IT APPEAR?

6   **A**   IT APPEARS TO BE PATRICK ARNOLD.

7           **THE COURT:**  MR. NEDROW, YOU CUT OFF THE LEFT SIDE OF

8   THAT.

9           **MR. NEDROW:**  I'M SORRY, YOUR HONOR.  THANK YOU.

10  **BY MR. NEDROW**

11  **Q**   WHO'S THE E-MAIL SENT TO?

12  **A**   TO VICTOR CONTE.

13  **Q**   AND, AGAIN, GEOGRAPHICALLY, TO YOUR UNDERSTANDING, WHERE

14  WOULD HAVE BEEN THE GEOGRAPHICAL LOCATION OF ORIGIN AND RECEIPT

15  OF THIS E-MAIL?

16  **A**   WELL, I MEAN, OF COURSE, BY LOOKING AT THE E-MAIL I CAN'T

17  TELL WHERE IT WAS SENT AND RECEIVED, BUT I KNEW THAT PATRICK

18  ARNOLD LIVED IN THE MIDWEST IN ILLINOIS, AND I KNEW THAT VICTOR

19  CONTE RESIDED IN BALCO LABS, WHICH THE E-MAIL ADDRESS IS

20  CONTE@BALCOLAB.COM WAS IN BURLINGAME, CALIFORNIA.

21  **Q**   WHAT'S THE SUBJECT OF THE E-MAIL?

22  **A**   NORBOLETHONE.

23  **Q**   AND THEN -- IT'S A SHORT ONE, SO WE WILL GO AHEAD AND READ

24  IT.  CAN YOU READ THE TEXT, PLEASE?

25  **A**   "I KNOW THE GIRL WHO THEY JUST SNAGGED FOR NORBOLETHONE.

1  IT IS NOT THE SAME GIRL I WAS HELPING IN THE OLYMPICS, BUT A

2  CYCLIST GIRL.  I SAW HER TESTS AND EVERYTHING.  SHE IS TRYING

3  TO FIGHT IT, AND I AM ADVISING HER TECHNICALLY ON HOW TO DO IT.

4  NEEDLESS TO SAY, IF YOU KNOW ANYONE TAKING THE STUFF WHO IS

5  TAKING SUBJECT TO TESTING, THEN TELL THEM TO STOP."

6  Q    AND WE'RE NOT GOING TO GO INTO THIS ENTIRE BOTTOM PART OF

7  THIS EXHIBIT, BUT DOES THE BOTTOM PART APPEAR TO DEAL WITH A

8  SEPARATE E-MAIL?

9  A    YES, IT DOES.

10  Q    AND WHO IS IT FROM?

11  A    IT APPEARS TO BE FROM VICTOR CONTE TO PATRICK ARNOLD.

12  Q    AND IT HAS THE WORDS "DEAR PATRICK" IN IT, CORRECT?

13  A    CORRECT.

14  Q    AND THE ARTICLE THAT IS CONTAINED BELOW -- AGAIN, I'M NOT

15  GOING TO GO OVER IT VERBATIM, BUT WHAT'S THE GENERAL SUBJECT

16  MATTER OF THAT ARTICLE BELOW?

17  A    THE GENERAL SUBJECT MATTER APPEARS TO BE DR. DON CATLIN'S

18  DISCOVERY OF NORBOLETHONE AT THE UCLA LAB.

19  Q    AS YOU SIT HERE NOW, AGENT NOVITZKY, DO YOU HAVE A

20  RECOLLECTION OF EXACTLY WHEN YOU CAME ACROSS THIS E-MAIL IN

21  REVIEWING THE HUNDREDS OF DOCUMENTS AT BALCO?

22  A    NOT WHEN I DID IT PERSONALLY, BUT THE INDICATION IS ON THE

23  SCREEN THERE, PRINTED FOR VICTOR CONTE, WITH A DATE OF

24  9/12/2003, WOULD HAVE MEANT THAT EITHER MYSELF OR THE COMPUTER

25  INVESTIGATIVE SPECIALIST WOULD HAVE PRINTED THAT OUT FROM THE

1   IMAGED HARD DRIVE THAT WE SEIZED FROM BALCO LABORATORY ON THAT

2   DATE.

3   Q    AND ON THAT DATE, SEPTEMBER 12TH, 2003, WHERE WERE YOU IN

4   THE PROCESS OF BEGINNING TO HAVE ATHLETES SUBPOENAED TO GET

5   THEIR STATEMENTS ABOUT THE RELATIONSHIPS WITH BALCO?

6   A    WE WERE RIGHT IN THE MIDDLE OF TRYING TO DETERMINE WHO WE

7   WANTED TO BRING INTO THE GRAND JURY TO PROVIDE TESTIMONY AND

8   EVIDENCE IN THIS CASE.

9   Q    APPROXIMATELY HOW MANY ATHLETES, APPROXIMATELY, WERE

10  BROUGHT IN TO TESTIFY DURING BALCO GRAND JURY PROCEEDINGS IN

11  THE AUTUMN OF 2003?

12  A    APPROXIMATELY 30.

13  Q    AND WHO ARE THE TARGETS OF THAT GRAND JURY INVESTIGATION?

14  A    THE TARGETS OF THE GRAND JURY WERE VICTOR CONTE, JAMES

15  VALENTE, GREG ANDERSON, PATRICK ARNOLD.  I'M NOT SURE WHETHER

16  OR NOT REMY KORCHEMNY, WHO WAS INDICTED IN THE INITIAL ROUND OF

17  BALCO DEFENDANTS, WAS INCLUDED AT THAT TIME OR NOT, BUT HE

18  ULTIMATELY BECAME A TARGET OF THAT GRAND JURY AS WELL.

19  Q    BEGINNING IN APPROXIMATELY OCTOBER 2003, DID WITNESSES

20  BEGIN TO COME IN AND GIVE TESTIMONY IN CONNECTION WITH THIS

21  INVESTIGATION?

22  A    YES, THEY DID.

23  Q    AND THEY WEREN'T ALL ATHLETES, WERE THEY?

24  A    NO, THEY WEREN'T ALL ATHLETES.

25  Q    WAS ONE OF THEM TAMMY THOMAS?

1    A    YES, SHE WAS.

2    Q    AT THIS TIME IN OCTOBER OF 2003, WHAT DID YOU KNOW ABOUT

3    TAMMY THOMAS?

4    A    I KNEW SHE WAS AN OLYMPIC LEVEL, HIGH CLASS CALIBER CYCLIST

5    WHO HAD TESTED POSITIVE FOR NORBOLETHONE WHO APPEARED TO BE

6    REFERENCED IN AN E-MAIL FOUND AT BALCO AS HAVING SOME

7    CONNECTION WITH PATRICK ARNOLD.

8    Q    WHY DID YOU WANT TO GET HER STATEMENT IN CONNECTION WITH

9    THIS INVESTIGATION?

10   A    IT APPEARED THAT SHE HAD DIRECT CONNECTION WITH PATRICK

11   ARNOLD, AND IT DID NOT APPEAR AS IF SHE HAD RECEIVED

12   NORBOLETHONE FROM BALCO LABORATORIES.  AND SO WHAT WE THOUGHT

13   WE HAD WAS SOMEONE WITH DIRECT KNOWLEDGE OF POTENTIALLY THE

14   MANUFACTURER OF ONE OF THESE SUBSTANCES THAT OBVIOUSLY WOULD BE

15   VERY VALUABLE TO US AS A WITNESS, BECAUSE INDICATION WAS THE

16   ATHLETES THAT WERE BALCO CLIENTS WERE GOING AND RECEIVING THE

17   STUFF FROM VICTOR CONTE, AS OPPOSED TO THE PERSON WHO WAS

18   ACTUALLY MAKING THE ITEM.

19   Q    YOU DESCRIBED EARLIER FINDING NUMEROUS FILES AND LEDGERS

20   REFERENCING THE SPECIFIC ATHLETES AT THE SEARCH OF BALCO; DO

21   YOU RECALL THAT?

22   A    YES.

23   Q    WELL, AGAIN, WITHOUT NAMING OTHER ATHLETE NAMES, WERE THEY

24   ORGANIZED BY ATHLETE?

25   A    FOR THE MOST PART, YES.  THERE WAS SOME LOOSE DOCUMENTS

1   THAT WEREN'T IN AN ATHLETE'S FOLDER, BUT FOR THE MOST PART THEY

2   WERE IN A FOLDER WITH THEIR NAMES ON THEM.

3   Q    JUST TAKING A SAMPLE ATHLETE FOLDER, WITHOUT NAMING NAMES,

4   WHAT KIND OF THINGS WHEN YOU FOUND AN ATHLETE FOLDER AT BALCO

5   WERE FOUND WITHIN THE FOLDER?

6   A    BLOOD TESTS, URINE TESTS FOR THE PRESENCE OF STEROIDS,

7   CALENDARS WITH ABBREVIATIONS AND ENTRIES WHICH APPEARED TO BE

8   DOPING TYPE CALENDARS, INVOICES SHOWING NUMBERS ON THEM.

9   Q    DID YOU FIND SUCH A FOLDER AS YOU DESCRIBED FOR TAMMY

10  THOMAS AT BALCO?

11  A    NO, WE DID NOT.

12  Q    WHAT THEN WAS YOUR CONNECTION THAT YOU WERE DRAWING BETWEEN

13  BALCO AND PATRICK ARNOLD AND TAMMY THOMAS?  WHAT WAS THE BASIS

14  FOR THAT?

15  A    WELL, BEING THAT THERE WASN'T A FOLDER THERE, THE

16  CONNECTION BEING DRAWN WAS THAT TAMMY THOMAS WAS A PATRICK

17  ARNOLD CLIENT AND HAD BEEN REFERRED TO BALCO LABORATORIES WHEN

18  SHE TESTED POSITIVE FOR NORBOLETHONE FOR CONSULTATION.

19  Q    AND HOW DID YOU KNOW THAT THAT HAD HAPPENED?

20  A    WELL, I THINK THE E-MAIL MAKES THAT -- MADE IT PRETTY CLEAR

21  THAT SHE HAD DONE THAT.  AND THEN HER POSITIVE NORBOLETHONE

22  TEST WHICH STARTED OFF AT THE USOC ATHLETE CENTER, AND WENT TO

23  LPJ RESEARCH, ENDED UP IN BALCO LABORATORIES IN BURLINGAME,

24  CALIFORNIA.

25  Q    SO WE ARE CLEAR, THE FIRST E-MAIL YOU REFERENCED WE

1   DISCUSSED WAS EXHIBIT 14, THE "I KNOW THE GIRL THEY JUST

2   SNAGGED FOR NORBOLETHONE" E-MAIL?

3   A   CORRECT.

4   Q   ALL RIGHT.  LET'S GO BACK TO EXHIBIT 16.

5             NOW, LET ME ASK YOU, HOW WERE YOU ABLE TO CONNECT

6   THIS DOCUMENT TO PATRICK ARNOLD?

7   A   THE TOP OF THE DOCUMENT WITH THE HEADER "LPJ RESEARCH,"

8   WHICH WAS A BUSINESS AFFILIATED WITH PATRICK ARNOLD.

9   Q   HOW WERE YOU ABLE TO CONNECT THIS DOCUMENT WITH TAMMY

10  THOMAS?

11  A   USOC ATHLETE CENTER IN COLORADO SPRINGS, APRIL 12TH, FAX

12  DATE, AND ONE OF THE PREVIOUS EXHIBITS INTRODUCED WAS THE

13  COLLECTION FORM FROM TAMMY THOMAS ON APRIL 10TH, AND INDICATION

14  ON THAT FORM WAS IT WAS COLLECTED, I BELIEVE THE SAME LOCATION,

15  IF NOT IN COLORADO SPRINGS.

16  Q   NOW, I WANT TO BE CLEAR HERE.  DID YOU HAVE ALL THE

17  KNOWLEDGE YOU ARE DESCRIBING, THOUGH, IN 2003 WHEN YOU WANTED

18  MS. THOMAS TO COME IN AND TESTIFY?

19  A   NO.

20  Q   BUT WHAT DID YOU KNOW IN PARTICULAR ABOUT NORBOLETHONE?

21  A   WHAT DID I KNOW ABOUT NORBOLETHONE?

22  Q   YES.  AND, IN PARTICULAR, THE SIGNIFICANCE OF THIS

23  DOCUMENT, EXHIBIT 16, WHICH APPEARED TO RELATE TO THE

24  IDENTIFICATION OF THE SUBSTANCE OF NORBOLETHONE AND AN UNNAMED

25  PERSON.

1 **A**    WELL, I KNEW OR FOUND OUT THAT THERE HAD ONLY BEEN ONE

2 PERSON WHO HAD TESTED POSITIVE FOR NORBOLETHONE, AND THAT WAS

3 TAMMY THOMAS.

4 **Q**    HOW DID YOU KNOW THAT?

5 **A**    MEDIA REPORTS.

6 **Q**    YOU DID RESEARCH?

7 **A**    CORRECT.

8 **Q**    DID YOU THINK MS. THOMAS WOULD HAVE INFORMATION MATERIAL TO

9 THE INVESTIGATION OF THE LINK BETWEEN MR. ARNOLD AND MR. CONTE

10 BASED ON THESE FACTS?

11 **A**    YES.

12 **Q**    ON NOVEMBER 6TH, 2003, DID MS. THOMAS COME IN TO THE GRAND

13 JURY AND TESTIFY?

14 **A**    YES, SHE DID.

15 **Q**    DO YOU KNOW HOW SHE WAS SERVED IN TERMS OF COMING IN?

16 **A**    YES, I DO.

17 **Q**    HOW?

18 **A**    ACTUALLY, I SENT HER SUBPOENA TO A CO-WORKER IN THE

19 MISSISSIPPI AREA WHO ACTUALLY GAVE IT TO ANOTHER INDIVIDUAL

20 AGENT WHO WENT OUT AND SERVED MS. THOMAS IN MISSISSIPPI.

21 **Q**    DID MS. THOMAS COME IN TO THIS COURTHOUSE ON NOVEMBER 6TH,

22 2003?

23 **A**    YES, SHE DID.

24 **Q**    JUST FOR THE RECORD, WAS HER TESTIMONY ON THIS FLOOR OR A

25 DIFFERENT FLOOR?

1  **A**   NO.  THE GRAND JURY IS ON THE 17TH FLOOR, I BELIEVE.

2  **Q**   AND WAS –– DID YOU HAVE INTERACTION WITH HER THAT DAY

3  OUTSIDE THE GRAND JURY ROOM?

4  **A**   BRIEFLY.

5  **Q**   PLEASE DESCRIBE THE NATURE OF THAT INTERACTION.

6  **A**   I WAS JUST RETURNING FROM DROPPING ANOTHER WITNESS OFF.  IT

7  WAS AROUND LUNCHTIME, AND I RECALL GOING INTO THE GRAND JURY

8  WITNESS WAITING ROOM, WHICH ARE LITTLE ROOMS OFF THE GRAND JURY

9  WHERE WITNESSES AND ATTORNEYS CAN WAIT OR CONFER, AND I

10 RECALLED BOTH MS. THOMAS AND HER ATTORNEY BEING IN THIS WAITING

11 ROOM.  AND I BRIEFLY SAID HELLO TO BOTH OF THEM, AND THEN

12 PRESENTED THEM WITH AN IMMUNITY ORDER FOR MS. THOMAS.

13 **Q**   YOU REFERENCED AN IMMUNITY ORDER.  DO YOU HAVE BEFORE YOU

14 WHAT'S BEEN MARKED AS EXHIBIT 17?

15 **A**   YES, I DO.

16 **Q**   IS THIS THE ORDER THAT YOU HANDED MS. THOMAS ON THAT DAY?

17 **A**   COPY OF IT, YES.

18 **Q**   OKAY.  BUT A COPY OF IT?

19 **A**   YES.

20      **MR. NEDROW:**  AND, YOUR HONOR, AS A FILED COURT

21 DOCUMENT, AS OTHERS HAVE BEEN ADDRESSED IN THIS CASE, I'D ASK

22 THE COURT TO TAKE JUDICIAL NOTICE AND MOVE GOVERNMENT

23 EXHIBIT 17 INTO EVIDENCE.

24      **MR. BALOGH:**  STIPULATE TO ITS ENTRY.

25      **THE COURT:**  THANK YOU.  IT WILL BE RECEIVED.

1              (GOVERNMENT'S EXHIBIT 17 RECEIVED IN EVIDENCE)

2              **MR. NEDROW:**  THANK YOU, YOUR HONOR.  AND IF I MAY, I

3    WOULD LIKE TO PUBLISH IT TO THE JURY.

4              **THE COURT:**  YOU MAY.

5              (DOCUMENT DISPLAYED.)

6              **MR. NEDROW:**  THANK YOU.

7    **BY MR. NEDROW**

8    **Q**    AGENT NOVITZKY, IS THIS A COPY OF THE ORDER THAT YOU SERVED

9    ON MS. THOMAS?

10   **A**    YES, IT IS.

11   **Q**    AND WE SAY "SERVED"; IT'S A LEGAL TERM.  DID YOU HAND IT TO

12   HER OR HER ATTORNEY THAT DAY?

13   **A**    HANDED TO THEM, I BELIEVE PUT IT ON THE TABLE IN FRONT OF

14   THEM.

15   **Q**    DO YOU KNOW WHO HER ATTORNEY WAS THAT DAY?

16   **A**    YES.

17   **Q**    WHAT'S HIS NAME?

18   **A**    RANDY MONTESANO.

19   **Q**    I'D LIKE TO GO THROUGH THIS --

20             **MR. NEDROW:**  AND, ACTUALLY, YOUR HONOR, I WOULD LIKE

21   TO READ THE EXHIBIT INTO THE RECORD, IF I MAY.

22   **BY MR. NEDROW**

23   **Q**    THIS IS IMMUNITY ORDER DATED OCTOBER 30TH, 2003, AGENT

24   NOVITZKY, AND IT STATES:

25             "ON MOTION OF KEVIN V. RYAN, UNITED STATES

1    ATTORNEY FOR THE NORTHERN DISTRICT OF CALIFORNIA, THE

2    COURT HEREBY FINDS AND ORDERS AS FOLLOWS:

3        "NUMBER ONE, TAMMY THOMAS MAY BE CALLED TO

4    TESTIFY BEFORE THE GRAND JURY.

5        "NUMBER TWO, IN THE JUDGMENT OF THE UNITED STATES

6    ATTORNEY, TAMMY THOMAS IS LIKELY TO REFUSE TO TESTIFY

7    ON THE BASIS OF HER FIFTH AMENDMENT PRIVILEGE AGAINST

8    SELF INCRIMINATION.

9        "NUMBER THREE, IN THE JUDGMENT OF THE UNITED

10   STATES ATTORNEY, THE TESTIMONY AND OTHER INFORMATION

11   TO BE OBTAINED FROM TAMMY THOMAS IS NECESSARY TO THE

12   PUBLIC INTEREST.

13       "NUMBER FOUR, THE MOTION FILED HERE HAS BEEN MADE

14   WITH APPROVAL OF THE DESIGNATE OF THE ASSISTANT

15   ATTORNEY GENERAL IN CHARGE OF THE CRIMINAL DIVISION

16   OF THE DEPARTMENT OF JUSTICE PURSUANT TO THE

17   AUTHORITY VESTED IN HIM BY 18 USC 6003 AND 28 CFR

18   0.175.

19       "IT IS, THEREFORE, ORDERED THAT TAMMY THOMAS, AS

20   SOON AS SHE MAY BE CALLED, SHALL TESTIFY UNDER OATH

21   AND PROVIDE OTHER INFORMATION, INCLUDING DOCUMENTS IN

22   THIS CASE, AND IN ANY FURTHER ANCILLARY PROCEEDINGS.

23       "IT IS FURTHER ORDERED THAT THE TESTIMONY AND

24   OTHER INFORMATION COMPELLED FROM TAMMY THOMAS

25   PURSUANT TO THIS ORDER, INCLUDING PERSONAL OR

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page217 of 250

1    BUSINESS RECORDS, THE FACT OF HER PRODUCTION OF ANY

2    RECORDS, AND ANY INFORMATION DIRECTLY OR INDIRECTLY

3    DERIVED FROM SUCH TESTIMONY MAY NOT BE USED AGAINST

4    HER IN ANY CRIMINAL CASE, EXCEPT A PROSECUTION FOR

5    PERJURY, FALSE DECLARATION OR OTHERWISE FAILING TO

6    COMPLY WITH THIS ORDER.

7         "IT IS FURTHER ORDERED THAT THE GOVERNMENT'S

8    APPLICATION IN THIS ORDER BE PLACED UNDER SEAL UNTIL

9    FURTHER ORDER BY THE COURT, EXCEPT THAT A COPY OF

10   THIS ORDER MAY BE SERVED UPON THE WITNESS AND/OR HER

11   COUNSEL AND DISCLOSED TO THE GRAND JURY CONDUCTING

12   THE INVESTIGATION IN THIS MATTER."

13         AND IT'S SIGNED BY MAXINE M. CHESNEY, UNITED STATES

14   DISTRICT JUDGE.

15         DID THE PORTIONS I READ IN ANY WAY ACCURATELY

16   SUMMARIZE THAT, AGENT NOVITZKSY?

17   **A**   YES.

18   **Q**   NOW, THE SIGNATURE LINE ISN'T DATED; IS THAT ACCURATE?

19   **A**   THAT'S CORRECT.

20   **Q**   HOWEVER, THERE IS A DATE UPON WHICH THIS DOCUMENT WAS

21   FILED.  THAT DATE IS VISIBLE IN THE UPPER RIGHT CORNER.  DO YOU

22   SEE THAT, AGENT NOVITZKY?

23   **A**   YES, I DO.

24   **Q**   WHAT'S THE DATE?

25   **A**   OCTOBER 30TH, 2003.

1  Q    BASED ON YOUR RECOLLECTION OF THE DATES, WHERE DID THAT

2  FALL IN CONNECTION WITH MS. THOMAS' GRAND JURY TESTIMONY?

3  A    IT FELL A WEEK BEFORE HER GRAND JURY TESTIMONY.

4  Q    AGAIN, IT'S YOUR RECOLLECTION THAT A FILED AND SIGNED COPY

5  OF THIS ORDER IS WHAT YOU SERVED UPON MS. THOMAS AS YOU

6  DESCRIBED?

7  A    YES, THAT IS.

8  Q    OKAY.  YOU'VE -- YOU, OF COURSE, WERE NOT IN THE GRAND JURY

9  ROOM WHEN MS. THOMAS WAS QUESTIONED, CORRECT?

10 A    THAT'S CORRECT.

11 Q    DID YOU, PURSUANT TO YOUR DUTIES AS A SPECIAL AGENT, HAVE

12 THE OPPORTUNITY AFTER HER TESTIMONY TO LOOK AT HER GRAND JURY

13 TRANSCRIPT?

14 A    YES, I HAVE.

15 Q    AND WERE HER STATEMENTS MATERIAL TO YOU IN TERMS OF

16 DECIDING WHAT COURSE THE INVESTIGATION WAS GOING TO TAKE AFTER

17 THE DATE OF HER TESTIMONY?

18 A    YES.

19 Q    PLEASE DESCRIBE HOW HER TESTIMONY IMPACTED YOU AS YOU MADE

20 INVESTIGATIVE DECISIONS GOING FORWARD AFTER HER TESTIMONY.

21 A    SHE GAVE INCONSISTENT STATEMENTS IN TERMS OF THE EVIDENCE

22 WE WERE COMPARING THEM TO, IN THAT SHE MADE STATEMENTS THAT SHE

23 DIDN'T GET THESE SUBSTANCES, INCLUDING NORBOLETHONE, FROM

24 PATRICK ARNOLD.

25          AGAIN, WE WERE EXPECTING HER TO BE THE LINK TO

1  PATRICK ARNOLD AND TALK ABOUT WHAT SHE SPOKE ABOUT WITH HIM,

2  WHAT SHE KNEW ABOUT THESE THINGS, INCLUDING NORBOLETHONE, AND

3  HER TESTIMONY WAS THAT SHE NEVER GOT NORBOLETHONE FROM PATRICK

4  ARNOLD.

5           SO, IN SUM AND SUBSTANCE, AFTER READING THESE MANY

6  INCONSISTENT STATEMENTS IN HER GRAND JURY TESTIMONY, WE LOST, I

7  FELT, THE OPPORTUNITY TO HAVE THE ONE WITNESS WITH DIRECT

8  KNOWLEDGE AND DIRECT CONTACT WITH PATRICK ARNOLD IN THE EARLY

9  STAGES OF THIS INVESTIGATION.

10 **Q**   YOU -- AGAIN, THERE WERE A NUMBER OF OTHER ATHLETES WHO

11 CAME IN AND WERE ASKED ABOUT PATRICK ARNOLD -- I'M SORRY.  LET

12 ME START OVER.

13          A NUMBER OF ATHLETES BESIDES TAMMY THOMAS TESTIFIED

14 DURING THE 2003 GRAND JURY INVESTIGATION AND, ACTUALLY, IN 2004

15 IN THIS MATTER; IS THAT CORRECT?

16 **A**   THAT'S CORRECT.

17 **Q**   WERE OTHER ATHLETES ASKED ABOUT PATRICK ARNOLD BESIDES

18 TAMMY THOMAS?

19 **A**   YES.

20 **Q**   WAS EVERY SINGLE ATHLETE ASKED -- THIS IS BASED ON YOUR

21 REVIEW OF THE GRAND JURY TRANSCRIPT ABOUT PATRICK ARNOLD?

22 **A**   NOT EVERY SINGLE ATHLETE.

23 **Q**   HOW WOULD YOU CHARACTERIZE IT AS FAR AS A MAJORITY, OR

24 HALF, OR MINORITY?  HOW WOULD YOU CHARACTERIZE IT?

25 **A**   I WOULD CHARACTERIZE IT AS A MAJORITY.

1  Q   DID YOU EVER DURING THIS STAGE OF THE INVESTIGATION UNCOVER

2  ANY ATHLETE WHO HAD, IN YOUR VIEW, THE POTENTIAL TO HAVE

3  INFORMATION ABOUT PATRICK ARNOLD BESIDES TAMMY THOMAS?

4  A   NOT THE UNIQUE INFORMATION, THE POTENTIAL SHE HAD, NO,

5  THERE WERE NO OTHER ATHLETES DURING THIS INITIAL ROUND OF

6  WITNESSES THAT CAME BEFORE THE GRAND JURY THAT WERE IN HER

7  CATEGORY.

8  Q   AND IN LATE 2003 AND EARLY 2004, DID YOUR ATTENTION TURN

9  TOWARDS THE IDEA OF RECOMMENDING POSSIBLE CHARGES AGAINST SOME

10 OF THE PEOPLE INVOLVED IN THE BALCO INVESTIGATION?

11 A   YES, IT DID.

12 Q   DID YOU ULTIMATELY COMPLETE A REPORT AND MAKE A FORMAL

13 RECOMMENDATION AS TO PEOPLE YOU THOUGHT OUGHT TO BE CHARGED FOR

14 THEIR INVOLVEMENT IN CONSPIRING TO DISTRIBUTE STEROIDS FOR

15 BALCO?

16 A   YES, FOR THOSE INDIVIDUALS THAT THERE WERE ACTUALLY MONEY

17 LAUNDERING CHARGES ON, WHICH ARE IRS VIOLATIONS THAT WE ARE

18 ABLE TO RECOMMEND.

19 Q   THANK YOU FOR CLARIFYING.  I APOLOGIZE.

20      YOUR AGENCY'S FOCUS IS FINANCIAL INVESTIGATIONS,

21 CORRECT?

22 A   CORRECT.

23 Q   DID YOU PREPARE A REPORT WHERE YOU RECOMMENDED A NUMBER OF

24 MONEY LAUNDERING VIOLATIONS FLOWING FROM THE BALCO

25 INVESTIGATION?

1  **A**   YES.

2  **Q**   AND DID THAT REPORT ENCOMPASS THE STEROID DISTRIBUTION

3  ACTIVITIES UNDERLYING THOSE FINANCIAL CRIMES BY SOME

4  INDIVIDUALS?

5  **A**   YES.

6  **Q**   AND WHO WERE THE INDIVIDUALS WHO ULTIMATELY YOU RECOMMENDED

7  BE CHARGED IN CONNECTION WITH THE ORIGINAL BALCO INVESTIGATION?

8  **A**   VICTOR CONTE, JAMES VALENTE, GREG ANDERSON.  REMY KORCHEMNY

9  WAS ALSO CHARGED IN THE INITIAL ROUND, BUT HE WAS NOT CHARGED

10 WITH MONEY LAUNDERING VIOLATIONS, SO THAT CAME OUTSIDE OF THE

11 IRS RECOMMENDATION.  BUT, NEVERTHELESS, I DID PARTICIPATE IN

12 THAT PORTION OF THE INVESTIGATION BECAUSE IT WAS RELATED, SO

13 RELATED TO THE OTHERS THAT DID FALL WITHIN THE IRS

14 JURISDICTION.

15 **Q**   AND JUST FOR COMPLETENESS AND FOR THE JURY, BRIEFLY, IF YOU

16 COULD PLEASE TELL US WHO REMY KORCHEMNY WAS?

17 **A**   REMY KORCHEMNY WAS A -- OR IS -- WELL, HE WAS AN ELITE

18 TRACK AND FIELD COACH AT OLYMPIC LEVEL, COACHED OLYMPIC TRACK

19 AND FIELD ATHLETES.

20 **Q**   SO THE FOUR INDIVIDUALS YOU MENTIONED WERE CHARGED IN

21 APPROXIMATELY FEBRUARY OF 2004; IS THAT CORRECT?

22 **A**   THAT'S CORRECT.

23 **Q**   DID YOU IN YOUR REPORT RECOMMEND THAT MR. ARNOLD BE CHARGED

24 WITH THOSE FOUR INDIVIDUALS?

25 **A**   NO, I DIDN'T.

1  Q   WHY DIDN'T YOU RECOMMEND HE BE CHARGED IN LATE 2003, EARLY

2  2004?

3  A   I DIDN'T FEEL WE HAD THE NECESSARY EVIDENCE AT THAT POINT

4  TO RECOMMEND ANY TYPE OF CHARGES AGAINST HIM.

5  Q   AFTER THOSE FOUR BALCO DEFENDANTS WERE CHARGED, DID YOU

6  CONTINUE TO CONSIDER MR. ARNOLD A POSSIBLE FIFTH UNCHARGED

7  COCONSPIRATOR IN THE BALCO CASE?

8  A   YES.

9  Q   DID YOU CONTINUE INVESTIGATIVE ACTIVITIES IN CONNECTION

10  WITH THAT THOUGHT PROCESS?

11  A   YES.

12  Q   PLEASE DESCRIBE IN 2004, AFTER THE BALCO INDICTMENT, YOUR

13  INVESTIGATIVE ACTIVITIES IN CONTINUING TO EXAMINE MR. ARNOLD.

14  A   SOME OF THE SAME INVESTIGATION TECHNIQUES THAT I USED ON

15  THE PREVIOUSLY CHARGED INDIVIDUALS WHOM I ANALYZED, FINANCIAL

16  RECORDS, BANK ACCOUNTS.  WE EXAMINED E-MAIL COMMUNICATION.  WE

17  EXAMINED POSTINGS ON PUBLIC INTERNET BOARDS.  WE INTERVIEWED

18  PEOPLE.  WE BROUGHT INDIVIDUALS BEFORE A GRAND JURY.  AND,

19  ULTIMATELY, WE ALSO CONDUCTED SEARCH WARRANTS ON PATRICK

20  ARNOLD'S BUSINESS AND HIS RESIDENCE IN ILLINOIS.

21  Q   AND WHEN APPROXIMATELY DID THOSE SEARCH WARRANTS AT

22  MR. ARNOLD'S BUSINESS AND PLACE OF RESIDENCE OCCUR?

23  A   MY RECOLLECTION IS APPROXIMATELY FALL OF 2005.

24  Q   SO THAT WOULD BE APPROXIMATELY TWO YEARS AFTER THE BALCO

25  SEARCH WARRANTS, CORRECT?

Case3:06-cr-00803-SI  Document145  Filed07/01/08  Page223 of 250

1  **A**   CORRECT.

2  **Q**   NOW, IN THE INTERIM DID YOU CALL UP PATRICK ARNOLD AND ASK

3  HIM IF YOU COULD, YOU KNOW, TAKE A LOOK AT HIS RECORDS OR GO

4  AND CONTACT HIM PERSONALLY?

5  **A**   NO.

6  **Q**   HOW COME YOU DIDN'T TAKE THAT APPROACH?

7  **A**   BECAUSE PATRICK ARNOLD WOULD -- THE BALCO INVESTIGATION

8  BECAME A PUBLIC-TYPE INVESTIGATION.  THERE WAS OBVIOUSLY

9  INDICTMENTS THAT WERE PUBLICLY RELEASED, SEARCH WARRANT

10  AFFIDAVIT WAS PUBLICLY RELEASED.  AND AT THAT POINT IN TIME I

11  THOUGHT THAT HE WOULD BE READY FOR SOMEONE TO COME IN CONTACT

12  WITH HIM.  THE ELEMENT OF SURPRISE WAS LOST.

13         SO WE KIND OF LET THINGS LAY FOR A LITTLE BIT AND

14  TOOK A LOOK AT SOME OTHER INVESTIGATIVE AREAS WHERE, YOU KNOW,

15  HE MAY OR MAY NOT KNOW WE'RE CONTINUING TO TAKE A LOOK AT HIM.

16  **Q**   DURING THAT SEARCH OF PATRICK ARNOLD'S IN 2005, YOU, OF

17  COURSE, OBTAINED A SEARCH WARRANT PRIOR TO THAT SEARCH,

18  CORRECT?

19  **A**   I DIDN'T OBTAIN A WARRANT, ACTUALLY.  A FOOD AND DRUG

20  ADMINISTRATION OFFICE OF CRIMINAL INVESTIGATION AGENT OBTAINED

21  THE WARRANT, BUT IT WAS BASED PRIMARILY ON MY INVESTIGATIVE

22  WORK AND INFORMATION.

23  **Q**   THANK YOU.  I APOLOGIZE.

24         A WARRANT WAS OBTAINED PRIOR TO ENTERING

25  MR. ARNOLD'S RESIDENCE, CORRECT?

1   **A**   CORRECT.

2   **Q**   DID YOU PARTICIPATE IN THAT SEARCH?

3   **A**   I PARTICIPATED IN THE SEARCH OF HIS BUSINESS, NOT HIS

4   RESIDENCE.

5   **Q**   WITH RESPECT TO THE RESIDENCE AT THAT -- EXCUSE ME -- THE

6   BUSINESS, WHERE WAS THAT LOCATED AT THAT TIME, TO YOUR

7   RECOLLECTION?

8   **A**   IN OR AROUND CHAMPAIGN, ILLINOIS.

9   **Q**   WHAT KINDS OF THINGS PERTINENT TO THE INVESTIGATION DID YOU

10  FIND DURING THE SEARCH WARRANT OF MR. ARNOLD'S RESIDENCE?

11  **A**   AGAIN, I DIDN'T SEARCH HIS RESIDENCE.

12  **Q**   I'M SORRY.  THE BUSINESS.  PLEASE GO AHEAD.

13  **A**   IN THE BUSINESS WE FOUND -- COULD YOU REPEAT THE QUESTION?

14  I'M SORRY.

15  **Q**   YES.  I'M SORRY.  LET ME ACTUALLY BACK OFF AND DO A BROADER

16  QUESTION.

17          WERE THINGS -- TELL US ABOUT WHAT KINDS OF THINGS

18  WERE FOUND IN GENERAL FROM THE SEARCH WARRANTS AT MR. ARNOLD'S

19  RESIDENCE AND PLACES AT WHICH HE HAD AN EXPECTATION OF PRIVACY.

20  **A**   E-MAILS WHICH WERE PERTINENT TO THE INVESTIGATION, DRUGS

21  WHICH WERE PERTINENT TO THE INVESTIGATION, LABORATORY RECORDS

22  WHICH WERE PERTINENT TO THE INVESTIGATION.

23  **Q**   DID YOU ATTEMPT AT THE TIME OF THE SEARCH WARRANT TO SPEAK

24  WITH MR. ARNOLD?

25  **A**   I'M NOT SURE WHETHER I ATTEMPTED OR -- BECAUSE I'M NOT SURE

1  WHETHER OR NOT I KNEW HE HAD BEEN REPRESENTED PREVIOUSLY TO

2  THAT.  THERE WASN'T -- EITHER WAY, HE WAS NOT INTERVIEWED

3  DURING THE EXECUTION OF THE WARRANT.

4         MY RECOLLECTION IS I THINK I DID ASK IF HE WOULD

5  SUBMIT TO AN INTERVIEW, AND HE TOLD ME NO.

6  **Q**   LET ME ASK, AFTER THE SEARCH WARRANT AT MR. ARNOLD'S, DID

7  YOU EVALUATE EVIDENCE FROM THAT PROCESS AND ALSO YOUR ONGOING

8  INVESTIGATION AND FOCUS ON OTHER POSSIBLE WITNESSES WHO COULD

9  TESTIFY REGARDING MR. ARNOLD'S ACTIVITY?

10 **A**   YES.

11 **Q**   AND DID SOMEONE IN CONNECTION WITH LOOKING AT MR. ARNOLD

12 COME TO YOUR ATTENTION AS A POSSIBLE WITNESS WITH INFORMATION

13 ABOUT MR. ARNOLD?

14 **A**   YES.

15 **Q**   WHO WAS THAT?

16 **A**   WELL, THERE WERE MULTIPLE PEOPLE.

17 **Q**   AND I DON'T WANT TO NAME ANY ATHLETES, BUT I WOULD LIKE TO

18 ASK IF THERE WAS ANYBODY, JUST LIMITING IT TO PEOPLE WHO HAD

19 KNOWLEDGE OF HIS ACTIVITIES IN DISTRIBUTING DRUGS, IF YOU COULD

20 SUMMARIZE ANY WITNESSES WHO HAD KNOWLEDGE IN THAT REGARD?

21 **A**   AND YOU ARE ASKING ME FROM THE SEARCH WARRANT ITEMS DID WE

22 DETERMINE ANYBODY THERE WAS --

23 **Q**   YES.

24 **A**   I'M NOT SURE RIGHT NOW WHETHER OR NOT SEARCH WARRANT ITEMS

25 LED US ON TO OTHER INDIVIDUALS OR WHETHER IT WAS OTHER AREAS OF

1   INFORMATION OF EVIDENCE LED US TO THESE OTHER INDIVIDUALS.

2   Q    OKAY.  IN ANY EVENT, DID YOU ULTIMATELY RECOMMEND

3   MR. ARNOLD GET CHARGED?

4   A    AGAIN, MR. ARNOLD WAS NOT CHARGED WITH MONEY LAUNDERING

5   VIOLATIONS ULTIMATELY, AND SO IT WASN'T AN OFFICIAL

6   RECOMMENDATION FROM IRS, ALTHOUGH I DID PARTICIPATE IN THE

7   INVESTIGATION.

8   Q    WAS MR. ARNOLD ULTIMATELY CHARGED?

9   A    YES, HE WAS.

10  Q    WHAT WAS HE CHARGED WITH?

11  A    HE WAS CHARGED WITH DISTRIBUTING CONTROLLED SUBSTANCES.

12  Q    AND, SPECIFICALLY, WAS HE CHARGED WITH HAVING ANY

13  RELATIONSHIP TO ANY OTHER CASE YOU HAD BEEN INVESTIGATING PRIOR

14  TO 2005?

15  A    YES, HE WAS.

16  Q    WHAT WAS HE CHARGED WITH?

17  A    HE WAS CHARGED WITH CONSPIRACY TO DISTRIBUTE THESE

18  CONTROLLED SUBSTANCES WITH THE INDIVIDUALS CHARGED IN THE

19  INITIAL BALCO GRAND JURY.

20  Q    UNDER THE TERMS WITH WHICH HE WAS CHARGED, WHAT WAS HE

21  ALLEGED TO HAVE DONE?

22  A    DISTRIBUTED THESE CONTROLLED SUBSTANCES.

23  Q    YES.  BUT, SPECIFICALLY, WHAT WAS HIS RELATIONSHIP TO THE

24  PEOPLE YOU'VE TALKED TO PREVIOUSLY, THE BALCO COCONSPIRATORS?

25  A    HE WAS A COCONSPIRATOR TO THEM.

1  Q    WHAT WAS HIS ROLE IN THE CONSPIRACY WITH VICTOR CONTE AND

2  THE OTHER COCONSPIRATORS?

3  A    HE WAS THE MANUFACTURER OF THE DRUGS THAT WERE DISTRIBUTED.

4  Q    OKAY.  AGENT NOVITZKY, YOU HAVE BEFORE YOU ACTUALLY DEFENSE

5  EXHIBIT D, WHICH IS NOT LABELED ON THAT COPY, I DON'T THINK,

6  BUT IT IS THE PLEA AGREEMENT OF PATRICK ARNOLD; DO YOU SEE

7  THAT?

8  A    YES.

9  Q    AND, FRANKLY, I APOLOGIZE.  I SHOULD KNOW THIS.  I'M NOT

10 SURE IF THIS EXHIBIT IS IN EVIDENCE OR NOT?

11              **THE CLERK:**  I THINK IT IS.  WAIT.

12              **MR. BALOGH:**  I HAVE IT AS IN --

13              **THE CLERK:**  IT IS IN.

14              **MR. NEDROW:**  THANK YOU.  LET'S GO AHEAD AND PUT THIS

15 ON THE SCREEN.

16              (DOCUMENT DISPLAYED.)

17 **BY MR. NEDROW**

18 Q    AGENT NOVITZKY, I WOULD LIKE TO ASK YOU ABOUT EXHIBIT D.

19 DOES PAGE TWO OF EXHIBIT D DESCRIBE MR. ARNOLD'S INVOLVEMENT IN

20 THE BALCO CONSPIRACY TO WHICH HE PLEADED GUILTY AND ADMITTED IN

21 OPEN COURT?

22 A    YES.

23 Q    WERE YOU THERE THAT DAY WHEN MR. ARNOLD PLED GUILTY?

24 A    YES, I WAS.

25 Q    AND YOU ARE FAMILIAR FROM YOUR EXPERIENCE WITH WHAT HAPPENS

1    WHEN A PERSON PLEADS GUILTY?

2    **A**   YES.

3    **Q**   WHAT'S THE CIRCUMSTANCES UNDER WHICH THEIR STATEMENT IS

4    TAKEN IN COURT?

5    **A**   IT'S READ FROM THE GUILTY PLEA.

6    **Q**   YES.  BUT AS FAR AS THE INDIVIDUAL DEFENDANT, ARE YOU

7    FAMILIAR WITH ANY --

8    **A**   YES, I AM.

9    **Q**   GO AHEAD -- WELL, LET ME FINISH THE QUESTION.

10            ANY CONDITIONS OR CIRCUMSTANCES THAT APPLY TO THEIR

11    STATEMENT?

12   **A**   YES.

13   **Q**   AND WHAT'S THAT?

14   **A**   IT'S TAKEN UNDER OATH.

15   **Q**   AND UNDER OATH IN HIS PLEA AGREEMENT, MR. ARNOLD STATED IN

16   THE FIRST FULL SENTENCE UNDER PARAGRAPH TWO THAT:

17          "WHILE WORKING AS AN ORGANIC CHEMIST IN

18           CHAMPAIGN, ILLINOIS, HE KNOWINGLY PARTICIPATED IN A

19           CONSPIRACY TO ILLEGALLY DISTRIBUTE STEROIDS AND OTHER

20           PERFORMANCE-ENHANCING DRUGS TO PROFESSIONAL

21           ATHLETES."

22            IS THAT CORRECT?

23   **A**   CORRECT.

24   **Q**   AND THERE ARE THREE SUBSTANCES IDENTIFIED.  ONE OF THEM,

25   NUMBER ONE IS A SYNTHETIC AND UNDETECTABLE STEROID-LIKE

1  DERIVATIVE, TETRAHYDROGESTRINONE, ALSO KNOWN AS THG OR THE

2  CLEAR; IS THAT CORRECT?

3  **A**  CORRECT.

4  **Q**  AND NUMBER THREE IS A SUBSTANCE CALLED NORBOLETHONE, AN

5  ANABOLIC STEROID; IS THAT CORRECT?

6  **A**  CORRECT.

7  **Q**  THAT'S WHAT MR. ARNOLD SAID HERE UNDER OATH ON THE DAY OF

8  THIS PLEA AGREEMENT?

9  **A**  YES, HE DID.

10 **Q**  JUST BRIEFLY AGAIN FOR THE JURY, THERE'S THIS SECOND

11 SUBSTANCE CALLED DESOXYMETHYLTESTOSTERONE, ALSO KNOWN AS DMT,

12 OR MADOL.  ARE YOU FAMILIAR FROM YOUR INVESTIGATION WHAT THAT

13 SUBSTANCE IS?

14 **A**  YES.

15 **Q**  CAN YOU BRIEFLY JUST SUMMARIZE FOR THE JURY'S INFORMATION,

16 THE COURT'S, WHAT THAT SUBSTANCE IS?

17 **A**  YES, ANOTHER DESIGNER STEROID CREATED BY PATRICK ARNOLD,

18 WHICH IS NOW SPECIFICALLY CATEGORIZED AS AN ANABOLIC STEROID

19 UNDER FEDERAL LAW.

20 **Q**  GOING ON AND BACK TO THE PLEA AGREEMENT, THE NEXT LINE,

21 MR. ARNOLD SAID UNDER OATH:

22      "MY PURPOSE IN DEVELOPING AND DISTRIBUTING THESE

23    DRUGS WAS TO PROVIDE PROFESSIONAL ELITE ATHLETES WITH

24    STEROIDS OR STEROID-LIKE DRUGS WHICH WOULD ENABLE

25    THEM TO ARTIFICIALLY ENHANCE THEIR ATHLETIC

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page230 of 250

1              PERFORMANCE BUT NOT BE DETECTABLE UNDER THE DRUG

2              TESTING PROTOCOLS IN USE BY THE SPORTS IN WHICH

3              ATHLETES PARTICIPATED."

4                   IS THAT CORRECT?

5    A    YES.

6    Q    AND THE NEXT LINE SAYS:

7              "I WIRE TRANSFERRED $10,800 TO CHINA, IN PART FOR

8          THE PURCHASE OF GESTRINONE, A MATERIAL I USED IN THE

9          PROCESS OF MANUFACTURING THG."

10                  IS THAT CORRECT?

11   A    THAT'S CORRECT.

12   Q    AND THE NEXT SENTENCE, IT SAYS:

13             "AT THE TIME I DEVELOPED, MANUFACTURED AND

14         DISTRIBUTED THE NORBOLETHONE, I KNEW NORBOLETHONE WAS

15         A DRUG OR HORMONAL SUBSTANCE CHEMICALLY AND

16         PHARMACOLOGICALLY RELATED TO TESTOSTERONE THAT

17         PROMOTED MUSCLE GROWTH."

18                  IS THAT CORRECT?

19   A    CORRECT.

20   Q    AND I WILL NOT READ THE REMAINDER OF THE FACTUAL BASIS, BUT

21   THERE ARE THREE MORE PARAGRAPHS, GOING ON TO LINE 21, IN WHICH

22   THERE ARE OTHER ADMISSIONS BY MR. ARNOLD UNDER OATH WITH

23   RESPECT TO HIS INVOLVEMENT IN CONSPIRING WITH MR. CONTE TO

24   DISTRIBUTE STEROIDS, CORRECT?

25             **MR. BALOGH:**  OBJECTION.  MISSTATES THE DOCUMENT.

1          **THE COURT:**  SUSTAINED.

2          **MR. NEDROW:**  THANK YOU.  OKAY.  ACTUALLY, I

3   APOLOGIZE.  OH, IT'S IN EVIDENCE.  THANK YOU.  I WASN'T SURE OF

4   THE OBJECTION.  THANK YOU.  LET'S MOVE FORWARD THEN.

5   **BY MR. NEDROW**

6   **Q**   LET ME NOW ASK, AGENT NOVITZKY, BACK TO THE IMPACT OF

7   MS. THOMAS' STATEMENTS IN HER GRAND JURY TESTIMONY ON HER

8   INVESTIGATION --

9   **A**   MM-HMM.

10  **Q**   YOU'VE REVIEWED THAT TRANSCRIPT -- I'M SORRY -- YEAH, LET

11  ME GO BACK TO THAT.

12          YOU REVIEWED THAT TRANSCRIPT AS PART OF YOUR

13  INVESTIGATIVE DUTIES, CORRECT?

14  **A**   CORRECT.

15  **Q**   WERE THERE A COUPLE OF TOPICS IN PARTICULAR THAT WOULD HAVE

16  BEEN BENEFICIAL TO YOU IN THE AUTUMN OF 2003 AS YOU EVALUATED

17  PATRICK ARNOLD'S INVOLVEMENT IN THE CONSPIRACY WITH VICTOR

18  CONTE?

19  **A**   YES.

20  **Q**   AND WHAT WAS ONE THEME OF QUESTIONING -- I'M SORRY.  LET ME

21  START OVER ON THAT QUESTION.

22          WHAT WAS ONE AREA OF INTEREST THAT YOU HAD ABOUT

23  WHICH SHE PROVIDED ANSWERS UNDER OATH IN HER GRAND JURY

24  TESTIMONY?

25  **A**   HOW TAMMY THOMAS TESTED POSITIVE FOR NORBOLETHONE.

1  **Q**   AND DID SHE PROVIDE ANSWERS REGARDING THAT IN THE GRAND

2  JURY TESTIMONY?

3  **A**   YES.

4  **Q**   AND WHAT DID SHE SAY ON THAT TOPIC?

5  **A**   THAT IT COULD HAVE BEEN FROM A BIRTH CONTROL --

6         **MR. BALOGH:**  OBJECTION.  HER TESTIMONY IS NOT IN

7  EVIDENCE.

8         **THE COURT:**  SUSTAINED.

9         **MR. NEDROW:**  OKAY.  I'M SORRY.  MAY I APPROACH

10 BRIEFLY ON A SIDEBAR IF I MAY?  THANK YOU.

11         (SIDEBAR DISCUSSION HELD OUT OF THE HEARING OF THE

12         JURY.)

13         **MR. NEDROW:**  OF COURSE I KNOW IT'S NOT IN EVIDENCE,

14 SO I APOLOGIZE FOR THAT.  BUT GIVEN THE MATERIALITY THEME, I

15 THINK AGENT NOVITZKY OUGHT TO BE ABLE TO TESTIFY AT LEAST

16 THEMATICALLY ON THE IMPACT OF HER DENIALS ON CERTAIN ASPECTS OF

17 HIS INVESTIGATION.  I CAN CERTAINLY STOP HIM FROM PROVIDING

18 DIRECT QUOTES IN THE TESTIMONY, BUT, FOR EXAMPLE, ON ISSUES

19 SUCH AS DENYING NORBOLETHONE, DENYING GETTING ITEMS FROM

20 PATRICK ARNOLD, DENYING GETTING STEROIDS.

21         I THINK HE NEEDS TO BE ABLE TO TALK ABOUT IN GENERAL

22 WHAT SHE SAID AND THEN THE IMPACT ON THE INVESTIGATION, GIVEN

23 THE WAY THE DEFENSE HAS SUGGESTED THERE WAS NO REAL LINK

24 BETWEEN THOSE STATEMENTS AND HIS INVESTIGATION.

25         **MR. BALOGH:**  MAY I BE HEARD, YOUR HONOR?  THE ONLY

1   DECISIONS THAT HAVE BEEN MADE SO FAR WITH RESPECT TO THE

2   GOVERNMENT'S CASE IS THE GOVERNMENT'S DECISION OF WHICH ORDER

3   TO PUT EVIDENCE IN.  THEY HAVE DECIDED TO SAVE THE TRANSCRIPT

4   FOR LAST BECAUSE THEY'VE DECIDED TACTICALLY THAT'S HOW THEY

5   WANT TO PRESENT THEIR CASE.  HAVING MADE THE DECISION, IT

6   DOESN'T GIVE HIM THE RIGHT TO INTRODUCE EVIDENCE THAT'S NOT IN

7   THE RECORD.

8           I THINK THE PROSECUTION'S PROBLEM MAY BE SOLVED BY

9   SAYING, WHEN TAMMY THOMAS WAS CALLED TO THE GRAND JURY, WHAT

10  TYPES OF EVIDENCE DID YOU HOPE TO OBTAIN FROM HER; DID YOU

11  OBTAIN THAT TYPE OF INFORMATION; IF YOU DID NOT RECEIVE IT, HOW

12  DID YOU THEN STRUCTURE YOUR INVESTIGATION?  THAT COULD ADDRESS

13  ALL THE MATERIALITY CONCERNS THAT MR. NEDROW HAS IDENTIFIED,

14  BUT "SHE LIED ABOUT THIS QUESTION" IS AN IMPROPER WAY TO GET AT

15  THAT.

16          IDENTIFYING THE QUESTION SHE WAS ASKED IS NOT A

17  PROPER WAY TO GET THAT.  HE CAN TALK ABOUT THE SUBJECT MATTERS

18  HE DISCUSSED WITH COUNSEL AND WHAT IS HIS BELIEF OF WHAT NEEDED

19  TO BE DONE WHEN HE DIDN'T GET USEFUL INFORMATION FROM IT, BUT I

20  THINK HE NEEDS TO BE QUITE LIMITED ON THIS.  THE ONLY REASON WE

21  ARE IN THIS BOX IS BECAUSE THEY PLACED THEMSELVES THERE.

22          **THE COURT:**  I AGREE WITH THAT.  AND YOU COULD DO

23  WHAT COUNSEL SUGGESTED, THAT WILL WORK.

24          **MR. NEDROW:**  OKAY.

25          **THE COURT:**  ALTERNATIVELY, AT SOME POINT, WE ARE

1  GOING TO READ THE TRANSCRIPT.

2          **MR. NEDROW:**  I'M SORRY?

3          **THE COURT:**  IF YOU WANT TO DO THAT AND COME BACK AND

4  ASK HIM QUESTIONS, YOU CAN DO THAT.  I AGREE YOU CAN'T FEED HIM

5  THE QUESTIONS AND ANSWERS JUST YET.

6          **MR. NEDROW:**  I REALLY DO APPRECIATE THAT.  AND, OF

7  COURSE, WE ARE GETTING CLOSE TO THE END HERE.  PERHAPS WHAT

8  I'LL DO IS FINISH UP IN THESE LAST COUPLE MINUTES WITH

9  UNRELATED TOPICS, AND, EITHER IN THE MANNER YOU SUGGESTED BE

10 MORE GENERALIZED OR OBLIQUE ABOUT IT, OR MAYBE WE WILL DO THE

11 TRANSCRIPT --

12         **MR. BALOGH:**  NO, I DON'T THINK THE COURT SUGGESTED

13 THAT WE ARE GOING TO INTERRUPT MY CROSS-EXAMINATION OF THIS

14 WITNESS TO PERMIT YOU THE OPPORTUNITY TO INTRODUCE THE

15 TRANSCRIPT AND HAVE IT READ TO THE JURY.  IS THAT WHAT THE

16 COURT SUGGESTED?

17         **THE COURT:**  I HADN'T THOUGHT OF THAT.

18         **MR. BALOGH:**  THAT'S WHAT I THINK SHOULD HAPPEN, IS

19 HE SHOULD COMPLETE HIS EXAMINATION OF MR. NOVITZKY, AND AT THE

20 TIME HE'S DONE HE SHOULD TENDER THE WITNESS TO ME, AND I SHOULD

21 EXAMINE HIM.  AND IF SUCH TIME AS AFTER THE TRANSCRIPT IS READ,

22 IF THEY WANT TO MAKE AN OFFER ON THIS BASIS TO RECALL HIM, WE

23 CAN CROSS THAT BRIDGE THEN.

24         RIGHT NOW I THINK THEY'VE SET THE ORDER, AND THERE'S

25 A WAY TO GET THIS MATERIALITY THAT HAS NOTHING TO DO WITH THE

1  TRANSCRIPT.  I'VE GIVEN THAT PATHWAY.  IT'S VERY EASY.  BUT WE

2  SHOULD PROCEED IN THE NORMAL OF COURSE OF TRIAL.  THAT'S MY

3  POSITION.

4         **MR. NEDROW:**  AND I'M FINE WITH THAT, CONTINUING, BUT

5  I GUESS MY ONLY REQUEST WOULD BE I WILL TRY AND MAKE IT LIMITED

6  OR FOCUSED ON WHAT AGENT NOVITZKY KNEW AND, THEREFORE, HOW HE

7  STRUCTURED HIS INVESTIGATION.  BUT I DO THINK GIVEN THE

8  DEFENSE, REALLY I THINK PRETTY CLEARLY OPENING THE DOOR ON

9  MATERIALITY, THAT'S APPROPRIATE.

10        **MR. BALOGH:**  IT IS APPLES AND ORANGES.  I'M NOT

11  SUGGESTING THE SUBJECT MATTER IS OFF LIMITS.  THE SUBJECT

12  MATTER IS ABSOLUTELY IN LIMITS.  THEY JUST CAN'T REFER TO

13  EVIDENCE THAT'S NOT IN THE RECORD.  IT'S NOT IN THE RECORD

14  BECAUSE THEY DIDN'T TAKE THE TIME TO INTRODUCE BEFORE THEY

15  CALLED THE CASE AGENT.  THAT'S NOT MY FAULT.

16        **THE COURT:**  WELL, YOU'VE SAID YOU CAN PROCEED ALONG

17  THOSE LINES.  I SUGGEST YOU DO THAT.

18        **MR. NEDROW:**  I THINK --

19        **THE COURT:**  I THINK YOU CAN PROBABLY GET WHAT YOU

20  NEED.

21        **MR. NEDROW:**  I THINK SO, TOO, YOUR HONOR, AND I'LL

22  START BACK.

23        (END OF SIDEBAR DISCUSSION; PROCEEDINGS RESUMED IN

24        OPEN COURT IN THE HEARING OF THE JURY.)

25

1  **BY MR. NEDROW**

2  **Q**   AGENT NOVITZKY, WITHOUT GETTING INTO DETAILS OF THE

3  TRANSCRIPT OF MS. THOMAS AT THIS POINT, WHAT I WOULD LIKE TO

4  ASK YOU IS:  AS YOU CONTINUED YOUR INVESTIGATION INTO THESE

5  MATTERS AFTER 2003, AND BASED UPON SOME OF THE THINGS WE

6  DISCUSSED TODAY, DID YOU DEVELOP INFORMATION THAT PATRICK

7  ARNOLD WAS, IN FACT, A PART OF THE BALCO CONSPIRACY?

8  **A**   YES.

9  **Q**   AND IF YOU HAD -- IF YOU HAD HAD THE INFORMATION THAT YOU

10 HAVE NOW ABOUT PATRICK ARNOLD, WOULD YOU HAVE RECOMMENDED THAT

11 HE BE INDICTED IN FEBRUARY 2004 WITH THE OTHER BALCO

12 COCONSPIRATORS?

13 **A**   YES.

14 **Q**   AND WITHOUT REFERENCING ANY PARTICULAR ITEMS, JUST LET ME

15 ASK YOU THIS:  WHAT TOPICS OF INFORMATION SPECIFICALLY DID YOU

16 FEEL THAT YOU LACKED, OR, I GUESS, WHAT AREAS OF INFORMATION DO

17 YOU FEEL YOU LACKED LEADING UP TO THE BALCO INDICTMENT THAT

18 WERE UNANSWERED QUESTIONS ABOUT PATRICK ARNOLD THAT PREVENTED

19 YOU FROM RECOMMENDING HE BE INDICTED IN 2004?

20 **A**   KNOWLEDGE OF WHAT THESE SUBSTANCES WERE, HOW THEY WERE

21 DISTRIBUTED, HOW THEY WERE INSTRUCTED TO BE USED, METHODS BY

22 WHICH THESE SUBSTANCES WERE MANUFACTURED, OTHER RECIPIENTS OF

23 THESE SUBSTANCES.

24 **Q**   DID YOU FEEL AT THAT POINT YOU HAD ANSWERED ALL THE

25 QUESTIONS THAT YOU HAD REGARDING A POSSIBLE LINK BETWEEN

1  PATRICK ARNOLD AND VICTOR CONTE?

2          **MR. BALOGH:**  EXCUSE ME.  VAGUE AS TO TIME.

3          **THE COURT:**  SUSTAINED.

4          **MR. NEDROW:**  FAIR.

5  **BY MR. NEDROW**

6  **Q**  DID YOU FEEL -- AT THE TIME OF RECOMMENDING THE BALCO

7  INDICTMENT, DID YOU FEEL YOU HAD ALL THE INFORMATION YOU NEEDED

8  AS TO THE CONTEXT AND NATURE OF ANY RELATIONSHIP BETWEEN

9  PATRICK ARNOLD AND VICTOR CONTE?

10  **A**  NO.

11  **Q**  AND LET ME ASK YOU IN PARTICULAR ABOUT -- AND THIS IS

12  PROBABLY MY LAST THING FOR TODAY -- AN ITEM THAT'S IN EVIDENCE,

13  AND MAY I ASK --

14          **THE CLERK:**  WHAT NUMBER?

15          **MR. NEDROW:**  IT IS EXHIBIT 15.

16          **THE CLERK:**  YEAH.

17          **MR. NEDROW:**  LET ME GET A COPY OF IT.  THIS IS IN

18  EVIDENCE, SO I'LL PUT IT ON THE OVERHEAD.

19          (DOCUMENT DISPLAYED.)

20  **BY MR. NEDROW**

21  **Q**  ARE YOU FAMILIAR --

22          **THE COURT:**  THE EXHIBIT IN EVIDENCE DOESN'T HAVE ALL

23  THAT PINK STUFF ON IT.  YOU CAN SHOW IT, BUT THAT'S YOUR PINK

24  STUFF.

25          **MR. NEDROW:**  YES.  THANK YOU, YOUR HONOR.  YOU'RE

1  RIGHT.  I APOLOGIZE THIS WAS THE FIRST ONE I GRABBED, AND SO I

2  APOLOGIZE FOR THE PINK STUFF.  I GUESS IT DOES GO TO AREAS THE

3  GOVERNMENT MAY WANT TO EMPHASIZE.

4  **BY MR. NEDROW**

5  **Q**   BUT, IN ANY EVENT, AGENT NOVITZKY --

6           (DOCUMENT HANDED TO COUNSEL.)

7           **MR. NEDROW:**  THANK YOU.  THAT'S FINE.  I WILL USE

8  THE NEUTRAL ONE.

9  **BY MR. NEDROW**

10 **Q**   AGENT NOVITZKY, ARE YOU FAMILIAR WITH THIS E-MAIL THAT IS

11 EXHIBIT 15 THAT IS ON THE MONITOR BEFORE YOU?

12 **A**   I THINK WE NEED TO SWITCH THE SWITCH ON THE MONITOR, OR

13 SOMETHING IS NOT ON, NOT ON MINE.

14           **MR. BALOGH:**  I THINK IT'S WITH TRACY.

15           **THE CLERK:**  I'M SORRY.  WHAT ARE WE DOING?

16 PUBLISH --

17           (DOCUMENT DISPLAYED.)

18           **THE WITNESS:**  NOW I SEE.

19 **BY MR. NEDROW**

20 **Q**   REMIND US AGAIN BRIEFLY WHAT THIS E-MAIL -- DID YOU COME

21 ACROSS THIS E-MAIL IN THE CONTEXT OF YOUR INVESTIGATION?

22 **A**   YES.  IT WAS PROVIDED TO ME BY AN FDA COMPUTER INVESTIGATOR

23 SPECIALIST WHO IMAGED HARD DRIVES RELATED TO THE PATRICK ARNOLD

24 SEARCH WARRANTS.

25 **Q**   WHO WAS THAT?

1   **A**   ROB BLENKINSOP.

2   **Q**   ARE YOU AWARE OF HOW MR. BLENKINSOP OBTAINED THIS E-MAIL?

3   **A**   YES, I AM.

4   **Q**   TELL US HOW HE DID THAT.

5   **A**   HE IMAGED A COMPUTER HARD DRIVE AT THE RESIDENCE OF PATRICK

6   ARNOLD, BROUGHT IT BACK INTO HIS OFFICE, AND DID A FORENSIC

7   ANALYSIS OF IT, AND WAS ABLE TO RETRIEVE E-MAILS FROM IT,

8   INCLUDING THIS ONE.

9   **Q**   AND THIS E-MAIL IS WRITTEN FROM A SENDER WHO IS IDENTIFYING

10  HIM OR HERSELF AS ANN FRANK, CORRECT?

11  **A**   CORRECT.

12  **Q**   AND FROM THE CONTEXT OF THE E-MAIL AND YOUR UNDERSTANDING

13  OF ALL THE FACTS IN THIS CASE, DO YOU UNDERSTAND -- WHO DO YOU

14  UNDERSTAND THIS E-MAIL TO BE FROM?

15  **A**   TAMMY THOMAS.

16  **Q**   AND IN PARTICULAR LET ME ASK YOU ABOUT A COUPLE OF ASPECTS

17  OF THIS E-MAIL.  GOING TO THE BOTTOM OF -- THE BOTTOM

18  PORTION -- AND THIS APPEARS TO BE THE FIRST CHRONOLOGICAL PART

19  OF THE E-MAIL, CORRECT?

20  **A**   CORRECT.

21  **Q**   CAN YOU JUST READ THE LAST TWO SENTENCES STARTING WITH THE

22  WORD "THIS"?

23  **A**   "THIS IS REALLY WEIRD SINCE I CAN'T THINK OF ANYONE EXCEPT

24  MAYBE VC OUT IN SAN FRAN.  HAVE YOU HEARD ANYTHING ELSE ON HIS

25  CASE?"

1  Q   IF YOU WOULD HAVE INFORMATION THAT TAMMY THOMAS WAS

2  COMMUNICATING ABOUT PATRICK ARNOLD WITH PATRICK ARNOLD LIKE

3  THIS -- I'M SORRY.  STRIKE THAT.  LET ME START OVER.

4         THIS E-MAIL IS SENT IN 2003, OCTOBER 6TH, 2003,

5  CORRECT?

6  A   CORRECT.

7  Q   SO THAT'S A MONTH BEFORE TAMMY THOMAS APPROXIMATELY

8  TESTIFIED BEFORE THE GRAND JURY?

9  A   EXACTLY ONE MONTH BEFORE.

10 Q   IF YOU KNEW IN 2003 AND IN EARLY 2004 THAT MS. THOMAS HAD

11 THIS KIND OF COMMUNICATION WITH MR. CONTE AND MR. ARNOLD, WOULD

12 THAT HAVE HAD AN IMPACT ON YOUR EVALUATION OF MR. ARNOLD'S

13 RELATIONSHIP WITH HIM?

14         **MR. BALOGH:**  OBJECTION.  FORM.

15         **THE COURT:**  WHAT?

16         **MR. BALOGH:**  IT'S A HYPOTHETICAL.  HE CAN REPHRASE

17 IT ANOTHER WAY TO GET THE INFORMATION, BUT THAT'S NOT THE RIGHT

18 WAY.

19         **THE COURT:**  CAN YOU REPHRASE?

20         **MR. NEDROW:**  YES.  THANK YOU.

21 **BY MR. NEDROW**

22 Q   WOULD KNOWLEDGE OF THIS INFORMATION HAD AN IMPACT ON YOUR

23 EVALUATION OF THE CASE IN 2003?

24         **MR. BALOGH:**  SAME OBJECTION.

25         **THE COURT:**  I'M ACTUALLY GOING TO OVERRULE THE

1   OBJECTION.  I'LL LET YOU ANSWER THAT QUESTION.

2            **THE WITNESS:**  COULD YOU ASK IT ONE MORE TIME?

3   **BY MR. NEDROW**

4   **Q**   WOULD HAVING THIS INFORMATION IN 2003 HAVE AIDED YOU IN

5   YOUR EVALUATION OF THE INVESTIGATION IN 2003?

6   **A**   YES.

7   **Q**   HOW WOULD IT HAVE HELPED YOU?

8   **A**   WHAT THIS SHOWS ME IS THAT TAMMY THOMAS HAD KNOWLEDGE OF A

9   CONNECTION BETWEEN PATRICK ARNOLD AND VICTOR CONTE BECAUSE SHE

10  INQUIRED OF PATRICK ARNOLD WHAT WAS GOING ON WITH VICTOR

11  CONTE'S CASE.

12  **Q**   AND HOW ABOUT AT THE TOP OF THIS E-MAIL, THIS STATEMENT,

13  THE FIRST SENTENCE WHICH SAYS:

14           "I'M JUST NOW GETTING YOUR E-MAIL, BUT I SPOKE

15            WITH THE FEDS BRIEFLY TODAY, AND THEY SAID THEY FOUND

16            A RECORD OF MY NAME AT VC, AND THEY SAID THEY THOUGHT

17            VC AND PA WERE GIVING STEROIDS TO ATHLETES."

18           DO YOU SEE THAT SENTENCE?

19  **A**   YES.

20  **Q**   SAME QUESTION.  WOULD KNOWLEDGE OF THAT HAVE AIDED YOU IN

21  2003 AND 2004 IN EVALUATING THE CASE?

22  **A**   WELL, THAT STATEMENT RIGHT THERE IS JUST HER TALKING ABOUT

23  WHAT THE FEDERAL AGENTS TOLD HER, SO IT'S NOT --

24  **Q**   RIGHT.  BUT EVEN THE USE OF THE INITIALS VC, FOR EXAMPLE?

25  **A**   TRUE.

Case3:06-cr-00803-SI   Document145   Filed07/01/08   Page242 of 250

1          **MR. BALOGH:**  OBJECTION.  ARGUMENTATIVE, LEADING.

2          **MR. NEDROW:**  OKAY.  LET'S MOVE ON TO ANOTHER --

3          **THE COURT:**  SUSTAINED.

4          **MR. NEDROW:**  THANK YOU.  LET'S MOVE ON TO ANOTHER

5     QUESTION, AND I'LL WRAP UP FOR TODAY.  I KNOW WE'RE OUT OF

6     TIME.

7     **BY MR. NEDROW**

8     **Q**   LET ME ASK YOU ABOUT THIS STATEMENT, AND IT'S A STATEMENT

9     TOWARDS THE END OF THE FIRST PARAGRAPH.

10          "HE WAS SUPPOSED TO CLEAN HOUSE AFTER IT WAS ALL

11       OVER WITH, BUT APPARENTLY HE DID NOT."

12          DO YOU SEE THAT SENTENCE?

13    **A**   YES.

14    **Q**   WOULD THAT HAVE AIDED YOU?

15    **A**   YES.

16    **Q**   HOW SO?

17    **A**   WHAT WAS VICTOR CONTE CLEANING HOUSE WITH?  WHAT WAS HE

18    CLEANING HOUSE THAT HAD TO DO WITH TAMMY THOMAS?  WHAT ITEMS

19    WERE BEING CLEANED OR SUPPOSED TO BE CLEANED?

20    **Q**   OKAY.  AND -- OKAY.  I THINK THAT'S FINE.

21          THANK YOU, AGENT NOVITZKY.

22          YOUR HONOR, I KNOW WE'RE OVER TIME, SO I'M HAPPY AT

23    THIS POINT -- THOUGH I SHOULD BE CLEAR I'M NOT QUITE DONE WITH

24    MY DIRECT, BUT I'M ALMOST DONE.

25          **THE COURT:**  ALL RIGHT.  LADIES AND GENTLEMEN, THAT

1  BRINGS US TO THE END OF OUR DAY, AND, SADLY, THAT BRINGS US TO

2  THE END OF OUR WEEK TOGETHER.  WE WILL HAVE OTHER MATTERS GOING

3  ON HERE, BUT NOT THIS TRIAL TOMORROW, SO YOU NEED TO COME BACK

4  MONDAY MORNING AT 8:30.

5          AND THAT MEANS THAT WE'LL BE APART FOR THREE DAYS.

6  PEOPLE ARE GOING TO BE ASKING YOU WHAT YOU'RE DOING, AND YOU

7  MAY NOT TELL THEM.  YOU MAY TELL THEM ONLY THAT YOU ARE ON A

8  JURY TRIAL.

9          DON'T TALK ABOUT THE TRIAL WITH ANYBODY.  DON'T READ

10  ABOUT IT IN THE PAPER.  DON'T LISTEN TO IT.  IT'S SO CRITICAL

11  YOU JUST DECIDE THE CASE BASED ON THE INFORMATION YOU HEAR IN

12  THIS COURTROOM THAT'S PRESENTED FROM THE WITNESS STAND AND

13  NOWHERE ELSE.  SO PLEASE BE VERY CAUTIOUS ABOUT THAT.  HAVE A

14  GREAT WEEKEND.  WE'LL SEE YOU 8:30 MONDAY MORNING.

15          (THE JURY EXITED THE COURTROOM.)

16          **THE COURT:**  SO WHAT'S OUR PLAN FOR THE REST --

17          **MR. BALOGH:**  THE JURY IS COMING BACK AT 8:30, SO WE

18  ARE NOT GOING TO DO THE JURY CONFERENCE THEN?  THEY'RE

19  EXPECTING TESTIMONY, OBVIOUSLY.

20          **THE COURT:**  RIGHT.  THAT WAS ONLY IF WE FINISHED UP

21  TODAY.

22          **MR. BALOGH:**  EXACTLY.  SO I THINK WE JUST BEGIN ON

23  MONDAY ANEW.  I DON'T THINK THERE'S ANYTHING FROM THE DEFENSE

24  WE NEED TO RAISE AT THIS TIME.

25          **THE COURT:**  I DON'T CARE IF THIS IS ON -- LEAVE IT

 1  ON THE RECORD.

 2         TELL ME HOW WE ARE DOING IN TERMS OF TIME.

 3         **MR. NEDROW:**  YES, YOUR HONOR.  WE ARE CERTAINLY VERY

 4  CLOSE ON CONCLUDING THE GOVERNMENT'S DIRECT OF AGENT NOVITZKY,

 5  NO MORE THAN A HALF HOUR, POSSIBLY LESS.  AND THEN THE NEXT

 6  GOVERNMENT WITNESS IS PROBABLY GOING TO BE DR. CATLIN.  AND

 7  THEN THE ONLY OTHER REMAINING ITEM OF BUSINESS WILL BE THE

 8  TRANSCRIPT.

 9         **THE COURT:**  OKAY.  MY CURRENT THOUGHT IS THAT I

10  ACTUALLY WOULD HAVE MY LAW CLERKS READ IT, SO IF THAT WILL WORK

11  FOR YOU.  I HAVE A FEMALE AND A MALE LAW CLERK, AND SO WE'LL

12  HAVE THE FEMALE LAW CLERK PLAY THE DEFENDANT AND THE MAIL LAW

13  CLERK PLAY THE LAWYER AND JUST READ IT.  WILL THAT WORK?

14         **MR. NEDROW:**  YES.

15         **THE COURT:**  ARE THERE ANY PARTS OF IT YOU HAVE

16  STIPULATED TO DELETE OR ALTER?

17         **MR. NEDROW:**  NO.

18         **MR. PARRELLA:**  THE ONLY THING I WOULD SAY IS WE

19  SHOULD DELETE THE NONVERBAL COMMUNICATIONS WHICH YOU ALREADY

20  PASSED ON.

21         **THE COURT:**  RIGHT.  SHE WON'T READ --

22         **MR. PARRELLA:**  OTHER THAN THAT.

23         **THE COURT:**  WE WON'T READ THAT.

24         **MR. BALOGH:**  I'M GOING TO TRY TO CONFER WITH THE

25  GOVERNMENT.  I DO HAVE A FEW SMALL AREAS I'M CONCERNED ABOUT,

1   AND I THINK WE CAN RAISE THEM DISCREETLY WITH THE COURT ON

2   MONDAY MORNING IF THERE'S NO RESOLUTION.

3            **THE COURT:**  ALL RIGHT.  SO YOU WOULD THEN EASILY

4   COMPLETE MONDAY?

5            **MR. PARRELLA:**  YES, WE SHOULD.  WE SHOULD REST BY

6   MONDAY.

7            **MR. NEDROW:**  I'M VERY HOPEFUL OF THAT, YOUR HONOR.

8   LET ME BE MORE SPECIFIC.  DR. CATLIN'S TESTIMONY SHOULDN'T TAKE

9   MORE THAN --

10            **MR. PARRELLA:**  WE SHOULD FINISH MONDAY.  THAT

11   SHOULDN'T BE A PROBLEM.

12            **THE COURT:**  HE'S NOT SAYING ANYTHING.

13            **MR. BALOGH:**  TO BE DETERMINED.  AS YOU'VE SEEN, WHEN

14   I DON'T NEED TO ASK QUESTIONS, I DON'T ASK QUESTIONS.  SO IT

15   WILL BE AS SHORT AS IT HAS TO BE AND AS LONG AS IT NEEDS TO BE.

16   I PROMISE THAT.

17            **THE COURT:**  I'M SO GLAD I ASKED.

18            **MR. BALOGH:**  ONE OTHER THING ABOUT THE TRANSCRIPT,

19   I'M JUST GOING TO VOUCH FOR THE COURT REPORTER, CAN WE MAKE IT

20   AGREEABLE THAT SHE WON'T HAVE TO TYPE THAT PORTION WHEN IT'S 45

21   PAGES BEING READ INTO THE RECORD, WHICH MAY BE DIFFICULT?  IN

22   OTHER TRIALS I HAVE HAD WHEN THE TRANSCRIPT IS BEING READ INTO

23   THE RECORD, IT'S OFTEN -- THE EXHIBIT IS READ AND THE COURT

24   REPORTER DOESN'T HAVE TO RETYPE THE EXACT DUPLICATE.

25            **THE COURT:**  WE'LL JUST MARK IT AS AN EXHIBIT.

1          **MR. BALOGH:**  BUT IT'S NOT GOING TO JURY.

2          **THE COURT:**  RIGHT, RIGHT.  IT WILL SIMPLY BE READ.

3   FRANKLY, IF ANYBODY WANTED TO DO A LITTLE RESEARCH ON THAT, I

4   WOULDN'T MIND.  I'VE DONE SOME PRELIMINARY RESEARCH ON IT WHICH

5   HAS BEEN EQUIVOCAL.  I CAN THINK OF REASONS WHY A TRANSCRIPT IN

6   A FALSE DECLARATIONS CASE MIGHT BE DIFFERENT FROM THE

7   TRANSCRIPT IN OTHER CIRCUMSTANCES.  BUT, AS IT STANDS RIGHT

8   NOW, WE'LL JUST READ IT ALOUD.  SO UNTIL SOMEBODY BRINGS ME

9   SOMETHING DIFFERENT, THAT'S HOW WE'LL DO IT.

10          **MR. BALOGH:**  OUR VIEW TODAY, IT IS AN OPEN QUESTION.

11  IT'S SUBJECT TO THE COURT'S DISCRETION.  AND, BASICALLY, I

12  THINK YOU ARE GOING TO BE ON FIRM GROUND DECIDING EITHER WAY.

13  WE CAN EXPLAIN THE REASONS WHY WE THINK IT SHOULDN'T GO IN IF

14  IT COMES TO THAT.

15          **THE COURT:**  ALL RIGHT.  IF IT COMES TO THAT.

16          AND THEN YOU THINK YOU HAVE LESS THAN A DAY, RIGHT?

17          **MR. BALOGH:**  I THINK I WOULD COMFORTABLY SAY WE

18  ANTICIPATE THE DEFENSE CASE BEING A DAY OR LESS.

19          **THE COURT:**  ALL RIGHT.  MY THINKING THEN IS WE

20  SHOULD DO THE JURY INSTRUCTION CONFERENCE MONDAY AFTER COURT.

21          **MR. BALOGH:**  EXCELLENT.

22          **THE COURT:**  AND THEN YOU CAN PUT YOUR CASE ON ON

23  TUESDAY.  I HAVE A PRETRIAL CONFERENCE IN ANOTHER CASE AT 3:30

24  ON TUESDAY, SO WE CAN ONLY GO UNTIL 3:30.  THEN I WOULD HOPE WE

25  COULD DO CLOSING ARGUMENTS AND INSTRUCTIONS ON WEDNESDAY.

1          **MR. NEDROW:**  GREAT.  THANK YOU VERY MUCH, YOUR

2    HONOR.

3               (PROCEEDINGS ADJOURNED.)

1                          **I N D E X**

2

**PLAINTIFF'S WITNESSES**                         **PAGE**    **VOL.**

3
**BRIAN C. BISHOP**

4
DIRECT EXAMINATION BY MR. PARRELLA               685       4
5  CROSS-EXAMINATION BY MR. BALOGH                 696       4
   REDIRECT EXAMINATION BY MR. PARRELLA            734       4
6

7  **BRIAN OSHINOMI**

8  DIRECT EXAMINATION BY MR. PARRELLA               736       4

9

   **JEREMY PRICE**
10
   DIRECT EXAMINATION BY MR. PARRELLA               746       4
11 CROSS-EXAMINATION BY MR. BALOGH                 763       4
   REDIRECT EXAMINATION BY MR. PARRELLA            776       4
12

13 **SZEMAN ANABELLA LEUNG**

14 DIRECT EXAMINATION BY MR. NEDROW                 778       4

15

   **BORISLAV STARCEVIC**
16
   DIRECT EXAMINATION BY MR. NEDROW                 784       4
17 CROSS-EXAMINATION BY MR. BALOGH                 801       4
   REDIRECT EXAMINATION BY MR. NEDROW              836       4
18

19 **JEFFREY NOVITZKY**

20 DIRECT EXAMINATION BY MR. NEDROW                 837       4

21

22

23

24

25

1                        **I N D E X**

2

3  **PLAINTIFF'S EXHIBITS**              **IDEN**   **VOL.**   **EVID**   **VOL.**

4  12 (PORTIONS)                                          692       4

5     PAGES 7-11                                          759       4

6     PAGES 12-20                                         798       4

7

8  10 (PORTIONS)                                          696       4

9     PAGE 7                                              751       4

10    PAGES 8-11                                          752       4

11    PAGES 14-20                                         792       4

12

13 11 PAGE 12                                             723       4

14    PAGE 31                                             724       4

15

16

17

18

19

20

21

22

23

24

25

1

2                           **CERTIFICATE OF REPORTER**

3

4           I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING PROCEEDINGS IN CR 06-803 SI, UNITED

7    STATES OF AMERICA V. TAMMY THOMAS, WERE REPORTED BY ME, A

8    CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED

9    UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A

10   FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY

11   ME AT THE TIME OF FILING.

12            THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

13   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

14   COURT FILE.

15

16                         /S/ JOAN MARIE COLUMBINI

17                   JOAN MARIE COLUMBINI, CSR 5435, RPR

18                        FRIDAY, JUNE 27, 2008

19

20

21

22

23

24

25